**FILED**

**FEB - 5 2008**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Fredrick M. Gamble (Plaintiff)
MAJOR, U.S. Army, (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)
Regional Confinement Facility
1490 Randolph Road
Fort Sill, OK 73503

Case: 1:08-cv-00207
Assigned To : Huvelle, Ellen S.
Assign. Date : 2/5/2008
Description: FOIA/Privacy Act

v.

Department of the Army and agencies within it's military departments as follow:

Department of the Army
ATTN: U.S. Army Legal Services Agency
901 North Stuart Street
Arlington, VA 22203-1837;

Alaska Department of Military and Veterans Affairs
ATTN: The Alaska Army National Guard
P.O. Box 5800 Camp Denali
Fort Richardson, AK 99505-5800;

Alaska Department of Military and Veterans Affairs
ATTN: The Alaska National Guard Youth Corps
P.O. Box 5800 Camp Denali
Fort Richardson, AK 99505-5800

## COMPLAINT

### FACTS

   The plaintiff is a member of the Alaska National Guard (AK ARNG) currently

on Title 10 status.  On January 11, 2007, the plaintiff was sentenced to forfeiture

of all pay and allowances, two years incarceration, and dismissal from the U.S.

Army on the following charges: Multiple counts of Adultery, Multiple counts of

violating General Order Number 1, Fraternization, Indecent Assault, Indecent

Language, Conduct Unbecoming of an Officer and a Gentleman, and

Maltreatment of  Subordinate.  This sentence was imposed on the plaintiff during

**RECEIVED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

a General Court-Martial held in Bagram Airfield (BAF) Afghanistan, presided over by a Military Judge (M.J.) and a court-member panel made up of field grade officers in the 10th Mountain Division, which found the Plaintiff guilty of six out of six charges, and seven out of nine specifications.

The Alaska Army National Guard (AK ARNG) unit that was deployed to Kandahar Airfield (KAF) from Fort Richardson, Alaska, was composed of a group which includes Soldiers, both full-time and part-time AK ARNG members and other National Guard members from other States, and/or Territories. The AK ARNG members have served in most cases together for years in Alaska,. They see each other on a frequent basis within their community and on duty and compete with each other for promotion and career advancement on a more static basis than an active Army unit competes because they are not subject to the same frequency of reassignment as the active Army members. Consequently, Alaska Guard members who were deployed to KAF expected to return to Alaska at the conclusion of the deployment and work under the same chain of command for many years into the future.

At the time of the majority of the alleged offenses, the plaintiff served as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in his case were also assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R. Steven Williams commanded the NCE as the NSE is a subordinate command in his Brigade (BDE). CSM Pamela Harrington serves as the Command Sergeant Major for the NSE. 1SG Robert Braun serves as the First

2

Sergeant for the NCE. Each named individual served in the same capacity at all times relevant to this lawsuit.

The plaintiff transferred to the AK ARNG from the Texas Army National Guard (TX ARNG) in 1992. The plaintiff then served part-time in the AK ARNG until 1997 when he was hired full-time by the AK ARNG. In 1994, the plaintiff began working with the Alaska National Guard Youth Corps Challenge Program (a program that falls underneath the command of the AK ARNG, and is now called The Alaska National Guard Youth Corps) as a Team Leader. The plaintiff was wrongfully fired based off the improper preferral of charges, and the improper legal standard used against him in an investigation. However, the plaintiff filed an EEO complaint due to this improper preferral of charges and improper legal standard, which resulted in an EEO Investigation into the matter. At the conclusion of this EEO Investigation, the plaintiff was reinstated to his former position, and granted all back pay commensurate to the time he would have received if he wasn't wrongfully fired, and given a letter of apology by the then Alaska National Guard Youth Corps Challenge Program Director (COL Fleming). The AK ARNG Chief of Staff informed the plaintiff that "the file would be destroyed by the AK ARNG and as a result the The Alaska National Guard Youth Corps if no more incidents occurred over a one year period" or words to that effect. Finally, the plaintiff then quit the The Alaska National Guard Youth Corps in 1994 after being offered another job with the State of Alaska.

Since that incident the AK ARNG and The Alaska National Guard Youth Corps have maintained a secret file on the plaintiff that was suppose to be

3

destroyed. Furthermore, these agencies since 1994 have acted on a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, and this conduct amounted to a "reckless disregard" of the plaintiff's rights. Louis v. VA, No C95-5606, slip op. at 4-5 (W.D. Wash. Oct. 31, 1996). This negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974, displayed conduct that directly resulted in inaccurate, non-relevant, and untimely information being given to people without a need to know, who in turn maliciously used the information from an incomplete secret file to spread rumors to the public (defined to include "not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system.") in order to adversely effect the plaintiff.

In an attempt to suppress these, intentional and willful acts by the agencies the plaintiff was forced to higher a civilian lawyer who submitted a Motion to Suppress these inaccurate, non-relevant, and untimely information in court in NOV 2006. However, although the Motion was upheld by the M.J. the intentional and willful act by the agencies still resulted in the releasing of personal information maintained by these agencies that contained specific details and direct quotes from an inaccurate, non-relevant, untimely, and non-complete secret file, that as a direct result of the violations of Privacy caused the plaintiff severe damage to his military and civilian career prospects, in addition to, his family and him having to suffer through severe mental distress, embarrassment, and humiliation, both personally and professionally. Furthermore, these acts by

4

the defendant have caused the following damages to the plaintiff: Name; Material and moral; Lost revenue; General; Punitive; and Real.

The following factual account is drawn largely from the "factual Background" portion of the plaintiff's Grostefon Matters to the Court of Appeals for the Armed Forces (C.A.A.F.), which in turn is drawn from the allegations he offered to other elements of the U.C.M.J. authorities as an attempt to mitigate the damages caused by the defendants:

Prior to the trial the plaintiff had sought relief from the U.S. Army with a Letter of Resignation filed in November 2006, but his resignation was denied upon the results of his trial. However, on the eve of trial, the Department of Army, through the Army Review Board Agency, expressed interest in delaying the trial in order to potentially accept the Plaintiffs resignation. Although the M.J. rejected the request for a delay, this would have saved the Government the expense of the trial and resulted in no conviction or jail time for the plaintiff.

On 29 December 2006, the plaintiff filed two motions to dismiss, with prejudice, all charges and specifications to his case due to the following: 1) The appearance of Privacy Act of 1974, as well as actual Privacy Act of 1974. This motion was raised pursuant to RCM 907(a); 2) Violation of Article 13, U.C.M.J., or, in the alternative, in the event of conviction, grant credit to the accused against the adjudged sentence. This motion was raised pursuant to R.C.M. 906(a) and 907(a). However, in January 2007, the military judge denied both motions prior to the trial by General Court-Martial. Now based on the sentencing of more than one year the whole trial and the motions are under appeal.

Charges were preferred in this case on 19 AUG 2006 by MAJ Michael Sullivan. The charges were referred to trial by general court-martial by MG Freakley on 13 November 2006. The plaintiff was reassigned to Bagram Airfield (BAF), Afghanistan, before charges were preferred in his case. He returned to KAF, for approximately one week, to attend the article 32 hearing, but otherwise remained at BAF, awaiting trial for a period of roughly five months.

On 7 May 2007, the plaintiff through his Military Defense Trial Lawyer submitted his request for clemency in the matter of U.S. v. MAJ Gamble to the Commander, Combined/Joint Task Force (CJTF)-82, Bagram Airfield, Afghanistan, APO AE 09354.

On 9 May 2007, Headquarters, Combined/Joint Task Force (CTJF)-82, (Formerly CJTF-76) Bagram Airfield, Afghanistan APO AE 09354, responded with General Court-Martial Order Number 5.

On 15 May 2007, the plaintiff submitted his packet for clemency through the Fort Sill, Regional Correctional Facility (Ft. Sill RCF), in an attempt to obtain clemency through MG Ralston, Commanding General of Fort Sill.

On 8 June 2007, MG Ralston responded with an answer on the plaintiff's clemency request granting the plaintiff's spouse a waiver on pay for six months, but still refused to grant the appropriate relief based on Combined/Joint Task Force (CJTF)-82s 1105 review to the plaintiff.

On 18 July 2007, the plaintiff submitted his packet for clemency and parole through the Ft. Sill RCF to the Army Clemency and Parole Board in Alexandria Virginia.

6

On 26 July 2007, the plaintiff was summoned in front of the Ft. Sill RCF Clemency and Parole Board for their recommendation to be sent to the Army Clemency and Parole Board in Alexandra Virginia.

On 16 August 2007, plaintiff through his Appellate Defense Counsel served a Brief on Behalf of Plaintiff Docket Number Army 20070029 to the ACCA. The plaintiff's Appellate Defense Counsel, and Branch Chief, Defense Appellate Division "carefully examine the record of trial in this case, do not admit that the finding and sentence are correct in law and fact, and submit the case upon its merit." The Brief on Behalf of Plaintiff was done pursuant to U.S. v. Grostefon, 12 M.J. 431 (C.M.A. 1982), plaintiff requested that Honorable Court to consider the information provided by plaintiff to that Court with its attached Appendixes.

On 16 September 2007, the Army Clemency and Parole Board denied the plaintiff's request for parole and clemency. The denial memorandum states that the Clemency and Parole Board arrived "at its parole determination, the Board considered all aspects of your case. The Board noted that you have attended treatment and you have assisted other inmates. However, the Board also noted that you have poor parole plan, you do not accept responsibility for your offenses, and you abused your position of trust in committing your offenses. The Board felt that you have not served the punitive, rehabilitative and deterrent aspects of your sentence to confinement for your multiple serious offenses.

On 27 September 2007 the plaintiff through his Appellate Defense served Tab C from the Plaintiff's Brief on Behalf of Plaintiff Docket Number Army 20070029 to the ACCA as a separate Habeas Corpus Writ of Extra Ordinary Relief. This

was done in order to dismiss all charges and specifications and seek relief from damages caused by an Improper Legal Standard. Furthermore, the plaintiff's Defense Counsel informed him that the Chief Justice of ACCA had requested for the plaintiff to submit the remaining eight Writs stated in his first Writ.

On October 18, 2007 the ACCA failed to take any "purging action" in the plaintiff's case with the denial of the plaintiff's Brief on Behalf of Plaintiff Docket Number Army 20070029 submitted pursuant to U.S. v. Grostefon. ACCA stated Per Curium: On consideration of the entire record, including consideration of the issues personally specified by the plaintiff, we hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, those findings of guilty and the sentence are AFFIRMED.

On October 25, 2007, the U.S. Army Legal Services Agency Government Appellate Division petitioned the ACCA in opposition to the extraordinary relief in the nature of the plaintiffs Writ of Habeas Corpus. The Government respondents requested that the ACCA deny the plaintiff's writ based on the following: That the plaintiff's claims questioning legal rulings by the military judge are not appropriate for an extraordinary writ, and should be left for review under Article 66, UCMJ; and the Court does not have the authority to award civil damages.

On November 9, 2007, the Acting Deputy Assistant Secretary of the Army denied the plaintiffs Parole Appeal request. Mr. Wilson A. Shatzer stated that "after reviewing your (the plaintiffs) file and the matters you submitted, I concur with the Board's decision. The seriousness of your multiple offenses requires continued confinement to fulfill the punitive, deterrent and rehabilitative aspects

of the court's sentence. I have taken note of your (the plaintiffs) good overall confinement record and your (the plaintiffs) documented parole plan. However, parole is premature for your multiple serious offenses including maltreatment of and sexual offenses upon subordinate female soldiers in a deployed environment." The plaintiff disagrees with Mr. Shatzer's statements here as the court sentenced him to only one count of Maltreatment (Charge II Specification 1 IAW Article 93), not multiple counts, and moreover the plaintiff plead not guilty to that charge. Additionally, the language in the plaintiff's record tends to mislead administrative personnel who review it based on the verbiage that he actually pleads guilty to and that he was actually convicted of. These constant inconsistencies in his record have as the record and the facts show produced prejudice for the plaintiff not only in all judicial but in all administrative due processes of law in reference to his case, and a request for an appeal review has been forwarded to the Court of Appeals for the Armed Forces (C.A.A.F.).

On November 12, 2007, COL Richard C. Longo Acting Commander denied the plaintiffs second Clemency Request to the Ft. Sill convening authority. However, no actions for the denial were given for the plaintiff to cite here for this honorable court.

On November 15, 2007, the plaintiff's attorney informed him that the ACCA denied his petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus dated November 13, 2007.

## LAW

The plaintiff relies on the following authorities in support of his Lawsuit:

Freedom of Information Act, U.S. Code, 552, (1966)

Federal Torts Claims Act

U.S. v. Plumb, 47 M.J. 771 1997

U.S. v. Gore, 60 M.J. 178 (2004)

U.S. v. Simpson, 58 M.J. 368 (2003)

U.S. v. Stoneman, 57 M.J. 35 (2002)

U.S. v. Biagaise, 50 M.J. 143 (1999)

U.S. v. Ayala, 43 M.J. 296 (1995)

U.S. v. Gleason, 43 M.J. 69, 73 (C.M.A. 1994)

U.S. v. Stombaugh, 40 M.J. 211 (C.M.A. 1994)

U.S. v. Levite, 25 M.J. 334, 338 – 339 (C.M.A. 1987)

U.S. v. Rosser, 6 M.J. 267 (C.M.A. 1979)

U.S. v. Francis, 54 M.J. 636 (Army Ct. Crim. App. 2000)

U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994)

U.S. v. Cruz, 20 M.J. 873 (A.C.M.R. 1985)

U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990)

U.S. v. Smith, 53 M.J. 168 (2000)

U.S. v. Palmiter, 20 M.J. 90 (C.M.A. 1985)

U.S. v. Washington, 42 M.J. 547, 562 (A.F. Ct. Crim. App. 1995)

U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994)

U.S. v. Shepherd, (C.C.A. LEXIS 189, 2002)

U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986)

Clarke v. Breckenridge, (C.M.R. LEXIS 10, 1991)

MacLean v. U.S., (C.C.A. LEXIS 290, 2003)

Bousley v. U.S., 118 S. Ct. 1604, 1610 (1998)

Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963)

Rogers v. Richmond, 365 U.S. 534, 547 (1961)

Beck v. Ohio, Supra, 379 U.S. at (1992 – 1993)

Ashcraft v. Tennessee, 322 U.S. 143, 145 (1944)

U.S. v. LTC Joseph E. Wilson Jr., (C.C.A. LEXIS 165, 2006)

MacLean v. U.S., (C.C.A. LEXIS 290, 2003)

U.S. v. Harvey, 60 M.J. 611 (C.C.A. LEXIS 159, 2004)

U.S. v. Flynn, (1998)

Cummings v. Dep't Navy, 279 F. 3d 1051, 1053-58 (D.C. Cir. 2002)

Feres v. U.S., 340 U.S. 135, 146 (1950)

U.S. v. Brown, (1954)

Article 66, U.C.M.J.

Article 37(a), U.C.M.J.

R.C.M. 1105

R.C.M. 1106(f)(1)

Waller v. Swift, 30 M.J. 139 (C.M.A. 1990)

McCray v. Grande, 38 M.J. 657 (A.C.M.R. 1993)

Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R. 1992)

Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986)

U.S. v. Aurich, 31 M.J. 95 (C.M.A. 1990)

U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990)

U.S. v. Ohrt, 28 M.J. 301 (C.M.A. 1989)

U.S. v. Sullivan, 26 M.J. 442, 443 (C.M.A. 1988)

U.S. v. Bradley, 47 M.J. 715 (A.F. Ct. Crim. App 1997)

U.S. v. Johnson, 14 U.S. C.M.A. 548, 34 C.M.R. 328, 331

(C.M.A.1964)

U.S. v. Kitchens, 12 U.S.C.M.A. 589, 31 C.M.R. 175, 180

(C.M.A. 1961)

U.S. v. Marnaluy, 10 U.S.C.M.A. 102, 27 C.M.R. 176, 181

(C.M.A. 1959)

U.S. v. Dickey, 41 M.J. 637 (N.M.Ct.Crim.App. 1994)

U.S. v. Newbold, 45 M.J. 109 (1996)

U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986)

U.S. v. Dugan, 58 M.J. 253 (2003)

U.S. v. Baldwin, 54 M.J. 308 (2001)

U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990)

U.S. v. Agurs, 427 U.S. 97 (1976)

Brady v.Maryland, 373 U.S. 83 (1963)

U.S. v. Trimper, 26 M.J. 534 (A.F.C.M.R. 1988)

U.S. v. Hart, 27 M.J. 839 (A.C.M.R. 1989)

Kastigar v. U.S., 406 U.S. 441 (1972

New Jersey v. Portash, 440 U.S. 450 (1979)

U.S. v. Garrett, 24 M.J. 413 (C.M.A. 1987)

R.C.M. 705(b)

U.S. v. Olivero, 39 M.J. 246 (C.M.A. 1994)

U.S. v. Jameson, 33 M.J. 669 (N.M.C.M.R. 1991)

U.S. v. Hall, 36 M.J. 1043 (N.M.C.M.R. 1993)

U.S. v. Drayton, 45 M.J. 180 (1996)

U.S. v. Jones, 33 M.J. 1040 (N.M.C.M.R. 1990)

U.S. v. Clemons, 35 M.J. 767 (A.C.M.R. 1992)

U.S. v. Edmond, 63 M.J. 256, 2006 CAAF Lexis 518

U.S. v. Singleton, 41 M.J. 200 (C.M.A. 1994)

U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990)

U.S. v. Horner, 22 M.J. 294 (C.M.A. 1986)

U.S. v. Peele, 46 M.J. 866 (CAAF 1997)

U.S. v. Moss, 63 M.J. 233, 2006 CAAF

Louis v. VA, No C95-5606, slip op. at 4-5 (W.D. Wash. Oct. 31, 1996)

Bois v. Marsh, 801 F. 2d 462 (D.C. Cir. 1986)

U.S. v. Johnson, 481 U.S. 681, 699 (1987)

Mount v. U.S. Postal Service, 79 F. 3d 531 (6th Cir. 1996)

Henson v. NASA, 14 F. 3d 1143, 1146 (6th Cir. 1994)

## Witnesses/evidence

Plaintiff requests the witnesses on the Defense Witness List (Amended) dated

28 December 2006, any witnesses identified in the Appellant's Brief on Behalf of

Behalf of Appellant Docket Number Army 20070029, and any personnel who have submitted character letters, memorandums in this motion, and BG Thomas Katkus from the Alaska Army National Guard be produced and present for oral argument at the call of the Court. (Attachment 1) In addition, the Appellant requests the following evidence produced:

- U.S. vs. Gamble Defense Motion to Dismiss All Charges and Specifications (Unlawful Command Influence), 29 December 2006 (Attch 2)

- U.S. vs. Gamble Defense Motion to Dismiss All Charges and Specifications (Article 13, U.C.M.J.), 29 December 2006 (Attch 3)

- General Court-Martial Order Number 5 dated 9 May 2007 (Attch 4)

- AR 15 – 6 Investigation email from MAJ Barr to 1SG Braun (Attch 5)

- KTTU Channel 2 Alaska News Bulletin (Attch 6)

- Ft. Sill MGI Policy (Attch 7)

- 1SG Braun's Sexual Harassment Note (Attch 8)

- CJTF-76 Command Policy Memorandum (Attch 9)

- Flagging Action dated 31 JUL 06 (Attch 10)

- COL Williams note to the AR 15 – 6 Investigating Officer (Attch 11)

- Military No-Contact Order (Attch 12) – This piece of evidence shows how the plaintiff was not allowed to talk to anyone about the investigation despite the written comments of the AR 15 – 6 Investigating Officer

- Plaintiff's Resignation for the Good of the Service (Attch 13) – This piece of evidence shows how the plaintiff attempted to resign in lieu of general court-martial, in order to pursue other job opportunities, but was denied

14

- Multiple pay documents (Attch 14) – These pieces of evidence show how the plaintiff was granted pay, however, the defendant committed errors in the plaintiff's pay that caused various types of damages, despite the plaintiff and his family attempting to resolve these problems

- VMI Publishing Agreement, 29 DEC 2006 (Attch 15) – These pieces of evidence shows some of the lifetime earning potential of the Plaintiff as far as awarding the Plaintiff the relief he seeks against the defendants.

- Book Review by the Critic (Attch 16), This piece of evidence shows some of the lifetime earning potential of the Plaintiff as far as awarding the Plaintiff the relief he seeks against the defendants.

### BURDEN OF PROOF AND STANDARD OF PROOF

In order to bring a damages action under subsection (g)(1)(C), the plaintiff has the burden of proving that (1) a defective record (2) proximately caused (3) an adverse determination concerning him. Furthermore, in order to obtain relief under the Privacy Act the plaintiff must establish that (1) the agency violated a provision of the Act; (2) the violation of the Act was "intentional or willful," and (3) this action had an adverse effect on the plaintiff and that if these three factors are satisfied, the plaintiff is entitled to the greater of $1,000 or the actual damages sustained. Proof of actual damages is required in order to recover either the statutory minimum or damages beyond the minimum, then actual damages sustained by the plaintiff are recoverable, but in no case shall a person who is entitled to recovery receive less than the sum of $1,000 in accordance with 5 U.S.C. 552a(g)(4)(A).

## ARGUMENT

An individual may sue an agency if the agency fails to maintain records with accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any agency determination and the agency makes a determination that is adverse to the individual. An individual may also sue an agency if the agency fails to comply with any other Privacy Act provision in a manner that has an adverse effect on the individual.

An individual may file a lawsuit against any agency in the Federal District Court in which the individual lives, in which the records are situated, or in the District of Columbia. A lawsuit must be filed within two years from the date on which the basis for the lawsuit arose.

Most individuals require the assistance of an attorney to file a lawsuit. An individual who files a lawsuit and substantially prevails may be awarded reasonable attorney fees and litigation costs reasonably incurred. Some requesters may be able to handle their own case without an attorney.

The Privacy Act of 1974 provides safeguards against an invasion of privacy through the misuse of records by Federal agencies. In general, the act allows a citizen to learn how records are collected, maintained, used, and disseminated by the Federal Government. The act also permits an individual to gain access to most personal information maintained by Federal agencies and to seek amendment of any inaccurate, incomplete, untimely, or irrelevant information.

The Privacy Act applies to personal information maintained by agencies in the executive branch of the Federal Government. The executive branch includes cabinet departments, military departments, government corporations, government controlled corporations, independent regulatory agencies, and other establishments in the executive branch. Agencies subject to the Freedom of Information Act are also subject to the Privacy Act. The Privacy Act does not generally apply to records maintained by State and local governments or private companies or organizations.

In general, the only records subject to the Privacy Act are records that are maintained in a system of records. The idea of a "system of records" is unique to the Privacy Act and requires explanation.

The act defines a "record" to include most personal information maintained by an agency about an individual. A record contains individually identifiable information, including but not limited to information about education, financial transactions, medical history, criminal history, or employment history. A "system of records" is a group of records from which information is actually retrieved by name, Social Security number, or other identifying symbol assigned to an individual.

Some personal information is not kept in a system of records. This information is not subject to the provisions of the Privacy Act, although access may be requested under the FOIA. Most personal information in government files is subject to the Privacy Act.

17

The Privacy Act also establishes general records management requirements for Federal agencies. In summary, there are five basic requirements that are most relevant to individuals.

First, each agency must establish procedures allowing individuals to see and copy records about themselves. An individual may also seek to amend any information that is not accurate, relevant, timely, or complete. The rights to inspect and to correct records are the most important provisions of the Privacy Act. The plaintiff submits that the AK ARNG provides a procedure that allows individuals to see and copy records about themselves, however, this procedure consists of unit Records Reviews, or individually scheduled record reviews that are done usually for promotion or deployment. In fact the plaintiff had recently conducted a records review for promotion and deployment in circa May 2006, and was not aware or informed that the government was in the possession of a secret file that he needed to amend that contained information that was not accurate, relevant, timely, or complete. Therefore, the plaintiff asserts that his right to inspect and to correct records maintained by the defendant was denied.

Second, each agency must publish notices describing all systems of records. The notices include a complete description of personal data recordkeeping policies, practices, and systems. This requirement prevents the maintenance of secret record systems. The plaintiff asserts that the defendants failed to publish notices describing all systems of records that included a complete description of personal data recordkeeping policies, practices, and systems. Even in the plaintiffs dealing with the AK ARNG Human Resources Office, the agency

18

maintained a separate system of records in its agencies, thus, maintaining a secret record system and file on the plaintiff. The plaintiff was told by his Military Chain of Command that the file would be destroyed after one year, and the information contained in that secret file was never presented by the defendants in order for the plaintiff to review his complete record in accordance with personal data recordkeeping policies, practices, and systems.

Third, each agency must make reasonable efforts to maintain accurate, relevant, timely, and complete records about individuals. Agencies are prohibited from maintaining information about how individuals exercise rights guaranteed by the first amendment to the U.S. Constitution unless maintenance of the information is specifically authorized by statue or by the individual or relates to an authorized law enforcement activity. The plaintiff asserts the following: That a secret file maintained by the defendants kept on the plaintiff was inaccurate based on it not containing all of the facts in that investigation; Not relevant to the legal case at KAF in which the file was given, because just as the plaintiff proved in his Motion to Suppress trial, the incidents have no direct connections with each other, therefore, the information does not relate to an authorized law enforcement activity. In fact the Criminal Investigation Division (CID) the only authorized law enforcement element at KAF either never investigated the plaintiff's case, (albeit rumors spread that they did indeed do an investigation but the investigation was inconclusive) or the investigation was withheld from disclosure by the defendants during the plaintiff's trial, since no such investigation was ever provided. Regardless, the only authorized law enforcement element never requested the

plaintiff's file from 12 years prior to this event, because it simply wasn't relevant to the case in which they would have investigated. Furthermore, the plaintiff's first amendment right was violated because the maintenance of this information was not specifically authorized to be given to COL Williams in order to provide to LTC Thomas based on any statue, or by the plaintiff. The plaintiff was told by COL Williams that "he had heard the plaintiff did similar things like this in the past, and that The Alaska National Guard Youth Corps was providing a file to the AK ARNG to send to COL Williams to be used against the plaintiff in the Army Regulation (AR) 15 – 6 Investigation he was having LTC Thomas conduct" or words to that effect. Therefore, the plaintiff asserts that rumors and hearsay does not rise to the level of relevance; Not timely based on the defendants leaking inaccurate information over several years to personnel without a reason to know. The Privacy Act law pursuant to 10 U.S.C. 3013 and Army Regulation 15 – 6, when they request information during a AR 15 – 6 investigation the law states that this information will be used to evaluate the facts and circumstances currently under investigation. Your (the witness) response is not mandatory. However, your (the witness) failure to respond will require that we (the government) evaluate this matter without the benefit of your (the witnesses) input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this

information and such action may be filed in your official personnel files. The timing of the use of this information was used intentionally and willfully by Department of Defense employees, not acting within their official capacity, who did not have a need to know this information, and who should not have, but did somehow have access to this information, in order to make a determination to adversely impact the plaintiff's character, rights, and/or opportunities to a fair investigation and trial; A complete record about the plaintiff was not maintained by the defendants in their secret file as the file was lacking the EEO investigation that reinstated the plaintiff. Further, based on no administrative, judicial, or rehabilitative requirements from the results of that EEO investigation the plaintiff points out for this Honorable court that being cleared from all of the allegations in that file directly lead to the following in the AK ARNG: The plaintiff's three promotions below the zone (ahead of his peers); Positions of greater responsibility within the AK ARNG including being directly in charge of 1/3 of the State full-time, and one of nineteen National Guard Members from 54 States and Territories selected to attend the full-time Intermediate Level Education (Command and General Staff Officer Course) at Fort Leavenworth KS; and highered full-time without ever receiving a negative counseling statement or a negative Officer Evaluation Report (OER). Therefore, the accuracy, relevance, timely disclosure over the last several years from an incomplete record about the plaintiff was intentional and willful based on the defendant disclosing a record which it contained in a system of records with either means of communication to persons without written request by, or with the prior written consent of, the

plaintiff in which the record pertain to, for the sole purpose of adversely impacting the plaintiff.

Fourth, the act establishes rules governing the use and disclosure of personal information. The act specifies that information collected for one purpose may not be used for another purpose without notice to or the consent of the subject of the record. The act also requires that each agency keep a record of some disclosures of personal information. As stated above the information collected for one purpose was intentionally and willfully used for another adverse purpose without the notice to or the consent of the plaintiff. In fact the defendant used this information in the plaintiff's case at KAF without the plaintiff even knowing such comments were made until he received a copy of his AR 15 – 6 investigation, at which point was to late for the plaintiff to refute these false allegations, due to the plaintiff being denied the right to gather witnesses in his defense, in order to prevent the malice disclosure of personal information by the defendant to the entire witness pool, and the fact-finder.

Fifth, the act provides legal remedies that permit an individual to seek enforcement of the rights granted under the act. In addition, Federal employees who fail to comply with the act's provisions may be subjected to criminal penalties. The plaintiff is seeking those legal remedies as he is requesting that this Honorable court enforce the rights granted to him under the Privacy Act of 1974 by providing legal remedies for damages caused by the negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974 by the defendant.

## A Defective Record Proximately Caused an Adverse Determination

The plaintiff clearly has stated that a secret and defective record was maintained by the defendant. In the plaintiff's military record of trial and allied paper work, this file was sent to KAF in an attempt to utilize the information in it against the plaintiff. Once this file arrived to KAF, the defendant upon request of the plaintiff provided a copy of it to the plaintiff's military lawyer at BAF several months after they received it, which in turn showed it to the plaintiff. Furthermore, the plaintiff's civilian attorney made a defense against this defective record for it to be held out of the plaintiff's military trial, by submitting a motion to suppress, which was upheld in NOV 06 by a military judge. This record was defective because it was inaccurate, non-relevant, untimely, and incomplete as stated previously.

The plaintiff's record clearly shows that he was not only going to be convicted, but he was going to be incarcerated based on COL Williams initial statements to his primary staff. In fact, if analysis on confessions in the plaintiff's case are analyzed then the presence of all three types of Unlawful Command Influence (UCI) will be prevalent with the chain of command granting immunity in order for material witnesses to change their statements; Ignoring numerous inconsistencies in the material witnesses official statements, their statements made during defense interviews, and while under oath on the witness stand; Members of the chain of command who later become accusers talking to other possible material witnesses for weeks prior to the launch of any informal or formal investigation into any alleged misconduct ever being reported by that

23

material witness; Holding town hall meetings to release personal command opinion to the entire witness pool; The command making side deals with material witnesses in order to promise them benefits; Releasing privacy information protected under the privacy act law in order to influence and forge the witness pools opinions based on obvious malicious intent. The U.S. Army was not working in the public's best interest at the time they informed other Soldiers of private information protected by the privacy act law, and in fact, never should have been so careless with that information before, during, and after an ongoing investigation, as to make it common knowledge even to civilians working on KAF, and civilians back in the rear in Alaska.

The egregious acts of Unlawful Command Influence in the plaintiff's case will prove how violations of the Privacy Act of 1974 were the proximate cause of the adverse determination upon the plaintiff. Furthermore, these egregious acts will show how the defendant violated a provision of the Act, violated the Act intentionally or willfully, and how this action had an adverse effect on the plaintiff.

Where there is a disparity in rank or position, attempts to influence a witness may rise to the level of unlawful command influence. The plaintiff asserts that, the statements by senior Officers and senior Non Commissioned Officers to personnel assigned to the command post, in addition to, the actions made by COL Williams and personnel in command mantle positions, rise to such a level under the facts of this case. The plaintiff, like the Military Judge (M.J.) in this case, is satisfied by the sheer weight of allegations and the testimony provided during his judicial hearings, that the plaintiff has provided far more than "bare

allegations and speculation" and has, therefore, met the first prong of the
Stombaugh test.  In fact U.S. v. Plumb, 47 M.J. 771 1997 cites that while the
actions of criminal investigators such as the Air Force Office of Special
Investigations (AFOSI) agents involved here, do not normally implicate
commanders.  However, we find that in the plaintiff's case that the actions of the
investigators do.  Here the AR 15 – 6 Investigating Officer and other non
appointed investigators which held command mantle positions acted under the
mantle of the AR 15 – 6 command authority.  Moreover, COL Williams was the
plaintiff's commander, thus the actions of the Kandahar Air Field appointed and
non appointed investigators who worked under COL Williams supervision and
direction are imputed to him and become actions of the commander.

  The plaintiff turns next to the question of fairness in the plaintiff's trial.  In
evaluating this second prong of the Stombaugh test, the M.J. relied heavily on
the fact that "every witness testifying . . . stated without hesitation that their ability
and willingness to testify truthfully has not been affected by any government
actions.  It is well settled that "such perfunctory statements from subordinates on
the effects of command influence are inherently suspect, not because of the
credibility of the witness, but because of the difficulty of the subordinate in
ascertaining for themselves the effect of an attempted command influence.  After
concluding that the defense had raised facts which, if true, constituted unlawful
command influence, but had failed to demonstrate any harm to the plaintiff, the
M.J. merely asserted his belief that the standards of fairness had been and would

continue to be met.[1]  He did not, however, take any corrective measures to prevent further interference with defense witnesses or assure defense access to witnesses and evidence.  More disturbing still, the M.J. failed to take any remedial actions related to the threats made to the witnesses.  Although defense counsel only asked for future protection for the witnesses and that the M.J. consider these threats when deciding on the motions to dismiss, the M.J. had an independent duty to ensure the fairness of the proceedings and the ability of the defense counsel to call witnesses free of threats, interference, and influence.

The M.J should have taken steps to rid the trial of any possible taint.  At a minimum, he could have recommended Commander's calls in the NCE, the NSE, and the rear detachment to inform all potential witnesses that if requested as defense witnesses, their testimony was a duty; and then in accordance with U.S. v. Sullivan, 26 M.J. 442, 443 (C.M.A. 1988), ordered the government to produce all witnesses requested by the defense, then informed each of the duty to testify and assure them that no adverse actions would follow.  Although in this case it may initially appear that the M.J. did indeed do this as a minimum, his jurisdiction clearly doesn't extend to the plaintiffs rear detachment, and other potential witnesses in this case who are not under U.C.M.J. authority as Title 32 Soldiers, thus, his requirement here was never met, and therefore, he still had the

---

[1] Although the plaintiff asserts that no court looking into all the facts of his case to this point have found this fact crucial to their findings.  The plaintiff is disturbed that the military judges to date in their "essential findings of facts" constitute little more than a recitation of the testimony of the various witnesses.  Even where there were clear conflicts in the testimony of several witnesses, the Military Judges made no effort to clarify which witness they found more credible or on which version of the evidence they relied.  This has been done despite the plaintiffs request that the plaintiff court reach their own conclusions per Article 66(c), U.C.M.J., 18 U.S.C. 866(c).

independent duty to ensure the fairness of the proceedings and the ability of the defense counsel to call witnesses free of threats, interference, and influence, and thus erred. Furthermore, additional steps should have been taken to neutralize COL Williams's, 1SG Braun's, CSM Harrington's, Major Nichols's, and the rear detachment's threats to witnesses. While the plaintiff realizes that it would be an extreme sanction, he believes it would have been appropriate for the M.J. to refuse to permit them to testify. Even though they may not have been called by the government in its case-in-chief, making such an order in open court, (especially during the plaintiff's Motion to dismiss trial), would have gone a long way to restore public confidence in the fairness of this trial. Unfortunately instead of taking such remedial actions, the M.J. relied on the willingness of witnesses to testify. This reliance dealt exclusively with the impact on this plaintiff and looked only for prejudice to this case.

The ACCA erred when it agreed with the trial judge that there was no actual harm to the plaintiff; the inquiry into the evidence raised by the plaintiff pre-trial with his motions, and even more so, during his appeal process, should not have ended in a premature post-trail judgment, but instead with the ACCA considering much more drastic remedies such as determining if the plaintiff's discovery of evidence is true or untrue by conducting a DuBay hearing to fully develop the issue of command influence. However, in the judicial and administrative handlings of his case, insufficient effort has been expended to root out the cause and nullify the effects of command influence. Further, whenever unlawful command influence is an issue in a case, the court must consider not only the

effects on "actual" influence, but also whether the appearance of unlawful command influence exists. The ACCA's concern in apparent unlawful command influence cases is not only that the plaintiff receives a fair trial, but also that the public perceives military justice as fair and impartial. Rosser, 6 M.J. at 272; U.S. vs. Allen, 31 M.J. 572 (N.M.C.M.R. 1990). If there is an appearance of unlawful command influence, the ACCA must consider whether or not remedial action is required. Rosier, 6 M.J. at 271 – 272. This honorable court should therefore find the ACCA and the M.J. erred as a matter of law by failing to consider the cumulative effects the egregious and multiple forms of unlawful command influence had on the appearance of fairness and freedom from command influence required for courts-martial, U.S. v. Bradley, 47 M.J. 715 (A.F. Ct. Crim. App 1997), and therefore, find no remedy short of overturning the findings and sentence.

The third prong in the Stombaugh test deals with the court being satisfied beyond a reasonable doubt that any unlawful command influence did not affect the findings or sentence where the witnesses were driven from the witness stand by the influence. During the Plaintiff's Motion to Dismiss trial based on UCI, he presented evidence to meet this portion of the test, additionally, in his appeal he's presented evidence that meets this requirement and questions how the court could ever be satisfied beyond a reasonable doubt that unlawful command influence did not affect the findings or sentence in his case when at least two witnesses actions clearly demonstrate that they were driven from the witness stand. SSG's Prado and Francis's actions demonstrated not only a refusal to

28

testify on the stand, but that they indeed were driven from the witness stand by the influence of the command. Therefore, the plaintiff had to obtain their reluctant Stipulation of Fact testimonies. The actions of SSG Prado saw her commit herself to mental treatment facility when she went home on emergency leave so she would not have to return to the deployed unit run by COL Williams and others identified in a command mantle position who threatened her in reference to this case. Although she was scheduled to testify by telephone SSG Francis refused to call into the court to testify when she was at home on leave. The plaintiff even during his appeal process made it known that MAJ Lawendowski, (a Soldier in his rear detachment unit), told the plaintiff's spouse that personnel in Command Mantle positions in the rear detachment ordered him not to speak to the plaintiff's civilian counsel. These are obvious examples of how the witnesses were driven from the witness stand by command influence.

There are several other acts which raise the ugly specter that command influence is present in this case. When such acts are committed by commanders, the appropriateness of the appellation "unlawful command influence" is clear. However, where the complained of acts are performed not by commanders, but by others acting either as investigators or on their own (i.e., Officers telling potential witnesses to "stay away" from the case), it may be less obvious that unlawful command influence is afoot. Plumb, 47 M.J. 771 1997. However, in this case the plaintiff has more than proven that UCI was afoot, by meeting every prong of the Stombaugh test, in addition to, showing in his motions trials, his General Court-Martial trial, and during his appeal with his

record of trial, and allied papers associated with his court-martial how all three types of UCI are so incredibly strong in the Plaintiff's case that even if a correct legal standard was later applied during the General Court-Martial, the devastation to his right to the due process of the law was so violated, and his defense so crippled, that the false official statements followed by perjury committed by the material witnesses on the stand guaranteed a conviction and wrongful incarceration. Regardless of how he plead, and regardless of what or who was called by his defense counsel, based on the existence of all three types of UCI he was already guilty in the witness pools eyes who lined up to testify falsely against him in order to make themselves look good in front of COL Williams. He was found guilty to offenses in his case on January 11, 2007 which he by no means committed, and never was even afforded the fair chance to prove his innocence, based on the environment of terror created by the Unlawful Command Influence applied to his case.

The Plaintiff is asking this honorable court to look at his case in a fresh new perspective which includes facts that are similar to U.S. v. Levite, 25 M.J. 334 (C.M.A. 1987). Where the command influence in his case was exercised not by the convening authority, but instead by various subordinate unit commanders and noncommissioned officers who attempted to dissuade a number of individuals from testifying on behalf of the accused. In Levite the court reversed the conviction, based on four factors.

First, the ACCA was afforded the opportunity by the plaintiff to fully develop and look into all matters brought up to it in both his Grostefon matters and in his

Writ of Habeas Corpus. However, the ACCA decided to not fully develop and look into all matters by improperly affirming the findings and sentence without basing their decision on settle case law, valid regulation, and statue. As Judge Cox noted in his concurring opinion in U.S. v. Levite, when we find "the existence of command influence lurking in the record of trial or allied papers of a court-martial, we shall go to extraordinary lengths to be certain "beyond a reasonable doubt" that neither the findings nor the sentence have been tainted …" 25 M.J. at 341. Here the evidence of command influence is not merely "lurking in the record" - - rather, there is a veritable cavalcade which overshadows a few defense witnesses taking the stand to testify that they were not influenced by it. Moreover, the plaintiff's case is so fragrant with the odor of government misconduct, and rife with witnesses who believed they had been the targets of command influence, that it is unreasonable to believe the ACCA was able to conclude beyond a reasonable doubt that the plaintiff was not prejudiced by the numerous and egregious acts of command influence and interference with witnesses without the assistance of a post-trial DuBay hearing. The plaintiff therefore asserts that this honorable court by settled case law must resolve their doubts in his favor. U.S. v. Johnson, 14 U.S. C.M.A. 548, 34 C.M.R. 328, 331 (C.M.A. 1964); U.S. v. Kitchens, 12 U.S.C.M.A. 589, 31 C.M.R. 175, 180 (C.M.A. 1961); U.S. v. Marnaluy, 10 U.S.C.M.A. 102, 27 C.M.R. 176, 181 (C.M.A. 1959).

Second, the pretrial "briefings" that presented Levite as a knife-wielding panderer and assailant polluted the proceedings. Likewise the unlawful command influence in this case polluted the plaintiff's proceedings with multiple

town hall meetings, primary staff calls, visits and comments from personnel in command mantle positions, and the leaking of Privacy Act and Freedom on Information Act Violations which presented him as a "bad guy who needs to go down"; or a "predator"; or a "psychological predator"; or a criminal "with a pattern and history." Furthermore, this taint continues to pollute the plaintiff's judicial and administrative proceedings by presenting the plaintiff through his transcript, as a sexually harassing, indecently assaulting, sex offender. Certainly, those comments fit into the same polluting of the proceedings category.

Moreover, command influence may also appear when a commander takes particularly strong action against those suspected or accused of committing an offense. For example, in U.S. v. Cruz, the commander held a mass formation, made a strong speech condemning drug activity, publicly stripped the culprits of their unit crests, and had them apprehended. The court concluded that although those actions might have amounted to illegal pretrial punishment under Article 13, they did not affect the finding of guilt in the accused's case. Furthermore, in U.S. v. Dickey, 41 M.J. 637 (N.M.Ct.Crim.App. 1994), strong speech by commander to command reference the accused's charged with rape as low life's and scumbags was not unlawful command influence; commander was not convening authority and accused failed to show how speech deprived him of fair trial; court noted that the presumption of innocence does not control pretrial functions of commanders, etc. who are charged with concluding that it is more probable than not that an accused committed the offense in authorizing searches. etc. In addition, in U.S. v. Newbold, 45 M.J. 109 (1996), evidence that

commander made numerous negative reference about accused and his offenses in front of unit at "all hands" formation; accused failed to show that such conduct had affected the proceedings. Therefore, the lower courts may have indeed considered the comments COL Williams and others subject to his command made did not amount to UCI, but instead Article 13 violations, however, the accused submits that his Article 13 motion was denied. In addition, the evidence that he has presented definitely shows that COL Williams and others subject to his command did far more than just make comments, their actions that preceded and followed those statements amounted to unlawful command influence, as they showed that every effort was made by the command to ensure that the court-martial convicted and punished the plaintiff in accordance with its will.

The plaintiff cites U.S. v. Black, here as their actions clearly prove that the alliance forged between the prosecution, the Commander, and the material witnesses throughout the Plaintiffs case did not maintain the required delicate balance between military justice and command discipline. U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994). As in the U.S. v. Black case the Plaintiffs Commander and most of the witnesses are also the officers and NCOs who convened the Plaintiffs investigation, therefore, the record should leave this Honorable court with a reasonable doubt as to whether the proceedings were affected by UCI. Additionally, command influence can arise during any contact with any participant in the trial. In U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990), aff'd, 33 M.J. 209 (C.M.A. 1991), the court listed six factors that the military courts have considered in deciding whether a commander's contacts were

impermissible: (1) The timing of the contact, in the plaintiffs case evidence from his record of trial and allied papers show that the timing of this contact began with witnesses prior to any investigation ever being ordered by the commander, and proceeded throughout his court-martial and after its completion; (2) Who made the contact, in the plaintiffs case it was members of the command who held command mantle positions over potential witnesses; (3) The type of contact, in the plaintiffs case witnesses clearly testified how they were threatened to provide testimony about things they could not say were true. That they faced punishment if they did not comply with what the personnel in command mantle position held was true. Ordered not to talk to, or "stay away" from the plaintiffs civilian defense attorney, or "not provide to many facts"; (4) The content of the contact, this contact whether it was done at "Town Hall Meetings, in writing, or during other meetings in private or public was intended to make the desires of the command known to the entire witness pool. In addition, as in U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986) this Honorable court should address the possibility of massive command influence affecting other cases related to this case, and how witnesses who didn't testify against the plaintiff were court-martialed and/or chaptered out of the military for their non compliance to the commands will. Further, in U.S. v. Dugan, 58 M.J. 253 (2003) during deliberations, court member referenced pretrial statements by commander at "Commander's Call" regarding drug offenses; court ordered DuBay hearing on claim of command influence. Also in U.S. v. Baldwin, 54 M.J. 308 (2001) court ordered DuBay hearing on question of whether commander's meeting during

34

accused's court-martial amounted to command influence. Yet no DuBay hearing was ordered in the plaintiffs case based on the content of the contact made by his command; (5) Who was contacted, in this case the entire witness pool of subordinate Soldiers. The command ensured they contacted all witnesses by holding four separate "Town Hall Meetings" in order to accommodate working schedules, they visited witnesses prior to them making any official statements, escorted witnesses to the AR 15 – 6 Investigating Officer, and people in command mantle positions contacted witnesses about an AR 15 – 6 Investigation that they claimed they were conducting, when in fact they were not assigned as the AR 15 – 6 Investigating Officer, nor was any such Command directed formal or informal investigation going on at that time; (6) The reasonable likelihood that the accused was prejudiced at trial. All of the facts that the plaintiff has listed to this point has clearly demonstrated this likelihood, and additional information still to be cited by the plaintiff will reveal how the actions taken by COL Williams himself and others subsequent to the his statements prejudiced his trial just as in Clarke v. Brackenridge, (C.M.R. LEXIS 10, 1991).

Third, the prosecution has never shown that the pretrial and post-trial tampering of the witnesses was harmless. Obviously the defense team, the appellate branch, the Plaintiff's family, witnesses called in behalf of the Plaintiff, and the Plaintiff have all displayed believe that the burden of beyond a reasonable doubt (the responsibility of the Government) was never reached. The obvious lack of concern for the commands of the Constitution, the Code, and the President existent in this case with the obvious taint that still resonates in the

35

Plaintiffs record now because such a level was never reached by the Government,. The plaintiff makes this claim based on the following facts:

The government has never presented any clear and convincing evidence that there was no unlawful command influence. In Levite the court did not address whether the accused in unlawful command influence cases must establish that he has been specifically prejudiced by that influence. In a concurring opinion, Judge Cox expressed the view that it was not necessary to address who carried what burden of proof. In his view, unless he is satisfied beyond a reasonable doubt that the accused has received a fair trial, he will vote for relief. Whether stated or not, it appears that once the issue of command influence has been shown by the accused, the burden rests upon the prosecution to show that the accused nonetheless received a fair trial, beyond a reasonable doubt. The plaintiff asserts that doubt must exist when the only clear and convincing evidence has been presented by him that UCI has indeed occurred when witnesses testified on how their commander COL Williams held four separate Town Hall meetings about the plaintiff while the investigation into the allegations were pending. Where witnesses testified COL Williams was obviously angry, and that everybody knew he was talking about the Plaintiff. One witness testified that, "I felt his (the Plaintiff) character was murdered, was crucified." Soldiers felt coerced by senior NCOs to give statements. For example, when SSG Tyson said that she didn't have any personal knowledge about the plaintiff, but just knew rumors, and that she was threatened by 1SG Braun. SSG Tyson did the proper thing and refused to repeat gossip at which point 1SG Braun took to

demonizing the plaintiff with references such as "psychological predator" and comments like "he's a bad guy and needs to go down," or words to that effect. 1SG Braun also made threats: while invoking the name of the Commander, he told SSG Tyson that she would be faced with Article 15 action if she didn't reveal rumors to which she was privy. This threat was clearly made to secure information that SSG Tyson could not say was true.

The government has never proven beyond a reasonable doubt that the unlawful command influence didn't prejudice the proceedings. In the plaintiff's case one junior enlisted female received a summary court-martial resulting in her being sentenced to 10 days in confinement, and then she was chaptered out of the Army for not testifying against the Plaintiff, in addition to, her pleas for help from the command for sexual harassment were ignored, because the accused in her case was a witness in the plaintiffs case. Those who did testify against the Plaintiff received immunity. In one instance, a witness against the Plaintiff was protected by senior NCOs when she was caught apparently drunk in theater. That witness was later promoted before the trial. The unit created a climate of fear for those that supported the Plaintiff: SSG Francis revealed during interviews with Defense Counsel that she feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her Acting Commander, MAJ Nichols, and advised that she didn't have to talk to the Defense counsel. MAJ Nichols was ultimately found to be a victim in the plaintiff's case. Additionally, CSM Harrington told SSG Francis before the Defense interview not to provide "too

37

many details," or words to that effect. In Levite the court noted: "Word travels fast in the military, and these actions, in view of their specificity and content, were so damaging as to render remote the possibility of a fair trial at that time."

The Military Judge never took corrective actions, as the plaintiff has already depicted in the argument section. The military judge erred by not granting the Plaintiff's motion to dismiss for unlawful command influence. This is a serious charge that was not submitted lightly by the Plaintiff's civilian defense counsel, COL (ret) David Brash. As the former chief military judge of the Air Force, Mr. Brash was well aware of the importance of such an allegation. Even so, the evidence of unlawful command influence at the Brigade level was so highly compelling that it should have been the deciding factor in the Plaintiff's case. The Plaintiff did not receiving a fair trial because members of the Plaintiff's unit, worked very hard to ensure that this didn't happen. Article 37(a), U.C.M.J. defines unlawful command influence as action, by one with the mantle of command authority, which rises to the level of an attempt to coerce or, by unauthorized means, influence the action of a court-martial or any member thereof, in reaching the findings or sentence in any case. Further, if unlawful command influence is directed against prospective Defense witnesses it affects the accused's right to have access to favorable evidence. Additionally, the military judge erred in not granting the Plaintiff Article 13 credit. The plaintiff was exposed to humiliation by his unit leadership at both Town Hall meetings and core staff meetings examples of Article 13 violations are outlined further by the plaintiff's record in his Motion to Dismiss based on Article 13 violations.

(Attachment 3). The law is clear that an Article 13 violation can be predicated upon public humiliation of an accused, to include referring to an accused as a criminal in front of the unit. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994). This humiliation can even take place in a circumstance where the accused is not present at the unit during the references. U.S. v. Baigase, 50 M.J. 143, 152 n.3 (1999). This is exactly the type of behavior the Plaintiff was exposed to by his unit leadership.

Fourth, the Court of Military Review failed to take any "purging action." The ACCA obviously did not address whether the accused in this unlawful command influence case established that he has been specifically prejudiced by that influence. The court concluded in Levite by stating: In summary, the command influence exercised in this case was as pervasive as it was pernicious. Every effort was made by the command to ensure that the court-martial convicted and punished plaintiff in accordance with its will. Concern for the commands of the Constitution, the Code, and the President was nonexistent. Upon discovery of this fraud on the court, insufficient effort was expended to root out its cause and nullify its effect. We have no confidence, as a matter of law, in this verdict, and it must be overturned. In the Plaintiff's case the multiple errors still remaining in his Record of Trial and allied paperwork is proof of how his case has not been individually, legally appropriately, and carefully reviewed by the Article 32 Investigator, the Military Judge at Trial, the ACCA, the Convening Authority's, and the Clemency and Parole Board. In addition, the Army Regulation 15 – 6 Investigator, the Government Prosecutor, the Article 32 Investigator, the Military

Judge at the Trial Court, the ACCA, the Convening Authority's, and the Clemency and Parole Board have solely looked at and made determinations based on a record filled with numerous legal errors which amounts to fraud on the court, and a failure of any of the above entities to make any "purging actions".

The Plaintiff will continue to cite settled case law instances that mirror his case, and is supported with the evidence he is presenting to this Honorable court in his Attachments. Judge Cox noted in his concurring opinion in U.S. vs. Levite, when the court finds "the existence of command influence lurking in the record of trial or allied papers of a court-martial, we shall go to extraordinary lengths to be certain "beyond a reasonable doubt" that neither the findings nor the sentence have been tainted..." 25 M.J. at 341. Here the evidence of command influence is not merely "lurking in the record" – rather, there is a veritable cavalcade which overshadows a few defense witnesses taking the stand to testify that they were not influenced by it". The Plaintiff's trial so permeates with unlawful command influence that it's not plausible to say beyond a reasonable doubt that neither the findings nor sentence was tainted.  Additionally, the military judge erred in his discretion during the pre-trial motions; the convening authority failed in its R.C.M. 1105 and 1106 post trial responsibilities to determine whether or not the evidence presented by unlawful command influenced witnesses was voluntary, relevant, material, and sufficiently reliable to warrant presentation to the court-members and future authorities who grant clemency and/or parole; and the ACCA failed to make any purging actions. For these reasons alone, the Plaintiff feels that the findings and sentence should be set aside completely, and has

requested that action through the Court of Appeals for the Armed Forces (C.A.A.F).

Unlawful command influence can exist in a variety of forms, and it can occur even though the source of the influence did not intend to affect a case. Actual unlawful command influence occurs when, under the totality of the circumstances, the evidence would lead a reasonable person to conclude that command influence affected the disposition of a case and prejudiced the accused. One military court has suggested it occurs "when the convening authority has been brought into the deliberation room." After viewing all the evidence describing what "actually" happened, military courts determine if actual command influence occurred based on their expertise in military affairs. In other words, determinations of actual command influence are "based upon considerations from inside the military justice system."

In contrast, apparent unlawful command influence occurs when reasonable members of the "public" (defined to include "not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system.") believe command influence prejudiced the accused. Thus, this type of unlawful influence is based upon extrinsic considerations, i.e., those form outside the system. The question of whether apparent unlawful influence existed is only relevant when no actual unlawful influence exists, because remedying any actual influence will most likely remove the appearance of prejudice.

Actual unlawful command influence affects the actual fairness of a trial, while the appearance of unlawful command influence merely affects the level of "public" confidence in the military justice system. Although it has no direct impact on the fairness of a trial, the appearance of unlawful command influence is as much to be condemned as its actual existence. Therefore, the template for measuring prejudice from unlawful command influence is not simply whether such influence actually existed, but instead, whether there is an appearance of such influence.

Perceived unlawful command influence is another distinct concept of influence that can fall into either category of actual or apparent unlawful command influence. This type of influence focuses on how the recipient of command influence perceives that influence. If the recipient is a court member, and his or her independent judgment is affected by the influence, or if the recipient is a witness who decides to testify differently or not at all as a result of the influence, actual command influence has occurred. On the other hand, if the recipient is a sufficiently large group of service members (i.e., members of the "public"), and members of that group perceive that the command influence affects the overall fairness of the system, then apparent unlawful command influence has occurred. In all cases, the perception by the recipient must be reasonable in light of the circumstances.

In U.S. v. Cruz, 20 M.J. 873 a case may occur in which the appearance of UCI is so aggravated and so ineradicable that no remedy short of reversal of the findings and sentence will convince the public that the accused has been fairly

tried. The Plaintiff asserts that this also is such a case based on even prior to his Article 32 court hearing, the Commands UCI negatively influenced and threatened the potential witness pool with several KAF wide "Town Hall meetings" held by the commander. The "Town Hall meetings" were followed by and/or preceded by personal visits to potential material witnesses by members of the chain of command, who were not authorized or appointed to interfere with an ongoing investigation, nor authorized or appointed to conduct an informal investigation. Apparent unlawful command influence clearly occurred in the plaintiffs trial because reasonable members of the "public" (defined to include "not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system.") not only believed but testified how command influence prejudiced the accused. Perceived unlawful command influence happened occurred because recipients of command influence perceived that influence happened. In the plaintiff's case witnesses decided to testify differently or not at all as a result of the influence, therefore, actual command influence occurred. Furthermore, a sufficiently large group of service members (i.e., members of the "public"), and members of that group perceived that the command influence affected the overall fairness of the system, thus, apparent unlawful command influence occurred. In all cases, the perception by the recipient was and is reasonable in light of the circumstances.

   With regard to the Town Hall Meetings, the Plaintiff first asserts that, circumstantially, the evidence reflects intent to punish the accused. Here, the

Plaintiff points to four factors. First, the Commander was obviously angry and agitated. It was thus likely that he was lashing out at the accused, although not calling him by name. Indeed, the Plaintiffs case was the centerpiece of the comments and COL Williams' apparent frustration. Second, there was no reference to a presumption of innocence or any pending due process rights. The Plaintiff was labeled a criminal, plain and simple, as one who violated General Order Number One in specific ways. Third, the Plaintiff had already been exiled to BAF and everyone at the Town Hall Meeting knew the references were to him. It would be disingenuous to propose that the audience did not know who the unidentified "officer" was when he was referred to as "the officer now at Bagram," or "my right hand man." Testimony at trial of witnesses during the Plaintiffs General Court-Martial clearly demonstrates how almost everyone who testified knew COL Williams was referring to the Plaintiff. Fourth, the speaker had to know all these things, as the Commander. Collectively, these factors circumstantially point to an intent to punish the Plaintiff.

In the alternative, if this Honorable Court were to find no intent to punish, the second part of the analysis calls for examination of the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Here, two spring to mind. First, COL Williams may have sought to impress upon the unit the seriousness of General Order Number One violations and deter further offenders. Second, he may have sought to put a stop to rumors about the Plaintiffs case. The Plaintiff concedes that both objectives are legitimate and non-punitive. The Plaintiff asserts, however, that COL Williams's pursuit of these

objectives was not reasonable. The logic here is simple. In order to deter future violations of General Order Number One, simply state what will happen to future offenders, as emphatically as necessary, without reference to any ongoing case. Furthermore, prosecute all violators of such offenses consistently, instead of forging alliances between the prosecution, the Commander, and the material witnesses that will not maintain the delicate balance between military justice and command discipline in your unit.[2] In order to stop rumors about the Plaintiffs case, simply tell the unit to cease and desist on the rumor front, and maintain the required information management functions on sensitive personnel information which is protected from disclosure by a privacy statute 10 U.S.C. 3013 and Army Regulation 15 – 6. In addition to, not providing the public access to records in the possession or control of the Federal Government (U.S. Code, 552, 1966).[3] Again, there is no legitimate reason to brand the plaintiff as guilty, and list the offenses to make either legitimate point. Thus, the challenged conduct in this case also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial

_____

[2] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts these events certainly constituted unlawful command influence U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994).

[3] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts that these events certainly amounted to pretrial public humiliation and embarrassment and that the Military Judge erred in failing to grant the Plaintiff pre-trial confinement credit pursuant to R.C.M. 305 (k), Manual for Courts-Martial. The Military Judge abused his discretion in determining that this embarrassment existed at all, and that it was not tantamount to confinement. U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986).

public humiliation. As noted above, such humiliation can occur even if the accused is not present with the unit, or at the location of the humiliation. Baigase, 50 M.J. 143, 152 n.3.

With the evidence presented on COL Williams' statements at the Town Hall Meetings, the Plaintiff demonstrated that COL Williams potentially and did in fact cause the Plaintiff public humiliation. Essentially, the Commander gathered the unit as a whole, albeit in a series of briefings to accommodate duty schedules, pronounced the Plaintiff guilty of specific and listed offenses, voiced his desire of the maximum consequence, and did so with an emphasis variously described as "livid," "more than pissed," and "with smoke coming out of his ears." One junior NCO was appalled at the lack of any reference to due process or the presumption of innocence. Although the Plaintiff's name was not mentioned, such characterizations as "one of our officers," or "an officer since transferred to Bagram," or "my right hand man," was all employed, and each pointed clearly to the Plaintiff, just like the Master Sergeant's comments in Baigase, 50 M.J. at 147. In addition, COL Williams provided personnel information for use in the case, and he was aware by training and experience that the information should not be provided to individuals who were not authorized access to such information. U.S. v. Sheperd, (C.C.A. LEXIS 189, 2002). Furthermore, COL Williams presented this information as the Commander of the Plaintiff, and most of the witnesses were also the officers and NCOs who convened the investigation and then later testified against the Plaintiff as accusers, which itself should raise a reasonable doubt as to whether the proceedings were affected by

UCI. U.S. v. Black, 40 M.J. 615 (C.M.R LEXIS 188, 1994).  Finally, based on COL Williams being an accuser as well, a reasonable person would harbor a doubt about the COL's impartiality based on the evidence of record and actions taken by the COL himself and others subsequent to the COL's Statements.[4] Clarke v. Brackenridge, (C.M.R. LEXIS 10, 1991).

With regard to the core staff briefing, and follow-on comments regarding the Plaintiff, the Plaintiff asserts that the circumstantial evidence of intent to punish is even stronger.  To be sure, a pronouncement of guilt, coupled with a reading of the charges, presents an instance of public humiliation for the Plaintiff within the select community to which he especially belonged as the former Executive Officer, COL Williams' senior staff.  He was more directly and personally humiliated by these comments which were shared in a group setting with his former close associates and friends, and, moreover, folks whom he will likely see and with whom he will deal with upon his return to Alaska.  Thus the potential for humiliation was high, just based upon the briefing, and known to COL Williams at the time of the briefing.  When the frequent references to "predator" took place after the briefing, the emphasis became personal, and even more humiliating as the core staff began to parrot the reference until it became "the" term by which to refer to the Plaintiff.

_____

[4] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts that these events coupled with COL Williams actions throughout the due process of law certainly would cause a reasonable person to harbor a doubt about the COL's impartiality based on the evidence of record and actions taken by the COL himself and others subsequent to the COL's statements.  Clarke v. Brackenridge, (C.M.R. LEXIS 10, 1991).

In the beginning of AUG 2006 after the informal investigation had started MAJ Knowles informed the Plaintiff that information reference his case had already made it's way back to Alaska and was circulating via the civilian spouses. In accordance with the Freedom of Information Act and the Privacy Act this should never happen with an ongoing military investigation. Yet when the Plaintiff brought this information up to COL Williams, he responded "I know who it is, and that he would take care of it even if he needed to give out an Article 15" or words to that effect. However, proof of the leak of the plaintiffs ongoing investigation became even more apparent when two female officers in Alaska who were not under U.C.M.J. authority, or under the command of COL Williams, who were not acting within the confounds of their official capacity, who did not have a need to know anything about the case, and who were not even included on the appointed AR 15 – 6 investigators witness list as potential or interviewed witnesses, somehow produce sworn statements that the Prosecution tried to use against the plaintiff in the case as evidence. MAJ Lawendowski will testify how the plaintiffs case back in the rear detachment in Alaska was the topic of hallway, lunch table, and water cooler conversations, not to mention how the information of the case made it's way completely through the organization so that members in the plaintiffs rear detachment unit were coming up to him asking him questions about the case. Information on the case even made it's way down to a unit mobilized from the plaintiffs unit to Mississippi, who were training up for duty in Iraq/Kuwait.

In fact the Family Readiness Group who are civilians as well, even called the Plaintiffs wife to see if she needed any assistance because they heard about the

case in AUG 2006. Rumors presented by the command traveled so fast that one of the officers who made a sworn statement in the rear was not even a member of the AK ARNG, but a spouse of one of the government witnesses who was an accuser against the plaintiff, and who would benefit from the plaintiff being prosecuted. Furthermore, the final blow of public humiliation occurred when the Channel 2 News in Alaska broadcast a feature on the Plaintiff labeled Evidence Attachment 6, because this same anonymous person or perhaps a different one called the news station on the very day that the Plaintiffs orders for transfer from Kuwait's Field Detention Cite to Fort Sills Regional Correction Facility were cut. This anonymous person somehow had facts (although some of them were incorrect based on the discrepancies in the plaintiffs record of trial and allied papers) that they presented to the news, and the news contacted what they called the U.S. Army to confront them on these facts since the U.S. Army had not officially broke the story. In fact the Fort Sill Manual Guide for Inmates clearly states the plaintiff's wife would be informed of his safe arrival by a letter from the commander. (Attachment 7). In addition, all forms of outside contact for inmates being transferred from Kuwait are taken away to ensure the safety and success of the transfer. Yet sensitive personal information which was protected from disclosure by a privacy statute made it's way to a civilian television news station, although the U.S. Army, and the Alaska Army National Guard perform information management functions and are suppose to be the only ones acting in an official capacity who have access to this private information. U.S. v. Shepherd, (C.C.A. LEXIS 189, 2002). The information in the Plaintiffs case was

suppose to be private and not public, however, the total disregard of the Plaintiffs right to privacy during an ongoing investigation has caused the Plaintiff not just some or partial, but total and complete public humiliation and embarrassment. The Plaintiffs private information was deliberately used in several public forums in order to humiliate the Plaintiff in public. Therefore, the Plaintiff asserts the intent to punish has been demonstrated circumstantially.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis again moves to the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Only on such objectives seems apparent: to keep the senior/core staff apprised of the status of the case pending against the former XO. Again, the Defense concedes the object is legitimate and non-punitive in the abstract, but the execution was unreasonable. The staff could have been apprised of the case status, even with a listing of offenses, without reference to the Plaintiffs guilt. However, once COL Williams moved past that status briefing and undertook to use the term "predator," apparently influencing the staff to do the same, no legitimate purpose whatsoever was served. Only humiliation remained. The same is true for the references to the confinement COL Williams believed appropriate. Thus, again, the challenged conduct as it relates to interaction with the senior staff also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial humiliation.

In a rare example of an Plaintiff court reversing a case due to improper preferral of charges, the court in U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990) noted that the commander's probable cause to prefer charges may be based upon incompetent, inadmissible, or even illegally obtained evidence, but that the prosecution has a professional duty to ensure that baseless charges do not result in a denial of due process. The court concluded, that under the facts of this case, the aggregation of legally and factually unsupportable charges denied due process even as to the valid charges. In doing so, the court noted that the mere allegation of baseless charges may influence the fact finder by suggesting that the accused is a bad character.

In U.S. v. Plumb, 47 M.J. 771, 1997, Plumb contended that the evidence is factually insufficient to support the findings of guilty; that the military judge erred in refusing to grant an evidentiary hearing on the admissibility of an exculpatory polygraph; that court members may have improperly considered extraneous information; that the sentence is inappropriate; and, that the case was so permeated with UCI that the findings and sentence should be set aside. The Court agreed with the Plaintiff's contentions on the polygraph and UCI, set aside the findings, and sentence.

### The Agencies Intentional or Willful Violations of the Privacy Act on 1974

In the U.S. v. Plumb case the court concluded that in their combined 90 – plus years of service as Judge Advocates, they had never seen a case so fragrant with the odor of government misconduct, nor one so rife with witnesses who believed they had been the targets of command influence. Because they were

51

unable to conclude beyond a reasonable doubt that the plaintiff was not prejudiced by the numerous and egregious acts of command influence and interference with witnesses, we must resolve our doubts in his favor. U.S. v. Johnson, 14 U.S. C.M.A. 548, 34 C.M.R. 328, 331 (C.M.A. 1964); U.S. v. Kitchens, 12 U.S.C.M.A. 589, 31 C.M.R. 175, 180 (C.M.A. 1961); U.S. v. Marnaluy, 10 U.S.C.M.A. 102, 27 C.M.R. 176, 181 (C.M.A. 1959).

The plaintiff believes that he has more than alleged sufficient facts which, if true, constitute UCI in accordance with meeting his burden of proof. Therefore, the plaintiff here will demonstrate the following egregious acts of UCI similar in the Plumb Case, to his own case, and provide facts from his record of trial and/or allied papers in direct comparison to each of the unlawful command influence issues that overturned the Plumb case, and prove that all three forms of UCI exist in his case. Consequently, if correct the identified similarities in the plaintiff's case that resembles all of the egregious UCI acts committed in Plumb will amount to nothing short of unlawful command influenced fraud on the court based on the following: The information presented by the Prosecution is factually insufficient to support the findings of guilty due to the aggregation of legally and factually unsupportable charges that denied the due process of law even as to the valid charges; That the military judge erred in refusing to grant relieve based on the Motions to Dismiss Trail; That court members may have improperly considered extraneous information based upon baseless charges that may have influenced them (the fact finders) by suggesting that the accused is a bad character with incompetent, inadmissible, or even illegally obtained evidence;

52

That the sentence is inappropriate; and, that the case was so permeated with UCI that (1) the agency violated a provision of the Act; (2) the violation of the Act was "intentional or willful," and (3) this action had an adverse effect on the plaintiff. Therefore, meeting the plaintiff's burden of proof in order to obtain relief under the Privacy Act.

The first egregious UCI act in Plumb was where witnesses believed investigators were trying to influence them. The comparison with the plaintiff's case here is exactly the same, witnesses believed investigators were trying to influence them.

The secondly egregious UCI act in Plumb was where those same investigators prepared an inaccurate transcript of that surveillance which implicated the plaintiff in crimes he did not commit. The comparison with the plaintiff's case here is where those same investigators prepared an inaccurate transcript of the investigation which implicated the plaintiff in crimes he did not commit.

The third egregious UCI act in Plumb was where commanders and supervisors alike warned witnesses away from the trial and the plaintiff. The comparison with the plaintiff's case here is exactly the same, where commanders and supervisors alike warned witnesses away from the trial and the plaintiff.

The fourth egregious UCI act in Plumb was where witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense. The comparison with the plaintiff's case here is exactly

the same, where witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense.

The fifth egregious UCI act in Plumb was where government investigators denied the defense access to evidence and threatened defense counsel. The comparison with the plaintiff's case here is exactly the same, where government investigators denied the defense access to evidence and threatened defense witnesses.

The sixth egregious UCI act in Plumb was where at least one witness was told not to talk to defense counsel, while one government witness was merely encouraged to reconsider his statement and another was simply re-interviewed. The comparison with the plaintiff's case here is exactly the same, where at least one witness was told not to talk to defense counsel, while one government witness was merely encouraged to reconsider her statement and another was simply re-interviewed.

The seventh egregious UCI act in Plumb was Where government investigators obtained "emergency" approval for a wire surveillance which had been disapproved by the AF General Counsel. The comparison with the plaintiff's case here is where personnel in command mantle positions acting as unauthorized investigators apparently on their own decided to conduct a surveillance mission on a Senior Officer, which had not been officially approved by the Commander.

The eighth egregious UCI act in Plumb was where a government investigator socialized with a court-member immediately before trial. The comparison with the plaintiff's case here is where personnel in command mantle positions and/or accusers socialized with each other or witnesses as follows: Outside of the courtroom immediately before and after they testified at the plaintiffs Court-Martial trial; Before and after they committed perjury at the Article 32, Motions trials, or plaintiffs Court-Martial trial; and Before and after they made false official statements during the AR 15 – 6 Investigation.

The plaintiff will combine the first and fifth egregious acts of UCI in comparison here, where witnesses believed investigators were trying to influence them, and government investigators denied the defense access to evidence, and threatened defense witnesses. The plaintiff provides the following as facts in reference to defense witnesses believing investigators were trying to influence and threatened them: Before the AR 15 – 6 Investigation ever began CSM Harrington conducted a so called "preliminary investigation" where she questioned SSG Jacqueline Tyson. During the course of the interview, SSG Tyson advised CSM Harrington that she (Tyson) had no information relevant to the investigation beyond rumor and speculation. (The reference to the investigation here demonstrates how witnesses believed people in command mantle positions were conducting an investigation into rumors and alleged offenses), CSM Harrington, apparently believing that SSG Tyson was withholding information, informed SSG Tyson that, "if we later find you are hiding something, COL Williams said we will be giving you an Article 15," or words to that effect.

Based upon the context of the conversation, and the demeanor of CSM Harrington, SSG Tyson perceived this admonishment as a threat that she would face adverse action if she did not provide information detrimental to the Plaintiffs case.

After CSM Harrington was unable to persuade SSG Tyson to provide information in the case that CSM Harrington wanted her to provide, 1SG Braun later approached SSG Tyson. 1SG Braun first advised SSG Tyson that the Plaintiff was a "psychological predator," and that SSG Tyson should provide information about the Plaintiff. He told SSG Tyson that the Plaintiff was "a bad guy and needed to go down," or words to that effect. SSG Tyson again advised that she knew no facts and refused to provide references to rumor and speculation that were circulating around the post. At this point, 1SG Braun advised SSG Tyson that if she did not provide the rumor and innuendo, "COL Williams said she would be receiving an Article 15 if it later turned out she was withholding information," or words to that effect. Based upon the context of the conversation, and the demeanor of 1SG Braun, SSG Tyson considered this admonishment a threat that she would face adverse action if she did not provide information detrimental to the Plaintiff.

CSM Harrington and 1SG Braun interviewed a majority of the alleged victims in this case during and after their so-called "preliminary investigation." They also interviewed other unit personnel who were not called as witnesses. During the initial phase of their "preliminary investigation", CSM Harrington interviewed SSG Peggy Prado. During this interview, CSM Harrington told SSG Prado that she

(Harrington) believed Prado was withholding information about the Plaintiff. CSM Harrington then told SSG Prado that if Prado did not reveal the requested information about the Plaintiff, SSG Prado would be facing an investigation/action regarding Prado's alleged relationship with MSG Ed Lopez. SSG Prado viewed this as a threat and became emotionally overwhelmed by the pressure brought to bear by the interview. Furthermore, despite 1SG Braun's testimony and CSM Harrington's testimony during the plaintiffs motion trial, the plaintiff had two E8 witnesses who were prepared to testify to how 1SG Braun and CSM Harrington were committing perjury during the plaintiffs Motion to Dismiss trial when asked about their threats on SSG Prado. However, due to the UCI and fear that the command had performed on SSG Prado, she was driven from the witness stand by that influence and did not testify, and therefore, the plaintiff was forced to only submit a stipulation of fact from her, and not call forth the two witnesses he had summoned to acknowledge her testimony. SSG Prado and SSG Tyson believed that investigators were trying to influence them to make false statements, and when they would not do so, they both believed that they were threatened. Finally, from their actions it demonstrates that based on the unlawful command influence displayed by the command, the plaintiff was denied access to evidence that would have been used to disprove illegally preferred charges against him, prove his innocence, and afford him a fair trial.

Further evidence in the plaintiffs Record of Trial or allied paperwork displays more egregious acts of UCI when government investigators denied the defense access to evidence. During the week of 25 December 2006, the Plaintiff's

Defense counsel conducted witness interviews at KAF in order to raise motions for Unlawful Command Influence and Article 13 violations. Several witnesses (not alleged victims) refused to meet with Defense counsel. The Staff Judge Advocate encouraged each hesitant witness to meet with the Defense and secured all requested interviews for the Defense. Among other fact witnesses, the Defense interviewed SSG Kim Francis. SSG Francis provided information favorable to the Plaintiff's case. The day after the interview, SSG Francis returned to the interview room and revealed that she now feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her acting Commander, MAJ Nichols, and advised that she did not have to talk to the Defense counsel. MAJ Nichols is an alleged victim in the Plaintiff's case. She further advised that her Sergeant Major, CSM Harrington, told her before the interview not to provide "too many details," or words to that effect.

The three witnesses who refused to meet with the Plaintiff's Defense counsel upon initial request by the Non Commissioned Officer in Charge (NCOIC) of the KAF Legal Office were the following: CPT Bingley; SFC Arnett; and SSG Cuyar. After encouragement by the KAF Staff Judge Advocate, SFC Arnett interviewed with the Defense, but conditioned participation upon having the Staff Judge Advocate (SJA) in the room for the interview. The Plaintiff's Defense counsel agreed to this condition. SSG Cuyar agreed to meet under the same condition, and the Defense agreed to the condition again. The Defense withdrew its request for the interview with CPT Bingley. SFC Arnett refused to meet with the

Defense in the first instance because "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what the Plaintiff did in this case," or words to that effect. This further demonstrates that although the prosecution had the professional duty to ensure that baseless charges do not result in the denial of due process, which in fact the plaintiff's due process was denied by the UCI actions of his command. COL Williams and other officers and NCO's under his command preferred charges based upon incompetent, inadmissible, or even illegally obtained evidence. In doing so this Honorable court just as the court did in U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990) should concluded, that under the facts of this case, the aggregation of legally and factually unsupportable charges denied due process even as to the valid charges. In doing so, that court noted that the mere allegation of baseless charges may influence the fact finder by suggesting that the accused is a bad character, and as displayed here a witness drawn from this unlawfully command influenced witness pool who to that point should not have know anything about an ongoing investigation on the accused, responded with the same malice, discontent, and will to prosecute the plaintiff as the command had asserted in its four town hall meetings, because SFC Arnett believed that the plaintiff was a bad character based on the mere allegation of baseless charges from the command.

On 25 and 26 August 2006, and 28 and 29 September 2006, "Town Hall Meetings" were convened for NCE and NSE, respectively, for one of the two days each month. Several versions of the meetings were held on the target days to accommodate all members of the unit and the different shifts they worked.

One of the issues discussed at the meetings included a briefing by the Commander, COL Williams, regarding violations of General Order Number One, and the Plaintiffs case specifically.  During this portion of the presentation, COL Williams advised all attendees that he would address all violations by seeking the maximum punishment available.  COL Williams then went on to tell the group that "we have an officer"[5] who has chosen to violate General Order Number One and is now facing charges which include adultery, fraternization, conduct unbecoming an officer and gentleman, and sexual harassment, among others," or words to that effect.  Most of the attendees knew COL Williams was referring to the Plaintiff because the Plaintiff was not at the Town Hall Meetings, the various references to the officer in question clearly indicated the Plaintiff, and because there had been much discussion at all levels within the unit about the Plaintiff's case at the time preceding and between the Town Hall Meetings.  Attendees described COL Williams' demeanor during the briefing as "livid" and "beyond pissed."  Some subordinate members of the unit took the briefing as a pronouncement of the Plaintiff's guilt by the Commander and prejudgment as to punishment.  This group included 1LT James Johnson, MSG Ed Lopez, SSG Kim Francis and SSG Jorge Vega.  Nearly all listed witnesses for the Government during the Plaintiffs General Court-Martial attended these Town Hall Meetings.

---

[5] In referring to "this officer," COL Williams also called him "my right hand man" and "an officer since transferred to Bagram," presumably using different references at different sessions of the Town hall meetings.

On 1 AUG 2006, COL Williams addressed the Plaintiff's case with his "core staff." This discussion took place in conjunction with one of the unit's daily Commander's Update Briefings, or "CUBs." The following Individuals attended in their Brigade level capacities: MAJ Lee Knowles, NCE S-4; MAJ Rob Barr, NCE S-1; MAJ Chad Parker, NCE S-2; MAJ Jeff Roach, NCE S-3; LTC Raleigh Jones, NCE S-5, MAJ Richard Koch, the Chaplain, CSM Robert Averrett, and as of 31 JULY 2006, the newly appointed BDE XO, LTC Michael Thompson. MAJ KIM, NCE S-6 most likely was in attendance as well. This was the first day that the Plaintiff was ordered to show LTC Thompson the ropes about the Brigade XO job, but as the Plaintiff was sitting in the back of the room (as he had given his normal seat to LTC Thompson) waiting for the briefing to begin. COL Williams came into the room told the Plaintiff to come with him outside into the hallway. COL Williams then excused the Plaintiff from needing to attend the meeting by saying "you don't need to be here for this" or words to that effect. COL Williams then proceeded back into the meeting room and said he was serious about violations of General Order Number One. He also told the group that the Plaintiff had violated General Order Number One, listed each of the charges pending against the Plaintiff, and said that he regretted having to take action against the Plaintiff. This meeting lasted about fifteen minutes. MAJ Koch, MAJ Barr, MAJ Parker, MAJ Roach, CSM Averrett, and LTC Thompson were all on the Government witness list against the Plaintiff during his court-martial.

Since the case has developed, nearly all members of the senior staff, to

include COL Williams, have referred to the Plaintiff as a "predator," typically while in each other's company in informal settings. Indeed, this term was used so frequently by members of the senior staff to describe the Plaintiff that one senior staff member characterized it as "the" term by which to refer to the Plaintiff. COL Williams has also expressed the opinion, in the presence of his senior staff, that the Plaintiff should get five to ten years for his offenses. Senior staff members have attributed such statements about confinement to COL Williams as well.

Some of the constitutional violations to the due process of law[6] that the plaintiff will address with this court deal with the favorable evidence, and its Constitutional Mandate. Although the formalized rules of discovery and disclosure require the prosecution to disclose any and all evidence that is favorable to the accused, it is important to recognize that the rule may also have a constitutional basis. In the U.S. v. Agurs, 427 U.S. 97 (1976), the Supreme Court ruled that if undisclosed evidence created a reasonable doubt about the accused's guilt, then the accused had been denied due process. And in Brady

---

[6] Regardless of how this Honorable Court findings are reference this document, based upon the exceptional circumstances present and existing in the Plaintiffs record, thereby, being in direct violation and deprivations of his constitutional rights. The plaintiff will address with writs of habeas corpus to the federal courts an attack on his court-martial conviction based on those constitutional rights violations, in addition to seeking relief against each defendant named: The U.S. Army, The Alaska Army National Guard, and The Alaska National Guard Youth Corps for their negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974. In addition to providing, the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding in violation of the Freedom of Information Act of 1964. Furthermore, the plaintiff will raise various Torts against individuals in the Plaintiffs chain of command and unit for the damages caused by the Wrongful Infliction of Emotional Distress; Wrongful Invasion of Privacy based on a public disclosure of private facts, and a publication placing the Plaintiff in a "false light."

v.Maryland, 373 U.S. 83 (1963), the Court laid out the well-recognized rule that due process would also be denied in those instances where the prosecution had withheld information requested by the defense which was material to the issue of guilt or punishment. Both of these rules have been applied by the military courts and are now memorialized in the Manual for Courts-Martial. Furthermore, in U.S. v. Trimper, 26 M.J. 534 (A.F.C.M.R. 1988) there is no constitutional right to evidence that is not exculpatory. The comparison to the Plumb case here is where in the Plumb case the military judge erred in refusing to grant an evidentiary hearing on the admissibility of an exculpatory polygraph. In the plaintiffs case the ACCA erred in not conducting an evidentiary (DuBay) hearing in order to look into the exculpatory evidence that the plaintiff and the witnesses he called presented, and the M.J. during his General Court-Martial trial erred in his discretion in denying his Motions to dismiss. Further, neither performed any purging actions. Finally, the prosecution and the command did not act in good faith when they presented perjured testimony and conducted themselves in similar misconduct before, during, and after the plaintiff's legal proceedings. This failure has allowed everyone judicially and administratively involved in the plaintiffs case to have improperly considered extraneous information; make an inappropriate sentence; and, produce a publication placing the Plaintiff in a "false light." The plaintiff contends that if this Honorable court ordered an exculpatory hearing the outcome would result in this Honorable court setting aside the findings and sentence due to the egregious acts of UCI and the deprival of the

due process of law.  Furthermore, they would directly show as the evidence in the plaintiff's record of trial demonstrates that several government witnesses made false official statements and committed perjury on the stand.  In U.S. v. Hart, 27 M.J. 839 (A.C.M.R. 1989), the court analyzed Supreme Court and military precedent and concluded that in the military the following "materiality" standards apply as follows:  Prosecution use of perjured testimony or similar misconduct will result in reversal unless it is harmless error beyond a reasonable doubt, regardless of whether the prosecution acted in good faith.

The plaintiff submits that more examples of perjured testimony or similar misconduct are present in his record as he cites the following as examples: When SPC Moses testified during the plaintiffs Article 32 trial.  Her testimony that she verbally made during the Article 32 trial completely contradicted the sworn statement in the AR 15 -6 Investigation that she had made, and then adopted into her testimony.  Her AR 15 – 6 sworn statement clearly stated that the plaintiff allegedly "made one statement about going to his room to get naked."  Yet she adopted that as her sworn statement after committing on the stand that "the accused repeated that comment a couple times a week."  This Honorable court should find it intriguing how SPC Moses told LTC Thomas prior to her going on leave, "that the plaintiff had been a little friendly, but it meant nothing to her." Furthermore, she stated that "SPC Edwards and her were close friends" (and roommates at KAF), and "that SPC Edwards told SPC Moses what the accused" (allegedly) "did to her".  This is intriguing because once PFC Moses (at that time) returned from leave after making those statements, she was caught apparently

drunk in theater, by SSG Francis, and SSG Tyson, who clearly testified or told the plaintiffs defense attorney that PFC Moses was drunk and throwing up, but 1SG Braun and CSM Harrington protected her by committing perjury that she was not drunk, and then the prosecution dropped her charges based on her committing perjury during the article 32 trial, and the "rumors" that the command knew reference to her various violations of General Order Number 1 by engaging in sexual activities with officers, and enlisted personnel in theater. Yet, the prosecutor still brought her to the plaintiffs court-martial in order to use her as a witness despite the fact that she had already committed perjury on the stand, and the command despite all of her violations still promoted her to the rank of specialist prior to the trial in complete contrast to the "livid" and "beyond pissed" comments by COL Williams on punishing anyone who was suspected of such offenses. This did not go unnoticed by the plaintiff and his civilian lawyer who knew beyond a reasonable doubt that if she got on the stand and committed perjury in her testimony again that, that would be tremendously detrimental to his trial, thus, pleading guilty (even without a pre-trial agreement), and then presenting himself as innocent was not only his best defense, but his only course of action against such testimony and denial of the due process of law.

Although the plaintiff did plead guilty, but present himself as innocent, the additional perjured testimony and/or false official statements of other witnesses still resulted in him being charges with crimes he did not commit, in addition to, being wrongfully incarcerated and sentence to twice the length of time that the prosecutor requested. Another example of perjured testimony is when MAJ

Nichols perjured herself at the article 32 hearing, the Motions trial, and the General Court-Martial trial. When MAJ Nichols took the stand during the article 32 investigation she stated that she had made no comments or had any relationship with the plaintiff that would encourage him to make such a remark when the plaintiff said the words or to the effect that "before this deployment is over we will have had sex." The plaintiff stated for the military judge during his care inquiry that he had no right to make the comments regardless of what MAJ Nichols had stated, due to good order and discipline of the unit. Yet and still, in a stipulation of fact submitted by the plaintiff at his General Court-Martial trial on MAJ Nichols it clearly stated that before the unit deployed, yet still on a Title 10 status, MAJ Nichols made comments that she didn't want to work late so "she could go get some (referenced to sex) before they deployed" or words to that effect. Furthermore, during combative's training with MAJ Nichols mounted (with her sitting on top of the plaintiff's midsection with both legs straddled to either side of him) and smiling at the plaintiff, she made the remark that "this looks promising" or words to that effect. This was clearly sexual hinting from MAJ Nichols that could surely be taken as playful bantering between the two since she initiated both comments without the plaintiff making or providing any sexual innuendos towards her when she made her comments. MAJ Nichols clearly had made comments and had a relationship with the plaintiff that would encourage him to make such a remark or remarks to her. However, despite her perjured testimony that she tearfully made on the article 32 and General Court-Martial stands, her actions and reasons for doing so were clearly to impress the

command. She was failing in her executive officer duties and had a strained relationship with her commander (as she stated on stand in words to that effect), MAJ Nichols had become roommates with CSM Harrington who as stated prior was going out of her way to ensure the command punished the plaintiff in accordance with her and the commands will. Furthermore, MAJ Nichols actions towards SSG Francis when she advised her prior to arriving at the plaintiffs legal counsel initial interview as SSG Francis's acting Commander, and as an alleged victim in the Plaintiff's case that SSG Francis did not have to talk to the Defense counsel displays how personnel in the command were motivated by revenge and/or were seeking special benefits from the Army, which are some of the reasons why there are so many inconsistencies from every witness who made statements to the plaintiffs attorney, and made false official statements during the AR 15 – 6 Investigation that later contradicted their testimonies.

The final reason for these inconsistencies is based on the fear that the command created before, during, and after the plaintiff's legal proceedings. All summed MAJ Nichols perjury, false official statements, and command influence on subordinates goes well beyond the normal scope of command actions, it violates article 37(a) of the U.M.C.J., and it obstructs justice by denying the plaintiff's right to the due process of law. The plaintiffs record of trial and allied papers clearly demonstrate that these egregious UCI acts were tremendously harmful, and constituted fraud on the court, as well as error and prejudice beyond a reasonable doubt with the prosecutions use of perjured testimony or similar

misconduct with false official statements during the AR 15 - 6 that have been adopted into sworn testimony and used as truths against the plaintiff in his case.

The second egregious act of UCI in comparison here, is where those same investigators prepared an inaccurate transcript of the investigation which implicated the plaintiff in crimes he did not commit. In this case the plaintiff will disclose facts on LTC Gary Thomas the AR 15 – 6 Investigator. On the DA Form 1574 LTC Thomas filled out, page 1 of 4 clearly shows that he was appointed by COL R. Stephen Williams as the AR 15 – 6 Investigating Officer (IO) in the Plaintiffs case on 30 JUL 2006. That same page goes on to show that the investigation commenced at KAF at 0800Z 31 JUL 2006, and LTC Thomas finished gathering/hearing evidence at 1900Z 7 AUG 2006, and completed his findings and recommendations at 0800Z 10 AUG 2006.

The Plaintiff believes that analysis of the exceptional circumstances present and existing in his record, reference confessions by the Plaintiff and by the material witnesses would raise a mixed question of fact and law. In fact, it would turn on both a historical fact in determining the voluntairness of the confessions, and whether certain promises were or were not made by the prosecution and by the chain of command to their witnesses. Furthermore, the Plaintiff believed when he submitted his Writ of Habeas Corpus, and his Grostefon matters that the ACCA would not have deferred to the military courts findings based on the record disclosing that the Military Court that adjudged the Plaintiff during his General Court-Martial did not actually hold as a matter of fact if the petitioners' confessions were "freely and voluntarily made." Beck vs. Ohio, supra, 379 U.S.

68

at 92 – 93, and Ashcraft vs. Tennessee, 322 U.S. 143, 145 (1944). Therefore, this Honorable court must make its own finding in service of a final resolution in the Plaintiffs case because of two exceptional circumstantial reasons. First, the findings are inadequate or unreasonable based on the fact-finding procedure being unfair, and secondly, the findings made were in the process of applying an improper legal standard.

If a reasonable person were to conduct an analysis of the IOs fact-finding procedure they would determine that he concluded hearing evidence to charge the Plaintiff and file his report at 1900Z 7 AUG 2006, but actually finished gathering evidence on 31 JUL 2006. Reasonable doubt should be raised here as the investigator only used one day to investigate all of the facts of the case. This is proven by the fact that LTC Thomas was appointed to conduct an informal investigation based on allegations against the Plaintiff on 30 JUL 2006, yet he managed to gather all pertinent and unbiased information for the entire case by the end of 31 JUL 2006. In addition to that, he made up a list of all potential witnesses he intended to interview based on questions raised from that information, and then provided a copy of that list to MAJ Barr the Brigade S1 either that evening or the next morning.

If the court examines Evidence Attachment 5 it will notice how non-appointed investigators helped LTC Thomas in preparing an inaccurate transcript of the investigation. Attachment 5 is an email from MAJ Robert Barr to 1SG Ronald Braun sent Tuesday, August 1, 2006 at 6:09 AM local time subject Interview schedule the court should find several facts that stand out. First MAJ Barr sends

69

the email to 1SG Braun the morning of 1 AUG 2006 saying "Confidential time schedule, please ensure that NCE Soldiers are present at the TLS Building at the designated time. Here MAJ Barr demonstrates the knowledge either by training or experience that information in an ongoing investigation is confidential and falls under the Privacy Act, albeit, he used an unclassified computer to send the message. Secondly, 1SG Braun forwards MAJ Barr's email over an unclassified system as well but addresses 16 different people in the to category and CSM Harrington in the Cc: category, with an email containing classified information during an ongoing military procedure. Furthermore, 13 of the 16 personnel were called as government witnesses during the procedure, and 1SG Braun should have known by training or experience that such information should only be giving to people with a need to know, or were acting in an official capacity and an unclassified system does not offer that type of protection. However, even more curious in both of these specific instances would be why not one but two government witnesses are acting on behave of the IO who has access to the same computer system, or could personally contact each individual himself identifying his role as the IO and informing them of an informal investigation that he's been ordered to conduct.

The next fact that stands out, as stated above is that LTC Thomas some how gathered enough "unbiased" facts in the Plaintiffs case to start interviewing possible prosecution and defense witnesses beginning at 1100Z 2 AUG 2006, and he remarkably did this in the course of one day. The AR 15 – 6 Investigation guide clearly states that key witnesses should be interviewed last during the

70

procedure. This is done to gather enough information to ask probing questions in order to find the truth and validity to all evidence gathered throughout the investigation, and to determine if statements are made voluntarily or not. At this point PFC Edwards (at the time) was the only witness who had officially filed a complaint in the form of an EEO complaint filed on 30 JUL 2006. However, she was the primary witness used throughout the Plaintiffs informal investigation and throughout his General Court-Martial by the Prosecution. Yet she was the very first witness to be interviewed by LTC Thomas who one would have to reasonably assume never looked into her credibility as a witness, nor did he investigate the facts behind her statements. In fact, the Plaintiffs record clearly shows that on 2 AUG 2006 at 1110Z LTC Thomas interviewed PFC Edwards his one and only time in what he thought was a fair fact-finding procedure, in order to gathering his evidence to determine his recommendation for the next higher level.

Moreover, the record clearly shows that on 5 AUG 2006 at 1030 AM local time SGT Robin Munnlyn comes in with a typed statement she wants to make sworn to LTC Thomas. First, a reasonable person would have to think how she knows what questions are going to be asked, or even what the specific questions are for her based on the IO's investigation. Secondly, on her statement she makes statements attributed to SPC Diana Chester which stated "A few days later she told me how – she was going to get promoted and I was like but how cause I knew she wasn't MOS's Q'd and I was like well that is cool – and she started the conversation out with – Yeah am going to be Corpal before this deployment is

over." Then she went on to say that 1SG Braun made a comment to her about "A year is a long time and a person can get very lonely, and if there was anything she needed to let him know" and I asked her what did he mean by that and she said that he wanted to have sex with her – and I asked her but your not going to right and she made the comment of "that she would is she got desperate enough." The Plaintiff even gave COL Williams the AR 15 – 6 appointing authority who has the power to expand the investigation, and who was suppose to be acting as a neutral party a copy of a note from 1SG Braun to SPC Chester labeled as Evidence Attachment 8. This note states "Ron 841 – 9432" (1SG Braun's KAF Cell Phone Number), then says "if you would like some company today! ☺." Yet, COL Williams nor LTC Thomas expanded the investigation in order to look into the truth of the matter, despite their duty as outlined in CJTF-76 Command Policy Memorandums labeled as Evidence Attachment 9.

A reasonable person could say maybe the IO didn't know this information, yet the Plaintiff contests that a more thorough and fair investigation would have revealed all of the facts found in the Plaintiffs existing record. Furthermore, LTC Thomas did interview SPC Chester on 7 AUG 2006 at 1055 AM Local, and he asked her this question "Were you ever forced, threatened, or misled to have sexual intercourse with anyone or to participate in a sexual act at any time whether it actually ever occurred or not? (to include threats of disciplinary action, undesirable duty, or threat of suspension of favorable action (promotion, award, privileges, etc.) or were you offered to exchange any of these for sex or sex acts)? SPC Chester replied "yes." LTC Thomas doesn't ask anymore questions

in his interview reference this question, one would have to reasonably assume he wrote down the following response to SPC Chester's statement next to her written "yes" in the same handwriting are the words, "she stated she has been sexually harassed, but not by the Plaintiff." This should have caused LTC Thomas to expand the investigation based on the facts that he was ordered by COL Williams in his appointment letter as the investigating officer on 30 JUL 2006 to "Use Chapter 4, AR 15 – 6, to guide your investigation. You may consider any evidence in your investigation that you determine to be relevant and material to the allegations. You will make appropriate findings and recommendations based on the facts gathered by your investigation." Therefore, the IO has no excuse not to have expanded the investigation to gather all of the facts pertaining to this case.

The next fact that stands out is even with the sworn statement made by SGT Munnlyn on 5 AUG 2006 at 1030 A.M. local time, SFC Sherry Butters makes another statement on 5 AUG 2006 at 2:47 PM Local time in reference to comments also attributed to SPC Chester. SFC Butters statement says that "while talking with SSG Tyson in her room, SPC Chester came in upset and started complaining that if she has a friend that she likes to eat with and talk with she doesn't see anything wrong with that and that this was wrong and just because she turned down a certain person that was asking for sexual favors that now this was happening. She also went on to say everyone knows what those two are up to late at night walking around and waiting on the picnic table late at night." This obviously should have shown the IO with now two witnesses on the

same day let alone two days before he interviewed SPC Chester on 7 AUG 2006, that something more was going on in the Plaintiffs case that included two additional personnel, one who specifically asked for sexual favors from SPC Chester, but was turned down, and the other that sat with that person on the picnic table at night. Based on SGT Munnlyns statement a reasonable person would assume that person turned down for sex was 1SG Braun, and the person who sat with him late at night on the picnic bench was CSM Harrington.

LTC Thomas had already interviewed CSM Harrington on 3 AUG 2006 at 0500z and one would have to assume that through his thorough and fair fact-finding procedure that he didn't ask because he simply didn't know what questions to ask CSM Harrington, because he never brought up those questions despite the CSM apparent knowledge of PFC Edwards statements almost verbatim during her sworn statement. CSM Harrington also states that she had "spoken to the individuals in room 3 (Prado, Tolliver, Thompson) and other potential eye witnesses" yet she was never appointed as an investigating officer by the chain of command to conduct herself in such actions. The fact that she is even allowed to get so personally and professionally involved in a legal process while holding the mantle of command authority in unto itself is not only amazing, but it's unlawful as well, and should raise reasonable doubt. If the court also analysis why CSM Harrington got involved and for what reasons it should simply examine 1SG Braun's sworn statement on 4 AUG 2006 which clearly states that "Approximately 4 weeks ago CSM Harrington conferenced with CSM Averrett and myself that she had heard from females within the barracks that the Plaintiff

74

had been seen inside the female barracks and in possibly in just a towel coming out of the latrine. With this information it was decided that CSM Harrington and I would stand watch outside the female barracks to watch for the Plaintiff possibly entering the female's barracks." He then later states "We witnessed SPC Chester leaving the female barracks walking all the way around the building before CSM Harrington decided to follow her into the parking lot to ask what/where she was going. I met up with them in the parking lot and waited for them to finish their discussion before being asked by CSM Harrington to help walk Chester over to the gym. Once seeing her into the gym CSM Harrington and I walked back to the picnic table in MOD Housing to continue observation of female billeting." Not surprisingly the facts state they were there to watch for the Plaintiff because of the reasonable possibility that he might be in the female barracks latrine area with just a towel on. Therefore, two lower ranking Soldiers decide to try to stakeout the barracks to ensure that a Senior Soldier who they have no command influence over does not do something. Then they leave their stakeout that they were so allegedly concerned about in order to walk SPC Chester to the gym, and then 1SG Braun proves who SPC Chester was talking about in SFC Butters statement, when he stated that the CSM Harrington and him then went back to the picnic table in MOD Housing until late hours of the night, and in his case into the early morning.

However, it is what 1SG Braun says next that proves more UCI and the unfairness of the fact-finding procedure in this case. 1SG Braun then states in his sworn statement that "within the past four weeks" PFC Edwards had

communicated with him, and "throughout the past weeks CSM Harrington has spoken with PFC Edwards and SPC Selden in my office at the US NCE to speak to them privately about writing a statement. At that time they said they would consider writing a statement but needed to think about it according to CSM Harrington. Later after SPC Selden decided to submit a statement shortly thereafter PFC Edwards decided to submit hers as well." The court should find it quite odd that CSM Harrington and 1SG Braun two accusers in this case worked on getting witnesses to make statements from anywhere from a few weeks, upwards to anywhere around a month. The same two people that three SSGs accused of threatening them, the same two people whom one was accused of sexually harassing a person, yet no adverse action was ever acted upon against that individual despite the written policy, and even with the same statements and witnesses that were used to convict the Plaintiff, and with hard evidence in the form of a note. In fact, that individual becomes a helper for the IO during his investigation against the Plaintiff which, took him and CSM Harrington anywhere up to a month to illegally produce so called "evidence" in PFC Edward's EEO complaint, that the IO simply somehow, came up with in a day. In addition, 1SG Braun and CSM Harrington had access to the witness list, and even more amazingly weren't asked any questions during the AR 15 – 6 investigation, nor anywhere in the proceedings until the Plaintiff made the UCI motion in JAN 2007, about their apparent misconduct throughout this process in means of utilizing UCI against subordinates under these two senior NCOs commands.

It would be completely disingenuous for a reasonable person to even start to believe that any subordinates under these two individuals' commands made their statements freely, or were not threatened and coerced into making statements. To a reasonable person looking at the evidence just presented they would have to ask themselves why LTC Thomas never interviewed these people again, furthermore, why he interviewed them first in his process, instead of interviewing them last like the AR 15 – 6 guideline suggests. If CSM Harrington and 1SG Braun took up to four weeks to talk to witnesses and gathered the information that it appears LTC Thomas simply used instead of gathering his own information and conducting his own investigation. Then the next statement made by SPC Edwards would have been proven in the beginning of the legal proceeding in the beginning of AUG 2006 and not at the Article 32 hearing on 27 OCT 2006 (which cost the Plaintiff over $20,000 in order to higher a civilian lawyer). In the plaintiffs Article 32 transcript SPC Edwards states "CSM Harrington and 1SG Braun told SPC Edwards about the 15 – 6 investigation." Considering SPC Edwards EEO complaint on 30 JUL 2006 jumped started the informal AR 15 – 6 Investigation, a reasonable person would have to believe based on all of the sworn statement evidence just used from the Plaintiffs record that CSM Harrington and 1SG Braun told SPC Edwards that they were conducting an AR 15 – 6 investigation, and then worked with her for up to four weeks in an attempt to get her to make a sworn statement which she did on 30 JUL 06, and one can only assume based on the statements of others who testified for the Plaintiff during the UCI and

Article 13 Motions in JAN 07 they used the same threats and aggression with SPC Edwards and SPC Seldon.

In LTC Thomas Executive Summary in his AR 15 – 6 Investigation he submitted to higher in order to prosecute the Plaintiff, he clearly demonstrates unfairness in the fact-finding procedure, and it clearly shows the use of an improper legal standard. In the Plaintiffs existing record located in his AR 15 – 6 record on page 4 of 4 in the IO's DA Form 1574, LTC Thomas states "The Plaintiff was given the opportunity to be interviewed, produce witnesses for interview, and to submit sworn statements. This was an in-formal investigation without a specified respondent; however the Plaintiff and any other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning were read their rights and signed DA Form 3881 waiving those rights." First, from the evidence in the plaintiffs record clearly shows that only three witnesses in the AR 15 – 6 signed DA Form 3881, the Plaintiff, SPC Chester, and SPC Lindsey. The Plaintiff will further show how no adverse action was taken against SPC Lindsey during the Plaintiffs proceedings; in fact, she was offered the reward of keeping her AGR job by the command for helping prosecute the Plaintiff. In addition, no adverse action was taken against any other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning simply because the IO didn't conduct a fair fact-finding procedure, and therefore, never asked such questions to individuals who surely should be reasonably suspected of interfering with an ongoing investigation amongst other charges. Furthermore, this clearly proves that the

alliance forged between the prosecution, the Commander, and the material witnesses throughout the Plaintiffs case did not maintain the required delicate balance between military justice and command discipline. U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994). As in the U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994) case the Plaintiffs Commander and most of the witnesses are also the officers and NCOs who convened the Plaintiffs investigation, and just like in that case the record should leave this Honorable court with a reasonable doubt as to whether the proceedings were affected by UCI.

LTC Thomas committed liable with his statement that the Plaintiff was "given the opportunity to produce witnesses for interview, and to submit sworn statements." On 4 AUG 2006 in an interview with the IO at 1000z MAJ Koch the Chaplain made the following statement "The Plaintiff has approached me twice seeking my help. The first time was Wednesday night, 2 August 2006. He had just finished talking with COL Williams and said he received permission to ask me to be a mediator between him and a witness base he wanted to develop. I told him I would have to check in with COL Williams and LTC Thomas (the IO for the 15 – 6 investigation) in the morning. After sleeping on it, I realized that I could not be put in that position and I felt that I was being manipulated by the Plaintiff to have access to people to possibly intimidate them. When I told COL Williams about my feelings he agreed and also commented that he did not give the Plaintiff permission to talk about the case with anyone even with me present. COL Williams said he told the Plaintiff that it would be a good idea to have a person such as me present if he engaged anyone in conversation (other than the

investigation) to protect himself. LTC Thomas agreed and reiterated that the Plaintiff was not allowed to talk with anyone about the investigation period." These egregious acts clearly demonstrate that the same investigators prepared an inaccurate transcript of the investigation, and forwarded those crimes based upon incompetent, inadmissible, or even illegally obtained evidence, to a higher authority based on crimes that the plaintiff did not commit. More evidence on this matter will be addressed in further comparison with the Plumb case.

The third and seventh egregious UCI act in the plaintiff's case was when commanders and supervisors alike warned witnesses away from the trial and the plaintiff, and where personnel in command mantle positions acting as unauthorized investigators apparently on their own, when they decided to conduct a surveillance mission on a Senior Officer, which had not been officially approved by the Commander. The Plaintiff calls to the courts attention his Military No-Contact Order, dated 31 JUL 2006 titled Evidence Attachment 10. This memorandum clearly states in paragraph 2(a) "Make no contact whatsoever in-person or through telephone, mail and other written correspondence, e-mail, or third parties, with the persons listed in paragraph 4, pertaining to the on-going AR 15 – 6 investigation and allegations of misconduct made against you related to the commission of adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1. If you believe it is necessary to have contact with these persons for matters unrelated to this investigation or these allegations of misconduct, such contact must be made through your chain of command." However, when the Plaintiff went to the only person in his chain of command

(who happened to be COL Williams) he was given one answer in regards to getting information such as sworn statements and/or witnesses for his defense, and that statement was "the Plaintiff is not allowed to talk with anyone about the investigation period." Therefore, the plaintiff was never "given the opportunity to produce witnesses for interview, and to submit sworn statements" which totally contradicts the executive summary of his AR 15 – 6 investigation.

LTC Thomas also used statements throughout his investigation that he never looked into in order to prove if they were true or untrue, voluntarily made or not, and in fact were in violation of the law, when the individuals who made them actually made false official statements. Yet once again, against his charge and responsibility as the IO to thoroughly investigate the matters fairly, and in doing so read other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning their rights and signed DA Form 3881 waiving those rights, he chose by his actions to do nothing. In doing nothing LTC Thomas, left this procedure unfair and extremely one sided, thereby, introducing untrue statements based on Privacy Act violations, Freedom of Information act violations, Wrongful Invasion of Privacy based on a public disclosure of private facts, and a publication placing the Plaintiff in a "false light. This was accomplished by people he classified as "victims and witnesses" who committed Slander, and Liable against the Plaintiff. Furthermore, LTC Thomas used these violations as actual facts in his findings and deliberation that he then deemed to be true based on his fair fact-finding procedure, in determining that his "investigation revealed a history and definite pattern of inappropriate

81

behavior, violations of regulations and potential crimes committed by the Plaintiff. LTC Thomas then submitted this so called "evidence" to a higher authority that also neglected and/or ignored the contradictions of statements, the credibility of their witnesses, and the multiple violations of several laws to convict the plaintiff of the alleged behavior, and then wrongfully imprison him based on an improper legal standard.

The plaintiff has already asserted that CSM Harrington and 1SG Braun initially conducted the investigation used by LTC Thomas. Now the evidence shows that after being informed by COL Williams, the COL's primary staff then joins in to assist in proving the Plaintiffs guilt, in order to support COL Williams proclamation of guilt. Evidence of the command as a whole conducting this investigation is proven with Evidence Attachment 10 which states the following "Effective 31 July 06, you are flagged for adverse action pending the result an AR 15 – 6 Investigation. You are to turn over the responsibly of the duties as 207th Infantry Brigade Executive Officer (XO) to LTC Michael A. Thompson. You are hereby directed to turn over all files (both paper and computer), documents, pending actions and other information pertaining to duties as the Brigade XO. A proper battle hand off is critical to the success of the unit. Effective 31 July 06, you are directed to assume the role as the ANA Liaison Officer and backfill LTC Thompson. He will turn over all actions and files to you and conduct a proper battle hand over. The Point of Contact for this memorandum is undersigned," and the memorandum is signed by COL R. Stephen Williams. However, no such battle hand off ever occurred with the plaintiff taking over duties for LTC

Thompson, but instead they stayed in the Brigade TOC area as the plaintiff showed the new XO the duties and responsibilities of the job.  In fact the plaintiffs shared his office with LTC Thompson until his transfer to BAF.

In MAJ Parker's sworn statement the plaintiff is using MAJ Parker's computer due to basically having been stripped of his office and position, by COL Williams on 31 MAY 2006, to research information since he was told that he was "not allowed to talk with anyone about the investigation period."  In the IO's write up on his interview with MAJ Parker on 3 AUG 2006 at 0500 he credits this statement to the interviewee "MAJ Parker said that MAJ Gamble had used his computer (still logged on to MAJ Parkers Login) to get information and had left it "at the web cite".  (That information was provided to the IO and is attached as Evidence Attachment 11)."  The amazing thing here is that COL Williams the appointing authority for the AR 15 – 6 investigation, and the so called "neutral party" in this investigation not only gets this information, but then personally gives it to the IO with the following statement written on a hard copy of the plaintiffs research "Gary – the plaintiff was on my S2s' computer and left this on.  He is looking to use this for defense."  This clearly shows that the Commander is trying to influence the outcome of the investigation, and cut off any potential defense the plaintiff was or could possibly use by not allowing him to gather witnesses, talk to anyone about the case, or even research a possible defense without trying to counter what ever the plaintiff came up with in his defense, prior to obtaining a military or a civilian lawyer, and his actions were contrary to statue, settled case law, or valid regulation.  COL Williams actions intentionally/willfully violate the

83

following: Article 37a of the U.C.M.J.; the maintenance of delicate balance between military justice and command discipline; and the plaintiff's constitutional rights to a fair trial.

The plaintiff in this instance was simply researching what he knew was going on, which was Wrongful Invasion of Privacy based on a public disclosure of private facts, a publication placing the plaintiff in a "false light, and unlawful command influence. All summed up these elements were all being used against him to support accusations of slander, libel and/or both. Slander involves verbal derogatory statements, while libel involves written ones. In a court of law, the plaintiff pursuing the lawsuit such as in this case would charge defamation of character to cover any form of false or damaging allegations. The commands tactic here of having everyone act as an IO against the plaintiff with information given to it by the commander along with his personal opinion on the punishment fitting for the plaintiff, further explains why it only took LTC Thomas one day to conduct a supposedly "fair fact-finding" procedure. Furthermore, this tactic clearly opens the door for slanderous and libelous statements from the witness pool, who could say anything that would make them look good in the eyes of the command, without regard to the truth or voluntariness, and face no consequences for doing so, based on the proven facts of only doing what the plaintiff described as "a one sided witch hunt" which sought only to prosecute him, and not obtain the truth of the matter, as so clearly demonstrated already by the command and the IO's actions. In fact several of the witnesses use obvious malicious intent against the plaintiff, these witnesses do it without working in the

public's best interest at the time, and in doing such directly led to the plaintiffs
wrongful incarceration, wrongful dismissal from the U.S. Army, severely
damaged the plaintiffs military and civilian career prospects, caused the plaintiff
and his family's personal and professional mental distress; embarrassment; and
humiliation.  Furthermore, it caused the plaintiff and his family to suffer
financially, physically, emotionally, and spiritually from the damages the
defendants caused to the following: his name; material and moral; lost revenue;
general; punitive; and real humiliation, embarrassment, wrongful imprisonment,
wrongful dismissal, and punitive damages.

   The plaintiff asserts that the unfairness of the fact-finding procedure by LTC
Thomas and the plaintiffs command even went as far as to repeatedly violate his
right to privacy, which is protected by a privacy statue.  Such violations are
clearly shown in the sworn statements of two of the witnesses during the AR 15 –
6 Investigation conducted by LTC Thomas.  First, MAJ Frank L. Veith Jr. on 4
AUG 2006, at 1730 local time.  In MAJ Veith's statement shows how the case
was topic of conversation by not only the primary staff at this time, but by others
directly under the command of COL Williams. MAJ Veith states that he "wants to
cite an action that was pointed out to me by MAJ Bill Luce."  He then goes on to
say "I was informed that the plaintiff personally" did an accusation and that such
accusation "can be verified by MAJ Rob Barr the NCE S-1."  This shows the
command utilized "teamwork" in ensuring that each person received the same
slanderous statements from an illegally kept file in the governments possession,
that they then turned into vicious libelous statements to present the plaintiff as a

bad character to the fact-finder, which the IO then used as unconfirmed truths. This coupled with the fact that the IO and the command collectively did not give the plaintiff a chance to defend himself from these statements that were used with malicious intent and with disregard to the public's best interest at the time in order to wrongfully incarcerate, and wrongfully dismissal him from the U.S. Army, severely damage the military and civilian career prospects, of the plaintiff while causing his family personal and professional mental distress; embarrassment; and humiliation. Furthermore, the plaintiff and his family had to suffer financially, physically, emotionally, and spiritually from the damages the defendants caused to the following: his name; material and moral; lost revenue; general; punitive; and real humiliation, embarrassment, wrongful imprisonment, wrongful dismissal, and punitive damages. Finally the plaintiff asserts that he did in fact prove that the accusations made by many of the defendants that he had "personally shopped" for woman to put on the deployment roster was proven to be false by a motion filed by the plaintiffs civilian lawyer in a Motion in November 2006 in Kuwait, and sustained by that M.J. The motion was sustained based on the testimony of several of the so-called "victims" in the plaintiff's case who said the statements were untrue, as well as a witness in the plaintiff's rear command. However, the damage was already done as an improper legal standard had already been applied to the plaintiffs case, as well as an unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the plaintiff" based on a total of "33 command influenced interviews, numerous official sworn

statements that were false, and an interview summaries that is full of liable that creates fraud on the court. All of which was taken and submitted into evidence that supposedly supports in depth the bases for the case that the government presented and utilized against the plaintiff based on these alleged "victims and witnesses."

MAJ Luce makes the statement in his interview with the IO 6 AUG 2006 that he "knew of a sexual harassment investigation back in Alaska" against the Plaintiff, and MAJ Veith is further credited with making the following statement "flirting with females is a "Faradism" and that he had a sexual harassment charge in Alaska." MAJ Veith makes that statement based on the IOs question of do you have any other information pertaining to this matter, or would you like to make any other statements? Please write any other information you would like to provide. Therefore, MAJ Veith made a statement that clearly shows The Alaska National Guard Youth Corps, and the Alaska Army National Guard violated the Privacy Act and the Freedom of Information Act with their negligence in the administration, supervision, and subsequent monitoring of the Privacy Act. The disclosure of information reference the plaintiff from a case 12 years prior is in a secret file kept by The Alaska National Guard Youth Corps, which is under the command authority of The Adjutant General of the State of Alaska, who is the Commissioner of the Alaska Army National Guard. The privacy of that case isn't even in the plaintiffs personnel file, and is also incomplete as the government was unable to turn up the EEO investigation done in that case by the Alaska Army National Guard. Yet, it is still protected by a privacy statute, but somehow

12 years later in a sworn statement made by a witness for the U.S. Army in a case against the plaintiff it is maliciously used as a damaging statement against the plaintiff in an ongoing investigation.  Furthermore, this violation of the privacy act is committed by people in command mantle positions in the plaintiff's case whom the U.S. Army has no U.C.M.J. authority over.  Yet their illegal actions are allowed by the government in the plaintiffs case, and taken as truth despite the government not being able to provide the plaintiff with a fair trial at this point based on its lack of jurisdiction over potential witnesses in the case who are committing egregious acts of UCI, in addition to breaking the Privacy and Freedom of Information Acts.  Furthermore, the government utilizes information obtained by the aggregation of legally and factually unsupportable charges, which denied the due process even as to the valid charges.  In doing so, the government allowed the mere allegation of baseless charges to influence not only the fact finder by suggesting that the accused is a bad character, but the entire witness pool in the plaintiffs case that extended even beyond the plaintiffs rear detachment to the public as well doing an ongoing investigation.  MAJ Veith made this statement as a matter of facts to describe the plaintiffs so called "Fredisms" or behavior, and that indeed he had been charged as a sexual harasser in Alaska.  This libelous statement clearly violates the Privacy Act which by law requires the U.S. Army, the Alaska Army National Guard, and The Alaska National Guard Youth Corps to perform information management functions and are suppose to be the only ones acting in an official capacity who have access to this private information.  Yet, a person who has never had a right to know, and

who is not acting in an official capacity swears to it as facts in an ongoing investigation 12 years after the fact, and the statement is not only taken as true for the investigation, but also circulate around the plaintiffs organization at KAF, Alaska, and a unit deployed to Mississippi as what the military trial judge at the BAF motions in JAN 2007 would call "rumors" that depict the plaintiff to the witness pool as the Command clearly wanted him to be depicted as "a predator, a psychological predator, and a bad guy who needed to go down." Furthermore, these rumors were being talked about in public settings and in private settings, and provided the public access to information contained in records in the possession or control of the defendant which release jeopardized the constitutional rights of the plaintiff during an ongoing legal proceeding. Once again the plaintiff supposedly kept this out of his case with a motion filed by the plaintiff's civilian lawyer in a Motion hearing in November 2006 in Kuwait, and sustained by a military judge. The motion was sustained, however, the damage was already done as an improper legal standard had already been applied to the plaintiff's case, as well as an unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the plaintiff." However, all of this information was used by commanders and supervisors alike to warn potential defense witnesses away from the trial and the plaintiff by suggesting and then taking illegal action to show that the plaintiff was a bad character.

The fourth and sixth egregious acts of UCI in the plaintiff's case was when witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense.  In addition to, the plaintiff having at least one witness who was told not to talk to defense counsel, while one government witness was merely encouraged to reconsider her statement and another was simply re-interviewed.  The plaintiff will first point out here how the record discloses how SPC Lindsey was re-interview after the AR 15 – 6 Investigation had ended, by the command and not by the AR 15 – 6 Investigator. At this re-interview she makes a totally new statement that completely contradicted her first official statement made at the AR 15 – 6 Investigation.  SPC Lindsey (yet another key witness interviewed early in the process except this witness was initially suspected and threatened with being charged with adultery and other charges) made what the prosecution considered a false official statement on 4 AUG 2006 at 1142 A.M. local time.  Her integrity was never challenged during the proceedings, nor was it ever looked into by the court as to whether her second statement made after the AR 15 – 6 Investigation had ended, at her "re-interview" and right before her going on leave on 19 AUG 2006 had any merit.  The military legal system just assumed she was completely and voluntarily telling the truth this specific time, and during this specific statement, unlike her previous time and statement, and although she made this new statement with 1SG Braun and others in command mantle positions who seem to not only be in the room with her during this interview, but who sign off on her new statement as witnesses.  The military legal system based on the actions of the

prosecutor and the command obviously encouraged her to re-interview prior to her going on leave, after the AR 15 – 6 Interviews were concluded. No other witnesses in the plaintiffs case was ever re-interviewed despite their role, and/or alleged misconduct throughout the plaintiff's case. The Plaintiff contests that 1SG Braun and others in command mantle positions were there in the room as witnesses to ensure SPC Lindsey carried through with that second statement in her re-interview, which also eventually resulted in her obtaining immunity throughout the trial from the prosecution, as well as her admonishment to SSG Francis before the General Court-Martial in JAN 2007 that she was promised by the command, that she could keep her Active Guard/Reserve (AGR) job upon returning to Alaska from Afghanistan. Thereby, one could perceive from the CSM Harrington statement they used SPC Seldon's statement that "SPC Lindsey was afraid of losing her military career if she was accused of adultery" as a motivation for her to get special benefits from the Army.

The plaintiff's next point is how SPC Dean was encouraged to reconsider her statement. SPC Dean although she was never charged with anything such as making a false official statement allegedly "sought out the prosecutor" in order to reconsider her statement that she also falsely made during the AR 15 – 6 Investigation. In her AR 15 – 6 Investigation she was strongly adamant to other witnesses who attested to how she stated that "she would and has never done anything with the plaintiff" or words to that affect. Yet SPC Edwards AR 15 - 6 statement contradicted SPC Dean's statement, because SPC Edwards makes mention that her and SPC Dean had a conversation in the rear about having sex

with the plaintiff. In that conversation SPC Edwards despite her perjured testimony and false sworn statements mentions that "she found the plaintiff attractive and wanted to have sex with him" or words to that effect. After that admonishment SPC Dean responds that "she had sex with the plaintiff and that it was a very enjoyable experience" or words to that effect. Yet both either perjured themselves when they testified or made false official statements that they never or no longer wanted anything sexual to do with the plaintiff. In making this reconsidered statement her new statements almost completely contradicted everything that she had sworn was true and correct before during the AR 15 – 6 investigation. However, the damage was still done as her false official statements so strongly displayed by her contributed to the atmosphere of fear and terror that the command created in order to obtain witnesses who believed that the plaintiff was "a bad guy who needed to go down", or "a predator." SPC Dean's testimony was successfully refuted by defense witnesses called to the stand during the plaintiffs General Court-Martial when they showed how the inconsistencies in her testimony about "being offended or sensitive to comments" or words to that effect by the plaintiff were a lie, or at least false enough for the jury not to reach beyond a reasonable doubt. The defense witness testimony showed how SPC Dean openly bragged about her use of sex toys while in theater. SPC Dean was seeking special benefits from the Army and was awarded immunity for her perjured testimony and false official statements in order to avoid being punished by the command or the prosecutor for having an adulterous affair before, and while she was at KAF on a Title 10 status. In fact

her alleged affair with the plaintiff was prior to her even being placed on a Title 10 which gave the plaintiffs Court-Martial no jurisdiction to prosecute her on that charge. Therefore, her seeking immunity was clearly an attempt to appease the desires of the command so she would not be prosecuted for the illegal activities that she now was participating in. Once again, despite numerous other government witnesses who made false official statements during the AR 15 – 6 Investigation, SPC Dean was the only witness encouraged to reconsider her false official statement, to be adopted by the prosecutor as true and factual in the plaintiff's trial.

The plaintiff cites here that with testimonial immunity it is the constitutional minimum, Kastigar v. U.S., 406 U.S. 441 (1972). Rule 301(c)(1) and promises that in return for testimony, the government will not use that testimony against the witness in any later prosecution. Nor will any derivative use be made of the testimony. This is the preferred type of immunity in military practice because it affords the government the opportunity to obtain otherwise protected testimony and yet retain the option to prosecute the witness. But if the immunized witness is later tried, the prosecution bears a heavy burden of demonstrating that no use, or derivative use, has been made of the accused's immunized testimony. In this case it would be the immunized testimony of SPC Lindsey and SPC Dean. in New Jersey v. Portash, 440 U.S. 450 (1979); and U.S. v. Garrett, 24 M.J. 413 (C.M.A. 1987) the prosecution satisfactorily showed that the evidence that it used at accused's retrial was not tainted by his immunized testimony given after the first conviction. The plaintiff cites these cases not because the government gave

two witnesses immunity, and not even for the care inquiry conducted by the M.J. on the plaintiff. The plaintiff cites these cases because the safest way for the prosecution to obtain immunized testimony and also prosecute the witness is to prosecute the witness first. An alternative is to obtain all of the evidence that it would use against the witness and then have the evidence certified and sealed before the witness testifies under the grant of immunity. At the later hearing to determine whether any derivative use will be made, the prosecution can present the "untainted" evidence it intends to use. However, the prosecution, the command, and the convening authority never prosecuted or intended to prosecute the witnesses it granted immunity to. It was solely bound and determined to prosecute the plaintiff according to its will. Furthermore, the M.J. at the plaintiffs court-martial and the ACCA never determined where the immunized testimony of those two witnesses was true in law and fact. As stated before they've only looked at the impacts of actual UCI on the plaintiff which have been in error, and not the apparent and perceived aspects of UCI. The plaintiff strongly asserts that the M.J. and the ACCA's lack of purging actions in his case once again demonstrates how they have failed to remove taint from his trial and thus denied him the due process of the law.

The grant of immunity removes the threat of incrimination from the witness and thus the witness can be compelled, over objection, to testify. Failure to do so may result in criminal or administrative sanctions. The grant should only require that the witness will testify truthfully. It should not spell out the contents of the testimony that the witness will give. The grant of immunity does not bar

later prosecution for false swearing, perjury, or making false official statements. In R.C.M. 705(b), and U.S. v. Olivero, 39 M.J. 246 (C.M.A. 1994) the accused was prosecuted for committing perjury at Article 32 Investigation after being granted immunity; and the conviction was reversed for lack of direct evidence of perjury.  The plaintiff points this out to bring up his next point, which is how witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense.  The only witness who was prosecuted prior to the trial, threatened by the command in a counseling statement that depending on how she testified would depend on if she was granted leave or not, and then Chaptered out of the Army after being repeatedly punished or denied favorable treatment in part because of her association with the plaintiff and because she support his defense was SPC Chester.

Prior to trial SPC Chester defended herself in a Summary Court-Martial, however, she received 10 days of incarceration as her punishment as a sentence.  Yet, she still managed to get SPC Lindsey dismissed from the proceeding for her repeated perjured testimony which the Summary Court-Martial officer noticed upon the proof offered and then concluded that she was not a credible witness.  Like SPC Lindsey, SPC Chester was initially suspected of misconduct by the command during the AR 15 – 6 Investigation.  Also she was told by the command that "she was not being prosecuted for her alleged offenses because they were only focused on getting the plaintiff" or word to that effect. However, when as stated above SPC Chester started to make allegations of how she was being sexually harassed by 1SG Braun the way the command treated

her from that point completely supports denying her favorable treatment in part because of her association with the plaintiff and her support of his defense against primary government witnesses, and witnesses who held command mantle positions. Examples are as follows: SPC Chester went to the Chaplain in AUG 06 to complain about being sexually harassed, but received no help or assistance from the Chaplain. She then went to the IG to file a complaint, but once again was granted no assistance after writing up a statement. She then tried to call the EEOs office in Bagram for assistance, but was granted no assistance. The commands responses seemed to be that she was just not credible for them to believe her charges. However, even as pointed out previously others like SGT Munnlyn and SFC Butters even gave sworn statements to how she had told them about this harassment, furthermore, even 1SG Braun's AR 15 – 6 Sworn statements seems to perfectly match the times, dates and locations of what SPC Chester had stated to others and in her complaints to the Chaplain, IG, EEO, and both AR 15 – 6 Investigators. Yet no one helped her because of her association with the plaintiff.

The Privacy Act of 1974, Freedom of Information Act of 1964, and Department of Defense Public Affairs regulations and practices encourage a policy of not commenting on an investigation while it is ongoing. However, she was also spoken of in deeds but not in name in the four town hall meetings, and during a Non Commission Officer Professional Development (NCOPD). During this NCOPD 1SG Braun by order of CSM Averrett gave a class on perceptions, and military customs and courtesies. No other NCOPDs were given to such a

96

massive group where it mentioned a racial example of "a little short black officer and a Specialist" or words to that effect and depicted alleged behavior in a negative way to everyone that would imply guilt of all of the charges in order to have more people testify against the plaintiff by creating an environment that fueled anger and malice towards the plaintiff and SPC Chester. SSG Vega stated that "he left the NCOPD whom SPC Chester was not invited to feeling sorry for her and the character assassination that was done to her and the plaintiff during the class" or words to that effect. Yet it wasn't until she obtained a lawyer and contacted the EEO in Bagram again that the Bagram EEO did something about her complaint. The incredible thing here are the actions that the EEO office and the command did in response to her sexual harassment complaint. The EEO office contacted COL Williams who ordered an AR 15 – 6 Investigation. Word traveled fast around KAF and 1SG Braun went to CSM Averrett because he had heard that SPC Chester still had in her possession a note that he had given her, (Attachment 8). He obtained this information from MAJ Veith, and CSM Averrett told 1SG Braun "not to worry about it" or words to that effect. COL Williams then assigned LTC Thomas's Executive Officer (XO) who was a witness for at least two AR 15 – 6 Investigation statements in the plaintiff's case as her Summary Court-Martial Officer. Then he assigned LTC Thomas's Operations Officer (S3) and the LTC Thomas's XOs roommate in theater who also was a witness to an AR 15 – 6 Investigation statement in the plaintiff's case. The S3/AR 15 – 6 Investigation officer for SPC Chester somehow concluded despite the same comments and witnesses utilized to

convict the plaintiff about alleged sexual harassment behavior, despite a handwritten note by 1SG Braun which constitutes hard evidence and not just the propensity of the evidence as in the plaintiffs case based on spoken testimony, that any actions by 1SG Braun were inconclusive and the AR 15 – 6 Investigation determined that no harassment by 1SG Braun occurred. Moreover, unlike how the plaintiffs command treated SPC Edwards who didn't go through half of the steps that SPC Chester did, and didn't have half the proof that SPC Chester did, the actions of the command clearly demonstrates how the command's treatment of other witnesses in other cases clearly displayed if you supported the plaintiff you would be punished.

A general or special court-martial convening authority is disqualified from appointing a court if he is an accuser; the case must be referred to a superior competent authority for disposition. Failure to do so, however, is a nonjurisdictional error. An accuser is a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than an official interest in the prosecution of the accused. The case law has amplified upon this proscription to include those convening authorities who are victims of an offense, those connected with the prosecution of the case, and those connected with the pretrial investigation. The proscription does not apply to summary court-martial convening authorities. However, in the plaintiffs case reference SPC Chester's summary court-martial, the plaintiff concedes that because it was a summary court-martial that it may not appear to apply legally, but when it is used by

98

accusers in command mantle positions in his case in-conjunction with a general court-martial in order to prefer improper charges and further threaten the potential witness pool with both administrative and judicial punishment it becomes a tool that the command utilized to deny him the due process of law with egregious acts of UCI to ensure he was punished according to its will.

When commanders and their representatives express personal opinions regarding the result in any particular case or series of cases, such as in the SPC Chester's Summary Court-Martial, their opinions may (and often do) affect the way judges, court members, counsel, and witnesses think and act. Because these opinions have, at the very least, the ability to improperly influence other courts-martial, they constitute actual or apparent unlawful command influence, as they did and have in the plaintiff's case. Article 37 of the U.C.M.J. expressly proscribes the censuring, reprimanding, or admonishing of members, judges, and counsel with respect to findings, sentences, or the functions these person performed in achieving those results. In the plaintiffs case as seen above COL Williams influenced these members in SPC Chester's case, and with his behind the scene actions with the plaintiffs AR 15 – 6 Investigator. He deliberately censured the fact-finders and potential witnesses under his command with respect to the findings in the plaintiff's case. Furthermore, post-trial comments to or about any witness testimony given during a trial will often raise to the issue of unlawful command influence. Like it did when CSM Averrett told 1SG Braun not to worry about the letter or words to that effect because the command had

already spread the word prior to, and from SPC Chester's court-martial that she was not credible even with physical evidence that substantiated her claims.

As one court has recognized, the policy of conducting post-trial lectures to witnesses after they have testified presents a potential chilling effect on the system. The phrase "chilling effect" is often cited in unlawful command influence cases to emphasize the devastating effects that commander statements and actions can have on future cases. Furthermore, such lecturing not only affects the future testimony of those particular witnesses, but also has a direct impact on the testimony of potential witnesses in future cases. This is especially true when comments criticizing witness testimony from a prior court-martial are addressed to groups.

Critical comments, however, are not the only prohibited conduct tending to discourage future testimony. Adverse post-trial actions against witnesses also create a chilling effect. For instance, in U.S. v. Jameson, 33 M.J. 669 (N.M.C.M.R. 1991) noting that process of litigation of command influence issues will benefit if it is possible to decide cases without stigmatizing perpetrators as "military justice outlaws;" court concluded, however, that adverse actions against two defense witnesses amounted to unlawful command influence. Not only was the review of that accused's case held to be potentially affected by unlawful command influence, but so was a subsequent court-martial involving similar charges. Therefore, commanders and their representatives must endeavor to choose their words and actions carefully so that members of their commands will not perceive them as discouraging witness testimony. COL Williams and others

100

in command mantle positions obviously never endeavored to choose their words and actions carefully because members of their command made truthful sworn statements and testified truthfully about how they perceived the egregious acts and statements as denying the plaintiff his due process of law by proclaiming him guilty, in an angry, livid manner, that created an environment of fear that defense witnesses expressed with comments about losing their jobs, the jobs of their loved ones, or suffering further chilling effects from the command because of the threats the command had and was using in order to discourage witness testimony.

The Court of Appeals for the Armed Forces has taken a very strong stance against attempts to frustrate the testimony of witnesses, and has stated such attempts violate an accused's right to have access to favorable evidence. U.S. v. Drayton, 45 M.J. 180 (1996); U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986); U.S. v. Gleason, 39 M.J. 776 (A.C.M.R. 1994). In the Gleason case the court drastically reduced sentence where there was blatant unlawful influence on defense witnesses. Furthermore, military courts have also held that unauthorized influence on witnesses, with respect to their testimony, violates Article 37 of the U.C.M.J., even though such influence is not specifically addressed in that provision.

Exerting influence on witnesses may also raise constitutional issues. Discouraging witnesses from testifying on behalf of the accused raises Sixth Amendment concerns in that it threatens the fundamental right to a fair trial, the right to compulsory process, the right to cross-examine and confront witnesses,

and the right to the assistance of counsel. It also potentially violates Article 46 of the U.C.M.J., which assures the defense equal access to evidence.

While intentional and direct attempts to influence witness testimony in a particular case are clearly prohibited, witnesses can be improperly influenced if there is an implication or perception that witnesses testifying on behalf of an accused will be cast in a negative light. U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986); U.S. v. Hall, 36 M.J. 1043 (N.M.C.M.R. 1993), where the trial judge erred in not reopening sentencing hearing to consider evidence of possible command influence on defense witness; trial judge permitted commander to sit in courtroom to hear testimony. In the plaintiffs case the ACCA erred similarly, and the trial judge permitted the command to be present at the trial. This issue will be addressed more in the plaintiff eighth and final egregious UCI act comparison. U.S. v. Jones, 33 M.J. 1040 (N.M.C.M.R. 1990), where the case was remanded for rehearing on sentence where it appeared that commander's adverse actions against defense witnesses in earlier case might have had impact on defense witnesses in accused's case. In U.S. v. Clemons, 35 M.J. 767 (A.C.M.R. 1992) the accused's commander's action of counseling four potential defense witnesses concerning case amounted to unlawful command influence and his actions had chilling effect on their testimony. Likewise, the pre AR 15 – 6 investigation counseling of witnesses by personnel in command mantle positions, which is present in the plaintiffs Record of Trial and allied paperwork, obviously proves the presence of this chilling effect. Furthermore, in the Clemons case the error was cured by judge's remedies at sentencing, inter alia, giving defense

broad latitude and barring prosecution from calling witnesses in aggravation. Yet no such cure was ever performed by the judge in the plaintiff's case in order to correct this error.

The dangers associated with commenting on possible testimony of witnesses were made clear in U.S. v. Thomas, where the court addressed the possibility of massive command influence affecting literally hundreds of cases. In the plaintiffs case the four town hall meetings, and actions of his rear detachment had this same possible massive command influence which literally affected hundreds of witnesses. In the Thomas case, the commanding general had offered his thoughts on the propriety of officers and noncommissioned officers testifying on behalf of defendants. The court ultimately concluded that in cases where unlawful influence has been exercised, the findings and sentence should not be affirmed unless it appears, beyond a reasonable doubt, that the findings and sentence have been affected by that influence, otherwise they have found it necessary to consider much more drastic remedies, however, in the plaintiffs case no drastic remedies from the trial judge, nor the ACCA were ever considered or instituted in order to cure his trial from the taint of UCI. Instead, the findings and sentence were affirmed when there appears beyond a reasonable doubt that the plaintiffs case clearly displays that UCI has been exercised.

Fraud on the court had a substantial contributing effect on the findings of guilty and the sentence. The ACCA erred in failing to order a fact-finding hearing to assess the victim's credibility after they recanted their testimony, especially

103

given the lack of physical evidence. In <u>U.S. v. Edmond</u>, 63 M.J. 256, 2006 CAAF Lexis 518 the plaintiff service member subpoenaed a codefendant to testify at his court-martial. The codefendant was present at the courthouse but was questioned by the prosecution and essentially warned that if he testified as he intended, he would likely be charged with perjury. The witness then decided not to testify and left the courthouse without speaking to defense counsel. The prosecutor and defense counsel stipulated on the record that the witness prejudiced his Fifth amendment right against self-incrimination. The service member argued that the evidence showed prosecutorial misconduct in the "advisement" of the witness and also that his defense attorney had provided ineffective assistance. Defense counsel admitted that he should have done more to preserve the record concerning the witness. The court agreed and found that the prosecutor's intent was likely to influence the witness not to testify. Defense counsel was ineffective by failing to talk with a potentially exculpatory defense witness as a possible legitimate defense.

In the plaintiffs case such behavior by the prosecutor strong arming witnesses such as SSG Prado calling her "a liar," or words to that effect, saying that "she was defending people," or words to that effect, and saying in the plaintiffs motion to suppress trial that "if given the chance to testify SPC Chester would commit perjury on the stand because she's already been found guilty at her summary court-martial," or words to that effect , in-conjunction with telling her if "she testified as she planned she would be prosecuted for perjury" certainly intimidated defense witnesses and assisted in driving them from the stand. No

government witnesses were punished or threatened with punishment for similar conduct on giving perjured testimony, or possibly giving perjured testimony, even when offered immunity, which is clearly substantiated through the record of trial and the allied paperwork. The prosecutor's intent was likely to influence defense witnesses not to testify, which they did not through their actions, while government witnesses did without fear of prosecution for committing perjury.

The eighth egregious UCI act was where personnel in command mantle positions and/or accusers socialized with each other or witnesses as follows: Outside of the courtroom immediately before and after they testified at the plaintiffs Court-Martial trial; Before and after they committed perjury at the Article 32, Motions trials, or plaintiffs Court-Martial trial; and Before and after they made false official statements during the AR 15 – 6 Investigation. Examples of this is as follows: Although courts-martial are public trials in most instances, attendance by a commander or his or her representatives may amount to unlawful command influence in and of itself. Such attendance, in or outside the courtroom, can discourage witness testimony or possibly affect the impartiality of judges and court members. In the plaintiffs case the witnesses both government and defense were mixed together in a "waiting area" outside of the courtroom prior to and during his Motion to Dismiss trail. When COL Williams arrived in this "waiting area" the government witnesses all gathered around him and were laughing and joking while the defense witnesses sat in the corners of the "waiting area" away from the government mob keeping to themselves. The plaintiff had his counsel request that the chain of command and personnel in command

mantle positions who had committed the egregious acts of UCI be banned from coming into the courtroom itself, since some of them had come into the room and sat down.  Just as in <u>U.S. v. Singleton</u>, 41 M.J. 200 (C.M.A. 1994) after hearing evidence that command influence may have been exercised in that case, the judge barred the chain of command from being present at trail.  However, the judge erred in the plaintiff's case, due to the fact that although he banned them from being inside of the courtroom, he did not ban them from being outside of the courtroom where witnesses were prior to the entering and immediately following them departing the courtroom.  Further, the ACCA erred when they did not do a post-trial hearing also based on the Singleton case where during even a lengthier post-trial hearing, the trial judge heard extensive evidence on a "reign of terror" conducted by the unit's Sergeant Major.  In the plaintiff's case, one of the unit's Sergeants Major, a 1SG, and the Commander were at the heart of witnesses testifying, and the evidence contained in the record of trial and allied papers about their "reign of terror."  Yet, the ACCA never conducted a DuBay hearing to clear the plaintiff's trial of taint.  Therefore, as in the plaintiffs Motion to Dismiss trial for Article 37 and 13 violations the commander testimony at trial may amount to improper influence if the testimony is designed to allow the commander to express his or her general views about the seriousness of the offense or the appropriate sentence to be adjudged.  COL Williams had already stated for the entire witness pool during the four town hall meetings and staff calls his very opinion on this matter, and now sat on the stand and defended his statements, and claiming he wasn't upset, despite the defense calling witnesses who testified

106

that he was and/or appeared to be by their perception. In the <u>U.S. v. Sanford</u>, 29 M.J. 413 (C.M.A. 1990) the commander's general views about appropriateness of punitive discharge were improper. In addition, in the <u>U.S. v. Horner</u>, 22 M.J. 294 (C.M.A. 1986) the battery commander's testimony indicated personal view that accused should be discharged. Although COL Williams carefully made his statements and emphasized how much time and how hard it was to replace the plaintiff, the plaintiff clearly shows that he committed perjury on the stand about the date and time in which he actually replaced the plaintiff. The judge just took for face value that COL Williams was telling the truth despite the conflicting witness testimony presented by the plaintiff for his defense. The testimony by COL Williams, CSM Harrington, 1SG Braun, and MAJ Nichols (all of the witnesses called by the government during the plaintiffs motion to dismiss trial) is impermissible if merely a pretext to influence the military trial judge into returning a particular sentence. Furthermore, COL Williams and MAJ Koch testified about an accused's rehabilitative potential when they defended their statements about how they called the plaintiff "a predator" and how his alleged behavior matched that of one, so the term stuck with others. However, unless the commander has direct knowledge of an accused's service performance (which the plaintiff acknowledges that COL Williams had, but MAJ Koch did not) and character to make a rational basis for his opinions (which the plaintiff acknowledges that COL Williams and MAJ Koch do not based on their egregious acts of UCI in trying to get the plaintiff convicted according to COL William's will) he may not offer that opinion.

Throughout the plaintiffs record of trial and allied papers the apparent taint of witnesses discussing the case before and after they committed perjury at the Article 32, Motions trials, Court-Martial trial, and before and after they made false official statements during the AR 15 – 6 Investigation is clearly there. The plaintiff has given several examples such as SPC Moses talking with SPC Edwards, and 1SG Braun talking with MAJ Veith. The witnesses did this without fear of being prosecuted because the command helped to spread rumors, uphold, and conduct an improper legal standard in order to punish the plaintiff according to its will.

## Cumulative Adverse Impact on the Plaintiff

The simple fact that the Plaintiff plead guilty to some of his charges is irrelevant based on even those findings were made in the process of applying an improper legal standard. In both Haynes vs. Washington, 373 U.S. 503, 516 – 518 (1963); and in Rogers vs. Richmond, 365 U.S. 534, 547 (1961) ("Historical facts 'found in the perspective framed by an erroneous legal standard can not plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them.") The unlawful command influence the plaintiffs chain of command utilized coupled with it's blatant disregard to his right to privacy during the Army Regulation (AR) 15 – 6 Investigation reached such an erroneous legal standard. The results of this erroneous legal standard led to the following: The plaintiff being permanently relieved from the Brigade Executive Officer position; and his subsequent transfer

from Kandhar Airfield (KAF) Afghanistan to Bagram Airfield (BAF) Afghanistan
based on the findings of that AR 15 – 6 Investigation.

Improvident pleas: In the plaintiff's case, there are three reasons why his
pleas of guilty are being raised as improvident. These three reasons are as
follow: Inconsistency actually exists to create variance between the alleged
offense and the offense pleaded to; there is evidence that negates the plaintiffs
guilt; and this case created a dilemma for the plaintiff, for whatever valid reason,
he wished to plead guilty and at the same time present himself in as sympathetic
a posture as possible to the sentencing authority. U.S. v. Peele, 46 M.J. 866
(CAAF 1997) the accused's attempt to plead guilty, and at same time mitigate his
guilt, resulted in improvident plea.

Although the Military Judge did do a thorough Care Inquiry, actual
inconsistency in the variance between the alleged offense and the offense
pleaded to still exists. For example the leak of privacy information by an
anonymous source verified by the U.S. Army, and reported by KTTU Channel 2
News (evidence attachment 6) in Alaska proves some of the improvidence in this
case. In this example the news reported four counts of sexual harassment the
plaintiff was found guilty of, however, the plaintiff never plead guilty to or was
found guilty of four counts of violating Article 93 maltreatment of subordinates
based on sexual harassment, but he instead plead guilty to the lesser offense of
a general disorder, Article 134, for making comments detrimental to the good
order and discipline of the unit. Secondly, several "victims" in the plaintiffs case
testified that they weren't either offended by the plaintiff's comments, didn't take

them as sexual advances, but rather trash talking, and/or non-offensive talk that they participated in, or by stipulation of fact participated in without a sexual relationship.  Sexual Harassment is unwelcome sexual advances, or Quid Pro Quo, not welcomed exchanges that produce nothing for this or for that, which constitutes the second part of proof in an improvident plea, actual evidence to prove the plaintiffs innocence.  Furthermore, this leads to the third point of an improvident plea, the plaintiff plead in light of how the judicial system was supporting evidence that it never truly confirmed based off of an improper legal standard.  The U.S. Army completely used as a foundation an unfair fact finding procedure which produced a libelous investigation with fraudulent official statements that consummated in slander in order to defame the plaintiff's character, and deny him the due process of law because personnel in command mantle positions and/or accusers socialized with each other.  They did this outside of the courtroom immediately before and after they testified at the plaintiffs Court-Martial trial; Before and after they committed perjury at the Article 32, Motions trials, or plaintiffs Court-Martial trial; and Before and after they made false official statements during the AR 15 – 6 Investigation.

The Plaintiff defended himself as he truly was, not guilty of the improper preferral of charges, but at the same time the fraud on the court forced him to plead either guilty, or to a lesser charge in order to avoid going to jail for up to 15 ½ years by appealing to the sentencing authority.  This is evident in accordance with the fact that the plaintiff was found guilty of seven out of seven charges, and 10 out of the 12 specifications regardless of how he plead, and the sentence

rendered was twice as harsh in the time of duration than the prosecution asked for, with the forfeiture of all pay and allowances which neither the defense, nor the prosecutor expected, and a dismissal from the service with a Sexual Offender Registration requirement. This harsh sentence was completely based on the incompetent, inadmissible, or even illegally obtained evidence used with malice, and motivated by revenge and/or in order to seek and/or obtain special benefits from the Army, by suggesting that the accused is a bad character by his command, the prosecutor, and witnesses.

Although courts-martial are public trials in most instances, attendance by a commander or his or her representatives may amount to unlawful command influence in and of itself. U.S. v. Aurich, 31 M.J. 95 (C.M.A. 1990) commander testimony at trial may amount to unlawful command influence, i.e. COL Williams committing perjury on the stand which otherwise the plaintiffs motion to dismiss based on violations of Article 13 and 37 would have been approved, demonstrates how the UCI in his case actually impacted the trial, the plaintiffs resignation, and improperly incarcerated him; U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990) practical effect of commander's testimony about his or her general views can be command influence calling the plaintiff a "predator" "psychological predator" saying" he should get 5 – 10 years" the four town hall meetings etc all amount to this. Also his presence at the trial in the room with every witness prior to them testifying. Such attendance, in or outside the courtroom, can discourage witness testimony or possibly affect the impartiality of judges and court members. Likewise, commander testimony at trial may amount to improper influence if the

testimony is designed to allow the commander to express his or her general views about the seriousness of the offense or the appropriate sentence to be adjudged. This scenario typically arises when the commander, or someone in the accused's chain of command, testifies about an accused's rehabilitative potential. Such as MAJ Koch's categorization of the plaintiff being a predator with the privacy act rumors of his alleged past behavior being the bases of rumors passed to the potential witness pool by the command. This was then later used by the commander himself and the primary staff and then others as the main way to refer to the plaintiff as "a predator." Such testimony is impermissible if merely a pretext to influence the court members into returning a particular sentence. U.S. v. Ohrt, 28 M.J. 301 (C.M.A. 1989) which it did influence the military judge who then erred in his discretion to dismiss all charges and specifications of this case based on all the levels of unlawful command influence which were raised. Unless the commander has direct knowledge of an accused's service performance and character to make a rational basis for his opinions, he may not offer that opinion. 28 M.J. at 304. In fact COL Williams's false statements that the Plaintiff threatened people while in his office is in direct contradiction with the evaluation, promotion, and confidence he'd expressed and documented on the plaintiff in the past. The plaintiff therefore contends that the evidence is factually insufficient to support the findings of guilty; that the military judge erred in refusing to grant his motion to dismiss; The ACCA failed to grant an evidentiary hearing on the admissibility of an exculpatory evidence; Court members improperly considered extraneous information; The sentence is

inappropriate; and the case is so permeated with UCI that (1) the agency violated a provision of the Act; (2) the violation of the Act was "intentional or willful," and (3) this action had an adverse effect on the plaintiff. Therefore, meeting the plaintiff's burden of proof in order to obtain relief under the Privacy Act.

The plaintiff's record clearly shows that he was not only going to be convicted, but he was going to be incarcerated based on COL Williams initial statements to his primary staff. In fact, if analysis on confessions in the plaintiff's case are analyzed then the presence of all three types of UCI will be prevalent with the chain of command granting immunity in order for material witnesses to change their statements; Ignoring numerous inconsistencies in the material witnesses official statements, their statements made during defense interviews, and while under oath on the witness stand; Members of the chain of command who later become accusers talking to other possible material witnesses for weeks prior to the launch of any informal or formal investigation  into any alleged misconduct ever being reported by that material witness; Holding town hall meetings to release personal command opinion to the entire witness pool; The command making side deals with material witnesses in order to promise them benefits; Releasing privacy information protected under the privacy act law in order to influence and forge the witness pools opinions based on obvious malicious intent. The U.S. Army was not working in the public's best interest at the time they informed other Soldiers of private information protected by the privacy act law, and in fact, never should have been so careless with that information before,

during, and after an ongoing investigation, as to make it common knowledge even to civilians working on KAF, and civilians back in the rear in Alaska.

The influence of all three types of UCI in the plaintiffs case were brought to light when a few brave Staff Sergeants fearfully testified at his Court-Martial, stating how members of the chain of command prior to the AR 15 – 6 investigation made statements that they perceived to be threats. There perception was that they would face adverse action if they did not provide information detrimental to the plaintiff's case based solely on rumor and speculation. The simple fact that these rumors and speculation were so prevalent in the plaintiff's case clearly establishes the U.S. Army provided personnel information for use in his case, and the U.S. Army was aware by training and experience that the information should not be provided to individuals who were not authorized access to such information. In fact the U.S. Army clearly violated it's own privacy act law pursuant to 10 U.S.C. 3013 and Army Regulation 15 – 6, when they request information during a AR 15 – 6 investigation. Material witnesses were required to read or be read a Privacy Act Statement (Read and Sign). This is required whenever personal information is solicited from an individual. All of the AR 15 – 6 witnesses signed such a Privacy Act Statement which by law stated that this information will be used to evaluate the facts and circumstances currently under investigation. Your (the witness) response is not mandatory. However, your (the witness) failure to respond will require that we (the government) evaluate this matter without the benefit of your (the witnesses) input. This information will be used in determining the

appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files. This clearly shows that the U.S. Army performs information functions and had access to sensitive personnel information which was protected from disclosure by a privacy statute. U.S. vs. Shepherd, (C.C.A. LEXIS 189, 2002). Yet the U.S. government and it's responsible agents used this privacy information protected by the law to defame the plaintiffs character with false official statements, and rumors made both in private and in public forums to impact the outcome of his AR 15 – 6 investigation, and the subsequent court-martial proceedings that followed it.

All three types of UCI are so incredibly strong in this case that most witnesses who knew the truth didn't come forward, and never may. Even if a correct legal standard was applied during the General Court-Martial, the devastation to the plaintiffs right to the due process of the law was so violated, and his defense so crippled, that the false official statements followed by perjury committed by the material witnesses on the stand guaranteed a conviction and wrongful incarceration. Regardless of how the plaintiff plead, and regardless of what or who was called by the plaintiff's defense counsel, based on the existence of all three types of UCI he was already guilty in the witness pools eyes. The plaintiff was found guilty to offenses in his case, which he by no means committed, and

never even had a fair chance to ever prove his innocence, based on the environment created by the unlawful command influence in his case before the AR 15 -6 Investigation ever even began.

The plaintiff's civilian attorney finally got a chance to interview all potential defense witnesses in December 2006 who by that time had been so influenced by the U.S. Army that they first refused to meet with the plaintiffs civilian defense attorney, and then when finally meeting with the plaintiff's civilian attorney made comments like "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what the plaintiff did in this case," or words to that effect. Coupled with threats by the chain of command over that same five month time, executing a Summary Court-Martial that sent personnel to jail who didn't conform to the chain of command's wishes despite being a victim of sexual harassment, and the example shown to all by the commander as to what he would even do to his "right hand man," and "best officer." The prosecution, the commander, and the material witnesses again fail to maintain the required delicate balance between military justice and command discipline by denying the plaintiff the right to the due process of the law when he requested it in AUG 06 in order to obtain witnesses in his defense during the AR 15 – 6 Investigation. Most of the witnesses were officers and/or Non-commissioned officers (NCOs) who convened the investigation. That information was passed to the appointed AR 15 – 6 investigating officer who was appointed on 30 JUL 2006, yet began interviewing people on 2 AUG out of the prescribed AR 15 -6s recommended order. The investigating officer never sought the truth in AUG 2006. He never

even researched all of the facts in the case, but instead relied on information provided to him by accusers. That's why he never interviewed all potential witnesses or few to any for that matter that the plaintiff would utilize at his court-martial in his defense, and whom he would have called upon at the AR 15 – 6 investigation phase if he had known who all of his accusers were, what charges they specifically were accusing him of, and if he was afforded the opportunity to gather and obtain witnesses to help defend himself from such charges. Instead, COL Williams and LTC Thomas denied the plaintiff his request to gather information in his defense, and upheld the commander's gage order on the plaintiff thereby, not allowing him to gather defense witnesses although in LTC Thomas's executive summary in the AR 15 – 6 he clearly states that the plaintiff was afforded that opportunity. In fact the plaintiff even went to the initiator of the investigation (who turned out to be an accuser) with evidence on another accuser that should have expanded the investigation. However, instead of expanding the investigation COL Williams chose to speak negatively about the plaintiff to the entire witness pool after transferring the plaintiff to BAF, and then later committed perjury on stand during the plaintiff's Motion to Dismiss trial. As a result witnesses failed to tell the truth, or come forward with true facts at all. All of these actions finally ensured the U.S. Army the outcome and findings based on the desires of the commander.

In U.S. v. Moss, 63 M.J. 233, 2006 CAAF the charges were based on the SGTs sexual contact with a niece, who waited seven months to report the incident. Likewise in the plaintiff case witnesses allegedly waited months or even

years before discloses any such contact or behavior of contact from the plaintiff.

In Moss the SGT sought to challenge the niece's credibility by introducing

evidence, per rule 608(c) of behavior problems she was having when she

reported the conduct on a theory that she fabricated the story, to distract

attention from other behavior.  The M.J. excluded the evidence on the

Governments Motion of Liminie and the SGT was convicted.  After the criminal

court of appeals affirmed.  The SGT appealed claiming that the exclusion of the

evidence violated his 6th Amendment rights.  The court so held, noting that where

as here, the right to confrontation was violated by an evidentiary ruling.  The

ruling was reviewed for abuse of discretion, and if such an abuse was found,

reversal was required.  Unless it was shown that the error was harmless beyond

reasonable doubt.  The court then held that because the partiality of the witness

was relevant because it affected the weight of her testimony and because fact

finders had been deprived of a chance to access her credibility the SGT's 6th

Amendment rights were violated by the exclusion.  The court reversed the

decision of the criminal appeals court, set aside the findings of guilty and the

sentence and returned the record of the trial to the Judge Advocate General of

the Air Force.

The plaintiff points this out because similar behavior is displayed in his case,

where there was a gag order, and the lack of military counsel delayed

confrontation until after multiple egregious acts of UCI were conducted by the

command making the environment non-conducive to being fair.  Numerous

witnesses called by the government fabricated their stories in order to obtain

favors from the command, revenge, and to distract attention from other behavior. The commands actions prejudiced the plaintiff's rights to equality and fairness. COL Williams even after the trial had an incident where he utilized his weapon in a threatening manner against coalition forces for not obeying his commands, but no actions were taken against him by the convening authority. Despite his obvious anger issues, and the fear he and his command created on witnesses without the fear of repercussions in the plaintiff's case witnesses saw him as untouchable and dared not challenge his authority and/or verbalized wishes. Government witnesses from the plaintiffs unit were assigned to guard him after his trial while he was incarcerated temporarily in Bagram awaiting transfer to Kuwait. Government witnesses who filed false official statements and committed perjury attempted to guard the witness as well in order to see him in behind bars. CSM Harrington, and 1SG Braun even arranged before the plaintiff contacted his lawyer to have themselves added onto the guard list, and visited the jail with MAJ Nichols to check on how the plaintiff was doing upon incarceration. Furthermore, while the plaintiff was incarcerated LTC Thompson while watching announced that COL Williams had given him two Brigade coins for him to present to the prosecution. These cumulative behaviors seem tremendously unusual and is not the normal behavior of people who knew the plaintiff for up to 15 years. This is clearly the behavior of people bent on revenge in order to have the plaintiff punished according to their will, to seek or acquire favors, and to distract attention from the egregious acts of UCI, fraud on the court, rules and laws in which they had broken. Once their will was executed on the plaintiff they lined up

to humiliate and embarrass him even more by watching him for three days in incarceration.

MAJ Mercer will testify about the email and subsequent mass meeting prosecution held prior to the Article 32 trial. This was done to coach the witnesses who were already talking with each other in order to ensure all of their testimonies matched and to try to reduce the amount of inconsistent statements, and further changing of statements. However, even though the prosecutions use of this perjured testimony matched initially in the record, once defendant witnesses committed this perjury as an example given earlier when SPC Moses perjured testimony changed to completely match her roommates SPC Edwards perjured testimony the result became a harmful error against the plaintiff which prejudiced his trial, and should result in a reversal regardless of whether the prosecution acted in good faith. The defendants repeated violations of UCI has the prejudicial cumulative effect of bearing multiple false sworn statements, a false investigation report, allegiances forged between the command, the prosecution, and witnesses, multiple counts of perjury, and fraud on the court which in total denied the plaintiff his right to a fair trial, and the due process of law. Furthermore, they are actual, apparent, and perceived egregious violations of Article 37 U.C.M.J., and demonstrate the agencies intentional or willful actions which caused an adverse effect because of disclosure of Privacy information against the plaintiff.

In <u>Bois v. Marsh</u>, 801 F. 2d 462 (D.C. Cir. 1986), for example, the court applied the Feres doctrine to a 42 U.S.C. 1985(3) suit by a military officer against

her superiors because the Supreme Court's "analysis in Feres and Chappell that courts should not imply damage remedies for service-connected injuries is fully applicable to" such suits generally. Bois, 801 F. 2d at 469 (emphasis added). In addition, the court extended Feres to the officer's intentional tort claims against her superiors because "subjecting military commanders to personal liability" for such claims would "pose an equal, if not greater, threat to military discipline as would permitting suits under the Federal Torts Claim Act (FTCA). Id. at 471.

Bois's reasoning remains sound. The courts do not mean to imply otherwise by declining to extend it here; the courts simply note that neither of the concerns prompting their decision in that case exists in the Privacy Act context. Likewise, by declining to extend Feres to the Privacy Act, the court is not – contrary to the assertion of their dissenting colleague – "abandoning" it because it is "under a cloud." Dissenting op. at 6. Nor is the court fashioning "a rule rather arbitrarily cutting [Feres] off with the exact applications already unjustified in this setting; as we have discussed, the Congress clearly enlisted the federal courts to inquire into potential military violations of the Privacy Act. Cf. U.S. v. Johnson, 481 U.S. 681, 699 (1987) (Scalia, J., dissenting) ("I do not think the effect upon military discipline is so certain, or so certainly substantial, that we are justified in holding (if we are ever justified in holding) that Congress did not mean what it plainly said in the statute before us."). What is more, subjecting the Navy to suit under the Act does not permit a servicewoman like Cummings to "resort to the courthouse" simply because she does not agree with her performance ratings. Instead, the Act provides a remedy only if the military department has unlawfully released the

performance rating and if the claimant establishes that she was injured as a result. See 5 U.S.C. 552a(b) prohibiting disclosure in certain circumstances; 5 U.S.C. 552a(g)(1)(D) requiring claimant to show "adverse effect" because of disclosure. In the plaintiff's case he is so claiming, as the defendants actions were unreasonable and caused the damages.

The plaintiff understands the kinds of risks to military discipline that damage actions under the Privacy Act pose. For damage actions under the Act in contrast with claims for specific relief, the plaintiff must show that the agency action was "intentional or willful." 5 U.S.C. 552a(g)(4). Proof that such an intent underlies the alleged breach (here an impermissible release of data) is likely to take the fact-finder deep into the breach's context. Indeed, the complaint here affirmatively asserts that the release arose out of sharply contested views about the plaintiff's secret file. The plaintiff's case doesn't tend to pit a plaintiff's superiors against one another, indeed, this damage action under 552a(g)(4) doesn't even yield evidence of prolonged workplace donnybrooks so commonly found in damage action suits. The plaintiff's case is more similar to <u>Mount v. U.S. Postal Service</u>, 79 F. 3d 531 (6th Cir. 1996) involving employee's claim that certain disclosures of medical and other records to director and union official were motivated by a desire to retaliate for complaints about work conditions. Likewise in the plaintiff's case the defendants were motivated by revenge and/or people utilizing Privacy Act information intentionally or willfully in order to obtain special benefits from the defendant.

In Henson v. NASA, 14 F. 3d 1143, 1146 (6th Cir. 1994) involving employee's claim that superior released confidential medical information, "intentionally or negligently inflicted severe emotional distress ... and engaged in an intentional, reckless, malicious, and tortuous pattern of abusive management" as part of a pattern of retaliation. The plaintiff asserts that such a pattern is found in the plaintiffs case through the numerous egregious acts of UCI, in which performing the defendant's conduct violated a Provision of the Act, that caused an adverse determination against the plaintiff, that rose out of these Intentional or Willful violations of the Privacy Act, that still adversely effect and impact the plaintiff and his family today, and are projected to do so throughout the remainder of their life's.

<u>RELIEF SOUGHT</u>

The plaintiff in the above case requests a trial by jury, and that the U.S. District Court for the District of Columbia enforce the rights granted under the Privacy Act of 1974 by providing legal remedies to the plaintiff's Intentional/Willful Standard and Actual Damages in Accuracy and Other Damages Lawsuit against the Department of the Army and agencies within it's military departments as follow: The Department of the Army, The Alaska Army National Guard, and The Alaska National Guard Youth Corps (Defendant). In accordance with the Privacy Act of 1974 the plaintiff is suing the defendant for the releasing of personal information maintained by these agencies, based on the following: In accordance with 5 U.S.C. 552a(g)(1)(c) these agencies failed to maintain any record concerning any individual with such accuracy, relevance, timeliness, and

completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; In accordance with 5 U.S.C. 552a(g)(1)(D), these agencies failed to comply with any other provision of this section, or any rule promulgated there under, in such a way as to have an adverse effect on an individual; and in accordance with 5 U.S.C. 552a(b) no agency shall disclose any record which is contained in a system of records by any means of communication to any person, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

As a result of these failures the plaintiff's military and civilian career prospects have been severely damaged, in addition to, his family and him having to suffer through severe mental distress, embarrassment, and humiliation, both personally and professionally. Furthermore, the defendant's have caused the following damages to the plaintiff: Name; Material and moral; Lost revenue; General; Punitive; and Real. The plaintiff therefore, requests that the U.S. District Court for the District of Columbia award him and his family based on violations of the Privacy Act of 1974, damages caused to the plaintiff and his family's potential lifetime earnings of the sum of $75,000,000 from the defendants.



Fredrick M. Bramble
Plaintiff

124

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUPPLEMENT TO PETITION          CIVIL ACTION NO.
FOR GRANT OF REVIEW

Fredrick M. Gamble (Plaintiff)
Regional Confinement Facility
1490 Randolph Road
Fort Sill, OK 73503
Phone Number: (580) 442 – 4313 (ATTN: Mrs. RaShonda Labrador)

                    v.

The Department of the Army and agencies within it's military departments as
follows:

The Department of the Army
ATTN: U.S. Army Legal Services Agency
901 N. Stuart Street, Suite 700
Arlington, VA 22203-1837

Alaska Department of Military and Veterans Affairs
ATTN: The Alaska Army National Guard
P.O. Box 5800 Camp Denali
Fort Richardson, AK 99505-5800;

Alaska Department of Military and Veterans Affairs
ATTN: The Alaska National Guard Youth Corps
P.O. Box 5800 Camp Denali
Fort Richardson, AK 99505-5800

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Statement of the Case

The plaintiff in the above case requests that the U.S. District Court for the

District of Columbia enforce the rights granted under the Privacy Act of 1974 by

providing legal remedies to the plaintiff's Intentional/Willful Standard and Actual

Damages in Accuracy and Other Damages Lawsuit against the Department of

the Army and agencies within it's military departments as follow: The

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

Department of the Army, The Alaska Army National Guard, and The Alaska National Guard Youth Corps (Defendant). In accordance with the Privacy Act of 1974 the plaintiff is seeking remedies[1] from the defendant for the releasing of personal information maintained by these agencies, based on the following: In accordance with 5 U.S.C. 552a(g)(1)(c) these agencies failed to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; In accordance with 5 U.S.C. 552a(g)(1)(D), these agencies failed to comply with any other provision of this section, or any rule promulgated there under, in such a way as to have an adverse effect on an individual; and in accordance with 5 U.S.C. 552a(b) no agency shall disclose any record which is contained in a system of records by any means of communication to any person, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

PLAINTIFF'S BACKGROUND

Fredrick M. Gamble is an individual, formerly residing at 1800 West 104th Avenue, Anchorage, Alaska, who has suffered damages to the following: Lost Earnings and Earning Capacity; Pain and Suffering; Loss of Enjoyment of Life; Name; Material and Moral; Lost Revenue; Credit; and Military and Civilian Career Prospects. In addition, he has suffered through severe Mental Distress,

---

[1] Compensatory damages attempt to make the plaintiff "whole" for the damage he has suffered as the result of the defendant's wrongdoing. Punitive damages are used to "punish" the defendant for extreme wrongdoing.

Embarrassment, and Humiliation, both Personally and Professionally due to the defendant's Intentional/Willful negligent acts which is the subject of this action.

Toni M. Gamble is an individual formerly residing at 1800 West 104th Avenue, Anchorage, Alaska. She is the spouse of the plaintiff, who has suffered severe mental distress, embarrassment, and humiliation, both personally and professionally due to the Intentional/Willful negligent acts of the defendant.

Christopher M. Gamble is an individual formerly residing at 1800 West 104th Avenue, Anchorage, Alaska. He is the minor son of the plaintiff, who has suffered severe mental distress, embarrassment, and humiliation, both personally and professionally due to the Intentional/Willful negligent acts of the defendant.

DeShayla M. Gamble is an individual formerly residing at 1800 West 104th Avenue, Anchorage, Alaska. She is the minor daughter of the plaintiff, who has suffered severe mental distress, embarrassment, and humiliation, both personally and professionally due to the Intentional/Willful negligent acts of the defendant.

Alexa M. Gamble is an individual formerly residing at 1800 West 104th Avenue, Anchorage, Alaska. She is the minor daughter of the plaintiff, who has suffered severe mental distress, embarrassment, and humiliation, both personally and professionally due to the Intentional/Willful negligent acts of the defendant.

The defendant, The Department of the Army and agencies within it's military departments as follows: The Department of the Army; The Alaska Army National

3

Guard; and the The Alaska National Guard Youth Corps employ or employed the Plaintiff. Thus, the defendant has due care for the Administrative, Supervisory, and Subsequent Monitoring responsibilities pursuant to 5 U.S.C. 552.

## FACTS

The plaintiff transferred to the AK ARNG from the Texas Army National Guard (TX ARNG) in 1992. The plaintiff then served part-time in the AK ARNG until 1997 when he was hired full-time by the AK ARNG. In 1994, the plaintiff began working with the Alaska National Guard Youth Corps Challenge Program (a program that falls underneath the command of the AK ARNG, and is now called The Alaska National Guard Youth Corps) as a Team Leader. The plaintiff was wrongfully dismissed based off the improper preferral of charges, and the improper legal standard used against him in an investigation. However, the plaintiff filed an EEO complaint with the Department of Military and Veterans Affairs through The Adjutant General's office, due to the improper preferral of charges and improper legal standard, which resulted in an EEO Investigation into the matter. At the conclusion of this EEO Investigation, the plaintiff was reinstated to his former position, and granted all back pay commensurate to the time he would have received if he wasn't wrongfully dismissed. In addition, he was given a letter of apology by the Alaska National Guard Youth Corps Challenge Program Director at that time. The AK ARNG Chief of Staff informed the plaintiff that "the file would be destroyed by the AK ARNG and as a result the Alaska National Guard Youth Corps if no more incidents occurred over a one year period" or words to that effect. Finally, the plaintiff then quit the Alaska

4

National Guard Youth Corps in 1994 after being offered another job with the State of Alaska.

Since that incident the AK ARNG and The Alaska National Guard Youth Corps have maintained a secret file on the plaintiff that was suppose to be destroyed after a year. Furthermore, these agencies since 1994 have acted on a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, and this conduct amounted to a "reckless disregard" for the plaintiff's rights. <u>Louis v. VA</u>, No C95-5606, slip op. at 4-5 (W.D. Wash. Oct. 31, 1996). This negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974, displayed conduct that directly resulted in inaccurate, non-relevant, and untimely information being given to people without a need to know, who in turn maliciously used the information from an incomplete secret file to spread rumors to the public[2] in order to adversely affect the plaintiff.

In an attempt to suppress these, intentional and willful acts by the agencies the plaintiff was forced to spend over $50,000 in order to higher a civilian lawyer who submitted a Motion to Suppress these inaccurate, non-relevant, and untimely information in court in NOV 2006. However, although the Motion was upheld by the Military Judge (M.J.) the intentional and willful act by the agencies still resulted in the releasing of personal information maintained by these agencies that contained specific details and direct quotes from an inaccurate, non-relevant, untimely, and incomplete secret file, that as a direct result of the violations of Privacy intentionally and willfully caused the damages to the plaintiff.

[2] The public is defined to include not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system.

5

The following factual accounts are drawn largely from the "Factual Background" portion of the plaintiff's Grostefon Matters to the Court of Appeals for the Armed Forces (CAAF), and TAB A of this action, which in turn is drawn from the allegations he offered to other elements of the U.C.M.J. authorities as an attempt to mitigate the damages caused by the defendants:

As a direct and proximate result of the negligence acts of the defendant, prior to the trial the plaintiff sought relief from the U.S. Army with a Letter of Resignation filed in November 2006, but his resignation was denied upon the results of his judicial trial. However, on the eve of trial, the Department of Army, through the Army Review Board Agency, expressed interest in delaying the trial in order to potentially accept the plaintiffs resignation. Although the Military Judge rejected the request for a delay, this would have saved the Government the expense of the trial and resulted in no conviction or jail time for the plaintiff.

On 29 December 2006, the plaintiff filed two motions to dismiss, with prejudice, all charges and specifications to his case due to the following: 1) Violation of Article 37(a), Uniform Code of Military Justice (U.C.M.J.) the appearance of Unlawful Command Influence (UCI), as well as actual UCI. This motion was raised pursuant to RCM 907(a); 2) Violation of Article 13, U.C.M.J., or, in the alternative, in the event of conviction, grant credit to the accused against the adjudged sentence. This motion was raised pursuant to R.C.M. 906(a) and 907(a). However, in January 2007, as a direct and proximate result of the negligence acts of the defendant, the military judge denied both motions

prior to the trial by General Court-Martial. Now based on the sentencing of more than one year the whole trial and the motions are under appeal to the (CAAF).

On 27 September 2007 the plaintiff through his Appellate Defense served Tab C from the Plaintiff's Brief on Behalf of Plaintiff Docket Number Army 20070029 to the Army Court of Criminal Appeals (ACCA) as a separate Habeas Corpus Writ of Extra Ordinary Relief. This was done in order to dismiss all charges and specifications and seek relief from damages caused by an Improper Legal Standard.

As a direct and proximate result of the negligence acts of the defendant, on October 25, 2007, the U.S. Army Legal Services Agency Government Appellate Division petitioned the ACCA in opposition to the extraordinary relief in the nature of the plaintiffs Writ of Habeas Corpus. The Government respondents requested that the ACCA deny the plaintiff's writ based on the following: That the plaintiff's claims questioning legal rulings by the military judge are not appropriate for an extraordinary writ, and should be left for direct appeal/review under Article 66, UCMJ; and the Court does not have the authority to award civil damages. This Honorable Court should note that the petition from the U.S. Army Legal Services Agency Government Appellate Division came after ACCA had prematurely affirmed the plaintiffs appeal, thus completing his review under Article 66.

As a direct and proximate result of the negligence acts of the defendant, on November 15, 2007, the plaintiff's attorney informed him that the ACCA denied his petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus dated November 13, 2007, no reason for the denial was noted.

7

As a direct and proximate result of the negligence acts of the defendant, the agencies provided third parties privacy act information for use in the plaintiffs judicial case, and the defendant was aware by training and experience that the information should not be provided to individuals who were not authorized access to such information. Moreover, the defendant know they fall under the Privacy Act as pursuant to 10 U.S.C. 3013 and Army Regulation 15 – 6, when they request information during an AR 15 – 6 Investigation. During an AR 15 – 6 Investigation, material witnesses are required to read or be read the following Privacy Act Statement (Read and Sign). This is required whenever personal information is solicited from an individual. All of the AR 15 – 6 witnesses signed such a Privacy Act Statement which by law stated that this information will be used to evaluate the facts and circumstances currently under investigation. Your (the witness) response is not mandatory. However, your (the witness) failure to respond will require that we (the government) evaluate this matter without the benefit of your (the witnesses) input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files. This clearly shows that the defendant performs information functions and had access to sensitive personnel information which is protected from disclosure by a privacy statute.

8

Congress clearly enlisted the federal courts to inquire into potential military

violations of the Privacy Act. Cf. U.S. v. Johnson, 481 U.S. 681, 699 (1987)

(Scalia, J., dissenting) ("I do not think the effect upon military discipline is so

certain, or so certainly substantial, that we are justified in holding (if we are ever

justified in holding) that Congress did not mean what it plainly said in the statute

before us."). What is more, subjecting the Navy to suit under the Act does not

permit a servicewoman like Cummings to "resort to the courthouse" simply

because she does not agree with her performance ratings. Instead, the Act

provides a remedy only if the military department has unlawfully released the

performance rating and if the claimant establishes that she was injured as a

result. See 5 U.S.C. 552a(b) prohibiting disclosure in certain circumstances; 5

U.S.C. 552a(g)(1)(D) requiring claimant to show "adverse effect" because of

disclosure. In the plaintiff's case, he is so claiming, as a direct and proximate

result of the negligence acts of the defendant, the defendant's actions were

unreasonable and caused the damages.

At all times relevant to the events in this action, the plaintiff and his family

were and still are in the exercise of the defendant's due care, and the

defendant's intentionally or negligently inflicted severe emotional distress … and

engaged in an intentional, reckless, malicious, and a tortuous pattern of abusive

management as part of a pattern of retaliation. The plaintiff asserts that such a

pattern is found in the plaintiffs case through the numerous egregious acts of

Unlawful Command Influence, in which performing them the defendant's conduct

violated a provision of the Privacy Act. These intentional/willful acts caused an

adverse determination against the plaintiff, and still continue to adversely affect and influence the plaintiff and his family today, and are projected to do so throughout the remainder of their lives.

### FIRST CLAIM FOR RELIEF:
### EARNINGS AND EARNING CAPACITY

The plaintiff repeats and realleges the allegations in the Facts section of this complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

Lost earnings refers to past income losses due to the injury, that is, earnings lost between the time of defendant's negligent acts and the time of trial. Clearly, the plaintiff has been out of work because of the defendant's negligence, thus, the defendant should compensate him for the wages lost as a result. Lost earning capacity refers to loss of future earning potential. As a result of the injury Actually and/or Proximately caused by the defendant's intentional/willful negligent acts that will prevent the plaintiff from going back to work for a period of time. The plaintiff has suffered extensive personal and professional injuries to his: Lost work and retirement revenue; Credit; Material and Moral; and Military and Civilian Career Prospects, at the age of thirty-six. Furthermore, the defendant's negligent acts have affected his ability to continue to earn money in the future. Under the single recovery rule, he must be compensated at trial for this future loss.

Interference with the plaintiff's contractual and business relationships – The plaintiff has a right to freedom from interference by others with the contractual relationships he entered into.  This applies even when, after the contractual or business relationship, admission of error are acknowledged by the offending party.  (Contracts occur into common forms: oral and written).  Damages can be punitive if the plaintiff can convince the court that the defendant specifically set out to interfere with the relationship or set out to ruin the plaintiffs reputation within the confines of the plaintiffs relationship.  Proof need only be beyond a reasonable doubt and not necessarily overwhelmingly convincing.  Potential disruption also is considered, since business relationships can be both short – and long-term such as the short-term contract the plaintiff was about to enter into with a religious book publishing company.

Wherefore, the plaintiff, seeks damages under the Privacy Act of 1974 5 U.S.C. 552, as well as on behalf of Toni M. Gamble, Christopher M. Gamble, DeShayla M. Gamble, and Alexa M. Gamble, for the loss of financial support, comfort, companionship, advice, society, and civilian counsel, together with interest and costs of suit.

SECOND CLAIM:
PAIN AND SUFFERING

The plaintiff repeats and realleges the allegations in the Facts section of this complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

11

Pain and suffering certainly includes physical pain from the impact of an incident, but it also includes on-going pain from a wound, or long term discomfort from a permanent condition such as high blood pressure. It also includes the pain of medical procedures or treatments in order to treat the injury.

Beyond these obvious connotations, the phrase also includes many other types of mental suffering from the consequences of the incident, such as the humiliation, anguish, or embarrassment suffered from living with the slanderous and libelous statements and publications associated with your name, reputation, and integrity. The frustration of dealing with false information being passed to the public as truths. The fright associated with a traumatic return to duty into a hostile work environment with the same unit the plaintiff has served in for over 15 years. Fear of a recurrence of the incident based the same U.C.M.J. legal system, which twice now has allowed the referral of improper charges in which the plaintiff has served in for over 20 years, or depression induced by the injury and its consequences.

Wherefore, the plaintiff, seeks damages under the Privacy Act of 1974 5 U.S.C. 552, as well as on behalf of Toni M. Gamble, Christopher M. Gamble, DeShayla M. Gamble, and Alexa M. Gamble, for the subjective reaction to the accident or its consequences as pertaining not only to the physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror, or ordeal.

THIRD CLAIM:
LOSS OF ENJOYMENT OF LIFE

The plaintiff repeats and realleges the allegations in the Facts section of this

complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

As a result of the defendant's intentional/willful negligent acts which have Actually and/or Proximately caused the plaintiff to suffer from the loss of the opportunity to engage in many of life's pleasurable activities. The plaintiff no longer has the desire and/or passion to serve 30 years in the military, a service he has devoted his life to since he was 17 years old. Furthermore, the physical pain and mental anguish generally associated with such an incident denied the plaintiff the ability as examples to: take walks or spend time with his wife; coach Christopher in football; teach DeShayla how to ride her bicycle with no training wheels, go with Alexa to her first day of kindergarten; relocate his family to Texas in order to get away from the phone calls and negative press associated with the defendants privacy act violations; or to enjoy many of life's other common, pleasurable experiences such as the general value of living life itself simply as a free American.

Wherefore, the plaintiff, seeks damages under the Privacy Act of 1974 5 U.S.C. 552, as well as on behalf of Toni M. Gamble, Christopher M. Gamble, DeShayla M. Gamble, and Alexa M. Gamble, and requests that this honorable court recognize loss of Enjoyment of Life as a distinct category of compensable damages, in which it compensates the plaintiff for the limitations on his life, for time he can never get back, due to the intentional/willful negligent acts committed

13

by the defendant in aspects of restoring the plaintiff's ability to function as a whole person.

### FOURTH CLAIM:
### A PUBLIC DISCLOSURE OF PRIVAE FACTS

The plaintiff repeats and realleges the allegations in the Facts section of this complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

The disclosed facts must involve the plaintiff's private life, i.e., those aspects of his life that have not already received some publicity and that are not left open to public observation or inspection. The element of a "public" disclosure requires more than publication in the defamation sense. The disclosure must involve publicity – communication either to the public at large or to enough individuals that it is likely to reach the general public. The defendant's intentional/willful negligent acts of disclosing private facts about the plaintiff in four town hall meetings, with rumors spread by people in command mantle positions, and the influencing of the public, just to name a few instances caused the plaintiff to suffer.

Interference with the plaintiff's privacy – This is another right protected by the courts – the plaintiffs right to be let alone. Such interference can take many forms, some obvious, others not so obvious. One of the not-so-obvious, or less direct violations to privacy, is the objectionable publicity to private information about the plaintiff. The defendant's intentional/willful negligent acts of disclosing

private information to the following: The public; People without a need to know; Anonymous phone callers who call the media; The Department of the Army and agencies within it's military departments as follow: The Department of the Army, The Alaska Army National Guard, and The Alaska National Guard Youth Corps employees, acting outside of their official capacity, violated the plaintiffs right to be let alone, interfered with his privacy, and did not act in the best interest of the public.

Wherefore, the plaintiff, seeks damages under the Privacy Act of 1974 5 U.S.C. 552, as well as on behalf of Toni M. Gamble, Christopher M. Gamble, DeShayla M. Gamble, and Alexa M. Gamble, due to suffering from serious emotional distress, difficulties to find work, inability to sleep, and other damages.

### FIFTH CLAIM:
### PUBLICATION PLACING PLAINTIFF IN A "FALSE LIGHT"

The plaintiff repeats and realleges the allegations in the Facts section of this complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

The false light in which the plaintiff is placed must be highly offensive to a reasonable person. If the false light would affect the plaintiff's reputation in the community, an action for defamation may also lie.

Interference with the plaintiff's reputation – As important as any freedom to which the plaintiff is entitled is freedom from unwarranted, untruthful attacks on his character. This kind of attack, if made in the presence of other people,

15

constitutes defamation, for which the plaintiff so claims he is entitled to nominal or punitive damages. The plaintiff will present evidence in TAB A and it's attachments to show that he was defamed orally, which constitutes slander, in addition to, in writing which has been shown to or seen by someone else, which constitutes liable. Slander is the less serious of the two wrongs because it is fleeting. The spoken words of defamation exist only as they are uttered and then disappear forever. Libel is permanent, and the damages awarded are therefore usually larger. Generally speaking, defamatory statements made over radio and television, and via computer are now considered libelous rather than slanderous.

The plaintiff asserts that he can recover damages from slander or libel without providing actual financial loss because he has been accused of something considered serious. The rationale for this is, since his good reputation of a professional person is essential to his ability to make a living, the law assumes that such accusations will diminish that ability and will therefore damage the plaintiff. This kind of attack slander or libel is called slander or libel per se. Spreading lies about others, especially when the lies affect their ability to make a living or may hurt them in their family or public relationships, constitutes slander if spoken to others and libel if written or transmitted to others. The plaintiff will provide proof that both of these have been violated by the defendant, as in his AR 15 – 6 Investigation, when numerous acts of slander and liable per se were presented in the form of false official statements, and then again at his trials with false official statements while the defendant's witnesses were under oath.

Wherefore, the plaintiff Fredrick M. Gamble, seeks damages under the Privacy Act of 1974 5 U.S.C. 552, as well as on behalf of Toni M. Gamble, Christopher M. Gamble, DeShayla M. Gamble, and Alexa M. Gamble, as a result of the defendant's intentional/willful negligent acts which have Actually and/or Proximately caused the plaintiff to suffer from damage to his reputation, wrongful infliction of emotional distress, wrongful invasion of privacy, and for pecuniary damages.

### SIXTH CLAIM:
### CLAIM FOR LOSS OF CONSORTIUM WITH THE PLAINTIFF'S FAMILY

The plaintiff repeats and realleges the allegations in the Facts section of the complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

Wherefore, the plaintiff seeks damages from the defendant due to loss of consortium with his wife Toni M. Gamble, and his children Christopher M., DeShayla M., and Alexa M. Gamble.  As a result of the defendant's intentional/willful negligent acts which have Actually and/or Proximately caused the plaintiff to suffer the loss of his family's comfort, companionship, advice, society, and counsel from the date of the allegations to present.

### SEVENTH CLAIM:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

The plaintiff repeats and realleges the allegations in the Facts section of the complaint.

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff, him to suffer extensive personal and professional injuries by violating his private and/or personal rights.

Following the defendant's intentional/willful negligent acts against the plaintiff, through telephone conversations, and written literature he received, he observed loved ones in his life in extreme pain, shock and distress from the injuries suffered from the violations of his privacy. His loved ones are as follow: Wife; Mother and Father; Mother and Father In-Laws, Brothers and Sister, Brothers and Sisters In-Laws; Friends; and his Children.

As a result of the terrifying experience of observing violations of his privacy and its aftermath, the plaintiff suffered both immediate emotional trauma, lost touch with his friends, and his relationship with his spouse, children, and immediate family has suffered long term emotional, spiritual, and physical damage, in addition to, his personal and professional employment opportunities.

Interference with the plaintiff's peace of mind – The growth in the sciences of medicine and psychology has brought about an expansion of the idea of freedom from fear or apprehension. The plaintiff asserts that this is an action against a defendant who intentionally inflicted mental suffering on him. The plaintiff has a right to freedom from the consequences of mentally abusing malicious acts, and asks that this honorable court protect that right by awarding damages – nominal, or small, if the harm is slight; punitive, or large, if the damage is great or the act particularly outrageous. Consider the mental anguish of being falsely accused of acts, moved to another post during wartime where you don't know anyone in

order to ostracize you and influence the future witness pool against you. Further, consider if someone attacks you and your families reputation and removes all available means to provide for them. The more uninhibited the attack(s), the more punitive the damages. At times, the intent alone, particularly if shown to be an act of vengeance or malice, can be sufficient to award punitive damages that are considerably greater than the cost or value of the plaintiff's reputation or career, depending on the mental anguish suffered. If such an act disrupts a business, the mental anguish can be quite severe, and the wrong may be punishable by stiff fines and/or a jail term. In some cases, such wrongs can be classified as a crime, which then necessitates the state (or in this case the federal government) to step in, since some states view the mental anguish to be associated with acts of violence that concern the public at large. This applies since other business may be subjected to similar malfeasance.

Wherefore, the plaintiff seeks damages from the defendant for negligent infliction of emotional distress.

## CONCLUSION

The defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts violations of the plaintiffs private and/or personal rights. The plaintiff claims trial by jury on all issues in this action and asks that the judge or jury finds that the defendant did in fact injure the plaintiff, and require them to: Give the plaintiff relief by paying him "damages" for the injury he has suffered; Discontinue the wrongful acts; and restore to the plaintiff what was taken from him and his family due to violations to his private and/or personal

19

rights by intentionally/willfully attacking the plaintiffs reputation arbitrarily, and taking away his liberty and freedom of action without just cause. TAB A, and it's evidence attachments, will prove that the defendant's intentional/willful acts were committed with deliberate intent (as when someone spreads false accusations about the plaintiff) and/or that it was the result of negligence on part of the defendant in the Administrative, Supervisory, and Subsequent Monitoring of the Privacy Act. TAB A, and it's evidence attachments will demonstrate that the defendant Actually and/or Proximately caused as a result of their intentional/willful negligent acts against the plaintiff actual damage and personal and professional injuries. The malicious acts by the defendant shown in TAB A, and it's evidence attachments will place actually and/or proximate cause on the defendant, which by law will hold them responsible for all the damages proved to have resulted from the acts, including damages to "third parties."

The plaintiff therefore, requests this honorable court to award him and his family based on violations of the Privacy Act of 1974, damages caused to the plaintiff the sum of $75,000,000 from the defendant.

Fredrick M. Gamble
Plaintiff

20

*Attachment #1*

UNITED STATES OF AMERICA  )
           )  Defense Witness List
     v.     )   (Amended)[1]
           )
Gamble, Fredrick, M.     )
Major, U.S. Army, (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) )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76 )  28 December 2006
Bagram Airfield, Afghanistan APO AE 09354)

    The Defense notifies the Trial Counsel, the Court, and the Court Reporter of the following witnesses that the Defense may call during all phases of trial and motion practice in the above-captioned court-martial:

1. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE  09354, telephone unknown (contact made through witness' chain of command at request of chain of command); MAJ Koch will testify, in support of the Defense UCI motion, that COL Williams has referred to MAJ Gamble as a "predator" in the presence of his core staff on frequent occasions.  This staff includes MAJs Barr, Parker, Roach, Knowles, LTCs Thompson and Jones, and CSM Averrett.  He will also testify that COL Williams, in the presence of the same individuals, has announced that the accused should get between five and ten years confinement.

2. SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE  09354, 841-9423; SFC Butters will testify in support of the Defense UCI motion, that the Alaska National Guard unit is a very tight-knit unit composed of folks who have worked together for years and expect to work together for years to come. She will testify that SPC Moses is overly emotional, seeks attention, and has bad character for truthfulness. She will also testify that it is common knowledge among the unit that many women have sex toys, the topic is discussed openly and often, and that the topic is not a cause for embarrassment. She will also testify that these matters apply to SPC Dean.

3. SPC Diana Chester, National Command Element, Kandahar Airfield, Afghanistan APO AE  09354, telephone unknown (contact made through witness' chain of command at request of chain of command); SPC Chester will testify that she did not have sexual intercourse with the accused.

4. SSG Jose Cuyar, National Command Element, Kandahar Airfield, Afghanistan APO AE  09354, telephone unknown (contact made through witness' chain of command at request of chain of command); interview pending – 28 Dec 06 (SSG Cuyar initially refused to meet with the Defense.  Due to the Staff Judge Advocate's encouragement, a late interview has been scheduled.)

5. MSG Robert Dockins, National Support Element, Kandahar Airfield, Afghanistan APO AE  09354, telephone unknown (contact made through witness' chain of

---

[1] This list has been amended, at the request of the Trial Counsel, to include the synopsis of each witness' testimony IAW R.C.M. 703(c)(2)(B)(i).

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

command at request of chain of command); MSG Dockins will testify, in rebuttal as necessary, that SSG Prado returned, after being summoned by SGM Harrington for interviews, in a tearful and distraught state.

6.  SSG Kim Francis[2], National Support Element, Kandahar Airfield, Afghanistan APO AE  09354, 841-1605; SGT Francis will testify, in support of the Defense UCI motion, that COL Williams addressed the unit at a Town Hall Meeting and said "his right hand man" had violated G.O. #1 and ran down a list of the infractions, to include: adultery, fraternization, conduct unbecoming an officer, and sexual harassment.  She will testify COL Williams was "beyond pissed" and that "he had smoke coming from his ears."  She will testify that she has been subjected to suggestions not to testify, and to limit her statements to the Defense, by her Sergeant Major and her Commander.  Consequently, she will testify that she fears career implications if she does testify. She will testify about SPC Moses' bad character for truthfulness.  She will testify about an alcohol related incident involving SPC Moses at KAF and statements attributed to MAJ Gamble by SPC Moses during the episode. She will testify about SPC Lindsey's description of her "deal" with the prosecution, and that SPC Lindsey told SSG Francis to tell anyone who interviewed SSG Francis "you don't know anything," or words to that effect.

7.  SPC Tanya James, National Support Element, Kandahar Airfield, Afghanistan APO AE  09354, 841-1726; SPC James will testify in support of the Defense UCI motion that COL Williams, in a Town Hall Meeting told the unit as a whole that there was an investigation pending against the accused (by implication), that the accused (by implication) had been transferred to BAF, that the implication) had violated G.O. #1.  She will also testify that a group from the Alaska Guard knew that SPC Moses had a brief affair with an officer back in Alaska.

8.  1LT James Johnson, National Support Element, Kandahar Airfield, Afghanistan APO AE  09354, 841-1183; LT Johnson will testify in support of the Defense UCI motion that, at a Town Hall Meeting, COL Williams announced to the unit that he had an officer since transferred to BAF who had violated G.O. # 1, and that he would take it to the maximum.  He will testify that COL Williams was "livid" during this announcement, and that there was no doubt he was talking about MAJ Gamble. He will testify that it was common knowledge in the unit that sex toys were available, people talked about them often, and that no one was embarrassed by the references.

9.  LTC Raleigh Jones, National Command Element, Kandahar Airfield, Afghanistan APO AE  09354, telephone unknown (contact made through witness' chain of command at request of chain of command); LTC Jones will testify, in support of the Defense UCI motion, that COL Williams, in a Commander's Update Briefing (CUB), or shortly thereafter, announced to the senior staff that the accused was guilty of violations of G.O. #1, and then went on to list and read all pending charges.  He will also testify that senior staff members have attributed to COL Williams statements that the accused needs to be confined.  He will also testify

---

[2] Via VTC.  The witness will be on leave beginning 28 Dec 06.  She will be on/near Ft. Richardson, Alaska.  Home Phone: 907-746-5315; Home Cell: 907-360-2096.

that many members of the senior staff regularly refer to the accused as a "predator;" in fact, the references are so frequent, it is "the" term used to describe the accused. LTC Jones will also testify that SPC Chester was assigned to work in the NCE vice the NSE upon the unit's arrival at KAF based upon mission requirements; not because of any contrivance on the part of the accused. He will also testify that SGT Wiggins was later moved to the NSE, rather than SPC Chester, because he was more qualified for those duties; not because of any contrivance by the accused.

10. MAJ Charles Knowles[3], National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2167; MAJ Knowles will testify, in support of the Defense UCI motion, that COL Williams briefed his "core staff" (to include MAJs Barr, parker, Roach, Knowles, LTCs Thompson and Jones, and possibly CSM Averrett) that the accused had violated G.O. #1.

11. SPC Michael LeClear, HHC Task Force Falcon Bagram Airfield, Afghanistan, supporting Task Force Nighthawk at Kandahar Airfield, Afghanistan, APO AE 09354, 841-1163; SPC LeClear will testify as to any prior inconsistent statements should any witness testify in a manner inconsistent with statements made during Defense interviews. He has sat in, as a witness, on all Defense interviews.

12. MSG Edward Lopez, Kandahar Airfield, Afghanistan APO AE 09354, 841- 2260; MSG Lopez will testify in support of the Defense UCI motion that COL Williams at a Town Hall Meeting advised the unit as a whole that "we have an officer" who has engaged in fraternization and adultery, that the case would be pushed to the max, and gave the impression that he believed the charges and had already determined the punishment.

13. MAJ Don Mercer, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1721; MAJ Mercer will testify that he has only seen the accused and SPC Chester together on a few occasions at the DFAC and that their interaction was completely professional.

14. SSG Peggy Prado[4], Ft. Richardson, Alaska, telephone unknown (contact made through witness' chain of command at request of chain of command); SSG Prado will testify, in support of the Defense UCI motion, that she was threatened by SGM Harrington to either reveal things about MAJ Gamble that SSG Prado could not confirm, or she would be faced with an action/investigation regarding SSG Prado's relationship with MSG Lopez.

15. CPT Elecon Reformado, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080; CPT Reformado will testify that he never saw the accused and SPC Chester in the DFAC or in a vehicle together. He will also testify that he was the approval authority for SPC Edwards' promotion waiver, not the accused.

---

[3] Via Stipulation of Expected Testimony.
[4] Via VTC or Stipulation of Expected Testimony. The witness was returned to Alaska from the deployment and is currently on Medical Hold at Ft. Richardson, Alaska.

16. SGT Lisa Thompson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1447; SGT Thompson will testify that SFC Ramsey was in charge of selecting folks who would go outside the wire for missions, subject to the approval of COL Williams, not the accused. She will also testify that SPC Moses is not easily offended by sexual comments. She will also testify that it was common to have male visitors in the female barracks at the time the accused was allegedly seen in or near SPC Chester's room.

17. SSG Jacqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2168; SSG Tyson will testify, in support of the Defense UCI motion that she was threatened with Article 15 action by both SGM Harrington and 1SG Braun if she did not confirm rumors circulating about MAJ Gamble's case; implying she was withholding information. Both senior NCOs told her COL Williams sanctioned this course of action. During these interviews, 1SG Braun referred to MAJ Gamble as a "psychological predator." He also told SSG Tyson that MAJ Gamble was a bad guy and needed to go down. They also demanded that SSG Tyson "spy" on MAJ Gamble and SPC Chester. She will testify that male visitors often frequented her room at the time the accused was allegedly in/near SPC Chester's room. She will also testify that SPC Edwards told SPC Moses the details of all allegations SPC Edwards is making against the accused.

18. SGT Jorge Vega, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1538; SGT Vega will testify in support of the Defense UCI motion that COL Williams, while "pissed off" addressed the entire unit at a Town Hall Meeting, told the unit that "a certain officer" had violated GO #1 by engaging in adultery, fraternization, conduct unbecoming an officer, and sexual harassment, and that the reference was obviously to MAJ Gamble. On the merits, he will testify that SPC Dean often talked about her sexual toys in public settings, and was never offended by references to them. He will also testify about SPC Lindsey's bad character for truthfulness.

In addition to the listed witnesses, the Defense expects to provide the Trial Counsel several character statements attesting to the accused's relevant character traits (good character for lawfulness, peacefulness, and good moral character) in defense of the charges. The drafters follow:

Mr. Wilber E. Hooks/Anchorage, Alaska/907-271-2247
Ms. Irene Hooks/Anchorage Alaska/907-269-8150
Mr. Maurice Gamble/Anchorage, Alaska/907-260-3819
Ms. Angie Calhoun/Augusta, Georgia/DSN 780-3083
Mr. Wilbur Hooks, Jr./Puyallup, Washington/206-220-6643
Mr. Lee H. Martin/Charleston, South Carolina/843-873-6693
MG Thomas Katkus/Anchorage, Alaska/907-688-3896 (good military character)
COL J. Marc Williams/Ft. Leavenworth, Kansas/913-684-7293 ( "   "   ")
Rev. Alonzo B. Patterson/Anchorage, Alaska/907-276-6609
Ms. Patricia A. Ray/Anchorage, Alaska/907-762-7676
Mr. Billy C. Ray/Anchorage, Alaska/909-345-4746
Rev. Ben Williams/Anchorage, Alaska/907-269-8147
Mr. Edward Chatman/Anchorage, Alaska/907-264-1153
Mr. Phillip B.J. Reed/Chicago, Illinois/312-404-8185

4

Mr. Bob Walsh/Anchorage, Alaska/907-271-3735
Mr. Sylvester Neal/Seattle, Washington/253-735-0139
Ms. Gertrude Peoples/Seattle, Washington/206-721-3189

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel

I certify that I have served (via e-mail) a true copy of the above on the Trial
Counsel on 28 Dec 06 (local, Kandahar Airfield, Afghanistan).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

Attachment #2

UNITED STATES OF AMERICA
                ) ) ) )
            v. Gamble, Fredrick, M.
                Major, U.S. Army, (574-80-
5016)                                    )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76 ) Bagram
Airfield, Afghanistan APO AE 09354)

Defense to Dismiss
All Charges and Specifications
(Unlawful Command Influence)


29 December 2006


## RELIEF SOUGHT

The Defense in the above case requests that the Court dismiss, with prejudice, all charges and specifications due to the appearance of unlawful command influence, as well as actual unlawful command influence. This motion is raised pursuant to RCM 907(a).

The Defense requests oral argument and an evidentiary hearing.


## BURDEN OF PROOF AND STANDARD OF PROOF

The initial burden of persuasion and proof in an unlawful command influence motion rests with the Defense. The Defense must show that there are sufficient facts, which, if true, constitute actual or apparent unlawful command influence. The Defense burden of proof here is "some evidence." If the Defense meets their burden, the burden of proof and persuasion then shifts to the Government to: 1) disprove the predicate facts on which the command influence allegation is based; or 2) persuade the military judge that the facts do not constitute unlawful command influence; or 3) produce evidence proving that the unlawful command influence will not effect the proceedings. The Government's burden of proof is beyond a reasonable doubt.


## FACTS

. The accused is a member of the Alaska National Guard currently on Title 10 status. At the time of the majority of the alleged offenses, the accused was serving as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in the case are assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R. Steven Williams commands both the NCE and NSE. SGM Pamela Harrington serves as the Command Sergeant Major/First Sergeant for the NSE. 1 SG Robert Braun serves as the First Sergeant for the NCE. Each named individual served in the same capacity at all times relevant to this motion.

When allegations of sexual harassment against the accused cam~ to the attention of SGM Harrington and 1 SG Braun, the two undertook a "preliminary investigation" of the matter. This investigation included conducting surveillance of certain female barracks late into the evening and interviewing certain female members of the units to determine if they had any information relevant to the case being developed against MAJ Gamble.

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

During the course of this "preliminary investigation," SGM Harrington questioned SSG Jacqueline Tyson. During the course of the interview, SSG Tyson advised SGM Harrington that she (Tyson) had no information relevant to the investigation beyond rumor and speculation. SGM Harrington, apparently believing that SSG Tyson was withholding information, informed SSG Tyson that, "if we later find you are hiding something, GOI Williams said we will be giving you an Article 15," or words to that effect. Based upon the context of the conversation, and the demeanor of SGM Harrington, SSG Tyson perceived this admonishment as a threat that she would face adverse action if she did not provide information detrimental to MAJ Gamble's case.

After SGM Harrington was unable to persuade SSG Tyson to provide information in the case, 1 SG Braun later approached SSG Tyson. 1 SG Braun first advised SSG Tyson that MAJ Gamble was a "psychological predator," and that SSG Tyson should provide information about MAJ Gamble. He told SSG Tyson that MAJ Gamble was "a bad guy and needed to go down," or words to that effect. SSG Tyson again advised that she knew no facts and refused to provide references to rumor and speculation that were circulating around the post. At this point, 1 SG Braun advised SSG Tyson that if she did not provide the rumor and innuendo, "GOI Williams said she would be receiving an Article 15 if it later turned out she was withholding information," or words to that effect. Based upon the context of the conversation, and the demeanor of 1 SG Braun, SSG Tyson considered this admonishment a threat that she would face adverse action if she did not provide information detrimental to MAJ Gamble's case.

SGM Harrington and 1 SG Braun interviewed a majority of the alleged victims in this case during and after their "preliminary investigation." They also interviewed other unit personnel. During this phase of the investigation, SGM Harrington interviewed SSG Peggy Prado. During the interview, SGM Harrington told SSG Prado that she (Harrington) believed Prado was withholding information about MAJ Gamble. SGM Harrington then told SSG Prado that if Prado did not reveal the requested information about MAJ Gamble, SSG Prado would be facing an investigation/action regarding Prado's alleged relationship with MSG Ed lopez. SSG Prado viewed this as a threat and became emotionally overwhelmed by the pressure brought to bear by the interview. [1]

On 25 and 26 August 2006, and 28 and 29 September 2006, a "Town Hall Meeting" was convened for NGE and NSE, respectively, for one of the two days each month. Several versions of the meetings were held on the target days to accommodate all members of the unit and the different shifts they worked. One of the issues discussed at the meetings included a briefing by the Gommander, GOI Williams, regarding violations of General Order Number One, and the accused's case specifically. During this portion of the presentation, GOI Williams advised all attendees that he would not tolerate any violation of General Order Number One, and, further, that he would address all violations by seeking the maximum punishment available. GOI Williams then went on

---

[1] The assertions regarding SSG Prado are subject to verification with the witness. The Defense asserts a good faith basis for the claims based upon statements attributed to SSG Prado shortly after the interview in question by two senior NCOs. SSG Prado is currently on "medical hold" in Alaska and the Defense has requested, through the chain of command, contact information for SSG Prado. The assertions are made preliminarily to meet the filing deadline and to apprise the Government of the allegations.

to tell the group that "we have an officer,,2 who has chosen to violate General Order Number One and is now facing charges which include adultery, fraternization, conduct unbecoming an officer, and sexual harassment, among others," or words to that effect. Most of the attendees knew COL Williams was referring to MAJ Gamble because MAJ Gamble was not at the Town Hall Meetings, the various references to the officer in question clearly indicated MAJ Gamble, and because there had been much discussion at all levels within the unit about MAJ Gamble's case at the time preceding and between the Town Hall Meetings. Attendees will describe COL Williams' demeanor during the briefing as "livid" and "beyond pissed." Some subordinate members of the unit took the briefing as a pronouncement of MAJ Gamble's guilt by the Commander and prejudgment as to punishment. This group included 1 L T James Johnson, MSG Ed Lopez, SSG Kim Francis and SGT Jorge Vega. Nearly all listed witnesses for the Government attended these Town Hall Meetings.

At some point within the same timeframe, COL Williams addressed MAJ Gamble's case with his "core staff." This discussion took place in conjunction with one of the unit's daily Commander's Update Briefings, or "CUBs." MAJ Lee Knowles attended in his capacity as NCE S-4, as did MAJ Rob Barr, NCE S-1; MAJ Chad Parker, NCE S2; MAJ Jeff Roach, NCE S-3; and LTC Raleigh Jones, NCE S-5, and MAJ Richard Koch, the Chaplain. CSM Robert Averrett and the unit XO, LTC Michael Thompson, likely attended as well. At this meeting, COL Williams said he was serious about violations of General Order Number One. He also told the group that MAJ Gamble had violated General Order Number One, listed each of the charges pending against the accused, and said that he regretted having to take action against MAJ Gamble. This meeting lasted about fifteen minutes. MAJ Koch, MAJ Barr, MAJ Parker, MAJ Roach, CSM Ave rrett , and LTC Thompson are on the Government witness list.

Since the case has developed, all members of the senior staff, to include COL Williams, have referred to MAJ Gamble as a "predator," typically while in each other's company in informal settings. Indeed, this term is used so frequently by members of the senior staff to describe MAJ Gamble that one senior staff member characterizes it as "the" term by which to refer to MAJ Gamble. COL Williams has also expressed the opinion, in the presence of his senior staff, that MAJ Gamble should get five to ten years for his offenses. Senior staff members have attributed such statements about confinement to COL Williams as well.

During the week of 25 Dec 06, Defense counsel conducted witness interviews at KAF. Several witnesses (not alleged victims) refused to meet with Defense counsel. The Staff Judge Advocate encouraged each hesitant witness to meet with the Defense and secured all requested interviews for the Defense. Among other fact witnesses, the Defense interviewed SSG Kim Francis. SSG Francis provided information favorable to MAJ Gamble's case. The day after the interview, SSG Francis returned to the interview room and revealed that she now feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her Commander, MAJ Nichols, and advised that she did not have to talk to the Defense counsel. MAJ Nichols is an alleged victim in the case. She further

---

2 In referring to "this officer," GOL Williams also called him "my right hand man" and "an officer since transferred to Bagram," presumably using different references at different sessions of the Town hall Meetings.

advised that her Sergeant Major, SGM Harrington, told her before the interview not to provide "too many details," or words to that effect.

The three witnesses who refused to meet with the Defense upon initial request by the NCOIC of the KAF Legal Office are: CPT Bingley; SFC Arnett; and SSG Cuyar. After encouragement by the KAF Staff Judge Advocate, SFC Arnett interviewed with the Defense, but conditioned participation upon having the SJA in the room for the interview. The Defense agreed to this condition. SSG Cuyar agreed to meet under the same condition, and the Defense agreed to the condition again. The Defense withdrew its request for the interview with CPT Bingley. SFC Arnett refused to meet with the Defense in the first instance because "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what MAJ Gamble did in this case," or words to that effect.

The Alaska Guard unit currently deployed to Kandahar Airfield (KAF) from Ft. Richardson, Alaska, is composed of a group which includes soldiers, both full-time and part-time Guard members, who have served for years together in Alaska. They see each other on a frequent basis within their community and on duty and compete with each other for promotion and career advancement on a more static basis than an active Army unit because they are not subject to the same frequency of reassignment as the active Army members. As a consequence, Alaska Guard members currently deployed to KAF can expect to return to Alaska at the conclusion of the deployment and work under the same chain of command for many years into the future.

<u>LAW</u>

The Defense relies on the following authorities in support of its motion:

> Article 37(a), U.C.M.J.
> RC.M. 907(a)
> <u>U.S. v. Gore</u>, 60 M.J. 178 (2004)
> <u>US v. Simpson</u>, 58 MJ 368 (2003) <u>US
> v. Stoneman</u>, 57 M.J. 35 (2002) <u>U.S.
> v. Biagaise</u>, 50 M.J. 143 (1999) <u>U.S.
> Avala</u>, 43 M.J. 296 (1995)
> <u>U.S. v. Gleason</u>, 43 M.J. 69, 73 (C.M.A 1994)
> <u>U.S. v. Stombaugh</u>, 40 M.J. 211 (C.M.A 1994) <u>U.S.
> v. Levite</u>, 25 M.J. 334, 338-339 (C.M.A 1987) <u>U.S. v.
> Rosser</u>, 6 M.J. 267 (C.M.A 1979)
> <u>U.S. v. Francis</u>, 54 M.J. 636 (Army Ct.Crim.App. 2000)
> <u>U.S. v. Stamper</u>, 39 M.J. 1097 (AC.M.R 1994)
> <u>U.S. v. Cruz</u>, 20 M.J. 873 (AC.M.R 1985)
> <u>U.S. v. Allen</u>, 31 M.J. 572 (N.M.C.M.R 1990)

<u>WITNESSES/EVIDENCE</u>

The Defense requests the following witnesses produced and present for this motion:

LTC Raleigh Jones

MAJ "Lee" Knowles[3]
MAJ Richard Koch
1 L T James
Johnson MSG Ed
Lopez
SFC Troy Arnett[4]
SFC Sherrie Butters
SSG Peggy Prado[5]
SSG Jacqueline Tyson
SSG Kim Francis[6] TSgt
Amy Hartleban[7] SGT
Jorge Vega

The Defense requests the following evidence produced for this motion:

- Attendance Logs, "Town Hall Meetings" (Attch 1)
- Government's Witness List (Attch 2)

## ARGUMENT

As noted above, the initial burden in an unlawful command influence motion rests with the Defense. Here, the Defense must show that there are sufficient facts, which, if true, constitute unlawful command influence. The threshold is "more than mere allegation or speculation - some evidence." It is a low threshold. U.S. v. Simpson, 58 M.J. 368, 373 (2003); U.S. v. Biaoase, 50 M.J. 143, 150 (1999). The burden does not shift to the Government unless the Defense meets "the initial burden of producing sufficient evidence to raise unlawful command influence." U.S. v. Avala, 43 M.J. 296, 299 (1995). The Defense must further show that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings. This requires the trial court to examine, prospectively, the *potential* impact of the alleged unlawful command influence. U.S. v. Francis, 54 M.J. 636,637 (Army Ct.Crim.App. 2000). Additionally, the alleged actor in the unlawful command influence allegation must have acted with the mantle of command authority. Biaoase, 50 M.J. at 150; U.S. v. Stombauoh, 40 M.J. 208, 211, 213 (C.M.A. 1994); Avala, 43 M.J. at 299; U.S. v. Levite, 25 M.J. 334, 338-339 (C.M.A. 1987).

Unlawful command influence is defined as action, by one with the mantle of command authority, which rises to the level of an attempt to coerce or, by unauthorized means, influence the action of a court-martial or any member thereof, in reaching the findings or sentence in any case. Article 37(a), U.C.M.J. Further, if unlawful command influence is directed against prospective Defense witnesses it impacts the accused's right to have access to favorable evidence. U.S. v. Gore, 60 M.J. 178, 185 (2004). If the Defense does meets their burden, the burden then shifts to the Government to 1) disprove the predicate facts on which the command influence is based; or 2) persuade

[3] The Defense is amenable to a Stipulation of Expected Testimony, telephone testimony, or VTC testimony to accommodate MAJ Knowles' end of tour travel to CONUS on 28 Dec 06.
[4] Via Stipulation of Expected Testimony.
[5] The Defense is amenable to telephone or VTC testimony, during motion practice, due to SSG Prado's medical hold status in Alaska.
[6] The Defense is amenable to VTC testimony during motion practice, and trial on the merits, due to SSG Francis' departure for mid-tour leave as of 28 Dec 06.
[7] Via Stipulation of Expected Testimony.

the military judge that the facts do not constitute unlawful command influence; or 3) produce evidence proving that the unlawful command influence will not effect the proceedings. The Government's burden in this regard is beyond a reasonable doubt. <u>US v. Stoneman</u>, 57 M.J. 35,41 (2002); <u>Biaaase</u>, 50 M.J. at 151.

Unlawful command influence can be either apparent or actual, and the trial court is charged with the examination of both aspects of the issue when a motion alleging unlawful command influence is raised. <u>Simpson</u>, 58 M.J. at 374. Actual unlawful command influence is the outright attempt to unlawfully influence the outcome of the proceedings. Apparent unlawful command influence exists when a reasonable member of the public, if aware of all the facts, would have a loss of confidence in the military justice system and believe it to be unfair. <u>U.S. v. Rosser</u>, 6 M.J. 267, 271,273 (C.M.A. 1979); <u>U.S. v. Cruz</u>, 20 M.J. 873, 890 (A.C.M.R. 1985) *rvd on other grounds;* <u>U.S. v. Allen</u>, 31 M.J. 572, 590 (N.M.C.M.R. 1990). If apparent unlawful command influence is alleged, and "some evidence" is presented to carry the Defense burden, the Government must demonstrate, beyond a reasonable doubt, that the proceedings were free from the apparent taint of unlawful command influence, as viewed by a reasonable member of the public. <u>Simpson,</u> 58 M.J. at 374,375. The Defense will address each factual scenario, in turn.

### The Tyson and Prado Interviews

In a unique twist of factual scenarios typically encountered in unlawful command influence witness tampering cases, the present case reflects an endeavor by senior NCOs in the chain of command to persuade potential witnesses to provide information detrimental to the accused's case, with a presumable eye on the witness' ultimate testimony in court, or, at least, development of such evidence based upon the comments of the witnesses. Here, SGM Harrington was less aggressive than 1 SG Braun in dealing with SSG Tyson, a junior NCO. SGM Harrington made clear that she believed SSG Tyson had information detrimental to MAJ Gamble's case, regardless of SSG Tyson's claims to the contrary. Rather than leaving the interview on that note, however, the Sergeant Major upped the ante by invoking the Commander's name[8] and telling SSG Tyson that she would be facing Article 15 action, at the direction of the Commander, if it later became known that SSG Tyson was withholding information. Although the posture taken by the Sergeant Major is probably within the bounds of the law in that she addresses action as a consequence of the presumed false official statement by SSG Tyson, the context of the conversation, the superior-subordinate relationship, and the invocation of the Commander's name brought home a clear threat to SSG Tyson; indeed, a threc;lt well supported in her mind under the circumstances.

Even if the SGM Harrington interview did not rise to the level of actual unlawful command influence, the subsequent interview by 1 SG Braun eclipsed the bounds of unlawfulness by leaps and bounds. In this interview, SSG Tyson made it very clear that she only knew rumors around the post regarding MAJ Gamble and refused to reveal any matter of which she did not have personal knowledge. Grounded in her realization of the potential devastating consequences for MAJ Gamble if unsupported rumors were repeated during formal investigations; she stood up to 1 SG Braun and flatly told him she would not repeat rumors. Instead of respecting this junior NCOs appropriate stance,

---

[8] The Defense has uncovered no information to suggest the Commander, COl Williams, knew of the tactics employed by these senior NCOs, or their use of his name.

and, unfortunately, failing to realize the correctness of her position, 1 SG Braun took to demonizing the accused with references such as "psychological predator" and comments like "he's a bad guy and needs to go down," or words to that effect. Then he, too, went the threat route. While invoking the name of the Commander, he told SSG Tyson that she would be faced with Article 15 action if she did not reveal rumors to which she was privy. This threat, unlike that of SGM Harrington, was clearly levied to secure from SSG Tyson information that SSG Tyson could not say was true; in fact, could not say was any more than idle talk on the street.

The circumstances surrounding the Prado interview are much less certain for the reasons described in Footnote 1. At this point, all the Defense can allege, based upon statements attributed to SSG Prado by two senior NCOs, and the circumstantial evidence of her emotional distress after the interview, is that similar tactics were employed, except that she was threatened with action regarding her alleged unprofessional relationship with MSG Lopez, as opposed to Article 15 action. The Defense expects SSG Prado will be available to testify at the evidentiary hearing on this motion.

With regard to all three events described above, the Defense asserts that the facts constitute unlawful command influence because command pressure has been brought to bear by individuals acting with the mantle of command authority. Levite, 25 M.J. at 339. Specifically, threats - real and perceived - were levied by a Sergeant Major and First Sergeant against junior NCOs in order to secure information detrimental to the accused, without concern for the validity of the information. The logical connection to the court-martial, of course, is that the command actors were on a mission to develop information detrimental to the accused for presentation at trial, or to develop such information based upon what they were able to force from SSGs Prado and Tyson. The consequent unfairness in the proceedings is twofold. First, such heavy-handed behavior presents great risk that uncorroborated or false information will be presented to avoid the threatened consequence. Although these two junior NCOs were able, for the most part, to stand up to these tactics, we will never know which junior enlisted folks were not that, unfortunately is often the essence of unlawful command influence; if it is successful, the victim falls in line and authorities never discover it has occurred. This point raises the second aspect of consequent unfairness. The willingness of these two senior NCOs to employ these tactics would cause the reasonable person to question the fairness of the proceedings because it is clear they will engage in such activity, and others who have succumbed will never be discovered. Clearly, in this regard, the Defense has carried the burden of demonstrating some evidence of both actual and apparent unlawful command influence - a "low" threshold. BiaQase, 50 M.J. at 150.

### The Francis Admonishment

The Defense asserts that the admonishments given SSG Francis by her Commander and her Sergeant Major squarely rise to the level of actual unlawful command influence. "The exercise of command influence tends to deprive servicemembers of their constitutional rights. If directed against prospective Defense witnesses, it transgresses the accused's right to have access to favorable evidence." Gore, 60 M.J. 178, 185 (2004); quoting U.S. v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986); U.S. v. Gleason, 43 M.J. 69, 73 (1994).

When MAJ Nichols told SSG Francis that she did not have to interview with Defense Counsel, MAJ Nichols was absolutely correct - there is no right to a pretrial interview. However, ethical standards and adherence to Article 46, U.C.M.J., have always dictated, in military practice, that the admonishment of no right to a pretrial interview is accompanied by encouragement from the neutral advisor to interview with opposing counsel. Indeed, this is the exact professional and ethical tact presumably employed by the KAF Staff Judge Advocate in producing SFC Arnett and SSG Cuyar for Defense interview. Unfortunately, MAJ Nichols, SSG Francis' Commander, is neither neutral, nor did she encourage the interview. Not only is MAJ Nichols not neutral, she is one of the alleged victims in the case, yet saw no conflict of interest in advising a witness who could produce information favorable to the Defense to think twice about testifying. Even if MAJ Nichols did not use those words, that was certainly the impression she left with SSG Francis. Moreover, and, arguably, more importantly, she gave this advice with the full authority of Command over SSG Francis.

SGM Harrington undertook an even more obvious exercise of unlawful command influence. She brazenly told SSG Francis to withhold information. SSG Francis could not be clearer - SGM Harrington told her to withhold information from the Defense Counsel. The implications are grave, and move far beyond unlawful command influence. Again, SGM Harrington was obviously acting with the mantle of command authority, and, as to SSG Francis, dealing with a junior NCO in her own unit. Predictably, this behavior is not far removed from the tactic employed by SGM Harrington against SSG Prado and SSG Tyson as well. Fortunately, like SSGs Prado and Tyson, SSG Francis has stood up to this unlawful command influence, so far. She has expressed fear for her career and that of her husband. When the admonishment by the Commander and the Sergeant Major, coupled with the National Guard environment, which sees static command and unit structures unchanged for years, it will be a true test for SSG Francis to carry through with her expressed intention to testify. It should also be noted that SSG Francis, as one of the main witnesses for the Town Hall Meeting allegations, addressed below, was also privy to the Commander's emphatic insistence that the accused is guilty and must face the "maximum."

These admonishments to SSG Francis constitute well more than "some" evidence of unlawful command influence - actual and apparent. Taken separately or together, they constitute an effort to influence a witness. The logical connection to the court-martial is that the accused is thereby deprived of access to witnesses in the first instance, and subject to witness testimony which may be tempered at trial due to fear of reprisal in the second instance.[9]

## The Town Hall Meetings

[9] In the event the Court denies the Defense Motion, the Defense nevertheless respectfully requests that the Court employ prophylactic remedial measures to protect SSG Francis from future retribution akin to those employed by the trial judge in Biaoase. They include: warning SGM Harrington and MAJ Nichols about the consequences of reprisal against SSG Francis and attempting to influence witnesses otherwise, before trial on the merits (respectfully request such admonishment, as it applies to MAJ Nichols, embrace any conversations she has with other alleged victims, if not restricting her from contact with them altogether); directing written justification regarding any future downgrade on official evaluations of SSG Francis which are lower than her present evaluations; and consider having SGM Harrington and/or MAJ Nichols removed from SSG Francis' rating chain with no ability otherwise to influence any of her future evaluations.

With the evidence presented on COI Williams' statements at the Town Hall Meetings, the Defense has demonstrated that he has potentially tainted the witness pool in this case. The actions constitute both actual and apparent unlawful command influence. Essentially, the Commander gathered the unit as a whole, albeit in a series of briefings to accommodate duty schedules, pronounced MAJ Gamble guilty of specific and listed offenses, voiced his desire of the maximum consequence, and did so with an emphasis variously described as "livid," "more than pissed," and "with smoke coming out of his ears." The obvious, natural, and probable consequence for all potential witnesses in the audience: message received. One junior NCO was appalled at the lack of any reference to due process or the presumption of innocence. Although MAJ Gamble's name was not mentioned, such characterizations as "one of our officers," or "an officer since transferred to Bagram," or "my right hand man," were all employed, and each pointed clearly to MAJ Gamble, just like the Master Sergeant's comments in <u>Baioase</u> clearly referenced that accused by implication. <u>Baioase</u>, 50 M.J. at 147. Thus, the failure to name the accused is a hollow rationalization for the powerful potential impact on the court-martial carried with the comments. It should be noted such impact, such as that brought to bear here, on a witness pool serves not only to deter witnesses from testifying in favor of an accused, it also serves to embolden witnesses who may have been less than candid in the past or encourage other witnesses to embellish unfavorable information in order to tow the company line. The greatest potential for such powerful impact clearly rests at the junior enlisted level. In this regard, SPCs Selden, Dean and Edwards were at both briefings and SPCs Lindsey, Chester, and Moses each attended one. Also, MAJ Nichols attended both Town Hall Meetings. While the descriptions of the meetings differ slightly from witness to witness, likely because of attendance at different versions, the message from each witness is consistent. They had no doubt COI Williams was angry, he was talking about MAJ Gamble, and he presumed MAJ Gamble guilty. This message is curiously consistent with the reason provided by SFC Arnett for his refusal to talk to Defense Counsel: "you are the Defense and there is no defense for what MAJ Gamble did in this case." SFC Arnett attended the August Town Hall Meeting.

The Defense asserts that these events constitute unlawful command influence because COI Williams', even if by neglect, attempted to influence the outcome of the proceedings by making clear to the entire witness pool command's perspective on the case.[10] His motives, even if noble, are irrelevant. The Defense further asserts that no evidence need be produced that any witnesses were actually influenced for two reasons. First, the gravamen of unlawful command influence is the actor's" ... *attempt* to coerce, or by any unauthorized means, influence the action of a court-martial... " Article 37(a), U.C.M.J. *(emphasis added)*. Second, as noted above, successful unlawful command influence leaves no witnesses in its wake. Fortunately, there are several strong attendees who are prepared to testify about the substance of the Town Hall Meetings, but many folks "just can't remember." This is unlawful command influence and the logical connection to the court-martial is witness taint, both pro and con. Additionally, the evidence of apparent unlawful command influence is overwhelming based upon the

---

[10] Even if the Court were to rule that the Town Hall Meetings did not constitute unlawful command influence in an of themselves, the Defense asserts these events certainly constituted a violation of Article 13, U.C.M.J. <u>U.S. v. Stamper</u>, 39 M.J. 1097 (AC.M.R. 1994). The Defense has raised this issue by separate motion.

Town Hall Meetings and clearly triggers the Government's burden to disprove the same beyond a reasonable doubt.

### The Core Staff Briefing/Derogatory Comments

The Defense asserts that unlawful command influence flowing from the Town Hall Meetings was brought to bear on the unit's senior staff in a more personal, persuasive, and direct way when COL Williams pronounced MAJ gamble's Guilt, read the charges he faced, and opined that confinement was appropriate. He did this in the direct presence, with opportunity for direct eye contact, of no less than six, possibly as many as eight, witnesses in this case. Couple this with his subsequent and frequent references to the accused as a "predator," and the references senior staff personnel have made to COL Williams' call for five to ten years confinement, the writing on the wall for this select group of officers is clear. Again, attempted influence, by intent or neglect, has been brought to bear on the witness pool in an even more coercive environment. As. noted above, the law does not distinguish between an insidious design to influence potential witnesses, or even the most noble of causes - it is the potential impact of the actor's conduct. BiaQase, 50 M.J. at 153 *(Judge Sullivan, concurring)*. That potential impact, for the reasons discussed under "Town Hall Meetings," above, is even more pronounced when the audience is pared down to COL Williams' core staff.

### Cumulative Impact/Apparent Unlawful Command Influence

The Defense has addressed the appearance of unlawful command influence under each activity heading. The Defense further asserts that these activities, collectively, provide abundant evidence that a reasonable member of the public, if aware of all the facts and activities described herein, would have a loss of confidence in the military justice system and believe it to be unfair.

### CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to dismiss, with prejudice, all charges and specifications due to the appearance of unlawful command influence, as well as actual unlawful command influence.


(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble


(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel


I certify that I have served (via e-mail) a true copy of the above on the Trial Counsel on 29 Dec 06 (local, Kandahar Airfield, Afghanistan).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

*Attachment #3*

UNITED STATES OF AMERICA          )
                                  )
          v.                      )          Defense to Dismiss
                                  )          All Charges and Specifications
 Gamble, Fredrick, M.             )          (Article 13, U.C.M.J.)
 Major, U.S. Army, (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)  )
 Headquarters  and  Headquarters Company )
 Combined/Joint  Task  Force  (CJTF) - 76 )   29 December 2006
 Bagram Airfield, Afghanistan APO AE 09354)

## RELIEF SOUGHT

The Defense in the above case requests that the Court dismiss, with prejudice, all charges and specifications due to violation of Article 13, U.C.M.J., or, in the alternative, in the event of conviction, grant credit to the accused against the adjudged sentence. This motion is raised pursuant to RC.M. 906(a) and 907(a).

The Defense requests oral argument and an evidentiary hearing.

## BURDEN OF PROOF AND STANDARD OF PROOF

The burden of persuasion and proof is on the Defense, as moving party, IAW RC.M. 905(c).

## FACTS

The accused is a member of the Alaska National Guard currently on Title 10 status. At the time of the majority of the alleged offenses, the accused was serving as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in the case are assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R Steven Williams commands both the NCE and NSE.

Charges were preferred in this case on 19 Aug 06 by MAJ Michael Sullivan. The charges were referred to trial by general court-martial by MG Freakley on 13 Nov 06. The accused was reassigned to Bagram Airfield (BAF), Afghanistan, before charges were preferred in this case. He returned to KAF, for approximately one week, to attend the Article 32 hearing, but has remained at BAF otherwise, awaiting trial. Trial is scheduled to convene at BAF on 9 Jan 07.

On 25 and 26 Aug 06, and 28 and 29 Sep 06, a "Town Hall Meeting" was convened for NCE and NSE, respectively, for one of the two days each month. Several versions of the meetings were held on the target days to accommodate all members of the unit and the different shifts they worked. One of the issues discussed at the meetings included a briefing by the Commander, COL Williams, regarding violations of General Order Number One, and the accused's case specifically. During this portion of the presentation, COL Williams advised all attendees that he would not tolerate any violation of General Order Number One, and, further, that he would address all violations by seeking the maximum punishment available. COL Williams then went on to tell the

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

With regard to the Town Hall Meetings, the Defense first asserts that, circumstantially, the evidence reflects an intent to punish the accused. Here, the Defense points to four factors. First, the Commander was obviously angry and agitated. It was thus likely that he was lashing out at the accused, although not calling him by name. Indeed, the MAJ Gamble's case was the centerpiece of the comments and COL Williams' apparent frustration. Second, there was no reference to a presumption of innocence or any pending due process rights. MAJ Gamble was labeled a criminal, plain and simple, as one who violated General Order Number One in specific ways. Third, MAJ Gamble had already been exiled to BAF and everyone at the Town Hall Meeting knew the references were to him. It would be disingenuous to propose that the audience did not know who the unidentified "officer" was when he was referred to as "the officer now at Bagram," or "my right hand man." Fourth, the speaker had to know all these things, as the Commander. Collectively, these factors circumstantially point to an intent to punish MAJ Gamble.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis calls for examination of the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Here, two spring to mind. First, COL Williams may have sought to impress upon the unit the seriousness of General Order Number One violations and deter future offenders. Second, he may have sought to put a stop to rumors about MAJ Gamble's case. The Defense concedes that both objectives are legitimate and non-punitive. The Defense asserts, however, that eOL Williams's pursuit of these objectives was not reasonable. The logic here is simple. In order to deter future violations of General Order Number One, simply state what will happen to future offenders, as emphatically as necessary, without reference to any ongoing case. In order to stop rumors about MAJ Gamble's case, simply tell the unit to cease and desist on the rumor front. Again, there is no legitimate reason to brand the accused as guilty, and list the offenses to make either legitimate point. Thus, the challenged conduct in this case also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial public humiliation. As noted above, such humiliation can occur even if the accused is not present with the unit, or at the location of the humiliation. Baiaase, 50 M.J. 143, 152 n.3.

## The Core Staff Briefing/Derogatory Comments

With regard to the core staff briefing, and follow-on comments reg~rding the accused, the Defense asserts that the circumstantial evidence of intent to punish is even stronger. To be sure, a pronouncement of guilt, coupled with a reading of the charges, presents an instance of public humiliation for the accused within the select community to which he especially belonged as the former Executive Officer, COL Williams' senior staff. He was more directly and personally humiliated by these comments which were shared in a group setting with his former close associates and friends, and, moreover, folks whom he will likely see and with whom he will deal upon his return to Alaska. Thus the potential for humiliation was high, just based upon the briefing, and known to COL Williams at the time of the briefing. When the frequent references to "predator" took place after the briefing, the emphasis became personal, and even more humiliating as the core staff began to parrot the reference until it became "the" term by which to refer to MAJ Gamble. The Defense asserts the intent to punish has been demonstrated circumstantially.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis again moves to the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Only one such objective seems apparent: to keep the senior/core staff apprised of the status of the case pending against the former XO. Again, the Defense concedes the object is legitimate and non-punitive in the abstract, but the execution was unreasonable. The staff could have been apprised of the case status, even with a listing of offenses, without reference to MAJ Gamble's guilt. However, once COL Williams moved past that status briefing and undertook to use the tetm "predator," apparently influencing the staff to do the same, no legitimate purpose whatsoever was served. Only humiliation remained. The same is true for the references to the confinement COL Williams believed appropriate. Thus, again, the challenged conduct as it relates to interaction with the senior staff also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial public humiliation.

<u>CONCLUSION</u>

Based on the foregoing, the Defense moves this Honorable Court to dismiss, with prejudice, all charges and specifications due to violation of Article 13. In the alternative, the Defense respectfully requests the Court grant credit to the accused, if convicted, against the adjudged sentence. The Defense asserts such credit should be no less than three days for one confinement credit, if confinement is adjudged, for each day since the Town Hall Meetings were held, and the frequent references to the accused as a "predator" began. Accordingly, the Defense requests at least three days for one credit for each day from 25 Aug 06 until 9 Jan 07.

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel

I certify that I have served (via e-mail) a true copy of the above on the Trial Counsel on 29 Dec 06 (local, Kandahar Airfield, Afghanistan).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

## DNA Processing Required, 10 USC § 1565

DEPARTMENT OF DEFENSE
Headquarters, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76)
Bagram Airfield, Afghanistan
APO AE 09354

GENERAL COURT-MARTIAL ORDER                                    9 May 2007
NUMBER                          5

MAJ Fredrick M. Gamble, 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, U.S. Army, Headquarters and Headquarters Company, Combined/Joint Task Force (CJTF)-82, Afghanistan, APO AE 09354, was arraigned at Bagram Airfield, Afghanistan, on the following offenses at a General Court-Martial convened by Commander, Combined/Joint Task Force (CJTF)-82.

Charge I. Article 92. Plea: Guilty. Finding: Guilty.

Specification: At or near Kandahar Airfield, Afghanistan, between, on or about 17 April 2006 and on or about 30 July 2006, violated a lawful general order, to wit: paragraph 5d of Combined/Joint Task Force (CJTF)-76 General Order Number 1, dated 21 February 2006, by wrongfully engaging in sexual relations and intimate behavior in a deployed environment with Specialist (E4) D. M. C., a person not his wife. Plea: Guilty. Finding: Guilty

Charge II. Article 93. Plea: Not Guilty. Finding: Guilty.

Specification 1: At or near Fort Richardson, Alaska and at or near Kandahar Airfield, Afghanistan, between on or about 17 April 2006 and on or about 30 July 2006, did maltreat Private First Class (E3) L. B. E., a person subject to his orders, by engaging in sexual harassment, to wit: by wrongfully stating to Private First Class E. "you have nice lips," "I'd like to kiss your lips," "you have a nice ass for a white girl," "have you ever been with a black man," "you've heard the phrase, once you go black you never go back," "I have a nice stomach and am well on my way to a six pack," " you know what they say about black men and the size of their dicks," "I don't think you can handle this," "I'm a big boy," "when will you be alone in your room," "you'll be alone in your room, right," "let me kiss your lips," "let me touch your tits," "just one time," "we can fuck around in the Colonel's vehicle because it has dark tinted windows and no one can see inside," "C. and I are fucking around, do you want to join us," "reach right in there, it will get bigger the more you play with it," "sleep with me and I'll make your promotion to Specialist happen," "sleep with me and I'll get you outside the wire," and "you can't let anything happen to you, I haven't taken advantage of you yet," or words to that effect, and by wrongfully winking his eye at Private First Class E. and entering her female barracks while she was asleep. Plea: Not Guilty. Finding: Guilty.

Specification 2: At or near Kandahar Airfield, Afghanistan, between on or about 1 June 2006 and on or about 30 July 2006, did maltreat Private First Class (PFC) K. L. M., a person subject to his orders, by engaging in sexual harassment, to wit: by wrongfully stating to Private First Class M. "I'm going to my room to get naked," or words to that effect. Plea: Not Guilty. Finding: Dismissed upon government motion.

*08 0207*

**FILED**

FEB - 5 2008

**NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT**

GCMO No. 5, DD HQ, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76), Bagram Airfield, Afghanistan, dated 9 May 2007 (continued)

Specification 3, later renumbered Specification 2: At or near Kandahar Airfield, Afghanistan, between on or about 1 June 2006 and on or about 30 July 2006, did maltreat Specialist (E4) J. P. D., a person subject to his orders, by engaging in sexual harassment, to wit: by wrongfully stating to Specialist D. "apparently I am having sex with all the females here at KAF" and "if you ever get bored with your toys you know where to find me" or words to that effect. Plea: Not Guilty. Finding: Not Guilty

Charge III. Article 133. Plea: Guilty. Finding: Guilty.

Specification: At or near Fort Richardson, Alaska and at or near Kandahar Airfield, Afghanistan, between on or about 17 April 2006 and on or about 30 July 2006, did use sexually harassing language towards Major (O4) K. A. N., to wit: by wrongfully stating to Major N. "sometime during this deployment we will have sex," "have you ever been with a black man," "why will you not do me," "I know you want me," "all you have to do is ask," and "we can have sex anytime," or words to that effect - such conduct being disgraceful and indecent that constitutes conduct unbecoming an officer and a gentleman. Plea: Guilty, excepting the words, "use sexually harassing language towards," substituting therefor the words, "wrongfully make certain comments to," excepting the words, "by wrongfully stating to Major N.," excepting the word, "indecent," to the excepted words: Not Guilty. To the words substituted therefor: Guilty. Finding: Guilty.

Charge IV. Article 134. Plea: Guilty. Finding: Guilty.

Specification 1: A married man, did, at or near Fort Richardson, Alaska, between on or about 17 April 2006 and on or about 1 June 2006, wrongfully have sexual intercourse with Specialist (E4) D. M. C., a woman not his wife. Plea: Guilty. Finding: Guilty.

Specification 2: At or near Kandahar Airfield, Afghanistan, between on or about 1 June 2006 and on or about 30 July 2006, committed an indecent assault upon Private First Class (E3) L. B. E., a person not his wife by grabbing Private First Class E.'s hand and placing it onto his PT shorts over his penis and stating "see what you do to me," or words to that effect, with the intent to gratify his sexual lust or desires. Plea: Not Guilty. Finding: Guilty.

Specification 3: At or near Fort Richardson, Alaska and at or near Kandahar Airfield, Afghanistan, between on or about 17 April 2006 and on or about 30 July 2006, fraternized with Specialist (E4) D. M. C., an enlisted person, on terms of equality, to wit: by engaging in sexual relations with Specialist C., going to dinner and driving around Kandahar Airfield alone with Specialist C. in his assigned GOV, visiting her in the female barracks, engaging in inappropriate physical contact with SPC C., and spending time with Specialist C. while off duty, in violation of the custom of the United States Army that officers shall not fraternize with enlisted persons on terms of military equality. Plea: Guilty, excepting the words, "driving alone with Specialist C. on divers occasions in his POV," to the excepted words: Not Guilty. Finding: Guilty, except the words, "driving alone with Specialist C. on divers occasions in his POV," of the excepted words: Not Guilty.

2

GCMO No. 5, DD HQ, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76), Bagram Airfield, Afghanistan, dated 9 May 2007 (continued)

Additional Charge I. Article 92. Plea: Guilty. Finding: Guilty.

Specification: At or near Kandahar Airfield, Afghanistan, between, on or about 1 June 2006 and on or about 30 July 2006, violated a lawful general order, to wit:  paragraph 5d of Combined/Joint Task Force (CJTF)-76 General Order Number 1, dated 21 February 2006, by wrongfully engaging in sexual relations and intimate behavior in a deployed environment with Specialist (E4) S. L., a person not his wife. Plea: Guilty. Finding: Guilty.

Additional Charge II. Article 93. Plea: Not Guilty, but Guilty to the lesser included offense of general disorder in violation of Article 134, UCMJ. Finding: Not Guilty, but Guilty of the lesser included offense of general disorder in violation of Article 134, UCMJ

Specification 1:  At or near Fort Richardson, Alaska and at or near Kandahar Airfield, Afghanistan, between on or about 17 April 2006 an on or about 30 July 2006, maltreated Specialist (E4) A. J. S., a person subject to his orders, by using sexually harassing language towards the said Specialist S., to wit: "can you handle a man in power," "women like men with power," and "I could take you," or words to that effect. Plea: Guilty, excepting the language, "and at or near Kandahar Airfield, Afghanistan," excepting the word and figures, "30 July 2006," substituting therefor the word and figures, "1 June 2006," excepting the word, "maltreat," substituting therefor the words, "engage in a general disorder in his interaction with," excepting the words, "using sexually harassing," substituting therefor the words, "wrongfully using certain," excepting the words, "and I could take you, or words to that effect," substituting therefor the words "or words to that effect, which conduct was prejudicial to good order and discipline," to the excepted words and figures, Not Guilty. To the words and figures substituted therefore: Guilty. Finding: Guilty, except the words, "and at or near Kandahar Airfield, Afghanistan" and except the word and figures, "30 July 2006" substituting therefor the word and figures, "1 June 2006" and except the word, "maltreat" substituting therefor the words, "engage in general disorder in his interaction with" and except the words, "using sexually harassing language" substituting therefor the words, "wrongfully use certain language" and except the words, "I could take you, or words to that effect" substituting therefor the words, "or words to that effect, which conduct was prejudicial to good order and discipline." Of the excepted words: Not Guilty. Of the Substituted words: Guilty. Not Guilty of a violation of Article 93, but Guilty of a violation of Article 134.

Specification 2: At or near Kandahar Airfield, Afghanistan, between, on or about 1 June 2006 and on or about 30 July 2006, maltreated Private First Class (E3) L. B. E., a person subject to his orders, by throwing rocks at her barracks room window at night in order to get her attention and solicit her to come outside and by surreptitiously following her around Kandahar Airfield and later reciting to Private First Class E. his knowledge of her activities and whereabouts.  Plea: Not Guilty.  Finding: Not Guilty.

GCMO No. 5, DD HQ, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76), Bagram Airfield, Afghanistan, dated 9 May 2007 (continued)

Additional Charge III. Article 134. Plea: Guilty. Finding: Guilty.

Specification 1:  A married man, did, at or near Fort Richardson, Alaska, on divers occasions, between on or about 17 April 2006 and on or about 1 June 2006, wrongfully have sexual intercourse with Specialist (E4) S. L., a woman not his wife. Plea: Guilty, excepting the words, "on divers occasions," to the excepted words, Not Guilty. Finding: Guilty, except the words, "on divers occasions," of the excepted words, Not Guilty.

Specification 2:  At or near Fort Richardson, Alaska and at or near Kandahar Airfield, Afghanistan, on divers occasions, between on or about 17 April 2006 and on or about 30 July 2006, did orally communicate to Specialist (E4) S. L., certain indecent language while exposing his penis, to wit: "let me put this in your mouth," "you know you want it in your ass," and "I'll be gentle," or words to that effect. Plea: Not Guilty. Finding: Guilty.

## SENTENCE

The sentence was adjudged on 11 January 2007.  The accused was sentenced to forfeit all pay and allowances; to be confined for 2 years; and to be dismissed from the service.

## ACTION

The sentence is approved and, except for the part of the sentence extending to dismissal, will be executed. The automatic forfeiture of all pay and allowances and the adjudged forfeiture of all pay and allowances was deferred effective 11 January 2007 and is terminated this date.

BY COMMAND OF MAJOR GENERAL RODRIGUEZ:

WILLIAM L. KEATING
CW2, JA
Legal Administrator

DISTRIBUTION:
1-Accused
1-COL Wright, MJ
1-COL Pohl, MJ
1-COL Masterton, MJ
1-CPT Calcagni, III, TC
1-CPT Kerr, DC
1-Cdr, HHC
1-Cdr, CJTF-82
2-Cdr, CJTF-82 Attn:  SJA

4

GCMO No. 5, DD HQ, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76), Bagram Airfield, Afghanistan, dated 9 May 2007 (continued)

1-Cdr, ATTN:  SJA, Fort Sill, OK 73503-5100
1-Cdr, Ft. Sill Personnel Control Facility, Fort Sill, OK  73503-5100
1-510th PSB, Motel 6, Bagram Airfield, Afghanistan, APO AE 09354
1-Cdr, Finance, Bagram Airfield, Afghanistan, APO AE 09354
1-U.S. Army Human Resources Command, ATTN:  AHRC-MSP-S, 200 Stovall Street, Alexandria, VA 22332-0400
2-Professor of Law, United States Military Academy, West Point, NY  10996
1-Cdr, Afghanistan MP Det. (CID), Building 591, Bagram Airfield, APO AE 09354
1-HQ, USACIDC, ATTN:  CIOP-ZC, 6010 6th Street, Fort Belvoir, VA  22060-5506
1-HQDA, Office of the Provost Marshall General, ATTN:  MP Division Operations, 2800 Army Pentagon Washington DC 20310-2800
10-Clerk of Court, ATTN: JALS-CCZ, U.S. Army Legal Services Agency, HQDA, 901 N. Stuart Street, Arlington, VA 22203-1837
12-Cdr, Ft. Sill Personnel Control Facility, Fort Sill, OK  73503-5100

**61.** To the best of your memory, please list the overall ratings on each of your performance reports. If any referral reports, please give details: I am considered a top 5% performer on almost every evaluation I've ever gotten in recent memory. I am almost always top blocked, or the Rater and Senior Rater comments would suggest such, with promote ahead of contemporaries.

**62.** If you received no performance report during a rating period, or no recent performance report, indicate what you believe your supervisor(s) would say about you in a performance report dated the day before the alleged offense(s) was committed or discovered, including the numerical ratings you believe you would have been given: They would of said and they did basically say that I was the best Soldier they had.

**63.** Give a list of all statements you know to have been given in the investigation of this case – to include your own: Everyone on the 15-6 investigation list as follows:

| | |
|---|---|
| From | "Gamble, Fredrick MAJ USA Army NCE NCE XO" <Fredrick.Gamble@AFGHAN.SWA.ARMY.MIL> |
| Sent | Tuesday, August 1, 2006 9:44 pm |
| To | fredrick.gamble@us.army.mil |
| Cc | |
| Bcc | |
| Subject | FW: Interview Schedule |
| Attachments | Interview Schedule.doc        24K    TLS Floor Plan as of 1 Aug.ppt        214K |

Fredrick M. Gamble
MAJ(P), IN
US NCE XO

DSN Office: 318 841 - 2164
DSN Cell: 318 841 - 9613
SVOIP: 331 - 7171
NIPR Email: fredrick.gamble@kaf.afgn.army.mil
SIPR Email: fredrick.gamble@kaf.afgn.army.smil.mil
CENTRIXS Email: fredrick.gamble@afgn.centcom.gctf.cmil.mil

**From:** Braun, Ronald 1SG USA Army NCE OPS SGM/1SG
**Sent:** Tuesday, August 01, 2006 8:28 PM
**To:** Edwards, Lydia B PFC USA Army Supply Clerk NCE; Tyson, Jacqueline SSG USA Army NCE S1 Training NCO; Parker, Chad MAJ USA Army NCE S2 OIC; Roach, Jeffery A MAJ USA Army NCE S3; Ramsey, John SSG USA Army NCE SFC; Knowles, Charles MAJ USA Army NCE S4 OIC; Averett, Robert CSM USA Army NCE NSE CSM; Veith, Frank MAJ USA Army NCE MNB Deputy J6; Chester, Diana SPC USA Army NCE S3 TAC AIR Tech; Gamble, Fredrick MAJ USA Army NCE NCE XO; Moses, Karla PFC USA Army NCE Driver; Parrish, Robert SGT USA Army NCE ADAM SYS OPS; Keith, Steven; Koch, Richard MAJ USA Army NCE Chaplain; Osborn, David LTC USA Army NCE J3 Plans Chief; Lindsey, Sheena SPC USA Army NSE S-1 Legal
**Cc:** Harrington, Pamela MSG USA NSE NSE CSM
**Subject:** FW: Interview Schedule

Ladies and Gentlemen,

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Please note the below requirement and attached times and locations for your interviews. You will be given more information in reference to this when you arrive at your appointed time. Thank You!!

Top

**Ronald A. Braun**
**HHC, US-NCE**
**First Sergeant**

**From:** Barr, Robert MAJ USA Army NCE S1 OIC
**Sent:** Tuesday, August 01, 2006 6:09 AM
**To:** Braun, Ronald 1SG USA Army NCE OPS SGM/1SG
**Subject:** Interview Schedule

Confidential time schedule, please ensure that NCE Soldiers are present at the TLS Building at the designated time.

MAJ Barr

## 15-6 Interview Schedule

| Rank/ Name | Unit | Scheduled Date/Time | Actual Date/Time |
|---|---|---|---|
| PFC Edwards | NCE | 1100Z 2 Aug 06 | |
| SSG Tyson | NCE | 1200Z 2 Aug 06 | |
| PFC Moses | NCE | 1300Z 2 Aug 06 | |
| MSG Harrington | NSE | 0500Z 3 Aug 06 | |
| MAJ Parker | NCE | 0600Z 3 Aug 06 | |
| SPC Sheldon | NSE | 0700Z 3 Aug 06 | |
| MAJ Roach | NCE | 0800Z 3 Aug 06 | |
| SFC Ramsey | NCE | 0900Z 3 Aug 06 | |
| SSG Parrish | NCE | 1000Z 3 Aug 06 | |
| SGT Keith | NCE | 1100Z 3 Aug 06 | |
| MAJ Knowles | NCE | 1200z 3 Aug 06 | |
| 1SG Braun | NCE | 0700Z 4 Aug 06 | |

| CSM Averett | NCE | 0800Z 4 Aug 06 |
| MAJ Barr | NCE | 0900Z 4 Aug 06 |
| MAJ Koch | NCE | 1000Z 4 Aug 06 |
| SPC Dean | NSE | 1100Z 4 Aug 06 |
| MAJ Veith | MNB | 1200Z 4 Aug 06 |
| LTC Osborn | MNB | 1300z 4 Aug 06 |
| SPC Chester | NCE | 0500Z 5 Aug 06 |
| SPC Lindsey | NCE | 0600Z 5 Aug 06 |
| MAJ Gamble | NCE | 0800Z 5 Aug 06 |

Of course this list was changed and added to for the 15-6 investigation which you have a copy of.

**64. Have you talked to anyone about this (this includes law enforcement, command, family, friends, etc.)? If so, who, when, and what was said?:** My wife, Parents, and Younger brother Will. Pretty much have discussed everything detailed in my "Game Plan" with them.

**65. List all evidence in this case that you are aware of:** I will have to refer to the "Game Plan" document. It is about 50 pages long and is as follows:

My intent as far as this case is concerned is as follows:

My case closely resembles that of Command Sgt. Maj. Gene McKinney's case in 1998. CSM McKinney was on trial on charges of groping or crudely pressuring six military women for sex beginning in 1994. He faced 55 1/2 years in prison if convicted and was charged with 19 counts, including assault, adultery and obstruction of justice. Like CSM McKinney my intent right now is to fight these charges and clear my name. The basis of his defense follows:

### Defense lawyers say accusers lied

McKinney's lawyers have argued that all six of his accusers are lying. Defense attorneys led him through rebuttals of the charges of five of the six women before court adjourned Tuesday.

The defense will resume Wednesday with McKinney seeking to rebut charges by Staff Sgt. Christine Fetrow, whose allegations account for 10 of the 19 charges.

On Tuesday, McKinney testified that he had rescinded a job offer to one of his accusers, Sgt. Christine Roy, after learning she was pregnant because the job entailed too much travel and stress. McKinney said she offered to have an abortion if he would give her the job, but that he talked her out of it.

He denied seeing or speaking with Roy on October 30, 1996. She has testified that he forced himself on her as she sat on a couch in his Army quarters on that night.

# 15-6 Interview Schedule

| Rank/ Name | Unit | Scheduled Date/Time | Actual Date/Time |
|---|---|---|---|
| PFC Edwards | NCE | 1100Z 2 Aug 06 | |
| SSG Tyson | NCE | 1200Z 2 Aug 06 | |
| PFC Moses | NCE | 1300Z 2 Aug 06 | |
| MSG Harrington | NSE | 0500Z 3 Aug 06 | |
| MAJ Parker | NCE | 0600Z 3 Aug 06 | |
| SPC Sheldon | NSE | 0700Z 3 Aug 06 | |
| MAJ Roach | NCE | 0800Z 3 Aug 06 | |
| SFC Ramsey | NCE | 0900Z 3 Aug 06 | |
| SSG Parrish | NCE | 1000Z 3 Aug 06 | |
| SGT Keith | NCE | 1100Z 3 Aug 06 | |
| MAJ Knowles | NCE | 1200z 3 Aug 06 | |
| 1SG Braun | NCE | 0700Z 4 Aug 06 | |
| CSM Averett | NCE | 0800Z 4 Aug 06 | |
| MAJ Barr | NCE | 0900Z 4 Aug 06 | |
| MAJ Koch | NCE | 1000Z 4 Aug 06 | |
| SPC Dean | NSE | 1100Z 4 Aug 06 | |
| MAJ Veith | MNB | 1200Z 4 Aug 06 | |
| LTC Osborn | MNB | 1300z 4 Aug 06 | |
| SPC Chester | NCE | 0500Z 5 Aug 06 | |
| SPC Lindsey | NCE | 0600Z 5 Aug 06 | |
| MAJ Gamble | NCE | 0800Z 5 Aug 06 | |



# Current Office Structure
# PAX Locations



Interviews



KTUU.com | Alaska's news and information source | Alaska Army Guard major court-ma... Page 1 of 1
Case 1:08-cv-00207-ESH    Document 1-7    Filed 02/05/2008    Page 1 of 19
Attachment #6

<<Back



inAlaska com

## Alaska Army Guard major court-martialed

by Angela Unruh
Monday, Feb. 12, 2007

**Anchorage, Alaska -** An Alaska Army National Guardsman has been dismissed from the service after sexually harassing other soldiers. As a result, U.S. Army officials say the soldier, who was with the 207th Infantry Brigade, will spend two years in confinement.

Fred Gamble grew up in Alaska, playing football for Dimond High School, before joining the Alaska Army National Guard.

His love for the military was featured in a 2002 Juneau Empire article, but between April and July 2006, during training at Fort Richardson and while deployed to Afghanistan, the 36-year-old major would run into trouble.

In August 2006, Gamble was charged with adultery, engaging in consensual sexual intercourse with two female subordinates under his authority, non-consensual sexual misconduct, indecent assault and using indecent language against four additional female subordinates.

He was court-martialed in January and found guilty of all charges except three counts of sexual harassment. Gamble was sentenced to forfeit all pay and allowances, serve two years of confinement and was dismissed from the service.

When the incidents occurred, Gamble was assigned to the 207th Infantry Brigade and served as the executive officer to the U.S. National Command Element.

The misconduct for which he was convicted included five victims, all female subordinates under his authority. They ranged in rank from private to major.

The Army never officially announced the incident, but only confirmed the court martial after being confronted with evidence Channel 2 News received from an anonymous phone call.


Alaska Army National Guard Maj. Fred Gamble, center (Courtesy: Juneau Empire)


Gamble grew up in Alaska and played football for Dimond High School. (Brad Hillwig/KTUU-TV)


Gamble was court-martialed and will spend two years in jail for sexual-related offenses with subordinates. (Brad Hillwig/KTUU-TV)

 WorldNow

All content © Copyright 2000 - 2007 WorldNow and KTUU. All Rights Reserved.
For more information on this site, please read our Privacy Policy and Terms of Service.

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment #7

The Commander or his designated representative will authorize the search when feasible. If time precludes the Commander's authorization, he will be notified as soon as possible thereafter. All items of a suspicious nature, or for which an inmate cannot produce proof of ownership and authorization to possess, may be confiscated for evaluation as evidence. Inmates need not be present for their property to be searched.

2-4    COMMANDER'S LETTER TO FAMILIES. Upon arrival, a personal letter from the Commander is sent to the immediate family of each inmate advising them of their safe arrival, correspondence procedures, visiting hours, and emergency contact procedures. No reference is made about any individual's case; however, it is recommended that each inmate advise their family of their circumstances surrounding their incarceration.

2-5    COMMANDER'S OPEN DOOR POLICY. Inmates will follow the procedures outlined below when requesting to use the open door policy:

a. Before requesting an appointment with the Commander, ensure the subject of your request is first presented at the lowest level. Prepare for your appointment in advance by developing a specific and detailed written request.

b. It is the Commander's intention to see everyone who needs to be seen, and help everyone that needs help. Consider the many means of communication you have available before requesting an appointment with the Commander. The Commander, Sergeant Major or Deputy will walk through the inmates' living areas at least once per week to facilitate communication.

c. In all cases, inmates should use the Open Door Policy as a last resort, prior to contacting a higher command or an outside agency.

2-6    PRETRIAL CONFINEMENT. Pretrial procedures and standards are set forth in AR 27-10 and Rules for Courts-Martial (RCM) 305, MCM.

a. Pretrial inmates will be segregated from other inmates in employment and recreational areas. They will be billeted separately from post-trial (adjudged or sentenced) inmates to the greatest extent possible. This segregation may not be waived. Pretrial inmates are prohibited from co-mingling, associating, dining, or engaging in conversation with post trial inmates.

(1) Officer pretrial inmates may waiver the right to be segregated from other pretrial inmates and assigned duties appropriate to their grade by signing a written waiver. Utilize DD Form 510 addressed to PSB Chief for this request.

(2) Noncommissioned officer inmates may waiver the right to be segregated from other pretrial inmates and assigned duties appropriate to their rank by signing a written waiver. Utilize

10

DD Form 510 addressed to PSB Chief for this request.

b. AR 190-47 and AR 27-10 govern pretrial confinement pro. prohibits pretrial inmates from having completely separated area-made to accommodate them. Unless specified below, pretrial in rules as post-trial inmates. The following outlines requirements accommodate pretrial inmates:

(1) All pretrial inmates will be housed in the pretrial hous segregation from post trial inmates.

(2) Pretrial inmates will have recreation call in accordano Calls in Appendix C.

(3) Pretrial inmates are authorized the use of the facility accordance with the Schedule of Calls in Appendix C.

(4) Pretrial Inmates will be afforded television privilege-Schedule of Calls. Guard Commanders may cancel television prit deemed necessary for control measures, facility rules violations, ( activities (i.e., chow, clean-up, etc.).

(5) Pretrial inmates will consume their meals during non will alternate the order of chow, first or last, weekly. They are n area determined by the shift correctional supervisor, separating

(6) Pretrial Inmates will maintain their own living cell ai Manual for the Guidance of Inmates (Rulebook).

(7) Pretrial inmates are subject to the same rules and sta trial Inmates. Violations may include forfeiture of certain privil television, recreation, rations, telephone, games, etc. Serious vi court-martial charges.

(8) Pretrial inmates are classified as maximum custody restraints when outside the facility.

2-7    CUSTODY GRADES. A classification board to deter upgrades will convene once a month for post trial inmates. Inn classification review as determined by the RCF Commander. I as maximum custody.

a. Maximum Custody. Maximum (MAX) custody is for I custodial supervision. Two correctional cadre soldiers will eSt

11

08 0207

**FILED**

FEB 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Attachment #8



08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, COMBINED/JOINT TASK FORCE (CJTF -76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF

CJTF-76-EO

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: CJTF-76 Policy Memorandum EO-3, Equal Opportunity Complaint Procedures

1. References:

    a. DOD 1350.2, Department of Defense Military Equal Opportunity (EO) Program, August 1995, Chg 1, 1 May 1997.

    b. AR 600-20, Army Command Policy, 1 February 2006.

    c. AFI 36-2706, Military Equal Opportunity (MEO) Program, 29 July 2004.

    d. Marine Corps Order (MCO) P5354.1D, 14 April 2003, Equal Opportunity (EO) Manual; MCO 1000.9, 8 June 1998, Sexual Harassment.

    e. SECNAV Instruction 5350.16, Equal Opportunity (EO) with the Department of the Navy, 28 June 1999.

    f. AR 690-12, Equal Employment Opportunity and Affirmative Action, 4 March 1988.

    g. CFC-A Policy Memorandum #003, Equal Opportunity Complaint Policy, 15 February 2005.

2. Equal Opportunity Complaint Procedures: Equal Opportunity complaints allege sexual harassment and/or discrimination based on the protected categories of race, gender, religion, ethnicity, or national origin. The victim or anyone with knowledge of alleged discrimination or harassment will report the incident within 60 calendar days from the date it occurred. In summary, there are two types of complaints that can be filed:

    a. Informal. Individuals are not required to submit an informal complaint in writing. The individual, another unit member, or a person in the individual's chain of command may resolve these complaints.

    b. Formal. A complainant files a formal complaint in writing and swears to the accuracy of the information, using DA 7279-R, Equal Opportunity Complaint Form. The commander will report formal complaints in writing to the General Court Martial Authority within 72 hours.

**08 0207**

FILED

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CJTF-76-EO
SUBJECT:  CJTF-76 Policy Memorandum EO-3, Equal Opportunity Complaint Procedures

c.  If a complaint is received after 60 calendar days, the commander may, but is not required to, conduct an investigation into the allegations.  In deciding whether to conduct an investigation, the commander will consider, among other factors, the reason for the delay, the availability of witnesses, and whether a full and fair investigation can be conducted.

3.  Processing equal opportunity complaints through the chain of command is strongly encouraged; however, it is not the only channel available to CJTF-76 personnel.  Should the complainant feel uncomfortable in filing a complaint with his/her chain of command, or should the complaint be against a member of his/her chain of command, a number of alternate agencies exist through which the issues may be identified for resolution.  A complaint may be submitted through the next higher chain of command, an Equal Opportunity Advisor, Inspector General, Chaplain, Provost Marshal, Staff Judge Advocate, or Medical Agency.  In all instances, the complainant will be protected from acts or threats of reprisal.

4.  Allegations of sexual assault will not be processed through equal opportunity channels.  Instead, a report of an incident of sexual assault shall be referred as soon as practicable to the appropriate Military Criminal Investigative Organization.

5.  POC is the CJTF-76 Equal Opportunity Office at DSN 318-231-4035/4027.

BENJAMIN E. BREAKLEY
Major General, USA
Commanding

DISTRIBUTION:
A

2



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, COMBINED/JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF

CJTF-76-EO                                                              ? 1 ⎡⎤⎦ 2008

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  CJTF-76 Policy Memorandum EO-1, Equal Opportunity

1.  References:

   a.  DOD 1350.2, Department of Defense Military Equal Opportunity (EO) Program, August 1995, Chg 1, 1 May 1997.

   b.  AR 600-20, Army Command Policy, 1 February 2006.

   c.  AFI 36-2706, Military Equal Opportunity (MEO) Program, 29 July 2004.

   d.  Marine Corps Order (MCO) P5354.1D, 14 April 2003, Equal Opportunity (EO) Manual; MCO 1000.9, 8 June 1998, Sexual Harassment.

   e.  SECNAV Instruction 5350.16, Equal Opportunity (EO) with the Department of the Navy, 28 June 1999.

   f.  AR 690-12, Equal Employment Opportunity and Affirmative Action, 4 March 1988.

   g.  CFC-A Policy Memorandum #002, Equal Opportunity Policy, 15 February 2005.

2.  This policy applies to all CJTF–76 personnel in the Combined/Joint Operations Area (CJOA).

3.  An effective equal opportunity program ensures an environment free from discrimination for all personnel without regard to race, gender, religion, ethnicity, or national origin.  Our readiness to accomplish our mission is absolutely dependent on the ability of every member of this team, military and civilian, to make the most of their skills as individuals and to maximize their contributions to CJTF-76's efforts.  Any obstacle that limits the opportunity for anyone to produce to his or her maximum potential must be eliminated.  The environment here must be one that is positive, supportive, and unencumbered.  Our mission and our people demand nothing less.

4.  Each member of this CJTF, but especially leaders, must make a priority effort to ensure that <u>everyone</u> is treated fairly and with respect.  Specifically, leaders will:

CJTF-76-EO
SUBJECT:  CJTF-76 Policy Memorandum EO-1, Equal Opportunity

   a.  Take immediate and appropriate action to eliminate intolerant, insensitive, and inappropriate behavior

   b.  Use the full range of corrective tools when dealing with transgression.

   c.  Use the tools and assistance available through various staffs and agencies to assist in implementing programs and assessing unit climate.

   d.  Execute small group, discussion based, and interactive equal opportunity training that focuses on education and prevention.

   e.  Set the example.

5.  POC is the CJTF-76 Equal Opportunity Office at DSN 318-231-4035/4027.


BENJAMIN C. FREAKLEY
Major General, USA
Commanding

DISTRIBUTION:
A

2

**DEPARTMENT OF DEFENSE**
HEADQUARTERS, COMBINED/JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF

CJTF-76-EO

2 1 FEB 2006

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: CJTF-76 Policy Memorandum EO-2, Prevention of Sexual Harassment (POSH) and Sexual Assault

1. References:

   a. DOD 1350.2, Department of Defense Military Equal Opportunity (EO) Program, August 1995, Chg 1, 1 May 1997.

   b. AR 600-20, Army Command Policy, 1 February 2006.

   c. ALARACT 176/2004, Army Sexual Assault Prevention and Response Program, 19 August 2004.

   d. AFI 36-2706, Military Equal Opportunity (MEO) Program, 29 July 2004.

   e. Marine Corps Order (MCO) P5354.1D, 14 April 2003, Equal Opportunity (EO) Manual; MCO 1000.9, 8 June 1998, Sexual Harassment.

   f. SECNAV Instruction 5350.16, Equal Opportunity (EO) with the Department of the Navy, 28 June 1999.

   g. AR 690-12, Equal Employment Opportunity and Affirmative Action, 4 March 1988.

2. Sexual harassment constitutes unacceptable conduct and will not be tolerated. Leadership at all levels will create and maintain an environment conducive to maximum productivity and respect for human dignity.

3. Military or civilian personnel who create a hostile environment by subjecting others to offensive, unwanted, and unsolicited comments or behaviors of a sexual nature is engaging in sexual harassment. Examples include sexual remarks, jokes, comments, innuendo, gestures, and physical contact. A leader who attempts to control, influence, or in any way affect the career, promotion or awards of a Soldier or employee in exchange for sexual favors is also engaging in sexual harassment. Leaders who condone sexual harassment in the workplace by failing to curb it may also be participating in sexual harassment.

CJTF-76-EO
SUBJECT: CJTF-76 Policy Memorandum EO-2, Prevention of Sexual Harassment (POSH) and Sexual Assault

4. Training and awareness programs coupled with appropriate disciplinary measures against offenders and leader accountability are the keys. Leaders are responsible for ensuring that all supervisors and employees are aware of what constitutes sexual harassment and available avenues of redress. I expect commanders at all levels to continuously address the issue of sexual harassment and sexual assault. Requirements include:

a. Prevention education and training. All personnel must understand the standards for proper behavior. All CJTF-76 personnel, to include leaders, will receive POSH sexual assault training within the first 60 days in the CJOA, if they did not receive it within 90 days of deployment, and semi-annually thereafter. Topics may include but are not limited to the following: behavioral characteristics and other indicators of EO problem areas; appropriate and acceptable behaviors that contribute to unit cohesion and teamwork; preventing, identifying, addressing and eliminating discrimination, sexual harassment and sexual assault; and legal/administrative consequences of participating in acts of unlawful discrimination, sexual harassment, and sexual assault.

b. Sexual Assault Response. All CJTF-76 personnel will be familiar with sexual assault reporting procedures. If a sex crime occurs, personnel should:

(1) Call the military police immediately (local MP numbers should be posted in unit area).

(2) Assess the victim and inform the military police if immediate medical attention is required.

(3) Protect the victim's privacy.

(4) Protect the crime scene.

(5) Notify Chain of Command.

c. Enforce the standards. I expect every leader to be alert for instances of inappropriate behavior that is sexual in nature. Leaders must be prepared to identify and deal with instances of sexual harassment or sexual assault. Commanders will notify me of receipt of all formal complaints of sexual harassment or assault within 72 hours. Additionally, commanders will provide progress reports until the investigation is complete.

CJTF-76-EO
SUBJECT:  CJTF-76 Policy Memorandum EO-2, Prevention of Sexual Harassment (POSH) and Sexual Assault

6. I am personally committed to the establishment of an environment free of sexual harassment, where all our military and civilian personnel can perform to their full potential. I expect the same commitment from all members of this CJTF.

7. POC is the CJTF-76 Equal Opportunity Office, DSN 318-231-4035/4027.

BENJAMIN C. FREAKLEY
Major General, USA
Commanding

DISTRIBUTION:
A

3



**DEPARTMENT OF THE ARMY**
UNITED STATES NATIONAL COMMAND ELEMENT, REGIONAL COMMAND-SOUTH
KANDAHAR, AFGHANISTAN
APO AE 09355-9998

AKNG-BDE                                                                    30 July 2006

MEMORANDUM FOR MAJ Fredrick M. Gamble

SUBJECT:  Executive Officer duties

1.  Effective 31 ~~AUG~~ July 06, you are flagged for adverse action pending the result an AR 15-6 Investigation. You are to turn over the responsibly of the duties as 207th Infantry Brigade Executive Officer (XO) to LTC Michael A. Thompson. You are hereby directed to turn over all files (both paper and computer), documents, pending actions and other information pertaining to duties as the Brigade XO. A proper battle hand off is critical to the success of the unit.

2.  Effective 31 ~~AUG~~ July 06, you are directed to assume the role as the ANA Liaison Officer and backfill LTC Thompson. He will turn over all actions and files to you and conduct a proper battle hand over.

2.  POC. The Point of Contact for this memorandum is undersigned at DSN 318-841-1619.

R. STEPHEN WILLIAMS
COL, US NCE
Commanding

**08 0207**

**FILED**

FEB 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# REPORT TO SUSPEND FAVORABLE PERSONNEL ACTIONS (FLAG)
For use of this form, see AR 600-8-2; the proponent agency is MILPERCEN.

## SECTION I - ADMINISTRATIVE DATA

| 1. NAME *(Last, First, MI)* | 2. SSN | 3. RANK |
|---|---|---|
| Gamble, Fredrick M. | 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 | MAJ |

| 4. | | | 5. ETS/ESA/MRD |
|---|---|---|---|
| ☒ On active duty | ☐ Not on active duty | ☐ On ADT | INDEF |

| 6. UNIT ASSIGNED AND ARMY MAJOR COMMAND | 7. STATION *(Geographical location)* |
|---|---|
| 207th INF Brigade | 207th INF Brigade, Kandahar, Afghanistan |

8. PSC CONTROLLING FLAGGING ACTION AND TELEPHONE NUMBER
207th INF Brigade, DSN: 318-841-1619

9. THIS ACTION IS TO:

| ☒ Initiate a flag *(Sections II and V only)* | ☐ Transfer a flag *(Sections III and V only)* | ☐ Remove flag *(Sections IV and V only)* |
|---|---|---|

## SECTION II - INITIATE A FLAG

10. ☒ A FLAG IS INITIATED, EFFECTIVE _____ 31 JUL 06 _____ FOR THE FOLLOWING REASON:

**NON-TRANSFERABLE**

☒ Adverse action (A)  *Pending Investigation*

☐ Elimination - field initiated (B)

☐ Removal from selection list - field initiated (C)

☐ Referred OER (D)

☐ Security violation (E)

☐ HQDA use only - elimination or removal from selection list (F)

**TRANSFERABLE**

☐ APFT failure (J)

☐ Weight control program (K)

## SECTION III - TRANSFER A FLAG

11. ☐ A FLAG IS TRANSFERED FOR THE FOLLOWING REASON:

☐ Adverse action - HQDA directed reassignment (G)

☐ Adverse action - punishment phase (H)

☐ Supporting documents attached?  ☐ Yes  ☐ No

☐ APFT failure (J)

☐ Weight control program (K)

## SECTION IV - REMOVE A FLAG

12. ☐ A FLAG IS REMOVED, EFFECTIVE _____ FOR THE FOLLOWING REASON:

☐ Case closed favorably (C)

☐ Disciplinary action taken (D)

☐ Soldier transferred to a different Army component or discharged while case in process *(destroy case file)* (E)

☐ Other final action (E)

## SECTION V - AUTHENTICATION

DISTRIBUTION
1 - Unit Commander    1 - F&AO
1 - PSC    1 - Commander, gaining unit *(transfer flag only)*

| NAME, RANK, TITLE, AND ORGANIZATION | SIGNATURE | DATE |
|---|---|---|
| Williams, R. Stephen | *[signature]* | 30 JUL 06 |

**DA FORM 268, JUN 87**    EDITION OF 1 JAN 80 IS OBSOLETE.    USAPPC V2.00



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, NATIONAL COMMAND ELEMENT
KANDAHAR AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-NCE

MEMORANDUM FOR MAJ Fredrick Marcellus Gamble, Headquarters, National Command Element, Kandahar, Afghanistan

SUBJECT: Military No-Contact Order

1. This is a Military No-Contact Order issued to ensure the integrity of the court-martial process and to protect you from allegations of criminal misconduct.

2. You are directed to:

   a. Make no contact whatsoever in-person or through telephone, mail and other written correspondence, e-mail, or third parties, with the persons listed in paragraph 4, pertaining to the on-going AR 15-6 investigation and allegations of misconduct made against you related to the commission of adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1. If you believe it is necessary to have contact with these persons for matters unrelated to this investigation or these allegations of misconduct, such contact must be made through your chain of command.

   b. Report all contacts and attempted contacts with you initiated by any person(s) named in paragraph 4 unless sooner canceled by me or by higher authority.

3. This order is an administrative action to ensure there is no improper interference with the investigation process and the security of the persons listed below. It is also intended to protect you from further allegations including, but not limited to adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1.

4. This order is issued concerning your association and contact with the following persons: SPC Chester, PFC Edwards, PFC Moses and SGT Tyson. This order also extends to preclude any contact with other female officers or enlisted Soldiers who are implicated by this investigation as witnesses, victims or co-accuseds.

5. This order remains in effect unless modified or rescinded by me. Violations of this order may result in administrative or disciplinary action, including trial by court martial.

R. STEPHEN WILLIAMS
COL, AV
Commanding

CJTF-76-NCE

SUBJECT: Military No-Contact Order

1. I have read the above military no-contact order, dated _____ and understand its content. I acknowledge that administrative action or disciplinary action may be taken against me if I fail to follow this order.

2. I understand that failure to sign does not relieve me of responsibility to comply with the terms of the military no-contact order.

FREDRICK M. GAMBLE
MAJ, BRANCH
US Army

9

## Your Rights Against Religious Discrimination

Employers must not discriminate against employees based on their religion, and they must accommodate employees' needs to practice their faiths.

Federal law (Title VII of the Civil Rights Act) and most state laws prohibit employers from discriminating on the basis of religion. This means that your employer cannot make any decisions based on or treat you differently because of your religious beliefs or practices in any aspect of employment -- from hiring to firing and everything in between.

In addition, where workers articulate a need to express their religious beliefs and practices in the workplace, companies are generally required to accommodate them, unless doing so would cause the company undue hardship. Similarly, where employees need a little flexibility to practice their religion outside of work, the employer might have to comply. This might mean not scheduling an employee to work on her Sabbath day, for example, or relaxing a dress code so that an employee can wear religious garments.

Companies do, however, have some flexibility in how they accommodate employees. An employer is required to make reasonable accommodations -- not to accept whatever accommodation the employee suggests, nor to spare the employee all expenses in making the accommodation. For example, your employer might give you the day off for a religious observance, but do so without pay. Or, if changing an employee's schedule to accommodate a religious belief would wreak havoc on a seniority system and cause severe morale problems among other employees, the employer might not have to agree to it.

| How can I stop harassment based on my ethnicity or religion? | For more information on religious discrimination, including how to respond if you believe you have been discriminated against because of your religion, contact your local field office of the Equal Employment Opportunity Commission (contact information is available at www.eeoc.gov) and your state fair employment practices agency. Note that if you wish to file a complaint with a government agency and/or file a lawsuit, there are time limits for doing, so be sure not to miss them. |

Gary — Gamble was on my S2's computer and left this on

He is looking to use this for defense.

08 0207

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

NOTE: Continue in succeeding order when a document is not applicable.
Revised 22 May 2003

Attachment #12



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, NATIONAL COMMAND ELEMENT
KANDAHAR AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-NCE

MEMORANDUM FOR MAJ Fredrick Marcellus Gamble, Headquarters, National Command Element, Kandahar, Afghanistan

SUBJECT: Military No-Contact Order

1. This is a Military No-Contact Order issued to ensure the integrity of the court-martial process and to protect you from allegations of criminal misconduct.

2. You are directed to:

   a. Make no contact whatsoever in-person or through telephone, mail and other written correspondence, e-mail, or third parties, with the persons listed in paragraph 4, pertaining to the on-going AR 15-6 investigation and allegations of misconduct made against you related to the commission of adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1. If you believe it is necessary to have contact with these persons for matters unrelated to this investigation or these allegations of misconduct, such contact must be made through your chain of command.

   b. Report all contacts and attempted contacts with you initiated by any person(s) named in paragraph 4 unless sooner canceled by me or by higher authority.

3. This order is an administrative action to ensure there is no improper interference with the investigation process and the security of the persons listed below. It is also intended to protect you from further allegations including, but not limited to adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1.

4. This order is issued concerning your association and contact with the following persons: SPC Chester, PFC Edwards, PFC Moses and SGT Tyson. This order also extends to preclude any contact with other female officers or enlisted Soldiers who are implicated by this investigation as witnesses, victims or co-accuses.

5. This order remains in effect unless modified or rescinded by me. Violations of this order may result in administrative or disciplinary action, including trial by court martial.

08 0207

R. STEPHEN WILLIAMS
COL, AV
Commanding

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

CJTF-76-NCE

SUBJECT: Military No-Contact Order

1. I have read the above military no-contact order, dated _____ and understand its content. I acknowledge that administrative action or disciplinary action may be taken against me if I fail to follow this order.

2. I understand that failure to sign does not relieve me of responsibility to comply with the terms of the military no-contact order.

FREDRICK M. GAMBLE
MAJ, BRANCH
US Army

*- LAW OFFICES OF -*

# STEVENS & BRASH L.L.C.
*WORLDWIDE MILITARY DEFENDERS*

**Offices in Washington, DC & Pittsburgh, PA**

| | | |
|---|---|---|
| **Richard V. Stevens** | **Toll Free Phone:** (800) 988-0602 | **David F. Brash** |
| Phone: (703) 798-3064 | **E-mail:** SBLawLLC@msn.com | Phone: (412) 760-8220 |
| Fax:   (703) 997-1367 | | Fax: (814) 690-7778 |
| E-mail: stevenslaw@msn.com | **Web: www.militaryadvocate.com** | E-mail: brashlaw@msn.com |

---

CJTF76-SJA-TDS                                    17 November 2006

MEMORANDUM THRU Combined/Joint Task Force-76, Bagram Airfield, Afghanistan  APO AE 09354

FOR: CDR, HRC (AHRC-OPD-A), 200 Stovall Street, Alexandria, VA  22332-0478

Subject: Resignation for the Good of the Service (in lieu of general court-martial)

1. I, Fredrick M. Gamble, O-4, Infantry, 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, voluntarily tender my resignation from the Army for the good of the service under the provisions of AR 600-8-24, chapter 3, para 3-13. I do not desire to appear before a court-martial or board of officers. I have not been subject to coercion with respect to this resignation, have been advised of, and fully understand the implications of this action.

2. I have been advised that prior to submitting this resignation I may, at my option, consult with and be represented by legally qualified counsel who may be a member of the Judge Advocate General's Corps, or civilian counsel, retained by me. I have been fully advised and counseled in this matter by CPT Mark A. Kerr, Trial Defense Counsel, Bagram Field Office, U.S. Army Trial Defense Service, a member of the Judge Advocate General's Corps and Mr. David F. Brash, a civilian attorney licensed to practice in the states of Colorado and Pennsylvania, on various dates in October and November 2006 at Bagram Airfield, Afghanistan.

3. I have been afforded an opportunity to present matters in explanation, mitigation, or defense of my case and such matters are attached.

4. I understand that this resignation, if accepted, may be considered as being Under Other Than Honorable Conditions. I also understand that a resignation for the good of the Service may be withdrawn only with the approval of HQDA. I further understand that if my resignation is accepted Under Other Than Honorable Conditions, I will not be entitled to compensation for unused accrues leave.

5. If my resignation is accepted, regardless of the type of discharge certificate furnished, I understand that I will not receive separation pay and that I will be barred from all rights, based on the period of service from which I will be separated, under any laws administered by the

08 0207    **FILED**

Request for Resignation
1

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Department of Veteran's Affairs, except War Risk, U.S. Government (converted), national Service Life Insurance, or Servicemen's Group Life Insurance policies I may hold.

6. Present duty station: HQ, U.S. NCE, Kandahar Airfield, Afghanistan, APO AE 09354; with further attachment to HHC Combined/Joint Task Force (CJTF) – 76, Bagram Airfield, Afghanistan, APO AE 09354, pending the resolution of criminal charges.

7. I do not desire separation overseas.

8. My mailing address after separation will be 1800 West 104th Avenue, Anchorage, AK 99515.

9. I understand that if I participated in certain advanced education programs, I may be required to reimburse the United States Government as stated in written agreement made by me with the United States Government under law and regulations.

FREDRICK M. GAMBLE
MAJ, IN
U.S. Army

Attachments:
1. Memorandum in Support of Resignation Request (Brash)
2. Biographical Sketch (Gamble)
3. Family Photograph
4. Officer Performance Reports

- *LAW OFFICES OF* -

# STEVENS & BRASH L.L.C.
*WORLDWIDE MILITARY DEFENDERS*

**Offices in Washington, DC & Pittsburgh, PA**

**Richard V. Stevens**
Phone: (703) 798-3064
Fax:    (703) 997-1367
E-mail: stevenslaw@msn.com

**Toll Free Phone:** (800) 988-0602
**E-mail:** SBLawLLC@msn.com

**Web:** www.militaryadvocate.com

**David F. Brash**
Phone: (412) 760-8220
Fax: (814) 690-7778
E-mail: brashlaw@msn.com

11 January 2007

MEMORANDUM THRU Staff Judge Advocate, Officer of the Staff Judge Advocate, CJTF-76

FOR: Commander, Combined/Joint Task Force (CJTF) – 76, Bagram Airfield, Afghanistan 09354

SUBJECT:   Request for Deferment of Automatic and Adjudged Forfeitures, Major Fredrick M. Gamble, Headquarters and Headquarters Company, CJTF-76, Bagram Airfield, Afghanistan 09354

1. MAJ Gamble respectfully requests you defer his automatic and adjudged forfeitures until time of action, pursuant to Articles 57(a) and 58(b), U.C.M.J., with payment thereof to his dependents. As you know, MAJ Gamble pled guilty to certain offenses, and was found guilty of additional offenses, in trial before general court-martial yesterday. The sentence adjudged was confinement for two years, total forfeitures, and dismissal from the service.

2. MAJ Gamble is married. He and his wife, Toni, have three children: Christopher (age 10), DeShayla (age 6), and Alexa (age 4). Mrs. Gamble has taken on outside-the-home employment for many months as MAJ Gamble's trial approached in an effort to defray the costs which would face the family if MAJ Gamble were convicted and his monthly income terminated. She continues to work toward that end, but, frankly, her efforts have not been able to accumulate sufficient funds to overcome the loss of income due to termination of MAJ Gamble's salary. Now, she faces the responsibility of providing sole support for her family, the inability to pay the monthly mortgage, consequent loss of the family home, and no prospect of dependable income from her husband for the next two years. The Defense has attached a copy of the family's monthly and fixed expenses to demonstrate the financial obligations facing Mrs. Gamble at this point. Although we are aware that deferral of automatic/adjudged forfeitures cannot extend beyond a six month period, it will provide, in some small measure, some immediate financial relief for the family in this time of crisis.

3. In this case, Sir, Trial Counsel did not argue for forfeitures. It is true, as both the Government and Defense argued, that MAJ Gamble's family faces the current crisis because of his criminal actions. The Defense readily concedes this fact and acknowledges that you need not show any concern for MAJ Gamble's family because he did not in the first instance. Nevertheless, the Defense respectfully requests that you consider the Gamble family continuing members of the Army community in this most difficult time, and recognize, through compassionate exercise of

**FILED**

08 0207

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

your discretion, that they contributed in no way to MAJ Gamble's actions. They truly occupy the position of innocents caught in the devastation.

4. In conclusion, the Defense understands there is no obligation on your part, Sir, to exercise your deferral authority. We understand it is a matter of grace within your sound discretion. We humbly request, on behalf of Mrs. Gamble, your favorable consideration of this request.


Respectfully Submitted,


DAVID F. BRASH, Esquire
*LAW OFFICES OF STEVENS & BRASH, L.L.C.*
Offices in Washington, DC & Pittsburgh, PA
Civilian Attorney for MAJ Fredrick M. Gamble



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, COMBINED JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-CG                                                      **2 2 JAN** 2007

MEMORANDUM FOR Major Fredrick M. Gamble, Headquarters and Headquarters Company, Combined/Joint Task Force (CJTF)-76, Bagram Airfield, Afghanistan, APO AE 09354

SUBJECT:  Request for Deferment of Forfeitures, <u>Major Fredrick M. Gamble</u>

1. On 11 January 2007, you were convicted at a general court-martial for violating several articles under the UCMJ, to include Article 92 for violating a lawful general order, Article 93 for sexually harassing female Soldiers under your authority, Article 133 for conduct unbecoming an officer and gentleman, and Article 134 for adultery, sexual assault, use of indecent language, and engaging in general disorder  The court-martial sentenced you to be confined for a period of two (2) years, to forfeit all pay and allowances, and to be dismissed from the service. On 11 January 2007, your defense counsel, on your behalf, requested deferment of the adjudged and automatic forfeitures to provide support to your dependents.

2. I have carefully reviewed your request for deferment of the adjudged and automatic forfeitures. I have considered the factors listed in Rules for Courts-Martial (R.C.M.) 1101(c)(3) to include, but not limited to, the nature of the offenses you committed, the sentence you were adjudged, the effect of a deferment on good order and discipline as well as your character, your family situation, and your service record.

3. In accordance with Article 57(a)(2), 58b(a), and R.C.M. 1101, your request for deferment of the adjudged and automatic forfeitures in the general court-martial case of <u>United States v. Major Fredrick M. Gamble</u>, 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, Headquarters and Headquarters Company, Combined/Joint Task Force (CJFF)-76, Bagram Airfield, Afghanistan APO AE 09354, **is approved**. At the time of action, I will consider suspending or disapproving, in whole or in part, the adjudged forfeitures and waiving automatic forfeitures for a period not to exceed six (6) months.

BENJAMIN C. FREAKLEY
Major General, USA
Commanding



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, COMBINED JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-CG                                                                                           2 2 JAN 2007

MEMORANDUM FOR 10th Soldier Support Battalion – Defense Finance and Accounting Section, ATTN:  Special Actions Section, Combined/Joint Task Force (CJTF)-76, Bagram Airfield, Afghanistan, APO AE 09354

SUBJECT:  Request for Deferment of Forfeitures, Major Fredrick M. Gamble

1.  After reviewing the request for deferment of adjudged and automatic forfeitures of pay and allowances in the general court-martial case of United States v. Major Fredrick M. Gamble, 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, Headquarters and Headquarters Company, Combined/Joint Task Force (CJFF)-76, APO AE 09354, the request is acted on as follows:

    a.  _____  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 February 2007.

    b.  _____  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 March 2007.

    c.  _____  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 April 2007.

    d.  _____  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 May 2007.

    e.  _____  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 June 2007.

    f.  _BCF_  The forfeiture of all pay and allowances required by Article 58b, UCMJ, is deferred effective 11 January 2007 until 11 July 2007.

2.  I hereby direct the Finance Office, ATTN:  Special Actions Section, to take action to adjust the pay account of Major Fredrick M. Gamble, 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, consistent with my decision in paragraph 1 above.  I further direct that an involuntary allotment be started in the amount of all pay and allowances forfeited pursuant to Article 58b, UCMJ, and deferred by me in this action, payable to Mrs. Toni Gamble for the purpose of providing support to the accused's dependents.

BENJAMIN C. FREAKLEY
Major General, USA
Commanding

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| | |
|---|---|
| **From:** | mark.kerr@swa.army.mil |
| **To:** | akgambles@aol.com |
| **Cc:** | brashlaw@msn.com |
| **Subject:** | FW: US v. Gamble: Request to Defer Forfeitures |
| **Date:** | Mon, 22 Jan 2007 7:41 PM |
| **Attachments:** | Deferment_of_Forfeitures_Granted_22-Jan-07.pdf (56K) |

Ma'am,
The deferment Mr. Brash put  <<Deferment of Forfeitures Granted
22-Jan-07.pdf>> in on the forfeitures was approved until July 11th.  As
you can see in the attached document, all pay and allowances until that
time are going to be put in allotment that will go to you.  When the
convening authority takes final action on the sentence we will ask him
to consider an additional six month deferment.

Also, I spoke with the Chief of Justice yesterday and his office would
like your contact information.  They are looking to see if there is any
transitional assistance they can provide.  Please let me know if it
would be OK for me to provide them this information, as I believe they
will try to provide what assistance they can for your family.


Very Respectfully,

Mark Kerr
CPT, JA
Defense Counsel

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| From: | brashlaw@msn.com |
|---|---|
| To: | akgambles@aol.com,  mark.kerr@swa.army.mil |
| Cc: | m_a_kerr@yahoo.com |
| Subject: | RE: PAY HAS STOPPED-Gamble |
| Date: | Sun, 4 Feb 2007 5:15 AM |

Toni,

I may be stubbing my toe here trying to give advice because I'm not familiar with the Army pay system, but I would recommend you take the documents I sent regarding MG Freakley's action on the pay directly to the Finance Office at Ft. Rich on Monday. At the same time, pending confirmation from CPT Kerr, you should stop by the Legal Assistance office, or at least make an appt. so a JAG over there could follow this thing on the ground in Alaska for you. In the AF system, you would still be entitled to Legal Assistance.  I will forward the documents to you again by separate e-mail. All I've mentioned is conditioned upon CPT Kerr's confirmation that it's the way to go in the Army.

Sincerely,
Dave

>From: akgambles@aol.com
>To: mark.kerr@swa.army.mil
>CC: brashlaw@msn.com
>Subject: PAY HAS STOPPED-Gamble
>Date: Sat, 03 Feb 2007 21:30:17 -0500
>
>I am surprised at the speed of pay being stopped. Do you need to contact >someone there or do I do it here and pray that the care enough to do >anything about it in an urgent status.
>
>The is no pending pay at all for me in the form of an allotment. The pay >stop date was 1/11/2007. The day he was sentenced not 14 days later as >instructed.
>
>But as the jury said, why should they care about Fred's family when he did >not care himself.
>
>
>_____
>Check out the new AOL. Most comprehensive set of free safety and security >tools, free access to millions of high-quality videos from across the web, >free AOL Mail and more.

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| | |
|---|---|
| **From:** | mark.kerr@swa.army.mil |
| **To:** | akgambles@aol.com, erin.cobb@swa.army.mil, patrick.s.obrien@afghan.swa.army.mil |
| **Cc:** | brashlaw@msn.com |
| **Subject:** | RE: URGENT-Re:Shipment of Household |
| **Date:** | Thu, 8 Mar 2007 7:39 PM |

Toni,
Yes, I talked with Fred yesterday and we are trying to work the
Government here to get the orders cut adding you and the kids to Fred's
orders.  This will include a provision to allow you to ship household
goods from the home of record to CONUS along with a vehicle.

I am also trying to track down what happened to the payments that
weren't directly deposited in JAN and FEB.

Also, I will be going to Kandahar after this trial term to gather
statements, so that we can put in our clemency request in APR.

Very Respectfully,

Mark Kerr
CPT, JA
Defense Counsel


-----Original Message-----
From: akgambles@aol.com [mailto:akgambles@aol.com]
Sent: Thursday, March 08, 2007 7:20 PM
To: Kerr, Mark USA CPT USA CJTF76-OSJA ; Cobb, Erin USA PO1 USN
CJTF76-OSJA ; OBrien, Patrick USA CPT USA CJTF76-OSJA
Cc: brashlaw@msn.com
Subject: Re: URGENT-Re:Shipment of Household

Mark,
I am just wondering if something has been done regarding this request. I
understand that you are all very busy. Can you please help me to resolve
this issue as soon as possible? I am literally running out of time.
Below are the attached emails.
Sincerely,
Toni Gamble


----- Original Message ----- From: "Kerr, Mark USA CPT USA CJTF76-OSJA "
<mark.kerr@swa.army.mil>
To: "David Brash" <brashlaw@msn.com>; "Cobb, Erin USA PO1 USN
CJTF76-OSJA " <erin.cobb@swa.army.mil>; "OBrien, Patrick USA CPT USA
CJTF76-OSJA " <patrick.s.obrien@afghan.swa.army.mil>
Sent: Monday, March 05, 2007 2:34 AM
Subject: RE: URGENT-Re:Shipment of Household

Dave,
We just got back. I'll get on this today.

Best Regards,
Mark

-----Original Message-----
From: David Brash [mailto:brashlaw@msn.com]
Sent: Thursday, March 01, 2007 11:26 PM
To: Cobb, Erin USA PO1 USN CJTF76-OSJA ; Kerr, Mark USA CPT USA
CJTF76-OSJA ; OBrien, Patrick USA CPT USA CJTF76-OSJA

Subject: Fw: URGENT-Re:Shipment of Household

Mark/Patrick,

Please, please, guys do respond to this. This lady needs help or stands to lose $15K. She's got some other issues I addressed in earlier e-mails, but this appears to be hot. Can someone give her a hand, or hook her up with someone, quickly, in the Legal Assistance Office who can?

The Gambles receieved all the mailed items.

Sincerely,
Dave

----- Original Message -----
From: akgambles@aol.com
To: brashlaw@msn.com
Sent: Thursday, March 01, 2007 6:12 PM
Subject: URGENT-Re:Shipment of Household

Dave,
Jan Myers (Family Support) just called me back along with Kathy Freeman (National Guard Transportation Person) and informed me that I am "entitled".

The Judical Officer or Order Issuing Officer (in Afghanistan) must ammend Fred's orders to include me and the kids, marriage information, and why I can move to Roundrock,Texas a CONUS area. I am entiled to move to another location besides the "home of record".

This regulations is in the following:

JSTR;Chapter 5; U5370-Paragraph H

Can you have them do this for me please? I really need this to happen FAST.

Thanks,
Toni

-----Original Message-----
From: akgambles@aol.com
To: jan.myers@us.army.mil; jan.glines1@us.army.mil
Cc: brashlaw@msn.com
Sent: Thu, 1 Mar 2007 1:06 PM
Subject: Re: Shipment of Household

Jan,
I just spoke to Marty in transportation, after she requested the fax of the "order" for Fred from Ft. Sill.

She stated that there is no "entitlement" for our house hold goods and a vehicle to be shipped anywhere, except Fred's home of record, which is Alaska. She is looking into it but is sure that the Army cannot pay for it. I asked if there were anything regarding special circumstances like ours. She said that she did not think so.

So, once again, I am at square one, and it appears that I will be responsible for paying about $14,750.00 to ship the household goods, and one vehicle myself.

Could you please clarify with HR with a yes or no so that I can include it in my records.

Thank you,

Toni Gamble

-----Original Message-----
From: jan.myers@us.army.mil
<javascript:parent.ComposeTo("jan.myers%40us.army.mil", "");>
To: akgambles@aol.com
<javascript:parent.ComposeTo("akgambles%40aol.com", "");>
Sent: Thu, 1 Mar 2007 12:11 PM
Subject: RE: Shipment of Household

The number is 384-1814. She did say their preference is for you to come
in person. Good Luck! Jan

Jan Myers
State Family Program Director
Phone: 907-428-6663
DSN Phone: 384-4663
Fax: 907-428-6685
DSN Fax: 384-4685
Toll-Free: 1-888-917-3608
Cell: 907-632-3378

-----Original Message-----
From: akgambles@aol.com [mailto:akgambles@aol.com]
Sent: Thursday, March 01, 2007 10:47 AM
To: Myers, Jan SMS NGAK
Subject: Re: Shipment of Household

Hello,
Can you provide the phone number for Marty and Terri?
Thanks,
Toni

-----Original Message-----
From: jan.myers@us.army.mil
To: akgambles@aol.com
Sent: Wed, 28 Feb 2007 2:25 PM
Subject: Shipment of Household

Hi Toni!
I just got off the phone with the Transportation people at Ft
Richardson. I spoke with Marty. She said since your name is not on the
order you need a Power of Attorney, POA. You need to go Building 600,
across the street from the Base Theater, Room B145. Marty or Terri will
help you. It is on the 1st floor, facing the theater. They are open
Monday - Wednesday and Friday from 0730-1130 and 1230-1630; on Thursday
they open at 0830. You need your ID, order and POA. They will then get
everything set-up. She said 'in-person'
is the best way to go. If you have any problems, call me!

Jan Myers
State Family Program Director
Phone: 907-428-6663
DSN Phone: 384-4663
Fax: 907-428-6685
DSN Fax: 384-4685
Toll-Free: 1-888-917-3608
Cell: 907-632-3378

---

AOL now offers free email to everyone. Find out more about what's free
from AOL at AOL.com
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
>
r=htt

<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
>
r=htt>
p://www.aol.com <http://www.aol.com/>  <http://www.aol.com/
<http://www.aol.com/> > > .

---

AOL now offers free email to everyone. Find out more about what's free
from AOL at AOL.com
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
>
r=http://www.aol.com <http://www.aol.com/> > .

---

AOL now offers free email to everyone. Find out more about what's free
from AOL at AOL.com
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
r=http://www.aol.com> .

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| | |
|---|---|
| **From:** | akgambles@aol.com |
| **To:** | mark.kerr@swa.army.mil |
| **Cc:** | brashlaw@msn.com |
| **Subject:** | Final-ClemencyDoc for Gamble, Fredrick |
| **Date:** | Mon, 19 Mar 2007 7:03 PM |
| **Attachments:** | Gamble_Clemency.doc (39K) |

Mark,
Here is the final revision for the Clemency Letter. Please forward the final to Fred.
Thanks,
Toni


-----Original Message-----
From: mark.kerr@swa.army.mil
To: akgambles@aol.com
Sent: Mon, 19 Mar 2007 10:51 AM
Subject: FW: Gamble, Fredrick


Toni,
Attached please find Fred's clemency draft.  I am still working with the
Guard and new chief of Justice here to get the 2 payments in JAN and FEB
taken care of and to get you and the kids added to the orders and to
have the orders amended to allow you to move the household goods and
vehicle to TX.

I will be flying to KAF on Wednesday (or the next available flight
thereafter) to take care of clemency and hopefully finalize the finance
and orders issue in person.

Very Respectfully,

Mark Kerr
CPT, JA
Defense Counsel


-----Original Message-----
From: Labrador, Rashonda M CIV USA
[mailto:rashonda.labrador@us.army.mil]
Sent: Monday, March 19, 2007 6:42 PM
To: mark.kerr@us.army.mil
Subject: Gamble, Fredrick

Sir,
I have Gamble here who would like for you to forward this attachment to
his wife.  He is unable to access internet or email ability to his wife.
If possible, can you forward the attachment labeled "Gamble Clemency" to
akgambles@aol.com.  That would be greatly appreciated.  Also, he will be
calling you at 2300 CST today, 19 March 2007. If this time is not
feasible, please respond as to when a good time will be available.
Thank you in advance for your assistance in this matter.  Have a great
day!!

RaShonda Labrador, MS
Psychologist
P.O. Box 305
Ft. Sill, OK 73503
(580) 442-4313
DSN: 639-4313

AOL now offers free email to everyone. Find out more about what's free from AOL at **AOL.com**.

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| From: | mark.kerr@swa.army.mil |
|---|---|
| To: | akgambles@aol.com,  mark.kerr@us.army.mil |
| Cc: | brashlaw@msn.com |
| Subject: | RE: Any Updates |
| Date: | Sat, 24 Mar 2007 4:26 AM |

Toni,
I am scheduled for a flight down to KAF tonight.  Fred said he thought
the pay issue was taken care of, but one issue that has come up is that
for a while Fred was still receiving COLA and the combat zone
entitlements, which he is no longer entitled to have.  That is probably
part of the issue with the pay withdrawl after the deposit.  Hopefully,
I will have more answers tomorrow or Monday, but if not, the press may
be the way to go.

As for the orders to get you and the kids to Texas, 82nd Airborne says
that can't do it, because Fred is no longer on their books.  The SFC
that handles post-trial matters for them does not think they (or anyone
else) would do it anyway, even if Fred was getting an Honorable
Discharge.

Very Respectfully,
Mark

-----Original Message-----
From: akgambles@aol.com [mailto:akgambles@aol.com]
Sent: Saturday, March 24, 2007 11:28 AM
To: Kerr, Mark USA CPT USA CJTF76-OSJA ; mark.kerr@us.army.mil
Cc: brashlaw@msn.com
Subject: Any Updates

Mark,
Just writing to ask about any updates? Also, still no check for payment.
Mark, I can't even pay to ship some of my things because the pay
situation is getting worse. I don't know what they are doing about it,
if anything. I am tired of being nice about this. Nothing should be this
difficult or take this long or do I have to be one of those people who
calls the news for action to be taken.
Thanks,
Toni

_____

AOL now offers free email to everyone. Find out more about what's free
from AOL at AOL.com
<http://pr.atwola.com/promoclk/1615326657x4311227241x4298082137/aol?redi
r=http://www.aol.com> .

Reminder: AOL will never ask you to send us your password or credit card number in an email.  This message has been scanned for known viruses.

| From: | brashlaw@msn.com |
|---|---|
| To: | akgambles@aol.com |
| Subject: | Lack of Support |
| Date: | Sat, 24 Mar 2007 5:17 AM |

Toni,

I've been watching these e-mails with growing angst.  I agree with your last message about not being "nice" any more.  Is there anyone at Ft. Rich - Legal Assistance, IG, command element that remained, victim advocate - who is/can engage on this? Maybe Ken Norsworthy? I don't know the Army rules on the move, and the pay issue was a victory at first but a mess in the execution.  If there is anybody you or Mr. Hooks know locally with some pull, I would not hesitate to engage them. I have no Army contacts and can't break into their system.  I felt fortunate to get the pay continuation approved, minor as that was in the big scheme of things.  It looks like the whole legal team on the Govt's side who dealt with Fred's case is no longer there since Mark refers to the 82nd.  That may be part of the problem, but it's no excuse. It looks like Mark is pursuing the clemency case with his trip to KAF, but the TDS guys may not normally deal with the residual family issues, just the post-trial actions like clemency. That's why it would be best to try and get someone who can get on this there, in Alaska, with you.  Again, I'm Army ignorant here, but in the Air Force, the Legal Assistance JAG or Victim Advocate would be the one to take this on

Sincerely,
Dave

_____

David F. Brash, Esquire
Law Offices of Stevens & Brash, LLC
P.O. Box 14633
Pittsburgh, PA  15234
412-760-8220
brashlaw@msn.com
www.militaryadvocate.com

~~E,~~ ~~Fredrick~~ M.
574-8∅-5∅16

**JAN**  ~~I think~~ S/B paid $4,499.82 mid month and I was on IE JAN ∅7
S/B paid $3,148.22 Eom and agree I was paid that 29 MAR ∅7. However,
that was in error based on stop direct deposit on 15 JAN ∅7 + it was in error
saying the payment was for 1-28 FEB

**FEB**  S/B paid $4,499.81 mid month but never was due to stoppage of direct deposit
All pay including SAVE PAY, HFP/IDP, FSH still should be paid based on being in theater. Therefore,
this amount is still outstanding for FEB
S/B paid $4,433.58 for Eom and agree I was based on restart of direct deposit
and payment received on 1 MAR ∅7

**MAR**  1st thing is that I was taken off of the computer system and 60 days of leave
I have never been paid for
2nd somehow a debt incurred here S/B paid Base, BAH, + COLA for the month basically
making each payment around $4,000, or $4,000 mid month and $4,000 Eom. Since payments
are once a month at least $8,000 per month after taxes based on being ~~entitled to~~ entitled to
$9,29∅.3∅ before taxes. However, on 4 APR ∅7 for the month of MAR my wife
was only paid $3,645.17 which still left a ~~cost~~ payment due my wife. of about $4,000. Another check in the  -$5000
amount of about $3,4∅∅ was sent for MAR still leaving $6∅∅-$1,∅∅∅ or more still due her.
Making the amount still owed about $5,∅∅∅-$6,∅∅∅.

**APR**  S/O paid around $9,29∅.3∅ before taxes which means she should get a check for
at least $8,∅∅∅ - $9,∅∅∅.

~~Very Truly~~

**PAY INQUIRY**

For use of this form see AR 37-104-3; the proponent agency is USAFAC.

| | BLOCK NUMBER |
|---|---|
| INQUIRY NO. | DATE |

## SECTION I (To be completed by soldier)

| NAME (Last, First, Middle) | SSN | GRADE |
|---|---|---|
| GAMBLE | 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 | O4 |

| UNIT | PHONE NUMBER |
|---|---|
| RCF | |

NATURE OF PAY INQUIRY (Be specific)

Pay issue for Jan - Mar

## SECTION II (To be completed by Unit Commander)

| | DATE | TL NUMBER |
|---|---|---|
| ☐ 1. Supporting document(s) submitted or will be submitted to finance. | | |

☐ 2. Local payment. Soldier has been counseled regarding impact on future pay. My recommendation is to approve/disapprove (cross out the appropriate word) the local payment.

☐ 3. Other (Specify)

| Signature of Unit Commander (or soldier as appropriate). | DATE |
|---|---|
| | 11 APR 07 |

## SECTION III (To be completed by Finance)

PROBLEM  ☐ Allotment  ☑ Entitlements  ☐ Collection  ☐ Leave
☐ Non-receipt Check  ☐ Non-receipt LES  ☐ Other (Specify)

### INQUIRY ANALYSIS CAUSE

☐ 1. Non-receipt of document from Unit Commander.
☐ 2. Late receipt of document from Unit Commander.
☐ 3. Document received - Finance did not process.
☐ 4. Document received and processed but rejected on DJUOL.
☐ 5. Document received from Unit Commander on time but too late to be processed prior to JUMPS cutoff.
☐ 6. Problem with prior station.
☐ 7. USAFAC
☑ 8. Other (Specify)  question from soldier

DESCRIPTION OF CAUSE AND ACTION TAKEN.

In response to the inquiry made yesterday, I am attaching a copy of your audits and the roll up. The audits were performed independently by two different clerks.
This may make it easier for us to communicate since you can ask direct questions about each entitlement so we can pinpoint the area you see as incorrect.

### ACTION REQUIRED

| ☐ DA Form 3684 | ☐ Local Payment | INQUIRY EVALUATION |
|---|---|---|
| ☐ Other (Specify) | | ☑ Valid    ☐ Invalid |

| DATE APPROVED LOCAL PAYMENT PAID | SIGNATURE OF PAY CLERK |
|---|---|
| | Marilyn Riles    070424 |

DA FORM

1ST AUDIT BY: KLW  
DATE: 5-Apr-07

2ND AUDIT BY: 7
DATE: 070404

| NAME/SSAN | | | | FICA WAGES | |
|---|---|---|---|---|---|
| GAMBLE, FREDRICK 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 | | | | 13755.06 | DEFENSE MILITARY PAY OFFICE FT SILL OK 73503 ADSN 481000 |

| EAD | TOE | TAX EX | PAY PERIOD | TAX INCOME | |
|---|---|---|---|---|---|
| 970915 | 0 | M-10 | 24-Jan-07 | 13708.39 | |

UNIT: PCF, FT SILL OK 73503

| REMARKS | ENTITLEMENTS | CODE | AMOUNT | COLLECTIONS | CODE | AMOUNT |
|---|---|---|---|---|---|---|
| GCMO: SENTENCE ADJUDGED 11JAN07: TF, CONF X 2 YEARS DISMISSAL | AMT UNPAID FINAL LES | 90 | | DEBT FROM FINAL LES | 42 | 16327.25 |
| | BASE PAY | 51 | 13755.06 | BASE PAY | 51 | |
| 070711 TO CURRENT CONFINEMENT 070724 TO CURRENT DEFERMENT | BAH | 89 | 4653.00 | BAH | 89 | |
| | BAS | 57 | | BAS | 57 | 89.94 |
| EMERGENCY AUDIT COMPLETED TO ACCESS DEBT. | CLOTHING | 60 | | CLOTHING | 60 | |
| | HDP | 64 | | HDP | 64 | 46.67 |
| DUE US: | VHA/BAH | 66 | | VHA/BAH | 66 | |
| DEBT FROM FINAL LES, BAS FROM 070111-070124, HDP FROM 070111-070124 | COLA | 72 | | COLA | 72 | |
| CASUAL PAYMENTS FOR DEFERMENT, AFTER SEP HFP/IDP FSGLI, SGLI | UCMJ | 31 | | UCMJ | 31 | |
| | EOM | 90 | 7648.03 | CAS PAY | 93 | 3148.22 |
| DUE SM: | 6.2% FICA-SOC SEC | 29 | | MGIB | | |
| BP,BAH FOR 070125-070330 FOR DEFERMENT, AFTER SEP CHECK | 1.45% FICA-MED | 29 | | SEB | | |
| CANCELLATIONS, AFTER SEP HFP/IDP OVERCOLL | AFRH | 23 | | HFP/IDP AFTER SEP | | 225.00 |
| LEAVE NOT PAYABLE AT THIS TIME | SGLI | 46 | | CAS PAY | | 3645.27 |
| | ACLVT | | | | | |
| | EOM | | 4499.81 | FSGLI | | 11.00 |
| ORIGINAL ETS: INDEF | HFP/IDP AFTER SEP | | 225.00 | AFRH | 23 | |
| SGLI COLLECTED FOR PERIOD OF EXLV _____ TO _____. | BAL DUE US | 42 | | SGLI | 46 | 29.00 |
| | TOTAL ENT | | 30780.90 | STTAX-AK | 25 | |
| LEAVE BALANCE ___ PAID AS: | TOTAL COLL | | 27325.26 | 6.2% FICA-SOC SEC | 29 | 852.81 |
| _____ ORDINARY LEAVE | AMOUNT DUE | | 3455.64 | 1.45% FICA-MED | 29 | 199.45 |
| _____ ACCRUED LEAVE | | | | | | |
| _____ NO PAYMENT MADE | AMOUNT PAID | 26 | | FED TAX | 21 | 2750.65 |
| MAILING ADDRESS: | AMT UNPAID CARRIED FWD | 27 | | TOTAL COLL | | 27325.26 |

DA FORM 2139-E as of 070315

NAME: GAMBLE, FREDRICK
SSAN: 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
CONF: 070111- CURRENT
PRETRIAL: N/A

ADMIN SEP: 070124
DD214:
LV DATES:
ORIG ETS DATE: INDEF

ADJ: 070111 GENERAL
SENTENCE: FORF ALL P&A, DISMISSAL
  CONF X 2 YEARS
GCMO#   DTD

| | BASE PAY | | BAH | | BAS | | SAVE PAY | | HFP/IDP | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID |
| Dec-06 | 6117.60 | 6117.60 | 2079.00 | 2079.00 | 187.49 | 187.49 | 100.00 | 100.00 | 225.00 | 225.00 |
| Jan-07 | 6252.30 | 6252.30 | 2115.00 | 2115.00 | 192.74 | 64.25 | 100.00 | 33.33 | 225.00 | 225.00 |
| Feb-07 | 6252.30 | 6252.30 | 2115.00 | 2115.00 | 192.74 | 0.00 | 100.00 | 0.00 | 225.00 | 0.00 |
| Mar-07 | 0.00 | 6252.30 | 0.00 | 2115.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| AFTER SEP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -225.00 | 0.00 |
| FINAL | -7502.76 | 0.00 | -2538.00 | 0.00 | -231.29 | 0.00 | -120.00 | 0.00 | -225.00 | 0.00 |
| TOTAL | 11119.44 | 24874.50 | 3771.00 | 8424.00 | 341.68 | 251.74 | 180.00 | 133.33 | 225.00 | 450.00 |
| DIFFERENCE | 13755.06 | | - 4653.00 | | -89.94 | | -46.67 | | 225.00 | |

| | SGLI | | AFRH | | FSGLI | | FSH | | COLA | |
|---|---|---|---|---|---|---|---|---|---|---|
| | COLL | S/B COLL | COLL | S/B COLL | COLL | S/B COLL | COLL | S/B COLL | PAID | S/B PAID |
| Dec-06 | 29.00 | 29.00 | | | 5.50 | 5.50 | 250.00 | 250.00 | 988.90 | 988.90 |
| Jan-07 | 29.00 | 29.00 | | | 5.50 | 5.50 | 250.00 | 200.00 | 1023.00 | 792.00 |
| Feb-07 | 29.00 | 29.00 | | | 5.50 | 5.50 | 250.00 | 0.00 | 924.00 | 0.00 |
| Mar-07 | 0.00 | 29.00 | | | 0.00 | 5.50 | 0.00 | 0.00 | 0.00 | 0.00 |
| FINAL | 0.00 | 0.00 | | | -5.50 | 0.00 | -300.00 | 0.00 | -1155.00 | 0.00 |
| TOTAL | 87.00 | 116.00 | 0.00 | 0.00 | 11.00 | 22.00 | 450.00 | 450.00 | 1780.90 | 1780.90 |
| DIFFERENCE | -29.00 | | 0.00 | | -11.00 | | 0.00 | | 0.00 | |

| START | END | LES | | REMARKS |
|---|---|---|---|---|
| 070111 | CURRENT | | | CONFINEMENT |
| 070125 | CURRENT | | | DEFERMENT |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ADJUSTMENTS
  DUE SM

  DUE US

AS OF 070315

1st audit 4/5/2007 -KLW

NAME: GAMBLE, FREDRICK  
SSAN: 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  
CONF: 070111-PRESENT  
PRETRIAL: N/A  

ADMIN SEP: 070124  
DD214:  
LV DATES:  
ORIG ETS DATE:  

ADJ:  
SENTENCE:  

GCMO# DTD

| | BASE PAY | | BAH | | BAS | | CLOTHING | | SAVE PAY | | HFP/IDP | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID | PAID | S/B PAID |
| Dec-06 | 6117.60 | 6117.60 | 2079.00 | 2079.00 | 187.49 | 187.49 | | | 100.00 | 100.00 | 225.00 | 225.00 |
| Jan-07 | 6252.30 | 6252.30 | 2115.00 | 2115.00 | 192.74 | 64.25 | | | 100.00 | 33.33 | 225.00 | 225.00 |
| Feb-07 | 6252.30 | 6252.30 | 2115.00 | 2115.00 | 192.74 | 0.00 | | | 100.00 | 0.00 | 225.00 | |
| Final Mar 07 | -7502.76 | 6252.30 | -2538.00 | 2115.00 | -231.29 | 0.00 | | | -120.00 | 0.00 | -225.00 | |
| AFTER SEP | | | | | | | | | | | -225.00 | |
| TOTAL | 11119.44 | 24874.50 | 3771.00 | 8424.00 | 341.68 | 251.74 | 0.00 | 0.00 | 180.00 | 133.33 | 225.00 | 450.00 |
| DIFFERENCE | 13755.06 | | 4653.00 | | -89.94 | | 0.00 | | -46.67 | | 225.00 | |

| | SGLI | | AFRH | | FSGLI | | | COLL | S/B COLL | FSH | | COLA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | COLL | S/B COLL | COLL | S/B COLL | COLL | S/B COLL | COLL | | | PAID | S/B PAID | PAID | S/B PAID |
| Dec-06 | 29.00 | 29.00 | | | 5.50 | 5.50 | | | | 250.00 | 250.00 | 998.90 | 998.90 |
| Jan-07 | 29.00 | 29.00 | | | 5.50 | 5.50 | | | | 250.00 | 200.00 | 1023.00 | 792.00 |
| Feb-07 | 29.00 | 29.00 | | | 5.50 | 5.50 | | | | 250.00 | 0.00 | 924.00 | 0.00 |
| Final Mar 07 | 0.00 | 29.00 | | | -5.50 | 5.50 | | | | -300.00 | 0.00 | -1155.00 | 0.00 |
| TOTAL | 87.00 | 116.00 | 0.00 | 0.00 | 11.00 | 22.00 | 0.00 | 0.00 | | 450.00 | 450.00 | 1790.90 | 1790.90 |
| DIFFERENCE | -29.00 | | 0.00 | | -11.00 | | 0.00 | | | 0.00 | | 0.00 | |

| START | END | LES | REMARKS |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**ADJUSTMENTS**  
**DUE SM**

| |
|---|
| |
| |
| |
| |
| |
| |

**DUE US**

| |
|---|
| |
| |
| |
| |
| |
| |

# BOOK PUBLISHING AGREEMENT

This agreement is made this 29th day of December, 2006, between Fredrick M. Gamble residing at 1800 West 104th Avenue, Anchorage, Alaska 99515, hereinafter called the AUTHOR; and VMI Publishers, a Limited Liability Company, doing business at 26306 Metolius Meadows Dr., Camp Sherman, Oregon, 97730, hereinafter called the PUBLISHER; concerning the work tentatively known as *The Fourth Revelation,* hereinafter called the WORK.

1. Grant of rights

    1.1 The AUTHOR grants to the PUBLISHER the exclusive right to print, publish, and sublicense the WORK, throughout the world in any language during the full term of copyright.

    1.2 The AUTHOR also grants to the PUBLISHER the exclusive right to sell, or sublicense to sell the WORK to any and all retail outlets, including, but not limited to all commercial bookstores in the United States.

    1.3 The AUTHOR grants to the PUBLISHER the non-exclusive right to sell the WORK in any and all other venues. AUTHOR retains the non-exclusive right to sell his WORK anywhere other than in retail bookstore outlets.

2. Publication

    2.1 The PUBLISHER agrees to publish the WORK within twelve (12) months of the delivery of the final, accepted manuscript. In the event of a delay from causes beyond the PUBLISHER's control, the respective publication date may be postponed accordingly for up to six (6) months, but the PUBLISHER shall notify the AUTHOR of the reason for the delay.

    2.2 Failure of the PUBLISHER to comply with this provision may result in the termination of this agreement. In the event that the PUBLISHER fails to publish any work comprising the WORK, the AUTHOR shall have the right, upon sixty (60) days' written notice to the PUBLISHER, to terminate this agreement, provided, however, that if the PUBLISHER publishes said work within the sixty (60) day period, the AUTHOR'S notice of termination shall have no effect and this agreement as pertains to said work shall remain in full force and effect.

    2.3 Failure of the PUBLISHER, under the provisions of Item 2.2 of this agreement, PUBLISHER shall refund all deposits, in full, to AUTHOR.

    2.4 The rights granted by the AUTHOR to the PUBLISHER shall include the following:

08 0207

FILED

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

a.   To publish the WORK in such form, style, size, type, and manner as it deems best suited to the sale of the WORK;

b.   To set or alter the title of the WORK;

c.   To determine the dates of publication; the method and means of advertising, promoting, and selling the WORK; the price at which the WORK shall be sold; the imprint under which the WORK shall be published; and all other publishing details, including the total number of copies to be printed;

d.   To publish subsequent and revised editions of the WORK whenever, in PUBLISHER'S judgment, it is advisable;

e.   To license others to publish and sell the WORK or any derivative work;

f.   To decide if and when reprints shall be made;

g.   To use the AUTHOR'S name on the WORK or any derivative work and identify the WORK as the product of the AUTHOR.

3.  Manuscript

3.1 The author agrees to deliver to the publisher not later than April 15, 2007 a complete manuscript of WORK in MSWord format on disk or via email. The delivered manuscript shall be satisfactory to the PUBLISHER in content and form. If the AUTHOR fails to deliver the manuscript by its established due date, the respective date of publication may also be extended by up to twelve (12) months. If AUTHOR completely fails to deliver the WORK under this agreement and a solution acceptable to both the PUBLISHER and AUTHOR cannot be determined, the PUBLISHER may terminate this agreement by giving written notice. If the agreement is thus terminated for failure by AUTHOR to produce the manuscript, AUTHOR agrees to pay PUBLISHER for any editorial, design, pre-press, and marketing work already in progress.

3.2 AUTHOR agrees to supply the PUBLISHER with indexes, bibliographies, footnotes, and/or other supplementary materials, such as illustrations or photographs, if the AUTHOR and the PUBLISHER agree that such material is required. If the AUTHOR fails to supply the required supplementary material in a form acceptable to the PUBLISHER, the PUBLISHER shall have the right to charge the AUTHOR for the expense of having it made.

3.3 The PUBLISHER will take proper care of the manuscripts, disks, or other materials sent by the AUTHOR, but the PUBLISHER shall not be liable for any loss or damage to any materials either in the PUBLISHER's possession or in production or transit.

4.  Editing and proofreading

3

4.1 The PUBLISHER has the right to edit the WORK so that it conforms to proper American usage, grammar, and punctuation, but shall make no substantive changes in the texts without the consent of the AUTHOR.

4.2 The PUBLISHER shall submit each edited text to the AUTHOR for approval at least seven (7) days before typesetting. The AUTHOR agrees to read, check, and correct the edited text and return it to the PUBLISHER according to an agreed schedule, failing which the PUBLISHER may proceed with typesetting.

4.3 The AUTHOR agrees that the expense of the AUTHOR'S corrections after typesetting (other than those due to printer's errors) shall be charged to the AUTHOR at actual cost.

5.  Warranty

5.1 The AUTHOR warrants that he is the sole AUTHOR or proprietor of the WORK; that he is the sole owner of the rights herein conveyed to the PUBLISHER; that the WORK is an original, unpublished work; that the WORK does not violate the copyright of any other party; that the WORK contains nothing libelous or scandalous and does not violate anyone's right of privacy.

5.2 The AUTHOR shall notify the PUBLISHER if any portion of the WORK has been previously published. The AUTHOR shall provide the PUBLISHER with written permissions from copyright holders to reproduce or quote from material protected by copyright. Any payment required for said permissions shall be paid by the AUTHOR.

5.3 The AUTHOR agrees to exempt the PUBLISHER from penalties and hold the PUBLISHER harmless against all liabilities, losses, damages, and expense of any kind whatsoever resulting from any claim, action, or proceeding asserted or instituted and sustained on the ground that the said WORK violates any copyright or proprietary right, or contains anything libelous or in violation of any right of privacy. The AUTHOR further agrees to cooperate fully in the defense thereof.

5.4 The PUBLISHER makes no guarantees, either expressed or implied, regarding the potential volume of sales of WORK in retail bookstore outlets.

6.  Registration of copyright

6.1 The PUBLISHER agrees to copyright the WORK in the AUTHOR'S name and to register the copyright in the United States. Both AUTHOR and

PUBLISHER agree to execute all papers and documents as may be necessary to secure and protect the copyright in the WORK and any derivative WORK.

7. Competing Work

7.1 The AUTHOR agrees that he will not, without the PUBLISHER's consent, publish or contract to publish any derivative work, any abridged or other edition of the WORK, or any other work that would adversely affect the sale of the WORK while this contract is in force.

8. Royalties

8.1 The PUBLISHER shall pay a royalty to the AUTHOR based on the PUBLISHER's net revenue (i.e., the amount received by the PUBLISHER from its customers) from sales of the WORK, less returns, as follows:

a. Twelve percent (12%) on the first 5,000 copies; fifteen percent (15%) on the second 5,000 copies; and eighteen percent (18%) on all copies over 10,000.

b. On special editions, such as book club editions or translations, when published through license of publication rights or lease of negative films: fifty percent (50 %) of the PUBLISHER's net receipts;

c. No royalty shall be paid on any copies sold at discount to author, or given away for review and promotion, or on copies damaged by fire or water, or on copies sold as remainders, or when the PUBLISHER, at its discretion, permits reproduction of the WORK or its derivatives without charge in Braille or other forms for use by the physically handicapped.

9. Subsidiary Rights

9.1 The PUBLISHER, in consultation with AUTHOR, shall have the exclusive right to publish or license others to publish or use the WORK in as many different forms as appropriate, including without limitation, foreign language editions, serialization, syndication, digest, abridgement, motion picture, dramatization, radio, television, mechanical rendition, audio recording, calendars (both dated and perpetual), and any other use or derivative use. The net proceeds from licenses shall be divided fifty percent (50 %) to the AUTHOR and fifty percent (50 %) to the PUBLISHER in lieu of royalty.

9.2 The PUBLISHER agrees to furnish the AUTHOR, upon written request, with copies of any contract from sale or license of subsidiary rights.

10. Statements and Payments for Royalties

5

10.1 The PUBLISHER shall prepare annual statements accounting for all sales hereunder through the end of December each calendar year, such statements to be mailed with royalty payment within ninety (90) days thereafter.

11. Author Copies.

11.1 The AUTHOR, as part of this agreement, agrees to purchase one thousand (1,000 ) copies of WORK, at the time of the first printing. PUBLISHER agrees to sell to AUTHOR said copies for $11.90 per copy, a thirty percent (30%) discount off the retail price of $16.99. Shipping charges additional.

11.2 Payment for these initial AUTHOR copies shall be made as follows: Fifty percent (50%) shall be paid by AUTHOR to PUBLISHER up front, at the time of signing this contract, and fifty percent (50%) within 10 days (10) prior to shipping of AUTHOR copies to AUTHOR's designated place of shipment. AUTHOR also agrees to pay all shipping charges for AUTHOR copies, said charges to be included with second payment.

11.3 Following this initial print run, the AUTHOR may purchase additional copies of the WORK in case lots at a discount of fifty-percent (50%) off the published retail price, shipping charges additional.

11.4 Copies purchased by the AUTHOR are royalty free and may not be returned. Such copies may not be resold to any non-church retail outlet or store, but may be sold in church bookstores or tables, at speaking engagements, on the internet, or other sources of distribution that are not retail book outlets or stores.

12. Reversion of rights

12.1 If after initial publication the PUBLISHER finds that the sale of any work comprising the WORK reaches a point not justifying a reprint, the PUBLISHER shall have the right to declare that work out of print. By written notice to the AUTHORS' last known address, the PUBLISHER shall advise the AUTHORS of this declaration, and the AUTHORS shall have the right for thirty (30) days from the date of notice to purchase the negative films, for the actual cost charged to the PUBLISHER. AUTHOR shall also have the right to purchase any remainders at eighty percent (80%) off the published retail price, shipping charges additional. If the AUTHOR fails to purchase, as aforesaid, within ten (10) days of said written notice, the PUBLISHER may dispose of any such films, bound copies, and sheets without further liability or royalties to AUTHOR. This license as it pertains to the WORK shall terminate six (6) months after the date of the above notice, and the rights of the PUBLISHER in the work declared out of print shall automatically transfer to the AUTHOR.

6

12.2 If the PUBLISHER fails to render annual statements or defaults in the payment of royalties due with such statements, the AUTHOR shall have the option, upon written request, to demand such payment. If the PUBLISHER fails to deliver such payment within thirty (30) days of request, or if the PUBLISHER declares bankruptcy or liquidates its business for any reason whatsoever, all rights herein granted shall terminate and revert to the AUTHOR without further procedure and without prejudice to the AUTHOR's claim for monies due.

12.3 In the event this license is subsequently terminated in the manner provided by the Copyright Act of 1976 (17 U.S. C. sec. 203) and the owner of the termination interest shall offer to assign, license, or otherwise transfer the WORK or any derivative work to others, such owner shall offer to the PUBLISHER the right of first refusal to secure the same interest upon the same terms and conditions as are offered to the others. The PUBLISHER shall accept or reject such an offer within thirty (30) days of receipt.

13. Assignment and Successors.

13.1 No assignment of this agreement shall be binding upon either party without the written consent of both the AUTHOR and the PUBLISHER, except that the AUTHOR may assign any monies due under this agreement to any person or persons.

13.2 The provisions of this agreement shall be binding upon the AUTHOR and the AUTHOR's legal representatives, heirs, and assigns, as well as upon the successors and assigns of the PUBLISHER.

14. Arbitration

14.1 This agreement will be governed by and interpreted in accordance with the laws of the State of Oregon. The AUTHOR and PUBLISHER agree that any controversy or claim arising out of this agreement or the breach thereof shall be settled in accordance with the rules of the Institute for Christian Conciliation of Peacemakers Ministries, as set for at http://www.hispeace.org/. Such arbitration shall be held in the city of Portland, Oregon. The parties agree that any judgment upon the award may be entered in the highest court of the forum, state or federal, having jurisdiction. The parties understand that these methods shall be the sole remedy for any controversy or claim arising out of this Agreement of the subject matter hereof, and expressly waive their right to file a lawsuit or claim against one another for such disputes, except to enforce an arbitration decision. This provision shall survive termination of this agreement.

15. Complete Agreement

7

This agreement constitutes the entire understanding between the PUBLISHER and the AUTHOR. There are no representations, covenants, or warranties other than those expressly set forth herein.

AUTHOR and PUBLISHER, until notifying the other of a change of address, shall correspond and send payments to the following address:

PUBLISHER: VMI Publishers, LLC,
William Carmichael, CEO
26306 Metolius Meadows Drive
Camp Sherman, Oregon 97730
(541) 595-2403
Email: bill@vmipublishers.com

AUTHOR:    Fredrick M. Gamble
1800 West 104th Avenue
Anchorage, AK 99515
(907) 349-1444
Email: akgambles@aol.com

In witness hereof, the parties affix their signatures.

_____
(Author/date)

12/29/06

_____
(William Carmichael, CEO, VMI Publishers, LLC)/Date)

$16.99 per book

purchase 1,000 books = $11,893

1st 10,000 books sold – 12% = $2.04 per book = $20,400

2nd 10,000 books sold – 15% = $2.55 = $25,500

3rd 20,001 - ? books sold – 18% = $3.06 = ?

From
Sent: Thursday, December 14, 2006 11:03 am
To: fredrick.gamble@us.army.mil
Cc:
Bcc:
Subject: RE: The Fourth Revelation Manuscript 2nd attempt

Hi Fred,
I am happy to report to you that your manuscript was approved for publication in our recent editorial meeting. We do think it needs more work in composition and I think our editors will have some input for you on that. Sci-fi needs to stay plausible in plot from page to page, so some work needs to be done to keep it that way. I think you will enjoy working with our editors.

While we appreciate the effort you have made in having a cover designed for your book, we have some doubt as to whether this is the best cover for sales of the book in retail stores. We also think the title needs more brainstorming before a final decision is made. At any rate, we would like to have you as an author if you are open to changes and suggestions for improving both the content and cover of the book.

The next step in this process is to issue you the Author Agreement. In order to do this, I need to confirm your legal name and also the correct address. In addition, I need to know how many books you plan to purchase with the original print run as this also becomes part of the Author Agreement. You can find the discount schedule on the FAQ page of our website, www.vmipublishers.com. Given the size of your manuscript, it would probably retail for $16.99 as a trade paper book. If you order the minimum 1000 copies, your price would be 30% off of this retail price.

Let me know if you are ready to take this to the next step. I look forward to hearing from you.

-----Original Message-----

-----Original Message-----
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To: akgambles@aol.com <akgambles@aol.com>
Sent: Tue, 7 Aug 2007 9:09 am
Subject: ▮▮▮▮▮▮▮ Newsweek is looking for Writers!

Fredrick,

I've posted a new article on my blog
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
that I think will be particularly interesting to you.  You have an opportunity
to appear in Newseek.  Visit my blog to find out how.

Best regards,

▮▮▮▮▮▮


▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

Check out my website ▮▮▮▮▮▮▮▮▮▮▮▮ to find out about my 2006 IPPY
award winning book, The Takers; Book One of The Oz Chronicles, and the 2007 IPPY
award winning book , Délon City, Book Two of the Oz Chronicles

Check out my promotional video
▮▮▮▮▮▮▮▮▮▮▮▮

Also check out my blog at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮


How's My Driving?
Did this answer appropriately address your question(s)?
If Yes select this link to respond: ▮▮▮▮▮▮▮▮▮▮
1 - Excellent - (explanation optional)
2 - Good - (explanation optional)
If No select this link to respond: ▮▮▮▮▮▮▮▮▮▮
3 - Unsatisfactory (please explain)
"To continue receiving e-mail communications from me, please add my email
address, ▮▮▮▮▮▮▮▮▮▮▮▮ to your safe sender list. That way,
you'll ensure communications from me go in your inbox and not your junk, trash
or bulk folder."

-----Original Message-----
From: akgambles@aol.com
To: ████████████████████████████████████████
Sent: Fri, 10 Aug 2007 12:05 pm
Subject: Re: Literary Agency: Fall Planning Georgina

Good Afternoon,

I am contacting you on behalf of my husband, Fredrick Gamble. I speak to him daily by phone, and I have power of attorney in all his matters. He would still like to proceed with whatever plan you have to market his book.

We no longer live in Anchorage, Alaska. We relocated to Round Rock, Texas so that I could be near my family, while Fred is physically unable to be here with his family. It is possible that he could be gone for another year before transitioning out of the military.

If you need to reach me, on Fred's behalf, for anything, I can be reached at:

Fred Gamble
c/o Toni Gamble
2014 Elder Way
Round Rock, TX  78664
(512) 716-3055


-----Original Message-----
From: ████████████████████████████████████████
To: 'Gamble, Frederick' <AKGambles@aol.com>
Sent: Thu, 9 Aug 2007 8:46 am
Subject: ████████████████ Fall Planning Georgina

To:     Frederick M. Gamble

Re:     Touching Base - The Fourth Revelation


Hello, and continued best wishes for our mutual success.

As you know we are very diligent about replying to every email and with all the spam flying around we want to make sure that we haven't missed anything in the last 30 days.

Now is a good time to make sure we have done all that we can as we are planning for a very active fall selling season.

Our sales have been going well.  As you may know we just closed a deal for Kristin Finn, with HCI, the publishers of the Chicken Soup Series, for her book, "Bipolar & Pregnant", and we just closed a screenplay sale for one of our authors too.  Let's hope our next sale is yours!

Would you please drop me (or your agent) an email to say hello, and let's be sure that everything is accurate? Let us know if there have been any changes to your work, or if there is anything else we should note for your file. We'll also want to discuss strategies for fall.

Thank you for your time and patience in this very slow moving industry. Here's to our mutual success!

Andrea - Dir. of Administration
(I'm happy to assist you, however it is preferable if you email your agent). During these "reminder times" they are very busy so give them an extra day or two to reply.

-----Original Message-----
From: Richard Ridley <richard.ridley@booksurge.com>
To: akgambles@aol.com <akgambles@aol.com>
Sent: Tue, 7 Aug 2007 9:09 am
Subject: BookSurge: Newsweek is looking for Writers!

Fredrick,

I've posted a new article on my blog
(http://selfpublishedamerican.blogspot.com/)
that I think will be particularly interesting to you.  You have an
opportunity
to appear in Newseek.  Visit my blog to find out how.

Best regards,

Richard

---

Richard Ridley
Publishing Consultant & Booksurge Author
BookSurge POD, LLC
7290-B Investment Drive
Charleston, SC 29418
843-789-5119

Check out my website  http://www.rwridley.com to find out about my 2006
IPPY
award winning book, The Takers; Book One of The Oz Chronicles, and the
2007 IPPY
award winning book , Délon City, Book Two of the Oz Chronicles

Check out my promotional video
http://www.youtube.com/watch?v=AQ6BKo4E0l0

Also check out my blog at http://selfpublishedamerican.blogspot.com/


How's My Driving?
Did this answer appropriately address your question(s)?
If Yes select this link to respond: salesteam701@booksurge.com
1 - Excellent - (explanation optional)
2 - Good - (explanation optional)
If No select this link to respond: salesteam702@booksurge.com
3 - Unsatisfactory (please explain)
"To continue receiving e-mail communications from me, please add my
email
address, richard.ridley@booksurge.com, to your safe sender list. That
way,
you'll ensure communications from me go in your inbox and not your
junk, trash
or bulk folder."

Dear Frederick,

Your critique has been completed (see below) and for expediency it has also been forwarded to your Literary Agent. Your agent will review the critique and get back to you within a few days to discuss the results with you. If you have NOT heard from the agent within five days, please contact them.

Thank you again for your commitment to your writing career. At Writers Literary we stand ready to assist you in all phases of bringing your work to the top quality possible and if you decide that future improvements are necessary, we hope you will allow us to assist you.

If you have any comments about your critique (good or bad) please let me know. We are always trying to improve our processes and customer service.

=====================================================================

Many authors can make their own changes suggested by the critique. However, some authors try to make their own changes, when they really don't have the skills necessary to do so. Therefore the Literary Agency that you work with has asked us to provide the following information to them as well (see below):

NOTE: There is an industry saying, "if you put 10 editors in a room you will come out with 15 opinions". We have no desire to argue about the subjective notes below. These notes are provided with every critique and provide a quick reference only. Please refer to the actual critique for more detail.

From The Editor:

In my opinion as the person that has reviewed this work, the changes or improvements suggested by this review can be made by the author.

___yes___    (Yes, Probably, Maybe, No) This is a 4 point forcing scale.

The amount of work needed to bring this to industry quality standards is:

__x__ not much
_____ some
_____ a lot

**08 0207**

How much formatting work is needed?

__x__ None
_____ Some
_____ A lot

**FILED**

FEB - 5 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Remember, the purpose of the critique is to get an unbiased plan of action to bring your work up to professional standards. Your agent will work with you and this information to do so.

Vicki - Writers Literary Services
Critique Administration
AdminV@writersliterary.com

P.S.

Analogies & Metaphors - In an effort to maintain a light heart about all this the list below should give you a laugh!

**Critique Section – This Information will be provided by the Critic: Cynthia Sherman**

**The Current Title – How catchy is it? How well does it convey the information in the manuscript?**
The Trilogy is entitled "The Crown of Creation", the first book in that trilogy which manuscript is enclosed is entitled "The Fourth Revelation."
**By Frederick Gamble**
This title is catchy, and it conveys the information in the manuscript. This is a terrific title, and it will draw your potential readers in. Nice choice.

## The Current Synopsis – How catchy is it? Does it intrigue?
The current synopsis is catchy, intriguing, and well written.
See below for more information on how a synopsis can be written.

Thank you for outlining each chapter. This outline will be needed as the publishing process continues.

## The Current Length of the Work – Is it appropriate for the target market?
The current length of this work is around 57,928 words.
The target market is for

My target markets are religious, minority, and science fiction readers from teen to adult.
I do agree with this target market.

## What is the power of the opening 3-5 sentences?
In the not-too-distant future on the island of Hawaii, a University scientist named Dr. Cynthia Scott helped log and chart near-earth asteroids.
"All right guys, I'm going to look at the center of the Milky Way again," announced Cynthia to her colleagues.
Cynthia always smiled before she looked through the eyepiece of the giant

telescope. She'd started here twelve years ago as an undergraduate student; married young and had a baby girl. The father never really provided a lot, and shortly thereafter deserted the small family. Cynthia never faltered; she stuck to her dream and earned a doctoral degree in Space Physics. Looking at this portion of space helped pay her way through college, and today, she almost ran the Observatory.

This time as Cynthia gazed through the eyepiece of the university observatory's giant telescope, located 13,796 feet atop Mauna Kea Reserve, she noticed something that she had not seen before in this particular sector.

She backed away from the eyepiece with a look of disbelief, rechecked the telescopes coordinates before repositioning her right eye on the telescope. "Unbelievable!" she yelled with a profound gasp of excitement. "Professor Vargas, I think you need to look at this!"

"Cynthia, what's wrong -- you sound panicked," said Professor Francisco Vargas, the university's Head of Astronomy, heading to the telescope.

"I can't believe what I just saw; it just doesn't make any sense. I've been looking at the stars in this sector for years, but now all of a sudden... this!" Cynthia said, making room at the eyepiece.

These sentences are powerful. They introduce characters, a setting, and they set the tone. This is a nice beginning. The readers will be intrigued.

**Dialogue (if any) – Describe and comment.**
The dialogue is easy to understand and follow. The readers will appreciate the ease with which this may be read. Nice work. Each scene transitions smoothly into the next because of this dialogue. I am impressed.

**Mechanics – Grammar:**
Nice work. Thank you. The editors will be pleased.

**Mechanics – Spelling:**

| | |
|---|---|
| billons | Spell as billions. (18) |
| pretences | Spell as pretenses. (40) |

**Mechanics – Punctuation:**
Excellent work. Thank you for following the rules of punctuation.

**Mechanics – Formatting:**
When submitting a manuscript to an editor for corrections or suggestions, Times New Roman size 12 is usually use.

**Is there a need for illustrations? (Children's, non-fiction, etc.)**

Illustrations are not needed for this adult fiction manuscript. The text provides a clear image of characters, settings, and events. Nice work.

**Other / Conclusion**
This is an extremely well written manuscript. The characters are fabulous, as is the plot. I am impressed with your imagination, writing skills, and storytelling ability. The readers will absolutely love this material. Thank you for submitting a manuscript with so few errors. This material will be a HUGE, HUGE success. I do wish you luck with this endeavor. However you will not need luck, as you have a gift for words.

CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Fredrick M. Gamble
1490 Randolph Road
Fort Sill, OK 73503

88880

**DEFENDANTS**

Department of the Army and agencies within it's military departments
Department of the Army ¹ETAL
901 N. Stuart Street
Arlington, VA 22203-1837

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT 88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Pro Se (PX)

ATTORNEYS (IF KNOWN)

Case: 1:08-cv-00207
Assigned To : Huvelle, Ellen S.
Assign. Date : 2/5/2008
Description: FOIA/Privacy Act

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**      OR      ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☒ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(F)

| ○ **G.** *Habeas Corpus/2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☒ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. 552a(g)(1)(c) Intentional/Willful Standard and Actual Damages in Accuracy and Other Damages Lawsuit

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 75,000,000   Check YES only if demanded in complaint

JURY DEMAND: YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY** *n.f.* (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE ~~December 28, 2007~~ 2-5-08    SIGNATURE OF ATTORNEY OF RECORD *F. Hill*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.