UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Fredrick M. Gamble | ) | Answer In Opposition to the |
| Regional Confinement Facility | ) | Motion and Memorandum in |
| 1490 Randolph Road | ) | Support of Motion to Dismiss |
| Fort Sill, OK 73503-5305 | ) | |
| Phone Number: (580) 442 - 4313 | ) | Civ. Action No. 08-0207 (ESH) |
| ATTN: Mrs. RaShonda Labrador | ) | |
| (Plaintiff) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Department of the Army and agencies | ) | |
| within it's military departments as follow: | ) | |
| The U.S. Army, The Alaska Department | ) | |
| Of Military and Veterans Affairs:  The | ) | |
| Alaska Army National Guard, and the | ) | |
| Alaska Military Youth Academy (formerly) | ) | |
| the Alaska National Guard Youth Corps | ) | |
| (Defendant) | ) | April 29, 2008 |

### Preamble

Come now the undersigned plaintiff, *pro se*, pursuant to Local Civil Rule

(LCvR) 7(b), this Honorable Court's Order dated April 14, 2008, and responding

to the "Motion and Memorandum in Support of Motion to Dismiss."  For the

reasons stated herein, this Honorable Court should deny the Motion.

### Statement of the Case

Once the plaintiff exhausted all of his administrative remedies with the United

States Army in respects to his General Courts-Martial (GCM) conviction, the

plaintiff In Accordance With (IAW) 5 U.S.C. 552, on February 5, 2008 sought

legal remedies through this Honorable Court from injuries sustained from the

defendant by filing an Intentional/Willful Standard and Actual Damages in

Accuracy and Other Damages Lawsuit against the Department of the Army, et

al., Defendants,[1] based on violations of the Privacy Act of 1974. Furthermore, circa April 23, 2008 the plaintiff filed a Motion for Summary Judgment against the Defendant which contained an amendment to his Complaint, and an additional lawsuit IAW Rule 42 of the Federal Rules of Civil Procedure (FRCP) based on the defendant's violation of the Freedom of Information Act (FOIA) of 1964 IAW 5 U.S.C. 552.[2]

Unlike the incorrect statement in the defendant's motion, the plaintiff is still a member of the U.S. Army. IAW 10 U.S.C. Sections 859 through 876, Articles 59 – 76. Although he has exhausted all of his administrative remedies, he has not exhausted all of his Post-Trial remedies, nor has he received from the Department of Defense a Department of the Defense (DD) Form 214 dismissing him from the Army. Furthermore, as stipulated in the evidence contained in his Motion For Summary Judgment, the Office of The Judge Advocate General (JAG) for the U.S. Army is reviewing the plaintiff's request for clemency which was submitted on February 29, 2008 to the Secretary of the Army IAW Article 74 Uniform Code of Military Justice, (U.C.M.J.) Remission and Suspension. Moreover, the U.S. Army JAG is now carefully considering all aspects of the plaintiffs GCM, to ensure that his legal rights were fully protected IAW Article 64 U.C.M.J. Review by a Judge Advocate.

Both of the combined lawsuits from the plaintiff, seek a sum of $150,000,000 ($75,000,000 each) in actual and punitive damages for alleged violations of his

---

1 See Complaint filed as Civil Action 08-207 (ESH)
2 See Motion For Summary Judgment Reference Civil Action 08-0207 (ESH)

rights under the Privacy Act of 1974, and the FOIA of 1964, occurring before, during and after the investigation that led to his court martial, to include up to 14 years earlier when he worked for the Alaska Army National Guard (AK ARNG), and the Alaska Military Youth Academy (AK MYA). The plaintiff alleges in his Intentional/Willful Standard and Actual Damages in Accuracy and Other Damages Lawsuit based on violations of the Privacy Act of 1974, and the Providing the Public Access to Information Contained in Records in the Possession or Control of the Federal Government which Release Jeopardized the Constitutional Rights of the Plaintiff during an Ongoing Legal Proceeding in Violation of the FOIA of 1964 Lawsuit, that the defendant is the actual cause of violations of 5 U.S.C. 552.

On April 14, 2008 the State of Alaska (SOA), Office of the Attorney General filed a limited entry of appearance on behalf of the SOA and the AK ARNG and the AK MYA[3] seeking dismissal from the plaintiff's claims against the AK ARNG and the AK MYA arising from their role as agencies or departments of the SOA. This motion asserts that the National Guard (NG) is a hybrid organization that serves both the state in which it is located and the federal government in times of need. To the extent that the plaintiff claims arise from the AK ARNG and the AK MYA's actions as agencies of the SOA, however, the Eleventh Amendment to the United States Constitution prevents the plaintiff from bringing these claims in federal court. Therefore, this Honorable Court lacks jurisdiction over these claims and as such the claims against the DMVA must be dismissed.

---

3 When the reference stipulates as a whole, the SOA, the AK ARNG, and the AK MYA, it will hereto be referred to as the Department of Military and Veterans Affairs (DMVA)

## Statement of the Facts

All facts necessary for the disposition of this case are found in argument.

## Petitioner's Statement of the Issues

I.

WHETHER THE DEFENDANT HAS SOVEREIGN IMMUNITY
THROUGH THE ELEVENTH AMENDMENT, THUS BARRING
THIS HONORABLE COURT FROM HAVING JURISDICTION.

II.

WHETHER THIS HONORABLE COURT SHOULD DISMISS THE
PLAINTIFF'S CLAIMS AGAINST THE DMVA UNDER RULES 12(b)(1)
OF THE FRCP FOR LACK OF PERSONAL JURISDICTION.

III.

WHETHER THE PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED, UNDER RULE 12(b)(6) OF THE FRCP.

## Specific Relief Sought

The defendant seeks this Honorable court to order a dismissal of the plaintiff's

claims against the DMVA as agencies or departments of the SOA.

## Jurisdictional Statement

The District Courts shall have original jurisdiction or may have jurisdiction

when:  The United States is a defendant[4]; Action to compel an officer of the U.S.

to perform his duty[5]; Tort Claims Procedure[6]; Civil Action for deprivation of

rights[7]; Tort Actions Against State Officials[8]; Collateral Review of Courts-Martial[9];

---

4 28 U.S.C. 1346
5 28 U.S.C. 1361
6 28 U.S.C. 2671
7 42 U.S.C. 1983
8 Eleventh Amendment
9 28 U.S.C. 1651

violations of the Privacy Act of 1974[10]; and violations of the FOIA of 1964[11].

### Reasons for Denial of the Relief Requested

The ordering to dismiss the plaintiff's claims against the DMVA based on the SOA claim to sovereign immunity under the 11th Amendment is completely unwarranted. The plaintiff asserts that due to this Honorable Courts jurisdiction in this case, in conjunction with the defendant's own acknowledgement that the NG "occupies a distinct role in the federal structure that does not fit neatly within the scope of either state or national concerns,"[12] that this Court can not justly take a narrow view on this matter based on that scope by simply allowing the defendant to subject the plaintiff to military law in order to prosecute him, and then not apply that same expansion on all liable parties, by allowing them to claim immunity after the evidence of production submitted to this Honorable Court by the plaintiff clearly shows how his basic constitutional rights have been actually intentionally/willfully violated by the defendant's negligent actions which amounts to gross error and constitutes judicial usurpation of power.

As aforementioned the DMVA is not strictly a State entity, but is also Federal entity codified in the U.S. Constitution with Federal Statues that governs it under U.S.C.'s 10 and 32. Therefore, when the DMVA acts negligently under a federal statue it can not then claim state immunity, nor when it willfully involves itself in a Federal or Military Trail through negligent acts which are subject to review by this Honorable Court, can it then seek State immunity when it's actions violate

---

10  5 U.S.C. 552
11  5 U.S.C. 552
12  Knutson v. Wisconsin Air National Guard, 995 F.2d 765, 767 (7th Cir. 1993)

Federal Law, and when they are the actual cause of damages claimed in a lawsuit.

In Feres[13], the U.S. Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise of or are in the course of activity incident to service." Cummings[14] argued that this doctrine should not be extended to suits against government agencies under the Privacy Act, and this Honorable Court agreed.

In determining whether members of the Armed Forces may sue the military for damages under the Privacy Act, we start with the "cardinal" canon of statutory construction: "Courts must presume that [the Congress] says in a statute what it means and means in a statute what it says there." Conn. Nataional Bank v. Germain, 503 U.S. 249, 253-54 (1992) (citations omitted). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Id. At 254 (quoting Rubin v. U.S., 449 U.S. 424, 430 (1981)). With these precepts in mind, the plaintiff turns to the text of the Privacy Act.

As the district court recognized, the Privacy act "applies to 'agencies,' defined as 'any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the government … or any independent regulatory agency.'" Cummings, 116 f. Supp. 2d at 78 n.5 (quoting 5 U.S.C. 552(f)) (emphasis added). And as the trial court further observed, certain provisions of the Act

---

13 Feres v. U.S., 340 U.S. 135 (1950)
14 Cummings v. Department of the Navy, 116 F. Supp. 2d 76, 78–82 (D.D.C. 2000).

manifest congressional intent to protect uniformed personnel like Cummings. See id. At 78 n.5, 81 (citing 5 U.S.C. 552(f), 552a(g)(1), 552a(k)(5) and 552a(k)(7)). One provision permits agencies, in certain circumstances, to exempt from the Act's purview "investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for … military service…." 5 U.S.C. 552a(k)(5). Another allows exemption—again, in limited circumstances—of "evaluation material used to determine potential for promotion in the Armed Services…." 5 U.S.C. 552a(k)(7). The District Court rightly noted that such exemptions "would be unnecessary if military service persons were excluded from the Privacy Act altogether." Cumming, 116 F. Supp. 2d at 78 n.5.

The court concluded that the aforementioned provisions, taken together, demonstrate that the Congress unambiguously intended to establish a duty that runs from a "military department" (like the Navy) to military personnel (like Cummings) not to "disclose any record which is contained in a system of records" (like Cumming's Evaluation Board report). 5 U.S.C. 552a(b). The Navy did not contest this. Instead, it contended that "without necessarily waiving immunity with respect to money damages," the Congress "intended to apply the Act to 'military departments'" by permitting a service member to seek equitable remedies only. Br. Of Appellee at 25. Its contention finds no support in the text of the statute; without regard to the identity of the plaintiff or the agency she is suing, the Act plainly authorizes injunctive relief, 5 U.S.C. 552a(g)(2)(A), (3)(A),

and monetary relief, 5 U.S.C. 552a(g)(4),[15] and it permits a court to "assess against the United States reasonable attorney fees and other litigation costs," 5 U.S.C. s 552a(g)(2)(B), (3)(B). Moreover, that the Act allows a military department to exempt from the Act's reach certain records based upon their content, 5 U.S.C. 552a(k)(5), (7), demonstrates that the Congress did not intend the courts to craft additional exemptions from coverage based upon the type of relief a service woman requests (i.e., by limiting suits to equitable relief only). See Fawn Mining Corp. v. Hudson, 80 F.3d 519, 523 (D.C. Cir. 1996) ("Neither lawyers nor judges serve as back-seat lawmakers who may extend statues beyond their bounds or change the rules that Congress has set.").

The district court correctly reminded us that "waivers of sovereign immunity must be unequivocally expressed and narrowly construed," Cummings, 116 F. Supp. 2d at 81 (quoting Dorsey v. Department of Labor, 41 F. 3d 1551, 1555 (D.C. Cir. 19964)). Erroneously, however, it denied effect to the unequivocally expressed waiver contained in the Privacy Act, 5 U.S.C. 552a(g). Construing a waiver of sovereign immunity narrowly, even "strictly in favor of the sovereign," means only that a court may not "enlarge the waiver beyond what the language requires." Tomasello v. Rubin, 167 F. 3d 612, 618 (D.C. Cir. 1999) (quoting U.S. v. Nordic Village, Inc., 503 U.S. 30, 34 (1992)). We need not "enlarge" by any stretch the Privacy Act's purview in order for the statute to avoid the effects of the

---

15 Section 552a(g)(4) provides:

In any suit brought under the provisions of … this [Act] in which the court determines that the agency acted in a manner which was intentional or willful, the U.S. shall be liable to the individual in an amount equal to the sum of … actual damages sustained by the individual … and … the costs of the action together with reasonable attorney fees as determined by the court.

Feres doctrine. As the district court acknowledged," on its face, the Privacy Act would appear to permit actions brought by military personnel....: Cummings, 116 F. Supp. 2d at 81. And statutory text remains the best evidence of congressional intent. See Tataranowicz v. Sullivan, 959 F.2d 268, 276 (D.C. Cir. 1992). The Act not only appears to, but does, permit actions brought by military personnel. Therefore, the DMVA incorrectly claimed that the plaintiff "does not assert, nor can he allege, any set of facts indicating that the SOA's immunity from such a suit has been waived or abrogated.[16]" Furthermore, they claim that "Alaska has not waived its Eleventh Amendment immunity from suits in federal court[17] and the plaintiff has not pointed to any authority indicating that Congress has manifested an unequivocal intent to abrogate state sovereign immunity for the claims he brings in his complaint.[18] Thus, the Eleventh Amendment is a complete bar to the plaintiff's claims against the AK ARNG and the AK MYA arising from their actions as agencies of the SOA and those claims must be dismissed."

As aforementioned : "Courts must presume that [the Congress] says in a statute what it means and means in a statute what it says there." Conn. Nataional Bank v. Germain, 503 U.S. 249, 253-54 (1992) (citations omitted). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Id. At 254 (quoting Rubin v. U.S., 449 U.S.

---

16 See, e.g., Port Authority, 495 U.S. at 305-07; Will v. Michigan Department of State Police, 491 U.S. 58, 64-66 (1989).
17 State v. O/S Lynn Kendall, 310 F. Supp. 433, 434-435 (D. Alaska 1970).
18 Indeed, the plaintiff appears to presume that the AK ARNG and AK MYA are entirely federal agencies. See Docket No. 1, Supplement to Petition for Grant of Review at 16-17.

424, 430 (1981)). With these precepts in mind, the plaintiff turns to the text of the Privacy Act which clearly demonstrates that Congress unambiguously intended to establish a duty that runs from a "military department" (like the AK ARNG) to military personnel (like the plaintiff) not to "disclose any record which is contained in a system of records" (like the DMVA's incomplete secret file on the plaintiff) in violation of 5 U.S.C. 552a(b). Furthermore, Congress did not intend the courts to craft additional exemptions from coverage based upon the type of relief from a serviceman's requests (i.e., by limiting suits to equitable relief only), nor by ordering the grant of dismissal to claims when sovereign immunity clearly contradicts settled case law, valid regulation, or statute. Therefore, the statutory text remains the best evidence of congressional intent. Thus, as argued previously in the plaintiff's complaint under 5 U.S.C. 552, and as now as the plaintiff further asserts, alleges, and offers as facts the following statutes which either indicates that the DMVA waived its immunity or that Congress abrogated their immunity.

### Jurisdiction to Collateral Review the Plaintiff's Court-Martial Conviction

In evidence attachment 1 of this document, hereto referred to as TAB C, the Writ of Habeas Corpus filed by the plaintiff to the Army Criminal Court of Appeals (ACCA) to Dismiss all Charges and Specifications and seek Relief from Damages caused by an Improper Legal Standard, dated July 1, 2007. The plaintiff so claimed that the command influenced errors of the defendant amounted to gross error and constituted judicial usurpation of power, thus violating his Constitutional rights. Evidence Attachment 2, the Defendant's

Answer in Opposition to the Petition for Extraordinary Relief in the Nature of a

Writ of Habeas Corpus, served on ACCA October 25, 2007, and Evidence

Attachment 3 ACCA's Order, dated November 13, 2007 denying consideration of

the plaintiff's petition, establishes how the plaintiff has produced evidence in

TABs A and B to his complaint that prove that once the DMVA willfully sent his

record to Kandahar AirField Afghanistan (KAF) without his consent, they violated

5 U.S.C. 552, and they actually and concurrently caused injuries to the plaintiff

and waived their right to any sovereignty guaranteed under the Eleventh

Amendment by acting as a federal agency under the Department of the Army.

The defendant now seeks to claim that this Honorable court does not have

jurisdiction over the plaintiff's complaint, although it has the authority and

jurisdiction to Collaterally Review and if deemed appropriate reverse his GCM

conviction.  The DMVA willfully participated as a federal agency in the plaintiff's

GCM, and violated 5 U.S.C. 552 with their actions; thus, they circumstantially

waived their sovereign immunity under the Eleventh Amendment.  Moreover,

throughout the plaintiff's GCM the defendant has maintained that it had

jurisdiction and was protecting the plaintiff's basic Constitutional rights essential

to a fair trial, and they guaranteed his due process of law.  However, that is

impossible based on the Nature of Court-Martial Jurisdiction which can only

consider disciplinary, or penal cases.[19]  Yet, somehow the defendant asserts that

this Court lacks jurisdiction, yet contends that it did not lack jurisdiction, and that

it indeed afforded the plaintiff a fair trial, despite all of the concurrently liable

---

19 See R.C.M. 201(a)(1)

parties who actually caused the plaintiff's injuries through negligence.

The military courts may only try criminal cases and adjudge only criminal sentence.[20] They have no authority to adjudge civil remedies such as the payment of damages or the collection of private debts.[21] Furthermore, the courts, in referring to the nature of the court-martial, often label it as a "creature of statute,"[22] a phrase that sets the appropriate tone for any discussion of court-martial jurisdiction. Practitioners working within the system of military justice must be ever cognizant that, only after a variety of jurisdictional prerequisites have been satisfied, may a court-martial properly hear a case and render a valid judgment. The opportunities for jurisdictional defects are many, and the effect of any such defect is the same: the court-martial is void.

Based on the defendant's continual unwillingness to perform drastic remedies, or perform any purging actions in his GCM case, and the military courts inability to address Privacy Act, FOIA, and Constitutional violations due to their lack of jurisdiction. The plaintiff under his Post Trial Remedies in addition to his right to submit Writs to a federal court to collaterally Review his Courts-Martial Conviction, initially filed a complaint with this Honorable Court in order to prove the Privacy Act violations in his case, which then lead to him filing a FOIA complaint, which in turn both lay the foundation for his Writ to challenge his GCM conviction, in this Honorable Court.

Assuming that the service member has exhausted whatever military remedies

---

20 R.C.M. 201(a)
21 R.C.M. 201(a)(1)
22 McClaughry v. Deming, 186 U.S. 49 (1902)

12

exist for reviewing his court-martial conviction, he may seek collateral review through one of several avenues. The review can take a number of forms, but is usually undertaken where the service member is seeking monetary claims or damages, i.e., in the U.S. Court of Claims, or relief in the nature of habeas corpus, injunctive relief, mandamus, or a declaratory judgment.

Convicted service members may seek immediate release from the "custody" of the Armed Forces through a petition for habeas corpus[23] in Federal district courts.[24] The service member does not necessarily have to be in actual confinement or restraint. In determining whether the petitioner is in unlawful custody, the federal courts will collaterally review the court-martial and may consider arguments that the court-martial was without jurisdiction, that due process was lacking, or that the trial did not afford all the procedural safeguards necessary for a fair trial under military law.

Since the Privacy Act has its own provisions and set of laws that governs it, usually Writs of Mandamus are not submitted. Thus, the plaintiff submits Evidence Attachment 4 with this answer to this Honorable Court in order to collaterally review his court-martial that led to the adverse military records[25] caused by this incident, and he will not submit a Writ of Mandamus due to the remedy to empower this Honorable Court to order United States officers and employees to perform duties owed the petitioner, e.g., change military records[26] if

---

23  Evidence Attachment 4 IAW LCvR 9.2
24  28 U.S.C. 2255
25  Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965)
26  10 U.S.C. 1552 (1994)

a mistake has been made in completing the records, was already granted

through 5 U.S.C. 552, and that request was also made in the plaintiff's original

complaint.

### 28 U.S.C. 1361

Action to compel an officer of the U.S. to perform his duty.  The district courts

shall have original jurisdiction of any action in the nature of mandamus to compel

an officer or employee of the U.S. or any agency thereof to perform a duty owed

to the plaintiff.

### 28 U.S.C. 1346

(a) The district courts shall have original jurisdiction, concurrent with the U.S.

Court of Federal Claims, of: (b)(1) Subject to the provisions of chapter 171 of this

title, the district courts, together with the U.S. District Court for the District of the

Canal Zone and the District Court of the Virgin Islands, shall have exclusive

jurisdiction of civil actions on claims against the U.S., for money damages,

accruing on and after January 1, 1945, for injury or loss of property, or personal

injury or death caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or

employment, under circumstances where the U.S., if a private person, would be

liable to the claimant in accordance with the law of the place where the act or

omission occurred.

### 28 U.S.C. 2671

As used in this chapter and sections 1346(b) and 2401(b) of this title, the term

"Federal agency" includes the executive departments, the judicial and legislative

branches, the military departments, independent establishments of the U.S., and corporations primarily acting as instrumentalities or agencies of the U.S., but does not include any contractor with the U.S.

"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the U.S., members of the National Guard while engaged in training or duty under section 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the U.S., whether with or without compensation.

"Acting within the scope of his office or employment", in the case of a member of the military or naval forces of the U.S. or a member of the National Guard as defined in section 101(3) of title 32, means acting in line of duty.

### 42 U.S.C. 1983

Every person who, under color of any statue, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the U.S. or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this

section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statue of the District of Columbia.

The basic jurisdictional requirement in this statue is a violation of an individual's constitutional right, by someone acting under state law (thus only against the state and local government, not federal). Additionally, most violations of this act look like torts. Individuals in their personal capacity can be sued, in addition to, individuals in their official capacity. When this happens the employer also has to pay. Money damages from local government entities and from individuals can be collected, while injunctions receive no money damages because of the 11th amendment, the court will order a stop to unconstitutional behavior by the state.

## ELEVENTH AMENDMENT

The immunity of a State from suit has long been held not to extend to actions against state officials for damages arising out of willful and negligent disregard of state laws. The reach of the rule is evident in Scheuer v. Rhodes, 416 u.S. 232 (1974) in which the Court held that plaintiffs were not barred by the Eleventh Amendment or other immunity doctrines from suing the governor and other officials of a State alleging that they deprived plaintiffs of federal rights under color of state law and seeking damages, when it was clear that plaintiffs were seeking to impose individual and personal liability on the officials. There was no "executive immunity" from suit, the Court held; rather, the immunity of state officials is qualified and varies according to the scope of discretion and

responsibilities of the particular office and the circumstances existing at the time the challenged action was taken.

The Eleventh Amendment only applies to the state and its agencies, which includes universities. It does not apply to cities and other non-state governmental entities. The amendment also states that the plaintiff can sue state officials in their personal capacity, but cannot sue them in their official capacity. Thus, in theory the state is not responsible for judgments against state employees under 1983, but all states indemnify them if it is in their official capacity. Furthermore, States may waive Eleventh amendment immunity in several ways, including by buying insurance since Official policy is necessary to make a 1983 claim against the governmental employer.

### 5 U.S.C. 552

Official policy was established by the plaintiff in his original complaint in the argument section of TAB A. The plaintiff then proved in TAB B how an incomplete secret file was kept by the DMVA in violation of 5 U.S.C. 552, since it was indeed maintained in a system of records. Additionally, the DMVA through negligent acts in both personal and official capacity caused the plaintiff actual damage by sending the incomplete secret record to KAF without the plaintiff's permission in order to use it against him by the U.S. Army, while simultaneously providing the public with information that it appeared to have leaked over the course of some 14 years while it secretly maintained said record. The plaintiff conceded in his complaint that the Privacy Act does not generally apply to records maintained by State and local governments or private companies or

organizations. However, in general, the only records subject to the Privacy Act are records that are maintained in a system of records, and therefore, it does include the DMVA which as stated in the Argument section of the plaintiff's complaint meet the five basic requirements that are most relevant to individuals through the Privacy Acts established general records management requirements for Federal agencies, such as the DMVA in this case. Thus the plaintiff's claims against the DMVA as in Scheuer v. Rhodes, 416 U.S. 232 (1974) which showed the reach of the rule upheld by the Court is not barred by the Eleventh Amendment or other immunity doctrines.

The DMVA was acting under the mandate of the U.S. Army which will be shown in the plaintiff's Writ holds no military law jurisdiction over it, nevertheless, the DMVA's actions implicate them directly in the plaintiffs GCM as an actual cause of his injuries. Therefore, this Honorable court has jurisdiction of this case as stated throughout this answer, and as originally stated in the plaintiff's complaint under 5 U.S.C. 552. Therefore, the plaintiff may sue an agency if the agency fails to maintain records with accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any agency determination and the agency makes a determination that is adverse to the individual. An individual may also sue an agency if the agency fails to comply with any other Privacy Act provision in a manner that has an adverse effect on the individual.

An individual may file a lawsuit against an agency in the Federal District Court in which the individual lives, in which the records are situated, or in the District of Columbia.

I. *Defendant's Allegations of Sovereign Immunity through the 11th Amendment.*

As aforementioned through the production of evidence the plaintiff has proven

that the DMVA's actions under 5 U.S.C. 552 resulted in a breach of duty, and

once it is shown that the defendant owed a duty of due care to the plaintiff, the

plaintiff must then show that the defendant breached this duty through an act or

omission exposing others to an unreasonable risk of harm. These three

elements – i.e., an act or omission by the defendant, a duty of due care owed to

the plaintiff, and a breach of duty by creation of an unreasonable risk of harm –

together constitute a "negligent act." However, the elements of causation and

damages must also be satisfied in order to establish liability for the negligent act,

and the plaintiff's complaints and their attachments prove this. Furthermore,

whether the defendant has breached a duty of due care requires a two-step

demonstration: (1) proof of what actually happened, which the plaintiff attests he

has shown with an omission by the defendant, and (2) a showing that the

defendant acted unreasonably under those circumstances, which TAB B shows

the defendant indeed did by violating its "duty owed" responsibilities in relation to

5 U.S.C. 552, as the plaintiff had to file Motions prior to his GCM based on the

damages caused by the DMVA and it's breach of law with the record in question.

The defendant's negligent act must be the cause of he plaintiff's injuries in

order to impose liability. This involves two separate determinations: (1) whether

the defendant's conduct was the actual cause (or cause in fact) of the injuries,

and (2) whether it was the proximate (or legal) cause thereof, which the plaintiff

has proven both determinations. Furthermore, the DMVA circumstantially waived

it's immunity when it's separate negligent acts and third parties concurred to cause a single injury, and it appears that the plaintiff would not have been injured but for the concurrence, then both defendant and the third party are actual causes, thus the DMVA shares in Concurrent liability with the Department of the Army as one of its agencies and therefore, can not be immune to it's illegal actions in violation of 5 U.S.C. 552.

Finally, the DMVA does not indicate rather it is, or it isn't a state that retains the common law rule that grants immunity to lower-level governmental officers or employees only when performing "discretionary" as opposed to "ministerial" functions.

Discretionary functions are those in which the officer has some element of personal judgment or decision making. In carrying these functions, the officer is granted immunity as long as they were acting in good faith,[27] which the plaintiff has proven the defendant's personnel were negligent, thus, they did not act in good faith.

Ministerial functions are those in which the officer is left no choice of their own; they are carrying out orders of others or established duties of their office. Here there is no immunity. If the officer negligently fails to perform their required duties properly, they can be held personally liable for any damages resulting from their acts, even if they were acting in good faith.[28] Which again the plaintiff through the evidence of production has proven that third parties from the DMVA did not act in good faith, but in negligence, hence, they are liable.

II. *Petitioner's Allegations to Dismiss Plaintiff's Claims under Rule 12(b)(1), and based on the Plaintiff's failure to state a Claim upon which Relief can be granted under Rule 12(b)(6) OF THE FRCP.*

The defendant seeks dismissal of the plaintiff's claims against the SOA, the AK ARNG, and the AK MYA under Rules 12(b)(1) and 12(b)(6) of the FRCP. Rule 12(B)(6) of the FRCP allows early dismissal for "failure to state a claim upon which relief can be granted." The motion filed under this rule sought to test the legal sufficiency of the plaintiff's claims in his original complaint, in which the plaintiff proved his claim with the burden of production. Additionally, when reviewing a Rule 12(b)(6) motion to dismiss, all allegations of material facts in the plaintiffs complaints are taken as true and construed in the light most favorable to the nonmoving party. However, the Court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Therefore, the plaintiff in his Motion for Summary Judgment had to show that there is no "genuine issue of material fact" in the lawsuit, and that he is "entitled to judgment as a matter of law." The plaintiff in that motion showed that there was no "genuine issue of material fact," as he meet his burden of production by submitting as evidence a memorandum from LTC Bailar the Alaska National Guard's Staff Judge Advocate, that showed by the DMVA's own admittances that they indeed violated various provisions of the Privacy Act of 1974, and the FOIA of 1964, as the defendant's claimed to perform the custodial duties, and were even the attestation authority of the "secret" file concerning a 1994 investigation on the plaintiff which was

---

27  Ross v. Consumers Power Co., 363 N. W. 2d 641 (Mich. 1984).
28  Collins v. Kentucky Natural Resources Environmental Protection Cabinet, 10 S. W. 3d 122 (KY 1999).

incomplete. Furthermore, without the plaintiff's approval the DMVA improperly

produced this file to the U.S. Army, upon the U.S. Army's prosecutor's request.

Moreover, the DMVA leaked private information from this file to its employees,

who maliciously used it against the plaintiff with false official statements and to

the public through rumors before, during, and after an ongoing legal federal

procedure that led to an adverse action against the plaintiff in his GCM.  Finally,

the evidence clearly shows the willingness by the defendant to be included in the

plaintiff's GCM, which is reviewable by this Honorable Court, and which waives

their 11th Amendment immunity.  Regardless of that, IAW 5 U.S.C. 552 this

Honorable Court still has jurisdiction in this Civil Case based on the fact that the

DMVA has a system of records pursuant to 5 U.S.C. 552 which even to this day it

continues to maintain a record in violation of the federal law on the plaintiff.

12(b)(1) requires a plaintiff to show by a preponderance of the evidence that

the court has jurisdiction to hear his claims.  The plaintiff so met his burden of

preponderance evidence with his complaints and their allied paperwork, in

addition to this answer to the defendant's motion by showing how a record was

indeed maintained by the defendant.  In the plaintiff's military record of trial and

its allied paper work, and in TAB B it clearly shows the DMVA sent the record in

question to KAF, in an attempt to utilize the information in it against the plaintiff.

Once this file arrived to KAF, the defendant upon request of the plaintiff provided

a copy of it to the plaintiff's military lawyer at Bagram AirField (BAF) several

months after they received it, which in turn showed it to the plaintiff.

Furthermore, the plaintiff's civilian attorney made a defense against this defective

record for it to be held out of the plaintiff's military trial, by submitting a motion to

suppress, which was upheld in December 2006 by a military judge. This record

was defective because it was inaccurate, non-relevant, untimely, and incomplete

as stated in the plaintiff's complaint.

Finally, the plaintiff proved by evidence of persuasion that the District Courts

shall have original jurisdiction or may have jurisdiction when: The United States

is a defendant; Action to compel an officer of the U.S. to perform his duty; Tort

Claims Procedure; Civil Action for deprivation of rights; Tort Actions Against

State Officials; Collateral Review of Courts-Martial; violations of the Privacy Act

of 1974; and violations of the FOIA of 1964.

## Conclusion

The DMVA's Motion questioning this Honorable Courts jurisdiction in the

plaintiff's case is unwarranted. The DMVA is a concurrently liabe party that

actually caused injuries to the plaintiff, by negligently performing their duties

owed to the plaintiff IAW 5 U.S.C 552. Additionally, the DMVA does not have

sovereign immunity through the Eleventh Amendment based on negligently and

willfully involving themselves in a military investigation that is subject to collateral

review by this Honorable Court. Furthermore, based upon concurrent liability

they are subject to the claims upon which relief can be granted by this Honorable

Court through 5 U.S.C. 552 as proven by both evidence of persuasion and

production by the plaintiff.

Wherefore, the plaintiff respectfully requests that this Honorable Court deny the DMVA's Motion to Dismiss the plaintiff's claims against the DMVA as agencies or departments of the SOA.


FREDRICK M. GAMBLE
Plaintiff

UNITIED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Fredrick M. Gamble | ) | Collateral Review pursuant to a |
| Regional Confinement Facility | ) | Writ of Habeas Corpus to |
| 1490 Randolph Road | ) | Reverse the Plaintiff's General |
| Fort Sill, OK 73503-5305 | ) | Court-Martial Conviction, and |
| Phone Number: (580) 442 - 4313 | ) | Immediately Release him from |
| ATTN: Mrs. RaShonda Labrador | ) | Incarceration, Without him being |
| (Plaintiff) | ) | Subjected to the Ramifications |
| | ) | of the Adverse Action Adjudged |
| v. | ) | by his GCM sentence Pending |
| | ) | the Final Actions Performed by |
| Department of the Army and agencies | ) | this Honorable Court |
| within it's military departments as follow: | ) | |
| The U.S. Army, The Alaska Department | ) | Civ. Action No. 08-0207 (ESH) |
| Of Military and Veterans Affairs:  The | ) | |
| Alaska Army National Guard, and the | ) | |
| Alaska Military Youth Academy (formerly) | | |
| the Alaska National Guard Youth Corps | ) | |
| (Defendant) | ) | May 2, 2008 |

## WRIT OF HABEAS CORPUS FOR COLLATERAL REVIEW

### STATEMENT OF THE FACTS

The plaintiff repeats and re-alleges the allegations in the Facts section of his

Privacy Act complaint Case Number 1:08-cv-207 dated February 5, 2008 and

TAB A of that document.

The plaintiff is currently confined at the Fort Sill, Oklahoma, Regional

Corrections Facility (FT Sill, RCF), where he has been wrongfully incarcerated

there since February 12, 2007.  Moreover, the plaintiff has been wrongfully

incarcerated since his move from Kandahar AirField (KAF) Afghanistan to

Bagram AirField (BAF) on August 11, 2006.

This Writ concerns a conviction, sentence, time-credit, denial of parole, and

the wrongfully adjudged post incarceration requirements that will be imposed on

1

the plaintiff.

The Military Court that entered the judgment of the conviction the plaintiff seeks relief from was the General Court-Martial Order Number 5, Headquarters, Combined/Joint Task Force (CJTF)-82, (Formerly CJTF-76) BAF, Afghanistan, APO AE 09354, dated May 9, 2007.

The case number in the trial court was Army 20070029.

The name of the trial judge is COL Reynold P. Masterton, Military Judge (MJ)

The plaintiff was represented by counsel during these proceedings. His civilian attorney was David Brash, and his military attorney was CPT Mark Kerr.

The judgment was entered against the plaintiff on January 11, 2007.

The plaintiff was convicted of the following offenses:

Charge I. Article 92, Finding: Guilty.

Specification – Violation of a lawful General Order, Finding: Guilty.

Charge II. Article 93, Finding: Guilty.

Specification 1 – Maltreatment of Subordinate, Finding: Guilty.

Charge III. Article 133, Finding: Guilty.

Specification - Conduct Unbecoming of an Officer and a Gentleman, Finding: Guilty.

Charge IV. Article 134, Finding: Guilty.

Specification 1 – Adultery, Finding: Guilty.

Specification 2 – Indecent Assault, Finding: Guilty.

Specification 3 Fraternization, Finding: Guilty, excepting the words, "driving alone with Specialist Chester on diverse occasions in his Privately

2

Owned Vehicle (POV)," to the excepted words: Not Guilty. Of the substituted words, Guilty.

Additional Charge I. Article 92, Guilty.

Specification – Violation of a lawful General Order, Finding: Guilty.

Additional Charge II. Article 134, Finding: Guilty.

Specification 1 – General Disorder, Finding: Guilty, excepting the language, "and at or near KAF," excepting the word and figures, "30 July 2006," substituting therefore the word and figures, "1 June 2006," excepting the word, "maltreat," substituting therefore the words, "engage in a general disorder in his interaction with," excepting the words, "using sexually harassing," substituting therefore the words, "wrongfully using certain," excepting the words, "and I could take you, or words to that effect," substituting therefore the words "or words to that effect, which conduct was prejudicial to good order and discipline," of the excepted words: Not Guilty, of the substituted words: Guilty. Not Guilty of a violation of Article 93, but Guilty of a violation of Article 134.

Additional Charge III. Article 134, Finding: Guilty.

Specification 1 – Adultery, Finding: Guilty, excepting the words, "on diverse occasions," to the excepted words, Not Guilty, Finding: Guilty, except the words, "on diverse occasions, of the excepted words, Not Guilty.

Specification 2 – Indecent Language: Finding Guilty.

Furthermore, the sentence was adjudged on January 11, 2007. The plaintiff was sentenced to forfeit all pay and allowances; to be confined for 2 years, and to be dismissed from the Service.

Based on the aforementioned charged offenses the plaintiff entered a mixed plea to his offenses as follows:

Charge I.  Article 92, Plea:  Guilty.

    Specification – Plea:  Guilty.

Charge II.  Article 93, Plea:  Not Guilty.

    Specification 1 – Plea:  Not Guilty.

Charge III.  Article 133, Plea:  Guilty.

    Specification – Plea:  Guilty, excepting the words, "use sexually harassing language towards," substituting therefore the words, "wrongfully make certain comments to," excepting the words, "by wrongfully stating to Major Nichols," excepting the word, "indecent," to the excepted words: Not Guilty.  To the words substituted therefore:  Guilty.

Charge IV.  Article 134, Plea:  Guilty.

    Specification 1 – Plea:  Guilty.

    Specification 2 – Plea:  Not Guilty.

    Specification 3 – Plea:  Guilty, excepting the words, "driving alone with Specialist Chester on diverse occasions in his POV," to the excepted words:  Not Guilty.

Additional Charge I.  Article 92, Plea:  Guilty.

    Specification – Plea:  Guilty.

Additional Charge II.  Article 93, Plea:  Not Guilty, but guilty to the lesser included offense of general disorder in violation of Article 134, UCMJ.

Additional Charge III.  Article 134, Plea:  Guilty.

4

Specification 1 – Plea: Guilty, excepting the words "on diverse occasions," to the excepted words, Not Guilty.

Specification 2 – Plea: Not Guilty.

The plaintiff was convicted by a panel of members in a Military Court at BAF, which entered the judgment of the conviction the plaintiff seeks relief from.

The plaintiff did not testify at his trial, however, following the MJ's denial of his Motions to Dismiss, the plaintiff changed his plea from not guilty on every charge and specification, to that of a mixed plea and testified in front of the MJ prior to trial.

The plaintiff appealed from the judgment of conviction through the Army Court of Criminal Appeals (ACCA), case Number Army 20070029. The plaintiff did most of his appellant work pro se, through Grostefon Matter, but he did have his appointed military counsel CPT Nathan Bankston submit to the military appellate courts the briefs on behalf of the appellant[1].

---

1 On 16 August 2007, the plaintiff through his Appellate Defense Counsel served a Brief on Behalf of Appellate Docket Number Army 20070029 to the ACCA. The plaintiff's Appellate Defense Counsel, and Branch Chief, Defense Appellate Division "carefully examine the record of trial in this case, do not admit that the finding and sentence are correct in law and fact, and submit the case upon its merit." The Brief on Behalf of Appellate was done pursuant to U.S. v. Grostefon, 12 M.J. 431 (C.M.A. 1982). Additionally, on 27 September 2007 the plaintiff through his Appellate Defense served Tab C from the Plaintiff's Brief on Behalf of Appellate Docket Number Army 20070029 to the ACCA as a separate Habeas Corpus Writ of Extra Ordinary Relief. This was done in order to dismiss all charges and specifications and seek relief from damages caused by an Improper Legal Standard. Additionally, on October 18, 2007 the ACCA failed to make any "purging action" in the plaintiff's case with the denial of the plaintiff's Brief on Behalf of Appellate Docket Number Army 20070029 submitted pursuant to U.S. v. Grostefon. Instead ACCA abused its discretion by AFFIRMING the findings of guilty and the sentence. Furthermore, on October 25, 2007, the U.S. Army Legal Services Agency Government Appellate Division petitioned the ACCA in opposition to the extraordinary relief in the nature of the plaintiffs Writ of Habeas Corpus. The Government respondents requested that the ACCA deny the plaintiff's writ based on the following: That the plaintiff's claims questioning legal rulings by the MJ are not appropriate for an extraordinary writ, and should be left for review under Article 66, UCMJ; and the Court does not have the authority to award civil damages. The plaintiff points out for this Honorable Court that ACCA had already completed its Article 66 Review with a denial, before the defendant's answer. Therefore, no review of he plaintiff's Writ was ever conducted by the defendant. Finally, on November 15, 2007, the plaintiff's attorney informed him that the ACCA denied his petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus dated November 13, 2007.

Based on the plaintiffs appeals the ACCA denied his appeal Per Curiam: On consideration of the entire record, including consideration of the issues personally specified by the appellant, we hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, those findings, of guilty and the sentence are AFFIRMED, dated October 16, 2007. Furthermore, the Court of Appeals for the Armed Forces (CAAF), case number USCA DKT. Number 08-0170/AR Crim. App. No. 20070029, on consideration of the petition for grant of review of the decision of the U.S. ACCA, it is by the Court this 19th day of February, 2008, ORDERED: That said petition be, and the same is hereby denied.

The plaintiff filed a petition for extraordinary relief through ACCA, case number Army Misc. 20071093, Related Docket: 20070029, but ACCA ORDER, on consideration of the Petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus, the petition is DENIED, dated November 13, 2007.

The plaintiff has not previously filed an application for a writ of habeas corpus under 28 U.S.C. 2441 challenging this conviction.

The plaintiff does have a Civil Lawsuit complaint pending in this Honorable Court case number 08-207 (ESH).

The plaintiff has exhausted all of his administrative remedies pursuant to the U.C.M.J.

The plaintiff's case does not have any factors peculiar to the military.

Historically the Eighth, Ninth, and Tenth Circuits have accepted Burns as habeas court's, and based their inquiry on whether the military courts fairly

considered the petitioner's claims.  However, the District of Columbia Circuit

Court has gone beyond Burns and held that the scope of review of military

judgments should be the same as in habeas review of state or federal

convictions, unless it's shown that conditions peculiar to military life require a

different rule.

The petitioner in Burns had been found guilty of rape and murder and

sentenced to death by Court-Martial (CM).  Burns alleged in his habeas petition

several deprivations of constitutional rights, contending that the military had

coerced his confession, suppressed evidence favorable to him, denied him

effective counsel, detained him illegally and created an atmosphere of terror and

vengeance not conducive to a fair decision.

Determining the proper scope of review -- The cited cases establish the power

of federal courts to review CM convictions to determine whether the military

acted within its proper jurisdictional sphere.  We are more concerned here,

however, with the extent to which Federal Courts may review the validity of

claims that errors in the military trial deprived the accused of due process of law,

when the military courts have previously considered and rejected the same

contentions.  We conclude from an extensive research of the case law that the

power of federal courts to review military convictions of habeas petition depends

on the nature of the issues raised, and in this determination, four principal

inquires are necessary.

1.  The asserted error must be of substantial constitutional dimension.

The first inquiry is whether the claim of error is one of constitutional significance,

or so fundamental as to have resulted in a miscarriage of justice. The writ of habeas corpus has limited scope; the federal courts do not sit to re-try…cases de novo but, rather to review for violation of federal constitutional standards. A conviction should be reversed however, when the alleged error constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." Most habeas corpus cases have provided relief only where it has been established that errors of constitutional dimension have occurred. But the Supreme Court held in a recent decision that nonconstitutional errors of law can be raised in habeas corpus proceedings where "the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice," and when the alleged error of law "presented exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." Davis vs. U.S., 417 U.S. 333, 346, 94 S. Ct. 2298, 2305, 41 L. Ed. 2d 109 (1974) quoting Hill vs. U.S., 368 U.S. 424, 428, 82 S. Ct. 468, 471, 7 L. Ed. 2d. 417 (1962). Thus, an essential prerequisite of any CM error we are asked to review is that it present a substantial claim of constitutional dimension, or that the error be so fundamental as to have resulted in a gross miscarriage of justice.

2. The issue must be one of law rather than of disputed fact already determined by the military tribunals. The second inquiry is whether the issue raised is basically a legal question, or whether resolution of the issue hinges on disputed issues of fact. The court of claims has noted that abstinence from reviewing CM proceedings need not necessarily be practiced "where the serviceman presents pure issues of constitutional law, unentangled with an

8

appraisal of a special set of facts.  Thus, a conclusion that a military prisoner's claim is one of law and not intertwined with disputed facts previously determined by the military is one important factor which favors broader review."

3.  Military considerations may warrant different treatment of constitutional claims.  The third inquiry is whether factors peculiar to the military or important military considerations require a different constitutional standard.

4.  The military courts must give adequate consideration to the issues involved and apply proper legal standards.  The fourth and final inquiry is whether the military courts have given adequate consideration to the issue raised in the habeas corpus proceeding, applying the proper legal standard to the issue. Decisions by reviewing courts within the military justice system must be given a healthy respect, particularly where the issue involves a determination of disputed issues of fact.  But a necessary prerequisite is that the military courts apply a proper legal standard to disputed factual claims.

To summarize CM convictions are subject to collateral review by federal civil courts on petitions for writs of habeas corpus where it is asserted that the CM acted without jurisdiction, or that substantial constitutional rights have been violated, or that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice.  Consideration by the military of such issues will not preclude judicial review for the military must afford to its personnel the protections of basic constitutional rights essential to a fair trial and the guarantee of the due process of law.  The scope of review for violations of constitutional rights, however, is narrower than in civil cases.  Thus,

9

federal courts should differentiate between questions of fact and law and review only questions of law which present substantial constitutional issues. Accordingly, they must not retry the facts or reevaluate the evidence, their function in this regard being limited to determining whether the military has fully and fairly considered contested factual issues.  Moreover, military law is a jurisprudence which exists separate and apart from the law governing civilian society so that what is permissible within the military may be constitutionally impermissible outside it.  Therefore, when the military courts have determined that factors peculiar to the military require a different application of constitutional standards, federal courts are reluctant to set aside such decisions.

## RELIEF SOUGHT

The plaintiff subjects his Military General Court-Martial (GCM) conviction to the U.S. District Court for the District of Columbia, and requests that a collateral review be conducted by this Honorable Court, as he asserts that his GCM acted without jurisdiction, that his substantial constitutional rights were violated, and that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice.  This Honorable Courts Collateral Review should determine the following:  whether the military has fully and fairly considered contested factual issues; review GCM convictions to determine whether the military acted within its proper jurisdictional sphere; review for violation of Federal Constitutional Standards that substantially violated the plaintiff's Constitutional rights, and if there were exceptional circumstances which are so fundamentally defective as to result in a miscarriage of justice.  If during

review this is discovered then the plaintiff's GCM conviction should be reversed;

Additionally, review for alleged errors that constituted the "failure to observe that fundamental fairness essential to the very concept of justice; and whether the military courts gave adequate consideration to the issue raised in the plaintiff's habeas corpus proceeding, applying the proper legal standard to the issue."

The plaintiff further requests this Honorable Court to order his immediately release from incarceration without having to deal with the adverse actions adjudged by his GCM sentence as he awaits the final actions to be taken by this Honorable Court.

Finally, the plaintiff requests that the judge trying this cause under habeas corpus order the defendant to pay damages to the plaintiff based on the discretion of this Honorable Court, for the following actual and punitive damages: the costs concerning bringing the defendant before her; all other costs of the proceeding; False Imprisonment since August 11, 2006, based on the defendants intent to confine the plaintiff.  The plaintiff's confinement was caused by the defendant's intentional acts or some force set in motion thereby.  Thus, the plaintiff may recover damages even though the plaintiff suffers no special damages - e.g., strip searches, injuries, loss of earnings, etc.  However, if sustained, these damages are also recoverable.  Therefore, the plaintiff is seeking the recovery of damages through the defendant's acts associated with him being wrongfully imprisoned for 21 months – e.g., taking away the plaintiff's liberty and freedom of action without just cause; intentionally/willfully attacking the plaintiff's reputation arbitrarily; strip searches; "pat downs"; drug tests;

11

earning and earning capacity; pain and suffering; loss of enjoyment of life; loss of

consortium with the plaintiff's family; negligent infliction of emotional distress;

irreparable damages to the plaintiff's military and civilian career prospects;

embarrassment and humiliation, both personally and professionally; and

damages to the plaintiff's Name. All of the damages are the actual result of the

intentional and malicious behavior or "deliberate indifference" proximately caused

by the defendant's negligence. This relief is raised pursuant to 28 U.S.C. 2441.

## BURDEN OF PROOF AND STANDARD OF PROOF

The power of federal courts to review military convictions of a habeas petition

depends on the nature of the issue raised, and in this determination, four

principle inquires are necessary.

1. The asserted error must be of substantial constitutional dimension.

The first inquiry is whether the claim of error is one of constitutional significance,

or so fundamental as to have resulted in a miscarriage of justice.

2. The issue must be one of law rather than of disputed fact already

determined by the military tribunals.

3. Military considerations may warrant different treatment of constitutional

claims.

4. The military courts must give adequate consideration to the issues

involved and apply proper legal standards.

## STATEMENT OF CASE

The principal function of habeas is to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted.

Once the service member's military remedies have been exhausted, the federal courts may collaterally review the court-martial. But as a general rule, federal court review of military decisions, especially in the review of courts-martial convictions, has historically been very deferential. Most federal courts are reluctant to intrude into military decision-making, particularly in light of the military's internal appellate system due to cases such as Chappell v. Wallace, 462 U.S. 296 (1983). See also Orloff v. Willoughby, 345 U.S. 83, 93 (1953) where civilian judges are not given the task of running the military; and Parker v. Levy, 417 U.S. 733 (1974) where the need for a separate jurisprudence for the military is necessary to promote the purposes of the armed forces.

Collateral review seeks a declaration that a judgment is void. The Supreme Court in Schlesinger v. Councilman, 420 U.S. 738 (1975) explained: Collateral attack seeks, as a necessary incident to relief otherwise within the court's power to grant, a declaration that a judgment is void. A judgment, however, is not rendered void merely by error, nor does the granting of collateral relief necessarily mean that the judgment is invalid for all purposes. On the contrary, it means only that for purposes of the matter at hand the judgment must be deemed without res judicata effect: because of lack of jurisdiction or some other equally fundamental defect, the judgment neither justifies nor bars relief from its

consequences. For example, a service member may seek monies for back pay in the Court of Claims on the argument that the military tribunal was without jurisdiction. Thus the threshold question is to determine whether a fundamental defect exists which would justify holding the conviction void.

As a general rule, before a service member may seek collateral review by a federal court, all available military remedies must be exhausted, or where the remedy sought is unavailable through the military. Assuming that the service member has exhausted whatever military remedies exist for reviewing his court-martial conviction, he may seek collateral review through one of several avenues. The review can take a number of forms, but is usually undertaken where the service member is seeking monetary claims or damages, i.e., in the United States Court of Claims, or relief in the nature of habeas corpus, injunctive relief, mandamus, or a declaratory judgment.

Convicted service members may seek immediate release from the "custody" of the armed forces through a petition for habeas corpus in Federal district courts IAW 28 U.S.C. 2441. The service member does not necessarily have to be in actual confinement or restraint. In determining whether the petitioner is in unlawful custody, the federal courts will collaterally review the court-martial and may consider arguments that the court-martial was without jurisdiction, that due process was lacking, or that the trial did not afford all the procedural safeguards necessary for a fair trial under military law as cited in Burns v. Wilson, 346 U.S. 137 (1953); Brosius v. Warden, 278 F.3d 239 (3d Cir. 2002) when the court noted split in federal circuits over meaning and application of majority's view in

Burns v. Wilson, which indicates that federal courts may not conduct de novo review of constitutional claim and may not go beyond determining whether military courts "dealt fully and fairly" with the service member's claim. Furthermore, in almost all cases, the courts will require exhaustion of military appeals – both automatic and discretionary.

LAW

The plaintiff relies on the following authorities in support of his Lawsuit:

Burns v. Wilson, 346 U.S. 137 73 S. CT. 1045, 97 L. Ed. 1508 (1953)

Davis v. U.S., 417 U.S. 333, 346, 94 S. Ct. 2298, 2305, 41 L. Ed. 2d 109 (1974)

Hill v. U.S., 368 U.S. 424, 428, 82 S. Ct. 468, 471, 7 L. Ed. 2d. 417 (1962)

U.S. v. Plumb, 47 M.J. 771 1997

U.S. v. Biagaise, 50 M.J. 143 (1999)

U.S. v. Gleason, 43 M.J. 69, 73 (C.M.A. 1994)

U.S. v. Stombaugh, 40 M.J. 211 (C.M.A. 1994)

U.S. v. Levite, 25 M.J. 334, 338 – 339 (C.M.A. 1987)

U.S. v. Rosser, 6 M.J. 267 (C.M.A. 1979)

U.S. v. Francis, 54 M.J. 636 (Army Ct. Crim. App. 2000)

U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994)

U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990)

U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994)

U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986)

Bousley v. U.S., 118 S. Ct. 1604, 1610 (1998)

Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963)

Rogers v. Richmond, 365 U.S. 534, 547 (1961)

Beck v. Ohio, Supra, 379 U.S. at (1992 – 1993)

Ashcraft v. Tennessee, 322 U.S. 143, 145 (1944)

Article 66, U.C.M.J.

Article 37(a), U.C.M.J.

Article 2, U.C.M.J.

Article 92, U.C.M.J.

Article 93, U.C.M.J.

Article 133, U.C.M.J.

Article 134, U.C.M.J.

Article 85, U.C.M.J.

Article 86, U.C.M.J.

Article 32, U.C.M.J.

Article 46, U.C.M.J.

Article 67, U.C.M.J.

R.C.M. 1105

R.C.M. 1106(f)(1)

Waller v. Swift, 30 M.J. 139 (C.M.A. 1990)

McCray v. Grande, 38 M.J. 657 (A.C.M.R. 1993)

Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R. 1992)

Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986)

U.S. v. Sullivan, 26 M.J. 442, 443 (C.M.A. 1988)

U.S. v. Bradley, 47 M.J. 715 (A.F. Ct. Crim. App 1997)

U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986)

U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990)

Kastigar v. U.S., 406 U.S. 441 (1972

New Jersey v. Portash, 440 U.S. 450 (1979)

U.S. v. Garrett, 24 M.J. 413 (C.M.A. 1987)

R.C.M. 705(b)

U.S. v. Olivero, 39 M.J. 246 (C.M.A. 1994)

U.S. v. Jameson, 33 M.J. 669 (N.M.C.M.R. 1991)

U.S. v. Hall, 36 M.J. 1043 (N.M.C.M.R. 1993)

U.S. v. Drayton, 45 M.J. 180 (1996)

U.S. v. Clemons, 35 M.J. 767 (A.C.M.R. 1992)

U.S. v. Edmond, 63 M.J. 256, 2006 CAAF Lexis 518

U.S. v. Peele, 46 M.J. 866 (CAAF 1997)

U.S. v. Moss, 63 M.J. 233, 2006 CAAF

U.S. v. Grostefon, 12 M.J. 431 (C.M.A. 1982)

Chappell v. Wallace, 462 U.S. 296 (1983)

Orloff v. Willoughby, 345 U.S. 83, 93 (1953)

Parker v. Levy, 417 U.S. 733 (1974)

Court in Schlesinger v. Councilman, 420 U.S. 738 (1975)

28 U.S.C. 2441

Burns v. Wilson, 346 U.S. 137 (1953)

Brosius v. Warden, 278 F.3d 239 (3d Cir. 2002)

10 U.S.C. 101(22) (1988)

10 U.S.C. 511 (1988)

U.S. v. Abernathy, 48 C.M.R. 205, 206 (C.G.C..M.R. 1974)

Duncan v. Usher, 23 M.J. 29 (C.M.A. 1986)

U.S. v. Caputo, 18 M.J. 259 (C.M.A. 1984)

U.S. v. Schuering, 16 C.M.A. 324, 36 C.M.R. 480 (1966)

Army Regulation (AR) 15 – 6

18 U.S.C. 866(c)

Fifth Amendment to the U.S. Constitution

Sixth Amendment to the U.S. Constitution

Fourteenth Amendment to the U.S. Constitution

Bolting v. Sharpe, 347 U.S. 497 (1954)

U.S. v. Henry, 42 M.J. 231 (1995)

U.S. v. Nix, 40 M.J. 6 (C.M.A. 1994)
U.S. v. Meek, 40 M.J. 675 (N.M.C.M.R. 1994)

Smith v. Philadelphia, 455 U.S. 209 (1982)

U.S. v. Argo, 46 M.J. 454 (1997)

U.S. v. Johnson, 21 M.J. 553 (A.F.C.M.R. 1985)

U.S. v. Stuckey, 10 M.J. 347 (C.M.A. 1981)

Jackson v. Virginia, ET AL. 443 U.S. 307; 99 S. CT. 2781; 61 L. Ed. 2d 560;
1979 U.S. Lexis 10 No. 78 – 5283 Supreme Court U.S. MAR 21, 1979 Argued
June 28, 1979 Decided

U.S. v. Davis, 58 M.J. 100; 2003 CAAF Lexis 159

5 U.S.C. 552

U.S. vs. Levite, 25 M.J. at 341

## WITNESSES/EVIDENCE

Plaintiff requests no witnesses for this Writ

Plaintiff submits no attachments with this Writ, due to all of the evidence

previously submitted to this Honorable Court in the form of the plaintiff's Civil

Case Complaints and their allied paperwork.

## GROUND ONE:  JURISDICTION

### Facts Supporting Ground One

The defendant lacked jurisdiction on all concurrently liable parties to afford a

fair trial.  As specifically provided for in Article 2, U.C.M.J., jurisdiction over

"persons serving with or accompanying an armed force in the field; in time of war

and also provides for jurisdiction over "persons serving with, employed by, or

accompanying the armed forces outside the U.S….."  In effect, these two

provisions attempt to subject civilians to the U.C.M.J.  The attempt has only been

successful in part.

The ability to exert military jurisdiction is of some concern because of the vital

functions that civilian technicians and support personnel often provide the

government in overseas stations.  Because jurisdiction over civilians in

peacetime is nonexistent, there is no effective deterrent for essential civilian

personnel to remain at their posts overseas when world tensions indicate that

War is imminent.  Several proposals have been considered, including the

possibility of amending Article 85 and 86, to hold such employees accountable

for desertion or absence without leave under limited circumstances.

Furthermore, this shows that the defendant did not hold jurisdiction over

19

everyone in the plaintiff's case who negligently and maliciously acted in his GCM.
The defendant did not hold jurisdiction over all concurrent and third parties in
order to afford the plaintiff a fair trial, by having the ability to prosecute for
instance civilians, and government employees who filed false official statements,
committed perjury and/or fraud on the court through their acts of negligence.

The defendant's negligent action caused a judicial usurpation of power.
Personal jurisdiction may exist over reservists on active duty[2] or during periods of
inactive duty for training (IDT),[3] and members of a state's National Guard may be
subject to court-martial jurisdiction while on active duty for training (ADT).[4]

With respect to jurisdiction over reservists, the services are unanimous in
exercising jurisdiction over individuals who are on "active duty."  Historically,
there was a split, however, on the question of exercising jurisdiction over those
individuals who are on inactive duty for training.  In the past the Army and the Air
Force, as a matter of policy, exercised court-martial jurisdiction under Article
2(a)(3) only in situations where the reservist was using expensive or dangerous
equipment.[5]  The Navy, Coast Guard, and Marines exercised jurisdiction in all
situations involving reserve training.[6]  Article 2(a)(3), U.C.M.J.,  now explicitly

---

2  "Active Duty" is defined in 10 U.S.C. 101(22) (1988) as:

> "full time in the active military service of the U.S.  It includes duty on the active list,
> full-time training duty, annual training duty and attendance, while in the active military
> service, at a school designated as a service school by law or by the Secretary of the
> military department concerned."

3  Article 2(a)(3) U.C.M.J.
4  10 U.S.C. 511 (1988)
5  U.S. v. Abernathy, 48 C.M.R. 205, 206 (C.G.C..M.R. 1974)
6  48 C.M.R. 205.  See also Duncan v. Usher, 23 M.J. 29 (C.M.A. 1986); U.S. v. Caputo, 18 M.J. 259
(C.M.A. 1984) (through discussion of jurisdiction over reservists); U.S. v. Schuering, 16 C.M.A. 324, 36
C.M.R. 480 (1966)

extends jurisdiction over:

> Members of a reserve component while on inactive duty training,
> But in the case of members of the Army National Guard of the U.S.
> or the Air National Guard of the U.S. only when in federal service.

In those instances where court-martial jurisdiction is being exercised, the

prosecution must establish that (1) the individual was actually on inactive duty

training; (2) the training as performed pursuant to written orders; (3) the orders

stated that the individual was subject to the U.C.M.J.; and (4) the individual

voluntarily accepted those orders.[7] The plaintiff asserts that the defendant can

not provide any proof that all of their personnel who acted negligently in the

plaintiff's GCM fit into one of these four categories. Thereby, proving that some

of the defendant's personnel who acted negligently in the plaintiff's case are

civilians and as such, are completely outside of the purview of the military courts

jurisdictional sphere.

The defendant improperly preferred charges from the plaintiff's Army

Regulation (AR) 15 – 6 Investigation – e.g. when the plaintiff showed evidence in

his case, and cited U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990). Where in a rare

example of a court reversing a case due to improper preferral of charges, the

court noted that the commander's probable cause to prefer charges may be

based upon incompetent, inadmissible, or even illegally obtained evidence, but

that the prosecution has a professional duty to ensure that baseless charges do

not result in a denial of due process. The court concluded, that under the facts of

this case, the aggregation of legally and factually unsupportable charges denied

---

7 U.S.v. Abernathy, 48 C.M.R. 205 (C.G.C.M.R. 1974)

due process even as to the valid charges. In doing so, the court noted that the mere allegation of baseless charges may influence the fact finder by suggesting that the accused is a bad character.

The defendant's actions resulted in the following: Improper Preferral of Charges; Constitutional violation claims, and violations of 5 U.S.C. 552 that could not have be raised on direct appeal through any military trial or appellate court; the claimed errors are a defect of a type that "saps the proceeding of any validity"; the conviction produced lingering and still extant collateral civil disabilities (even if the disabilities do not constitute custody; the error is of a type that would have justified relief during the term of imprisonment; the MJ's erred in their discretion in light of all of the missed evidence that has been presented by the plaintiff's from his existing record, and the testimony of the defense witnesses; the MJ's through Care Inquiry left inconsistencies in the plaintiffs pleas, and in light of the missed evidence found in the plaintiff's existing record makes the pleas improvident; the Convening Authority proved to be inelastic instead of impartial based on the time and diligence it used to review the case, and to ensure the plaintiff was not denied the due process of the law.

The simple fact that the Plaintiff plead guilty to some of his charges is irrelevant based on even those findings were made in the process of applying an improper legal standard. In both Haynes vs. Washington, 373 U.S. 503, 516 – 518 (1963); and in Rogers vs. Richmond, 365 U.S. 534, 547 (1961) ("Historical facts 'found in the perspective framed by an erroneous legal standard can not plausibly be expected to furnish the basis for correct conclusions if and merely

because a correct standard is later applied to them.")  The Unlawful Command Influence (UCI) the Plaintiffs chain of command utilized coupled with it's blatant disregard to his right to privacy during the AR 15 – 6 Investigation reached such an erroneous legal standard.  The results of this erroneous legal standard led to the following: The Plaintiff being permanently relieved from the Brigade Executive Officer position; and his subsequent transfer from Kandhar Airfield (KAF) Afghanistan to Bagram Airfield (BAF) Afghanistan based on the findings of that AR 15 – 6 Investigation.

The improper legal standard imposed by the U.S. Army continued prior to his Article 32 court hearing with the Commands UCI who negatively influenced and threatened the potential witness pool with several KAF wide "Town Hall meetings" held by the commander.  The "Town Hall meetings" were followed by and/or preceded by personal visits to potential material witnesses by members of the chain of command, who were not authorized or appointed to interfere with an ongoing investigation, nor authorized or appointed to conduct an informal investigation.

The defendants had several errors in discretion performed by all Courts involved who viewed the plaintiff's case – e.g. in evaluating the second prong of the Stombaugh[8] test, the MJ relied heavily on the fact that "every witness testifying . . . stated without hesitation that their ability and willingness to testify truthfully has not been affected by any government actions.  It is well settled that "such perfunctory statements from subordinates on the effects of command

---

8 U.S. v. Stombaugh, 40 M.J. 211 (C.M.A. 1994)

influence are inherently suspect, not because of the credibility of the witness, but because of the difficulty of the subordinate in ascertaining for themselves the effect of an attempted command influence. After concluding that the defense had raised facts which, if true, constituted unlawful command influence, but had failed to demonstrate any harm to the plaintiff, the MJ merely asserted his belief that the standards of fairness had been and would continue to be met.[9] He did not, however, take any corrective measures to prevent further interference with defense witnesses or assure defense access to witnesses and evidence. More disturbing still, the MJ failed to take any remedial actions related to the threats made to the witnesses. Although defense counsel only asked for future protection for the witnesses and that the MJ consider these threats when deciding on the motions to dismiss, the MJ had an independent duty to ensure the fairness of the proceedings and the ability of the defense counsel to call witnesses free of threats, interference, and influence.

The MJ should have taken steps to rid the trial of any possible taint. At a minimum, he could have recommended Commander's calls in the National Command Element (NCE), and the National Support Element (NSE), and the rear detachment in Alaska to inform all potential witnesses that if requested as defense witnesses, their testimony was a duty; and then in accordance with U.S.

---

9 Although the plaintiff asserts that no court looking into all the facts of his case to this point have found this fact crucial to their findings. The plaintiff is disturbed that the military judges to date in their "essential findings of facts" constitute little more than a recitation of the testimony of the various witnesses. Even where there were clear conflicts in the testimony of several witnesses, the MJs made no effort to clarify which witness they found more credible or on which version of the evidence they relied. This has been done despite the plaintiffs request that the plaintiff court reach their own conclusions per Article 66(c), U.C.M.J., 18 U.S.C. 866(c).

v. Sullivan, 26 M.J. 442, 443 (C.M.A. 1988), ordered the government to produce all witnesses requested by the defense, then informed each of the duty to testify and assure them that no adverse actions would follow.  Although in this case it may initially appear that the MJ did indeed do this as a minimum, his jurisdiction clearly does not extend to the plaintiffs rear detachment, and other potential witnesses in this case who are not under U.C.M.J. authority as Title 32 Soldiers, thus, his requirement here was never met, and therefore, he still had the independent duty to ensure the fairness of the proceedings and the ability of the defense counsel to call witnesses free of threats, interference, and influence, and thus erred.  Furthermore, additional steps should have been taken to neutralize COL Williams's, 1SG Braun's, CSM Harrington's, Major Nichols's, and the rear detachment's threats to witnesses.  While the plaintiff realizes that it would be an extreme sanction, he believes it would have been appropriate for the MJ to refuse to permit them to testify.  Even though they may not have been called by the government in its case-in-chief, making such an order in open court, (especially during the plaintiff's Motion to dismiss trial), would have gone a long way to restore public confidence in the fairness of this trial.  Unfortunately instead of taking such remedial actions, the MJ relied on the willingness of witnesses to testify.  This reliance dealt exclusively with the impact on this plaintiff and looked only for prejudice to this case.

The ACCA erred when it agreed with the trial judge that there was no actual harm to the plaintiff; the inquiry into the evidence raised by the plaintiff pre-trial with his motions, and even more so, during his appeal process, should not have

ended in a premature post-trail judgment, but instead with the ACCA considering much more drastic remedies such as determining if the plaintiff's discovery of evidence is true or untrue by conducting a DuBay hearing to fully develop the issue of command influence. However, in the judicial and administrative handlings of his case, insufficient effort has been expended to root out the cause and nullify the effects of command influence. Further, whenever UCI is an issue in a case, the court must consider not only the effects on "actual" influence, but also whether the appearance of UCI. The ACCA's concern in apparent UCI cases is not only that the plaintiff receives a fair trial, but also that the public perceives military justice as fair and impartial. Rosser, 6 M.J. at 272; U.S. vs. Allen, 31 M.J. 572 (N.M.C.M.R. 1990). If there is an appearance of UCI, the ACCA must consider whether or not remedial action is required. Rosier, 6 M.J. at 271 – 272. This honorable court should therefore find the ACCA and the MJ erred as a matter of law by failing to consider the cumulative effects the egregious and multiple forms of UCI had on the appearance of fairness and freedom from command influence required for courts-martial, U.S. v. Bradley, 47 M.J. 715 (A.F. Ct. Crim. App 1997), and therefore, find no remedy short of overturning the findings and sentence.

<u>Ground Two – Substantial Violation of Constitutional Rights</u>

## FACTS SUPPORTING GROUND TWO

The plaintiff has been detained illegally based on an Improper Legal Standard, e.g. in Waller v. Swift, 30 M.J. 139 (C.M.A. 1990) (court ordered accused released from post-trial confinement where convening authority

improperly commuted BCD to 12 months' confinement); McCray v. Grande, 38

M.J. 657 (A.C.M.R. 1993) (court granted habeas corpus relief for improperly

imposed post-trail confinement); Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R.

1992) (accused granted habeas corpus relief by ordering him released from

confinement and mandamus relief to compel the respondent to timely consider

his deferment request).  Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986) (noting

the inadequacy of normal appellate channels, court granted extraordinary relief to

convicted service member whose request for deferment of confinement had been

denied by convening authority).  Furthermore, the Plaintiff asserted that if

analysis of the exceptional circumstances present and existing in his record,

reference confessions by the Plaintiff and by the material witnesses would raise a

mixed question of fact and law.  In fact, it would turn on both a historical fact in

determining the voluntairness of the confessions, and whether certain promises

were or were not made by the prosecution and by the chain of command to their

witnesses.  Furthermore, the Plaintiff asserted to the defendant when he

submitted his Writ of Habeas Corpus, and his Grostefon matters that the ACCA

would not have deferred to the military courts findings based on the record

disclosing that the Military Court that adjudged the Plaintiff during his GCM did

not actually hold as a matter of fact if the petitioners' confessions were "freely

and voluntarily made."  Beck vs. Ohio, supra, 379 U.S. at 92 – 93, and Ashcraft

vs. Tennessee, 322 U.S. 143, 145 (1944).  Therefore, this Honorable Court must

make its own finding in service of a final resolution in the plaintiffs case because

of two exceptional circumstantial reasons.  First, the findings are inadequate or

unreasonable based on the fact-finding procedure being unfair, and secondly, the findings made were in the process of applying an improper legal standard.

The defendant created an atmosphere of terror and vengeance not conducive to a fair decision, e.g. the lack of a fair fact finding procedure. As one court has recognized, the policy of conducting post-trial lectures to witnesses after they have testified presents a potential chilling effect on the system. The phrase "chilling effect" is often cited in UCI cases to emphasize the devastating effects that commander statements and actions can have on future cases. Furthermore, such lecturing not only affects the future testimony of those particular witnesses, but also has a direct impact on the testimony of potential witnesses in future cases. This is especially true when comments criticizing witness testimony from a prior court-martial are addressed to groups.

Critical comments, however, are not the only prohibited conduct tending to discourage future testimony. Adverse post-trial actions against witnesses also create a chilling effect. For instance, in U.S. v. Jameson, 33 M.J. 669 (N.M.C.M.R. 1991) noting that process of litigation of command influence issues will benefit if it is possible to decide cases without stigmatizing perpetrators as "military justice outlaws;" court concluded, however, that adverse actions against two defense witnesses amounted to UCI. Not only was the review of that accused's case held to be potentially affected by UCI, but so was a subsequent court-martial involving similar charges. Therefore, commanders and their representatives must endeavor to choose their words and actions carefully so that members of their commands will not perceive them as discouraging witness

28

testimony. COL Williams and others in command mantle positions obviously never endeavored to choose their words and actions carefully because members of their command made truthful sworn statements and testified truthfully about how they perceived the egregious acts and statements as denying the plaintiff his due process of law by proclaiming him guilty, in an angry, livid manner, that created an environment of fear that defense witnesses expressed with comments about losing their jobs, the jobs of their loved ones, or suffering further chilling effects from the command because of the threats the command had and was using in order to discourage witness testimony.

Further evidence in the plaintiff's case that prove that the fact finding procedure wasn't fair was cited In Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963), and Rogers v. Richmond, 365 U.S. 534, 547 (1961) – where "Historical facts 'found in the perspective framed by an erroneous legal standard can not plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them." Additionally, in U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994) – Alliances forged between the prosecution, the Commander, and the material witnesses throughout his case did not maintain the required delicate balance between military justice and command discipline.

In U.S. v. Biagase, 50 M.J. 143 (1999) - Actual UCI affects the actual fairness of a trial, while the appearance of UCI merely affects the level of "public" confidence in the military justice system. Although it has no direct impact on the fairness of a trial, the appearance of UCI is as much to be condemned as its

29

actual existence.  Therefore, the template for measuring prejudice from UCI is not simply whether such influence actually existed, but instead, whether there is an appearance of such influence.

Apparent UCI occurs when reasonable members of the public defined to include "not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system."  U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990); believed command influence prejudiced the accused.  U.S. v. Rosser, 6 M.J. 267 (C.M.A. 1979); U.S. v. Campos, 37 M.J. 894 (A.C.M.R. 1993) (definition of apparent command influence); U.S. v. Plumb, 47 M.J. 771 (A.F.Ct.Crim.App. 1997) (noting issue of apparent unlawful influence, court reversed accused's conviction where command encouraged defense witnesses to avoid the accused and his trial; court noted that it had never seen such a flagrant case of government misconduct and egregious acts of command influence).  Thus, this type of unlawful influence is based upon extrinsic considerations, i.e., those from outside the system.  The question of whether apparent unlawful influence existed is only relevant when no actual unlawful influence exists, because remedying any actual influence will most likely remove the appearance of prejudice.

Perceived UCI is another distinct concept of influence that can fall into either category of actual or apparent unlawful command influence.  This type of influence focuses on how the recipient of command influence perceives that influence.  If the recipient is a court member, and his or her independent judgment is affected by the influence, or if the recipient is a witness who decides

to testify differently or not at all as a result of the influence, actual command influence has occurred. On the other hand, if the recipient is a sufficiently large group of service members (i.e., members of the "public"), and members of that group perceive that the command influence affects the overall fairness of the system, then apparent unlawful command influence has occurred. In all cases, the perception by the recipient must be reasonable in light of the circumstances. Thus, the offered evidence clearly shows, all three types of UCI exist in this case.

Violations of the plaintiff's 5th Amendment Due Process Rights. Under limited circumstances, the plaintiff might succeed in obtaining a dismissal of charges on the ground that he has been targeted for selective or vindictive prosecution in violation of his due process and equal protection rights.[10] The applicable Constitutional provision would be the Fifth Amendment to the United States Constitution, which prohibits the federal government form depriving a person of life, liberty, or property without due process of law. Although the Fifth Amendment contains on explicit reference to "equal protection," the Supreme Court has indicated that that concept is part of parcel of due process considerations that require that the government deal with persons in reasonable fashion, both substance and in procedure. Thus, the Court has referred to the protection in the Fifth Amendment as equal protection component of the due process clause as cited in Bolting v. Sharpe, 347 U.S. 497 (1954). According to applicable case law from both the federal and military courts, the

---

10 U.S. v. Nix, 40 M.J. 6 (C.M.A. 1994) trial court erred in not determining whether Special Court-Martial (SPCM) had more than an official interest in recommending General Court-Martial (GCM).

accused bears a heavy burden of demonstrating that (1) although there are others similarly situated who have not been prosecuted, the plaintiff has been singled out for prosecution, and (2) that the government's selection of him has been invidious or in bad faith, in that he has been selected for prosecution for an impermissible reason, such as his race or religion or in an attempt to frustrate his constitutional rights. In U.S. v. Henry, 42 M.J. 231 (1995) the accused did not waive selective prosecution issue by pleading guilty; he made plausible showing on appeal that he was targeted for prosecution because of his race; court remanded case for determination of issue.

A plaintiff might also move to dismiss the charges on the grounds of prosecutorial misconduct, i.e., the prosecution has acted in a fashion which has, or will, result in the denial of a fair trial. In U.S. v. Meek, 40 M.J. 675 (N.M.C.M.R. 1994) prosecutorial misconduct generally defined as prosecutorial action or inaction which violates some legal norm or standard, such as constitutional provision, statute, manual rule or professional ethical standard. Further, it should be noted that the actions of the prosecution team or the Staff Judge Advocate (SJA) may also include elements of UCI, and vindictiveness. Indeed, the lines may blur. But a motion to dismiss may be appropriate where the misconduct is not clearly in the nature of "command influence" or where, as discussed above, the plaintiff has not been specifically targeted for selective prosecution or disparate treatment. Examples of possible prosecutorial misconduct would include intimidation or improper coaching of witnesses, destroying or withholding evidence, or providing false or misleading information

to the court, the defense, or other participants, as in the plaintiff's case.

When the issue is raised, the trial court should determine first, whether in fact misconduct has occurred. What has been alleged as misconduct may be more in the nature of heavy handedness or overly aggressive behavior, which may not rise to the level of misconduct. Second, assuming that actions do amount to misconduct, the court should determine whether the plaintiff has been prejudiced. The test whether the prosecution's actions are so egregious as to deny the plaintiff a fair trial. In Smith v. Philadelphia, 455 U.S. 209 (1982) the issue of prosecutorial misconduct does not focus on prosecutor's culpability; instead it focuses on the fairness of the trial. Moreover, assuming that misconduct has occurred, which does not arise to the level required for dismissal of charges, the trial court may nonetheless impose lesser sanctions or remedies.

Because a motion to dismiss based upon selective prosecution relates to the preferral and referral of charges, there is some authority for the view that if the motion is not made before pleas are entered; the issue will be considered waived. On appeal, the court will review the MJ's findings of fact under the "clearly erroneous" standard of review.[11] If the MJ has concluded that there has been prosecutorial misconduct and that prejudice has resulted, the court will treat those issues as matters of law and will conduct a de novo review as cited in Argo.

Constitutional challenges to the underlying statue, regulation, or order are as follow: The Constitution of the United States contains a number of provisions

---

11  U.S. v. Argo, 46 M.J. 454 (1997) stating standard of review

33

designed to protect the individual from various types of government interference.[12] The statue, regulation, or order underlying the plaintiff's prosecution my be Challenged in a motion to dismiss on the grounds that it is inconsistent with the Constitution and is therefore invalid. Normally, failure to raise a constitutional challenge at the trial level will preclude appellate review of the issue.

Violations of the plaintiff's 6th Amendment right to witnesses and favorable evidence, e.g. in U.S. v. Moss, 63 M.J. 233, 2006 CAAF the charges were based on the SGTs sexual contact with a niece, who waited seven months to report the incident. Likewise in the plaintiff case witnesses allegedly waited months or even years before disclosing any such alleged contact or alleged behavior of contact from the plaintiff.

In Moss the SGT sought to challenge the niece's credibility by introducing evidence, per rule 608(c) of behavior problems she was having when she reported the conduct on a theory that she fabricated the story, to distract attention from other behavior. The MJ excluded the evidence on the Governments Motion of Liminie and the SGT was convicted. After the criminal court of appeals affirmed. The SGT appealed claiming that the exclusion of the evidence violated his 6th Amendment rights. The court so held, noting that where as here, the right to confrontation was violated by an evidentiary ruling. The ruling was reviewed for abuse of discretion, and if such an abuse was found,

---

12 U.S. v. Stuckey, 10 M.J. 347 (C.M.A. 1981) Bill of Rights applicable to service members; U.S. v. Johnson, 21 M.J. 553 (A.F.C.M.R. 1985) presumption exists that constitutional protections are equally applicable to civilian and military sectors.

reversal was required. Unless it was shown that the error was harmless beyond reasonable doubt. The court then held that because the partiality of the witness was relevant because it affected the weight of her testimony and because fact finders had been deprived of a chance to access her credibility the SGT's 6th Amendment rights were violated by the exclusion. The court reversed the decision of the criminal appeals court, set aside the findings of guilty and the sentence and returned the record of the trial to the Judge Advocate General of the Air Force.

The plaintiff points this out because similar behavior is displayed in his case, where there was a gag order, and the lack of military counsel delayed confrontation until after multiple egregious acts of UCI were conducted by the command making the environment non-conducive to being fair. Numerous witnesses called by the government fabricated their stories in order to obtain favors from the command, revenge, and to distract attention from other behavior. The commands actions prejudiced the plaintiff's rights to equality and fairness. COL Williams even after the trial had an incident where he utilized his weapon in a threatening manner against coalition forces for not obeying his commands, but no actions were taken against him by the convening authority. Despite his obvious anger issues, and the fear he and his command created on witnesses without the fear of repercussions in the plaintiff's case witnesses saw him as untouchable and dared not challenge his authority and/or verbalized wishes. Government witnesses from the plaintiffs unit were assigned to guard him after his trial while he was incarcerated temporarily in Bagram awaiting transfer to

Kuwait. Government witnesses who filed false official statements and committed perjury attempted to guard the plaintiff as well, in order to see him behind bars. CSM Harrington, and 1SG Braun even arranged before the plaintiff contacted his lawyer to have themselves added onto the guard list, and even visited the jail with MAJ Nichols to check on how the plaintiff was doing upon incarceration. Furthermore, while the plaintiff was incarcerated LTC Thompson while watching announced that COL Williams had given him two Brigade coins for him to present to the prosecution. These cumulative behaviors seem tremendously unusual and is not the normal behavior of people who knew the plaintiff for up to 15 years. This is clearly the behavior of people bent on revenge in order to have the plaintiff punished according to their will, to seek or acquire favors, and to distract attention from the egregious acts of UCI, fraud on the court, rules and laws in which they had broken. Once their malicious will was imposed upon the plaintiff they lined up to humiliate and embarrass him by watching him incarcerated for three days.

The CAAF has in the past taken a very strong stance against attempts to frustrate the testimony of witnesses, and has stated such attempts violate an accused's right to have access to favorable evidence. U.S. v. Drayton, 45 M.J. 180 (1996); U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986); U.S. v. Gleason, 39 M.J. 776 (A.C.M.R. 1994). In the Gleason case the court drastically reduced sentence where there was blatant unlawful influence on defense witnesses. Furthermore, military courts have also held that unauthorized influence on

witnesses, with respect to their testimony, violates Article 37 of the U.C.M.J., even though such influence is not specifically addressed in that provision.

Exerting influence on witnesses may also raise constitutional issues. Discouraging witnesses from testifying on behalf of the accused raises Sixth Amendment concerns in that it threatens the fundamental right to a fair trial, the right to compulsory process, the right to cross-examine and confront witnesses, and the right to the assistance of counsel. It also potentially violates Article 46 of the U.C.M.J., which assures the defense equal access to evidence.

The defendant never proved beyond a reasonable doubt that the UCI in the plaintiff's case didn't prejudice the proceedings. In the plaintiff's case one junior enlisted female received a summary court-martial resulting in her being sentenced to 10 days in confinement, and then she was chaptered out of the Army for not testifying against the Plaintiff, in addition to, her pleas for help from the command for sexual harassment were simply ignored, because the accused in that case was a witness in the plaintiffs case. Those who did testify against the Plaintiff received immunity. In one instance, a witness against the Plaintiff was protected by senior NCOs when she was caught apparently drunk in theater. That witness was later promoted before the trial. The unit created a climate of fear for those that supported the Plaintiff: SSG Francis revealed during interviews with Defense Counsel that she feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her Acting Commander, MAJ Nichols, and advised that she didn't have to talk to the Defense counsel. MAJ Nichols

was ultimately found to be a victim in the plaintiff's case. Additionally, CSM

Harrington told SSG Francis before the Defense interview not to provide "too

many details," or words to that effect. In Levite[13] the court noted: "Word travels

fast in the military, and these actions, in view of their specificity and content, were

so damaging as to render remote the possibility of a fair trial at that time."

While intentional and direct attempts to influence witness testimony in a

particular case are clearly prohibited, witnesses can be improperly influenced if

there is an implication or perception that witnesses testifying on behalf of an

accused will be cast in a negative light. U.S. v. Thomas, 22 M.J. 388 (C.M.A.

1986); U.S. v. Hall, 36 M.J. 1043 (N.M.C.M.R. 1993), where the trial judge erred

in not reopening sentencing hearing to consider evidence of possible command

influence on defense witness; trial judge permitted commander to sit in courtroom

to hear testimony. In the plaintiffs case the ACCA erred similarly, and the trial

judge permitted the command to be present at the trial. This issue was

addressed in the plaintiff eighth and final egregious UCI act comparison in his

complaint. U.S. v. Jones, 33 M.J. 1040 (N.M.C.M.R. 1990), where the case was

remanded for rehearing on sentence where it appeared that commander's

adverse actions against defense witnesses in earlier case might have had impact

on defense witnesses in accused's case. In U.S. v. Clemons, 35 M.J. 767

(A.C.M.R. 1992) the accused's commander's action of counseling four potential

defense witnesses concerning case amounted to UCI and his actions had chilling

effect on their testimony. Likewise, the pre AR 15 – 6 investigation counseling of

---

13 U.S. vs. Levite, 25 M.J. at 341

witnesses by personnel in command mantle positions, which is present in the plaintiffs Record of Trial and allied paperwork, obviously proves the presence of this chilling effect. Furthermore, in the Clemons case the error was cured by MJ's remedies at sentencing, inter alia, giving defense broad latitude and barring prosecution from calling witnesses in aggravation. Yet, no such cure was ever performed by the MJs in the plaintiff's case in order to correct this error.

The dangers associated with commenting on possible testimony of witnesses were made clear in U.S. v. Thomas, where the court addressed the possibility of massive command influence affecting literally hundreds of cases. In the plaintiffs case the four town hall meetings, and actions of his rear detachment had this same possible massive command influence which literally affected hundreds of witnesses. In the Thomas case, the commanding general had offered his thoughts on the propriety of officers and noncommissioned officers testifying on behalf of defendants. The court ultimately concluded that in cases where unlawful influence has been exercised, the findings and sentence should not be affirmed unless it appears, beyond a reasonable doubt, that the findings and sentence have been affected by that influence, otherwise they have found it necessary to consider much more drastic remedies, however, in the plaintiffs case no drastic remedies from the trial judge, nor the ACCA were ever considered or instituted in order to cure his trial from the taint of UCI. Instead, the findings and sentence were affirmed when there appears beyond a reasonable doubt that the plaintiffs case clearly displays that UCI has been exercised.

Fraud on the court had a substantial contributing effect on the findings of guilty and the sentence. The ACCA erred in failing to order a fact-finding hearing to assess the victim's credibility after they recanted their testimony, especially given the lack of physical evidence. In U.S. v. Edmond, 63 M.J. 256, 2006 CAAF Lexis 518 the service member subpoenaed a codefendant to testify at his court-martial. The codefendant was present at the courthouse but was questioned by the prosecution and essentially warned that if he testified as he intended, he would likely be charged with perjury. The witness then decided not to testify and left the courthouse without speaking to defense counsel. The prosecutor and defense counsel stipulated on the record that the witness prejudiced his Fifth amendment right against self-incrimination. The service member argued that the evidence showed prosecutorial misconduct in the "advisement" of the witness and also that his defense attorney had provided ineffective assistance. Defense counsel admitted that he should have done more to preserve the record concerning the witness. The court agreed and found that the prosecutor's intent was likely to influence the witness not to testify. Defense counsel was ineffective by failing to talk with a potentially exculpatory defense witness as a possible legitimate defense.

Violations of the plaintiff's Due Process Clause of the 14 Amendment. Jackson v. Virginia, ET AL. 443 U.S. 307; 99 S. CT. 2781; 61 L. Ed. 2d 560; 1979 U.S. Lexis 10 No. 78 – 5283 Supreme Court U.S. MAR 21, 1979 Argued June 28, 1979 Decided. In this case the inmate claimed that a Federal Habeas Court did not have to consider whether there was any evidence to support his

state court conviction, but had to determine whether there was sufficient evidence. The court held that, assuming the procedural prerequisites were satisfied, the inmate was entitled to habeas relief if there was evidence that no rational trier of fact could have found proof of guilt beyond reasonable doubt. The (Due Process Clause of the Fourteenth Amendment) protected a criminal Defendant against conviction except upon proof of reasonable doubt on every fact necessary to constitute the crime charged. The judgment of the appellate court reversing the district court's order granting habeas corpus relief to the inmate was affirmed.

<u>Ground Three – Exceptional Circumstances Which are so Fundamentally</u>

<u>Defective as to Result in a Miscarriage of Justice</u>

**FACTS SUPPORTING GROUND THREE**

The various malicious negligent acts by the defendant, e.g. the convening authorities inelastic attitude is displayed in their failure to provide the plaintiff with his R.C.M. 1105 Record of Trial (ROT), in addition to his R.C.M. 1105 Staff Judge Advocate Review (SJAR) during his incarceration, even after several requests. Furthermore, there lack of purging actions to remove taint from his record, demonstrates how the convening authority did not review the matters the plaintiff submitted, nor did they perform their Pre and Post Trial Responsibilities to the legal required standard. The plaintiff asserts just as the appellate did in U.S. v. Davis, 58 M.J. 100; 2003 CAAF Lexis 159 that by right, he is entitled to an individualized, legally appropriate, and careful review of his sentence by the convening authority.

41

The first egregious UCI act in Plumb was where witnesses believed investigators were trying to influence them.  The comparison with the plaintiff's case here is exactly the same, witnesses believed investigators were trying to influence them.

The secondly egregious UCI act in Plumb was where those same investigators prepared an inaccurate transcript of that surveillance which implicated the plaintiff in crimes he did not commit.  The comparison with the plaintiff's case here is where those same investigators prepared an inaccurate transcript of the investigation which implicated the plaintiff in crimes he did not commit.

The third egregious UCI act in Plumb was where commanders and supervisors alike warned witnesses away from the trial and the plaintiff.  The comparison with the plaintiff's case here is exactly the same, where commanders and supervisors alike warned witnesses away from the trial and the plaintiff.

The fourth egregious UCI act in Plumb was where witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense.  The comparison with the plaintiff's case here is exactly the same, where witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense.

The fifth egregious UCI act in Plumb was where government investigators denied the defense access to evidence and threatened defense counsel.  The comparison with the plaintiff's case here is exactly the same, where government

investigators denied the defense access to evidence and threatened defense witnesses.

The sixth egregious UCI act in Plumb was where at least one witness was told not to talk to defense counsel, while one government witness was merely encouraged to reconsider his statement and another was simply re-interviewed. The comparison with the plaintiff's case here is exactly the same, where at least one witness was told not to talk to defense counsel, while one government witness was merely encouraged to reconsider her statement and another was simply re-interviewed.

The seventh egregious UCI act in Plumb was Where government investigators obtained "emergency" approval for a wire surveillance which had been disapproved by the AF General Counsel. The comparison with the plaintiff's case here is where personnel in command mantle positions acting as unauthorized investigators apparently on their own decided to conduct a surveillance mission on a Senior Officer, which had not been officially approved by the Commander.

The eighth egregious UCI act in Plumb was where a government investigator socialized with a court-member immediately before trial. The comparison with the plaintiff's case here is where personnel in command mantle positions and/or accusers socialized with each other or witnesses as follows: Outside of the courtroom immediately before and after they testified at the plaintiffs Court-Martial trial; Before and after they committed perjury at the Article 32, Motions

trials, or plaintiffs Court-Martial trial; and Before and after they made false official statements during the AR 15 – 6 Investigation.

The improvidences of the plaintiff's pleas, e.g. in the plaintiff's case, there are three reasons why his pleas of guilty are being raised as improvident. These three reasons are as follow: Inconsistency actually exists to create variance between the alleged offense and the offense pleaded to; there is evidence that negates the plaintiffs guilt; and this case created a dilemma for the plaintiff, for whatever valid reason, he wished to plead guilty and at the same time present himself in as sympathetic a posture as possible to the sentencing authority. U.S. v. Peele, 46 M.J. 866 (CAAF 1997) the accused's attempt to plead guilty, and at same time mitigate his guilt, resulted in improvident plea.

The defendants improper granting of immunity, e.g. in the plaintiff cited that with testimonial immunity it is the constitutional minimum, Kastigar v. U.S., 406 U.S. 441 (1972). Rule 301(c)(1) and promises that in return for testimony, the government will not use that testimony against the witness in any later prosecution. Nor will any derivative use be made of the testimony. This is the preferred type of immunity in military practice because it affords the government the opportunity to obtain otherwise protected testimony and yet retain the option to prosecute the witness. But if the immunized witness is later tried, the prosecution bears a heavy burden of demonstrating that no use, or derivative use, has been made of the accused's immunized testimony. In this case it would be the immunized testimony of SPC Lindsey and SPC Dean. in New Jersey v. Portash, 440 U.S. 450 (1979); and U.S. v. Garrett, 24 M.J. 413 (C.M.A. 1987) the

prosecution satisfactorily showed that the evidence that it used at accused's retrial was not tainted by his immunized testimony given after the first conviction. The plaintiff cites these cases not because the government gave two witnesses immunity, and not even for the care inquiry conducted by the MJ on the plaintiff. The plaintiff cites these cases because the safest way for the prosecution to obtain immunized testimony and also prosecute the witness is to prosecute the witness first. An alternative is to obtain all of the evidence that it would use against the witness and then have the evidence certified and sealed before the witness testifies under the grant of immunity. At the later hearing to determine whether any derivative use will be made, the prosecution can present the "untainted" evidence it intends to use. However, the prosecution, the command, and the convening authority never prosecuted or intended to prosecute the witnesses it granted immunity to. It was solely bound and determined to prosecute the plaintiff according to its will. Furthermore, the MJ at the plaintiffs court-martial and the ACCA never determined where the immunized testimony of those two witnesses was true in law and fact. As stated before they've only looked at the impacts of actual UCI on the plaintiff which have been in error, and not the apparent and perceived aspects of UCI. The plaintiff strongly asserts that the MJ and the ACCA's lack of purging actions[?] in his case once again demonstrates how they have failed to remove taint from his trial and thus denied him the due process of the law.

The grant of immunity removes the threat of incrimination from the witness and thus the witness can be compelled, over objection, to testify. Failure to do

so may result in criminal or administrative sanctions. The grant should only require that the witness will testify truthfully. It should not spell out the contents of the testimony that the witness will give. The grant of immunity does not bar later prosecution for false swearing, perjury, or making false official statements. In R.C.M. 705(b), and U.S. v. Olivero, 39 M.J. 246 (C.M.A. 1994) the accused was prosecuted for committing perjury at Article 32 Investigation after being granted immunity; and the conviction was reversed for lack of direct evidence of perjury. The plaintiff points this out to bring up his next point, which is how witnesses were punished or denied favorable treatment in part because they associated with the plaintiff or supported his defense. The only witness who was prosecuted prior to the trial, threatened by the command in a counseling statement that depending on how she testified would depend on if she was granted leave or not, and then Chaptered out of the Army after being repeatedly punished or denied favorable treatment in part because of her association with the plaintiff and because she support his defense was SPC Chester.

An Article 13 violation can be predicated upon public humiliation of an accused, to include referring to an accused as a criminal in front of the unit. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994). This humiliation can even take place in a circumstance where the accused is not present at the unit during the references. U.S. v. Baigase, 50 M.J. 143, 152 n.3 (1999) (accused in pretrial confinement can be subjected to pretrial public humiliation even when separated from the unit due to pretrial confinement). This showed that the MJ abused his discretion in determining that the plaintiffs pre-trial humiliation did not constitute

punishment tantamount to any confinement credit.  U.S. v. Gregory, 21 M.J. 952

(C.M.R. LEXIS 2919, 1986).  The findings and sentence were affected by UCI

and the Military Judge did error in denying the Plaintiff's Motion requests to

dismissal all Charges and Specifications as an additional remedial measure.

U.S. v. Francis, 54 M.J. 636 (2000).  Thus assuring that the Plaintiff would be

incarcerated under a procedure which creates an impermissibly large risk that

the innocent will be convicted.  Bousley v. U.S., 118 S. Ct. 1604, 1610 (1998).

## CONCLUSION

The defendant since 1994 has acted on a continuum between negligence and

the very high standard of willful, arbitrary, or capricious conduct, and this conduct

amounted to a "reckless disregard" of the plaintiff's rights.  Louis v. VA, No C95-

5606, slip op. at 4-5 (W.D. Wash. Oct. 31, 1996).

The plaintiff has met his burden of production in showing that the defendant's

negligent actions were contrary to statue, settled case law, or valid regulation.

Furthermore, the plaintiff claimed several deprivations of constitutional rights as

follows:  The defendant lacked jurisdiction to afford the plaintiff a fair trial from all

illegal violation from all concurrently liable parties; the command influenced

errors amounted to gross error and constituted judicial usurpation of power, thus,

violating the plaintiff's constitutional rights; the plaintiff is wrongfully imprisoned

based on the lack of a fair fact finding procedure, and an Improper Legal

Standard; and the defendant created an atmosphere of terror and vengeance not

conducive to a fair decision.

Wherefore, the plaintiff subjects his GCM conviction to the U.S. District Court for the District of Columbia, and requests that a collateral review be conducted by this Honorable Court, as he asserts that his GCM acted without jurisdiction, that his substantial constitutional rights were violated, and that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice. This Honorable Courts Collateral Review should determine the following: whether the military has fully and fairly considered contested factual issues; review GCM convictions to determine whether the military acted within its proper jurisdictional sphere; review for violation of Federal Constitutional Standards that substantially violated the plaintiff's Constitutional rights, and if there were exceptional circumstances which are so fundamentally defective as to result in a miscarriage of justice. If during review this is discovered then the plaintiff's GCM conviction should be reversed; Additionally, review for alleged errors that constituted the "failure to observe that fundamental fairness essential to the very concept of justice; and whether the military courts gave adequate consideration to the issue raised in the plaintiff's habeas corpus proceeding, applying the proper legal standard to the issue."

The plaintiff further requests this Honorable Court to order his immediately release from incarceration without having to deal with the adverse actions adjudged by his GCM sentence as he awaits the final actions to be taken by this Honorable Court.

Finally, the plaintiff requests that the judge trying this cause under habeas corpus order the defendant to pay damages to the plaintiff based on the

discretion of this Honorable Court, for the following actual and punitive damages: the costs concerning bringing the defendant before her; all other costs of the proceeding; False Imprisonment since August 11, 2006, based on the defendants intent to confine the plaintiff. The plaintiff's confinement was caused by the defendant's intentional acts or some force set in motion thereby. Thus, the plaintiff may recover damages even though the plaintiff suffers no special damages - e.g., strip searches, injuries, loss of earnings, etc. However, if sustained, these damages are also recoverable. Therefore, the plaintiff is seeking the recovery of damages through the defendant's acts associated with him being wrongfully imprisoned for 21 months – e.g., taking away the plaintiff's liberty and freedom of action without just cause; intentionally/willfully attacking the plaintiff's reputation arbitrarily; strip searches; "pat downs"; drug tests; earning and earning capacity; pain and suffering; loss of enjoyment of life; loss of consortium with the plaintiff's family; negligent infliction of emotional distress; irreparable damages to the plaintiff's military and civilian career prospects; embarrassment and humiliation, both personally and professionally; and damages to the plaintiff's Name. All of the damages are the actual result of the intentional and malicious behavior or "deliberate indifference" proximately caused by the defendant's negligence. This relief is raised pursuant to 28 U.S.C. 2441.


FREDRICK M. GAMBLE
Plaintiff


49

Fredrick M. Gamble (Plaintiff)              )        Writ of Habeas Corpus Dismiss
MAJOR, U.S. Army, (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)       )        All Charges and Specifications
Regional Confinement Facility              )        and seek Relief from Damages
P.O. Box 305                                        )        Caused by an Improper Legal
Fort Sill, OK 73503-5305                      )        Standard
                                                            )
            v.                                             )
                                                            )
UNITED STATES ARMY (Defendant)     )        1 July 2007

## RELIEF SOUGHT

The Plaintiff in the above case requests that the Army Court of Criminal Appeals (ACCA) direct the Judge Advocate General to order a dismissal with prejudice, of all charges, and specifications due to findings against command influenced errors that amounted to gross error and constituted judicial usurpation of power, thus, violating the constitutional rights of the plaintiff. This relief is raised pursuant to Article 67, and 37(a), U.C.M.J.

Assuming that causation is proven, "actual damages" sustained by the individual as a result of the failure, but in no case less than $1,000 are recoverable. 5 U.S.C. 552a(g)(4)(A). The individual may bring a civil action based upon "Intentional/Willful Standard and Actual Damages in Accuracy and Other Damages Lawsuits whenever any agency…fails to comply with any other provision of this section, or any rule promulgated there under, in such a way as to have adverse effect on an individual. 5 U.S.C. 552a(g)(1)(D). Therefore, the Plaintiff seeks relief against each defendant named: The U.S. Army, The Alaska Army National Guard, and the Alaska Youth Corps Program for their negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974. In addition to, providing the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding in violation of the Freedom of Information Act of 1964.

Likewise, the Plaintiff seeks relief for damages caused by individuals (identified in individual Torts) in the Plaintiffs chain of command and unit for Wrongful Infliction of Emotional Distress; and Wrongful Invasion of Privacy based on a public disclosure of private facts, and a publication placing the plaintiff in a "false light." The Plaintiff requests that the ACCA award him and his family based on this writ the sum of no less than $20,000,000 from the defendants due to the fact that these violations created comments that severely damaged the Plaintiffs military and civilian career prospects, caused the Plaintiff and his family personal and professional mental distress, embarrassment, and humiliation. Furthermore, these constitutional violations directly led to the Plaintiffs wrongful incarceration and wrongful dismissal from the U.S. Army. The defendants used

command influence unlawfully to take away the Plaintiffs Career, Good moral character, Good moral name, and financial lively hood. Therefore, the Plaintiff also seeks relief for the following damages: to his reputation; to his name, material and moral; lost revenue; general; punitive; and real.

The Plaintiff is seeking extraordinary relief from the ACCA based on the following: The plaintiff has been wrongfully incarcerated based on the denial of both Unlawful Command Influence, and Article 13 Motion's to dismiss, and just as in Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986) the normal appellate channels are not adequate in seeking immediate relief from the petitioner's wrongful incarceration; The convening authority has denied all administrative remedies the plaintiff has offered in order to obtain relief; The plaintiff and his family have incurred various types of damages, and constitutional violations under the Privacy Act of 1974 and the Freedom of Information Act of 1964.

The plaintiff requests the following: De Novo review conducted by ACCA; Appellate counsel prepares a final brief; and present oral argument at the call of the Court.

## BURDEN OF PROOF AND STANDARD OF PROOF

The Petitioner bears a heavy burden of showing a need for extraordinary review of the case, and that the alleged errors amounted to gross error and constituted judicial usurpation of power.  That in turn normally requires that the petitioner show that the complained of action was contrary to statue, settled case law, or valid regulation.  The Burden of Proof rests on the Plaintiff in this writ to prove that if a mixed question of fact and law turns on a historical fact (for example, if the determination of the voluntairness of the confession by the Plaintiff or by the material witnesses in his case turns on whether a certain promise was or was not made by the prosecution and by his chain of command), then both the supreme court and the federal district court in a non Antiterrorism and Effective Death Penalty Act (AEDPA) case such as the Plaintiffs would defer to the military courts findings with regard to that fact unless:  (1) There is no finding; (2) the finding is inadequate or unreasonable (e.g., because there is no or too little evidence to support it or because the fact-finding procedure was unfair; or (3) the finding was made in the process of applying an improper legal standard.  If one of these exceptional circumstances is present and the existing record permits, the Supreme Court may, and a federal district court on habeas corpus will have to, make its own finding in service of a final resolution of the case.  In Beck vs. Ohio, supra, 379 U.S. at 92 – 93; Ashcraft vs. Tennessee, 322 U.S. 143, 145 (1944) (Court makes its own factual analysis because "record discloses that neither the trial court nor the Tennessee Supreme Court actually held as a matter of fact the petitioners' confessions were "freely and voluntarily made'").  If the Plaintiff meets his burden of prove then burden of pursuance transfers to the defendant to proof beyond a reasonable doubt that the petitioners' confessions were "freely and voluntarily made," Ashcraft v.

Tennessee, 322 U.S. 143, 145 (1944), and made without a promise of favorable actions by the Prosecution, or Command.

FACTS

On January 11, 2007 the Plaintiff was sentenced to forfeiture of all pay and allowances, two years incarceration, and dismissal from the U.S. Army on the following charges: Multiple counts of Adultery, Multiple counts of violating General Order Number 1, Fraternization, Indecent Assault, Indecent Language, Conduct Unbecoming of an Officer and a Gentleman, and Multiple counts of Maltreatment of Subordinates. This sentence was imposed on the Plaintiff during a General Court-Martial held in Bagram Airfield Afghanistan, presided over by a military judge and a court-member panel made up of field grade officers in the 10th Mountain Division, which found the Plaintiff guilty of six out of six charges, and seven out of nine specifications.

Prior to the trial the Plaintiff had sought relief from the U.S. Army with a Letter of Resignation filed in November 2006, but his resignation was denied upon the results of his trial. However, on the eve of trial, the Department of Army, through the Army Review Board Agency, expressed interest in delaying the trial in order to potentially accept the Plaintiffs resignation. Although the military judge rejected the request for a delay, this would have saved the Government the expense of the trial and resulted in no jail time for the Plaintiff.

On 29 December 2006, the Plaintiff also filed two motions to dismiss, with prejudice, all charges and specifications to his case due to the following: 1) The appearance of unlawful command influence, as well as actual unlawful command influence. This motion was raised pursuant to RCM 907(a); 2) Violation of Article 13, U.C.M.J., or, in the alternative, in the event of conviction, grant credit to the accused against the adjudged sentence. This motion was raised pursuant to R.C.M. 906(a) and 907(a). However, in January 2007, the military judge denied both motions prior to the trial by General Court-Martial. Now based on the sentencing of more than one year the whole trial and the motions are under appeal.

The Plaintiff is a member of the Alaska National Guard currently on Title 10 status. At the time of the majority of the alleged offenses, the Plaintiff was serving as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in the case are assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R. Steven Williams commands the NCE and NSE is a subordinate command in his Brigade (BDE). CSM Pamela Harrington serves as the Command Sergeant Major for the NSE. 1SG Robert Braun serves as the First Sergeant for the NCE. Each named individual served in the same capacity at all times relevant to this writ.

Charges were preferred in this case on 19 AUG 2006 by MAJ Michael Sullivan. The charges were referred to trial by general court-martial by MG Freakley on 13 November 2006. The Plaintiff was reassigned to Bagram Airfield (BAF), Afghanistan, before charges were preferred in this case. He returned to KAF, for approximately one week, to attend the article 32 hearing, but otherwise remained at BAF, awaiting trial for a period of roughly five months.

When the allegation of the Plaintiff being in a female barrack arose to the attention of CSM Harrington, she alerted 1SG Braun of the situation. The two took it upon themselves to conduct a so-called "preliminary investigation" on the matter. This investigation included conducting surveillance of a certain female barrack late into the evening and early into the morning. Then based on no results from their stakeout to ensure the Plaintiff wasn't going into the female barracks after hours, CSM Harrington began to interview certain female members of the units to determine if they had any information relevant to the allegations.

During the course of this so-called "preliminary investigation," CSM Harrington questioned SSG Jacqueline Tyson. During the course of the interview, SSG Tyson advised SGM Harrington that she (Tyson) had no information relevant to the investigation beyond rumor and speculation. SGM Harrington, apparently believing that SSG Tyson was withholding information, informed SSG Tyson that, "if we later find you are hiding something, COL Williams said we will be giving you an Article 15," or words to that effect. Based upon the context of the conversation, and the demeanor of CSM Harrington, SSG Tyson perceived this admonishment as a threat that she would face adverse action if she did not provide information detrimental to the Plaintiffs case.

After CSM Harrington was unable to persuade SSG Tyson to provide information in the case, 1SG Braun later approached SSG Tyson. 1SG Braun first advised SSG Tyson that the Plaintiff was a "psychological predator," and that SSG Tyson should provide information about the Plaintiff. He told SSG Tyson that the Plaintiff was "a bad guy and needed to go down," or words to that effect. SSG Tyson again advised that she knew no facts and refused to provide references to rumor and speculation that were circulating around the post. At this point, 1SG Braun advised SSG Tyson that if she did not provide the rumor and innuendo, "COL Williams said she would be receiving an Article 15 if it later turned out she was withholding information," or words to that effect. Based upon the context of the conversation, and the demeanor of 1SG Braun, SSG Tyson considered this admonishment a threat that she would face adverse action if she did not provide information detrimental to the Plaintiff.

CSM Harrington and 1SG Braun interviewed a majority of the alleged victims in this case during and after their so-called "preliminary investigation." They also interviewed other unit personnel. During this phase of the investigation, CSM Harrington interviewed SSG Peggy Prado. During the interview, CSM Harrington

told SSG Prado that she (Harrington) believed Prado was withholding information about the Plaintiff. CSM Harrington then told SSG Prado that if Prado did not reveal the requested information about the Plaintiff, SSG Prado would be facing an investigation/action regarding Prado's alleged relationship with MSG Ed Lopez. SSG Prado viewed this as a threat and became emotionally overwhelmed by the pressure brought to bear by the interview.

On 25 and 26 August 2006, and 28 and 29 September 2006, "Town Hall Meetings" were convened for NCE and NSE, respectively, for one of the two days each month. Several versions of the meetings were held on the target days to accommodate all members of the unit and the different shifts they worked. One of the issues discussed at the meetings included a briefing by the Commander, COL Williams, regarding violations of General Order Number One, and the Plaintiffs case specifically. During this portion of the presentation, COL Williams advised all attendees that he would address all violations by seeking the maximum punishment available. COL Williams then went on to tell the group that "we have an officer"[1] who has chosen to violate General Order Number One and is now facing charges which include adultery, fraternization, conduct unbecoming an officer and gentleman, and sexual harassment, among others," or words to that effect. Most of the attendees knew COL Williams was referring to the Plaintiff because the Plaintiff was not at the Town Hall Meetings, the various references to the officer in question clearly indicated the Plaintiff, and because there had been much discussion at all levels within the unit about the Plaintiff's case at the time preceding and between the Town Hall Meetings. Attendees described COL Williams' demeanor during the briefing as "livid" and "beyond pissed." Some subordinate members of the unit took the briefing as a pronouncement of the Plaintiff's guilt by the Commander and prejudgment as to punishment. This group included 1LT James Johnson, MSG Ed Lopez, SSG Kim Francis and SSG Jorge Vega. Nearly all listed witnesses for the Government during the Plaintiffs General Court-Martial attended these Town Hall Meetings.

On 1 AUG 2006, COL Williams addressed the Plaintiff's case with his "core staff." This discussion took place in conjunction with one of the unit's daily Commander's Update Briefings, or "CUBs." The following Individuals attended in their Brigade level capacities: MAJ Lee Knowles, NCE S-4; MAJ Rob Barr, NCE S-1; MAJ Chad Parker, NCE S-2; MAJ Jeff Roach, NCE S-3; LTC Raleigh Jones, NCE S-5, MAJ Richard Koch, the Chaplain, CSM Robert Averett, and as of 31 JULY 2006, the newly appointed BDE XO, LTC Michael Thompson. MAJ KIM, NCE S-6 most likely was in attendance as well. This was the first day that the Plaintiff was ordered to show LTC Thompson the ropes about the Brigade XO

---

[1] In referring to "this officer," COL Williams also called him "my right hand man" and "an officer since transferred to Bagram," presumably using different references at different sessions of the Town hall meetings.

job, but as the Plaintiff was sitting in the back of the room (as he had given his normal seat to LTC Thompson) waiting for the briefing to begin. COL Williams came into the room told the Plaintiff to come with him outside into the hallway. COL Williams then excused the Plaintiff from needing to attend the meeting by saying "you don't need to be here for this" or words to that effect. COL Williams then proceeded back into the meeting room and said he was serious about violations of General Order Number One. He also told the group that the Plaintiff had violated General Order Number One, listed each of the charges pending against the Plaintiff, and said that he regretted having to take action against the Plaintiff. This meeting lasted about fifteen minutes. MAJ Koch, MAJ Barr, MAJ Parker, MAJ Roach, CSM Averrett, and LTC Thompson were all on the Government witness list against the Plaintiff during his court-martial.

Since the case has developed, nearly all members of the senior staff, to include COL Williams, have referred to the Plaintiff as a "predator," typically while in each other's company in informal settings. Indeed, this term was used so frequently by members of the senior staff to describe the Plaintiff that one senior staff member characterized it as "the" term by which to refer to the Plaintiff. COL Williams has also expressed the opinion, in the presence of his senior staff, that the Plaintiff should get five to ten years for his offenses. Senior staff members have attributed such statements about confinement to COL Williams as well.

During the week of 25 December 2006, the Plaintiff's Defense counsel conducted witness interviews at KAF in order to raise motions for Unlawful Command Influence and Article 13 violations. Several witnesses (not alleged victims) refused to meet with Defense counsel. The Staff Judge Advocate encouraged each hesitant witness to meet with the Defense and secured all requested interviews for the Defense. Among other fact witnesses, the Defense interviewed SSG Kim Francis. SSG Francis provided information favorable to the Plaintiff's case. The day after the interview, SSG Francis returned to the interview room and revealed that she now feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her acting Commander, MAJ Nichols, and advised that she did not have to talk to the Defense counsel. MAJ Nichols is an alleged victim in the Plaintiff's case. She further advised that her Sergeant Major, CSM Harrington, told her before the interview not to provide "too many details," or words to that effect.

The three witnesses who refused to meet with the Plaintiff's Defense counsel upon initial request by the Non Commissioned Officer in Charge (NCOIC) of the KAF Legal Office were the following: CPT Bingley; SFC Arnett; and SSG Cuyar. After encouragement by the KAF Staff Judge Advocate, SFC Arnett interviewed with the Defense, but conditioned participation upon having the Staff Judge Advocate (SJA) in the room for the interview. The Plaintiff's Defense counsel agreed to this condition. SSG Cuyar agreed to meet under the same condition, and the Defense agreed to the condition again. The Defense withdrew its

request for the interview with CPT Bingley.  SFC Arnett refused to meet with the Defense in the first instance because "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what the Plaintiff did in this case," or words to that effect.

The Alaska Army National Guard unit currently deployed to Kandahar Airfield (KAF) from Fort Richardson, Alaska, is composed of a group which includes Soldiers, both full-time and part-time Guard members, who have served for years together in Alaska.  They see each other on a frequent basis within their community and on duty and compete with each other for promotion and career advancement on a more static basis than an active Army unit competes because they are not subject to the same frequency of reassignment as the active Army members.  Consequently, Alaska Guard members currently deployed to KAF can expect to return to Alaska at the conclusion of the deployment and work under the same chain of command for many years into the future.

LAW

The Plaintiff relies on the following authorities in support of his writ:

Freedom of Information Act, U.S. Code, 552, (1966)
Federal Torts Claims Act
U.S. vs. Gore, 60 M.J. 178 (2004)
U.S. v. Simpson, 58 M.J. 368 (2003)
U.S. v. Stoneman, 57 M.J. 35 (2002)
U.S. v. Biagaise, 50 M.J. 143 (1999)
U.S. v. Ayala, 43 M.J. 296 (1995)
U.S. v. Gleason, 43 M.J. 69, 73 (C.M.A. 1994)
U.S. v. Stombaugh, 40 M.J. 211 (C.M.A. 1994)
U.S. v. Levite, 25 M.J. 334, 338 – 339 (C.M.A. 1987)
U.S. v. Rosser, 6 M.J. 267 (C.M.A. 1979)
U.S. v. Francis, 54 M.J. 636 (Army Ct. Crim. App. 2000)
U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994)
U.S. v. Cruz, 20 M.J. 873 (A.C.M.R. 1985)
U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990)
U.S. v. Smith, 53 M.J. 168 (2000)
U.S. v. Palmiter, 20 M.J. 90 (C.M.A. 1985)
U.S. v. Washington, 42 M.J. 547, 562 (A.F. Ct. Crim. App. 1995)
U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994)
U.S. v. Shepherd, (C.C.A. LEXIS 189, 2002)
U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986)
Clarke v. Breckenridge, (C.M.R. LEXIS 10, 1991)
MacLean v. U.S., (C.C.A. LEXIS 290, 2003)
Bousley v. U.S., 118 S. Ct. 1604, 1610 (1998)
Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963)
Rogers v. Richmond, 365 U.S. 534, 547 (1961)

Beck v. Ohio, Supra, 379 U.S. at (1992 – 1993)
Ashcraft v. Tennessee, 322 U.S. 143, 145 (1944)
U.S. v. LTC Joseph E. Wilson Jr., (C.C.A. LEXIS 165, 2006)
U.S. v. Francis, 54 M.J. 636 (2000)
MacLean v. U.S., (C.C.A. LEXIS 290, 2003)
U.S. v. Harvey, 60 M.J. 611 (C.C.A. LEXIS 159, 2004)
U.S. v. Flynn, (1998)
Cummings v. Dep't Navy, 279 F. 3d 1051, 1053-58 (D.C. Cir. 2002)
Feres v. U.S., 340 U.S. 135, 146 (1950)
U.S. v. Brown, (1954)
Article 67, U.C.M.J.
Article 37(a), U.C.M.J.
Waller v. Swift, 30 M.J. 139 (C.M.A. 1990)
McCray v. Grande, 38 M.J. 657 (A.C.M.R. 1993)
Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R. 1992)
Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986)
U.S. v. Aurich, 31 M.J. 95 (C.M.A. 1990)
U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990)
U.S. v. Ohrt, 28 M.J. 301 (C.M.A. 1989)

## Witnesses/evidence

Plaintiff requests the witnesses on the Defense Witness List (Amended)[1] dated 28 December 2006 be produced and present for oral argument at the call of the Court.  (Attachment 1)  In addition, the plaintiff requests the following evidence produced for this Writ:

- U.S. vs. Gamble Defense Motion to Dismiss All Charges and Specifications (Unlawful Command Influence), 29 December 2006 (Attch 2)
- U.S. vs. Gamble Defense Motion to Dismiss All Charges and Specifications (Article 13, U.C.M.J.), 29 December 2006 (Attch 3)
- VMI Publishing Agreement, 29 DEC 2006 (Attch 4)
- MAJ Barr and 1SG Braun Email with attachments, 1 AUG 2006 (Attch 5)
- 1SG Braun note to SPC Chester (Attch 6)
- CJTF-76 Policy Memorandums dated 21 FEB 2006 (Attch 7)
- Memorandum flagging the plaintiff for adverse action pending the result of an AR 15 – 6 Investigation, 30 JUL 2006 (Attch 8)
- Report to Suspend Favorable Personnel Actions (Flag), 30 JUL 2006 (Attch 9)
- Military No-Contact Order, signed on 31 JUL 2006 with no date (Attch 10)
- Memorandum of notice of intent to impose Adverse Administrative Action dated 18 AUG 2006 (Attch 11)
- Memorandum of notice of intent to impose Adverse Administrative Action no date received on 19 AUG 2006 (Attch 12)
- Memorandum of Counseling from CJTF-76 Chief of Staff dated 28 AUG 2006 (Attch 13)

- Report to Suspend Favorable Personnel Actions (Flag), dated 29 AUG 2006 (Attch 14)
- Relief for cause memo, dated 28 AUG 2006 (Attch 15)
- Memorandum request for clemency dated 7 May 2007 (Attch 16)
- Clemency Letter to CJTF-82, dated 20 Mar 2007 (Attch 17)
- General Court-Martial Order Number 5 dated 9 May 2007 (Attch 18)
- Clemency Letter to MG Ralston, dated 15 May 2007 (Attch 19)
- Letter of Resignation, 17 Nov 2006 (Attch 20)
- Book Review by the Critic (Attch 21)
- Directorate of Emergency Services, Fort Sill, Oklahoma Manual for the Guidelines of Inmates paragraph 2-4 Commander's Letter to Families. Page 10 (Attch 22)
- Memorandum to request leave dated 15 Nov 2006 (Attch 23)
- Memorandum to request for Deferment of Automatic and Adjudged Forfeitures, dated 11 Jan 2007 (Attch 24)
- Memorandum response to request for Deferment of Forfeitures dated 22 Jan 2007 (Attch 25)
- Memorandum response to request for Deferment of Forfeitures for six months dated 22 Jan 2007 (Attch 26)
- KTUU, Channel 2 News (Anchorage, AK) bulletin, 12 FEB 2007 (Attch 27)
- Evidence of COL Williams UCI note to LTC Gary Thomas taken from AR 15 – 6 file under MAJ Parker section (Attch 28)

## ARGUMENT

The Plaintiff believes that analysis of the exceptional circumstances present and existing in his record, reference confessions by the Plaintiff and by the material witnesses would raise a mixed question of fact and law. In fact, it would turn on both a historical fact in determining the voluntairness of the confessions, and whether certain promises were or were not made by the prosecution and by the chain of command to their witnesses. Furthermore, the Plaintiff believes that based on habeas corpus this Honorable court will not defer to the military courts findings based on the record disclosing that the Military Court that adjudged the Plaintiff during his General Court-Martial did not actually hold as a matter of fact if the petitioners' confessions were "freely and voluntarily made." Beck vs. Ohio, supra, 379 U.S. at 92 – 93, and Ashcraft vs. Tennessee, 322 U.S. 143, 145 (1944). Therefore, this Honorable court must make its own finding in service of a final resolution in the Plaintiffs case because of two exceptional circumstantial reasons. First, the findings are inadequate or unreasonable based on the fact-finding procedure being unfair, and secondly, the findings made were in the process of applying an improper legal standard.

In a rare example of an appellate court reversing a case due to improper preferral of charges, the court in U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990) noted that the commander's probable cause to prefer charges may be based upon incompetent, inadmissible, or even illegally obtained evidence, but that the

prosecution has a professional duty to ensure that baseless charges do not result in a denial of due process. The court concluded, that under the facts of this case, the aggregation of legally and factually unsupportable charges denied due process even as to the valid charges. In doing so, the court noted that the mere allegation of baseless charges may influence the fact finder by suggesting that the accused is a bad character.

In Waller v. Swift, 30 M.J. 139 (C.M.A. 1990) (court ordered accused released from post-trial confinement where convening authority improperly commuted BCD to 12 months' confinement); McCray v. Grande, 38 M.J. 657 (A.C.M.R. 1993) (court granted habeas corpus relief for improperly imposed post-trail confinement); Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R. 1992) (accused granted habeas corpus relief by ordering him released from confinement and mandamus relief to compel the respondent to timely consider his deferment request). Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986) (noting the inadequacy of normal appellate channels, court granted extraordinary relief to convicted servicemember whose request for deferment of confinement had been denied by convening authority).

### Unfairness of the fact-finding procedure

LTC Thomas's AR 15 – 6 Investigator

On the DA Form 1574 LTC Thomas filled out, page 1 of 4 clearly shows that he was appointed by COL R. Stephen Williams as the AR 15 – 6 Investigating Officer (IO) in the Plaintiffs case on 30 JUL 2006. That same page goes on to show that the investigation commenced at KAF at 0800Z 31 JUL 2006, and LTC Thomas finished gathering/hearing evidence at 1900Z 7 AUG 2006, and completed his findings and recommendations at 0800Z 10 AUG 2006.

If a reasonable person were to conduct an analysis of the IOs fact-finding procedure they would determine that he concluded hearing evidence to charge the Plaintiff and file his report at 1900Z 7 AUG 2006, but actually finished gathering evidence on 31 JUL 2006. Reasonable doubt should be raised here as the investigator only used one day to investigate all of the facts of the case. This is proven by the fact that LTC Thomas was appointed to conduct an informal investigation based on allegations against the Plaintiff on 30 JUL 2006, yet he managed to gather all pertinent and unbiased information for the entire case by the end of 31 JUL 2006. In addition to that, he made up a list of all potential witnesses he intended to interview based on questions raised from that information, and then provided a copy of that list to MAJ Barr the Brigade S1 either that evening or the next morning.

If the court examines Evidence Attachment 5 an email from MAJ Robert Barr to 1SG Ronald Braun sent Tuesday, August 1, 2006 at 6:09 AM local time subject Interview schedule the court should find several facts that stand out.

First MAJ Barr sends the email to 1SG Braun the morning of 1 AUG 2006 saying "Confidential time schedule, please ensure that NCE Soldiers are present at the TLS Building at the designated time. Here MAJ Barr demonstrates the knowledge either by training or experience that information in an ongoing investigation is confidential and falls under the Privacy Act, albeit, he used an unclassified computer to send the message. Secondly, 1SG Braun forwards MAJ Barr's email over an unclassified system as well but addresses 16 different people in the to category and CSM Harrington in the Cc: category, with an email containing classified information during an ongoing military procedure. Furthermore, 13 of the 16 personnel were called as government witnesses during the procedure, and 1SG Braun should have known by training or experience that such information should only be giving to people with a need to know, or were acting in an official capacity and an unclassified system does not offer that type of protection. However, even more curious in both of these specific instances would be why not one but two government witnesses are acting on behave of the IO who has access to the same computer system, or could personally contact each individual himself identifying his role as the IO and informing them of an informal investigation that he's been ordered to conduct.

The next fact that stands out, as stated above is that LTC Thomas some how gathered enough "unbiased" facts in the Plaintiffs case to start interviewing possible prosecution and defense witnesses beginning at 1100Z 2 AUG 2006, and he remarkably did this in the course of one day. The AR 15 – 6 Investigation guide clearly states that key witnesses should be interviewed last during the procedure. This is done to gather enough information to ask probing questions in order to find the truth and validity to all evidence gathered throughout the investigation, and to determine if statements are made voluntarily or not. At this point PFC Edwards (at the time) was the only witness who had officially filed a complaint in the form of an EEO complaint filed on 30 JUL 2006. However, she was the primary witness used throughout the Plaintiffs informal investigation and throughout his General Court-Martial by the Prosecution. Yet she was the very first witness to be interviewed by LTC Thomas who one would have to reasonably assume never looked into her credibility as a witness, nor did he investigate the facts behind her statements. In fact, the Plaintiffs record clearly shows that on 2 AUG 2006 at 1110Z LTC Thomas interviewed PFC Edwards his one and only time in what he thought was a fair fact-finding procedure, in order to gathering his evidence to determine his recommendation for the next higher level.

Moreover, the record clearly shows that on 5 AUG 2006 at 1030 AM local time SGT Robin Munnlyn comes in with a typed sworn statement she wants to make sworn to LTC Thomas. First, a reasonable person would have to think how does she know what questions are going to be asked, or even what the specific questions are for her based on the IO's investigation. Secondly, on her statement she makes statements attributed to SPC Diana Chester which stated "A few days later she told me how – she was going to get promoted and I was like but how

11

cause I knew she wasn't MOS's Q'd and I was like well that is cool – and she started the conversation out with – Yeah am going to be Corpal before this deployment is over." Then she went on to say that 1SG Braun made a comment to her about "A year is a long time and a person can get very lonely, and if there was anything she needed to let him know" and I asked her what did he mean by that and she said that he wanted to have sex with her – and I asked her but your not going to right and she made the comment of "that she would is she got desperate enough." The Plaintiff even gave COL Williams the AR 15 – 6 appointing authority who has the power to expand the investigation, and who was suppose to be acting as a neutral party a copy of a note from 1SG Braun to SPC Chester labeled as Evidence Attachment 6. This note states "Ron 841 – 9432" (1SG Braun's KAF Cell Phone Number), then says "if you would like some company today! ☺." Yet, COL Williams nor LTC Thomas expanded the investigation in order to look into the truth of the matter, despite their duty as outlined in CTFJ-76 Command Policy Memorandums labeled as Evidence Attachment 7.

A reasonable person could say maybe the IO didn't know this information, yet the Plaintiff contests that a more thorough and fair investigation would have revealed all of the facts found in the Plaintiffs existing record. Furthermore, LTC Thomas did interview SPC Chester on 7 AUG 2006 at 1055 AM Local, and he asked her this question "Were you ever forced, threatened, or misled to have sexual intercourse with anyone or to participate in a sexual act at any time whether it actually ever occurred or not? (to include threats of disciplinary action, undesirable duty, or threat of suspension of favorable action (promotion, award, privileges, etc.) or were you offered to exchange any of these for sex or sex acts)? SPC Chester replied "yes." LTC Thomas doesn't ask anymore questions in his interview reference this question, one would have to assume he wrote down the following response to SPC Chester's statement next to her written "yes" in the same handwriting are the words, "she stated she has been sexually harassed, but not by the Plaintiff." This should have caused LTC Thomas to expand the investigation based on the facts that he was ordered by COL Williams in his appointment letter as the investigating officer on 30 JUL 2006 to "Use Chapter 4, AR 15 – 6, to guide your investigation. You may consider any evidence in your investigation that you determine to be relevant and material to the allegations. You will make appropriate findings and recommendations based on the facts gathered by your investigation." Therefore, the IO has no excuse not to have expanded the investigation to gather all of the facts pertaining to this case.

The next fact that stands out is even with the sworn statement made by SGT Munnlyn on 5 AUG 2006 at 1030 A.M. local time, SFC Sherry Butters makes another statement on 5 AUG 2006 at 2:47 PM Local time in reference to comments also attributed to SPC Chester. SFC Butters statement says that "while talking with SSG Tyson in her room, SPC Chester came in upset and started complaining that if she has a friend that she likes to eat with and talk with

she doesn't see anything wrong with that and that this was wrong and just because she turned down a certain person that was asking for sexual favors that now this was happening. She also went on to say everyone knows what those two are up to late at night walking around and waiting on the picnic table late at night." This obviously should have shown the IO with now two witnesses on the same day let alone two days before he interviewed SPC Chester on 7 AUG 2006, that something more was going on in the Plaintiffs case that included two additional personnel, one who specifically asked for sexual favors from SPC Chester, but was turned down, and the other that sat with that person on the picnic table at night. Based on SGT Munnlyns statement a reasonable person would assume that person turned down for sex was 1SG Braun, and the person who sat with him late at night on the picnic bench was CSM Harrington.

LTC Thomas had already interviewed CSM Harrington on 3 AUG 2006 at 0500z and one would have to assume that through his thorough and fair fact-finding procedure that he didn't ask because he simply didn't know what questions to ask CSM Harrington, because he never brought up those questions despite the CSM apparent knowledge of PFC Edwards statements almost verbatim during her sworn statement. CSM Harrington also states that she had "spoken to the individuals in room 3 (Prado, Tolliver, Thompson) and other potential eye witnesses" yet she was never appointed as an investigating officer by the chain of command to conduct herself in such actions. The fact that she is even allowed to get so personally and professionally involved in a legal process while holding the mantle of command authority in unto itself is not only amazing, but it's unlawful as well, and should raise reasonable doubt. If the court also analysis why CSM Harrington got involved and for what reasons it should simply examine 1SG Braun's sworn statement on 4 AUG 2006 which clearly states that "Approximately 4 weeks ago SGM Harrington conferenced with CSM Averett and myself that she had heard from females within the barracks that the Plaintiff had been seen inside the female barracks and in possibly in just a towel coming out of the latrine. With this information it was decided that SGM Harrington and I would stand watch outside the female barracks to watch for the Plaintiff possibly entering the females barracks." He then later states "We witnessed SPC Chester leaving the female barracks walking all the way around the building before SGM Harrington decided to follow her into the parking lot to ask what/where she was going. I met up with them in the parking lot and waited for them to finish their discussion before being asked by SGM Harrington to help walk Chester over to the gym. Once seeing her into the gym SGM Harrington and I walked back to the picnic table in MOD Housing to continue observation of female billeting." Not surprisingly the facts state they were there to watch for the Plaintiff because of the reasonable possibility that he might be in the female barracks latrine area with just a towel on. Therefore, two lower ranking Soldiers decide to try to stakeout the barracks to ensure that a Senior Soldier who they have no command influence over does not do something. Then they leave their stakeout that they were concerned about in order to walk SPC Chester to the gym, and then 1SG Braun proves who SPC Chester was talking about in SFC Butters

statement, when he stated that the CSM Harrington and him then went back to the picnic table in MOD Housing until late hours of the night, and in his case into the early morning.

However, it is what 1SG Braun says next that proves more UCI and the unfairness of the fact-finding procedure in this case. 1SG Braun then states in his sworn statement that "within the past four weeks" PFC Edwards had communicated with him, and "throughout the past weeks SGM Harrington has spoken with PFC Edwards and SPC Selden in my office at the US NCE to speak to them privately about writing a statement. At that time they said they would consider writing a statement but needed to think about it according to SGM Harrington. Later after SPC Selden decided to submit a statement shortly thereafter PFC Edwards decided to submit hers as well." The court should find it quite odd that CSM Harrington and 1SG Braun two accusers in this case worked on getting witnesses to make statements from anywhere from a few weeks, upwards to anywhere around a month. The same two people that three SSGs accused of threatening them, the same two people whom one was accused of sexually harassing a person, yet no adverse action was acted upon against that individual despite the written policy, and even with the same statements and witnesses that were used to convict the Plaintiff, and with hard evidence in the form of a note. In fact, that individual becomes a helper for the IO during his investigation against the Plaintiff which, took him and CSM Harrington anywhere up to a month to illegally produce so called "evidence" that the IO simply somehow, came up with in a day. In addition, 1SG Braun and CSM Harrington had access to the witness list, and even more amazingly weren't asked any questions during the AR 15 – 6 investigation, nor anywhere in the proceedings until the Plaintiff made the UCI motion in JAN 2007, about their apparent misconduct throughout this process in means of utilizing UCI against subordinates under these two senior NCOs commands.

It would be completely disingenuous for a reasonable person to even start to believe that any subordinates under these two individuals' commands made their statements freely, or were not threatened and coerced into making statements. To a reasonable person looking at the evidence just presented in this procedure, they would have to ask themselves why LTC Thomas never interviewed these people again, furthermore, why he interviewed them first in his process, instead of interviewing them last like the AR 15 – 6 guideline suggests. If CSM Harrington and 1SG Braun took up to four weeks to talk to witnesses and gathered the information that it appears LTC Thomas simply used instead of gathering his own information and conducting his own investigation. Then the next statement made by SPC Edwards would have been proven in the beginning of the legal proceeding in the beginning of AUG 2006 and not at the Article 32 hearing on 27 OCT 2006 (which cost the Plaintiff over $20,000 in order to higher a civilian lawyer). SPC Edwards states "SGM Harrington and 1SG Braun told SPC Edwards about the 15 – 6 investigation." Considering SPC Edwards EEO complaint on 30 JUL 2006 jumped started the informal AR 15 – 6 Investigation, a

reasonable person would have to believe based on all of the sworn statement evidence just used from the Plaintiffs record that CSM Harrington and 1SG Braun told SPC Edwards that they were conducting a 15 – 6 investigation, and then worked with her for up to four weeks in an attempt to get her to make a sworn statement which she did on 30 JUL 06, and one can only assume based on the statements of others who testified for the Plaintiff during the UCI and Article 13 Motions in JAN 07 they used the same threats and aggression with SPC Edwards and SPC Seldon. In fact, SGM Harrington attributes SPC Seldon with telling her that the Plaintiff and "SPC Lindsey had slept with" each other. Furthermore, SPC Seldon tells SGM Harrington that "SPC Lindsey was afraid of losing her military career if she was accused of adultery."

A reasonable person would then have to look at the facts on SPC Lindsey (yet another key witness interviewed early in the process except this witness was initially suspected and threatened with being charged with adultery etc.) who made what the prosecution considered a false statement on 4 AUG 2006 at 1142 A.M. local time. Her integrity was never challenged during the proceedings, nor was it ever looked into by the court as to whether her second statement made after the AR 15 – 6 Investigation had ended, and right before her going on leave on 19 AUG 2006. The military legal system just assumed she was completely and voluntarily telling the truth this specific time, and during this specific statement, unlike her previous time and statement, and although she made this new statement with 1SG Braun in the room as a witness. The military legal system never even looked into any of the facts listed above throughout the Plaintiffs case, and the Plaintiff contests that 1SG Braun was there in the room to ensure SPC Lindsey carried through with that second statement, which also resulted in her obtaining immunity throughout the trial from the prosecution, as well as her admonishment to SSG Francis before the General Court-Martial in JAN 2007 that she was promised by the command, that she could keep her Active Guard/Reserve (AGR) job upon returning to Alaska from Afghanistan. Thereby, one could perceive from the CSM Harrington statement they used SPC Seldon's statement that "SPC Lindsey was afraid of losing her military career if she was accused of adultery."

LTC Thomas also committed liable in his Executive Summary in his AR 15 – 6 Investigation which he submitted to higher in order to prosecute the Plaintiff which clearly establishes unfairness in the fact-finding procedure, and it clearly shows the use of an improper legal standard. This liable statement is clearly in the Plaintiffs existing record located in his 15 – 6 record on page 4 of 4 in the IO's DA Form 1574, and states as such "The Plaintiff was given the opportunity to be interviewed, produce witnesses for interview, and to submit sworn statements. This was an in-formal investigation without a specified respondent; however the Plaintiff and any other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning were read their rights and signed DA Form 3881 waiving those rights." First, from the evidence listed above the Plaintiff has already shown that only three witnesses in the AR 15 – 6 signed DA

Form 3881, the Plaintiff, SPC Chester, and SPC Lindsey.  The Plaintiff further showed that no adverse action was taken against SPC Lindsey during the Plaintiffs proceedings; in fact, she was offered the reward of keeping her AGR job by the command for helping prosecute the Plaintiff.  In addition, no adverse action was taken against any other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning simply because the IO didn't conduct a fair fact-finding procedure, and therefore, never asked such questions to individuals who surely should be reasonably suspected of interfering with an ongoing investigation amongst other charges.  Furthermore, this clearly proves that the alliance forged between the prosecution, the Commander, and the material witnesses throughout the Plaintiffs case did not maintain the required delicate balance between military justice and command discipline.  U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994).  As in the U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994) case the Plaintiffs Commander and most of the witnesses are also the officers and NCOs who convened the Plaintiffs investigation, and just like in that case the record should leave this honorable court with a reasonable doubt as to whether the proceedings were affected by UCI.

Secondly, LTC Thomas also committed liable with his statement that the Plaintiff was "given the opportunity to produce witnesses for interview, and to submit sworn statements."  On 4 AUG 2006 in an interview with the IO at 1000z MAJ Koch the Chaplain made the following statement "The Plaintiff has approached me twice seeking my help.  The first time was Wednesday night, 2 August 2006.  He had just finished talking with COL Williams and said he received permission to ask me to be a mediator between him and a witness base he wanted to develop.  I told him I would have to check in with COL Williams and LTC Thomas (the IO for the 15 – 6 investigation) in the morning.  After sleeping on it, I realized that I could not be put in that position and I felt that I was being manipulated by the Plaintiff to have access to people to possibly intimidate them. When I told COL Williams about my feelings he agreed and also commented that he did not give the Plaintiff permission to talk about the case with anyone even with me present.  COL Williams said he told the Plaintiff that it would be a good idea to have a person such as me present if he engaged anyone in conversation (other than the investigation) to protect himself.  LTC Thomas agreed and reiterated that the Plaintiff was not allowed to talk with anyone about the investigation period."

Finally, the Plaintiff calls to the courts attention his Military No-Contact Order, dated 31 JUL 2006 titled Evidence Attachment 10.  This memorandum clearly states in paragraph 2(a) "Make no contact whatsoever in-person or through telephone, mail and other written correspondence, e-mail, or third parties, with the persons listed in paragraph 4, pertaining to the on-going AR 15 – 6 investigation and allegations of misconduct made against you related to the commission of adultery, fraternization, sexual harassment, and violation of CJTF-76 General Order Number 1.  If you believe it is necessary to have contact with

these persons for matters unrelated to this investigation or these allegations of misconduct, such contact must be made through your chain of command." However, when the Plaintiff went to the only person in his chain of command (who happened to be COL Williams) he was given one answer in regards to getting information such as sworn statements and/or witnesses for his defense, and that statement was "the Plaintiff is not allowed to talk with anyone about the investigation period." Therefore, when was the plaintiff ever "given the opportunity to produce witnesses for interview, and to submit sworn statements."

LTC Thomas also used statements throughout his investigation that he never looked into in order to prove if they were true or untrue, voluntarily made or not, and in fact were in violation of the law, when the individuals who made them actually made false official statements. Yet once again, against his charge and responsibility as the IO to thoroughly investigate the matters fairly, and in doing so read other witnesses reasonably suspected of the possible surfacing of violations of crimes during their questioning their rights and signed DA Form 3881 waiving those rights, he chose by his actions to do nothing. In doing nothing LTC Thomas, left this procedure unfair and extremely one sided, thereby, introducing untrue statements based on Privacy Act violations, Freedom of Information act violations, Wrongful Invasion of Privacy based on a public disclosure of private facts, and a publication placing the plaintiff in a "false light. This was accomplished by people he classified as "victims and witnesses" who committed Slander, and Liable against the Plaintiff. Furthermore, LTC Thomas used these violations as actual facts in his findings and deliberation that he then deemed to be true based on his fair and fact-finding procedure, in determining that his "investigation revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the Plaintiff. LTC Thomas then submitted this so called "evidence" to a higher authority who also neglected and/or ignored the contradictions of statements, the credibility of their witnesses, and the multiple violations of several laws to convict the Plaintiff of the alleged behavior, and then wrongfully imprison him based on an improper legal standard.

The Plaintiff will show a glimpse of such statements here, but will go into further detail with all such statements in the Analysis of the Evidence later in this writ. The Plaintiff has already asserted that CSM Harrington and 1SG Bruan initially conducted the investigation used by LTC Thomas. Now the evidence shows that after being informed by COL Williams, the COL's primary staff then joins in to assist in proofing the Plaintiffs guilt, in order to support COL Williams proclamation of guilt. Evidence of the command as a whole conducting this investigation is proven with Evidence Attachment 8 which states the following "Effective 31 July 06, you are flagged for adverse action pending the result an AR 15 – 6 Investigation. You are to turn over the responsibly of the duties as 207[th] Infantry Brigade Executive Officer (XO) to LTC Michael A. Thompson. You are hereby directed to turn over all files (both paper and computer), documents, pending actions and other information pertaining to duties as the Brigade XO. A

proper battle hand off is critical to the success of the unit. Effective 31 July 06, you are directed to assume the role as the ANA Liaison Officer and backfill LTC Thompson. He will turn over all actions and files to you and conduct a proper battle hand over. The Point of Contact for this memorandum is undersigned," and the memorandum is signed by COL R. Stephen Williams. However, no such battle hand off ever occurred with the Plaintiff taking over duties for LTC Thompson, but instead they stayed in the Brigade TOC area as the Plaintiff showed the new XO the duties and responsibilities of the job. In fact the Plaintiffs shared his office with LTC Thompson until his transfer to BAF.

In MAJ Parker's sworn statement the Plaintiff is using MAJ Parker's computer due to basically having been stripped of his office and position, by COL Williams on 31 MAY 2006, to research information since he was told that he was "not allowed to talk with anyone about the investigation period." In the IO's write up on his interview with MAJ Parker on 3 AUG 2006 at 0500 he credits this statement to the interviewee "MAJ Parker said that MAJ Gamble had used his computer (still logged on to MAJ Parkers Login) to get information and had left it "at the web site". (That information was provided to the IO and is attached as Evidence Attachment 28)." The amazing thing here is that COL Williams the appointing authority for the AR 15 – 6 investigation, and the so called "neutral party" in this investigation not only gets this information, but then personally gives it to the IO with the following statement written on a hard copy of the Plaintiffs research "Gary – the Plaintiff was on my S2s' computer and left this on. He is looking to use this for defense." This clearly shows that the Commander is trying to influence the outcome of the investigation, and cut off any potential defense the plaintiff was or could possibly use by not allowing him to gather witnesses, talk to anyone about the case, or even research a possible defense without trying to counter what ever the plaintiff came up with in his defense, prior to obtaining a military or a civilian lawyer, and his actions were contrary to statue, settled case law, or valid regulation. COL Williams actions intentionally/willfully violate the following: Article 37a of the U.C.M.J.; the maintenance of delicate balance between military justice and command discipline; the plaintiffs right to a fair trial; and the plaintiffs constitutional rights.

The Plaintiff in this instance was simply researching what he knew was going on, which was Wrongful Invasion of Privacy based on a public disclosure of private facts, a publication placing the plaintiff in a "false light, and unlawful command influence. All summed up these elements were all being used against him to support accusations of slander, libel or both. Slander involves verbal derogatory statements, while libel involves written ones. In a court of law, the Plaintiff pursuing the lawsuit such as in this case would charge defamation of character to cover any form of false or damaging allegations. The commands tactic here of having everyone act as an IO against the Plaintiff further explains why it only took LTC Thomas one day to conduct a supposedly "fair fact-finding" procedure. Furthermore, this tactic clearly opens the door for slanderous and libelous statements from the witness pool, who could say anything that would

make them look good in the eyes of the command, without regard to the truth or voluntariness, and face no consequences for doing so, based on the proven facts of only doing what the Plaintiff described as "a one sided witch hunt" which sought only to prosecute him, and not obtain the truth of the matter, as so clearly demonstrated already by the command and the IO's actions. In fact several of the witnesses use obvious malicious intent against the Plaintiff, these witnesses do it without working in the public's best interest at the time, and in doing such directly led to the Plaintiffs wrongful incarceration, wrongful dismissal from the U.S. Army, severely damaged the Plaintiffs military and civilian career prospects, caused the Plaintiff and his family's personal and professional mental distress; embarrassment; and humiliation. Furthermore, it caused the Plaintiff and his family to suffer financially, physically, emotionally, and spiritually from the damages the defendants caused to the following: his name; material and moral; lost revenue; general; punitive; and real humiliation, embarrassment, wrongful imprisonment, wrongful dismissal, and punitive damages.

   The Plaintiff asserts that the unfairness of the fact-finding procedure by LTC Thomas and the Plaintiffs command even went as far as to repeatedly violate his right to privacy, that is protected by a privacy statue. Such violations are clearly shown in the sworn statements of two of the witnesses during the AR 15 – 6 Investigation conducted by LTC Thomas. First, MAJ Frank L. Veith Jr. on 4 AUG 2006, at 1730 local time. In MAJ Veith's statement shows how the case was topic of conversation by not only the primary staff at this time, but by others directly under the command of COL Williams. MAJ Veith states that he "wants to site an action that was pointed out to me by MAJ Bill Luce." He then goes on to say "I was informed that the Plaintiff personally" did an accusation and that such accusation "can be verified by MAJ Rob Barr the NCE S-1." This shows the command utilized "teamwork" in ensuring that each person received the same slanderous statements that they then turned to libelous statements, that the IO then used as unconfirmed truths. This coupled with the fact that the IO and the command collectively did not give the Plaintiff a chance to defend himself from these statements that were used with malicious intent and with disregard to the public's best interest at the time in order to wrongful incarceration, and wrongful dismissal him from the U.S. Army, severely damage the military and civilian career prospects, of the Plaintiff while causing his family personal and professional mental distress; embarrassment; and humiliation. Furthermore, the Plaintiff and his family had to suffer financially, physically, emotionally, and spiritually from the damages the defendants caused to the following: his name; material and moral; lost revenue; general; punitive; and real humiliation, embarrassment, wrongful imprisonment, wrongful dismissal, and punitive damages. Finally the Plaintiff asserts that he did in fact prove that the accusations made by many of the defendants that he had "personally shopped" for woman to put on the deployment roster was proven to be false by a motion filed by the Plaintiffs civilian lawyer in a Motion in November 2006 in Kuwait, and sustained by a military judge. The motion was sustained based on the testimony of several of the so-called "victims" in the Plaintiffs case who said the statements

were untrue, as well as a witness in the Plaintiffs rear command. However, the damage was already done as an improper legal standard had already been applied to the Plaintiffs case, as well as an unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the Plaintiff" based on a total of "33 interviews, sworn statements, interview summaries, taken and submitted into evidence or evidence that is supportive in depth of the interview summaries and sworn statements that were submitted into evidence as victims and witnesses."

MAJ Veith is further credited with making the following statement "flirting with females is a "Fredism" and that he had a sexual harassment charge in Alaska." MAJ Veith makes that statement based on the IOs question of do you have any other information pertaining to this matter, or would you like to make any other statements? Please write any other information you would like to provide. Therefore, MAJ Veith made a statement that clearly shows the Alaska Youth Corps Program, and the Alaska Army National Guard violated the Privacy Act and the Freedom of Information Act with their negligence in the administration, supervision, and subsequent monitoring of the Privacy Act. The disclosure of information reference the Plaintiff from a case 12 years prior is in a file kept by the Alaska Youth Corps Program, which is under the command authority of The Adjutant General of the State of Alaska, who is the Commissioner of the Alaska Army National Guard. The privacy of that case isn't even in the Plaintiffs personnel file, and is also incomplete as the government was unable to turn up the EEO investigation done in that case by the Alaska Army National Guard. Yet, it is still protected by a privacy statute, but somehow 12 years later in a sworn statement made by a witness for the U.S. Army in a case against the Plaintiff it is maliciously used as a damaging statement against the Plaintiff in an ongoing investigation. MAJ Veith made this statement as a matter of facts to describe the Plaintiffs so called "Fredisms" or behavior, and that indeed he had been charged as a sexual harasser in Alaska. This libelous statement clearly violates the Privacy Act which by law requires the U.S. Army, the Alaska Army National Guard, and the Alaska Youth Corps Program to perform information management functions and are suppose to be the only ones acting in an official capacity who have access to this private information. Yet, a person who has never had a right to know, and who is not acting in an official capacity swears to it as facts in an ongoing investigation 12 years after the fact, and the statement is not only taken as true for the investigation, but also circulate around the Plaintiffs organization at KAF, Alaska, and a unit deployed to Mississippi as what the military trial judge at the BAF motions in JAN 2007 would call "rumors" that depict the Plaintiff to the witness pool as the Command clearly wanted him to be depicted as "a predator, a psychological predator, and a bad guy who needed to go down." Furthermore, these rumors were being talked about in public settings and in private settings, provided, the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal

proceeding. Once again the Plaintiff supposedly kept this out of his case with a motion filed by the Plaintiffs civilian lawyer in a Motion hearing in November 2006 in Kuwait, and sustained by a military judge. The motion was sustained, however, the damage was already done as an improper legal standard had already been applied to the Plaintiffs case, as well as an unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the Plaintiff" based on a total of "33 interviews, sworn statements, interview summaries, taken and submitted into evidence or evidence that is supportive in depth of the interview summaries and sworn statements that were submitted in to evidence as victims and witnesses."

Secondly, MAJ Luce makes the statement in his interview with the IO 6 AUG 2006 that he also "knew of a sexual harassment investigation back in Alaska" against the Plaintiff. Showing more negligence in the administration, supervision, and subsequent monitoring of the Privacy Act by the U.S. Army, the Alaska Army National Guard, and the Alaska Youth Corps Program, in addition to, violations of the Freedom of Information Act, and they did it by conducting an improper legal standard, as well as an unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the Plaintiff" based on a total of "33 interviews, sworn statements, interview summaries, taken and submitted into evidence or evidence that is supportive in depth of the interview summaries and sworn statements that were submitted in to evidence as victims and witnesses."

### Improper Legal Standard

The simple fact that the Plaintiff plead guilty to some of his charges is irrelevant based on even those findings were made in the process of applying an improper legal standard. In both <u>Haynes vs. Washington</u>, 373 U.S. 503, 516 – 518 (1963); and in <u>Rogers vs. Richmond</u>, 365 U.S. 534, 547 (1961) ("Historical facts 'found in the perspective framed by an erroneous legal standard can not plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them.") The Unlawful Command Influence (UCI) the Plaintiffs chain of command utilized coupled with it's blatant disregard to his right to privacy during the Army Regulation (AR) 15 – 6 Investigation reached such an erroneous legal standard. The results of this erroneous legal standard led to the following: The Plaintiff being permanently reliefd from the Brigade Executive Officer position; and his subsequent transfer from Kandhar Airfield (KAF) Afghanistan to Bagram Airfield (BAF) Afghanistan based on the findings of that AR 15 – 6 Investigation.

The improper legal standard imposed by the U.S. Army continued prior to his Article 32 court hearing with the Commands UCI who negatively influenced and threatened the potential witness pool with several KAF wide "Town Hall meetings" held by the commander. The "Town Hall meetings" were followed by

and/or preceded by personal visits to potential material witnesses by members of the chain of command, who were not authorized or appointed to interfere with an ongoing investigation, nor authorized or appointed to conduct an informal investigation.

With regard to the Town Hall Meetings, the Plaintiff first asserts that, circumstantially, the evidence reflects intent to punish the accused. Here, the Plaintiff points to four factors. First, the Commander was obviously angry and agitated. It was thus likely that he was lashing out at the accused, although not calling him by name. Indeed, the Plaintiffs case was the centerpiece of the comments and COL Williams' apparent frustration. Second, there was no reference to a presumption of innocence or any pending due process rights. The Plaintiff was labeled a criminal, plain and simple, as one who violated General Order Number One in specific ways. Third, the Plaintiff had already been exiled to BAF and everyone at the Town Hall Meeting knew the references were to him. It would be disingenuous to propose that the audience did not know who the unidentified "officer" was when he was referred to as "the officer now at Bagram," or "my right hand man." Testimony of trial of witnesses during the Plaintiffs General Court-Martial clearly show that almost everyone who testified knew COL Williams was referring to the Plaintiff. Fourth, the speaker had to know all these things, as the Commander. Collectively, these factors circumstantially point to an intent to punish the Plaintiff.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis calls for examination of the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Here, two spring to mind. First, COL Williams may have sought to impress upon the unit the seriousness of General Order Number One violations and deter further offenders. Second, he may have sought to put a stop to rumors about the Plaintiffs case. The Plaintiff concedes that both objectives are legitimate and non-punitive. The Plaintiff asserts, however, that COL Williams's pursuit of these objectives was not reasonable. The logic here is simple. In order to deter future violations of General Order Number One, simply state what will happen to future offenders, as emphatically as necessary, without reference to any ongoing case. Furthermore, prosecute all violators of such offenses consistently, instead of forging alliances between the prosecution, the Commander, and the material witnesses that will not maintain the delicate balance between military justice and command discipline in your unit.[2] In order to stop rumors about the Plaintiffs case, simply tell the unit to cease and desist on the rumor front, and maintain the required information management functions on sensitive personnel information which is protected from disclosure by a privacy statute 10 U.S.C. 3013 and Army

---

[2] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts these events certainly constituted unlawful command influence U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994), The Plaintiff has raised this issue by a separate writ.

Regulation 15 – 6. In addition to, not providing the public access to records in the possession or control of the Federal Government (U.S. Code, 552, 1966).[3] Again, there is no legitimate reason to brand the Plaintiff as guilty, and list the offenses to make either legitimate point. Thus, the challenged conduct in this case also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial public humiliation.[4] As noted above, such humiliation can occur even if the accused is not present with the unit, or at the location of the humiliation. Baigase, 50 M.J. 143, 152 n.3.

   With the evidence presented on COL Williams' statements at the Town Hall Meetings, the Plaintiff demonstrated that COL Williams potentially and did in fact cause the Plaintiff public humiliation. Essentially, the Commander gathered the unit as a whole, albeit in a series of briefings to accommodate duty schedules, pronounced the Plaintiff guilty of specific and listed offenses, voiced his desire of the maximum consequence, and did so with an emphasis variously described as "livid," "more than pissed," and "with smoke coming out of his ears." One junior NCO was appalled at the lack of any reference to due process or the presumption of innocence. Although the Plaintiff's name was not mentioned, such characterizations as "one of our officers," or "an officer since transferred to Bagram," or "my right hand man," were all employed, and each pointed clearly to the Plaintiff, just like the Master Sergeant's comments in Baigase, 50 M.J. at 147. In addition, COL Williams provided personnel information for use in the case, and he was aware by training and experience that the information should not be provided to individuals who were not authorized access to such information. U.S. v. Sheperd, (C.C.A. LEXIS 189, 2002). Furthermore, COL Williams presented this information as the Commander of the Plaintiff, and most of the witnesses were also the officers and NCOs who convened the investigation and then later testified against the Plaintiff as accusers, which itself should raise a reasonable doubt as to whether the proceedings were affected by UCI. U.S. v. Black, 40 M.J. 615 (C.M.R LEXIS 188, 1994). Finally, based on COL Williams being an accuser as well, a reasonable person would harbor a doubt about the COL's impartiality based on the evidence of record and actions taken by the COL

---

[3] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts these events certainly constituted violation of the Privacy Act of 1974, and the Freedom of Information Act of 1964, The Plaintiff has raised these issues with two separate writs.

[4] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts that these events certainly amounted to pretrial public humiliation and embarrassment and that the Military Judge erred in failing to grant the Plaintiff pre-trial confinement credit pursuant to R.C.M. 305 (k), Manual for Courts-Martial. The Military Judge abused his discretion in determining that this embarrassment existed at all, and that it was not tantamount to confinement. U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986). The Plaintiff has raised this issue in a separate writ.

himself and others subsequent to the COL's Statements.[5]  Clarke v. Brackenridge, (C.M.R. LEXIS 10, 1991).

With regard to the core staff briefing, and follow-on comments regarding the Plaintiff, the Plaintiff asserts that the circumstantial evidence of intent to punish is even stronger.  To be sure, a pronouncement of guilt, coupled with a reading of the charges, presents an instance of public humiliation for the Plaintiff within the select community to which he especially belonged as the former Executive Officer, COL Williams' senior staff.  He was more directly and personally humiliated by these comments which were shared in a group setting with his former close associates and friends, and, moreover, folks whom he will likely see and with whom he will deal with upon his return to Alaska.  Thus the potential for humiliation was high, just based upon the briefing, and known to COL Williams at the time of the briefing.  When the frequent references to "predator" took place after the briefing, the emphasis became personal, and even more humiliating as the core staff began to parrot the reference until it became "the" term by which to refer to the Plaintiff.

In the beginning of AUG 2006 after the informal investigation had started MAJ Knowles informed the Plaintiff that information reference his case had already made it's way back to Alaska and was circulating via the civilian spouses.  In accordance with the Freedom of Information Act and the Privacy Act this should never happen with an ongoing military investigation.  Yet when the Plaintiff brought this information up to COL Williams, he responded "I know who it is, and that he would take care of it even if he needed to give out an Article 15" or words to that effect.  However, proof is clearly obtained when two more female witnesses in Alaska, not acting within the confounds of their official capacity, without a need to know anything about the case, and who were not even included on the appointed AR 15 – 6 investigators witness list as potential or interviewed witnesses, somehow produce sworn statements that the Prosecution tried to use against the Plaintiff in the case as evidence.  MAJ Lawendowski will testify how the Plaintiffs case back in the rear detachment in Alaska was the topic of hallway, lunch table, and water cooler conversations, not to mention how the information of the case made it's way completely through the organization so that members in the Plaintiffs rear detachment unit were coming up to him asking him questions about the case.  Information on the case even made it's way down to a unit mobilized from the Plaintiffs unit to Mississippi, who were training up for duty in Iraq/Kuwait.

---

[5] Even if the Court were to rule that the Town Hall Meetings did not constitute a violation of Article 13, U.C.M.J. U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994) in an of themselves, the Plaintiff asserts that these events coupled with COL Williams actions throughout the due process of law certainly would cause a reasonable person to harbor a doubt about the COL's impartiality based on the evidence of record and actions taken by the COL himself and others subsequent to the COL's statements.  Clarke v. Brackenridge, (C.M.R. LEXIS 10, 1991).  The Plaintiff has raised this issue in a separate writ.

In fact the Family Readiness Group who are civilians as well, even called the Plaintiffs wife to see if she needed any assistance because they heard about the case in AUG 2006. However, the final blow of public humiliation occurred when the Channel 2 News in Alaska broadcast a feature on the Plaintiff labeled Evidence Attachment 27, because this same anonymous person or perhaps a different one called the news station on the very day that the Plaintiffs orders for transfer from Kuwait's Field Detention Site to Fort Sills Regional Correction Facility were cut. This anonymous person somehow had facts that they presented to the news, and the news contacted what they called the U.S. Army to confront them on these facts since the U.S. Army had not officially broke the story. In fact the Fort Sill Manual Guide for Inmates clearly states the Plaintiffs wife would be informed of his safe arrival by a letter from the commander. In addition, all forms of outside contact for inmates being transferred from Kuwait are taken away to ensure the safety and success of the transfer. Yet sensitive personal information which was protected from disclosure by a privacy statute made it's way to a civilian television news station, although the U.S. Army, and the Alaska Army National Guard perform information management functions and are suppose to be the only ones acting in an official capacity who have access to this private information. U.S. v. Shepherd, (C.C.A. LEXIS 189, 2002). The information in the Plaintiffs case was suppose to be private and not public, however, the total disregard of the Plaintiffs right to privacy during an ongoing investigation has caused the Plaintiff not just some or partial, but total and complete public humiliation and embarrassment. The Plaintiffs private information was deliberately used in several public forums in order to humiliate the Plaintiff in public. Therefore, the Plaintiff asserts the intent to punish has been demonstrated circumstantially.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis again moves to the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Only on such objective seems apparent: to keep the senior/core staff apprised of the status of the case pending against the former XO. Again, the Defense concedes the object is legitimate and non-punitive in the abstract, but the execution was unreasonable. The staff could have been apprised of the case status, even with a listing of offenses, without reference to the Plaintiffs guilt. However, once COL Williams moved past that status briefing and undertook to use the term "predator," apparently influencing the staff to do the same, no legitimate purpose whatsoever was served. Only humiliation remained. The same is true for the references to the confinement COL Williams believed appropriate. Thus, again, the challenged conduct as it relates to interaction with the senior staff also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial humiliation.

Improvident pleas: In the Plaintiffs case, there are three reasons why his pleas of guilty are being raised as improvident. These three reasons are as follow: Inconsistency actually exists to create variance between the alleged

offense and the offense pleaded to; there is evidence that negates the plaintiffs guilt; and this case created a dilemma for the plaintiff, for whatever valid reason, he wished to plead guilty and at the same time present himself in as sympathetic a posture as possible to the sentencing authority.  U.S. v. Peele, 46 M.J. 866 (ACCA 1997) (accused's attempt to plead guilty, and at same time mitigate his guilt, resulted in improvident plea.)

Although the Military Judge did do a thorough Care Inquiry, actual inconsistency in the variance between the alleged offense and the offense pleaded to still exists.  For example the leak of privacy information by an anonymous source verified by the U.S. Army, and reported by KTTU Channel 2 News (evidence attachment 27) in Alaska proves some of the improvidence in this case.  In this example the news reported four counts of sexual harassment the plaintiff was found guilty of, however, the plaintiff never plead guilty to Article 93 maltreatment of subordinates based on sexual harassment, but he instead plead guilty to the lesser offense of a general disorder, Article 134, for making comments detrimental to the good order and discipline of the unit.  Secondly, several "victims" in the plaintiffs case testified that they weren't either offended by the plaintiffs comments, didn't take them as sexual advances, but rather trash talking, and/or non-offensive talk that they participated in, or by stipulation of fact participated in without a sexual relationship.  Sexual Harassment is unwelcome sexual advances, or Quid Pro Quo, not welcomed exchanges that produce nothing for this or for that, which constitutes the second part of proof in an improvident plea, actual evidence to prove the plaintiffs innocence.  Furthermore, this leads to the third point of an improvident plea, the plaintiff plead in light of how the judicial system was supporting evidence that it never truly confirmed based off of an improper legal standard.  The U.S. Army completely used as a foundation an unfair fact finding procedure which produced a libelous investigation with fraudulent official statements that consummated in slander in order to defame the plaintiffs character, and deny him the due process of law.

The plaintiff defended himself as he truly was, not guilty of the improper preferral of charges (which even included a multiplicious charge of Article 93 against SPC Edwards), but at the same time force him to plead either guilty, or to a lesser charge in order to avoid going to jail for up to 15 ½ years by appealing to the sentencing authority.  This is evident in accordance with the fact the plaintiff was found guilty of seven out of seven charges, and 10 out of the 12 specifications regardless of how he plead, and the sentence rendered was twice as harsh in the time of duration than the prosecution asked for, with the forfeiture of all pay and allowances which neither the defense, nor the prosecutor expected, and a dismissal from the service with a Sexual Offender Registration requirement.  This harsh sentence was completely based on the incompetent, inadmissible, or even illegally obtained evidence suggesting that the accused is a bad character by his command, the prosecutor, and witnesses.

26

## Analysis of the rest of the Evidence

VMI Publishing Agreement, 29 DEC 2006 (Attch 4) – This piece of evidence shows some of the lifetime earning potential of the Plaintiff as far as awarding the Plaintiff the relief he seeks against the defendants.

Report to Suspend Favorable Personnel Actions (Flag), 30 JUL 2006 (Attch 9), this piece of evidence shows how COL Williams committed perjury on the stand when he said he had to scramble to replace the plaintiff in AUG 2006, when he had already replaced the plaintiff in JUL 2006 with LTC Thompson, based on the plaintiffs outcome from the AR 15 – 6 Investigation.

Memorandum of notice of intent to impose Adverse Administrative Action dated 18 AUG 2006 (Attch 11), this piece of evidence further shows how COL Williams committed perjury on the stand.

Memorandum of notice of intent to impose Adverse Administrative Action no date received on 19 AUG 2006 (Attch 12), this piece of evidence further shows how COL Williams committed perjury on the stand.

Memorandum of Counseling from CJTF-76 Chief of Staff dated 28 AUG 2006 (Attch 13), this piece of evidence further shows how COL Williams committed perjury on the stand.

Report to Suspend Favorable Personnel Actions (Flag), dated 29 AUG 2006 (Attch 14), this piece of evidence further shows how COL Williams committed perjury on the stand.

Relief for cause memo, dated 28 AUG 2006 (Attch 15), this piece of evidence further shows how COL Williams committed perjury on the stand.

Memorandum request for clemency dated 7 May 2007 (Attch 16), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Clemency Letter to CJTF-82, dated 20 Mar 2007 (Attch 17), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

General Court-Martial Order Number 5 dated 9 May 2007 (Attch 18), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Clemency Letter to MG Ralston, dated 15 May 2007 (Attch 19), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Letter of Resignation, 17 Nov 2006 (Attch 20), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Book Review by the Critic (Attch 21), This piece of evidence shows some of the lifetime earning potential of the Plaintiff as far as awarding the Plaintiff the relief he seeks against the defendants.

Directorate of Emergency Services, Fort Sill, Oklahoma Manual for the Guidelines of Inmates paragraph 2-4 Commander's Letter to Families. Page 10 (Attch 22), this piece of evidence shows Privacy Act violations with the defendants negligence in information management functions. They had access to sensitive personnel information which was protected from disclosure by a privacy statute did not act in the public best interest when they violated the Plaintiffs right to privacy by providing information for use in the Plaintiff's case to the public. The defendants were aware by training and experience that this information should not be provided to individuals who were not authorized access to such information. Furthermore, it shows Freedom of Information Act violations by providing the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding.

Memorandum to request leave dated 15 Nov 2006 (Attch 23), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Memorandum to request for Deferment of Automatic and Adjudged Forfeitures, dated 11 Jan 2007 (Attch 24), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Memorandum response to request for Deferment of Forfeitures dated 22 Jan 2007 (Attch 25), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

Memorandum response to request for Deferment of Forfeitures for six months dated 22 Jan 2007 (Attch 26), this piece of evidence shows how the Plaintiff exhausted all of his administrative remedies, but still requires relief from this honorable court.

## Cumulative Impact of an Improper Legal Standard

The principal function of habeas is to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted. Unlawful command influence can exist in a variety of forms, and it can occur even though the source of the influence did not intend

to affect a case. Actual unlawful command influence occurs when, under the totality of the circumstances, the evidence would lead a reasonable person to conclude that command influence affected the disposition of a case and prejudiced the accused. One military court has suggested it occurs "when the convening authority has been brought into the deliberation room." After viewing all the evidence describing what "actually" happened, military courts determine if actual command influence occurred based on their expertise in military affairs. In other words, determinations of actual command influence are "based upon considerations from inside the military justice system."

In contrast, apparent unlawful command influence occurs when reasonable members of the "public" (defined to include "not only the civilian population, but also the rank and file of the services because most servicemembers are not directly involved with the military criminal justice system.") believe command influence prejudiced the accused. Thus, this type of unlawful influence is based upon extrinsic considerations, i.e., those form outside the system. The question of whether apparent unlawful influence existed is only relevant when no actual unlawful influence exists, because remedying any actual influence will most likely remove the appearance of prejudice.

Actual unlawful command influence affects the actual fairness of a trial, while the appearance of unlawful command influence merely affects the level of "public" confidence in the military justice system. Although it has no direct impact on the fairness of a trial, the appearance of unlawful command influence is as much to be condemned as its actual existence. Therefore, the template for measuring prejudice from unlawful command influence is not simply whether such influence actually existed, but instead, whether there is an appearance of such influence.

Perceived unlawful command influence is another distinct concept of influence that can fall into either category of actual or apparent unlawful command influence. This type of influence focuses on how the recipient of command influence perceives that influence. If the recipient is a court member, and his or her independent judgment is affected by the influence, or if the recipient is a witness who decides to testify differently or not at all as a result of the influence, actual command influence has occurred. On the other hand, if the recipient is a sufficiently large group of servicemembers (i.e., members of the "public"), and members of that group perceive that the command influence affects the overall fairness of the system, then apparent unlawful command influence has occurred. In all cases, the perception by the recipient must be reasonable in light of the circumstances.

The Plaintiff's record clearly shows that he was not only going to be convicted, but he was going to be incarcerated based on COL Williams initial statements to his primary staff. In fact, if analysis on confessions in the Plaintiff's case are analyzed then the presence of all three types of UCI will be prevalent with the

chain of command granting immunity in order for material witnesses to change their statements; ignoring numerous inconsistencies in the material witnesses official statements, their statements made during defense interviews, and while under oath on the witness stand; members of the chain of command who later become accusers (a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than official interest in the prosecution of the accused.) talking to possible material witnesses for weeks prior to the launch of any informal (official) investigation or official inquiry into any alleged misconduct ever being reported by that material witness; holding town hall meetings to release personal command opinion to the entire witness pool; making side deals with material witnesses; releasing privacy information protected under the privacy act law in order to influence and forge the witness pools opinions based on obvious malicious intent.  The U.S. Army was not working in the public's best interest at the time they informed other Soldiers of private information protected by the privacy act law, and in fact, never should have been so careless with that information before, during, and after an ongoing investigation, as to make it common knowledge even to civilians working on KAF, and civilians back in the rear in Alaska.

The influence of all three types of UCI in the Plaintiffs case were brought to light when a few brave Staff Sergeants fearfully testified at his Court-Martial, stating how members of the chain of command prior to the AR 15 – 6 investigation made statements that they perceived to be threats.  There perception was that they would face adverse action if they did not provide information detrimental to the Plaintiffs case based solely on rumor and speculation.  The simple fact that these rumors and speculation were so prevalent in the Plaintiffs case clearly establishes the U.S. Army provided personnel information for use in his case, and the U.S. Army was aware by training and experience that the information should not be provided to individuals who were not authorized access to such information.  In fact the U.S. Army clearly violated it's own privacy act law pursuant to 10 U.S.C. 3013 and Army Regulation 15 – 6, when they request information during a AR 15 – 6 investigation.  Material witnesses were required to read or be read a Privacy Act Statement (Read and Sign).  This is required whenever personal information is solicited from an individual.  All of the AR 15 – 6 witnesses signed such a Privacy Act Statement which by law stated that this information will be used to evaluate the facts and circumstances currently under investigation.  Your (the witness) response is not mandatory.  However, your (the witness) failure to respond will require that we (the government) evaluate this matter without the benefit of your (the witnesses) input.  This information will be used in determining the appropriateness of any action, including adverse administrative action.  Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information.  This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official

personnel files. This clearly shows that the U.S. Army performs information functions and had access to sensitive personnel information which was protected from disclosure by a privacy statute. U.S. vs. Shepherd, (C.C.A. LEXIS 189, 2002). Yet the U.S. government and it's responsible agents used this privacy information protected by the law to defame the Plaintiffs character with false official statements, and rumors made both in private and in public forums to impact the outcome of his AR 15 – 6 investigation, and the subsequent court-martial proceedings that followed it.

All three types of UCI are so incredibly strong in this case that most witnesses who knew the truth didn't come forward, and never may. Even if a correct legal standard was applied during the General Court-Martial, the devastation to the Plaintiffs right to the due process of the law was so violated, and his defense so crippled, that the false official statements followed by perjury committed by the material witnesses on the stand guaranteed a conviction and wrongful incarceration. Regardless of how the Plaintiff plead, and regardless of what or who was called by the Plaintiffs defense counsel, based on the existence of all three types of UCI he was already guilty in the witness pools eyes. The Plaintiff was found guilty to offenses in his case, which he by no means committed, and never even had a fair chance to ever prove his innocence, based on the environment created by the improper legal standard applied to his case before the AR 15 -6 Investigation.

The Plaintiff's civilian attorney finally got a chance to interview all potential defense witnesses in December 2006 who by that time had been so influenced by the U.S. Army that they first refused to meet with my civilian defense attorney, and then when finally meeting with the Plaintiff's civilian attorney made comments like "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what the Plaintiff did in this case," or words to that effect. Coupled with threats by the chain of command over that same five month time, executing a Summary Court-Martial that sent personnel to jail who didn't conform to the chain of command's wishes despite being a victim of sexual harassment, and the example shown to all by the commander as to what he would even do to his "right hand man," and "best officer." The prosecution, the commander, and the material witnesses again fail to maintain the required delicate balance between military justice and command discipline by denying the Plaintiff the right to the due process of the law when he requested it in AUG 06 in order to obtain witnesses in his defense during the AR 15 – 6 Investigation. Most of the witnesses were officers and/or Non-commissioned officers (NCOs) who convened the investigation. That information was passed to the appointed AR 15 – 6 investigating officer who was appointed on 30 JUL 2006, yet began interviewing people on 2 AUG out of the prescribed AR 15 -6s recommended order. The investigating officer never sought the truth in AUG 2006. He never even researched all of the facts in the case, but instead relied on information provided to him by accusers. That's why he never interviewed all potential witnesses or any in that matter that the Plaintiff would in his defense called upon

if he had known who my accusers were, and what charges they specifically were accusing him of. Instead, COL Williams and LTC Thomas denied the Plaintiff his request to gather information in his defense, and upheld the commander's gage order on the Plaintiff thereby, not allowing him to gather defense witnesses although in LTC Thomas's executive summary in the AR 15 – 6 he clearly states that the Plaintiff was afforded that opportunity. In fact the Plaintiff even went to the initiator of the investigation (who turned out to be an accuser) with evidence on another accuser that should have expanded the investigation. However instead of expanding the investigation COL Williams chose to speak negatively about the Plaintiff to the entire witness pool, and then later committed perjury on stand during the Plaintiff's trial. As a result witnesses failed to tell the truth, or come forward with true facts at all. All of these actions finally ensured the U.S. Army the outcome of the findings based on the desires of the commander.

Although courts-martial are public trials in most instances, attendance by a commander or his or her representatives may amount to unlawful command influence in and of itself. U.S. v. Aurich, 31 M.J. 95 (C.M.A. 1990) (commander testimony at trial may amount to unlawful command influence) i.e. COL Williams committing perjury on the stand which otherwise my motion would have passed actually impacted the trial, my resignation, and improperly incarcerated me; U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990) (practical effect of commander's testimony about his or her general views can be command influence) calling me a "predator" "psychological predator" saying "I should get 5 – 10 years" the four town hall meetings etc all amount to this. Also his presence at the trial in the room with every witness prior to them testifying. Such attendance, in or outside the courtroom, can discourage witness testimony or possibly affect the impartiality of judges and court members. Likewise, commander testimony at trial may amount to improper influence if the testimony is designed to allow the commander to express his or her general views about the seriousness of the offense or the appropriate sentence to be adjudged. This scenario typically arises when the commander, or someone in the accused's chain of command, testifies about an accused's rehabilitative potential. Such as MAJ Koch's categorization of me being a predator with the privacy act rumors of my behavior based on talking to others who were influenced by the command. This was then later used by the commander himself and the primary staff and then others as the main way to refer to me. Such testimony is impermissible if merely a pretext to influence the court members into returning a particular sentence. U.S. v. Ohrt, 28 M.J. 301 (C.M.A. 1989) which it did influence the military judge who then errored in his discretion to dismiss all charges and specifications of this case based on all the levels of unlawful command influence which were raised. Unless the commander has direct knowledge of an accused's service performance and character to make a rational basis for his opinions, he may not offer that opinion. 28 M.J. at 304. In fact COL Williams's false statements that the plaintiff threatened people while in his office is in direct contradiction with the evaluation, promotion, and confidence he'd expressed and documented on the plaintiff in the past.

## CONCLUSION

Based on the foregoing, the Plaintiff moves this Honorable Court to direct the Judge Advocate General to order a dismissal with prejudice, of all charges, and specifications due to the findings being inadequate or unreasonable based on the fact-finding procedure being unfair, in addition to, the findings made were in the process of applying an improper legal standard.  This relief is raised pursuant to Article 67, and 37(a), U.C.M.J.  Additionally, the Plaintiff in a writ must prove real damages in excess of $1,000, therefore, the Plaintiff seeks relief against each defendant named: The U.S. Army, The Alaska Army National Guard, and the Alaska Youth Corps Program for their negligence in the administration, supervision, and subsequent monitoring of the Privacy Act of 1974.  In addition to providing, the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding in violation of the Freedom of Information Act of 1964.  Likewise, the Plaintiff additionally seeks relief for damages by means of various Torts[6] from individuals identified in this writ in the Plaintiffs chain of command and unit for Wrongful Infliction of Emotional Distress; and Wrongful Invasion of Privacy based on a public disclosure of private facts, and a publication placing the plaintiff in a "false light."  For those reasons, even if all charges and specifications were dismissed with prejudice and the Plaintiff was reinstated to his former position and status he and his family would still not be able to recover financially, physically, emotionally, and spiritually from the damages the defendants caused to the following: his name; material and moral; lost revenue; general; punitive; and real.  The Plaintiff thereby, requests that the ACCA award him and his family based on the Improper Legal Standard found in this writ, the Plaintiffs damages caused to the plaintiff's potential life earnings, violations of the Privacy Act of 1974, and violations of the Freedom on Information Act of 1964 the sum of no less than $20,000,000 from the defendants.

---

[6] Regardless of how this Honorable Court findings are reference this Writ, based upon the exceptional circumstances present and existing in the Plaintiffs record, thereby, being inadequate or unreasonable based on the fact-finding procedure being unfair, and/or, the findings made were in the process of applying an improper legal standard. Beck vs. Ohio, supra, 379 U.S. at 92 – 93; Ashcraft vs. Tennessee, 322 U.S. 143, 145 (1944).  The Plaintiff has raised various Torts against individuals identified in this writ in a separate suit.

Fredrick M. Gamble
Plaintiff