## UNITIED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
                                    )
FREDRICK M. GAMBLE                  )
                                    )
          Plaintiff,                )
                                    )
     v.                             )      Civil Action No. 08-0207 (ESH)
                                    )
DEPARTMENT OF THE ARMY, AND         )
ALASKA DEPARTMENT OF MILITARY)
AND VETERANS AFFAIRS                )
                                    )
          Defendant,                )
_____    )      June 11, 2008
```

### AMENDMENT OF PLEADING

As an amendment as of right:  Pursuant to Federal Rules of Civil Procedure (FRCP) 15(a), allows amendment without leave of court any time before a responsive pleading is served, and based upon this Honorable Court's dismissal Order dated June 4, 2008 under 12(b)(1), which the plaintiff claims is without prejudice, for that reason, the plaintiff has a right to replead his complaint.

Since the defendants motion to dismiss under 12(b)(1) was granted, the plaintiff will have to choose between (a) continuing the action in the trial court by amending his pleading, as he is almost always allowed to do; and (b) appealing the decision on the motion.

If the plaintiff exercises leave to amend his complaint and the amendment is merely a technical one, most courts will not allow the plaintiff to argue on appeal that the dismissal of his earlier pleading was erroneous.  But if the amendment required by the court is so serious that it strikes what one court called "a vital blow to a substantial part of [the plaintiff's] cause of action," most courts will allow

1

the plaintiff to argue on appeal that the dismissal of the first pleading was erroneous.

The plaintiff objects to this Honorable Courts Ruling for the defendant's motion to dismiss, and emphasizes that the determination of the merits should not have been made on the basis of a 12(b)(1) motion. The plaintiff further, asserts that the dismissal of his earlier pleading in relation to the Alaska Department of Military and Veterans Affairs, the Alaska Army National Guard, and the Alaska Military Youth Academy was clearly erroneous or contrary to law, therefore, if the plaintiff does not wish to replead, and insists on the validity of his original pleading, a judgment will be entered on the judge's 12(b)(1) dismissal order; which allows the plaintiff to immediately appeal this judgment, since it would be a "final judgment." (See 28 U.S.C. 1291).

An involuntary dismissal under Rule 41(b) may be ordered by the court, on motion, for any of the reasons listed as defenses in Rule 12(b). Moreover, normally an involuntary dismissal is with prejudice, and thus has the effect of adjudication on the merits, unless the dismissing court specifies otherwise. Rule 41(b). Exceptions to this general rule (i.e., situations in which the dismissal is not with prejudice if the dismissing court is silent on the issue) are dismissals e.g. for the lack of jurisdiction (of both the parties and the subject matter).

In support of this motion, the plaintiff respectfully submits the attached memorandum of points and authorities showing how the district judge's order was clearly erroneous or contrary to law, a statement of material facts not in genuine dispute, an amendment of his pleading, a resubmitted Freedom of

Information Act (FOIA) claim with its attachments, and a proposed order, for which reasons stated therein, this Honorable Court should set aside it's order dated June 4, 2008 for the defendant, and modify the order for the plaintiff by denying the defendant's motion to dismiss based on FRCP Rule 12(b)(1), and accept the amendments to the plaintiffs original complaint.

FREDRICK M. GAMBLE
Plaintiff
Regional Confinement Facility
1490 Randolph Road
Fort Sill, OK 73503-5305
Phone Number: (580) 442 - 4313
ATTN: Mrs. RaShonda Labrador

**UNITIED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

*Let this
be filed
E S Hurcle
7/1/08*

| | | |
|---|---|---|
| FREDRICK M. GAMBLE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0207 (ESH) |
| | ) | |
| DEPARTMENT OF THE ARMY, AND | ) | |
| ALASKA DEPARTMENT OF MILITARY | ) | |
| AND VETERANS AFFAIRS | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | June 11, 2008 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S AMENDMENT OF PLEADING**

**I. INTRODUCTION**

Once the plaintiff exhausted all of his legal and administrative remedies with

the U.S. Army in aspects to obtaining relief through "purging actions" for the

disclosure of information maintained in a system of records caused by an

intentional, reckless, malicious, and tortuous pattern of management" as part of a

pattern of retaliation[1] performed by his command, when his command improperly

preferred charges based on incompetent, inadmissible, and illegally obtained

evidence,[2] before, during, and after his General Courts-Martial (GCM) conviction,

the plaintiff In Accordance With (IAW) 5 U.S.C. 552 sought relief through this

Honorable Court.

Based on a mere change of theory:  when what's amended is simply the claim

or theory, not the underlying facts that are asserted in support of the claim, the

---

1 Henson v. NASA, 14 F. 3d 1143, 1146 (6th Cir. 1994)
2 U.S. v. Asfeld, 30 Military Judge (M.J.) 917 (A.C.M.R. 1990)

1

court will typically find that the "same conduct, transaction or occurrence" requirement is satisfied.  Therefore, the plaintiff amends the claim or theory of his original complaint and not the underlying facts that are asserted in support of the claim with the following elements of complaint.

**A.  Jurisdiction:**  This Honorable Court has Federal Question, Supplemental, Collateral Review, Privacy Act and the Freedom of Information Act of 1964 (FOIA) jurisdiction and authority in this case over all liable parties.

**B.  Statement of Claim:**  The plaintiff alleges the defendant disclosed any record which is contained in a system of records in violation of the Privacy Act of 1974 and the FOIA of 1964.

**C.  Relief:**  The plaintiff's demand for judgment for the relief which he deems himself entitled is as follows:

**1.**  Compensatory Damages -  In the amount of $10,000,000 in order to make the plaintiff "whole" for the damages he has suffered as the result of the defendant's Privacy Act disclosure violation IAW 5 U.S.C. 552a(g)(4).  In addition to receiving an additional $10,000,000 for the actual damages sustained by the defendant's FOIA disclosure violation IAW 5 U.S.C. 552a subsection (g)(1)(c).  Thus, the plaintiff requests to receive the total compensatory damages of $20,000,000 IAW 5 U.S.C. 552a for the actual damages sustained by the defendant's disclosure as outlined in the plaintiff's supplement to petition.  e.g. earnings and earning capacity; loss of enjoyment of life; a public disclosure of private facts; a publication placing plaintiff in a "false light"; claim for loss of

2

consortium with the plaintiff's spouse; and negligent infliction of emotional distress.

**2.** Punitive Damages - In the amount of $65,000,000 in order to "punish" the defendant for extreme wrongdoing by disclosing any record in violation of the Privacy Act. In addition to, receiving and additional $65,000,000 in punitive damages in order to "punish" the defendant for extreme wrongdoing by disclosing any record in violation of the FOIA. Thus, the plaintiff requests to receive the total punitive damages of $130,000,000 for the defendant's egregious wrongdoing of disclosing information in violation of the Privacy and FOIAs from May 1994 to present.

**3.** Reasonable Attorney Fees and Other Litigation Costs IAW 5 U.S.C. s 552a(g)(2)(B), (3)(B).

**4.** Injunctive Relief - By ordering the defendant to stop its unlawful actions of publically disclosing private facts, and producing a publication placing the plaintiff in a "false light," IAW 5 U.S.C. 552a(g)(2)(A), (3)(A).

**5.** Mandamus Relief - Order the defendant to provide Mandamus relief of correcting the plaintiff's military records by removing the plaintiff's flagging actions and promoting him according to his original Presidential Promotion List 10 – 06, reinstating/renewing his Top Secret Security Clearance, restoring all lost leave that he would have received, and expunging his military record e.g. Relief For Cause OER, ROT, DNA and related FBI Criminal File documents, and all U.C.M.J. actions as they apply to Articles 69, 71, 75, 76 and

3

any other Articles and actions that would completely purge all taint from the plaintiff's record associated with the disclosure.

The Privacy Act has its own provisions and set of laws that governs it; hence, Writs of Mandamus are not submitted. Thus, the plaintiff will not submit a Writ of Mandamus due to the remedy to empower this Honorable Court to order U.S. officers and employees to perform duties owed the petitioner, e.g., change military records IAW 10 U.S.C. 1552 (1994) if a mistake has been made in completing the records, was already granted through 5 U.S.C. 552, therefore, that request was made in the plaintiff's original complaint.

      **6. Special Matters** – Special relief under special matters IAW FRCP Rule 9(b) for circumstances giving rise to any allegation of fraud or mistake, which the plaintiff submitted a Writ of Habeas Corpus to this Honorable Court on May 7, 2008 requesting a collateral review of his GCM, a reversal to his GCM conviction, due to substantial violations of the plaintiff's constitutional rights, the defendant's lack of jurisdiction during the GCM, and the exceptional circumstances which are so fundamentally defective as to result in a miscarriage of justice; in addition to, granting all the relief sought on pages 10 – 12 of that petition to include the plaintiff's immediate release from incarceration based on 28 U.S.C. 2255 which allows convicted service members to seek immediate release from the "custody" of the Armed Forces through a petition for habeas corpus in Federal district courts. The service member does not necessarily have to be in actual confinement or restraint. In determining whether the petitioner is in unlawful custody, the federal courts will collaterally review the Court-Martial

4

(CM) and may consider arguments that the CM was without jurisdiction, that due process was lacking, or that the trial did not afford all the procedural safeguards necessary for a fair trial under military law.

    **D.** In the Alternative - Grant a partial summary judgment to the plaintiff and award him the following relief:

        **1.** Compensatory damages in the total amount of $15,000,000 ($7,500,000 for each Complaint).

        **2.** Punitive damages in the total amount of $60,000,000 ($30,000,000 for each Complaint).

        **3.** The aforementioned Reasonable Attorney Fees and Other Litigation Costs.

        **4.** The aforementioned Injunctive Relief

        **5.** The aforementioned Mandamus Relief.

        **6.** The aforementioned Special Matters.

## II. <u>Facts</u>

The plaintiff repeats and re-alleges the allegations in the Facts section of his Privacy Act complaint Case Number 1:08-cv-207 dated February 5, 2008 and TAB A of that document. All other facts necessary for this memorandum in oppositions to the defendant's motion to dismiss have been previously submitted to this Honorable Court or are found in argument.

The Alaska Army National Guard (AK ARNG) has the exact same personnel record system as the Department of the Army (DA), yet never presented the defective record from a 1994 investigation to the plaintiff during one of its record

5

keeping policies, practices, and systems, in order for the plaintiff to inspect and to correct the information contained in the defective record in question. Thus, since the DMVA[3] "found" the record upon communicated request of the DA, and the AK ARNG's G1 is its custodian, the DMVA maintained a secret record system. Moreover, this disclosure was the proximate cause of the defendant making an adverse determination against the plaintiff in the form of an Army Regulation (AR) 15 – 6 investigation, which forms the basis for the U.S. v. Gamble, 2008 CAAF LEXIS 216 (Feb. 19, 2008) case.

On the $2^{nd} – 7^{th}$ of August 2006, the defendant demonstrated acknowledgment of its due care responsibilities owed to the plaintiff based on the AR 15 – 6 Investigating Officer (IO) signing as the person administering the Privacy Act oath to every witness called during the AR 15 – 6 investigation, who in turn signed the Privacy Act Statement, which shows that the witnesses read or have had read to them the Privacy Act Statement pursuant to 10 U.S.C. 3013 and AR 15 – 6. Furthermore, it declares that the witnesses fully understood the contents of their entire statement.

On the 4th and 6th of August 2006, several DA personnel intentionally/willfully swore to disclosed private information from a defective record maintained in a secret record system, against the plaintiff in an AR 15 – 6 Investigation at Kandahar Air Field (KAF), Afghanistan. Thus, making the disclosed private information part of the DAs system of records as it became allied paperwork to

---

3 When the reference stipulates as a whole, the SOA, the AK ARNG, and the AK MYA, it will hereto be referred to as the Department of Military and Veterans Affairs (DMVA)

the plaintiff's Record of Trial (ROT) IAW R.C.M. 1105.

On September 21, 2006 personnel from the DMVA, and the public in Alaska who were not acting in their official capacity, nor ever had a right to know such information, whom the U.S. Army had no jurisdiction over, and who were not on the defendant's witness list, made official sworn statements against the plaintiff, thus, showing that the defendant provided the public access to information contained in records in the possession or control of the federal government which release jeopardized the constitutional rights of the plaintiff during an ongoing legal proceeding in violation of the FOIA of 1964.

On September 27, 2006 the DMVA willfully disclosed a defective record contained in a secret record system to the DA via any communicated request reference the plaintiff.

On November 14, 2006 the DA submitted into evidence charges derived from the defective record received from the DMVA in Gamble.

On February 5, 2008 the plaintiff sought legal remedies through this Honorable Court for injuries sustained from the defendant's negligence, by filing an Intentional/Willful Standard and Actual Damages in Accuracy and Other Damages Lawsuit against the DA, et al., defendants,[4] based on their disclosing any record which is contained in a "system of records" in violation of the Privacy Act of 1974.

On April 14, 2008 the State of Alaska (SOA), Office of the Attorney General filed a limited entry of appearance on behalf of the SOA, the AK ARNG and the

---

4 See Complaint filed as Civil Action 08-207 (ESH)

AK MYA seeking dismissal from the plaintiff's claims against the AK ARNG and the AK MYA arising from their role as agencies or departments of the SOA. This motion asserted that the National Guard (NG) is a hybrid organization that serves both the state in which it is located and the federal government in times of need. Their appearance was to the extent that the plaintiff's claims arise from the AK ARNG and the AK MYA's actions as agencies of the SOA, and sought dismissal of the claims against them, based on the Eleventh Amendment to the U.S. Constitution, which prevents the plaintiff from bringing these claims in federal court. Therefore, they allege that this Honorable Court lacks jurisdiction over these claims and as such the claims against the DMVA must be dismissed.

On April 25, 2008 the plaintiff filed a Motion for Summary Judgment[5] against the Defendant which contained an amendment to his Complaint, and sought legal remedies through this Honorable Court for injuries sustained from the defendant's negligence, by filing an additional lawsuit for the defendant's Providing the Public Access to Information Contained in Records in the Possession or Control of the Federal Government which Release Jeopardized the Constitutional Rights of the Plaintiff during an Ongoing Legal Proceeding in Violation of the FOIA of 1964, and IAW FRCP Rule 42.

On May 7, 2008 in-conjunction with the aforementioned motion filed by the DMVA, the plaintiff submitted a Writ of Habeas Corpus to this Honorable Court requesting a collateral review of his GCM, a reversal to his GCM conviction based on the substantial violation of the plaintiff's Constitutional rights, the

---

5 See Motion For Summary Judgment Reference Civil Action 08-0207 (ESH)

8

defendant's lack of jurisdiction which denied him a fair trial, and the exceptional circumstances which are so fundamentally defective as to result in a miscarriage of justice. In addition to, receiving relief, and the plaintiff's immediate release from incarceration without having to deal with any adverse actions adjudged to him by his GCM sentence as he awaits the final actions to be taken by this Honorable Court in reversing his GCM conviction.

On May 14, 2008 the DA filed a motion to dismiss, or in the alternative, motion for a more definite statement, which only addressed claims against the U.S. Army and the other named defendants to the extent they are in a federal status and are acting as part of the U.S. Army. Furthermore, to the extent the Court accepted the plaintiff's summary judgment motion; defendant requested that their motion be deemed an opposition to plaintiff's summary judgment motion as well.

On June 4, 2008 this Honorable Court issued an ORDER for he defendant, granting their motion to dismiss for Lack of Jurisdiction pursuant to FRCP Rule 12(b)(1).

The plaintiff has made a claim for a trial by jury on all matters pertaining to this action.

## III. Opposing Points and Authorities

**A. The District Court Judge's Ruling pursuant to FRCP 12(b)(1), that the plaintiff fails to meet his burden of establishing subject matter jurisdiction because his claims are barred by Feres and the Eleventh Amendment of the United States Constitution:** The judge stated that the plaintiff contends that the AK ARNG is not protected by state sovereign immunity

9

because it is "not strictly a State entity, but is also [a] Federal entity." (Pl.'s Opp'n 5.) However, plaintiff's suit is barred by the Feres doctrine[6] if the AK ARNG is viewed as a federal entity, and it is barred by the Eleventh Amendment if it is viewed as a state entity. See Day v. Mass. Air Nat'l Guard, 167 F. 3d 678, 686 (1st Cir. 1999) ("it does not matter whether the Mass. NG is viewed as a federal or state entity. See generally Bowen v. Oistead, 125 F.3d 800, 804-05 (9th Cir. 19997). If federal, Feres applies; if not, damage claims against it in federal court are barred by the Eleventh Amendment. See Alabama v. Pugh, 438 U.S. 781, 782 (1978).") Therefore, plaintiff's suit is barred unless Congress abrogated state sovereign immunity when it enacted the Privacy Act, or Alaska waived its immunity.

Neither abrogation nor waiver has occurred in this case. Abrogation requires an "unequivocal expression of congressional intent." Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). Courts have already determined that the Privacy act lacks any manifestation of such intent. See, e.g. Lawson v. Sheldby County, 211 F.3d 331, 334-35 (6th Cir. 2000) ("Congress never expressly abrogated state sovereign immunity under the Privacy Act.") Likewise, waiver requires either "the most express language" or "overwhelming implications from the text as [will] leave no room for any other reasonable construction." Edelman v. Jordan, 415 U.S. 651, 673 (1974) (internal quotations and citations

---

6 The Feres doctrine limits the ability of armed services personnel to obtain damages from the federal government for activities "incident to service." Feres v. U.S., 340 U.S. 135, 141 (1950). This Court has held that the Feres doctrine applies to the Privacy Act. See Cummings v. Dep't of the Navy, 116 F. Supp. 2d 76, 82 (D.D.C. 2000).

omitted). Plaintiff argues that Alaska waived its sovereign immunity when it "willfully participated as a federal agency" in his court-martial. (Pl.'s Opp'n 11.) However, a state's cooperation in a federal proceeding does not constitute a wavier of its sovereign immunity. See Edelman, 415 U.S. at 673.

Therefore, for the foregoing reasons, defendants' Motion to Dismiss for Lack of Jurisdiction [Dkt. #8] is granted. A separate Order accompanies this Memorandum Opinion.

**2. Plaintiff's Claim:** The plaintiff opposes these claims based on the following opposing points and authorities:

**a. Federal Question Jurisdiction:** Under a Federal Question Jurisdiction case, there is not an adequate definition in a case "arising under" the Constitution, etc., that exists. The one that is most generally accepted is that the suit must be on "a substantial claim founded 'directly' upon federal law." The Supreme Court has formulated a somewhat more specific set of tests: In order for a federal question to exist, it must be the case "either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." See Franchise Tax Bd. V. Construction Laborers Vacation Trust, 463 U.S. 1 (1983).

In a vast majority of federal-question cases, federal law will be the source of the cause of action. For instance, a claim for Privacy Act violations clearly presents a federal question, because a federal statute (5 U.S.C. 552) is the source of the right the plaintiff is asserting. Thus, if the plaintiff's cause of action

11

derives from federal law, the case necessarily is one falling within the federal-question jurisdiction.

**b. Supplemental Jurisdiction:**  Supplemental jurisdiction, codified in 28 U.S.C. 1367, provides that in cases where "the district courts have original jurisdiction [over a federal question], the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III. ..."  Supplemental jurisdiction applies to additional claims between the same two parties, as well as to "pendent parties" (third parties brought into the suit under the federal court's jurisdiction), provided that both claims derive from a common nucleus of operative fact (a requirement implied by the statute's reference to "Article III case or controversy.")

The plaintiff concedes that a federal court would not ordinarily have jurisdiction over a "state entity" under an Eleventh Amendment claim, because that claim apparently does not present a federal question, and there is no diversity between the parties.  However, since a Privacy Act claim under 5 U.S.C. 552 does present a federal question, and since the "system of records" practices that are being relied on by the defendant to support that federal claim are the same as the "system of records" practices that are alleged to violate the state statute, it would present a federal question.  e.g. a Title 32 NG unit which "is a hybrid organization that serves both the state in which it is located and the federal government in times of need" is required by the DA as one of it's agencies to maintain the same exact system of records as a Title 10 Regular

Army unit, therefore, under the Privacy Act the defendant's so called "state entity" has an established federal general records management requirement. Moreover, the plaintiff's claims derive from a "common nucleus of operative fact," and the plaintiff would ordinarily be expected to try them all in one suit. The federal court is still free to use its discretion under 1367(c) to decline to hear the state-law claim, but on these facts it probably would hear the claim since considerations of judicial economy and convenience militate in favor of hearing both claims. Finally, since the "core" (basic) claim in the plaintiff's fact pattern involves a federal question under 5 U.S.C. 552, supplemental jurisdiction allows the plaintiff if he so chooses to add state-law claims such a 42 U.S.C. 1983 to his suit. Thus, the plaintiff can assert both a federal-statutory claim and a state-law (perhaps common-law) claim, since there is not diversity between plaintiff and defendant.

### c. FRCP 12(b)(1) – Lack of Subject Matter Jurisdiction

**Argument:** In <u>Feres</u>[7], the U.S. Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise of or are in the course of activity incident to service." <u>Cummings</u>[8] argued that this doctrine should not be extended to suits against government agencies under the Privacy Act, and this Honorable Court ruled in her favor on February 15, 2002. Thus, in determining whether members of the Armed Forces may sue the military for damages under the Privacy Act, we start with the "cardinal" canon of statutory construction: "Courts must presume that [the

---

7 <u>Feres v. U.S.</u>, 340 U.S. 135 (1950)
8 <u>Cummings v. Department of the Navy</u>, 116 F. Supp. 2d 76, 78 – 82 (D.D.C. 2000)

Congress] says in a statute what it means and means in a statute what it says there." Conn.Nataional Bank v. Germain, 503 U.S. 249, 253-54 (1992) (citations omitted). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" Id. At 254 (quoting Rubin v. U.S., 449 U.S. 424, 430 (1981)). With these precepts in mind, the plaintiff turns to the text of the Privacy Act.

As the district court recognized, the Privacy act "applies to 'agencies,' defined as 'any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the government … or any independent regulatory agency.'" Cummings, 116 f. Supp. 2d at 78 n.5 (quoting 5 U.S.C. 552(f)) (emphasis added). And as the trial court further observed, certain provisions of the Act manifest congressional intent to protect uniformed personnel like Cummings. See id. At 78 n.5, 81 (citing 5 U.S.C. 552(f), 552a(g)(1), 552a(k)(5) and 552a(k)(7)). One provision permits agencies, in certain circumstances, to exempt from the Act's purview "investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for … military service…." 5 U.S.C. 552a(k)(5). Another allows exemption—again, in limited circumstances—of "evaluation material used to determine potential for promotion in the Armed Services…." 5 U.S.C. 552a(k)(7). The District Court rightly noted that such exemptions "would be unnecessary if military service persons were excluded from the Privacy Act altogether." Cumming 116 F. Supp. 2d at 78 n.5.

14

The court concluded that the aforementioned provisions, taken together, demonstrate that the Congress unambiguously intended to establish a duty that runs from a "military department" (like the Navy) to military personnel (like Cummings) not to "disclose any record which is contained in a system of records" (like Cumming's Evaluation Board report). 5 U.S.C. 552a(b). The Navy did not contest this. Instead, it contended that "without necessarily waiving immunity with respect to money damages," the Congress "intended to apply the Act to 'military departments'" by permitting a service member to seek equitable remedies only. Br. Of Appellee at 25. Its contention finds no support in the text of the statute; without regard to the identity of the plaintiff or the agency she is suing, the Act plainly authorizes injunctive relief, 5 U.S.C. 552a(g)(2)(A), (3)(A), and monetary relief, 5 U.S.C. 552a(g)(4),[9] and it permits a court to "assess against the U.S. reasonable attorney fees and other litigation costs," 5 U.S.C. 552a(g)(2)(B), (3)(B). Moreover, that the Act allows a military department to exempt from the Act's reach certain records based upon their content, 5 U.S.C. 552a(k)(5), (7), demonstrates that the Congress did not intend the courts to craft additional exemptions from coverage based upon the type of relief a service woman requests (i.e., by limiting suits to equitable relief only). See Fawn Mining Corp. v. Hudson, 80 F.3d 519, 523 (D.C. Cir. 1996) ("Neither lawyers nor judges serve as back-seat lawmakers who may extend statues beyond their bounds or

---

9 Section 552a(g)(4) provides:

In any suit brought under the provisions of ... this [Act] in which the court determines that the agency acted in a manner which was intentional or willful, the U.S. shall be liable to the individual in an amount equal to the sum of ... actual damages sustained by the individual ... and ... the costs of the action together with reasonable attorney fees as determined by the court.

change the rules that Congress has set.").

This Honorable Court's claimed on June 4, 2008 that the <u>Feres</u> doctrine limits the ability of armed services personnel to obtain damages from the federal government for activities "incident to service," and that this Court has held that the <u>Feres</u> doctrine applies to the Privacy Act. See <u>Cummings</u>, however, the district judge erred by not quoting the final resolution of the <u>Cummings</u> case which upon appeal in 2002 did conclude that military decisions which cause clear violations of constitutional rights "beyond the bounds of human decency" have indeed been protected under <u>Feres</u>, due to sovereign immunity, however, sovereign immunity does not apply under 5 U.S.C. 552 when narrowly construing a duty that runs from a "military department" like the (DA and DMVA) to military personnel (like the plaintiff) not to '"disclose any record which is contained in a system of records".

This district court correctly reminded us that "waivers of sovereign immunity must be unequivocally expressed and narrowly construed," <u>Cummings</u>, 116 F. Supp. 2d at 81 (2002) (quoting <u>Dorsey v. Department of Labor</u>, 41 F. 3d 1551, 1555 (D.C. Cir. 1964)). Erroneously, however, it denied effect to the unequivocally expressed waiver contained in the Privacy Act, 5 U.S.C. 552a(g). Construing a waiver of sovereign immunity narrowly, even "strictly in favor of the sovereign," means only that a court may not "enlarge the waiver beyond what the language requires." <u>Tomasello v. Rubin</u>, 167 F. 3d 612, 618 (D.C. Cir. 1999) (quoting <u>U.S. v. Nordic Village, Inc.</u>, 503 U.S. 30, 34 (1992)). We need not "enlarge" by any stretch the Privacy Act's purview in order for the statute to avoid

the effects of the Feres doctrine. As the district court acknowledged," on its face, the Privacy Act would appear to permit actions brought by military personnel....: Cummings, 116 F. Supp. 2d at 81. And statutory text remains the best evidence of congressional intent. See Tataranowicz v. Sullivan, 959 F.2d 268, 276 (D.C. Cir. 1992). The Act not only appears to, but does, permit actions brought by military personnel.

Additionally, the DMVA's claim that the plaintiff "does not assert, nor can he allege, any set of facts indicating that the SOA's immunity from such a suit has been waived or abrogated"[10] by pointing to any authority indicating that Congress has manifested an unequivocal intent to abrogate state sovereign immunity for the claims he brings in his complaint,[11]making the Eleventh Amendment a complete bar to the plaintiff's claims is completely irrelevant since the AK ARNG has a federally established general records management requirements due to its records which are subject to the Privacy Act being maintained in a system of records. Therefore, since the Privacy Act on its face holds the AK ARNG to have a Federal agency requirement, and since a federal agency can not claim state immunity, the eleventh amendment claim as a defense is unrelated to the plaintiff's amended claims, and can not be used to bar the plaintiff's claim based on a disclosure of any record which is contained in a system of records in violation of Privacy Act of 1974 and the FOIA of 1964 when it is unequivocally expressed and narrowly construed.

---

10 Port Authority, 495 U.S. at 305-07; Will v. Michigan Dep't of State Police, 491 U.S. 58, 64-66 (1989)
11 Indeed, the plaintiff appears to presume that the AK ARNG and AK MYA are entirely federal agencies. See Docket No. 1, Supplement to Petition for Grant of Review at 16-17.

17

With the aforementioned legal precepts in mind to prove subject matter jurisdiction, the plaintiff's reliance on the text of the Privacy Act clearly reveals that Congress unambiguously intended to establish a duty that runs from a "military department" e.g. the DA and the DMVA, to military personnel e.g. the plaintiff, not to "disclose any record which is contained in a system of records" e.g. the DA and the DMVA's disclosure of any record on the plaintiff contained in a system of records which violated 5 U.S.C. 552a(b). Furthermore, Congress did not intend the courts to craft additional exemptions from coverage based upon the type of relief from a serviceman's requests i.e., by limiting suits to equitable relief only.

Additionally, specific concerns presented in the context of an intra-military lawsuits, in general "waivers of sovereign immunity must be unequivocally expressed" and narrowly construed. Dorsey v. Dep't of Labor, 309 U.S. App. D.C. 396, 41 F.3d 1551, 1555 (D.C. Cir. 1994) (quoting Irvin v. Dep't of Veterans Affairs, 498 U.S. 89, 95, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990). In this case, Congress waived sovereign immunity to make the "military departments" subject to the Privacy Act, but that waiver must be narrowly construed. The Feres doctrine will apply to the Privacy Act unless the concerns which gave rise to the ruling in Feres are simply not presented by the causes of action which Congress established.

        **d. Claim based on the merits:** If the plaintiff's claim is clearly based upon federal law, it qualifies for federal-question jurisdiction even if it is invalid on the merits. In this situation, the federal court will dismiss for failure

to state a claim on which relief may be granted (see Rule 12(b)(6)), not for lack of subject matter jurisdiction. See Bell v. Hood, 327 U.S. 678 (1946).

The military's loss of legal protections is the result of a 1950 Supreme Court ruling on a series of cases that became known collectively as the Feres Doctrine. In this and later opinions, the Supreme Court interpreted the Federal Torts Claim Act (FTCA) to effectively bar any tort action by service members, even though Congress exempted only "combat-related" injuries. The court unilaterally decided that even injuries in peacetime that are far removed from any combat-related functions are still "incident to service."

When the merits of a claim under the FTCA, are Intertwined with subject-matter jurisdiction, a district court errs by dismissing the case under FRCP 12(b)(1). In such cases, the district court may dismiss (if appropriate) under FRCP 12(b)(6) or 56 (summary judgment). Montez v. Dept. of Navy, No. 03-10767 (5th Cir. Nov. 30, 2004).

In the Montez, Etc; ET AL, the Whitts sued the Navy under the FTCA, contending that Partida caused Kimberly's death in the line of duty as a Navy enlisted man and that, therefore, the Navy was liable for her death. The district court dismissed the Whitts' complaint against the Navy under Rule 12(b)(1) for lack of subject matter jurisdiction.[12] The court held that the FTCA did not apply to the complaint against the Navy because of the court's finding that Partida was not "acting within the scope of his office or employment" as a member of the U.S.

---

12 We note that our examination of the record reveals that the Whitts objected to the district court that the determination of the merits should not have been made on the basis of a 12(b)(1) motion.

Navy at the time of the accident. The Whitts argue that the district court erroneously applied a 12(b)(1) standard to resolve the jurisdictional issue on the basis of facts dispositive of the merits as well as jurisdiction, and that instead the court should have applied a 12(b)(6) or summary judgment standard.

In general, where subject matter jurisdiction is being challenged, the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case. See Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947). "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Robinson v. TCI/US West Communications Inc., 117 F.3d at 900, 904 (5th Cir. 1997). In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case.

However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, we have held that the trial court must assume jurisdiction and proceed to the merits. In circumstances where "the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court ... is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case" under either Rule 12(b)(6) or Rule 56. Williamson v.

Tucker, 645 F.2d 404, 415 (5th Cir. 1981); see also Daigle v. Opelousas Health
Care, Inc., 774 F.2d 1344, 1347 (5th Cir. 1985).

As we stated in Williamson, 645 F.2d at 415[13]. Therefore, we follow our
general rule in holding that a jurisdictional attack intertwined with the merits of an
FTCA claim should be treated like any other intertwined attack, thereby making
resolution of the jurisdictional issue on a 12(b)(1) motion improper.

The government relies on our decision in Moran v. Kingdom of Saudi Arabia,
27 F.3d 169 (5th Cir. 1994), in which we allowed judges to make factual
determinations on a 12(b)(1) motion in regard to claims arising under the Foreign
Sovereign Immunities Act (FSIA). While Moran carved out a limited exception to
the general rule requiring the application of a 12(b)(6) or summary judgment
standard to resolve issues dispositive of both subject matter jurisdiction and the
merits, we took pains to explain why that exception applies only to cases brought
under the FSIA, inasmuch as FSIA claims involve immunity from suit. "[B]ecause
sovereign immunity under the FSIA is immunity from suit, not just from liability,
'postponing the determination of subject matter jurisdiction until some point
during or after trial would be inappropriate.'" Moran, 27 F.3d at 172 (quoting
Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445, 450 (6th Cir. 1988)).
An exception to the general rule for FSIA cases is justified by the fact that we
have held that the FSIA requires courts to fashion procedures that lead to pretrial

---

13 [N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction. Judicial
economy is best promoted when the existence of a federal right is directly reached and, where no claim is
found to exist; the case is dismissed on the merits. This refusal to treat indirect attacks on the merits as
Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is facing a
challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) ... or Rule 56
... both of which place greater restrictions on the district court's discretion.

resolution of a foreign state's immunity from suit – even if such procedures depart from the "usual" rule. See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General, 923 F.2d 380, 385 (5th Cir. 1991) (holding that the denial of a motion to dismiss for lack of subject matter jurisdiction is immediately appealable in cases brought under the FSIA); Arriba Ltd. V. Petroleos Mexicanos, 962 F.2d 528, 534 (5th Cir. 1992) (holding that the "usual procedure" for resolving contested jurisdictional issued did not apply in FSIA cases, and that district courts must utilize circumscribed discovery procedures to resolve jurisdictional motions prior to trial in order to preserve a foreign sovereign's immunity from the burdens of litigation).  The need for special procedures designed to preserve a foreign sovereign's immunity from suit is heightened in FSIA cases, which implicate notions of international comity, a concern that does not exist in FTCA cases against the United States. See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 626 (1983) (emphasizing '[d]ue respect for … principles of comity between nations' in asserting jurisdiction under the FSIA); Arriba, 962 F.2d at 537 (recognizing that principles of comity favor the exercise of restraint in asserting jurisdiction over foreign states under the FSIA).

Moreover, information provided to us by our sister Circuits indicates that Moran is best viewed as a limited exception to the general rule.  Two Courts of Appeals have held that an FTCA claim cannot be dismissed for lack of subject matter jurisdiction where the disputed jurisdictional facts concerning immunity are inextricably intertwined with the merits of the plaintiff's claim.  Citing our decision

in <u>Williamson v. Tucker</u>, 645 F.2d 404 (5th Cir. 1981), as the controlling precedent

on the issue, the Eleventh Circuit specifically has held in the context of the FTCA

that a claim against the United States may not be dismissed for lack of subject

matter jurisdiction under Rule 12(b)(1) based upon the district court's resolution

of the disputed factual question whether an employee of the U.S. government

was acting within the scope of his employment. See <u>Green v. Hill</u>, 954 F.2d 694,

698 (11th Cir. 1992); <u>Lawrence v. Dunbar</u>, 919 F.2d 1525, 1529 (11th Cir. 1990).

The Ninth Circuit also has held that an FTCA claim cannot be dismissed for lack

of jurisdiction under Rule 12(b)(1) where resolution of the jurisdictional issue is

dependent upon the resolution of factual issues going to the merits. See

<u>Augustine v. United States</u>, 704 F.2d 1074, 1079 (9th Cir. 1983) ("Because the

jurisdictional issue [when plaintiff's cause of action accrued for purposes for the

FTCA] is dependent upon the resolution of factual issues going to the merits, it

was incumbent upon the district court to apply summary judgment standards in

deciding whether to grant or deny the government's motion."). Therefore,

because the Whitts' claim is based on the FTCA, and not the FSIA, <u>Moran</u> does

not apply and the trial court must apply a 12(b)(6) or summary judgment standard

to resolve issues dispositive of both subject matter jurisdiction and the merits.[14]

According to case law in this Circuit, and consistent with the decisions of our

sister Circuits, the district court should not have resolved disputed facts

---

14 It may well be that the district court can determine whether Partida was acting within the course and
scope of his naval employment on a Rule 56 motion for summary judgment. However, it is clear that this is
not the basis of the district court's determination, nor did the court convert the 12(b)(1) motion into a motion
for summary judgment.

dispositive of both subject matter jurisdiction and the merits of an FTCA claim on a 12(b)(1) motion. Accordingly, for the foregoing reasons, the opinion of the district court is reversed and the case remanded for further proceedings consistent with this Court's opinion.

The plaintiff asserts that he has proven his case on the face of 5 U.S.C. 552, on his cases merits, through the burden of persuasion and through the burden of production the following:  a defective record proximately caused an adverse determination concerning him.  Furthermore, the plaintiff has meet his burden in order to obtain relief under the Privacy Act by establishing how a federal agency violated a provision of the Act, that the violation of the Act was "intentional or willful," and this action had an adverse effect on the plaintiff.

By the defendant's own acknowledgement, the NG "occupies a distinct role in the federal structure that does not fit neatly within the scope of either state or national concerns,"[15] thus, this Court can not simply take a narrow view on this matter based on the scope of various immunity claims, and allow the defendant to violate 5 U.S.C. 552, and then not narrowly construe Congress's intent on all liable parties in the plaintiff's case based upon the violations and there merits. The burden of production submitted to this Honorable Court by the plaintiff in TAB B clearly shows how the defendant's negligent actions exceeded gross error, and was nothing short of an intentional, reckless, malicious, and tortuous pattern of management" as part of a pattern of retaliation performed by the plaintiff's command with the disclosure of information which violated 5 U.S.C.

---

15 Knutson v. Wisconsin Air National Guard, 995 F.2d 765, 767 (7th Cir. 1993)

24

552. Thus, showing a violation of the Privacy Act, by showing how a federal agency subject to the Privacy Act made an improper disclosure.

As aforementioned the DMVA is not strictly a State entity, but is also a Federal entity codified in the U.S. Constitution with Federal Statues that governs it under U.S.C.'s 10 and 32. Therefore, when the DMVA acts negligently under a federal statue as a federal agency, it can not then claim state immunity when its actions violate the Federal Law that governs it. Additionally, their actions are the actual cause of the damages claimed in the suit, which they are concurrently liable. Thereby, as previously argued in the plaintiff's complaint under 5 U.S.C. 552, so claimed in the plaintiff's opposition to the DA's motion to dismiss and now as the plaintiff makes an amendment to his pleading, with opposing points and authorities IAW LCvR 7(b), the plaintiff pursuant to FRCP 12(b)(1), undeniably meet his burden of establishing subject matter jurisdiction by a preponderance of the evidence, and thus, this Honorable Court should set aside its determination.

**B. If this Honorable Court changed its ruling to be based on Claims Pursuant to a FRCP 12(b)(6) standard, That the Plaintiff Fails to State a Claim Upon Which Relief can be granted.**

**1. Plaintiff's Claim:** The plaintiff would oppose these claims based on the following opposing points and authorities:

**(a) FRCP 12(b)(6) standard:** A complaint should not be dismissed for "failure to state a claim on which relief may be granted" (Rule 12(b)(6)) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson,

355 U.S. 41 (1957). The plaintiff asserts that pleading under the codes was/is designed to reveal the underlying facts on which the claim is raised. Hence, the plaintiff has proven sets of facts with his Complaints, Writ of Habeas Corpus, and allied paperwork e.g. TABs A, B, and C, which were submitted to this Honorable Court that prove his set of facts in support his claim and entitle him to relief.

Similarly, the plaintiff in his original complaint was not required to recite facts that sufficiently demonstrate a prima facie case,[16] that is, as long as the plaintiff gave enough facts to put the defendant on reasonable notice about what was being alleged, it's irrelevant that the plaintiff had failed to allege some matters that he would ultimately have to prove in order to recover. Moreover, the plaintiff alleged on page 123 of his original complaint under the Relief Sought section that "IAW the Privacy Act of 1974 the plaintiff is suing the defendant for the releasing of personal information maintained by these agencies."[17]

Under established law, if the plaintiff wants to prove his case by circumstantial rather than direct evidence, plaintiff will have to at trial meet his burden of proof and standard of proof as outlined under 5 U.S.C. 552a subsection (g)(1)(C):

> **(1)** The plaintiff has the burden of proving that:
>
> > **a.** a defective record
> >
> > **b.** proximately caused
> >
> > **c.** an adverse determination concerning him

---

16 A prima facie case consists of all the facts which the plaintiff must prove in order to be entitled to have the case decided by the jury rather than dismissed by the judge on a motion for summary judgment or for a directed verdict.

17 These agencies refers to The U.S. Army, The Alaska Army National Guard (AK ARNG), and the Alaska Military Youth Academy (AK MYA) hereto referred to as the defendant.

26

**(2)** Furthermore, in order to obtain relief under the Privacy Act the plaintiff must establish that:

> **a.** the agency violated a provision of the Act
>
> **b.** the violation of the Act was "intentional or willful"
>
> **c.** this action had an adverse effect on the

plaintiff and that if these three factors are satisfied, the plaintiff is entitled to the greater of $1,000 or the actual damages sustained.

**(3)** Proof of actual damages is required in order to recover either the statutory minimum or damages beyond the minimum, then actual damages sustained by the plaintiff are recoverable, but in no case shall a person who is entitled to recovery receive less than the sum of $1,000. Moreover, as mentioned in the plaintiff's Complaint under A Defective Record Proximately Caused an Adverse Determination on page 24 "the egregious acts of Unlawful Command Influence (UCI) in the plaintiff's case will prove how violations of the Privacy Act of 1974 were the proximate cause of the adverse determination upon the plaintiff. Furthermore, these egregious acts will show how the defendant violated a provision of the Act, violated the Act intentionally or willfully, and how this action had an adverse effect on the plaintiff." Thus, all allegations stated in the plaintiff's Complaint and allied paperwork sought to meet his burden of proof under the requirements of 5 U.S.C. 552a subsection (g)(1)(C) by showing how these negligent acts were intentional/willful and not mere "unnecessary inclusions or allegations regarding the Plaintiff's Court Martial (CM)

27

which will only serve to confuse all parties if the defendant's motion to dismiss if not granted."

As aforementioned the district court acknowledged," on its face, the Privacy Act would appear to permit actions brought by military personnel....: Cummings, 116 F. Supp. 2d at 81. And statutory text remains the best evidence of congressional intent. See Tataranowicz v. Sullivan, 959 F.2d 268, 276 (D.C. Cir. 1992). Thus, contrary to any claim, the Act not only appears to, but does, permit actions to be brought by the plaintiff, and the Act does provide the granting of relief. Furthermore, the plaintiff in this motion has amended his pleading. Moreover, through his Complaints and its allied paperwork submitted to this Honorable Court the plaintiff asserts that he has provided "enough facts to state a claim for relief that is plausible on its face" under 5 U.S.C. 552.

The evidence contained in the Complaints and its allied paperwork demonstrates how the DMVA failed in their due care responsibilities owed to the plaintiff when it disclosed a secret defective record contained in a secret record system, to the DA upon any communicated request reference the plaintiff. Moreover, it demonstrates how both DMVA and the DA failed in their due care responsibilities owed the plaintiff when they both disclosed information from a record contained in a system of records by any means of communication to the public[18] who did not have a need to know, except pursuant to a written request by, or with the prior written consent of, the plaintiff to whom the record pertained.

---

18  defined to include "not only the civilian population, but also the rank and file of the services because most service members are not directly involved with the military criminal justice system." U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990)

28

Hence, all matters dealing with the plaintiff's claim of Privacy Act and FOIA Violations, and a collateral review of his GCM have been filed with this Honorable Court, and all points are relevant as all claims seeking the granting of relief are within the aspects of their specific statue. Moreover, the plaintiff asserts that the Court for Privacy Act and FOIA violations should look to the more immediate cause of the injury, which is the release of the plaintiff's record. Thus, the plaintiff's position would be correct due to the fact that the release of the record, not the creation or existence of the record, creates a cause of action under the Privacy Act.

Creating and maintaining the record is certainly military conduct, but all Privacy Act cases raised against the military will necessarily involve a record from a military "system of records" See 5 U.S.C. 552a(a)(5). If this Court were to employ the defendant's approach, any action for damages under the Privacy Act would be considered "gross negligence" or simply waived by sovereign immunity by virtue of the fact that a military record formed the basis for the action. Instead, the plaintiff asserts this Honorable Court to focus his Complaints on the following: whether or not the release of his record was, in itself, intentional/willful; if providing the public access to the information contained in any record in the possession or control of the defendant, who then incompetently and illegally released inadmissible evidence to the public, would jeopardize the constitutional rights of the Plaintiff during an ongoing legal proceeding; and if the evidence provided of such acts substantiates enough factual basis for granting the plaintiff relief from the defendant's various violations of 5 U.S.C. 552.

The plaintiff's case is reliant on the premise that a fact-finder could infer from the defendant's control and custody of his record that Army personnel released his record. As Cummings put it, "this case is about the unilateral release of confidential and private documents by Army personnel." That release was a military decision, regardless of how unlikely or outrageous the decision might appear to a casual observer. Military personnel by the reasonable person standard are considered to be professional, and thus, held at a higher standard than a normal person. Moreover, these professionals are aware by training and experience that private information should not be provided to individuals who were not authorized access to such information. U.S. v. Sheperd, (C.C.A. LEXIS 189, 2002). When properly reviewed the evidence on its face value under 5 U.S.C. 552 clearly demonstrates that the defendant performs information functions and had access to sensitive personnel information which was protected from disclosure by 5 U.S.C. 552. In addition, in Henson, involving employee's claim that superior released confidential medical information, "intentionally or negligently inflicted severe emotional distress … and engaged in an intentional, reckless, malicious, and tortuous pattern of abusive management" as part of a pattern of retaliation. Therefore, as aforementioned on page 123 of his original complaint the plaintiff "asserts that such a pattern is found in the plaintiff's case through the numerous egregious acts of UCI, in which performing, the defendant's conduct violated a Provision of the Act, that caused an adverse determination against the plaintiff, that rose out of these Intentional or Willful violations of the Privacy act, that still adversely effect and impact the plaintiff."

30

The plaintiff also argues just as Cummings did that the release of his record could not have been a discretionary military decision based on the following points named by the defendant: a state entity; intra-agency inquiry; injuries sustained that are not the proximate result of the adverse determination against the plaintiff; not maintained in a system of records; and based on gross negligence as cited in various places in the defendant's motion to dismiss. The plaintiff claims this because such a release would clearly not be permitted under the Privacy and FOIAs or by military regulation.

Through the plaintiff's production of evidence, the plaintiff has proven that the defendant's actions which violated 5 U.S.C. 552 resulted in a breach of duty, and once it is shown that the defendant owed a duty of due care to the plaintiff, the plaintiff must then show that the defendant breached this duty through an act or omission exposing others to an unreasonable risk of harm. These three elements – i.e., an act or omission by the defendant, a duty of due care owed to the plaintiff, and a breach of duty by creation of an unreasonable risk of harm – together constitute a "negligent act." However, the elements of causation and damages must also be satisfied in order to establish liability for the negligent act, and the plaintiff's asserts that he has satisfied this requirement.

**(4)** Whether the defendant has breached a duty of due care requires a two-step demonstration:

**a.** First, prove what actually happened, which the plaintiff attests he has done, e.g. with the omission by the defendant that the defendant did indeed intentionally/willingly disclose a defective record which is

31

contained in a "system of records" that violated 5 U.S.C. 552. The plaintiff asserts that there is no "genuine issue of material fact," as he meet his burden of production by submitting as evidence a memorandum from LTC Bailar the Alaska National Guard's Staff Judge Advocate, that showed by the DMVA's own admittances that they indeed violated various provisions of the Privacy and FOIAs, as the defendant's claimed to perform the custodial duties, and were even the attestation authority of a defective record concerning a 1994 investigation on the plaintiff which was incomplete. Furthermore, without the plaintiff's approval the DMVA improperly disclosed this file to the DA, upon the DA's prosecutor's request.

**b.** Secondly, the plaintiff has to show that the defendant acted unreasonably under those circumstances, which the plaintiff has also shown with the numerous amount of unreasonable actions demonstrated by the defendant's in how they violated their "duty owed" responsibilities to the plaintiff in relation to 5 U.S.C. 552 with relation to performing "discretionary," and/or "ministerial" functions, in addition to, the militaries "Materiality Standard."

**(1)** Discretionary functions are those in which the officer has some element of personal judgment or decision making. In carrying these functions, the officer is granted immunity as long as they were acting in good faith, which based on the merits of the plaintiff's case, and with what the plaintiff has proven with the burden of production, shows that the defendant's personnel were negligent, thus, they did not act in good faith.

**(2)** Ministerial functions are those in which the officer is left no choice of their own; they are carrying out orders of others or established duties of their office.  Here there is no immunity.  If the officer negligently fails to perform their required duties properly, they can be held personally liable for any damages resulting from their acts, even if they were acting in good faith.  Which again based on the merits of the plaintiff's case, and through the burden of production the plaintiff has proven that third parties from the defendant did not act in good faith, but in negligence, hence, they are liable.

**(3)** Finally, as aforementioned in the plaintiff's original complaint on page 64 cited in Hart,[19] the court analyzed Supreme Court and military precedent and concluded that in the military the following "materiality" standards apply as follows:  Prosecution use of perjured testimony or similar misconduct will result in reversal unless it is harmless error beyond a reasonable doubt, regardless of whether the prosecution acted in good faith.

The defendant's unreasonable actions resulted in the plaintiff having to file several Motions to Suppress the disclosed information prior to his GCM based on the damages caused by the defendant's breach of law with the defective record in question.  Thus, "in an attempt to suppress this, intentional/willful act by the agencies the plaintiff was forced to hirer a civilian lawyer (for circa $50,000) in order to suppress this inaccurate, non-relevant, and untimely information in court in NOV 2006 through a Motion to Suppress.  However, although the Motion was

---

19 U.S. v. Hart, 27 M.J. 839 (A.C.M.R. 1989)

upheld by the MJ the intentional/willful act by the agencies still resulted in the releasing of personal information maintained by these agencies that contained specific details and direct quotes from an inaccurate, non-relevant, untimely, and non-complete secret file, that as a direct result of the violations of Privacy caused the plaintiff severe damage," all combined these actions show how the defendant did indeed act unreasonably under the circumstances.

**(5)** The defendant's negligent act must be the cause of the plaintiff's injuries in order to impose liability. This involves two separate determinations:

**a.** First, whether the defendant's conduct was the actual cause (or cause in fact) of the injuries. In order to prove this the plaintiff cites from his original complaint on page 85 that "MAJ Luce makes the statement in his interview with the IO 6 AUG 2006 that he knew of a sexual harassment investigation back in Alaska" against the Plaintiff, and MAJ Veith is further credited with making the following statement "flirting with females is a "Fredism" and that he had a sexual harassment charge in Alaska. MAJ Veith makes that statement based on the IOs question of do you have any other information pertaining to this matter, or would you like to make any other statements? Please write any other information you would like to provide. Therefore, MAJ Veith made a statement that clearly shows the defendant violated the Privacy and the FOIAs with their negligence in the administration, supervision, and subsequent monitoring of the Act by disclosing information."

The disclosure of information reference the plaintiff from a case 12 years prior to that point was in a defective record maintained by the defendant and kept secret from the plaintiff as it was not made available to the plaintiff per the agencies established procedure allowing individuals to see and copy records about themselves. Therefore, the plaintiff who would have sought to amend information in the record that was not accurate, relevant, timely, or complete, was denied that right to inspect and to correct the record. Moreover, the information in that record was not even in the plaintiffs personnel file, and is also incomplete as the government was unable to turn up the EEO investigation in that case, yet it is still protected by a privacy statute. Moreover, 12 years after the fact in a sworn statement made by several of the defendant's witnesses, in an unrelated case against the plaintiff, it is maliciously used as a damaging statement against the plaintiff in an ongoing investigation.

MAJ Veith made this statement as a matter of fact to describe the plaintiffs so called "Fredisms" or behavior, and that indeed he had been charged as a sexual harasser in Alaska. This libelous statement clearly violates the Privacy Act which by law requires the defendant to perform information management functions and who are responsible in providing the due care responsibilities of the plaintiff's record, by only providing access to this private information to those acting in an official capacity. Yet, multiple defense witnesses who have never had a right to know such information, and who were not acting in their official capacity swear to disclosed defective information from a record in a system of records as facts in an ongoing investigation 12 years after the unrelated incident. Moreover, the

unrelated, uncharged and un-sworn allegations in the defective record do not even meet the legal propensity evidence standards of the Army, yet are not only introduced into the AR 15 – 6 investigation as true, but then are intentionally circulated around the plaintiffs organization at KAF, Alaska, and a unit deployed to Mississippi as what the MJ at the Bagram Air Field (BAF) Motions to Dismiss Trial in January 2007 called "rumors" that depict the plaintiff to the witness pool as the defendant's pattern of retaliation wanted him to be depicted as, "a predator, a psychological predator, and a bad guy who needed to go down."

These rumors were being talked about in public settings and in private settings, and provided the public access to information contained in records in the possession or control of the defendant which release jeopardized the constitutional rights of the plaintiff during an ongoing legal proceeding. This shows that the taint of disclosed information from a defective record was never purged out of the plaintiff's case. The damage of an improper legal standard had already been applied to the plaintiff's case, as well as the unfair fact-finding process that supposedly "revealed a history and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the plaintiff." Moreover, this information was used by commander and supervisors alike to warn potential defense witnesses away from the trial and the plaintiff by suggesting and then taking illegal action to show that the plaintiff was a bad character."

The defendant's unreasonable conduct displays that regardless of whether the defendant was a state or federal agency, the defendant's various and

separate intentional/willful negligent acts, along with the plethora of third parties
who conspired and concurred to cause a single injury, concurrently combine to
proximately cause the plaintiff's injuries, which the plaintiff asserts was based on
the disclosure. The defendant's egregious acts of UCI throughout the plaintiff's
case clearly put in view its intentional/willful intent as exhibited in TAB Bs
evidence attachments 6 and 7, the defendant maliciously used against the
plaintiff libelous and false official statements in an ongoing legal proceeding,
based on a public disclosure of private facts. The dissemination of truthful
private information which a reasonable person would find objectionable was not
simply used for the probative value of the evidence, but was used to injure the
plaintiff and, by so doing, resulted in unfair prejudice, MRE 403, which actually
caused exceptional circumstances that are so fundamentally defective as to
result in a miscarriage of justice."

      **b.** Second, whether it was the proximate (or
legal) cause thereof. The plaintiff asserts that he has proven through the burden
of production that the defendant was aware of its due care responsibilities.
Although the defendant cites 5 U.S.C. 502a(b)(1) as intra-agency release, as
argued earlier, such a claim would not be warranted since such a release would
clearly not be permitted under the Privacy and FOIAs or by military regulation.
The plaintiff alleged this in his FOIA Complaint on page 14 – 15 under the
Argument for Summary Judgment section "the defendant used straight
propensity evidence advanced under a logical theory of relevance, as they
requested and obtained access to a record described in 5 U.S.C. 552 subsection

(b)(7)(A), in addition to, (A) the investigation or proceeding involves a possible violation of criminal law; and (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings.  Thus, the defendant clearly interfered with enforcement proceedings, and violated the mandated laws set forth in 5 U.S.C. 552.  Additionally, the defendant proves by its own actions that it was aware that they had due care for the administrative, supervisory, and subsequent monitoring responsibilities of the plaintiff's record pursuant to 5 U.S.C. 552, by providing Privacy Act Statements for every witness called during the AR 15 – 6 investigation as exampled in evidence attachment 14 – 17." "Based on the sworn statements submitted by William Luce, and Frank Veith in evidence attachments 6 and 7 during the AR 15 – 6 investigation, provides proof that the defendant disclosed the existence of the record to the public, which substantially interfered with enforcement proceedings.  Moreover, this is prohibited by MRE 404(b) under a legal theory of relevance because admission would create significant risk that the members would convict the accused based upon a propensity theory and disregard the standard and elements required for proof beyond a reasonable doubt on the charged offenses.

The plaintiff's military ROT, its allied paper work, in addition to, TAB B clearly shows how the defendant requested the defective record in question to be sent to KAF, in an attempt to utilize the information in it against the plaintiff, once received the DA submitted the defective record against the plaintiff into evidence

on November 14, 2006. This record was defective because it was inaccurate, non-relevant, untimely, and incomplete as stated in the plaintiff's complaint. However, as aforementioned the logic theory that the plaintiff attempted to keep out of the courtroom had already manifested prior to his investigation based on the disclosure of this information. Therefore, despite the plaintiff's best intentions to suppress this information in court, the damage of this disclosure was only in theory "suppressed." The plaintiff clearly proves that the record was hidden from him, thus denying him the ability to "purge" this information from his record in order to prevent the adverse action imposed upon him. Additionally, the taint and damages still contained in the DA and DMVA's system of records pertaining to the plaintiff continue to adversely impact him to this day.

The plaintiff displayed some of the damage of this "un-purged" taint in his original complaint starting on page 85 when he asserted "the unfairness of the fact-finding procedure by LTC Thomas and how the plaintiffs command even went as far as to repeatedly violate his right to privacy, which is protected by a privacy statue. Such violations are clearly shown in the sworn statements of two of the witnesses during the AR 15 – 6 Investigation conducted by LTC Thomas. First, on 4 AUG 2006, at 1730 local time MAJ Frank L. Veith Jr statement shows how the case was the topic of conversation by not only the primary staff at that time, but by others directly under the command of COL Williams. MAJ Veith states that he "wants to cite an action that was pointed out to me by MAJ Bill Luce." He then goes on to say "I was informed that the plaintiff personally" did an accusation and that such accusation "can be verified by MAJ Rob Barr the NCE

S-1." This shows the command utilized "teamwork" in ensuring that each person received the same slanderous disclosure from a defective record in the defendant's possession, which the defendant utilized as vicious libelous statements in order to present the plaintiff as a bad character to public, the witness pool, and the fact-finder. This disclosed information was then utilized by the IO as unconfirmed truths in assisting him in conducting an unfair fact finding procedure, which resulted in an improper legal standard, which produced an adverse determination against the plaintiff. Thus, the defendant's utilization of disclosed information led to the aggregation of legally and factually unsupportable charges, which denied the plaintiff the due process even as to the valid charges. In doing so, the defendant allowed the mere allegation of baseless charges to influence not only the fact finder by suggesting that the accused is a bad character, but the entire witness pool in the plaintiffs case that extended even beyond the plaintiffs rear detachment to the public as well doing an ongoing investigation.

Fraud on the Court had a substantial contributing effect on the findings of guilty and the sentence. Therefore, as aforementioned by the plaintiff on page 108 of his original complaint as exampled by Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963); and in Rogers v. Richmond, 365 U.S. 534, 547 (1961) "Historical facts 'found in the perspective framed by an erroneous legal standard can not plausibly be expected to furnish the basis for correct conclusions if and merely because a correct standard is later applied to them."

40

This coupled with the fact that the IO and COL Williams collectively did not give the plaintiff a chance to defend himself from these statements that were used with malicious intent and with disregard to the public's best interest at that time in order to falsely imprison, and wrongfully dismiss the plaintiff from the U.S. Army, severely damaged the military and civilian career prospects, of the plaintiff while causing his family personal and professional mental distress; embarrassment; and humiliation based on the defendant's disclosure.

The plaintiff emphasizes that he did in fact prove that the accusations made by many of the defendant's witnesses who stated he had "personally shopped" for woman to put on the deployment roster was false, and sustained based on the testimony of several of the so-called "victims" in the plaintiff's case who said the statements were untrue, as well as a witness in the plaintiff's rear command. However, the damage was already done as an improper legal standard had already been applied to the plaintiffs case, as well as an unfair fact-finding process that supposedly "revealed a history" (which the plaintiff asserts means the past and not current allegations as the defendant claims) "and definite pattern of inappropriate behavior, violations of regulations and potential crimes committed by the plaintiff" based on a total of "33 command influenced interviews, numerous official sworn statements that were false, and an AR 15 – 6 executive summary that is full of liable that creates fraud on the court. All of the defendant's negligence was taken and submitted into evidence and is used to support in depth the bases for the Gamble case, along with the personnel who did such egregious acts as the foundation of the defendant's "victims and

41

witnesses" pool. Therefore, it certainly appears that the plaintiff would not have been injured but for the concurrence, hence, both defendant and the third parties are actual causes. Moreover, the DMVA shares in Concurrent liability with the DA as one of its agencies and therefore, can not be immune to it's illegal actions in violation of 5 U.S.C. 552. Wherefore, the plaintiff asserts, alleges, and offers as opposing points and authorities IAW LCvR 7(b), which indicates that the plaintiff pursuant to FRCP 12(b)(6), undeniably meet his burden of stating a claim upon which relief can be granted by a preponderance of the evidence.

### C. If this Honorable Court changed its ruling based on Claims Pursuant to the Summary Judgment standard.

**1. Plaintiff's Claim:** The plaintiff would oppose these claims based on the following opposing points and authorities:

**(a) Contents of Affidavits:** The plaintiff has produced affidavits which recite only matters as to which he has personal knowledge, only stated matters which would be admissible at trial, and "showed affirmatively that the affiant is competent to testify to the matters stated therein." See Rule 56(e).

**(b) Discovery Materials:** Second, the plaintiff may submit the fruits of discovery (e.g. depositions, interrogatory answers, etc.), no matter which side they were obtained from. See Rule 56(e).

**(c) Showing by movant:** Regardless of who will have the burden of persuasion on an issue at trial, the movant bears the initial burden of production on that issue. That is, as part of his summary judgment papers, he bears the burden of coming forward with information that "clearly establishes that

there is no factual dispute regarding the matter upon which summary judgment is sought." Sattar v. Motorola, Inc., 138 F.3d 1164 (1998).

Normally, the movant will, as noted, do this by presenting affidavits, depositions, etc. However, the Supreme Court has made it clear that at least in those situations in which the responding party will bear the burden of persuasion at trial, the movant will not necessarily have to come up with affidavits, depositions, or other evidentiary materials. Instead, he may be entitled to summary judgment merely by showing that the existing record contains no evidence that the other side (which will bear the burden of persuasion at trial) will be able to prove an essential element of its case. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

If one party can show that there is no "genuine issue of material fact" in the lawsuit, and that he is "entitled to judgment as a matter of law," he can win the case without going to trial; the court will go "behind the pleadings." That is, even if it appears from the pleadings that the parties are in dispute on some material issue of fact, the summary judgment motion may be granted if the movant can show that the disputed factual issues presented by the pleadings are illusory.

The motions filed by the defendant sought to test the legal sufficiency of the plaintiff's claims in his original complaint, in which the plaintiff proved his claim by the burden of persuasion and the burden of production. Additionally, all allegations of material facts in the plaintiffs complaints are taken as true and construed in the light most favorable to the nonmoving party. However, the Court

43

is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Therefore, the plaintiff in his Motion for Summary Judgment had to show that there is no "genuine issue of material fact" in the lawsuit, and that he is "entitled to judgment as a matter of law."

Based on the merits of this case the defendant calls its actions, in addition to, statements made by the plaintiff's commander to be merely the "plaintiff's legal conclusion that these statements and actions violate the Privacy Act, and fail to meet Twombly, 127 S. Ct. at 1964, and allege elements necessary to state a claim for which relief can be granted." However, the "plaintiff's legal conclusion's" are substantiated by affidavits, sworn statements, and court documented evidence from the plaintiff's GCM case, in which the defendant's very own military courts hastily affirmed were true according to law and facts.

The plaintiff has shown that there is no lack of a genuine issue in this case. The defendant disclosed any record which is contained in a system of records in violation of Privacy Act of 1974 and the FOIA of 1964, and the motions filed by the defendant only sought to test the legal sufficiency of the plaintiff's claims in his original complaint, and not to dispute the fact that it disclosed information in any record which is contained in a system of records in violation of Privacy Act of 1974 and the FOIA of 1964 in order to disproved the plaintiff's claim by the burden of persuasion and the burden of production. The plaintiff asserts that he has clearly and substantially met his burden of proof in this case through the production of legal and factual evidence, and that undoubtedly he is the only

44

party entitled to a summary judgment with the presumption he directed against the defendant.  The defendant bore the initial burden of producing an adequate rebuttal of non-presumed evidence to prove that a disclosure from a system of records did not happen.  Even so, the defendant has produced no non-presumed evidence of their disclosure of information contained in a system of records, in their rebuttal; hence, by law they should suffer a summary judgment.  Thus, the plaintiff is "entitled to judgment as a matter of law," and should win this case without going to trial, and this Honorable Courts decision should be set aside.

## VI. **CONCLUSION**

In support of this motion, the plaintiff respectfully submitted a memorandum of points and authorities showing how the district judge's order was clearly erroneous or contrary to law, a statement of material facts not in genuine dispute, an amendment of his pleading, a resubmitted FOIA claim which is attached with its attachments, and a proposed order, for which reasons stated therein, this Honorable Court should set aside it's order dated June 4, 2008 for the defendant, and modify the order for the plaintiff by denying the defendant's motion to dismiss based on FRCP Rule 12(b)(1), and accept the amendments to the plaintiffs original complaint.


*Fredrea M Gamble*
FREDRICK M. GAMBLE (Plaintiff)
Regional Confinement Facility
1490 Randolph Road
Fort Sill, OK 73503-5305
Phone Number: (580) 442 - 4313
ATTN: Mrs. RaShonda Labrador


45

## UNITIED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FREDRICK M. GAMBLE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 08-0207 (ESH)** |
| | ) | |
| **DEPARTMENT OF THE ARMY, AND** | ) | |
| **ALASKA DEPARTMENT OF MILITARY** | ) | |
| **AND VETERANS AFFAIRS** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | **June 11, 2008** |

## ORDER

Upon consideration of the Memorandum in Support of Plaintiff's Response in Opposition to the State of Alaska's Motion and Memorandum in support of Motion to Dismiss, Memorandum in support of plaintiff's amendment to pleading, and the opposition thereto, and the Court having considered the entire record herein, it is, this _____ day of _____, 2008,

ORDERED that Defendant's motion is DENIED, and it is further

ORDERED that judgment shall be entered for Plaintiff, and that the Defendant has 10 days from this order to either continue the action in the trial Court by answering, or allow a default judgment to be entered against them and then appeal the decision on the 12(b)(6) motion. The defendant may not appeal without taking the default judgment, because the denial of their motion is not a "final judgment" under 28 U.S.C. 1291.

Dated this _____ day of _____, 2008.

1

_____
Ellen S. Huvelle
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Fredrick M. Gamble (Plaintiff) )
Regional Confinement Facility )
1490 Randolph Road )
Fort Sill, OK 73503-5305 )
Phone Number: (580) 442 - 4313 )
ATTN: Mrs. RaShonda Labrador )
)
v. )
)
Department of the Army and agencies )
within it's military departments as follow: )
The U.S. Army, The Alaska Department )
Of Military and Veterans Affairs: The )
Alaska Army National Guard, and the )
Alaska Military Youth Academy (formerly) )
the Alaska National Guard Youth Corps )
(Defendant) )

Providing the Public Access to
Information Contained in Records
in the Possession or Control of
the Federal Government which
Release Jeopardized the
Constitutional Rights of the
Plaintiff during an Ongoing Legal
Proceeding in Violation of the
Freedom of Information Act of
1964 Lawsuit

RE: CIVIL ACTION NO.
1:08-cv-207. February 5, 2008

April 15, 2008

## COMPLAINT

## STATEMENT OF THE CASE

In accordance with (IAW) the Federal Rules of Civil Procedure (FRCP) Rule

42 which deals with consolidation of related cases or the holding of separate

trials. The plaintiff submits that this complaint be consolidated with his Privacy

Act complaint Case Number 1:08-cv-207, dated February 5, 2008 in order to

prevent the holding of a separate trial. Although this is a request to consolidate

this complaint with Case Number 1:08-cv-207, dated February 5, 2008, the

plaintiff desires that this complaint be viewed as a completely separate complaint

based upon its own merits. Furthermore, in Case Number 1:08-cv-207 and in

this complaint the plaintiff claims trial by jury on all issues. However, in

accordance with Rule 50 under the FRCP, which addresses situations in which a

case is so one-sided that the court may grant "judgment as a matter of law"

1

taking the case from the jury, in addition to, Rule 56 under the FRCP, which deals with summary judgment. The plaintiff is acting as the moving party by showing that there's no way a jury could find against him in Case Number 1:08-cv-207, dated February 5, 2008, and consequently this complaint based on the evidence of admittance of every element in the plaintiff's claim by the defendant in accordance with Rule 8(b) under the FRCP through a prior case. Furthermore, the factual allegations provided are enough to raise a right to relief above the speculate level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

The plaintiff thereby, requests that the U.S. District Court for the District of Columbia enforce his legal rights under the Freedom of Information Act of 1964 (FOIA) by providing legal remedies against the Department of the Army and agencies within it's military departments as follow: The U.S. Army, The Alaska Department of Military and Veterans Affairs: the Army National Guard (AK ARNG), and The Alaska Military Youth Academy (Defendant). The defendant provided, the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding in violation of the Freedom of Information Act of 1964 with the following negligent acts: In accordance with 5 U.S.C. 552b(6) these agencies disclosed personnel and similar files which constituted a clearly unwarranted invasion of personal privacy; 5 U.S.C. 552b(3)(A) Requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; 5 U.S.C. 552b(7) Records or

2

information compiled for law enforcement purposes, but only to the extent that the production of law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of an individual; 5 U.S.C. 552(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and – (A) the investigation or proceeding involves a possible violation of criminal law; and (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings.

## FACTS

The plaintiff repeats and re-alleges the allegations in the Facts section of his Privacy Act complaint Case Number 1:08-cv-207 dated February 5, 2008 and TAB A of that document.

## LAW

The plaintiff relies on the following authorities in support of his Lawsuit: Freedom of Information Act, U.S. Code, 552, (1966)

3

Federal Torts Claims Act

U.S. v. Plumb, 47 M.J. 771 1997

U.S. v. Gore, 60 M.J. 178 (2004)

U.S. v. Simpson, 58 M.J. 368 (2003)

U.S. v. Stoneman, 57 M.J. 35 (2002)

U.S. v. Biagaise, 50 M.J. 143 (1999)

U.S. v. Ayala, 43 M.J. 296 (1995)

U.S. v. Gleason, 43 M.J. 69, 73 (C.M.A. 1994)

U.S. v. Stombaugh, 40 M.J. 211 (C.M.A. 1994)

U.S. v. Levite, 25 M.J. 334, 338 – 339 (C.M.A. 1987)

U.S. v. Rosser, 6 M.J. 267 (C.M.A. 1979)

U.S. v. Francis, 54 M.J. 636 (Army Ct. Crim. App. 2000)

U.S. v. Stamper, 39 M.J. 1097 (A.C.M.R. 1994)

U.S. v. Cruz, 20 M.J. 873 (A.C.M.R. 1985)

U.S. v. Allen, 31 M.J. 572 (N.M.C.M.R. 1990)

U.S. v. Smith, 53 M.J. 168 (2000)

U.S. v. Palmiter, 20 M.J. 90 (C.M.A. 1985)

U.S. v. Washington, 42 M.J. 547, 562 (A.F. Ct. Crim. App. 1995)

U.S. v. Black, 40 M.J. 615 (C.M.R. LEXIS 188, 1994)

U.S. v. Shepherd, (C.C.A. LEXIS 189, 2002)

U.S. v. Gregory, 21 M.J. 952 (C.M.R. LEXIS 2919, 1986)

Clarke v. Breckenridge, (C.M.R. LEXIS 10, 1991)

MacLean v. U.S., (C.C.A. LEXIS 290, 2003)

4

Bousley v. U.S., 118 S. Ct. 1604, 1610 (1998)

Haynes v. Washington, 373 U.S. 503, 516 – 518 (1963)

Rogers v. Richmond, 365 U.S. 534, 547 (1961)

Beck v. Ohio, Supra, 379 U.S. at (1992 – 1993)

Ashcraft v. Tennessee, 322 U.S. 143, 145 (1944)

U.S. v. LTC Joseph E. Wilson Jr., (C.C.A. LEXIS 165, 2006)

MacLean v. U.S., (C.C.A. LEXIS 290, 2003)

U.S. v. Harvey, 60 M.J. 611 (C.C.A. LEXIS 159, 2004)

Cummings v. Dep't Navy, 279 F. 3d 1051, 1053-58 (D.C. Cir. 2002)

Feres v. U.S., 340 U.S. 135, 146 (1950)

Article 66, U.C.M.J.

Article 37(a), U.C.M.J.

R.C.M. 1105

R.C.M. 1106(f)(1)

Waller v. Swift, 30 M.J. 139 (C.M.A. 1990)

McCray v. Grande, 38 M.J. 657 (A.C.M.R. 1993)

Collazo v. Welling, 34 M.J. 793 (C.G.C.M.R. 1992)

Longhofer v. Hilber, 23 M.J. 755 (A.C.M.R. 1986)

U.S. v. Aurich, 31 M.J. 95 (C.M.A. 1990)

U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990)

U.S. v. Ohrt, 28 M.J. 301 (C.M.A. 1989)

U.S. v. Sullivan, 26 M.J. 442, 443 (C.M.A. 1988)

U.S. v. Bradley, 47 M.J. 715 (A.F. Ct. Crim. App 1997)

U.S. v. Johnson, 14 U.S. C.M.A. 548, 34 C.M.R. 328, 331 (C.M.A.1964)

U.S. v. Kitchens, 12 U.S.C.M.A. 589, 31 C.M.R. 175, 180 (C.M.A. 1961)

U.S. v. Marnaluy, 10 U.S.C.M.A. 102, 27 C.M.R. 176, 181 (C.M.A. 1959)

U.S. v. Dickey, 41 M.J. 637 (N.M.Ct.Crim.App. 1994)

U.S. v. Newbold, 45 M.J. 109 (1996)

U.S. v. Thomas, 22 M.J. 388 (C.M.A. 1986)

U.S. v. Dugan, 58 M.J. 253 (2003)

U.S. v. Baldwin, 54 M.J. 308 (2001)

U.S. v. Asfeld, 30 M.J. 917 (A.C.M.R. 1990)

U.S. v. Agurs, 427 U.S. 97 (1976)

Brady v.Maryland, 373 U.S. 83 (1963)

U.S. v. Trimper, 26 M.J. 534 (A.F.C.M.R. 1988)

U.S. v. Hart, 27 M.J. 839 (A.C.M.R. 1989)

Kastigar v. U.S., 406 U.S. 441 (1972

New Jersey v. Portash, 440 U.S. 450 (1979)

U.S. v. Garrett, 24 M.J. 413 (C.M.A. 1987)

R.C.M. 705(b)

U.S. v. Olivero, 39 M.J. 246 (C.M.A. 1994)

U.S. v. Jameson, 33 M.J. 669 (N.M.C.M.R. 1991)

U.S. v. Hall, 36 M.J. 1043 (N.M.C.M.R. 1993)

U.S. v. Drayton, 45 M.J. 180 (1996)

U.S. v. Jones, 33 M.J. 1040 (N.M.C.M.R. 1990)

U.S. v. Clemons, 35 M.J. 767 (A.C.M.R. 1992)

U.S. v. Edmond, 63 M.J. 256, 2006 CAAF Lexis 518

U.S. v. Singleton, 41 M.J. 200 (C.M.A. 1994)

U.S. v. Sanford, 29 M.J. 413 (C.M.A. 1990)

U.S. v. Horner, 22 M.J. 294 (C.M.A. 1986)

U.S. v. Peele, 46 M.J. 866 (CAAF 1997)

U.S. v. Moss, 63 M.J. 233, 2006 CAAF

Louis v. VA, No C95-5606, slip op. at 4-5 (W.D. Wash. Oct. 31, 1996)

Bois v. Marsh, 801 F. 2d 462 (D.C. Cir. 1986)

U.S. v. Johnson, 481 U.S. 681, 699 (1987)

Mount v. U.S. Postal Service, 79 F. 3d 531 (6th Cir. 1996)

Henson v. NASA, 14 F. 3d 1143, 1146 (6th Cir. 1994)

Sixth Amendment, U.S. Constitution

RCM 905(e)

RCM 906(b)(13)

MRE 401

MRE 402

MRE 403

MRE 404(b)

U.S. v. Rhodes, 61 M.J. 445 (2005)

U.S. v. Pruitt, 46 M.J. 148 (1997)

U.S. v. Robertson, 39 M.J. 211, 214 (1994)

U.S. v. Reynolds, 29 M.J. 105 (1989)

U.S. v. Henson, 58 M.J. 105 (1989)

U.S. v. Lowe, 56 M.J. 914, 916 (N.m. Ct. Crim. App. 2002)

RCM 703

RCM 906

U.S. v. Powell, 49 M.J. 220 (1998)

U.S. v. Wooten, 34 M.J. 141 (1992)

U.S. vs. Dorgan, 39 M.J. 827 (A.C.C.A. 1994)

U.S. v. Boswell, 36 M.J. 807 (A.C.C.A. 1993)

U.S. v. Berry, 61 M.J. 91 (2005)

U.S. v. Bailey, 55 M.J. 38 (2001)

U.S. v. Wright, 53 M.J. 476 (2000)

U.S. v. Dacosta, 63 M.J. 575 (A.C.C.A. 2006)

U.S. v. Dewrell, 52 M.J. 601 (A.F. Ct. Crim. App. 1999)

U.S. v. Myers, 51 M.J. 570 (N.M. Ct. Crim. App. 1999)

## WITNESSES/EVIDENCE

Plaintiff requests the witnesses on the Defense Witness List (Amended) dated
28 December 2006, any witnesses identified in the Appellant's Brief on Behalf of
Appellant Docket Number Army 20070029, and any persons who have been
identified in any evidence presented in this complaint, to include BG Thomas
Katkus from the AK ARNG be produced and present for oral argument at the call
of the Court. (Attachment 1) In addition, the Appellant requests the following
evidence produced:

U.S. vs. Gamble Defense Motion to Dismiss All Charges and
Specifications (Unlawful Command Influence), 29 December 2006 (Attch 2)

8

U.S. vs. Gamble Defense Motion to Dismiss All Charges and

Specifications (Article 13, U.C.M.J.), 29 December 2006 (Attch 3)

Memorandum from LTC Susan Bailar, 27 September 2006 (Attch 4)

Defense Motion in Limine (MRE 404(b)), 4 December 2006 with its 9

attachments (Attch 5)

Frank Veith AR 15 – 6 Investigation Sworn Statement, 4 AUG 2006 (Attch 6)

William Luce AR 15 – 6 Investigation Sworn Statement, 6 AUG 2006 (Attch 7)

Defense Motion For Appropriate Relief (Production of Merits Witnesses) with its 5

attachments (Attch 8)

Defense Motion in Limine, 4 December 2006 with its 7 attachments (Attch 9)

Rachel P. Saxby Sworn Statement, 21 September 2006 (Attch 10)

Debra J. Blaylock Sworn Statement, 21 September 2006 (Attch 11)

Plaintiff's Defense Request for Assistance in Securing Information, 15 October

2006 (Attch 12)

Article 32b Investigation defendant witness list, 7 September 2006 (Attch 13)

Michael Thompson Privacy Act Statement, 6 August 2006 (Attch 14)

Frank L. Veith Jr. Privacy Act Statement, 4 August 2006 (Attch 15)

Robert C. Barr Privacy Act Statement, 4 August 2006 (Attch 16)

William J. Luce Jr. Privacy Act Statement, 6 August 2006 (Attch 17)

## ARGUMENT FOR A SUMMARY JUDGMENT

In evidence attachment 4, the memorandum by LTC Susan Bailar the Staff

Judge Advocate (SJA) for Headquarter, Alaska National Guard, she admits that

the defendant's AK ARNG G1 in Alaska is the custodian of a record that they

found. Thus, proving that this record was contained in a system of records in the defendant's control, which the plaintiff claims was indeed a secret file as he was denied the access or knowledge to said record. Secondly, "per Mr. (formerly Captain) Jones, the documents are not the entire record of what happened; he indicated that the individual was re-hired by the Youth Corps director at the time after review of the case. I cannot locate any records indicating any military investigation or adverse action transpired as a result of this correspondence. The State Equal Employment Manager was unable to locate any EEO or EO records in current files, or the archives." The plaintiff clearly proves by the defendant's own acknowledgement that this secret file is indeed incomplete. Finally, the memorandum proves that the file was sent to Afghanistan without the plaintiff's permission to be used willfully and intentionally by the defendant's prosecutor in a pending case against the plaintiff.

The plaintiff has always asserted that there are no reliable facts upon which to base admission of the alleged uncharged misconduct set forth in the defendant's notice pertaining to the attachments located within evidence attachment 5. The defendant tried to rely upon certain statements attributed personnel assigned to the Alaska Military Youth Academy (Youth Corps) in 1994, as noted in attachment 5's Facts section. However, as shown in attachment 4, at some point after the termination, the plaintiff was re-hired to his position with the Youth Corps. There are no records within the control of the defendant that reflect any military investigation was conducted, nor that any adverse action transpired. In fact, as stated above the current SJA for the custodian of the records concedes

10

that "the documents [made available to the Trial Counsel] are not the entire record of what happened...," after consultation with the Youth Corps Commandant at the time the allegations were made, (then) CPT Jones.

The defendant's use of this incomplete secret file in the plaintiff's case in chief were displayed when the defendant sought to admit evidence pursuant to MRE 404(b), the admissibility of the evidence is governed by the three-prong test of U.S. v. Reynolds, 29 M.J. 105, 109 (1989). The Reynolds analysis remains good law; cited as recently as 2005, U.S. v. Rhodes, 61 M.J. 445, 452 (2005). First, the evidence must be evaluated under MRE 104(b) to determine whether the members reasonably could find that the alleged uncharged misconduct occurred. Secondly, and taking into account the defendant's theory of admissibility of each piece of challenged uncharged misconduct, it must be shown that the evidence makes a fact of consequence with regard to the charge offenses more or less probable. Finally, the alleged uncharged misconduct must be assessed under MRE 403 to determine if the probative value is substantially outweighed by the danger of unfair prejudice.

As to the first prong of Reynolds, court members could not reasonably conclude the alleged uncharged misconduct occurred, given the lack of any reliable evidence available to the defendant. While the plaintiff concedes that the defendant need not prove the alleged uncharged misconduct by preponderant evidence, nor that the military judge had to find that it occurred, as prerequisites to admission, the evidence must be reliable enough that the members could reasonably conclude it occurred, by preponderant evidence, Reynolds, at 109.

However, the military judge upheld the plaintiffs Motion in December 2006, and the information from the incomplete secret file appears on the outset, to not have been used during his trial or sentencing phase, due to the facts that the defendant fell far short of the above standard for the following six reasons pointed out in evidence attachment 5: first, none of the alleged victims were available to testify, thus their demeanor and attendant credibility could not be fairly assessed, and further, none of the witnesses from the 1994 incomplete secret file were ever brought up on the defendant's witness list; second, the typed statements are in unchallenged narrative format with no accommodation for any probing questions by an interviewer. In fact, the source of SPC Bacon's allegation are not even a typed statement ostensibly prepared by her, but, rather, a summary of a conversation prepared by another drafter with statements attributed to SPC Bacon; third, none of the statements are sworn; fourth, there is no evidence as to the circumstances under which the statements were made, who was in the interview (if there were an interview), and what information was provided the drafter prior to completion of the statements; fifth, the custodian of this secret record readily conceded that "…the documents are not the entire record of what happened…"; sixth, the custodian further conceded that the plaintiff was subsequently re-hired by the Youth Corps' director. Thus, all six reasons truly display how the information contained in the record the defendant's custodian "found" is not accurate, relevant, timely, or complete.

The plaintiff asserts that at the outset, the information contained in the record seems to have been actually suppressed and "supposedly" kept out of his trial

and sentencing phase. However, in evidence attachments 6 and 7 the sworn statements by Frank Veith, and William Luce, they clearly show that despite everything presented by the plaintiff and his civilian lawyer to keep prejudice out of his case, the defendant had already willfully disclosed personal information from the incomplete secret file in it's control, which constituted a clearly unwarranted invasion of personal privacy by placing the plaintiff in a false light with libelous statements, in addition to, providing the entire witness pool, and the public information from an incomplete secret file despite the defendant's requirement by law to keep such matters withheld from the public in such a manner as to leave no discretion on the issue.

There are multiple discretions on the issues of this file as evident in the defendant's malicious acts which violated 5 U.S.C. 552b(7) Records or information compiled for law enforcement purposes, but only to the extent that the production of law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of an individual, were all proven with evidence presented in the plaintiff's Motions in December 2006. These Motions display how such

13

information taken on its incomplete merits, without all of the evidence and facts, would only produce the possible probative value to all subjected to it, that the plaintiff had engaged in sexual harassment in 1994. Thus, it would demonstrate to any witness privy to this information that the plaintiff was likely to have committed the charged offenses he was facing during his AR 15 – 6 investigation.

The defendant used this as straight propensity evidence advanced under a logical theory of relevance, as they requested and obtained access to a record described in subsection (b)(7)(A), in addition to, (A) the investigation or proceeding involves a possible violation of criminal law; and (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings. The defendant clearly interfered with enforcement proceedings, and violated the mandated laws set forth in 5 U.S.C. 552. Additionally, the defendant proves by its own actions that it was aware that they had due care for the administrative, supervisory, and subsequent monitoring responsibilities of the plaintiff's record pursuant to 5 U.S.C. 552, by providing Privacy Act Statements for every witness called during the AR 15 – 6 investigation as exampled in evidence attachment 14 – 17. Each witness signed a Privacy Act Statement, which acknowledged that they read or have read to them the Privacy Act Statement pursuant to 10 U.S.C. 3013 and Army Regulation 15 – 6. Furthermore, it declares that they fully understood the contents of their entire statement. Moreover, the defendant's AR 15 – 6

Investigating Officer signed as the Person Administering the Oath which proves the investigation or proceeding involves a possible violation of criminal law.

Based on the sworn statements submitted by William Luce, and Frank Veith in evidence attachments 6 and 7 during the AR 15 – 6 investigation, provides proof that the defendant disclosed the existence of the record to the public, which substantially interfered with enforcement proceedings. Moreover, this is prohibited by MRE 404(b) under a legal theory of relevance because admission would create significant risk that the members would convict the accused based upon a propensity theory and disregard the standard and elements required for proof beyond a reasonable doubt on the charged offenses. The defendant's egregious acts of UCI throughout the plaintiff's case clearly put in view its intentional/willful intent as exhibited in evidence attachments 6 and 7, the defendant maliciously used against the plaintiff libelous and false official statements in an ongoing legal proceeding, based on a public disclosure of private facts. The dissemination of truthful private information which a reasonable person would find objectionable was not simply used for the probative value of the evidence, but was used to injure the plaintiff and, by so doing, resulted in unfair prejudice, MRE 403, which actually caused exceptional circumstances that are so fundamentally defective as to result in a miscarriage of justice.

Evidence attachments 10 and 11 demonstrate how this prejudice was not only located in Afghanistan, but by civilians located in Alaska, who were not on Title X with the U.S. Army, who had no right to know any information of an ongoing

15

investigation going on halfway around the world, who were not acting in any official capacity, nor were they located on any witness list. Yet, due to the defendant providing, the public access to information contained in records in the possession or control of the Federal Government which release jeopardized the constitutional rights of the Plaintiff during an ongoing legal proceeding in violation of the Freedom of Information Act of 1964, there is not just one, but two sworn statements on September 21, 2006. Rachel Saxby's statement even starts with "I recently heard some allegation of possible sexually misconduct by the plaintiff toward some female Soldiers in Afghanistan". The plaintiffs Article 32 Pretrial Investigation wasn't even held until October 25, 2006. Nevertheless, these rumors based on the information from a record in control of the government, and the incomplete and false impressions which resulted from it, combined with the allegations facing the plaintiff, as TAB A in Case Number 1:08-cv-207 showed in detail, made its way to the civilian sector and portrayed the plaintiff to anyone privy to the record or the rumors, as "a predator", as "a bad guy who needs to go down", and as a "psychological predator."

In the plaintiffs case there are multiple government agencies under the Department of the Army which hold concurrent liability. Furthermore, the Military Courts do not have jurisdiction over a Title 32 National Guard entity when they violate Federal Laws such as in the plaintiff's case. Thus, the Military Courts could never have afforded the plaintiff the possibility of a fair trial due to the fact that it holds no UCMJ authority over third parties in the plaintiff's case who committed illegal acts. Therefore, the plaintiff asserts that once the egregious

acts of UCI identified in TAB A of Case Number 1:08-cv-207 are carefully reviewed, it appears that he would not have been injured but for the concurrence of the defendant and it's third parties. The separate negligent acts of the defendant (U.S. Army, The Alaska Department of Military and Veterans Affairs: the AK ARNG, and the Alaska Military Youth Academy) concur to cause a single injury, hence; both the defendant and the third parties are the actual cause of the plaintiff's injuries.

Finally, in evidence attachment 8, the Defense Motion For Appropriate Relief (Production of Merits Witnesses), dated December 12, 2006, clearly discloses how the defendant intentionally utilized witnesses who it knew willingly made false official statements during an ongoing legal procedure, which through negligence rendered an adverse impact on the plaintiff, as these statements were adopted into their testimonies and validated as truths by the defendant. The plaintiff was prepared to call 1LT Robert Pillow as a witness at his trial. 1LT Pillow held the S-1 (Administrative Officer) position in a unit subordinate to the plaintiff's unit at Fort Richardson, AK at the time the unit's roster for the current deployment to Afghanistan was assembled. When the tasking came down to develop a roster for the unit's deployment to Afghanistan, 1LT Pillow personally took action to seek volunteers when the unit was unable to fill requirements from existing manning. He would have testified that the unit knew, at the time the Afghanistan roster was being filled, that the unit would also be tasked with a subsequent deployment requirement, to follow shortly after the Afghanistan deployment, which would be restricted to male Soldiers. Thus, 1LT Pillow would

17

have testified that the unit consequently sought females for the Afghanistan deployment, and that he personally emphasized females in his search for volunteers. He would have also testified that the reason the plaintiff had to be proactive in his efforts to seek volunteers for the Afghanistan roster was because the plaintiff, as the superior unit S-3 (Operations Officer), had to cover for the superior unit S-1, who was not effectively working the issue. Finally, 1LT Pillow would have testified that SPC Seldon and SPC Chester volunteered to him directly to go on the Afghanistan deployment.

Although the defendant was aware of the fact that Michael Thompson and Frank Veith made false official statements, these and other witnesses remained on the defendant's witness list as evidence attachment 13 depicts. Despite the plaintiff's Motions the defendant credited these witnesses sworn statements as being truthful in according to law and fact, that the plaintiff was in the halls of the unit essentially recruiting females for the deployment; the implication being: with an eye toward an opportunity to pursue them sexually while in Afghanistan. Other witnesses would have or did testify similarly as they all adopted their false statements to be a part of their testimony. Moreover, this was the attitude taken on by the plaintiff's command, as they utilized rumors such as the plaintiff was shopping for females in the hall in order to have sex with them, or words to that effect, which they spitefully spread around the potential witness pool prior to any investigation, and during an ongoing legal procedure. The defendants egregious acts were conducted with deliberately crafted coalitions between the command, the prosecution, and the witnesses in order to convict the plaintiff on propensity

18

evidence, and not on legal and factual evidence, which in accordance with 5

U.S.C. 552b(7) (B) would deprive the plaintiff his right to a fair trial or an impartial

adjudication. In fact, all of the evidence attachments and TAB A of Case Number

1:08-cv-207 displays exactly how the negligent acts of the defendant provided,

the public access to information contained in records in the possession or control

of the Federal Government release jeopardized the constitutional rights of the

Plaintiff during an ongoing legal proceeding in violation of the FOIA of 1964,

which actually caused the plaintiff's injuries.

### Additional Violations of the Privacy Act of 1974

In reference to Privacy Act Violations to the plaintiff's Top Secret (TS) Security

Clearance, the plaintiff can only assume that his clearance was suspended

based on the acts of sexual misconduct or perversion indicative of moral

turpitude, poor judgment, or lack of regard for the laws of society. The plaintiff

has to make this assumption because at the time of his TS security Clearance

suspension, no acts had actually been proven only alleged. In fact none of the

34 witnesses called had any first hand knowledge of any such acts occurring.

Therefore, the suspension would have been based on allegations and the wishes

of the command, based on using fraudulent information from an illegal file

depicting past behavior, and false official statements about the plaintiff.

The command even went as far as transferring the plaintiff immediately after

the AR 15 – 6 Investigation to another FOB, in conjunction with never allowing

him to dispute any of the facts predicated in that improper investigation, that was

based solely on unproven allegations. This deprived the plaintiff of his

fundamental rights given him, for IAW AR 380 – 67 paragraph 3 – 701.
Allegations related to disqualification whenever questionable behavior patterns
develop (as sited in the plaintiffs AR 15 – 6 executive summary by the IO),
derogatory information is discovered, or inconsistencies arise related to the
disqualification criteria outlined in paragraph 2 – 200 that could have an adverse
impact on an individual's security status, a special investigative inquiry (SII),
psychiatric, drug, or alcohol evaluation, as appropriate, may be requested to
resolve all relevant issues in doubt.

Obviously no SII was ever conducted by the Convening Authority, the Court,
or the Command based on the plaintiff specifically bringing forth evidence of the
commands questionable behavior patterns, derogatory information discovered
and presented in Motions to Suppress and Dismiss, or inconsistencies that arose
out of those motions and the trial itself pointed out by the plaintiff during the
appeals process that could have, and do disqualify the criteria of sexual
misconduct or perversion indicative of moral turpitude, poor judgment, or lack of
regard for the laws of society, which ultimately had an adverse impact on the
plaintiffs security status, and right to privacy. Furthermore, the chain of
command completely ignored AR 380 – 67, based on information provided in that
AR in Chapter 8 and located in paragraph 201 which states that unfavorable
administrative action procedures except, as provided for below, no unfavorable
administrative action shall be taken under the authority of this regulation unless
the person concerned has been given:

  1. A written statement of the reasons why the unfavorable administrative

20

action is being taken. The statement shall be as comprehensive and detailed as the protection of sources afforded confidentiality under the provisions of the Privacy Act of 1974 (5 U.S.C. 552a) (reference (m)) and national security permit. Prior to issuing a statement of reasons to a civilian employee for suspension IAW AR 380 – 67, or removal action, the issuing authority must comply with the provisions of Federal Personnel Manual, chapter 732, subchapter 1, paragraph 1 – 6b (reference (cc)). The signature authority must be as provided for in paragraph 6 – 101b(1)(b) and 6 – 101b(2)(b). In the plaintiffs case he never received a written statement of the reason why unfavorable administrative action was being taken on his security clearance. In fact the plaintiff was told by COL Williams that he was being moved to Bagram AirField (BAF) 11 AUG 06 to work in the J3 Tactical Operations Center (TOC), which he needed a security clearance in order to do, and as an officer he needed a clearance to even stay in theater, as the unit had already Returned From Active Duty (REFRAD) a CPT earlier in the deployment based on security clearance issues. Yet COL Williams having this knowledge still sent the plaintiff to BAF in order to punish him, conduct his four town hall meetings, and for people in command mantle positions within the command to continue to spread rumors and forge the entire witness pool attitudes against the plaintiff to fit that of COL Williams, which was that the plaintiff should go to jail for five to ten years, and that the plaintiff indeed was a bad guy who needed to go down, a psychological predator and a predator. The plaintiff makes this claim because once he arrived to BAF and reported in, he was informed by the 10th Mountain J2 section that his unit had suspended his

security clearance on 7 AUG 06. This proves willful and intentional intent by the command by their UCI actions here due to the plaintiffs security clearance being suspended based upon the outcome of his case already being determined by his command prior to the completion of the AR 15 – 6 investigation, and even prior to the plaintiffs official statement being given during that AR 15 – 6 investigation. The plaintiff indeed made his official statement on 7 AUG 06, but the paperwork and the process to suspend his clearance had already been done, in order for his clearance to be suspended effective 7 AUG 06. Even to that point the AR 15 – 6 Investigating Officer wasn't done with his AR 15 – 6 Investigation, and moreover, didn't know if the plaintiff had any information to contradict the charges against him, that according to AR 380 - 67, would cause an SII in order for the unit to suspend his clearance. A reasonable person can perceive and assume that the outcome of the AR 15 – 6 investigation was already determined by COL Williams and LTC Thomas based on knowing that they had blocked and not afforded the plaintiff the ability to defend himself against the allegations in his AR 15 – 6 investigation. This egregious act by the command which was intentional/willful caused the 10th Mountain to scramble to find something for the plaintiff to do, and prevented the plaintiff from working on anything except investigations during the 11 AUG 06 – 10 JAN 07 time he spent at BAF not incarcerated. Even more significant is that it left the plaintiff exiled in a war zone from friends, his unit, and anyone he knew in order to isolate, embarrass, humiliate, and punish him. With the plaintiff now gone from Kandahar AirField (KAF) the command continued to willfully and intentionally pass Privacy Act Information about him around KAF and

the rear detachment, without fear of him knowing about it. In addition, when the egregious acts of UCI were presented by the plaintiff in Motions to Dismiss in JAN 07 both motions for the egregious acts of Unlawful Command Influence, and Pre-Trial Punishment Credit for Embarrassment and Humiliation were denied by the Military Judge. (M.J.)

2. The Commander, CCF, is the DA authority for denial and/or revocation of security clearances and/or SCI access eligibility. The Commander, CCF, may delegate this authority to those individuals outlined in paragraph 6 – 101b. Furthermore, when CCF receives credible derogatory information and denial or revocation of a security clearance and/or SCI access eligibility is considered appropriate, CCF will forward a letter of intent through the command security manager to the individual. To date, the plaintiff has never received anything in reference to this regulation and the suspension of his clearance. Further, the 10th Mountain J2 shop informed the plaintiff that his security clearance was suspended by his parent unit, which meant that the AK ARNG in the rear suspended his clearance. Here is another clear example of a Title 32 entity doing things to a Title 10 Soldier, which the military court has, no jurisdiction over the Title 32 Soldiers, nor offered the plaintiff protection from their intentional/willful acts when prosecuting him, when the defendant performed these willful and intentional illegal activities which adversely impacted the plaintiff. Thus, IAW AR 380 – 67 unfavorable administrative actions were taken prior to the completion of any investigation, based solely on allegations of misconduct and not on acts that need to be proven. In addition to, the Privacy

Act of 1974 (5 U.S.C. 552a) (reference (m)), being violated with the defendant providing comprehensive and detailed statements of the plaintiffs conduct to the public, and never to him. The defendant knew based off of training and experience that no statement shall be as comprehensive and detailed as the protection of sources afforded confidentiality under the provisions of the Privacy Act of 1974 (5 U.S.C. 552a) (reference (m)) and national security permit and therefore violated the plaintiffs privacy.

Can the Plaintiff's employer defame him in a performance review without being liable to him for defamation? Maybe. Maybe not. An employer loses his or her qualified privilege to make defamatory comments in critiquing him or his work when the defamatory statement is made:

1. Without a good faith belief in the truth of the statement; or

2. Without reasonable grounds for believing the truth of the statement; or

3. With a motive or willingness to vex, harass, annoy, or injure him; or

4. Is exaggerated or not fully or fairly stated; or

5. The result of a reckless investigation; or

6. Motivated by hatred or ill will towards him.

Examples of statements that have been determined by the courts to be defamatory are those that involve; allegations of embezzlement, lying, irresponsibility, lack of integrity, dishonesty, laziness, incompetence, not being eligible for rehire, insubordination, being a traitor to the company , or having committed a criminal act. The OER that the plaintiff received in Afghanistan is an example of a publication placing the plaintiff in a "False Light". The OER which

was based on COL Williams Relief For Cause Memorandum, which was the result of a reckless investigation. This investigation didn't have a good faith belief in the truth of the comments. Otherwise, all of the intentional/willful acts committed by the defendant such as pre-investigation visits to potential witnesses, promises of rewards for cooperation, and threats for non-cooperation would not have occurred; The comments were without reasonable grounds for believing the truth of the statement, otherwise, witnesses who knowingly committed perjury during the Article 32 Hearing's charges would not have been voluntarily dropped by the defendant. The defendant's witnesses would not have been dismissed from testifying in another trial, which created a "chilling effect" in the plaintiff's trial, and the plaintiff would have received the ability to truly talk to and gather witnesses in his defense in an actual impartial investigation; The investigation would have been done thoroughly and completely enough to discover that violations of the Privacy Act occurred, because witnesses the defendant used against the plaintiff made statements that through their actions clearly demonstrated a motive and willingness to vex, harass, annoy, and injure him; Moreover, the investigation never fully developed the facts, and statements by the defendant's witnesses who repeatedly made exaggerated statements, that were not fully or fairly stated, such as when SPC Chester was asked if she was ever sexually harassed, and she responded with yes, but not by the plaintiff, therefore, the comment were ignored, and not fully or fairly stated again, or looked into for closure of the question with an answer that provides some type of proof one way or another to the investigating officer. In this case the answer

25

should have expanded the investigation in order to fully and fairly ensure no contradiction of testimony/sworn statements exist. In addition, through this impartial investigation other witnesses who hadn't been interviewed yet, knew the questions and showed up to the investigation with pre-typed statements, or in-depth and almost verbatim knowledge of the questions and the answers from other witnesses who had made prior exaggerated or not fully or fairly stated sworn statements. Finally, the defendant based on their actions was motivated by hatred or ill will towards the plaintiff, which clearly interfered with the plaintiff's reputation. The plaintiff is entitled to freedom from unwarranted, untruthful attacks on his character. This defendant publicly in the presence of other people attacked the plaintiff's character with comments spoken of at the four Town Hall meetings, and at COL Williams Primary Staff call, and embodied those comments in COL William's Relief For Cause Memorandum, the defendant's sworn statements, and the plaintiff's record of trial and associated papers. These comments to the public was intentionally/willfully done by the defendant in order to portray the plaintiff as one who had a lack of integrity, who was insubordinate, and a criminal who committed criminal acts, which constitutes defamation. There are numerous situations where the employer risks losing their qualified privilege and if the privilege is lost, as in the plaintiff's case, any publication of the false comment becomes defamatory and he is entitled to damages for the injury to his reputation.

Other factors that may be considered in making a finding of defamation are whether the person making the statement knows or believes the statement to be

true; whether the statement is the result of anger, jealousy, resentment, grudges, quarrels, ill-will or other conflict between the plaintiff and the defendant who made the statement. In this instance the plaintiff has clearly shown that witnesses testified that COL William's portrayed one who believed the statements to be true, however, the covert actions by defendant showed what the witnesses saw and testified so vehemently about, and that was that COL Williams was "livid", "pissed", "beyond pissed", and had "smoke coming out of his ears", and made no reference to the possibility of the plaintiff's innocence, or his right to the due process of law.

In order to be defamatory the statement must be, of course, false. The employer has the burden of proving that the statement is not false, or in other words, the employer has to prove that the statement was true. The statement must also seem to state a fact, or that it is based on fact, rather than an opinion, or based only on opinion. A statement made as a statement of opinion, rather than as an allegation of fact, is not defamatory. However, in the plaintiff's case, the violations of the Privacy Act here are not statements of opinion. They are clearly allegations of fact, because they are sworn statements, and sworn testimony, that the defendant used to incarcerate the plaintiff, although in the military court in NOV 06 the plaintiff showed with a Motion to Suppress that statements made were indeed false. Furthermore, the plaintiff provided evidence during his appeal process and to this honorable court of inconsistent and false statements that were sworn, or spoken during several trials and recorded in the plaintiff record of trial and allied paperwork. If the statements are statements of

opinion, rather than false statements of fact, they are not potentially libelous. The question to ask is, does the statement of opinion suggest that it is based on fact or is provable as a fact? Statements that may support a claim of libel are; false accusations of criminal conduct, lack of integrity, dishonesty, incompetence, or reprehensible personal moral behavior. For example, if you found in your personnel file, a false statement accusing you of suspected theft, such a statement would be libelous. Such a statement would imply to the average reader that it is confirmable as a fact, and is not just an unfounded personal opinion. However, the defendant clearly made statements of the plaintiff's criminal conduct, lack of integrity, and reprehensible personal moral behavior when several of the defendant's witnesses made sworn statements, and/or proclaimed publicly false statements accusing the plaintiff of suspected behavior. The defendant publicly referred to the plaintiff as a "predator", based on libelous information it acquired from an incomplete secret file.

A defamatory statement in a person's personnel file defames for as long as the statement exists in that person's file. Therefore, defamatory statements made 5, 10, or even 15 years ago, and placed in the plaintiff's personnel file may be subject to a lawsuit if they are still there in his file "attacking" his reputation or his good name up to the present time. The statute of limitations does not protect the employer on "old" statements that are still around to be seen or heard. If you are an employee or supervisor-employee and you are accused of engaging in sexual harassment or some other offensive activity and the fact of the accusation is "published," your employer may be liable to you for defamation. If the

28

employer notified other employees or other parties of the allegations against you, such conduct by the employer may be defamatory against you. In the plaintiff's case this secret incomplete personnel file allowed the defendant to accuse him of engaging in sexual harassment in the past. The accusation was captured during the plaintiffs AR 15 – 6 investigation as two defendant witnesses, MAJ Bill Luce, and MAJ Frank Veith made sworn statements, and MAJ Bill Luce even attributed MAJ Robert Barr as knowing or providing him with the information. COL Williams even told the plaintiff that he heard that he had done things like this before, and had requested a file being kept by the defendant be sent to him in Afghanistan. The fact that COL Williams and so many others knew of the alleged behavior that the plaintiff was never proven to have committed, still existing in a incomplete and secretly kept file made it defamatory statements despite the fact of it being to that point 12 years prior. The simply fact is that the defendant notified other employees and other civilian parties of the allegations against the plaintiff, and such conduct by the defendant is defamatory against the plaintiff because the comments are still in the plaintiffs file "attacking" his reputation or his good name up to the present time.

## CULMATIVE IMPACT

All of the defendant's evidence in the AR 15 – 6 investigation and subsequent General Court-Martial trial are entirely tainted with multiple egregious acts of UCI that marshaled in false sworn statements and perjured testimony based on documents from an incomplete secret file. Moreover, neither the defendant, nor the plaintiff has ever conceded that the information in that incomplete secret file

is reliable, and, in fact, the plaintiff moved to have that information excluded completely out of his case, which a military judge upheld. However, despite multiple errors made by the defendant's Military Court system, and based on "materiality" standards established by the Supreme Court in U.S. v. Hart, 27 M.J. 839 (A.C.M.R. 1989), his case should have resulted in a reversal of the plaintiff's criminal case, unless harmless error beyond a reasonable doubt was proven when the prosecution used perjured testimony or similar misconduct. Regardless of whether the prosecution acted in good faith, which obviously in the plaintiff's case they did not, the plaintiff has laid the foundation in his complaints that harmless error was not the result, but rather, two years of wrongful incarceration, and diverse injuries caused by the defendant's negligence.

The defendant violated the Freedom of Information Act of 1964 with that record, as all of the defendant's evidence was used in such a way as to demonstrate that the plaintiff engaged in some type of elaborate plan to ensure a variety of female Soldiers were identified for that deployment with an eye toward ultimate sexual pursuit of them in Afghanistan. Hence, the defendant, by implication, given the number of charges and alleged victims, sought to leave the witness pool, the public, and the members of the Court with the impression that the plaintiff habitually engaged in immoral, unlawful, and sexually aggressive behavior, based solely upon incompetent, inadmissible, and illegally obtained evidence.

## CONCLUSION

The defendant actually and/or proximately caused as a result of their intentional/willful negligent acts violations of the Freedom of Information Act of 1964. All of the evidence attachments contained in this complaint, in conjunction with Case Number 1:08-cv-207, TAB A, and that case's evidence attachments, will prove that the defendant actually and/or proximately caused as a result of their intentional/willful negligent acts against the plaintiff actual damage and personal and professional injuries. The malicious acts by the defendant shown in both complaints and the corresponding evidence attachments associated with both, will place actual and/or proximate cause on the defendant, which by law will hold them responsible for all the damages proved to have resulted from their acts, including damages from "third parties." Therefore, the plaintiff requests in accordance with FRCP Court Rule 50, the granting of a "judgment as a matter of law", in addition to, FRCP Court Rule 56, a summary judgment, and seeks for this honorable Court to find that the defendant did in fact injure the plaintiff. If this honorable Court denies a judgment in favor of the plaintiff's request per FRCP Court Rule 50 and 56, then the plaintiff requests a trial by jury on all issues in this action. Regardless of this honorable Courts action, the plaintiff requests that the judge or jury finds that the defendant did in fact injure the plaintiff, and require the defendant to: restore to the plaintiff what was taken from him and his family due to violations of his private and/or personal rights. The defendant intentionally/willfully attacked his reputation arbitrarily, and in doing so took away his liberty and freedom of action without just cause. Therefore, monetary relief is

granted the plaintiff for his actual damage claims in the sum of an additional

$75,000,000 from the defendants. This sum is separate from the Privacy Act

Law Suit reference Case Number 1:08-cv-207, and is submitted upon its own

merits based on the defendant's violations of the Freedom Of Information Act of

1964; and discontinue the wrongful acts of a publication placing the plaintiff in a

false light, by expunging all the plaintiff's administrative and legal military records

associated with the incomplete secret file.


FREDRICK M. GAMBLE
Plaintiff

UNITED STATES OF AMERICA     )

                             )

           v.          )

                             )

Gamble, Fredrick, M.       )

Major, U.S. Army, (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)  )

Headquarters and Headquarters Company  )

Combined/Joint Task Force (CJTF) - 76  )

Bagram Airfield, Afghanistan APO AE 09354)

Defense Witness List
(Amended)[1]



28 December 2006

       The Defense notifies the Trial Counsel, the Court, and the Court Reporter of the following witnesses that the Defense may call during all phases of trial and motion practice in the above-captioned court-martial:

1.  MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, telephone unknown (contact made through witness' chain of command at request of chain of command); MAJ Koch will testify, in support of the Defense UCI motion, that COL Williams has referred to MAJ Gamble as a "predator" in the presence of his core staff on frequent occasions. This staff includes MAJs Barr, Parker, Roach, Knowles, LTCs Thompson and Jones, and CSM Averrett. He will also testify that COL Williams, in the presence of the same individuals, has announced that the accused should get between five and ten years confinement.

2.  SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9423; SFC Butters will testify in support of the Defense UCI motion, that the Alaska National Guard unit is a very tight-knit unit composed of folks who have worked together for years and expect to work together for years to come. She will testify that SPC Moses is overly emotional, seeks attention, and has bad character for truthfulness. She will also testify that it is common knowledge among the unit that many women have sex toys, the topic is discussed openly and often, and that the topic is not a cause for embarrassment. She will also testify that these matters apply to SPC Dean.

3.  SPC Diana Chester, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, telephone unknown (contact made through witness' chain of command at request of chain of command); SPC Chester will testify that she did not have sexual intercourse with the accused.

4.  SSG Jose Cuyar, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, telephone unknown (contact made through witness' chain of command at request of chain of command); interview pending – 28 Dec 06 (SSG Cuyar initially refused to meet with the Defense. Due to the Staff Judge Advocate's encouragement, a late interview has been scheduled.)

5.  MSG Robert Dockins, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, telephone unknown (contact made through witness' chain of

---

[1] This list has been amended, at the request of the Trial Counsel, to include the synopsis of each witness' testimony IAW R.C.M. 703(c)(2)(B)(i).

command at request of chain of command); MSG Dockins will testify, in rebuttal as necessary, that SSG Prado returned, after being summoned by SGM Harrington for interviews, in a tearful and distraught state.

6. SSG Kim Francis[2], National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1605; SGT Francis will testify, in support of the Defense UCI motion, that COL Williams addressed the unit at a Town Hall Meeting and said "his right hand man" had violated G.O. #1 and ran down a list of the infractions, to include: adultery, fraternization, conduct unbecoming an officer, and sexual harassment. She will testify COL Williams was "beyond pissed" and that "he had smoke coming from his ears." She will testify that she has been subjected to suggestions not to testify, and to limit her statements to the Defense, by her Sergeant Major and her Commander. Consequently, she will testify that she fears career implications if she does testify. She will testify about SPC Moses' bad character for truthfulness. She will testify about an alcohol related incident involving SPC Moses at KAF and statements attributed to MAJ Gamble by SPC Moses during the episode. She will testify about SPC Lindsey's description of her "deal" with the prosecution, and that SPC Lindsey told SSG Francis to tell anyone who interviewed SSG Francis "you don't know anything," or words to that effect.

7. SPC Tanya James, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1726; SPC James will testify in support of the Defense UCI motion that COL Williams, in a Town Hall Meeting told the unit as a whole that there was an investigation pending against the accused (by implication), that the accused (by implication) had been transferred to BAF, that the accused (by implication) had violated G.O. #1. She will also testify that a group from the Alaska Guard knew that SPC Moses had a brief affair with an officer back in Alaska.

8. 1LT James Johnson, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1183; LT Johnson will testify in support of the Defense UCI motion that, at a Town Hall Meeting, COL Williams announced to the unit that he had an officer since transferred to BAF who had violated G.O. # 1, and that he would take it to the maximum. He will testify that COL Williams was "livid" during this announcement, and that there was no doubt he was talking about MAJ Gamble. He will testify that it was common knowledge in the unit that sex toys were available, people talked about them often, and that no one was embarrassed by the references.

9. LTC Raleigh Jones, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, telephone unknown (contact made through witness' chain of command at request of chain of command); LTC Jones will testify, in support of the Defense UCI motion, that COL Williams, in a Commander's Update Briefing (CUB), or shortly thereafter, announced to the senior staff that the accused was guilty of violations of G.O. #1, and then went on to list and read all pending charges. He will also testify that senior staff members have attributed to COL Williams statements that the accused needs to be confined. He will also testify

---

[2] Via VTC. The witness will be on leave beginning 28 Dec 06. She will be on/near Ft. Richardson, Alaska. Home Phone: 907-746-5315; Home Cell: 907-360-2096.

that many members of the senior staff regularly refer to the accused as a "predator;" in fact, the references are so frequent, it is "the" term used to describe the accused. LTC Jones will also testify that SPC Chester was assigned to work in the NCE vice the NSE upon the unit's arrival at KAF based upon mission requirements; not because of any contrivance on the part of the accused. He will also testify that SGT Wiggins was later moved to the NSE, rather than SPC Chester, because he was more qualified for those duties; not because of any contrivance by the accused.

10. MAJ Charles Knowles[3], National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2167; MAJ Knowles will testify, in support of the Defense UCI motion, that COL Williams briefed his "core staff" (to include MAJs Barr, parker, Roach, Knowles, LTCs Thompson and Jones, and possibly CSM Averrett) that the accused had violated G.O. #1.

11. SPC Michael LeClear, HHC Task Force Falcon Bagram Airfield, Afghanistan, supporting Task Force Nighthawk at Kandahar Airfield, Afghanistan, APO AE 09354, 841-1163; SPC LeClear will testify as to any prior inconsistent statements should any witness testify in a manner inconsistent with statements made during Defense interviews. He has sat in, as a witness, on all Defense interviews.

12. MSG Edward Lopez, Kandahar Airfield, Afghanistan APO AE 09354, 841- 2260; MSG Lopez will testify in support of the Defense UCI motion that COL Williams at a Town Hall Meeting advised the unit as a whole that "we have an officer" who has engaged in fraternization and adultery, that the case would be pushed to the max, and gave the impression that he believed the charges and had already determined the punishment.

13. MAJ Don Mercer, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1721; MAJ Mercer will testify that he has only seen the accused and SPC Chester together on a few occasions at the DFAC and that their interaction was completely professional.

14. SSG Peggy Prado[4], Ft. Richardson, Alaska, telephone unknown (contact made through witness' chain of command at request of chain of command); SSG Prado will testify, in support of the Defense UCI motion, that she was threatened by SGM Harrington to either reveal things about MAJ Gamble that SSG Prado could not confirm, or she would be faced with an action/investigation regarding SSG Prado's relationship with MSG Lopez.

15. CPT Elecon Reformado, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080; CPT Reformado will testify that he never saw the accused and SPC Chester in the DFAC or in a vehicle together. He will also testify that he was the approval authority for SPC Edwards' promotion waiver, not the accused.

---

[3] Via Stipulation of Expected Testimony.
[4] Via VTC or Stipulation of Expected Testimony. The witness was returned to Alaska from the deployment and is currently on Medical Hold at Ft. Richardson, Alaska.

16. SGT Lisa Thompson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1447; SGT Thompson will testify that SFC Ramsey was in charge of selecting folks who would go outside the wire for missions, subject to the approval of COL Williams, not the accused. She will also testify that SPC Moses is not easily offended by sexual comments. She will also testify that it was common to have male visitors in the female barracks at the time the accused was allegedly seen in or near SPC Chester's room.

17. SSG Jacqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2168; SSG Tyson will testify, in support of the Defense UCI motion that she was threatened with Article 15 action by both SGM Harrington and 1SG Braun if she did not confirm rumors circulating about MAJ Gamble's case; implying she was withholding information. Both senior NCOs told her COL Williams sanctioned this course of action. During these interviews, 1SG Braun referred to MAJ Gamble as a "psychological predator." He also told SSG Tyson that MAJ Gamble was a bad guy and needed to go down. They also demanded that SSG Tyson "spy" on MAJ Gamble and SPC Chester. She will testify that male visitors often frequented her room at the time the accused was allegedly in/near SPC Chester's room. She will also testify that SPC Edwards told SPC Moses the details of all allegations SPC Edwards is making against the accused.

18. SGT Jorge Vega, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1538; SGT Vega will testify in support of the Defense UCI motion that COL Williams, while "pissed off" addressed the entire unit at a Town Hall Meeting, told the unit that "a certain officer" had violated GO #1 by engaging in adultery, fraternization, conduct unbecoming an officer, and sexual harassment, and that the reference was obviously to MAJ Gamble. On the merits, he will testify that SPC Dean often talked about her sexual toys in public settings, and was never offended by references to them. He will also testify about SPC Lindsey's bad character for truthfulness.

In addition to the listed witnesses, the Defense expects to provide the Trial Counsel several character statements attesting to the accused's relevant character traits (good character for lawfulness, peacefulness, and good moral character) in defense of the charges. The drafters follow:

Mr. Wilber E. Hooks/Anchorage, Alaska/907-271-2247
Ms. Irene Hooks/Anchorage Alaska/907-269-8150
Mr. Maurice Gamble/Anchorage, Alaska/907-260-3819
Ms. Angie Calhoun/Augusta, Georgia/DSN 780-3083
Mr. Wilbur Hooks, Jr./Puyallup, Washington/206-220-6643
Mr. Lee H. Martin/Charleston, South Carolina/843-873-6693
MG Thomas Katkus/Anchorage, Alaska/907-688-3896 (good military character)
COL J. Marc Williams/Ft. Leavenworth, Kansas/913-684-7293 ( "   "   ")
Rev. Alonzo B. Patterson/Anchorage, Alaska/907-276-6609
Ms. Patricia A. Ray/Anchorage, Alaska/907-762-7676
Mr. Billy C. Ray/Anchorage, Alaska/909-345-4746
Rev. Ben Williams/Anchorage, Alaska/907-269-8147
Mr. Edward Chatman/Anchorage, Alaska/907-264-1153
Mr. Phillip B.J. Reed/Chicago, Illinois/312-404-8185

4

Mr. Bob Walsh/Anchorage, Alaska/907-271-3735
Mr. Sylvester Neal/Seattle, Washington/253-735-0139
Ms. Gertrude Peoples/Seattle, Washington/206-721-3189

                         (original signed)
                         David F. Brash
                         Civilian Defense Counsel for MAJ Gamble


                         (original signed for)
                         Mark A. Kerr
                         CPT, JA
                         Military Defense Counsel


    I certify that I have served (via e-mail) a true copy of the above on the Trial Counsel on 28 Dec 06 (local, Kandahar Airfield, Afghanistan).

                         (original signed)
                         David F. Brash
                         Civilian Defense Counsel for MAJ Gamble

Attachment #2

UNITED STATES OF AMERICA
   ) ) ) )
   v. Gamble, Fredrick, M.
    Major, U.S. Army, (574-80-
5016)        )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76 ) Bagram
Airfield, Afghanistan APO AE 09354)

Defense to Dismiss
All Charges and Specifications
(Unlawful Command Influence)


29 December 2006


## RELIEF SOUGHT

  The Defense in the above case requests that the Court dismiss, with prejudice, all charges and specifications due to the appearance of unlawful command influence, as well as actual unlawful command influence. This motion is raised pursuant to RCM 907(a).

  The Defense requests oral argument and an evidentiary hearing.


## BURDEN OF PROOF AND STANDARD OF PROOF

  The initial burden of persuasion and proof in an unlawful command influence motion rests with the Defense. The Defense must show that there are sufficient facts, which, if true, constitute actual or apparent unlawful command influence. The Defense burden of proof here is "some evidence." If the Defense meets their burden, the burden of proof and persuasion then shifts to the Government to: 1) disprove the predicate facts on which the command influence allegation is based; or 2) persuade the military judge that the facts do not constitute unlawful command influence; or 3) produce evidence proving that the unlawful command influence will not effect the proceedings. The Government's burden of proof is beyond a reasonable doubt.


## FACTS

  The accused is a member of the Alaska National Guard currently on Title 10 status. At the time of the majority of the alleged offenses, the accused was serving as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in the case are assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R. Steven Williams commands both the NCE and NSE. SGM Pamela Harrington serves as the Command Sergeant Major/First Sergeant for the NSE. 1 SG Robert Braun serves as the First Sergeant for the NCE. Each named individual served in the same capacity at all times relevant to this motion.

  When allegations of sexual harassment against the accused cam~ to the attention of SGM Harrington and 1 SG Braun, the two undertook a "preliminary investigation" of the matter. This investigation included conducting surveillance of certain female barracks late into the evening and interviewing certain female members of the units to determine if they had any information relevant to the case being developed against MAJ Gamble.

to tell the group that "we have an officer,,2 who has chosen to violate General Order Number One and is now facing charges which include adultery, fraternization, conduct unbecoming an officer, and sexual harassment, among others," or words to that effect. Most of the attendees knew COL Williams was referring to MAJ Gamble because MAJ Gamble was not at the Town Hall Meetings, the various references to the officer in question clearly indicated MAJ Gamble, and because there had been much discussion at all levels within the unit about MAJ Gamble's case at the time preceding and between the Town Hall Meetings. Attendees will describe COL Williams' demeanor during the briefing as "livid" and "beyond pissed." Some subordinate members of the unit took the briefing as a pronouncement of MAJ Gamble's guilt by the Commander and prejudgment as to punishment. This group included 1 L T James Johnson, MSG Ed Lopez, SSG Kim Francis and SGT Jorge Vega. Nearly all listed witnesses for the Government attended these Town Hall Meetings.

At some point within the same timeframe, COL Williams addressed MAJ Gamble's case with his "core staff." This discussion took place in conjunction with one of the unit's daily Commander's Update Briefings, or "CUBs." MAJ Lee Knowles attended in his capacity as NCE S-4, as did MAJ Rob Barr, NCE S-1; MAJ Chad Parker, NCE S2; MAJ Jeff Roach, NCE S-3; and LTC Raleigh Jones, NCE S-5, and MAJ Richard Koch, the Chaplain. CSM Robert Averrett and the unit XO, LTC Michael Thompson, likely attended as well. At this meeting, COL Williams said he was serious about violations of General Order Number One. He also told the group that MAJ Gamble had violated General Order Number One, listed each of the charges pending against the accused, and said that he regretted having to take action against MAJ Gamble. This meeting lasted about fifteen minutes. MAJ Koch, MAJ Barr, MAJ Parker, MAJ Roach, CSM
Ave rrett , and LTC Thompson are on the Government witness list.

Since the case has developed, all members of the senior staff, to include COL Williams, have referred to MAJ Gamble as a "predator," typically while in each other's company in informal settings. Indeed, this term is used so frequently by members of the senior staff to describe MAJ Gamble that one senior staff member characterizes it as "the" term by which to refer to MAJ Gamble. COL Williams has also expressed the opinion, in the presence of his senior staff, that MAJ Gamble should get five to ten years for his offenses. Senior staff members have attributed such statements about confinement to COL Williams as well.

During the week of 25 Dec 06, Defense counsel conducted witness interviews at KAF. Several witnesses (not alleged victims) refused to meet with Defense counsel. The Staff Judge Advocate encouraged each hesitant witness to meet with the Defense and secured all requested interviews for the Defense. Among other fact witnesses, the Defense interviewed SSG Kim Francis. SSG Francis provided information favorable to MAJ Gamble's case. The day after the interview, SSG Francis returned to the interview room and revealed that she now feared for her career, as well as her husband's, and was hesitant to testify. She asserted that prior to arriving for the initial interview; she was approached by her Commander, MAJ Nichols, and advised that she did not have to talk to the Defense counsel. MAJ Nichols is an alleged victim in the case. She further

2 In referring to "this officer," GOL Williams also called him "my right hand man" and "an officer since transferred to Bagram," presumably using different references at different sessions of the Town hall Meetings.

advised that her Sergeant Major, SGM Harrington, told her before the interview not to provide "too many details," or words to that effect.

The three witnesses who refused to meet with the Defense upon initial request by the NCOIC of the KAF Legal Office are: CPT Bingley; SFC Arnett; and SSG Cuyar. After encouragement by the KAF Staff Judge Advocate, SFC Arnett interviewed with the Defense, but conditioned participation upon having the SJA in the room for the interview. The Defense agreed to this condition. SSG Cuyar agreed to meet under the same condition, and the Defense agreed to the condition again. The Defense withdrew its request for the interview with CPT Bingley. SFC Arnett refused to meet with the Defense in the first instance because "civilian counsel is the 'Defense,' and in my opinion, there is no defense for what MAJ Gamble did in this case," or words to that effect.

The Alaska Guard unit currently deployed to Kandahar Airfield (KAF) from Ft. Richardson, Alaska, is composed of a group which includes soldiers, both full-time and part-time Guard members, who have served for years together in Alaska. They see each other on a frequent basis within their community and on duty and compete with each other for promotion and career advancement on a more static basis than an active Army unit because they are not subject to the same frequency of reassignment as the active Army members. As a consequence, Alaska Guard members currently deployed to KAF can expect to return to Alaska at the conclusion of the deployment and work under the same chain of command for many years into the future.

<u>LAW</u>

The Defense relies on the following authorities in support of its motion:

> Article 37(a), U.C.M.J.
> RC.M. 907(a)
> <u>U.S. v. Gore</u>, 60 M.J. 178 (2004)
> <u>US v. Simpson</u>, 58 MJ 368 (2003) <u>US</u>
> <u>v. Stoneman</u>, 57 M.J. 35 (2002) <u>U.S.</u>
> <u>v. Biagaise</u>, 50 M.J. 143 (1999) <u>U.S.</u>
> <u>Avala</u>, 43 M.J. 296 (1995)
> <u>U.S. v. Gleason</u>, 43 M.J. 69, 73 (C.M.A 1994)
> <u>U.S. v. Stombaugh</u>, 40 M.J. 211 (C.M.A 1994) <u>U.S.</u>
> <u>v. Levite</u>, 25 M.J. 334, 338-339 (C.M.A 1987) <u>U.S. v.</u>
> <u>Rosser</u>, 6 M.J. 267 (C.M.A 1979)
> <u>U.S. v. Francis</u>, 54 M.J. 636 (Army Ct.Crim.App. 2000)
> <u>U.S. v. Stamper</u>, 39 M.J. 1097 (AC.M.R 1994)
> <u>U.S. v. Cruz</u>, 20 M.J. 873 (AC.M.R 1985)
> <u>U.S. v. Allen</u>, 31 M.J. 572 (N.M.C.M.R 1990)

<u>WITNESSES/EVIDENCE</u>

The Defense requests the following witnesses produced and present for this motion:

LTC Raleigh Jones

MAJ "Lee" Knowles[3]
MAJ Richard Koch
1 L T James
Johnson MSG Ed
Lopez
SFC Troy Arnett[4]
SFC Sherrie Butters
SSG Peggy Prado[5]
SSG Jacqueline Tyson
SSG Kim Francis[6] TSgt
Amy Hartleban[7] SGT
Jorge Vega

The Defense requests the following evidence produced for this motion:

- Attendance Logs, "Town Hall Meetings" (Attch 1)
- Government's Witness List (Attch 2)

## ARGUMENT

As noted above, the initial burden in an unlawful command influence motion rests with the Defense. Here, the Defense must show that there are sufficient facts, which, if true, constitute unlawful command influence. The threshold is "more than mere allegation or speculation - some evidence." It is a low threshold. U.S. v. Simpson, 58 M.J. 368, 373 (2003); U.S. v. Biaoase, 50 M.J. 143, 150 (1999). The burden does not shift to the Government unless the Defense meets "the initial burden of producing sufficient evidence to raise unlawful command influence." U.S. v. Avala, 43 M.J. 296, 299 (1995). The Defense must further show that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings. This requires the trial court to examine, prospectively, the *potential* impact of the alleged unlawful command influence. U.S. v. Francis, 54 M.J. 636,637 (Army Ct.Crim.App. 2000). Additionally, the alleged actor in the unlawful command influence allegation must have acted with the mantle of command authority. Biaoase, 50 M.J. at 150; U.S. v. Stombauoh, 40 M.J. 208, 211, 213 (C.M.A. 1994); Avala, 43 M.J. at 299; U.S. v. Levite, 25 M.J. 334, 338-339 (C.M.A. 1987).

Unlawful command influence is defined as action, by one with the mantle of command authority, which rises to the level of an attempt to coerce or, by unauthorized means, influence the action of a court-martial or any member thereof, in reaching the findings or sentence in any case. Article 37(a), U.C.M.J. Further, if unlawful command influence is directed against prospective Defense witnesses it impacts the accused's right to have access to favorable evidence. U.S. v. Gore, 60 M.J. 178, 185 (2004). If the Defense does meets their burden, the burden then shifts to the Government to 1) disprove the predicate facts on which the command influence is based; or 2) persuade

---

[3] The Defense is amenable to a Stipulation of Expected Testimony, telephone testimony, or VTC testimony to accommodate MAJ Knowles' end of tour travel to CONUS on 28 Dec 06.
[4] Via Stipulation of Expected Testimony.
[5] The Defense is amenable to telephone or VTC testimony, during motion practice, due to SSG Prado's medical hold status in Alaska.
[6] The Defense is amenable to VTC testimony during motion practice, and trial on the merits, due to SSG Francis' departure for mid-tour leave as of 28 Dec 06.
[7] Via Stipulation of Expected Testimony.

the military judge that the facts do not constitute unlawful command influence; or 3) produce evidence proving that the unlawful command influence will not effect the proceedings. The Government's burden in this regard is beyond a reasonable doubt. US v. Stoneman, 57 M.J. 35,41 (2002); Biaaase, 50 M.J. at 151.

Unlawful command influence can be either apparent or actual, and the trial court is charged with the examination of both aspects of the issue when a motion alleging unlawful command influence is raised. Simpson, 58 M.J. at 374. Actual unlawful command influence is the outright attempt to unlawfully influence the outcome of the proceedings. Apparent unlawful command influence exists when a reasonable member of the public, if aware of all the facts, would have a loss of confidence in the military justice system and believe it to be unfair. U.S. v. Rosser, 6 M.J. 267, 271,273 (C.M.A. 1979); U.S. v. Cruz, 20 M.J. 873, 890 (A.C.M.R. 1985) rvd on other grounds; U.S. v. Allen, 31 M.J. 572, 590 (N.M.C.M.R. 1990). If apparent unlawful command influence is alleged, and "some evidence" is presented to carry the Defense burden, the Government must demonstrate, beyond a reasonable doubt, that the proceedings were free from the apparent taint of unlawful command influence, as viewed by a reasonable member of the public. Simpson, 58 M.J. at 374,375. The Defense will address each factual scenario, in turn.

### The Tyson and Prado Interviews

In a unique twist of factual scenarios typically encountered in unlawful command influence witness tampering cases, the present case reflects an endeavor by senior NCOs in the chain of command to persuade potential witnesses to provide information detrimental to the accused's case, with a presumable eye on the witness' ultimate testimony in court, or, at least, development of such evidence based upon the comments of the witnesses. Here, SGM Harrington was less aggressive than 1 SG Braun in dealing with SSG Tyson, a junior NCO. SGM Harrington made clear that she believed SSG Tyson had information detrimental to MAJ Gamble's case, regardless of SSG Tyson's claims to the contrary. Rather than leaving the interview on that note, however, the Sergeant Major upped the ante by invoking the Commander's name[8] and telling SSG Tyson that she would be facing Article 15 action, at the direction of the Commander, if it later became known that SSG Tyson was withholding information. Although the posture taken by the Sergeant Major is probably within the bounds of the law in that she addresses action as a consequence of the presumed false official statement by SSG Tyson, the context of the conversation, the superior-subordinate relationship, and the invocation of the Commander's name brought home a clear threat to SSG Tyson; indeed, a threc;lt well supported in her mind under the circumstances.

Even if the SGM Harrington interview did not rise to the level of actual unlawful command influence, the subsequent interview by 1 SG Braun eclipsed the bounds of unlawfulness by leaps and bounds. In this interview, SSG Tyson made it very clear that she only knew rumors around the post regarding MAJ Gamble and refused to reveal any matter of which she did not have personal knowledge. Grounded in her realization of the potential devastating consequences for MAJ Gamble if unsupported rumors were repeated during formal investigations; she stood up to 1 SG Braun and flatly told him she would not repeat rumors. Instead of respecting this junior NCOs appropriate stance,

---

8 The Defense has uncovered no information to suggest the Commander, COl Williams, knew of the tactics employed by these senior NCOs, or their use of his name.

and, unfortunately, failing to realize the correctness of her position, 1 SG Braun took to demonizing the accused with references such as "psychological predator" and comments like "he's a bad guy and needs to go down," or words to that effect. Then he, too, went the threat route. While invoking the name of the Commander, he told SSG Tyson that she would be faced with Article 15 action if she did not reveal rumors to which she was privy. This threat, unlike that of SGM Harrington, was clearly levied to secure from SSG Tyson information that SSG Tyson could not say was true; in fact, could not say was any more than idle talk on the street.

The circumstances surrounding the Prado interview are much less certain for the reasons described in Footnote 1. At this point, all the Defense can allege, based upon statements attributed to SSG Prado by two senior NCOs, and the circumstantial evidence of her emotional distress after the interview, is that similar tactics were employed, except that she was threatened with action regarding her alleged unprofessional relationship with MSG Lopez, as opposed to Article 15 action. The Defense expects SSG Prado will be available to testify at the evidentiary hearing on this motion.

With regard to all three events described above, the Defense asserts that the facts constitute unlawful command influence because command pressure has been brought to bear by individuals acting with the mantle of command authority. Levite, 25 M.J. at 339. Specifically, threats - real and perceived - were levied by a Sergeant Major and First Sergeant against junior NCOs in order to secure information detrimental to the accused, without concern for the validity of the information. The logical connection to the court-martial, of course, is that the command actors were on a mission to develop information detrimental to the accused for presentation at trial, or to develop such information based upon what they were able to force from SSGs Prado and Tyson. The consequent unfairness in the proceedings is twofold. First, such heavy-handed behavior presents great risk that uncorroborated or false information will be presented to avoid the threatened consequence. Although these two junior NCOs were able, for the most part, to stand up to these tactics, we will never know which junior enlisted folks were not that, unfortunately is often the essence of unlawful command influence; if it is successful, the victim falls in line and authorities never discover it has occurred. This point raises the second aspect of consequent unfairness. The willingness of these two senior NCOs to employ these tactics would cause the reasonable person to question the fairness of the proceedings because it is clear they will engage in such activity, and others who have succumbed will never be discovered. Clearly, in this regard, the Defense has carried the burden of demonstrating some evidence of both actual and apparent unlawful command influence - a "low" threshold. BiaQase, 50 M.J. at 150.

### The Francis Admonishment

The Defense asserts that the admonishments given SSG Francis by her Commander and her Sergeant Major squarely rise to the level of actual unlawful command influence. "The exercise of command influence tends to deprive servicemembers of their constitutional rights. If directed against prospective Defense witnesses, it transgresses the accused's right to have access to favorable evidence." Gore, 60 M.J. 178, 185 (2004); quoting U.S. v. Thomas, 22 M.J. 388, 393 (C.M.A. 1986); U.S. v. Gleason, 43 M.J. 69, 73 (1994).

When MAJ Nichols told SSG Francis that she did not have to interview with Defense Counsel, MAJ Nichols was absolutely correct - there is no right to a pretrial interview. However, ethical standards and adherence to Article 46, U.C.M.J., have always dictated, in military practice, that the admonishment of no right to a pretrial interview is accompanied by encouragement from the neutral advisor to interview with opposing counsel. Indeed, this is the exact professional and ethical tact presumably employed by the KAF Staff Judge Advocate in producing SFC Arnett and SSG Cuyar for Defense interview. Unfortunately, MAJ Nichols, SSG Francis' Commander, is neither neutral, nor did she encourage the interview. Not only is MAJ Nichols not neutral, she is one of the alleged victims in the case, yet saw no conflict of interest in advising a witness who could produce information favorable to the Defense to think twice about testifying. Even if MAJ Nichols did not use those words, that was certainly the impression she left with SSG Francis. Moreover, and, arguably, more importantly, she gave this advice with the full authority of Command over SSG Francis.

SGM Harrington undertook an even more obvious exercise of unlawful command influence. She brazenly told SSG Francis to withhold information. SSG Francis could not be clearer - SGM Harrington told her to withhold information from the Defense Counsel. The implications are grave, and move far beyond unlawful command influence. Again, SGM Harrington was obviously acting with the mantle of command authority, and, as to SSG Francis, dealing with a junior NCO in her own unit. Predictably, this behavior is not far removed from the tactic employed by SGM Harrington against SSG Prado and SSG Tyson as well. Fortunately, like SSGs Prado and Tyson, SSG Francis has stood up to this unlawful command influence, so far. She has expressed fear for her career and that of her husband. When the admonishment by the Commander and the Sergeant Major, coupled with the National Guard environment, which sees static command and unit structures unchanged for years, it will be a true test for SSG Francis to carry through with her expressed intention to testify. It should also be noted that SSG Francis, as one of the main witnesses for the Town Hall Meeting allegations, addressed below, was also privy to the Commander's emphatic insistence that the accused is guilty and must face the "maximum."

These admonishments to SSG Francis constitute well more than "some" evidence of unlawful command influence - actual and apparent. Taken separately or together, they constitute an effort to influence a witness. The logical connection to the court-martial is that the accused is thereby deprived of access to witnesses in the first instance, and subject to witness testimony which may be tempered at trial due to fear of reprisal in the second instance.[9]

### The Town Hall Meetings

[9] In the event the Court denies the Defense Motion, the Defense nevertheless respectfully requests that the Court employ prophylactic remedial measures to protect SSG Francis from future retribution akin to those employed by the trial judge in <u>Biaoase</u>. They include: warning SGM Harrington and MAJ Nichols about the consequences of reprisal against SSG Francis and attempting to influence witnesses otherwise, before trial on the merits (respectfully request such admonishment, as it applies to MAJ Nichols, embrace any conversations she has with other alleged victims, if not restricting her from contact with them altogether); directing written justification regarding any future downgrade on official evaluations of SSG Francis which are lower than her present evaluations; and consider having SGM Harrington and/or MAJ Nichols removed from SSG Francis' rating chain with no ability otherwise to influence any of her future evaluations.

With the evidence presented on COl Williams' statements at the Town Hall Meetings, the Defense has demonstrated that he has potentially tainted the witness pool in this case. The actions constitute both actual and apparent unlawful command influence. Essentially, the Commander gathered the unit as a whole, albeit in a series of briefings to accommodate duty schedules, pronounced MAJ Gamble guilty of specific and listed offenses, voiced his desire for the maximum consequence, and did so with an emphasis variously described as "livid," "more than pissed," and "with smoke coming out of his ears." The obvious, natural, and probable consequence for all potential witnesses in the audience: message received. One junior NCO was appalled at the lack of any reference to due process or the presumption of innocence. Although MAJ Gamble's name was not mentioned, such characterizations as "one of our officers," or "an officer since transferred to Bagram," or "my right hand man," were all employed, and each pointed clearly to MAJ Gamble, just like the Master Sergeant's comments in <u>Baioase</u> clearly referenced that accused by implication. <u>Baioase,</u> 50 M.J. at 147. Thus, the failure to name the accused is a hollow rationalization for the powerful potential impact on the court-martial carried with the comments. It should be noted such impact, such as that brought to bear here, on a witness pool serves not only to deter witnesses from testifying in favor of an accused, it also serves to embolden witnesses who may have been less than candid in the past or encourage other witnesses to embellish unfavorable information in order to tow the company line. The greatest potential for such powerful impact clearly rests at the junior enlisted level. In this regard, SPCs Selden, Dean and Edwards were at both briefings and SPCs Lindsey, Chester, and Moses each attended one. Also, MAJ Nichols attended both Town Hall Meetings. While the descriptions of the meetings differ slightly from witness to witness, likely because of attendance at different versions, the message from each witness is consistent. They had no doubt COl Williams was angry, he was talking about MAJ Gamble, and he presumed MAJ Gamble guilty. This message is curiously consistent with the reason provided by SFC Arnett for his refusal to talk to Defense Counsel: "you are the Defense and there is no defense for what MAJ Gamble did in this case." SFC Arnett attended the August Town Hall Meeting.

The Defense asserts that these events constitute unlawful command influence because COl Williams', even if by neglect, attempted to influence the outcome of the proceedings by making clear to the entire witness pool command's perspective on the case.[10] His motives, even if noble, are irrelevant. The Defense further asserts that no evidence need be produced that any witnesses were actually influenced for two reasons. First, the gravamen of unlawful command influence is the actor's" ... *attempt* to coerce, or by any unauthorized means, influence the action of a court-martial... " Article 37(a), U.C.M.J. *(emphasis added)*. Second, as noted above, successful unlawful command influence leaves no witnesses in its wake. Fortunately, there are several strong attendees who are prepared to testify about the substance of the Town Hall Meetings, but many folks "just can't remember." This is unlawful command influence and the logical connection to the court-martial is witness taint, both pro and con. Additionally, the evidence of apparent unlawful command influence is overwhelming based upon the

---

10 Even if the Court were to rule that the Town Hall Meetings did not constitute unlawful command influence in an of themselves, the Defense asserts these events certainly constituted a violation of Article 13, U.C.M.J. <u>U.S. v. Stamper</u>, 39 M.J. 1097 (AC.M.R. 1994). The Defense has raised this issue by separate motion.

Town Hall Meetings and clearly triggers the Government's burden to disprove the same beyond a reasonable doubt.

## The Core Staff Briefing|Derogatory Comments

The Defense asserts that unlawful command influence flowing from the Town Hall Meetings was brought to bear on the unit's senior staff in a more personal, persuasive, and direct way when COL Williams pronounced MAJ gamble's Guilt, read the charges he faced, and opined that confinement was appropriate. He did this in the direct presence, with opportunity for direct eye contact, of no less than six, possibly as many as eight, witnesses in this case. Couple this with his subsequent and frequent references to the accused as a "predator," and the references senior staff personnel have made to COL Williams' call for five to ten years confinement, the writing on the wall for this select group of officers is clear. Again, attempted influence, by intent or neglect, has been brought to bear on the witness pool in an even more coercive environment. As. noted above, the law does not distinguish between an insidious design to influence potential witnesses, or even the most noble of causes - it is the potential impact of the actor's conduct. BiaQase, 50 M.J. at 153 *(Judge Sullivan, concurring)*. That potential impact, for the reasons discussed under "Town Hall Meetings," above, is even more pronounced when the audience is pared down to COL Williams' core staff.

## Cumulative Impact/Apparent Unlawful Command Influence

The Defense has addressed the appearance of unlawful command influence under each activity heading. The Defense further asserts that these activities, collectively, provide abundant evidence that a reasonable member of the public, if aware of all the facts and activities described herein, would have a loss of confidence in the military justice system and believe it to be unfair.

## CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to dismiss, with prejudice, all charges and specifications due to the appearance of unlawful command influence, as well as actual unlawful command influence.

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel

I certify that I have served (via e-mail) a true copy of the above on the Trial Counsel on 29 Dec 06 (local, Kandahar Airfield, Afghanistan).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

UNITED STATES OF AMERICA          )
                                  )      Defense to Dismiss
            v.                    )      All Charges and Specifications
                                  )      (Article 13, U.C.M.J.)
Gamble, Fredrick, M.              )
Major, U.S. Army, (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)   )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76 )    29 December 2006
Bagram Airfield, Afghanistan APO AE 09354)


### RELIEF SOUGHT

The Defense in the above case requests that the Court dismiss, with prejudice, all charges and specifications due to violation of Article 13, U.C.M.J., or, in the alternative, in the event of conviction, grant credit to the accused against the adjudged sentence. This motion is raised pursuant to RC.M. 906(a) and 907(a).

The Defense requests oral argument and an evidentiary hearing.


### BURDEN OF PROOF AND STANDARD OF PROOF

The burden of persuasion and proof is on the Defense, as moving party, IAW RC.M. 905(c).


### FACTS

The accused is a member of the Alaska National Guard currently on Title 10 status. At the time of the majority of the alleged offenses, the accused was serving as the Executive Officer (XO) for the National Command Element (NCE) at Kandahar Airfield (KAF), Afghanistan. The alleged victims in the case are assigned either to the NCE, or the National Support Element (NSE), also located at KAF. COL R Steven Williams commands both the NCE and NSE.

Charges were preferred in this case on 19 Aug 06 by MAJ Michael Sullivan. The charges were referred to trial by general court-martial by MG Freakley on 13 Nov 06. The accused was reassigned to Bagram Airfield (BAF), Afghanistan, before charges were preferred in this case. He returned to KAF, for approximately one week, to attend the Article 32 hearing, but has remained at BAF otherwise, awaiting trial. Trial is scheduled to convene at BAF on 9 Jan 07.

On 25 and 26 Aug 06, and 28 and 29 Sep 06, a "Town Hall Meeting" was convened for NCE and NSE, respectively, for one of the two days each month. Several versions of the meetings were held on the target days to accommodate all members of the unit and the different shifts they worked. One of the issues discussed at the meetings included a briefing by the Commander, COL Williams, regarding violations of General Order Number One, and the accused's case specifically. During this portion of the presentation, COL Williams advised all attendees that he would not tolerate any violation of General Order Number One, and, further, that he would address all violations by seeking the maximum punishment available. COL Williams then went on to tell the

With regard to the Town Hall Meetings, the Defense first asserts that, circumstantially, the evidence reflects an intent to punish the accused. Here, the Defense points to four factors. First, the Commander was obviously angry and agitated. It was thus likely that he was lashing out at the accused, although not calling him by name. Indeed, the MAJ Gamble's case was the centerpiece of the comments and COL Williams' apparent frustration. Second, there was no reference to a presumption of innocence or any pending due process rights. MAJ Gamble was labeled a criminal, plain and simple, as one who violated General Order Number One in specific ways. Third, MAJ Gamble had already been exiled to BAF and everyone at the Town Hall Meeting knew the references were to him. It would be disingenuous to propose that the audience did not know who the unidentified "officer" was when he was referred to as "the officer now at Bagram," or "my right hand man." Fourth, the speaker had to know all these things, as the Commander. Collectively, these factors circumstantially point to an intent to punish MAJ Gamble.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis calls for examination of the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Here, two spring to mind. First, COL Williams may have sought to impress upon the unit the seriousness of General Order Number One violations and deter future offenders. Second, he may have sought to put a stop to rumors about MAJ Gamble's case. The Defense concedes that both objectives are legitimate and non-punitive. The Defense asserts, however, that eOL Williams's pursuit of these objectives was not reasonable. The logic here is simple. In order to deter future violations of General Order Number One, simply state what will happen to future offenders, as emphatically as necessary, without reference to any ongoing case. In order to stop rumors about MAJ Gamble's case, simply tell the unit to cease and desist on the rumor front. Again, there is no legitimate reason to brand the accused as guilty, and list the offenses to make either legitimate point. Thus, the challenged conduct in this case also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were unreasonable and amounted to pretrial public humiliation. As noted above, such humiliation can occur even if the accused is not present with the unit, or at the location of the humiliation. Baiaase, 50 M.J. 143, 152 n.3.

### The Core Staff Briefing/Derogatory Comments

With regard to the core staff briefing, and follow-on comments reg~rding the accused, the Defense asserts that the circumstantial evidence of intent to punish is even stronger. To be sure, a pronouncement of guilt, coupled with a reading of the charges, presents an instance of public humiliation for the accused within the select community to which he especially belonged as the former Executive Officer, COL Williams' senior staff. He was more directly and personally humiliated by these comments which were shared in a group setting with his former close associates and friends, and, moreover, folks whom he will likely see and with whom he will deal upon his return to Alaska. Thus the potential for humiliation was high, just based upon the briefing, and known to COL Williams at the time of the briefing. When the frequent references to "predator" took place after the briefing, the emphasis became personal, and even more humiliating as the core staff began to parrot the reference until it became "the" term by which to refer to MAJ Gamble. The Defense asserts the intent to punish has been demonstrated circumstantially.

In the alternative, if the Court were to find no intent to punish, the second part of the analysis again moves to the existence of legitimate, non-punitive, Government objectives advanced by the challenged conduct. Only one such objective seems apparent: to keep the senior/core staff apprised of the status of the case pending against the former XO. Again, the Defense concedes the object is legitimate and non-punitive in the abstract, but the execution was unreasonable. The staff could have been apprised of the case status, even with a listing of offenses, without reference to MAJ Gamble's guilt. However, once COL Williams moved past that status briefing and undertook to use the tetm "predator," apparently influencing the staff to do the same, no legitimate purpose whatsoever was served. Only humiliation remained. The same is true for the references to the confinement COL Williams believed appropriate. Thus, again, the challenged conduct as it relates to interaction with the senior staff also violated Article 13 because, even if undertaken for a legitimate objective, the measures employed were
unreasonable and amounted to pretrial public humiliation.

## CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to dismiss, with prejudice, all charges and specifications due to violation of Article 13. In the alternative, the Defense respectfully requests the Court grant credit to the accused, if convicted, against the adjudged sentence. The Defense asserts such credit should be no less than three days for one confinement credit, if confinement is adjudged, for each day since the Town Hall Meetings were held, and the frequent references to the accused as a "predator" began. Accordingly, the Defense requests at least three days for one credit for each day from 25 Aug 06 until 9 Jan 07.

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble


(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel


I certify that I have served (via e-mail) a true copy of the above on the Trial Counsel on 29 Dec 06 (local, Kandahar Airfield, Afghanistan).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble



**DEPARTMENTS OF THE ARMY AND THE AIR FORCE**
HEADQUARTERS, ALASKA NATIONAL GUARD
OFFICE OF THE STAFF JUDGE ADVOCATE
P.O. BOX 5800, CAMP DENALI
FORT RICHARDSON, ALASKA 99505-5800

27 September 2006

Captain John L. Calcagni III
Chief, Military Justice
HQs, Combined/Joint Task force (CJTF)-76
Bagram Airfield, Afghanistan
APO AE 09354

Dear Captain Calcagni:

Enclosed are documents responsive to your 23 September 2006 request; MAJ Collins coordinated with me, and instructed me to send documents and certification to you. There are two attached certifications, one from the G1 as custodian who found the records, but the second is the attestation of the author of the documents. There is no standard certification language for the G1. If you need a different certification, let me know. Both individuals work full-time on Fort Richardson. Per Mr. (formerly Captain) Jones, the documents are not the entire record of what happened; he indicated that the individual was re-hired by the Youth Corps director at the time after review of the case. I cannot locate any records indicating any military investigation or adverse action transpired as a result of this correspondence. The State Equal Employment Manager was unable to locate any EEO or EO records in current files, or the archives.

There may be other records relevant to your request in the State of Alaska records system. Further inquiry may be made of Mr. Jones. He may be reached at: TJones@ngchak.org. His telephone numbers are: Commercial (907)384-6017, home is (907)694-5860. His mailing address is: Mr. Timothy Jones, Director, Alaska Military Youth Academy, P.O. Box 5727, Fort Richardson, AK 99505. Records requests may be directly made to: Mr. John Cramer, Administrative Service Director, Department of Military and Veterans Affairs, P.O. Box 5800, Fort Richardson, AK 99505-0800. His voice phone is (907)428-6881 commercial, and his fax is (907) 428-6027. His e-mail is john_cramer@ak-prepared.com.

Sincerely,

Susan Bailar
Lieutenant Colonel, Alaska Air National Guard
Staff Judge Advocate (Joint)

Enclosures

DMVA                                                    14 MAY 94

MEMORANDUM FOR  Commander, 6th Bn, 297th In (L), P.O. Box 5800, Ft. Richardson, Alaska 99505-0800

SUBJECT:  Sexual Harassment case against 1LT Fred Gamble

6. The great preponderance of evidence, from highly reliable sources, indicates that on numerous occasions 1LT Gamble demonstrated behavior that was detrimental to the officer corps as a whole, and did indeed display conduct that was unbecoming of any officer, and had crossed the boundary of socially acceptable behavior.

7. On 29 Apr 94 1LT Gamble was notified that he would be given the opportunity to resign his position at the Youth Corps or he would be terminated. He stated that he would have his resignation to COL Fleming within the next three days.

8. On 9 May 94 I received a letter from 1LT Gamble stating that he had changed his mind and now refused to resign. He now stated that he would not resign based solely on here-say and that if he was terminated that he would file a grievance for racial and gender discrimination with the Alaska State Commission for Human Rights, with the chief-of-staff of the Department of Military and veterans affairs, and file a lawsuit against the State of Alaska for slander and wrongful discharge. His initial statement and final letter are included as enclosure #3.

9. The decision to terminate 1LT Gamble's employment was extremely difficult, COL Fleming listened to both sides of the dispute before releasing him. He has worked hard for me and has many innovative ideas. His talents are irreplaceable to me.  1LT Gamble was not fired because of his skin complexion, but because of the overwhelming amount of evidence relating to his sexual behavior. Team Leaders are expected to project an image of healthy life skills and to set the standard for behaviors to be emulated by the 16-18 year old Corpsmembers.

10. Due to the fact that at least one incident occurred while 1LT Gamble was at Annual Training with the 6th Battalion you may want to consider ordering a AR 15-6 investigation to determine if any further military action is warranted.

Encl.
Sexual Harassment Charge
Statements from victims
1LT Gamble's Statements
Termination Letter

                              TIMOTHY C. JONES
                              CPT, IN  AK ARNG
                              Commandant

c:
AA

Attachment 5

UNITED STATES OF AMERICA            )
                                    )
            v.                      )
                                    )
Gamble, Fredrick, M.                )        Defense Motion *in Limine*
Major, U.S. Army, (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)     )        (MRE 404(b))
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76  )
Bagram Airfield, Afghanistan APO AE 09354)   4 December 2006

## RELIEF SOUGHT

The Defense in the above case requests that the Court prevent the Government from admitting, or referring to, evidence offered under MRE 404(b), per the Government's Notice thereof; to wit:

- Admitting the evidence, in any form, in the Government's case-in-chief
- Questioning Defense character witnesses regarding the underlying allegations
- Admitting/using the evidence in any form in a sentencing case, should a conviction be obtained on any charge
- Using the evidence in any form, or questioning Defense witnesses in any respect, based upon the underlying allegations, at any phase of trial, under a rebuttal theory[1]

The Defense requests oral argument and an evidentiary hearing.

## BURDEN OF PROOF AND STANDARD OF PROOF

The Defense asserts that the burden of proof and the burden of persuasion regarding this motion is on the Government. Although the motion is raised by the Defense under RCM 906(b)(13), the Government is the proponent of the evidence. Therefore, the Government should be required to assume the role of the moving party for purposes of application of RCM 905(c)(1) and (2). The standard of proof is set forth in U.S. V. Reynolds, cited below.

## FACTS

At the outset, the Defense asserts there are no reliable facts upon which to base admission of the alleged uncharged misconduct set forth in the Government's Notice. However, based upon documents made available to the Defense, it appears that the Government will rely upon certain statements attributed personnel assigned to the Alaska Military Youth Academy (Youth Corps) in 1994. The following summary is drawn from those documents, but the Defense does not concede the reliability of the Youth Corps documents and, in fact, moves that they be excluded.

In 1994, MAJ (then 1LT) Gamble was assigned as a Team Leader with the Alaska National Guard Youth Corps. In April of that year, A1C Jenina Steward, a military subordinate, made an complaint against MAJ Gamble alleging that he had sexually harassed her. (Atch 1). The written complaint was brought to the attention of the chain of

---

[1] Although rebuttal use is raised at this point, the Defense only seeks to make this aspect of the motion a matter of record, recognizing the issue is not yet ripe.

command.  Some type of inquiry apparently followed.  During the course of the inquiry, additional sexual harassment allegations were made against MAJ Gamble by Dr. Jean Marcey (Atch 2), 1LT Gina Alzate (Atch 3), and SPC Kim Bacon (Atch 4). Each apparently made a statement in connection with their respective complaints.  At the conclusion of the inquiry, MAJ Gamble was terminated from employment with the Youth Corps. (Atch 5).

*The Steward Allegation.*  The Government's notice of alleged uncharged misconduct regarding (then) A1C Steward appears to be based upon a typed statement ostensibly drafted by A1C Steward.  Therein, the drafter alleges (then) 1LT Gamble made inappropriate comments to her, hugged her and grabbed her buttocks, and cornered her in a room after turning the lights out.

*The Bacon Allegation.*  The Government's notice of alleged uncharged misconduct regarding (then) SPC Bacon appears to be based upon a typed summary of statements made by SPC Bacon and attributed to her by the drafter, (then) CPT Jones. The statements attributed to SPC Bacon allege 1LT Gamble placed SPC Bacon's hand on his crotch on one occasion.

*The Marcey Allegation.*  The Government's notice of alleged uncharged misconduct regarding Dr. Marcey appears to be based upon a typed statement ostensibly drafted by Dr. Marcey.  Therein, the drafter alleges 1LT Gamble made inappropriate comments to her, cornered her in a room, and tried to kiss her.

*The Alzate Allegation.*  The Government's notice of alleged uncharged misconduct regarding (then) 1LT Alzate appears to be based upon a typed statement ostensibly drafted by 1Lt Alzate.  Therein, the drafter alleges 1LT Gamble made inappropriate comments to her and touched her abdomen.

At some point after the termination, MAJ Gamble was re-hired to his position with the Youth Corps. There are no records within the control of the Government that reflect any military investigation was conducted, nor that any adverse action transpired.  In fact, the current Staff Judge Advocate for the custodian of the records concedes that "the documents [made available to the Trial Counsel] are not the entire record of what happened…," after consultation with the Youth Corps Commandant at the time the allegations were made, (then) CPT Jones.  (Atch 6).

The Government now seeks to rely upon the information contained in the few Youth Corps documents they have obtained in order to introduce the underlying allegations at trial.

The Government has also provided notice that they will rely upon allegations made by SGT Robin Munnlyn regarding allegations about MAJ Gamble's behavior toward her in the pre-mobilization phase of their unit's deployment to Afghanistan.  The alleged behavior occurred before MAJ Gamble and SGT Munnlyn were placed on Title 10 status for the mobilization and deployment.  SGT Munnlyn alleges that MAJ Gamble made a series of inappropriate sexual comments to her. (Atch 7).

## LAW

The Defense relies on the following authorities in support of its motion:

> Sixth Amendment, U.S. Constitution
> RCM 905(e)
> RCM 906(b)(13)
> MRE 401
> MRE 402
> MRE 403
> MRE 404(b)
> U.S. v. Rhodes, 61 M.J. 445 (2005)
> U.S. v. Pruitt, 46 M.J.148 (1997)
> U.S. v. Robertson, 39 M.J. 211, 214 (1994)
> U.S. v. Reynolds, 29 M.J. 105 (1989)
> U.S. v. Henson, 58 M.J. 529, 531  (Army Ct.Crim.App. 2003)
> U.S. v. Lowe, 56 M.J. 914, 916  (N.M. Ct.Crim.App. 2002)

## WITNESSES/EVIDENCE

The Defense intends to call no witnesses for this motion.

The Defense requests the following evidence produced for this motion:

- Steward Statement (Atch 1)
- Marcey Statement (Atch 2)
- Alzate Statement (Atch 3)
- Bacon Statement (Atch 4)
- Termination Memo (Atch 5)
- Bailar Memo (Atch 6)
- Munnlyn Statement (Atch 7)
- Government Notice of Intent to Introduce Evidence Pursuant to MRE 404(b) (Atch 8)
- Government's Witness List (Atch 9)

## ARGUMENT

### Use in the Government's Case in Chief – The Youth Corps Allegations

When the Government seeks to admit evidence pursuant to MRE 404(b), the admissibility of the evidence is governed by the three-prong test of US . Reynolds, 29 M.J. 105, 109 (1989). The Reynolds analysis remains good law; cited as recently as 2005. U.S. v. Rhodes, 61 M.J. 445, 452 (2005). First, the evidence must be evaluated under MRE 104(b) to determine whether the members reasonably could find that the alleged uncharged misconduct occurred. Secondly, and taking into account the Government's theory of admissibility of each piece of challenged uncharged misconduct, it must be shown that the evidence makes a fact of consequence with regard to the charged offenses more or less probable. Finally, the alleged uncharged misconduct must be assessed under MRE 403 to determine if the probative value is substantially outweighed by the danger of unfair prejudice .

As to the first prong of <u>Reynolds</u>, court members could not reasonably conclude the alleged uncharged misconduct occurred, given the lack of any reliable evidence available to the Government. While the Defense concedes that the Government need not prove the alleged uncharged misconduct by preponderant evidence, nor that the military judge must find it occurred, as prerequisites to admission, the evidence must be reliable enough that the members could reasonably conclude it occurred, by preponderant evidence. <u>Reynolds</u>, at 109. The Government falls far short of this standard for six reasons. First, none of the alleged victims are available to testify, thus their demeanor and attendant credibility cannot be fairly assessed. Second, the typed statements are in unchallenged narrative format with no accommodation for any probing questions by an interviewer. In fact, the source of SPC Bacon's allegations is not even a typed statement ostensibly prepared by her, but, rather, a summary of a conversation prepared by another drafter with statements attributed to SPC Bacon. Third, none of the statements are sworn. Fourth, there is no evidence as to the circumstances under which the statements were made, who was in the interview (if there were an interview), and what information was provided the drafter prior to completion of the statements. Fifth, the custodian of the Government records readily concedes that "...the documents are not the entire record of what happened..." Sixth, the custodian further concedes that MAJ Gamble was subsequently re-hired by the Youth Corps' director.

As to the second prong of the <u>Reynolds</u> analysis, the Defense is not in a position to address this prong of assessment because the Government, in their notice, has not set forth a theory of admissibility, with any detail or explanation, which is the take off point, and a component part of, the second prong. Rather, the Government has simply provided a litany of the typical laundry list MRE 404(b) exceptions with no analysis. Suffice it to say at this juncture, however, that the allegations have no temporal connection, as they occurred over twelve years ago, and, for the majority of allegations, have no factual similarity to any conduct alleged in the charged offenses.

As to the third prong, the Defense asserts that the only possible probative value of the evidence would be to demonstrate that MAJ Gamble engaged in sexual harassment twelve years ago, thus it is likely he committed the charged offenses. This is straight propensity evidence advanced under a logical theory of relevance. However, it is prohibited under MRE 404(b) under a legal theory of relevance because admission would create significant risk that the members would convict the accused based upon a propensity theory and disregard the standard and elements required for proof beyond a reasonable doubt on the charged offenses. Simply, the probative value of the evidence is significantly outweighed by the danger of unfair prejudice. MRE 403.

A final basis for exclusion regarding all witnesses involved in the Youth Corps allegations is the Sixth Amendment's Confrontation Clause. The Government's witness list does not contain any of the Youth Corps allegation witnesses. The Defense asserts that presentation of their underlying allegations, in any form short of live testimony, abridges MAJ Gamble's right to confront these crucial witnesses. In fact, as noted above, there is no evidence whatsoever that anyone has ever confronted these witnesses.

4

## Use in the Government's Case in Chief – the Munnlyn Allegations

As to the first prong of <u>Reynolds</u>, the Defense concedes that the court members could reasonably conclude the alleged uncharged misconduct occurred, if, and only if, SGT Munnlyn testifies as a witness and her testimony is consistent with the assertions in the Government's MRE 404(b) Notice.

As to the second prong of the <u>Reynolds</u> analysis, the Defense, again, is not in a position to address this aspect of assessment. The Government, in their notice, has not set forth a theory of admissibility, with any detail or explanation, which is the take off point, and a component part of, the second prong. Rather, the Government has simply provided a litany of the typical laundry list MRE 404(b) exceptions with no analysis.

As to the third prong, the Defense asserts that the only possible probative value of the evidence would be to demonstrate that MAJ Gamble engaged in sexual harassment before his unit was placed on Title 10 status, thus it is likely he committed the charged offenses. This is again straight propensity evidence advanced under a logical theory of relevance. However, it is prohibited under MRE 404(b) under a legal theory of relevance because admission would create significant risk that the members would convict the accused based upon a propensity theory and disregard the standard and elements required for proof beyond a reasonable doubt on the charged offenses. The probative value of the evidence is significantly outweighed by the danger of unfair prejudice. MRE 403.

## Use in the Questioning of Defense Character Witnesses – Youth Corps

The Defense understands that the predicate for posing questions about the subject allegations to Defense character witnesses is: 1) testimony by the character witness which gives rise to a fair exploration or "test" of the witness' opinion; and 2) a good faith belief by the questioner that the underlying allegation is based upon an incident that did in fact occur. <u>U.S. v. Pruitt</u>, 46 M.J. 148, 151 n.4 (1997). Of course, extrinsic evidence of the underlying conduct would not be admissible. <u>U.S. v. Henson</u>, 58 M.J. 529, 531 (Army Ct.Crim.App. 2003). The Defense first asserts that the questioner, based upon the lack of reliability in the information available to both sides, could not entertain a good faith basis for the questions. As noted above, the witnesses are not on the Government's witness list; thus we can assume they have not been interviewed. They have completed narrative unchallenged statements in an unknown environment. The termination action which followed their complaints was rescinded and MAJ Gamble was rehired. Finally, the Government's own record custodian concedes the parties do not have the full story. For these reasons, the Defense contends that the evidence available to the Government, in its entirety, is not reliable. It is akin to the conclusory rap sheets held insufficient to support a good faith basis for character witness cross examination questions in <u>U.S. v. Robertson</u>, 39 M.J. 211, 214 (1994).

Secondly, the Defense asserts that even though the questions themselves will not be evidence, and the members would likely be so instructed if the questions were posed, the Court should nevertheless apply the MRE 403 balancing test to the questions themselves. This is so because MRE 403 is geared to prevent court members from convicting an accused based upon misuse of evidence; it addresses the risk that members will use the evidence for an improper purpose. In this case, information about the subject evidence poses that exact risk. If this information comes before the

members, even in the form of questions posed to Defense character witnesses, the risk is great that the members would misuse the information and convict based upon propensity; they would be misled. Therefore, if MRE 403 were not applied to the questions themselves, the Government would simply be able to "back door" the information in front of the members and achieve the same result they could not accomplish using MRE 404(b) in their case in chief. Accordingly, the Defense asserts this use of the allegations should be prohibited under the same rationale set forth above under the third prong (MRE 403) of the Reynolds test.

## Use in the Questioning of Defense Character Witnesses – Munnlyn

The Defense concedes that the Trial Counsel has a good faith basis to pose questions regarding the Munnlyn allegations to Defense character witnesses, if the door is opened during direct examination.

The Defense does not concede, however, that the Munnlyn allegations should come before the members, even in the form of character witness cross examination questions, because, as argued above, MRE 403 should apply. When MRE 403 is applied, the limited probative value of the question becomes substantially outweighed by the danger that the members will use the information for a prohibited purpose – a propensity conviction. Thus, the Munnlyn questions should be excluded as well.

## Use in the Sentencing Case

MRE 404(b) does not apply in the sentencing phase of trial. The admissibility standards at sentencing are drawn from a dual application of RCM 1001(b)(4) and MRE 403. If this trial proceeds to the sentencing phase, the Defense asserts that neither the Youth Corps allegations, nor the Munnlyn allegations are directly relating to or resulting from any of the charged offenses.[2] U.S. v. Lowe, 56 M.J. 914, 916 (N.M. Ct.Crim.App. 2002). Moreover, the Defense asserts under MRE 403, that presentation of any of this information, in the sentencing phase, would violate MRE 403 in that it would subject MAJ Gamble to a sentence based upon a propensity theory. Not only would this violate the parameters of MRE 403, but it would also present a conflicting message to the members, who will otherwise be instructed during the sentencing phase, "You are instructed that the accused is only to be sentenced for the offenses of which he has been found guilty," or words to that effect.

## CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to restrict the Government from utilizing the subject evidence offered under MRE 404(b) at any point in the trial to include use in the Government's case in chief, use in questioning Defense character witnesses, use in the sentencing case, should a conviction on any charge be obtained, and use under any rebuttal scenario.

(original signed)

---

[2] The Defense understands that this standard cannot be fully applied until the completion of the findings phase of trial. Thus, by this motion, the Defense makes the objection a matter of record even if the Court decides to defer ruling pending the outcome of the findings portion of the trial.

David F. Brash
Civilian Defense Counsel for MAJ Gamble


(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel


I certify that I have served (via e-mail) and have caused to be served (via BAF Trial Defense Services) a true copy of the above on the Trial Counsel on 4 Dec 06 (local, Pittsburgh, PA).


(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

4/13/94

1SG Masters:

This is the report I was requested to write as a follow up to my
meeting with Colonel Fleming & yourself on 4/13/94.

This is the account of the incidents between myself & 1LT Gamble.

1LT Gamble & I have been working together since the beginning of
January. As far as memory goes that is when the suggestive
innuendos began. I can't give dates for all of them. I had just
started this job & since he was a "superior" in my mind (I am an
E3;he is an O2: I am an assistant team leader; he is team leader)
I did not know how to respond so I would just be flip & get on
with my job. It was uncomfortable to me since he was the higher
rank but, I am used to guys hitting on me so I tried to shrug it
off. I have never had this occur on a job before & did not think
I had a reason to worry. I have always been able to deter
inappropriate male attention in my personal life & felt I had
reasonable rejected his advances. His most repetitive comment was
something about us sneaking off into a dark corner. The comments
got redundant & boring after a while & did start to get on my
nerves as he was always reminding me that he was my rater.

I brought the comments to your attention at or near the end of
February (possible earlier). You told me to let 1LT Gamble know
that it bothered me. I was unable to do this since I haven't
really seen 1LT Gamble since the conversation. The first time I
had seen 1LT Gamble for any length of time was on the morning of
12 April. The following is what happened.

1LT Gamble & I were in the TLC with several other people on
Annual Training in the area. We were talking about my leave to
Arizona next week. There has been an ongoing "joke" about how I
won't be back since I am going to see my boyfriend-- I was
standing there just shooting the breeze with 1LT Gamble. All I
remember from here is that we were alone. He said "Well I better
get one last hug in." It threw me for a loop as I can honestly
say that I have not hugged him or any other team leader but I
didn't think there was any harm in giving a coworker a hug
goodbye; it seemed innocent enough; but as he was hugging me, he
grabbed my butt, & literally rubbed & squeezed it. When I backed
off, he said "I just had to know what it felt like." I felt
dazed, confused, scared, intimidated. I had no idea how to react.
I just let it go since I didn't know what to do. He really caught
me off guard. I didn't want to make a scene. Part of me felt like
screaming but I was at my job and part of me said it was over & I
had to accept it. Even though part of me felt violated & trapped,
I tried to remain optimistic that this was the end of it & to let
it go. I did know one thing & that was I had to get out of there
& go home. I hung around for what seemed like an eternity. I
don't think anyone else was there. I don't know where 1LT Gamble
went; I don't know where anyone else went.

ENCLOSURE #1

The next think I remember is LT Bergey, SGT MacLamara, 1LT Gamble & myself were all in the TLC again. I found myself venting my frustrations regarding issues I have with the success of the program to anyone who was listening. LT Bergey told me that he understood that I just needed a break & to go home. 1LT Gamble called me into the room he was in from where I had been in the main office with LT Bergey. It is common practice to discuss issues privately so I reacted respectfully and went in. I figured he was my boss & smart enough to let it alone. I did NOT want that incident to affect my ability to follow through on my job. SGT MacLamara was standing in the main area & said he needed to talk to me. I had told him to wait one. I went into the room & 1LT Gamble was fixing his boots and when I got inside, he closed the door. He was carrying on with what appeared to be "genuine" concern regarding my feelings toward the program. I was sitting on the desk since there was no chairs to sit on. He was standing about 2 1/2 feet in front of me. He said "There's just one more thing I need to find out" and he turned the light out. My hands/arms went up immediately & I just started saying no, no, no, no! I kept real quiet since I didn't want to make a scene but panic & anger swelled up in my chest. I felt him on my hands pushing towards me & he was still trying to get close. I finally got around him & turned the light on and said "I have to draw the line somewhere". SGT MacLamara was standing outside the door when I walked out. I had rolled my eyes & SGT MacLamara had reacted like I was rolling them at him. I asked SGT MacLamara if I could give him a ride to 1st platoon barracks. As I was leaving the TLC, 1LT Gamble smiled at me as if nothing had even happened. When we got in the truck, I told SGT MacLamara what had ocurred. He recommended that I report the incident. He shared that he had been around one night when 1LT Gamble had tried to hit on SPC Bacon. SGT MacLamara told me he had seen the light flick off and flick on. I called & spoke with you from my home around 1330 Tuesday afternoon & related the above incident. You asked me to come back into the camp around 1530. When I got there we went over what happened. I addressed a concern that I am a person who doesn't take teasing too serious but the incidents today had scared me and was worried that my friendly personality would be thrown in my face. You reinforced that I did nothing wrong & that my main worry about my friendliness was unfounded & my interaction with other coworkers had never been inappropriate. You said you had called me back to the camp because you wanted me to meet with Colonel Fleming that day but had forgot the Colonel had an appointment & was not coming back to camp. You said you would call me first thing Wednesday & have me come in to talk with the Colonel. I got your call around 0930 on Thursday, 13 April & you asked me to come in at 1300. So I went in at 1300 & had my meeting with Colonel Fleming & yourself.

In brief, after we went over the events, I was asked what I wanted to do? I said I wanted to file a legal complaint & that I would follow through. Colonel Fleming asked several times if anyone was a witness. I said just SGT MacLamara who had seen the light go off & on. He said that wasn't enough & that it would be his word against mine. 1SG Masters emphasized that a lot of woman back down with it gets messy. I told him I would not. Then I was asked what I wanted done. I said I could not ever work with him again & I was not giving up my job because of this incident. You suggested we work separate shifts, I told you no, I don't feel comfortable with that because there is the chance of running into each other if he's still with the program. I also pointed out that he works with younger females that are not much younger than myself & the last point I made was the feeling of intimidation involved on my part. I was quick to point out "Hes an O2, I'm an E3". I said that even though rank doesn't play a big part at the Youth Corp, still the rank is there. The conversation was ended by telling me that it was necessary to get a hold of 1LT Gamble & SPC Bacon. Then I left.

I was confused about the outcome so I called you when I got home. I asked "What should I do now? Should I file an official complaint with EO or what?? You said to just write a statement, hang onto it & wait.

This is that statement. I am forwarding a copy to the persons listed below.

*Serina C Steward*, A1C

cc:  COLONEL FLEMING
     SGT MACLAMARA
     DEPT VETERAN AFFAIRS/HUMAN RESOURCES
     EO

May 6, 1994

The following statements pertain to the actions of Lt. Fred Gamble that were directed toward me between the months of January and April 1994 while employed at the Alaska National Guard Youth Corps:

• In January, during staff training, Lt. Gamble repeatedly referred to the possibility of vacationing together, in spite of the fact that he is married. He also made this comment to me during the presentation of one of our guests: "That dress is very becoming on her. If I was with her, it would be coming off her."

• In March, around the time of his birthday, Lt. Gamble told me he'd like to have me for a birthday present, "wrapped up in a red bow."

• In late March, while I was working during the evening, Lt. Gamble entered my office. After using the phone, he took me by the hand and led me into the adjoining classroom saying he had something to show me. He pushed me against the door and stood directly in front of me, saying not to worry, that no one would see us. I pushed him away and told him I could see the Colonel's office and that the lights were on. When he turned to look, I walked back into my office. He followed me and pushed me into the bathroom and tried to kiss me. Again, I pushed him away and told him he should be ashamed and wondered what his wife would think. He replied "She would be angry, but she would never leave me."

*Jean L. Marcey*

Jean L. Marcey

ENCLOSE #2

Alaska National Guard Youth Corps
PO Box 5727
Fort Richardson, AK 99505-0727

MEMORANDUM FOR RECORD

TO: Col John Fleming
FROM: 1LT Gina Alzate                    DATE: 28 April 1994
SUBJECT: Inappropriate behavior of a fellow AKNGYC staff member

## Situation #1

Approximately in the first week of March 1994, 1LT Fred Gamble was sitting at
SSgt Pasquale's work station at the AKNGYC Headquarters working with the
computer. When I entered the building, he greeted me with "Hi, legs!". I asked him,
"What did you call me?". He replied, "Legs". Then I asked, "What's legs?". "You're
the only one I see around here that wears skirts all the time, so I called you legs,"
he answered. After this response I proceeded to my office without acknowledging
him anymore.

## Situation #2

A few days after situation #1 occurred, I was at the copier machine at the
Headquarters busy with duplication. Lieutenant Gamble approached me from my
right side and started to stroke my seven months pregnant abdomen. I was startled
and asked him, "What do you think you're doing?". "I was rubbing for good luck", he
replied. "That's not appropriate. Don't do it again!", I stated firmly. He smiled at
me and walked away.

## Situation #3

On April 7, 1994, the Academic staff had a visit from Glencoe-McGraw Hill
representatives. We were having lunch at the AKNGYC Dining Facility. I sat at a
table first, while 2LT Branch and the two representatives were still at the serving
line. Lieutenant Gamble came up and greeted me. We exchanged pleasantries, then
he came up closer to place his hand on my abdomen again. This time I brushed his
hand aside, then I spoke with him on military customs and courtesies. I told him
that it was not appropriate to touch another military member in uniform without
that member's consent. Otherwise, it can be misconstrued as sexual harassment.
"There isn't anything more beautiful than growing a child and bringing that child
into this world", he replied. "Even then, we are in uniform and in a public setting",
I said. Then we talked about other matters.

ENCLOSE #2

ALASKA NATIONAL GUARD YOUTH CORPS
CAMP CARROLL TRAINING SITE
P.O. BOX 5727
FORT RICHARDSON, ALASKA  99505-0727

DMVA-YC-C                                          9 MAY 94

MEMORANDUM FOR RECORD

SUBJECT  Inappropriate sexual behavior of Youth Corps Staff Member

1. On approximately 26 APR 94 while I was inspecting the Team Leader Center SPC Kim Bacon, currently employed as an assistant team leader, inquired about a pending sexual harassment charge she had heard about. I informed SPC Bacon that I was not at liberty to discuss the charges against 1LT Gamble but I did say they were serious. At this time SPC Bacon volunteered the following information.

   a. One morning at 0600 hours herself and 1LT Gamble were alone in the Team Leader Center prior to a shift change. 1LT Gamble had walked up behind SPC Bacon, took her right hand and placed it on his groin area where she could clearly feel an erection. {I do not recall the exact words she used for the ensuing conversation}

   b. SPC Bacon was hesitant to bring out this information and made it clear that she had no intention of filing sexual harassment charges. She did not feel threatened or intimidated by 1LT Gamble. She felt he was merely flirting with her to see where it would lead. She told him in no uncertain terms that she was not interested and that she knew the telephone number to his wife!

2. A written statement summarizing the above event is expected today by SPC Bacon.

TIMOTHY C. JONES
CPT IN  AK ARNG
Corps Program Coordinator

ENCLOSE #2

ALASKA NATIONAL GUARD YOUTH CORPS
CAMP CARROLL TRAINING SITE
P.O. BOX 5727
FORT RICHARDSON, ALASKA  99505-0727

DMVA                                             14 MAY 94

MEMORANDUM FOR  Commander, 6th Bn, 297th In (L). P.O. Box 5800, Ft. Richardson, Alaska 99505-0800

SUBJECT:  Sexual Harassment case against 1LT Fred Gamble.

1. As requested this is a summery of events that lead up to the termination of employment of 1LT Fred Gamble from the Alaska National Guard Youth Corps. Enclosure #1 is a copy of the official charges that were filed on events that had occurred while 1LT Gamble was on active duty during AT-94.

2. On 13 Apr 94 a complaint was filed by Airman First Class Steward alleging sexual harassment. Her statement details two very serious charges that 1LT Gamble had physically touched her in a manner that is not appropriate for commissioned officers.

3. On 15 Apr 94 COL Fleming and 1ST Masters came to the field trains location to brief you and to confront 1LT Gamble about the allegations.

4. On 28 Apr 94 1LT Gamble (Team Leader), A1C Steward (Assistant Team Leader), CPT Mathewson (Air Guard Social Actions Officer and Lead Instructor), 1SG Masters (Deputy Commandant) and myself met to discuss the alleged events with the principal personnel involved. During this meeting both sides were given the opportunity to describe how they perceived the events in question. 1LT Gamble never denied the charges but stated simply that it was his word against hers. It was clear to all present, based on testimony by both parties, body language, interviews with SGT MacLamara and 1LT Bergey that something did indeed occur in the Team Leader Center on those dates. 1LT Gamble did admit to hugging his subordinate but that he did not remember fondling her. He only stated that he did allow his hand to slide down to her lower back in his customary hugging technique. It was not exactly clear what really did occur. Based on his information COL Fleming suspended 1LT Gamble with pay immediately to conduct an informal inquiry.

5. Prior to and while conducting his inquiry, several other female employees came forward with new and startling allegations. Information that was given to me and COL Fleming from Dr. Jean Marcey, 1LT Gina Alzate and SPC Kim Bacon convinced us that on numerous occasions 1LT Fred Gamble had touched female employees of the Alaska National Guard Youth Corps in an attempt to gain sexual favors from them. In each case these females were of equal or lesser military rank and/or a subordinate employee to him. None of this information was solicited nor was every female employee questioned about her working relationship with 1LT Gamble. I'm convinced that no conspiracy was planned by these witnesses and the majority of them felt intimidated by his aggressive behavior. Copies of these statements are enclosed for our review.

DMVA                                                    14 MAY 94

MEMORANDUM FOR  Commander, 6th Bn, 297th In (L), P.O. Box 5800, Ft. Richardson,
Alaska 99505-0800.

SUBJECT: Sexual Harassment case against 1LT Fred Gamble.

6. The great preponderance of evidence, from highly reliable sources, indicates that on numerous occasions
1LT Gamble demonstrated behavior that was detrimental to the officer corps as a whole, and did indeed
display conduct that was unbecoming of any officer, and had crossed the boundary of socially acceptable
behavior.

7. On 29 Apr 94 1LT Gamble was notified that he would be given the opportunity to resign his position at
the Youth Corps or he would be terminated. He stated that he would have his resignation to COL Fleming
within the next three days.

8. On 9 May 94 I received a letter from 1LT Gamble stating that he had changed his mind and now refused
to resign. He now stated that he would not resign based solely on here-say and that if he was terminated
that he would file a grievance for racial and gender discrimination with the Alaska State Commission for
Human Rights, with the chief-of-staff of the Department of Military and veterans affairs, and file a lawsuit
against the State of Alaska for slander and wrongful discharge. His initial statement and final letter are
included as enclosure #3.

9. The decision to terminate 1LT Gamble's employment was extremely difficult, COL Fleming listened to
both sides of the dispute before releasing him. He has worked hard for me and has many innovative ideas.
His talents are irreplaceable to me.  1LT Gamble was not fired because of his skin complexion, but because
of the overwhelming amount of evidence relating to his sexual behavior. Team Leaders are expected to
project an image of healthy life skills and to set the standard for behaviors to be emulated by the 16-18 year
old Corpsmembers.

10. Due to the fact that at least one incident occurred while 1LT Gamble was at Annual Training with the
6th Battalion you may want to consider ordering a AR 15-6 investigation to determine if any further
military action is warranted.


                                    TIMOTHY C. JONES
                                    CPT, IN  AK ARNG
4 Encl.                             Commandant
1. Sexual Harassment Charge
2. Statements from victims
3. 1LT Gamble's Statements
4. Termination Letter

CF:
CAA



**DEPARTMENTS OF THE ARMY AND THE AIR FORCE**
HEADQUARTERS, ALASKA NATIONAL GUARD
OFFICE OF THE STAFF JUDGE ADVOCATE
P.O. BOX 5800, CAMP DENALI
FORT RICHARDSON, ALASKA 99505-5800

27 September 2006

Captain John L. Calcagni III
Chief, Military Justice
HQs, Combined/Joint Task force (CJTF)-76
Bagram Airfield, Afghanistan
APO AE 09354

Dear Captain Calcagni:

Enclosed are documents responsive to your 23 September 2006 request; MAJ Collins coordinated with me, and instructed me to send documents and certification to you. There are two attached certifications, one from the G1 as custodian who found the records, but the second is the attestation of the author of the documents. There is no standard certification language for the G1. If you need a different certification, let me know. Both individuals work full-time on Fort Richardson. Per Mr. (formerly Captain) Jones, the documents are not the entire record of what happened; he indicated that the individual was re-hired by the Youth Corps director at the time after review of the case. I cannot locate any records indicating any military investigation or adverse action transpired as a result of this correspondence. The State Equal Employment Manager was unable to locate any EEO or EO records in current files, or the archives.

There may be other records relevant to your request in the State of Alaska records system. Further inquiry may be made of Mr. Jones. He may be reached at: TJones@ngchak.org. His telephone numbers are: Commercial (907)384-6017, home is (907)694-5860. His mailing address is: Mr. Timothy Jones, Director, Alaska Military Youth Academy, P.O. Box 5727, Fort Richardson, AK 99505. Records requests may be directly made to: Mr. John Cramer, Administrative Service Director, Department of Military and Veterans Affairs, P.O. Box 5800, Fort Richardson, AK 99505-0800. His voice phone is (907)428-6881 commercial, and his fax is (907) 428-6027. His e-mail is john_cramer@ak-prepared.com.

Sincerely,

Susan Bailar
Lieutenant Colonel, Alaska Air National Guard
Staff Judge Advocate (Joint)

Enclosures

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is ODCSOPS

## PRIVACY ACT STATEMENT

| | |
|---|---|
| AUTHORITY: | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 (SSN). |
| PRINCIPAL PURPOSE: | To provide commanders and law enforcement officials with means by which information may be accurately |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION Kandahar Airfield, Afghanistan | 2. DATE (YYYYMMDD) 20060825 | 3. TIME 1030 L | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME Munnlyn, Robin | | 6. SSN 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 | 7. GRADE/STATUS SGT |
| 8. ORGANIZATION OR ADDRESS KAF USNSE | | | |

9.

I, _____ Robin Sharon Munnlyn _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

a. What happened? Please describe the circumstances and events regarding MAJ Gamble's behavior towards you. Who, what, when, where, why, and how? Please include specific dates and times as accurately as possible.

I have provided my written statement as an attachment to the questions who is not a very close description to every that is in question.
Rem Mlyic

| 10. EXHIBIT G | 11. INITIALS OF PERSON MAKING STATEMENT RSM | PAGE 1 OF 6 PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.*

DA FORM 2823, DEC 1998          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V1.00

USE THIS PAGE IF NEEDE    THIS PAGE IS NOT NEEDED, PLEASE PROCEED T    IAL PAGE OF THIS FORM.

STATEMENT OF _Munnlyn , Robin_    TAKEN AT _URF_    DATED _5 Aug 06_

9. STATEMENT *(Continued)*

b.  Do you know anyone else that has been approached in an inappropriate way or has been witness to inappropriate behavior by MAJ Gamble? If so, who, what, when, where, why, and how?

This Section Not used

See Attaches

c.  How did the instance or instances of inappropriate behavior get started? Describe the circumstances.

d.  Did you ever have inappropriate contact with MAJ Gamble at any time whether willing or unwilling? If so please describe.

e.  Do you know for sure, from an eyewitness perspective, anyone else who has had inappropriate contact with MAJ Gamble? If so, Who?

INITIALS OF PERSON MAKING STATEMENT    _RM_    PAGE _2_ OF _8_ PAGES

PAGE 2, DA FORM 2823, DEC 1998    USAPA V1.00

In Anchorage.

The 1st of Feburar ~ I m....  ....to my new apartment – and I had some guys who wer.... .. the guard with me help me move and stuff and Spc Edw..... egan to tell me that we have lower enlisted sleeping with Offic......and I really didn't care but – he then began to tell me that if I figured out who it was that I wouldn't believe him so then I was like who – her began to tell me that Maj Gamble and Spc Lindsey were having an affair – and I looked at him and I was like whatever he is married and the Deccan of a church. I think you have your information wrong.

During our Lunch hour – myself and SSG Prado were sitting in her car and waiting till lunch was over and s.SPC Chester joined us in the car and we were sitting there and she began to talk with us about how the other day we were all dressed in civilian clothes and stuff and she then started to tell us who she thought was cute and who she would like to get with. She started to name off various people she thought was good looking. Then she stated that she was messing around with an officer, and so she wouldn't tell us who it was – she wanted us to guess, well myself and Prado ran through the officiers who would be deployed with us and we both said Maj Gmable, and she didn't say anything – but she smiled and then stated that the other day when she was late for PT formation she was with him at his house, and that is why she didn't make the formation. I turned to her and I was like but his married and she said "so am I", that don't mean anything.

When our company would meet up on Ft. Richardson and have to attend class – I would often noticed that Maj Gamble and Chester were always off by themselves talking were no one could hear.

I also observed that Maj Gambles conversation to myself and other female solders was a bit much for just casual talk. On one occasion I found out that Maj Gamble was in charge of putting the MOS list together for the Deployment. so I was passing him in the hall and I asked if I knew if my names was on the list to leave and he jokingly said that " I would have to rub him the right way in order to get on the list", and at the time I didn't understand what he meant so, then I stated again. well can you let me know if am on the list to leave on the next deployment. Later the week – in passing he said something about – Munnlyn are you sure you can handle being in the desert for a year – and I stated that if you can handle it then so can I – and he made a comment to the effect of " Munnlyn, you couldn't handle me", and I was unclear as to what he meant – so I responded with – am not trying to handle any part of you – I just want to go on the deployment.

I would say – there was at least two other times were Maj Gamble made Sexual comments in my direction that made me feel uncomfortable – the comments that were " You know I am the Go to man, and if you want something from me – you have to give me something", there was the comment of " Munnlyn, your to small – I might break you", " Munnlyn – you know you need a real man"

He would make comments about my Finance – and how a year away will change a person, and how if I ever got lonely I would know how to get a hold of him.

On KAF.

When we got to KAF – my room mates were Spc Seldon , Spc Lindsey and Spc Dean. After about a week or so – I finally asked Lindsey if in fact she had ever sleep with Maj Gamble and at the time when I asked her she didn't say yes or no – but as we talked she mentioned that him and her had a long relationship prior to deployment but she called it off – cause she wanted to get her life in order. So that was the end of it I paid no more attention to it.

In the weeks to come – I guess Chester found out that Lindsay and Gamble had something going on back in anchorage – well I was in the bathroom getting in the shower and Chester comes in there – and goes have you seen Lindsey and I go no – she was here but left – then I looked and I asked chester if she was ok, she looked up set and she began to tell me how she confronted Gamble and asked if he ever sleep with Spc Lindsey, and he never answered her – so she gave him a choice – he either stop seeing her or it was over between the two of them and I guess he didn't give her answer so she was frantic. She began to cry – I went to give her a hug and she push me away and stated that she was not about to be played like a fool – then she stormed off.

I got out of the shower and went to my room as I walked in Scp Lindsey came in right behind me – and I told her that Chester was looking for her – and she asked me if I knew what she wanted and I said na but you need to talk to her – and she asked why and began to tell her what happened in the bathroom, and spc Lindsey looked at me and said that she didn't have time for those pitty games. Then she stated how chester's behavior had changed – and she started to put things together and stated that Spc Chester had known that Maj Gamble and Spc Lindsey had something going on in anchorage – and she began to tell me why she stop hanging out with her – and Spc Lindsey mentioned that one night after Spc Chester and Spc Lindsey left the club – I guess Chester wanted to get an outfit or something at lindsey's house – and well when Lindsey got there Gamble was waiting outside so they went in and then shortly after Chester came by and walked in and Gamble was sitting on the sofa – Lindsey, figured she know what was going on – then Spc Lindsey stated that since we have been on KAF – that she only said hello to him – and that Chester can have him, she didn't want anything to do with that – Spc Lindsey made it very clear that she made a mistake and she didn't want anything to do with him.

Robin S. Munnlyn, SGT

3 of 6

Rsm

After that I guess they work ___ ___ they talking again with a few days. But Spc Lindsey real___ ___ care for her company, so she just spoke to her in passing.

SPC Chester would often come in my and want to talk with SPC Lindsey, and if she wasn't in the room she would talk with me about pretty much everything – one conversation we had she would mention that her and Maj Gamble and how they would be having sex, and the first question out of my mouth was where, there is no where you could possibly to do that and she began to tell me that they would often have sex in Maj Gambles room. because Maj Parker sleep so hard that he never wakes up.

As the weeks went on she would tell me how she and Maj Gamble would often come back to the Barracks when the barracks was empty and have sex. she told how her and Maj gamble had this conversation one day and he told her that he wanted her to have his baby. and that he was going to leave his wife for her.

A few days later she told me how – she was going to get promoted and I was like but how cause I knew she wasn't MOS 's Q'd and I was like well that is cool – and she started the conversation out with – Yeah am going to be Corpel before this deployment is over. Then she went on to say that ISG Braun made a comment to her about " A year is a long time and a person can get very lonely, and if there was anything she needed to let him know" and I asked her what did he mean by that and she said that he wanted to have sex with her – and I asked her but your not going to right and she made the comment of " that she would if she got desperate enough"

I have witness on more then time that I had seen Maj Gamble walk into Chesters Room – and her close the door behind them.

I have witness on more then several times that PFC French – from another unit here has come over and went into her room with her – has come into the Barracks and asked if anyone knew where she was.

There have been several times that I have been walking back from laundry and Maj Gamble would be standing at the end of the building waiting – and would come up to myself or who ever was out there smoking and say "if you see Chester in there can you let her know am out here or tell her to call me.

I remember one time in the bathroom Chester told me how the sex with Maj Gamble was so good that she would be so tried the next day

She once told me how – sometimes Maj Gamble would sleep over in her room and they would have sex in the morning when everyone was at our 0330z formation.

She once made a joke about he was snoring and she had to wake him up in the middle of the night and tell him to go back to his room cause she didn't want her room mates to hear him snoring.

Then I was told that by SSG Prado. that one morning when she went back to the room at around 0500z she over heard them having sex in the room.

SPC Chester often made jokes so I thought about all the men besides MAJ Gamble she was sleeping with – than one day I was in SSG Prado's room using the computer and Chester walked in changed clothes and then there was a knock on the door and so I opened and it was same guy and – Chester ran to the door and then asked me to give a message to Maj Gamble if he came by she said to tell him she would be right back – well not really paying much attention to what she said I was like ok – later night I was out by the door with the smokers and I saw Chester Running up to the building – and said slow down before you hurt yourself, and she said I got to hurry – and I was like why – and she said I got to be somewhere, so she ran inside and about 10 mins later she ran out and she goes don't wait up.

One day me and her where in the bathroom together and at the time I thought she was joking but she made the comment that she was going to try and see how many officers she can sleep with – and I was girl get a grip and then she stated that she was going to try and sleep with COL Williams. before this deployment was over.

Robin S. Munnlyn. SGT

4 of 6

Myself and Chester had an altercation of kind. One evening she came to me while I was in the bathroom and she told me that her and Maj Gamble were talking about everyone they have had relationships with and he had mentioned with and he had sleep with Spc Dean, who at the time was my room mate – so before she could go on I told her " That's not like Dean". she would never – and Spc Chester – stated that she knows there was something had gone one between them. So I finished in the bathroom and she left and I went to my room. Dean came in and I asked her if had ever sleep with Maj Gamble and she looked at me and asked what – " who said that – so I began to tell her what happened in the bathroom with me and Chester – Dean stated over and over that she never sleep with him – and when they were in Juneau in the same company she mentioned how he would always made passes at her – but she stated again " Not in hell would she sleep with him". Later that night I went to the gym – and as I walked up to the front of our barracks – Dean was standing there talking to Maj Gamble – I didn't hear what the conversation was about but later when dean got back to the room – myself and Spc Seldon were in the room and dean comes in and goes – she confronted Maj Gamble and asked him more then once if he said that and she said that " He never answered the questions. he told her that " Apparently  he is sleeping" and then he made the comment that if Dean ever got tired of her toys she would know where to find him... Dean was so discussed that she mentioned that she wouldn't touch him no matter how board she was with her toys. I guess that same night while Dean and Maj Gamble were talking Chester was walking back and forth pissed trying to hear what they were talking about – and it made Dean a bit un-easy – only cause she didn't want her to get the wrong imprecation about what was going on.

The next morning – I was up in the company area and Dean was telling me that her and SFC Butters went to lunch at the RSOI Tent and they saw Spc Chester and Maj Gamble eating lunch – and I guess as soon as Chester saw Dean she went out of her way to hello – and Dean thought that was odd – cause whenever Dean and Chester where in the same area Chester hardly ever talked to her – so she thought that was a bit odd – that she was all trying to talk to her.

Later that night – I over heard that Spc Chester was pissed with me cause I told Dean what she said – and I truly didn't care I only told Spc Dean cause I didn't want people talking about her like that – so she was pissed with and we haven't spoke since.

Spc Chester and Myself – don't talk – after that altercation I stayed away from her – cause I didn't want to do anything I would regret later.

*what does this mean?*

The statements above. I, Robin S. Munnlyn make of my own free will and without pressure of any kind by any superior officer in my chain of command. I make these statements knowing that if any information provided is false I will be prosecuted under UCMJ.

Robin S. Munnlyn
SGT, U.S ARMY
LTF 297ᵀᴴ BSB

5 of 6

RSM

STATEMENT OF _Munvin_    TAKEN AT _KAF_    DATED _5 Aug 06_

**9. STATEMENT** *(Continued)*

f. Do you have any other information pertaining to this matter, or would you like to make any other statements? Please write any other information you would like to provide.

This Section not used

See attached

**AFFIDAVIT**

I, _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE____. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
(Signature of Person Making Statement)

**WITNESSES:**

_____
Eric Riggs
KAF BASEOPS
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this __5__ day of _Aug_ , _2006_ at _Kandahar Airfield, AFghanistan_

_____
(Signature of Person Administering Oath)

_Gary W. Thomas_
(Typed Name of Person Administering Oath)

_KAF BASEOPS Cdr / IO_
(Authority To Administer Oaths)

_____

_____
ORGANIZATION OR ADDRESS

INITIALS OF PERSON MAKING STATEMENT    _RsM_    PAGE _5_ OF _5_ PAGES

PAGE 3, DA FORM 2823, DEC 1998    USAPA V1.00

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Notice of Government's |
| | ) | To Admit Evidence |
| GAMBLE, Fredrick M. | ) | Pursuant to M.R.E. 404(b) |
| MAJ, U.S. Army | ) | |
| Headquarters and Headquarters | ) | |
| Company | ) | |
| Combined/Joint Task Force (CJTF)-76 | ) | |
| Bagram Airfield, Afghanistan | ) | |
| APO AE 09354 | ) | 14 November 2006 |

COMES NOW THE UNITED STATES, by and through counsel, and hereby notifies the Defense that it seeks to introduce evidence at trial pursuant to M.R.E. 404 (b). Specifically, the Government seeks to introduce the following prior acts and statements of the accused:

1. Between on or about 1 January 1994 and on or about 13 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, engaged in the following sexual misconduct and language towards then Airman First Class (A1C) Jenina C. Stewart:

    a. Repetitive comments by the accused to PFC Stewart about them "sneaking off into a dark corner," and reminding A1C Stewart that the accused was "her rater," or words to that effect;

    b. Hugging A1C Stewart, grabbing, rubbing, and squeezing her buttocks without A1C Stewart's authority or consent, and stating to her "I just had to know what it felt like," or words to that effect; and

    c. Calling A1C Stewart into the accused's office, turning off the lights, walking towards PFC Stewart, and pushing himself towards her body.

2. Between on or about 1 January 1994 and on or about 31 March 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, engaged in the following sexual misconduct and language towards Ms. Jean L. Marcey:

    a. Commenting to Ms. Marcey that he would like to have her "for a birthday present" and "wrapped up in a red bow," or words to that effect;

    b. Grabbing Ms. Marcey by the hand, and without her consent or authority, leading her into a classroom, pushing her against a wall, standing directly in front of her, and stating "don't worry, no one will see us," or words to that effect; and

    c. Following Ms. Marcey into the female bathroom, and without her consent or authority, pushing her against the wall and attempting to kiss her.

3. Between on or about 1 March 1994 and on or about 7 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, engaged in the following sexual misconduct and language towards then First Lieutenant (1LT) Gina Alzate:

    a. Calling 1LT Alzate "legs" and explaining that he nicknamed her "legs" because she was the only one who wore skirts," or words to that effect; and

    b. Approaching 1LT Alzate and without her authority or consent, stroked her seven months pregnant abdomen.

4. On or about 26 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, engaged in the following sexual misconduct and language towards then Specialist (SPC) Kim Bacon:

    a. Walking up behind SPC Bacon, grabbing her right hand, and placing it on the accused's groin area, whereby she was able to feel that the accused had an erection.

5. Between on or about 17 April 2006 and on or about 30 July 2006, the accused engaged in the following sexual misconduct and language towards Sergeant (E5) Robin S. Munnlyn:

    a. Stating to SGT Munnlyn "you will have to rub me the right way to get on the deployment list," "are you sure you can handle being in the desert for a year," "you can't handle me," "you're too small - I might break you," "Munnlyn, you know you need a real man," "you know I am the go-to man," and "if you want something from me, you have to give something to me," or words to that effect.

The Government avers that the foregoing statements and acts by the accused are admissible pursuant to M.R.E. 404 (b) as evidence of the accused's motive, intent, plan and course of misconduct of soliciting subordinate personnel for sexual conversations, encounters, and relationships.

FOR THE UNITED STATES THIS 14th day of November 2006.


                //Original Signed//
                JOHN L. CALCAGNI III
                CPT, JA
                Chief, Military Justice

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, via electronic mail, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Government |
| | ) | Witness List |
| GAMBLE, Fredrick M. | ) | |
| MAJ, U.S. Army | ) | |
| Headquarters | ) | |
| National Command Element | ) | |
| Kandahar Airfield, Afghanistan | ) | |
| APO AE 09354 | | 14 November 2006 |

The Government notifies the Defense Counsel, the Court, and the Court Reporter of the following witnesses that the Government intends to call during all phases of trial in the above captioned court-martial:

1. CSM Robert Averett, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9612;

2. 1SG Ronald Braun, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9432;

3. SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

4. SPC Joyce Dean, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

5. SPC Lydia Edwards, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9364;

6. MSG Pamela Harrington, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1238/9356;

7. SPC Tonya James, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1726;

8. SGT Keith Steven, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

9. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1021;

10. SPC Sheena Lindsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9425;

11. MAJ William Luce, Task Force Grisley, Bagram Airfield, Afghanistan AOP AE 09354, 841-7906

12. SPC Karla Moses, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

13. SGT Robin Munnlyn, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1421;

13. MAJ Kelly Nichols, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9152 (cell), 841-1417 (office);

15. LTC David Osborn, Multi-National Brigade, Kandahar Airfield, Afghanistan, APO AE 09354, 841-7906

16. MAJ Chad Parker, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9419;

17. SSG Robert Parrish, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080/9183;

18. SFC John Ramsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9183;

19. 1LT Randall Russell, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1058 (cell), 841-9363 (office);

20. SPC Angela Selden, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9370 (cell), 841-1360 (office);

21. LTC Michael Thompson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9616;

22. SSG Jaqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9413; and

23. MAJ Frank Veith, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9344.

FOR THE UNITED STATES THIS 14th day of November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief of Military Justice

2

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above on the CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Trial Counsel

Attachment 6

# SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is ODCSOPS

PRIVACY ACT STATEMENT

AUTHORITY: Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 (SSN).

PRINCIPAL PURPOSE: To provide commanders and law enforcement officials with means by which information may be accurately

ROUTINE USES: Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval.

DISCLOSURE: Disclosure of your social security number is voluntary.

| 1. LOCATION Kandahar Airfield, Afghanistan | 2. DATE (YYYYMMDD) 20060804 | 3. TIME 1730 L | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME Veith, Frank | | 6. SSN 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 | 7. GRADE/STATUS MAJ |

8. ORGANIZATION OR ADDRESS
MNB-S

9.

I, Frank L. Veith JR _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I have personal knowledge concerning Actions between MAJ Fred Gamble And SPC Chester.

I witnessed 2 occasions during the mobilization training in Anchorage Alaska where MAJ Gamble was either Alone with SPC Chester or Acting inappropriately with SPC Chester. The first incident was during weapons issue where MAJ Gamble was "Rubbing Up" to And Laughing with SPC Chester while standing behind me in line. The next time I recall seeing them Alone was when MAJ Gamble was driving SPC Chester IN his POV during the Late Afternoon/Early Evening.

The other two events took place while in Kandahar Afghanistan at the US NCE Building I witnessed on two occasions MAJ Gamble behaving IN a "Very Relaxed" manner with SPC Chester. It was After 9pm in the June time frame. When I saw MAJ Gamble in PT Attire between → next page

| 10. EXHIBIT 5 | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.

DA FORM 2823, DEC 1998          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V1.00

USE THIS PAGE IF NEEDE    . HIS PAGE IS NOT NEEDED, PLEASE PROCEL    FINAL PAGE OF THIS FORM.

STATEMENT OF _Veith, Frank_ TAKEN AT _KAF_ DATED _4 Aug 06_

9. STATEMENT *(Continued)*

SPC Chester's desk having a personal conversation while she was on duty in the NCE TOC.

The next time I saw the two together was about a week later and they were again having a personal discussion only now the location was on the Front Porch of the NCE. This area is very dark at night and I was suprised to see them sitting there when I walked up to the building.

Lastly, I want to site an action that was pointed out to me by MAJ Bill Luce. I was informed that MAJ Gamble personally "stopped" and had MAJ Rob Barr sign them up on the Afghanistan deployment (SPC Chester & SPC Linsey). This can be verified by MAJ Rob Barr the NCE S-1.

INITIALS OF PERSON MAKING STATEMENT

PAGE _2_ OF _3_ PAGES

*PAGE 2, DA FORM 2823, DEC 1998*

USAPA V1.00

STATEMENT OF _Veith, Frank_ TAKEN AT _KAF_ DATED _4 Aug 06_

9. STATEMENT *(Continued)*

Nothing Follows

**AFFIDAVIT**

I, _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE____. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _4_ day of _Au___, _2006_ at _Kandahar Airfield, Afghanistan_

_Eric Riggs_
_KAF BASEOPS_
ORGANIZATION OR ADDRESS

_____
*(Signature of Person Administering Oath)*

_Gary W. Thomas_
*(Typed Name of Person Administering Oath)*

_KAF BASEOPS Cdr / IO_
ORGANIZATION OR ADDRESS

*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

PAGE _3_ OF _3_ PAGES

USAPA V1 00

Interview Summary   MAJ Veith                          4 Aug 06

Orientation (Read to the interviewed individual)

   1.  The purpose of this interview is to gain your sworn statement regarding any information you may have regarding the circumstances surrounding the allegations of Adultery, fraternization, and maltreatment of subordinates by  MAJ Fredrick Gamble. This is an in-formal investigation according to AR 15-6 as ordered by COL R. Stephen Williams, Commander of the US NCE, Kandahar Airfield, Afghanistan.

   2.  You are required to read or be read a Privacy Act Statement (Read and Sign). This is required whenever personal information is solicited from an individual.

   3.  *Rights Advisment (Not applicable)*

   4.  I have pre-printed the questions I will ask on the sworn statement. We will go through the questions one at a time and you may answer me orally as a part of the interview. Then please write your answers to those questions in your own words on the form as your sworn statement. The statement will be the primary source of information and is required by the Appointing Authority (COL Williams)

   5.  Do not discuss this interview or your statement with anybody except counsel or those with an official need to know.

   6.  Do you have any questions thus far?

   7.  We will proceed with the oath:
Raise your right hand and answer the question with a Yes or NO

Do you swear (or affirm) that the matters contained in this statement are the whole truth, and nothing but the truth (so help you god)?

**MAJ Veith answered Yes**

   8.  I will review the questions first and then we will go through them one by one and you will be allowed to write or discuss any other comments or statements that you wish at the end.

   9.  Summary of questions and answers.

      a.  What happened? Please describe the circumstances and events regarding MAJ Gamble's behavior towards you. Who, what , when, where, why, and how? Please include specific dates and times as accurately as possible.

**MAJ Veith stated that he had seen MAJ Gamble and SPC Chester together at the NCE TOC and on the porch of the NCE building alone together.**

He said that the perception had cause concern among the MNB officers
MAJ Veith stated that he was under the impression that MAJ Gamble had
"recruited" SPC Chester and SPC Lindsey for the deployment and had gotten them
assigned to the NCE HQ.

    b. Do you have any other information pertaining to this matter, or would
you like to make any other statements? Please write any other information you would like
to provide.

**MAJ Veith said that flirting with females is a "Fredism" and that he had a sexual
harassment charge in Alaska.**

10. Fill out the affidavit at the end of the DA Form 2823 (Sworn Statement)
  Initial each page at the bottom
  (Witness must sign that they witnessed the signature ONLY)

11. Remember, do not discuss this with anyone except counsel or those with an
OFFICIAL need to know. Also, only those involved in the investigation with a NEED
TO KNOW will read your statement.

12. This concludes the interview.

Attachment 7

## SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is ODCSOPS

### PRIVACY ACT STATEMENT

AUTHORITY: Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN).*
PRINCIPAL PURPOSE: To provide commanders and law enforcement officials with means by which information may be accurately
ROUTINE USES: Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval.
DISCLOSURE: Disclosure of your social security number is voluntary.

| 1. LOCATION Kandala Airfield, Afghanistan | 2. DATE (YYYYMMDD) 2006 08 06 | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME Luce, William | 6. SSN 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 | | 7. GRADE/STATUS MAJ |

8. ORGANIZATION OR ADDRESS
RAF USA SE

9.

I, William J. Luce Jr. , WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

During the Pre-Deployment training that started after 17 April I noticed that Major Gamble would sit on the bus with females, to and from traing and would drive SPC Chester in his car to training from the Armory on FT. Richardson. The other females I noticed him with are Lindsey and Edwards. I was told by the Group S-1 that Major Gamble had recruited Lindsey & Chester for this mission — they were told to see him for paperwork. During first ramp ceremony — LTC Thompson feel me in behind (2 rows) Major Gamble & PFC Edwards (and viewed inappropriate touching and overall demeaner (lack of respect why we were there) paying attention, talking, making body contact during ceremony. Inside of the TOC, the conversation between them was void of rank structure and extremely casual. I have noticed him to be touchy/feeley to both men & women.

Nothing
Follows

| 10. EXHIBIT FF | 11. INITIALS OF PERSON MAKING STATEMENT WJL | PAGE 1 OF 3 PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

DA FORM 2823, DEC 1998          DA FORM 2823, JUL 72, IS OBSOLETE          USAPA V1.00

USE THIS PAGE IF NEEDED. THIS PAGE IS NOT NEEDED, PLEASE PROCEED TO FINAL PAGE OF THIS FORM.

STATEMENT OF _Lucy Willson_ TAKEN AT _KFF_ DATED _6 Aug 06_

9. STATEMENT *(Continued)*

INITIALS OF PERSON MAKING STATEMENT _WTh_

PAGE 2 OF 3 PAGES

USAPA V1.00

STATEMENT OF _Luce, William_ TAKEN AT _KAF_ DATED _6 Aug 06_

9. STATEMENT   *(Continued)*

Nothing
Follows

**AFFIDAVIT**

I, _William J. Luce Jr._, WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _3_. , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_(Signature of Person Making Statement)_

WITNESSES:

X _B___
_Brian Rours_
_BASEOPS_
ORGANIZATION OR ADDRESS

_____
_____
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _6_ day of _Aug_ _2006_ at _Kandahar Airfield, Afghanistan_

_(Signature of Person Administering Oath)_

_Gary W. Thomas_
_(Typed Name of Person Administering Oath)_

_KAF BASEOPS Cdr / IO_
_(Authority To Administer Oaths)_

INITIALS OF PERSON MAKING STATEMENT
_WJL_

PAGE 3, DA FORM 2823, DEC 1998

PAGE _3_ OF _3_ PAGES

USAPA V1.00

Interviewee _Luce, William_          Date _6 Aug 06_

1. The purpose of this interview is to gain your sworn statement regarding any information you may have regarding the circumstances surrounding the allegations of Adultery, fraternization, and maltreatment of subordinates by MAJ Fredrick Gamble. This is an in-formal investigation according to AR 15-6 as ordered by COL R. Stephen Williams, Commander of the US NCE, Kandahar Airfield, Afghanistan.

2. You are required to read or be read a Privacy Act Statement (Read and Sign). This is required whenever personal information is solicited from an individual.

3. *Rights Advisment (Only for potential suspect/ respondent):*
   a. *I am LTC Gary Thomas, KAF BASEOPS Cdr and Investigating Officer*
   b. *You are suspected of violation of General Order #1, Fraternization, Possibly Adultry, Possible Sexual Harrassment, and Conduct Unbecoming*

   c. *Before I ask you any questions, you must understand your rights.*
      *You do not have to answer my questions or say anything*
      *Anything you say can be used against you in a criminal trail*
      *You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. This lawyer can be a civilian you arrange for at no expense to the government or a military lawyer detailed to you at no expense to you, or both.*

   d. *What do you wish to do?*
      *Fill out and Sign Section B of DA 3881 to waive rights*

      *Check block in section C and sign to request a lawyer or if you do not want to be questioned.*

4. I have pre-printed the questions I will ask on the sworn statement. We will go through the questions one at a time and you may answer me orally as a part of the interview. Then please write your answers to those questions in your own words on the form as your sworn statement. The statement will be the primary source of information and is required by the Appointing Authority (COL Williams)

5. Do not discuss this interview or your statement with anybody except counsel or those with an official need to know.

6. Do you have any questions thus far?

7. We will proceed with the oath:
Raise your right hand and answer the question with a Yes or NO

Do you swear (or affirm) that the matters contained in this statement are the whole truth, and nothing but the truth (so help you god)?

8. I will review the questions first and then we will go through them one by one and you will be allowed to write or discuss any other comments or statements that you wish at the end.

9. Questions.

a. What happened? Please describe the circumstances and events regarding MAJ Gamble's behavior towards you. Who, what, when, where, why, and how? Please include specific dates and times as accurately as possible.

During train up

MAJ Gamble "recruited" females for deployment

Witnessed questionable interaction between his Lindsey, Chester, Edwards (too casual,

Saw him riding in vehicle with Chester (Alaska, Ft Rile

b. Do you know anyone else that has been approached in an inappropriate way or has been witness to inappropriate behavior by MAJ Gamble? If so, who, what, when, where, why, and how?

Moved from NSE to NCE

Ramp ceremony incident (He witnessed the behavior also) touchy feely, contact He was apparently waiting on or seeking out Edwards

c. How did the instance or instances of inappropriate behavior get started? Describe the circumstances.

Inappropriate "comfortable" behavior between Chester & Gamble at TOC

Has witnessed "touchy feely behavior" with many fem

d. Did you ever have inappropriate contact with MAJ Gamble at any time whether willing or unwilling? If so please describe.

*Knew of a sexual harassment investigation back in Alaska*

e. Do you know for sure, from an eyewitness perspective, anyone else who has had inappropriate contact with MAJ Gamble? If so, Who?

f. Do you have any other information pertaining to this matter, or would you like to make any other statements? Please write any other information you would like to provide.

10. Fill out the affidavit at the end of the DA Form 2823 (Sworn Statement)
    Initial each page at the bottom
    (Witness must sign that they witnessed the signature ONLY)

11. Remember, do not discuss this with anyone except counsel or those with an
OFFICIAL need to know. Also, only those involved in the investigation with a NEED
TO KNOW will read your statement.

12. This concludes the interview.

UNITED STATES OF AMERICA    )
                                  )    Defense Motion For
        v.                  )    Appropriate Relief
                                    )    (Production of Merits Witnesses)
Gamble, Fredrick, M.            )
Major, U.S. Army, (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)    )
Headquarters and Headquarters Company  )
Combined/Joint Task Force (CJTF) - 76   )    12 December 2006
Bagram Airfield, Afghanistan APO AE 09354)

## RELIEF SOUGHT

The Defense requests that the Court direct the Government to produce four merits witnesses requested by the Defense: Mr. Wilbur Hooks, Mr. Maurice Gamble, Mr. Wilbur Hooks, Jr., and 1LT Robert Pillow. R.C.M. 703(c)(2)(D); R.C.M. 906(b)(7).

The Defense requests oral argument and an evidentiary hearing.

## BURDEN OF PROOF AND STANDARD OF PROOF

The burden of proof and persuasion is on the Defense to establish that the testimony of these witnesses is relevant and necessary to the Defense case. R.C.M. 905(c)(2)(A), 906(b)(7); U.S. v. Boswell 36 M.J. 807 (Army Ct.Crim.App. 1993). The Defense asserts that the Government then bears the burden of demonstrating that the witnesses need not be produced under the relevant law.

## FACTS

On 8 Dec 06, the Defense forwarded to the Government a request, pursuant to R.C.M. 703(c)(2)(B)(i), for the production of four merits witnesses. (Attach 1). This request included the name of each witness, the summary of the respective testimony of each witness, the phone number of each witness, and the location of each witness. (Attach 1). The first three witnesses (Mr. Hooks, Mr. Gamble, Mr. Hooks, Jr.) will serve to present evidence of the accused's good character for lawfulness, peaceableness, and good moral character. The fourth (1LT Pillow) will testify about the manner in which the deployment roster for the accused's unit was assembled for the current deployment to Afghanistan and how several of the unit members came to be on the roster. The Defense also included an attendant discovery request that the Trial Counsel provide the Defense a summary of the advice given the Convening Authority, and the Convening Authority's response thereto, pursuant to R.C.M. 703(d), Discussion.

Mr. Wilbur Hooks is MAJ Gamble's father. He is an Army veteran, a career law enforcement officer, and currently employed with the Department of Homeland Security. Mr. Hooks will draw from his life-long observation of his son's behavior to testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, MAJ Gamble's character for peaceableness. Mr. Hooks' testimony will be based upon the unique perspective of a parent and primary caregiver. Mr. Hooks lives in Anchorage, Alaska, and is prepared to travel to Afghanistan by any means provided by the Government.

Mr. Maurice Gamble is MAJ Gamble's brother. He is an Army veteran, a career air traffic controller, and currently employed with the Federal Aviation Administration as an Air Traffic Control Supervisor. Mr. Gamble will draw from his life-long observation of his brother's behavior to testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, MAJ Gamble's character for peaceableness. Mr. Gamble is MAJ Gamble's older brother. His testimony will be based upon the unique perspective of a mentor and sibling, versus a parent. Mr. Gamble lives in Anchorage, Alaska, and is prepared to travel to Afghanistan by any means provided by the Government.

Mr. Wilbur Hooks, Jr. is MAJ Gamble's brother. He is currently employed as a Federal Protective Service Inspector with the Department of Homeland Security. Mr. Hooks will testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, the MAJ Gamble's character for peaceableness. Mr. Hooks is MAJ Gamble's younger brother. His testimony will be based upon the unique perspective of a younger sibling to whom the accused served as a mentor, versus the perspective of a parent or older sibling. Mr. Hooks lives in Puyallup, Washington, and is prepared to travel to Afghanistan by any means provided by the Government.

LT Pillow held the S-1 position in a unit subordinate to MAJ Gamble's unit at Ft. Richardson at the time the unit's roster for the current deployment to Afghanistan was assembled. When the tasking came down to develop a roster for the unit's deployment to Afghanistan, LT Pillow personally took action to seek volunteers when the unit was unable to fill requirements from existing manning. He will testify that the unit knew, at the time the Afghanistan roster was being filled, that the unit would also be tasked with a subsequent deployment requirement, to follow shortly after the Afghanistan deployment, which would be restricted to male soldiers. Thus, LT Pillow will testify that the unit consequently sought females for the Afghanistan deployment, and that he personally emphasized females in his search for volunteers. He will also testify that the reason MAJ Gamble had to be proactive in his efforts to seek volunteers for the Afghanistan roster was because MAJ Gamble, as the superior unit S-3, had to cover for the superior unit S-1, who was not effectively working the issue. Finally, LT Pillow will testify that SPC Seldon and SPC Chester volunteered to him directly to go on the Afghanistan deployment.

On the day after the request was lodged, the Government denied the request, based upon undefined "military operational necessity." (Attach 2). In support of this decision, the Government cites a sentencing witness production case, which sets forth a standard inapplicable to merits witness requests, and asserts the proffered testimony of the witnesses does not meet the relevance/necessity standard set forth in R.C.M. 703(b)(1), Discussion.

LTC Thompson and MAJ Veith are on the Government witness list. (Attach 3). LTC Thompson will testify that MAJ Gamble was in the halls of the unit essentially recruiting females for the deployment; the implication being: with an eye toward an

opportunity to pursue them sexually while in Afghanistan. (Attach 4).[1]  Other witnesses will testify similarly. (Attach 5).[2]

LAW

The Defense relies on the following authorities in support of its motion:

> RCM 703
> RCM 906
> U.S. v. Powell 49 M.J. 220 (1998)
> U.S. v. Wooten 34 M.J. 141 (1992).
> U.S. v. Dorgan, 39 M.J. 827 (Army Ct.Crim.App. 1994).
> U.S. v. Boswell 36 M.J. 807 (Army Ct.Crim.App. 1993)

WITNESSES/EVIDENCE

The Defense requests the following witnesses produced and present for this motion:

SrA Gonzalez
SPC Michael LeClear

The Defense requests the following evidence produced for this motion:

- Defense Witness Request (Attach 1)
- Government Disapproval of Defense Witness Request (Attach 2)
- Government Witness List (Attach 3)
- Sworn Statement, LTC Thompson (Attach 4)
- Sworn Statement  MAJ Veith (Attach 5)

ARGUMENT

A Defense witness whose testimony is relevant and necessary must be produced or the proceedings must be abated.  U.S. v. Powell, 49 M.J. 220 (1998).  "Relevant" means evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.  "Necessary" means not cumulative and that the evidence would "contribute to a party's presentation of the case in some positive way on a matter in issue."  R.C.M. 703(b)(1), Discussion; U.S. v. Powell, 49 M.J. 220 (1998).  In essence, testimony is relevant and necessary if it negates Government evidence or supports the Defense. U.S. v. Dorgan, 39 M.J. 827 (Army Ct.Crim.App. 1994).  Finally, subpoenas issued to witnesses inside the United States for travel outside the United

---

[1] During the AR 15-6 investigation, LTC Thompson told the IO, "MAJ Gamble went around recruiting females for the deployment."
[2] MAJ Frank Veith's 4 Aug 06 sworn statement to the AR 15-6 IO provides, in part:  "Lastly, I want to site an action that was pointed out to me by MAJ Bill Luce.  I was informed that MAJ Gamble personally 'shopped' and had MAJ Rob Barr sign them up (SPC Chester and SPC Lindsey) on the Afghanistan deployment."

3

States do create a legal obligation, and serve as the basis for court-ordered travel when the witness seeks to travel. U.S. v. Wooten, 34 M.J. 141 (1992).

The Government's evidence in this case is being marshaled in such a way so as to demonstrate that MAJ Gamble engaged in some type of elaborate plan to ensure a variety of female soldiers were identified for this deployment with an eye toward ultimate sexual pursuit of them in Afghanistan. Moreover, the Government, by implication, given the number of charges and alleged victims, may seek to leave the members with the impression that MAJ Gamble habitually engages in immoral, unlawful, and sexually aggressive behavior.

Pursuant to MRE 404(a)(1), an accused may offer character witnesses who will testify about a character trait of the accused when the character at issue has a tendency to demonstrate that it is unlikely the accused committed the charged offenses. Examples include good character for lawfulness; good character for peaceableness; and good moral character. U.S. v. True, 41 M.J. 424 (1995); U.S. v. Clemons, 16 M.J. 44 (1983); U.S. v. Stanley, 15 M.J. 94 (A.F.Ct.Crim.App.1983). Evidence of one of these pertinent character traits may be sufficient to cause a reasonable doubt as to the accused's guilt. DA Pamphlet 27-9, Instruction 7-8-1 (2001).

With regard to the character evidence, the Government asserts, by virtue of the citation referenced in their denial of the witness request, that the evidence is not relevant or necessary, or that it is somehow cumulative. It is not cumulative because the Defense has asked for no other witnesses regarding these character traits.[3] It is certainly relevant because, as the applicable Benchbook instruction makes clear, this evidence alone may be sufficient to generate the requisite reasonable doubt. This evidence is relevant, necessary, and it is not cumulative.

CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to produce four merits witnesses: Mr. Wilber Hooks, Mr. Maurice Gamble, Mr. Wilber Hooks, Jr., and 1LT Robert Pillow.

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

(original signed for)

---

[3] The Defense does concede that this evidence, like all character evidence, may be presented through affidavits, etc. The Defense is willing to pursue this approach for the presentation of a good military character defense, and has made no request for live witnesses to do the same. However, without live witnesses for the law abiding/moral/peacableness character, the Defense is at a distinct disadvantage because the Defense would be in a position of having to offer paper on these points while the Government has a bullpen of live witnesses chomping on the bit to testify in rebuttal. When this occurs, the Defense could not call the live requested witnesses in surrebuttal. The Defense is not insensitive to the cost and logistic challenges of presenting live witnesses from CONUS, and has taken this into account in relying solely on MAJ Gamble's Officer Performance Reports to present evidence of good military character.

4

Mark A. Kerr
CPT, JA
Military Defense Counsel


I certify that I have served (via e-mail) and have caused to be served (via BAF Trial Defense Services) a true copy of the above on the Trial Counsel on 12 Dec 06 (local, Manas AB).


(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

- *LAW OFFICES OF* -

# STEVENS & BRASH L.L.C.

*WORLDWIDE MILITARY DEFENDERS*

Offices in Washington, DC & Pittsburgh, PA

Richard V. Stevens
Phone: (703) 798-3064
Fax:    (703) 997-1367
E-mail: stevenslaw@msn.com

Toll Free Phone: (800) 988-0602
E-mail: SBLawLLC@msn.com

Web: www.militaryadvocate.com

David F. Brash
Phone: (412) 760-8220
Fax: (814) 690-7778
E-mail: brashlaw@msn.com

8 December 2006

MEMORANDUM FOR TRIAL COUNSEL

SUBJECT: Defense Request for Production of Witnesses/Additional Discovery Request

IAW R.C.M. 703(c)(2), the Defense submits the following list of witnesses:

Witnesses requested pursuant to R.C.M. 703(c)(2)(B)(i):

Name: **Wilbur E. Hooks**
Telephone Number: (907) 271-2247
Location: Anchorage, Alaska
Synopsis of Expected Testimony:  Mr. Hooks is MAJ Gamble's father.  He is an Army veteran, a career law enforcement officer, and currently employed with the Department of Homeland Security.  Mr. Hooks will testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, MAJ Gamble's character for peaceableness.

Name: **Maurice Gamble**
Telephone Number: (906) 260-3819
Location: Anchorage, Alaska
Synopsis of Expected Testimony:  Mr. Gamble is MAJ Gamble's brother.  He is an Army veteran, a career air traffic controller, and currently employed with the Federal Aviation Administration as an Air Traffic Control Supervisor.  Mr. Gamble will testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, MAJ Gamble's character for peaceableness.

Name: **Wilbur Hooks, Jr.**
Telephone Number: (206) 220-6643
Location: Puyallup, Washington
Synopsis of Expected Testimony:  Mr. Hooks is MAJ Gamble's brother.  He is currently employed as a Federal Protective Service Inspector with the Department of Homeland Security.  Mr. Hooks will testify about MAJ Gamble's good moral character, good character for lawfulness, and, as it relates to Specification 2 of Charge IV, the MAJ Gamble's character for peaceableness.

Name: **LT Robert Pillow**
Telephone Number: (907) 428-6634
Location: Anchorage, Alaska
Synopsis of Expected Testimony: LT Pillow will testify about the manner in which the roster for the unit's deployment to Afghanistan was built. He will testify about how SPC Seldon, SPC Chester, and SPC Lindsey came to be on the roster.

Name: **SPC Michael LeClear**
Telephone Number: Unknown
Location: KAF
Synopsis of Expected Testimony: SPC LeClear was assigned as a witness for the Defense for the limited purpose of Defense interviews prior to the Article 32 hearing of all alleged victims, and approximately fifteen other witnesses, all of whom are on the Government's witness list. SPC LeClear must be available to rebut the testimony of any of these witnesses insofar as it is inconsistent with statements made to the Defense during these interviews.

Name: **MAJ Charles Lee Knowles**
Telephone Number: Unknown
Location: KAF
Synopsis of Expected Testimony: MAJ Knowles will testify about his observations of the interaction between MAJ Gamble and SPC Chester.

**Specific request as it relates to the above-named CONUS/Alaska witnesses, and any witnesses who are no longer stationed at Kandahar Air Field (KAF): Prior to any denial regarding production of merits witnesses under this request, the Defense specifically requests the Convening Authority be notified of the Trial Counsel's intention to deny any portion of the request. (R.C.M. 703, Discussion). The Defense further requests, pursuant to the Defense Discovery Request earlier lodged, a summary of the substance of the notification given the Convening Authority, the date of the notification, by whom the notification was made, and the Convening Authority's response thereto.**

The Defense expects there will be additions to this list in two respects. First, there will be witnesses identified, with the motion, if the Defense decides to raise a motion alleging unlawful command influence and/or a violation of Article 13, UCMJ. Second, additional merits witnesses may be developed after lead Defense counsel arrives back in Afghanistan for the 18 Dec 06 Article 39(a) session. Any witnesses identified under either requirement are expected to be at KAF such that international travel will not be required.

Respectfully Submitted,

*///signed////*
DAVID F. BRASH, Esquire
*LAW OFFICES OF STEVENS & BRASH, L.L.C.*
Offices in Washington, DC & Pittsburgh, PA
Civilian Attorney for MAJ Fredrick M. Gamble

UNITED STATES )
)
v. ) Government Notice of
) Witness Non-Production
GAMBLE, Fredrick M. )
MAJ, U.S. Army )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF)-76 )
Bagram Airfield, Afghanistan )
APO AE 09354 ) 9 December 2006

COMES NOW THE UNITED STATES, by and through counsel, and in accordance with the Rules for Courts-Martial (RCM) 703(c)(2), responds to the Defense Request for Witness Production, dated 8 December 2006 and received on the same date.

1.   The Government denies production of the following defense witnesses pursuant to the standards set forth in R.C.M. 703(b)(1), Discussion; United States v. Combs, 20 M.J. 441 (C.M.A. 1985); and for reasons of military operational necessity.

    a.  Mr. Wilbur E. Hooks
    b.  Mr. Maurice Gamble
    c.  Mr. Wilbur Hooks, Jr.
    d.  LT Robert Pillow

2.   The Government does not oppose production of the following witnesses:

    a.  MAJ Charles Lee Knowles
    b.  SPC Michael LeClear

FOR THE UNITED STATES on the 9th day of December 2006.

        //original signed//
        JOHN L. CALCAGNI, III
        CPT, JA
        Chief of Military Justice

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above on CPT Mark A. Kerr, Military Defense Counsel, and on Mr. David F. Brash, Civilian Defense Counsel, via electronic mail, on 9 December 2006.


//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Government |
| | ) | Witness List |
| GAMBLE, Fredrick M. | ) | |
| MAJ, U.S. Army | ) | |
| Headquarters | ) | |
| National Command Element | ) | |
| Kandahar Airfield, Afghanistan | ) | |
| APO AE 09354 | | 14 November 2006 |

The Government notifies the Defense Counsel, the Court, and the Court Reporter of the following witnesses that the Government intends to call during all phases of trial in the above captioned court-martial:

1. CSM Robert Averett, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9612;

2. 1SG Ronald Braun, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9432;

3. SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

4. SPC Joyce Dean, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

5. SPC Lydia Edwards, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9364;

6. MSG Pamela Harrington, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1238/9356;

7. SPC Tonya James, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1726;

8. SGT Keith Steven, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

9. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1021;

10. SPC Sheena Lindsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9425;

11. MAJ William Luce, Task Force Grisley, Bagram Airfield, Afghanistan AOP AE 09354, 841-7906

12. SPC Karla Moses, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

13. SGT Robin Munnlyn, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1421;

13. MAJ Kelly Nichols, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9152 (cell), 841-1417 (office);

15. LTC David Osborn, Multi-National Brigade, Kandahar Airfield, Afghanistan, APO AE 09354, 841-7906

16. MAJ Chad Parker, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9419;

17. SSG Robert Parrish, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080/9183;

18. SFC John Ramsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9183;

19. 1LT Randall Russell, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1058 (cell), 841-9363 (office);

20. SPC Angela Selden, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9370 (cell), 841-1360 (office);

21. LTC Michael Thompson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9616;

22. SSG Jaqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9413; and

23. MAJ Frank Veith, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9344.

FOR THE UNITED STATES THIS 14th day of November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief of Military Justice

2

## <u>CERTIFICATION</u>

I certify that I served or caused to be served a true copy of the above on the CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Trial Counsel

3

Interview Summary LTC Thompson                          Date 6 Aug 06

Orientation (Read to the interviewed individual)

1. The purpose of this interview is to gain your sworn statement regarding any information you may have regarding the circumstances surrounding the allegations of Adultery, fraternization, and maltreatment of subordinates by MAJ Fredrick Gamble. This is an in-formal investigation according to AR 15-6 as ordered by COL R. Stephen Williams, Commander of the US NCE, Kandahar Airfield, Afghanistan.

2. You are required to read or be read a Privacy Act Statement (Read and Sign). This is required whenever personal information is solicited from an individual.

3. *Rights Advisment (Not applicable)*

4. I will ask some questions and you may answer me orally as a part of the interview. Then please write your answers to those questions in your own words on the form as your sworn statement. The statement will be the primary source of information and is required by the Appointing Authority (COL Williams)

5. Do not discuss this interview or your statement with anybody except counsel or those with an official need to know.

6. Do you have any questions thus far?

7. We will proceed with the oath:
Raise your right hand and answer the question with a Yes or NO

Do you swear (or affirm) that the matters contained in this statement are the whole truth, and nothing but the truth (so help you god)?

**LTC Thompson answered Yes**

8. I will ask questions one by one and you will be allowed to write or discuss any other comments or statements that you wish at the end.

9. Summary of questions and answers.

a. What happened? Please describe the circumstances and events regarding MAJ Gamble's behavior. Who, what, when, where, why, and how? Please include specific dates and times as accurately as possible.

**LTC Thompson stated he was XO during post mob training and that he had noticed MAJ Gamble was extremely friendly with females**

Attachment 9

UNITED STATES OF AMERICA          )
                                  )
              v.                  )
                                  )
                                  )        Defense Motion *in Limine*
Gamble, Fredrick, M.              )
Major, U.S. Army, (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)   )
Headquarters and Headquarters Company )
Combined/Joint Task Force (CJTF) - 76  )
Bagram Airfield, Afghanistan APO AE 09354) )       4 December 2006

## RELIEF SOUGHT

The Defense requests that the Court prevent the Government from admitting, or referring to, evidence offered under MRE 413, per the Government's Notice thereof; to wit:

-   Admitting the evidence, in any form, in the Government's case-in-chief
-   Questioning Defense character witnesses regarding the underlying allegations
-   Admitting/using the evidence in any form in a sentencing case, should a conviction be obtained on any charge
-   Using the evidence in any form, or questioning Defense witnesses in any respect based upon the underlying allegations, at any phase of trial, under a rebuttal theory[1]

The Defense requests oral argument and an evidentiary hearing.

## BURDEN OF PROOF AND STANDARD OF PROOF

The Defense asserts that the burden of proof and the burden of persuasion regarding this motion is on the Government. Although the motion is raised by the Defense under RCM 906(b)(13), the Government is the proponent of the evidence. Therefore, the Government should be required to assume the role of the moving party for purposes of application of RCM 905(c)(1) and (2). The standard of proof is set forth in <u>U.S. V. Reynolds</u>, and <u>U.S. v. Dacosta</u>, cited below.

## FACTS

At the outset, the Defense asserts there are no reliable facts upon which to base admission of the alleged evidence of similar crimes in sexual assault cases set forth in the Government's Notice. However, based upon documents made available to the Defense, it appears that the Government will rely upon certain statements attributed personnel assigned to the Alaska Military Youth Academy (Youth Corps) in 1994. The following summary is drawn from those documents, but the Defense does not concede the reliability of the Youth Corps documents and, in fact, moves that they be excluded.

In 1994, MAJ (then 1LT) Gamble was assigned as a Team Leader with the Alaska National Guard Youth Corps. In April of that year, A1C Jenina Steward, a military subordinate, made an complaint against MAJ Gamble alleging that he had sexually harassed her. (Atch 1). The written complaint was brought to the attention of the chain of

---

[1] Although rebuttal use is raised at this point, the Defense only seeks to make this aspect of the motion a matter of record, recognizing the issue is not yet ripe.

command. Some type of inquiry apparently followed. During the course of the inquiry, additional sexual harassment allegations were made against MAJ Gamble by Dr. Jean Marcey (Atch 2) and SPC Kim Bacon (Atch 3). Each apparently made a statement in connection with their respective complaints. At the conclusion of the inquiry, MAJ Gamble was terminated from employment with the Youth Corps. (Atch 4).

*The Steward Allegation.* The Government's notice of alleged uncharged misconduct regarding (then) A1C Steward appears to be based upon a typed statement ostensibly drafted by A1C Stewart. Therein, the drafter alleges (then) 1LT Gamble made inappropriate comments to her, hugged her and grabbed her buttocks, and cornered her in a room after turning the lights out.

*The Bacon Allegation.* The Government's notice of alleged uncharged misconduct regarding (then) SPC Bacon appears to be based upon a typed summary of statements made by SPC Bacon and attributed to her by the drafter, (then) CPT Jones. Therein, the statements attributed to SPC Bacon allege 1LT Gamble placed SPC Bacon's hand on his crotch on one occasion.

*The Marcey Allegation.* The Government's notice of alleged uncharged misconduct regarding Dr. Marcey appears to be based upon a typed statement ostensibly drafted by Dr. Marcey. Therein, the drafter alleges 1LT Gamble made inappropriate comments to her, cornered her in a room, and tried to kiss her.

At some point after the termination, MAJ Gamble was re-hired to his position with the Youth Corps. There are no records within the control of the Government that reflect any military investigation was conducted, nor that any adverse action transpired. In fact, the current Staff Judge Advocate for the custodian of the records concedes that "the documents [made available to the Trial Counsel] are not the entire record of what happened...," after consultation with the Youth Corps Commandant at the time of the allegations. (Atch 5).

The Government now seeks to rely upon the information contained in the few Youth Corps documents they have obtained in order to introduce the underlying allegations at trial.

## LAW

The Defense relies on the following authorities in support of its motion:

Sixth Amendment, U.S. Constitution
RCM 905(e)
RCM 906(b)(13)
MRE 401
MRE 402
MRE 403
MRE 404(b)
MRE 413
U.S. v. Berry, 61 M.J. 91 (2005)
U.S. v. Bailey, 55 M.J. 38 (2001)
U.S. v. Wright, 53 M.J. 476 (2000)
U.S. v. Pruitt, 46 M.J. 148 (1997)

U.S. v. Robertson, 39 M.J. 211 (1994)
U.S. v. Reynolds, 29 M.J. 105 (1989)
U.S. v. Dacosta, 63 M.J. 575 (Army Ct.Crim.App. 2006)
U.S. V. Henson, 58 M.J. 529 (Army Ct.Crim.App. 2003)
U.S. V. Dewrell, 52 M.J. 601 (A.F. Ct.Crim.App. 1999)
U.S. v. Lowe, 56 M.J. 914, 916  (N.M. Ct.Crim.App. 2002)
U.S. v. Myers, 51 M.J. 570  (N.M. Ct.Crim.App. 1999)

## WITNESSES/EVIDENCE

The Defense intends to call no witnesses for this motion.

The Defense requests the following evidence produced for this motion:

- Attachments 1-5, referenced above.
- Government Notice of Intent to Introduce Evidence of Similar Crimes in Sexual Assault Cases under MRE 413 (Atch 6).
- Government's Witness List (Atch 7).

## ARGUMENT

The appropriate predicate determinations when dealing with the admissibility of evidence offered under MRE 413 are best set out in U.S. v. Myers, 51 M.J. 570 (N.M. Ct.Crim.App. 1999).  Although Meyers was one of the first cases to address the framework for assessing MRE 413, the guidelines therein remain consistent with the requirements of subsequent precedent.  The Meyers court proposed the following areas be addressed in sequence: whether the accused is charged with "an offense of sexual assault;" whether the evidence offered is "evidence of the accused's commission of one or more offenses of sexual assault;" whether the evidence is relevant; whether the evidence passes MRE 403 muster; and whether proper disclosure has taken place. Meyers, 51 M.J. at 580, n. 20.  These areas will be addressed in turn.

## Use in the Government's Case in Chief

### Is the Accused Charged With an Offense of Sexual Assault?

In order for MRE 413 to apply, the accused must be charged with "an offense of sexual assault."  U.S. v. Berry, 61 M.J. 91, 95 (2005); U.S. v. Dacosta, 63 M.J. 575, 580 (Army Ct.Crim.App. 2006).  "An offense of sexual assault" is defined at MRE 413(d). Under the particulars of the definition set forth under the rule, the accused is only charged with a single "offense of sexual assault."  Specification 2 of Charge IV alleges the accused committed an indecent assault upon (then) PFC Edwards by placing her hand on his crotch.  This allegation squarely fits the definition scenario set forth at MRE 413(d)(3).

The Specification of Charge I (alleged violation of General Order Number 1 with SPC Chester) does not meet MRE 413(d) criteria in any respect because it does not allege non-consensual behavior.

Specification 1 of Charge II (alleged sexual harassment of PFC Edwards) does not meet MRE 413(d) criteria in any respect because it does not allege any physical

3

contact, and any arguable alleged attempt per MRE 413(d)(5) rises to no more than an attempt to engage in *consensual* sexual behavior.

Specification 3 of Charge II (alleged sexual harassment of (then) PFC Moses) does not meet MRE 413(d) criteria in any respect because it does not allege any physical contact, nor does it even allege any arguable "attempt" per MRE 413(d)(5). It simply alleges an innocuous statement was made in her presence.

Specification 4 of Charge II (alleged sexual harassment of SPC Dean) does not meet MRE 413(d) criteria in any respect because it does not allege any physical contact, and any arguable alleged attempt per MRE 413(d)(5) rises to no more than an attempt to engage in *consensual* sexual behavior.

The Specification of Charge III (alleged sexual harassment of MAJ Nichols) does not meet MRE 413(d) criteria in any respect because it does not allege any physical contact, and any arguable alleged attempt per MRE 413(d)(5) rises to no more than an attempt to engage in *consensual* sexual behavior.

Specification 1 of Charge IV (alleged adultery with SPC Chester) does not meet MRE 413(d) criteria in any respect because it does not allege non-consensual behavior.

Specification 3 of Charge IV (alleged fraternization with SPC Chester) does not meet MRE 413(d) criteria in any respect because it does not allege non-consensual behavior.

The Specification of Additional Charge I (alleged violation of General Order Number 1 with SPC Lindsey) does not meet MRE 413(d) criteria in any respect because it does not allege non-consensual behavior.

Specification 1 of Additional Charge II (alleged indecent language with SPC Lindsey) does not meet MRE 413(d) criteria in any respect because SPC Lindsey will testify, as she did at the Article 32 hearing, that the alleged exchange between she and the accused captured by the specification was consensual.

Specification 2 of Additional Charge II (alleged sexual harassment of SPC Seldon) does not meet MRE 413(d) criteria in any respect because it does not allege any physical contact, and any arguable alleged attempt per MRE 413(d)(5) rises to no more than an attempt to engage in *consensual* sexual behavior.

Specification 3 of Additional Charge II (alleged sexual harassment of PFC Edwards) does not meet MRE 413(d) criteria in any respect because it does not allege any physical contact, and any arguable alleged attempt per MRE 413(d)(5) rises to no more than an attempt to engage in *consensual* sexual behavior.

The Specification of Additional Charge III (alleged adultery with SPC Lindsey) does not meet MRE 413(d) criteria in any respect because it does not allege non-consensual behavior.

Therefore, the Government only meets the threshold requirement of the rule with regard to one out of thirteen allegations, yet seeks to derive the benefit of the rule

(conviction by propensity evidence) via application to twelve offenses to which the rule was not designed to apply.

## Is the Evidence Offered Evidence of the Accused's Commission of One or More Offenses of Sexual Assault?

In order for MRE 413 to apply, the evidence must be evidence of the accused's commission of another offense of sexual assault. Berry, 61 M.J. at 95, Dacosta, 63 M.J. at 580. The Defense concedes that the challenged information, as set forth in the Government's MRE 413 Notice, as it relates to the Steward allegation, meets the criteria of MRE 413(d)(1), as coupled with MRE 413(f).

The Defense asserts the challenged information, as set forth in the Government's MRE 413 Notice, as it relates to the Marcey allegation does not meet the criteria of MRE 413(d)(1), because a "sexual act" per MRE 413(e) is not alleged; "sexual contact" per MRE 413(f) is not alleged; and no attempt to undertake either is alleged per MRE 413(d)(5).

The Defense asserts the challenged information, as set forth in the Government's MRE 413 Notice, and accompanying statement attributed to the witness, as it relates to the Bacon allegation, does not meet the criteria of MRE 413(d) because SPC Bacon makes clear in her accompanying statement that her lack of consent was only expressed at the conclusion of the alleged conduct. Specifically, the statement on the subject attributed to her provides, in part, "1LT Gamble had walked up behind SPC Bacon, took her right hand and placed it on his groin area where she could clearly feel an erection;" and "She did not feel threatened or intimidated by 1LT Gamble. She felt he was merely flirting with her to see where it would lead. She told him in no uncertain terms that she was not interested and that she knew the telephone number to his wife!"

Thus, only the Steward allegations qualify for consideration under MRE 413.

## Is the Evidence Relevant Under MRE 402?

The relevance assessment under MRE 402 essentially embraces two steps. It must first be determined whether the challenged evidence shows that the accused has a particular propensity bearing on the charged offense. In determining relevance under MRE 402, the Court must take into account the proponent's theory of admissibility. Here, the Government's sole theory for admissibility is propensity. Also, MRE 402 calls for a logical relevance determination, versus a legal relevancy determination. U.S. v. Bailey, 55 M.J. 38, 40 (2001). Admittedly, for purposes of how MRE 413 works in the typical case where the proffered evidence involved a prior sexual assault, relevance is all but mandated – this is the logical relevance aspect. U.S. V. Dewrell, 52 M.J. 601, 609 (A.F. Ct. Crim.App. 1999). The second component part is to determine, under MRE 104(b), whether the members could reasonably find, by preponderant evidence, that the uncharged (MRE 413) misconduct occurred -- this is essentially a combination of the first two prongs of the MRE 404(b) test of U.S. v. Reynolds, 29 M.J. 105 (1989), taking into account any relevance theory advanced by the proponent in addition to propensity alone. U.S. v. Wright, 53 M.J. 476, 482 (2000); Dacosta, 63 M.J. at 580; Myers, 51 M.J. at 581, n.20. After application of the two-part analysis, it becomes clear the challenged evidence is not relevant under MRE 402.

Even under the Air Force Court's theory of "mandated admissibility" set forth in Dewrell, the challenged evidence has no tendency to demonstrate that the accused has a particular propensity bearing on the charged offense.[2] "Mandated relevance" can only apply if the case involves propensity evidence as to conduct addressed in MRE 413, i.e., sexual assault. The only arguable propensity connection advanced by the Government in this case is based upon the allegations attributed to SPC Bacon as they match up against the allegations made by SPC Edwards regarding the indecent assault specification. The arguable match, of course, is the allegation that the accused placed the hand of both women on his crotch. This is a logical relevance connection, fully diluted by application of a legal relevance test under MRE 403, and application of the second two Reynolds prongs, addressed below. As to the Steward and Marcey allegations, these collective assertions do not bear any logical relevance to any of the charged offenses as the factual scenarios at play have no connection to any scenario alleged on the charge sheet.

As to the second part of the equation, court members could not reasonably conclude the alleged uncharged MRE 413 evidence occurred, given the lack of any reliable evidence available to the Government. While the Defense concedes that the Government need not prove the alleged uncharged misconduct by preponderant evidence, nor that the military judge must find it occurred, as prerequisites to admission, the evidence must be reliable enough that the members could reasonably conclude it occurred, by preponderant evidence. Dacosta, 63 M.J. at 580. The Government falls far short of this standard for six reasons. First, none of the alleged victims are available to testify, thus their demeanor and attendant credibility cannot be fairly assessed. Second, the typed statements are in unchallenged narrative format with no accommodation for any probing questions by an interviewer. In fact, the source of SPC Bacon's allegations is not even a typed statement ostensibly prepared by her, but, rather, a summary of a conversation prepared by another drafter with statements attributed to SPC Bacon. Third, none of the statements are sworn. Fourth, there is no evidence as to the circumstances under which the statements were made, who was in the interview (if there were an interview), and what information was provided the drafter prior to completion of the statements. Fifth, the custodian of the Government records readily concedes that "...the documents are not the entire record of what happened..." Sixth, the custodian further concedes that MAJ Gamble was subsequently re-hired by the Youth Corps' director.

## Is the Probative Value of the Evidence Substantially Outweighed by the Danger of Unfair Prejudice Under MRE 403?

The MRE 403 assessment embraces a variety of factors, set forth in nonexhaustive and nonexclusive lists in Wright, 53 M.J. at 482-483; and Bailey, 55 M.J. at 41. These factors are: temporal proximity between the other acts and the charged offense; similarity of the other acts to the event charged; frequency of the acts; the presence or lack of intervening circumstances; the relationship between the accused and the alleged victims for the charged offenses and the similar acts; the strength of proof of the act; the time needed for proof of the prior act; distraction to the fact finder;

---

[2] As noted above, there is only one charged offense to which MRE 413 can apply, the alleged Indecent Assault. The Defense again points out that permitting admission of MRE 413 material in a case where the rule applies to only one of thirteen charged offenses turns the rule on its head.

6

potential for less prejudicial evidence; and probative weight of the evidence. These factors will be addressed in turn.

There is no temporal proximity whatsoever between the challenged evidence and the charged offenses. The MRE 413 material embraces allegations nearly twelve years old. Evidence of offenses occurring nearly a decade before the charged offenses appears to be the outside limit of potentially admissible MRE 413 material in our military appellate courts interpreting the rule. Bailey, 55 M.J. at 41. In any event, the challenged evidence is so far removed in time from the charged offenses that this factor must be applied against admission.

As noted above, only one of the MRE 413 allegations is anywhere near "similar" to a charged offense; that alleged by SPC Bacon. The only arguable similarity is how the Bacon allegations match up against the allegations made by SPC Edwards regarding the indecent assault specification - the allegation that the accused placed the hand of both women on his crotch. The Defense again contends this is a logical relevance similarity, fully diluted by application of a legal relevance test under MRE 403, and application of the second two Reynolds prongs, per Dacosta, addressed above. As to the Stewart and Marcey allegations, these collective assertions do not even bear any logical relevance, or similarity, to any of the charged offenses as the factual scenarios at play have no connection to any scenario alleged on the charge sheet. It should also be noted here again, that the MRE 413 information should only be compared against the charged indecent assault, as that is the only charged offense to which MRE 413 applies. This factor must be applied against admission.

As to frequency, the challenged evidence does embrace three alleged touchings. However, each alleged victim does not describe any additional touchings, nor is there evidence of any subsequent sexual harassment allegations between the time of the Youth Corps allegations and the events alleged in the charged offenses. Certainly, allegations under MRE 413 should not be deemed "frequent" when there is a twelve year respite between the sets of allegations. This factor must be applied against admission.

The presence or lack of intervening circumstances does not appear to be relevant to the MRE 413 assessment in this case. Of course, the most obvious intervening circumstances is the twelve year gap between allegations. Otherwise, there is no apparent change in the circumstances of the accused or the alleged victims in the interim. This factor appears to have no real bearing in the present case.

The relationship between the accused and the alleged victims for the charged offenses and the MRE 413 material does have a bearing on the assessment in this case. The Defense acknowledges that, with the exception of Dr. Marcey, the other two alleged victims under MRE 413 apparently occupied the position of military subordinate in relation to the position of the accused. When measured against the relevant charged offenses, the same can be said of SPC Edwards, however, as noted above, only the charged indecent assault should be the focus. Although this similarity points toward admission at first blush, the Defense believes, on the whole, similarity to one of thirteen alleged offenses under this factor does not come close to favoring admission when taking the entire assessment into account. The status of the other alleged victims of the charged offenses is irrelevant because only the charged indecent assault is captured within the MRE 413 definitions.

The Defense asserts that the Government cannot come close to showing any strength of proof in the challenged MRE 413 material. For the six reasons set forth above, this factor clearly weighs against admission.

Regarding the time needed for proof of the prior act, the Defense first asserts that the Government must be restricted from offering the proof in any form short of the live testimony of all of the MRE 413 alleged victims.[3] In this case, not only will substantial time be invested in attempting to have these three fact witnesses appear and testify in Afghanistan, but significant time will be spent in additional discovery requests, likely consequent motions to compel, and delay requests to accommodate exploration of viable impeachment information on each. Moreover, even if all three were to appear and testify, the trial would quickly spin-off to a distracting mini-trial on each count and compromise many hours of valuable trial time. This factor weights against admission.

For many of the same reasons just noted, presentation of the challenged evidence will cause great distraction for the court members. The trial will quickly devolve into a side show regarding the Youth Corps allegations, as well as presentation of attendant impeachment evidence, all of which will take the focus away from the true issues in the case. This factor weighs against admission.

The Defense can discern no available less prejudicial evidence and contends that this factor does not apply to the facts of this case.

Consideration of the probative weight of the challenged evidence neatly brings home the problem with admission across the board. Noting, yet again, that the MRE 413 evidence may only be applicable to one of thirteen offenses, it should also be noted that many of the charged offenses are *consensual* in nature. Particularly as to these offenses, there is no arguable probative value. This factor calls for application of the gravamen of MRE 403 – whether the members will use the evidence for an improper purpose. Indeed they will. The risk is great because the evidence only may apply to one charged offense, but the members will likely be quick to employ a smoke and fire assessment to the case. No instruction from the bench can negate this risk, and the risk far outweighs any minimal probative value. This factor weighs against admission.

### Have Proper Disclosure and Notice Been Provided?

The Defense asserts that the Government has not provided notice as required under MRE 413(b). That requirement provides, "...the Government shall disclose the evidence to the accused, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered..." The Defense concedes that the Government has disclosed "...statements of witnesses..." and, arguably, a "summary" of the information involved, but the rule requires and contemplates that the notice be of "...any *testimony* that is to be offered..." (emphasis added). The Defense

---

[3] An additional basis for exclusion regarding all witnesses involved in the Youth Corps allegations is the Sixth Amendment's Confrontation Clause. The Government's witness list does not contain any of the Youth Corps allegation witnesses. The Defense asserts that presentation of their underlying allegations, in any form short of live testimony, abridges the accused's right to confront these crucial witnesses. In fact, there is no evidence whatsoever that anyone has ever confronted these witnesses.

asserts the Government, by their MRE 413 Notice, coupled with the Government Witness List, makes clear they intend to present no "testimony," because they have no intention of calling the identified witnesses.

## Use in the Questioning of Defense Character Witnesses

The Defense understands that the predicate for posing questions about the subject allegations to Defense character witnesses is: 1) testimony by the character witness which gives rise to a fair exploration or "test" of the witness' opinion; and 2) a good faith belief by the questioner that the underlying allegation is based upon an incident that did in fact occur. U.S. v. Pruitt, 46 M.J. 148, 151 n.4 (1997). Of course, extrinsic evidence of the underlying conduct would not be admissible. U.S. v. Henson, 58 M.J. 529, 531 (Army Ct.Crim.App. 2003). The Defense first asserts that the questioner, based upon the lack of reliability in the information available to both sides, could not entertain a good faith basis for the questions. As noted above, the witnesses are not on the Government's witness list; thus we can assume they have not been interviewed. They have completed narrative unchallenged statements in an unknown environment. The termination action which followed their complaints was rescinded and MAJ Gamble was rehired. Finally, the Government's own record custodian concedes the parties do not have the full story. For these reasons, the Defense contends that the evidence available to the Government, in its entirety, is not reliable. It is akin to the conclusory rap sheets held insufficient to support a good faith basis for character witness cross examination questions in U.S. v. Robertson, 39 M.J. 211, 214 (1994).

Secondly, the Defense asserts that even though the questions themselves will not be evidence, and the members would likely be so instructed if the questions were posed, the Court should nevertheless apply the MRE 403 balancing test to the questions themselves. This is so because MRE 403 is geared to prevent court members from convicting an accused based upon misuse of evidence; it addresses the risk that members will use the evidence for an improper purpose. In this case, information about the subject evidence poses that exact risk. If this information comes before the members, even in the form of questions posed to Defense character witnesses, the risk is great that the members would misuse the information and convict based upon propensity. Therefore, if MRE 403 were not applied to the questions themselves, the Government would simply be able to "back door" the information in front of the members and achieve the same result they could not accomplish under MRE 413. Accordingly, the Defense asserts this use of the allegations should be prohibited under the rationale applicable to MRE 403.

## Use in the Sentencing Case

MRE 413 does not apply in the sentencing phase of trial. The admissibility standards at sentencing are drawn from a dual application of RCM 1001 and MRE 403. If this trial proceeds to the sentencing phase, the Defense asserts that neither the Youth Corps allegations, nor the Munnlyn allegations, are directly relating to or resulting from any of the charged offenses.[4] U.S. v. Lowe, 56 M.J. 914, 916 (N.M. Ct.Crim.App. 2002). Moreover, the Defense asserts under MRE 403, that presentation of any of this information, in the sentencing phase, would violate MRE 403 in that it would subject MAJ

---

[4] The Defense understands that this standard cannot be fully applied until the completion of the findings phase of trial. Thus, by this motion, the Defense makes the objection a matter of record even if the Court decides to defer ruling pending the outcome of the findings portion of the trial.

Gamble to a sentence based upon a propensity theory. Not only would this violate the parameters of MRE 403, but it would also present a conflicting message to the members, who will otherwise be instructed during the sentencing phase, "You are instructed that the accused is only to be sentenced for the offenses of which he has been found guilty," or words to that effect.

CONCLUSION

Based on the foregoing, the Defense moves this Honorable Court to restrict the Government from utilitizing the subject evidence offered under MRE 413 at any point in the trial to include use in the Government's case in chief, use in questioning Defense character witnesses, and use in the sentencing case, should a conviction on any charge be obtained.

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

(original signed for)
Mark A. Kerr
CPT, JA
Military Defense Counsel

I certify that I have served (via e-mail) and have caused to be served (via BAF Trial Defense Services) a true copy of the above on the Trial Counsel on 4 Dec 06 (local, Pittsburgh, PA).

(original signed)
David F. Brash
Civilian Defense Counsel for MAJ Gamble

4/13/94

1SG Masters:

This is the report I was requested to write as a follow up to my
meeting with Colonel Fleming & yourself on 4/13/94.

This is the account of the incidents between myself & 1LT Gamble.

1LT Gamble & I have been working together since the beginning of
January. As far as memory goes that is when the suggestive
innuendos began. I can't give dates for all of them. I had just
started this job & since he was a "superior" in my mind (I am an
E3; he is an O2: I am an assistant team leader; he is team leader)
I did not know how to respond so I would just be flip & get on
with my job. It was uncomfortable to me since he was the higher
rank but, I am used to guys hitting on me so I tried to shrug it
off. I have never had this occur on a job before & did not think
I had a reason to worry. I have always been able to deter
inappropriate male attention in my personal life & felt I had
reasonable rejected his advances. His most repetitive comment was
something about us sneaking off into a dark corner. The comments
got redundant & boring after a while & did start to get on my
nerves as he was always reminding me that he was my rater.

I brought the comments to your attention at or near the end of
February (possible earlier). You told me to let 1LT Gamble know
that it bothered me. I was unable to do this since I haven't
really seen 1LT Gamble since the conversation. The first time I
had seen 1LT Gamble for any length of time was on the morning of
12 April. The following is what happened.

1LT Gamble & I were in the TLC with several other people on
Annual Training in the area. We were talking about my leave to
Arizona next week. There has been an ongoing "joke" about how I
won't be back since I am going to see my boyfriend-- I was
standing there just shooting the breeze with 1LT Gamble. All I
remember from here is that we were alone. He said "Well I better
get one last hug in." It threw me for a loop as I can honestly
say that I have not hugged him or any other team leader but I
didn't think there was any harm in giving a coworker a hug
goodbye; it seemed innocent enough; but as he was hugging me; he
grabbed my butt, & literally rubbed & squeezed it. When I backed
off, he said "I just had to know what it felt like." I felt
dazed, confused, scared, intimidated. I had no idea how to react.
I just let it go since I didn't know what to do. He really caught
me off guard. I didn't want to make a scene. Part of me felt like
screaming but I was at my job and part of me said it was over & I
had to accept it. Even though part of me felt violated & trapped,
I tried to remain optimistic that this was the end of it & to let
it go. I did know one thing & that was I had to get out of there
& go home. I hung around for what seemed like an eternity. I
don't think anyone else was there. I don't know where 1LT Gamble
went; I don't know where anyone else went.

ENCLOSURE #1

The next think I remember is LT Bergey, SGT MacLamara, 1LT Gamble & myself were all in the TLC again. I found myself venting my frustrations regarding issues I have with the success of the program to anyone who was listening. LT Bergey told me that he understood that I just needed a break & to go home. 1LT Gamble called me into the room he was in from where I had been in the main office with LT Bergey. It is common practice to discuss issues privately so I reacted respectfully and went in. I figured he was my boss & smart enough to let it alone. I did NOT want that incident to affect my ability to follow through on my job. SGT MacLamara was standing in the main area & said he needed to talk to me. I had told him to wait one. I went into the room & 1LT Gamble was fixing his boots and when I got inside, he closed the door. He was carrying on with what appeared to be "genuine" concern regarding my feelings toward the program. I was sitting on the desk since there was no chairs to sit on. He was standing about 2 1/2 feet in front of me. He said "There's just one more thing I need to find out" and he turned the light out. My hands/arms went up immediately & I just started saying no, no, no, no! I kept real quiet since I didn't want to make a scene but panic & anger swelled up in my chest. I felt him on my hands pushing towards me & he was still trying to get close. I finally got around him & turned the light on and said "I have to draw the line somewhere". SGT MacLamara was standing outside the door when I walked out. I had rolled my eyes & SGT MacLamara had reacted like I was rolling them at him. I asked SGT MacLamara if I could give him a ride to 1st platoon barracks. As I was leaving the TLC, 1LT Gamble smiled at me as if nothing had even happened. When we got in the truck, I told SGT MacLamara what had occurred. He recommended that I report the incident. He shared that he had been around one night when 1LT Gamble had tried to hit on SPC Bacon. SGT MacLamara told me he had seen the light flick off and flick on. I called & spoke with you from my home around 1330 Tuesday afternoon & related the above incident. You asked me to come back into the camp around 1530. When I got there we went over what happened. I addressed a concern that I am a person who doesn't take teasing too serious but the incidents today had scared me and was worried that my friendly personality would be thrown in my face. You reinforced that I did nothing wrong & that my main worry about my friendliness was unfounded & my interaction with other coworkers had never been inappropriate. You said you had called me back to the camp because you wanted me to meet with Colonel Fleming that day but had forgot the Colonel had an appointment & was not coming back to camp. You said you would call me first thing Wednesday & have me come in to talk with the Colonel. I got your call around 0930 on Thursday, 13 April & you asked me to come in at 1300. So I went in at 1300 & had my meeting with Colonel Fleming & yourself.

In brief, after we went over the events, I was asked what I
wanted to do? I said I wanted to file a legal complaint & that I
would follow through. Colonel Fleming asked several times if
anyone was a witness. I said just SGT MacLamara who had seen the
light go off & on. He said that wasn't enough & that it would be
his word against mine. 1SG Masters emphasized that a lot of woman
back down with it gets messy. I told him I would not. Then I was
asked what I wanted done. I said I could not ever work with him
again & I was not giving up my job because of this incident. You
suggested we work separate shifts, I told you no, I don't feel
comfortable with that because there is the chance of running into
each other if he's still with the program. I also pointed out
that he works with younger females that are not much younger than
myself, & the last point I made was the feeling of intimidation
involved on my part. I was quick to point out "Hes an O2, I'm an
E3". I said that even though rank doesn't play a big part at the
Youth Corp, still the rank is there. The conversation was ended
by telling me that it was necessary to get a hold of 1LT Gamble &
SPC Bacon. Then I left.

I was confused about the outcome so I called you when I got home.
I asked "What should I do now? Should I file an official
complaint with EO or what?? You said to just write a statement,
hang onto it & wait.

This is that statement. I am forwarding a copy to the persons
listed below.

*Jenina C Steward*, A1C

cc:  COLONEL FLEMING
     SGT MACLAMARA
     DEPT VETERAN AFFAIRS/HUMAN RESOURCES
     EO

May 6, 1994

The following statements pertain to the actions of Lt. Fred Gamble that were directed toward me between the months of January and April 1994 while employed at the Alaska National Guard Youth Corps:

• In January, during staff training, Lt. Gamble repeatedly referred to the possibility of vacationing together, in spite of the fact that he is married. He also made this comment to me during the presentation of one of our guests: "That dress is very becoming on her. If I was with her, it would be coming off her."

• In March, around the time of his birthday, Lt. Gamble told me he'd like to have me for a birthday present, "wrapped up in a red bow."

• In late March, while I was working during the evening, Lt. Gamble entered my office. After using the phone, he took me by the hand and led me into the adjoining classroom saying he had something to show me. He pushed me against the door and stood directly in front of me, saying not to worry, that no one would see us. I pushed him away and told him I could see the Colonel's office and that the lights were on. When he turned to look, I walked back into my office. He followed me and pushed me into the bathroom and tried to kiss me. Again, I pushed him away and told him he should be ashamed and wondered what his wife would think. He replied "She would be angry, but she would never leave me."


*Jean L. Marcey*

Jean L. Marcey


ENCLOSE #2

ALASKA NATIONAL GUARD YOUTH CORPS
CAMP CARROLL TRAINING SITE
P.O. BOX 5727
FORT RICHARDSON, ALASKA 99505-0727

DMVA

14 MAY 94

MEMORANDUM FOR  Commander, 6th Bn, 297th In (L) P.O. Box 5800, Ft. Richardson, Alaska 99505-0800

SUBJECT:  Sexual Harassment case against 1LT Fred Gamble

1. As requested this is a summery of events that lead up to the termination of employment of 1LT Fred Gamble from the Alaska National Guard Youth Corps. Enclosure #1 is a copy of the official charges that were filed on events that had occurred while 1LT Gamble was on active duty during AT-94.

2. On 13 Apr 94 a complaint was filed by Airman First Class Steward alleging sexual harassment. Her statement details two very serious charges that 1LT Gamble had physically touched her in a manner that is not appropriate for commissioned officers.

3. On 15 Apr 94 COL Fleming and 1ST Masters came to the field trains location to brief you and to confront 1LT Gamble about the allegations.

4. On 28 Apr 94 1LT Gamble (Team Leader), A1C Steward (Assistant Team Leader), CPT Mathewson Air Guard Social Actions Officer and Lead Instructor), 1SG Masters (Deputy Commandant) and myself met to discuss the alleged events with the principal personnel involved. During this meeting both sides were given the opportunity to describe how they perceived the events in question. 1LT Gamble never denied the charges but stated simply that it was his word against hers. It was clear to all present, based on testimony y both parties, body language, interviews with SGT MacLamara and 1LT Bergey that something did ideed occur in the Team Leader Center on those dates. 1LT Gamble did admit to hugging his subordinate ut that he did not remember fondling her. He only stated that he did allow his hand to slide down to her wer back in his customary hugging technique. It was not exactly clear what really did occur. Based on is information COL Fleming suspended 1LT Gamble with pay immediately to conduct an informal quiry.

5. Prior to and while conducting his inquiry, several other female employees came forward with new and rtling allegations. Information that was given to me and COL Fleming from Dr. Jean Marcey, 1LT Gina zate and SPC Kim Bacon convinced us that on numerous occasions 1LT Fred Gamble had touched iale employees of the Alaska National Guard Youth Corps in an attempt to gain sexual favors from m. In each case these females were of equal or lesser military rank and/or a subordinate employee to i. None of this information was solicited nor was every female employee questioned about her working ationship with 1LT Gamble. I'm convinced that no conspiracy was planned by these witnesses and the ority of them felt intimidated by his aggressive behavior. Copies of these statements are enclosed for r review.

DMVA                                                14 MAY 94

MEMORANDUM FOR  Commander, 6th Bn, 297th In (L), P.O. Box 5800, Ft. Richardson, Alaska 99505-0800

SUBJECT:  Sexual Harassment case against 1LT Fred Gamble.

6. The great preponderance of evidence, from highly reliable sources, indicates that on numerous occasions 1LT Gamble demonstrated behavior that was detrimental to the officer corps as a whole, and did indeed display conduct that was unbecoming of any officer, and had crossed the boundary of socially acceptable behavior

7. On 29 Apr 94 1LT Gamble was notified that he would be given the opportunity to resign his position at the Youth Corps or he would be terminated. He stated that he would have his resignation to COL Fleming within the next three days.

8. On 9 May 94 I received a letter from 1LT Gamble stating that he had changed his mind and now refused to resign. He now stated that he would not resign based solely on here-say and that if he was terminated that he would file a grievance for racial and gender discrimination with the Alaska State Commission for Human Rights, with the chief-of-staff of the Department of Military and veterans affairs, and file a lawsuit against the State of Alaska for slander and wrongful discharge. His initial statement and final letter are included as enclosure #3.

9. The decision to terminate 1LT Gamble's employment was extremely difficult, COL Fleming listened to both sides of the dispute before releasing him. He has worked hard for me and has many innovative ideas. His talents are irreplaceable to me. 1LT Gamble was not fired because of his skin complexion, but because of the overwhelming amount of evidence relating to his sexual behavior. Team Leaders are expected to project an image of healthy life skills and to set the standard for behaviors to be emulated by the 16-18 year old Corpsmembers.

10. Due to the fact that at least one incident occurred while 1LT Gamble was at Annual Training with the 6th Battalion you may want to consider ordering a AR 15-6 investigation to determine if any further military action is warranted.

Encl.
Sexual Harassment Charge                TIMOTHY C. JONES
Statements from victims                 CPT, IN  AK ARNG
1LT Gamble's Statements                 Commandant
Termination Letter



**DEPARTMENTS OF THE ARMY AND THE AIR FORCE**
HEADQUARTERS, ALASKA NATIONAL GUARD
OFFICE OF THE STAFF JUDGE ADVOCATE
P.O. BOX 5800, CAMP DENALI
FORT RICHARDSON, ALASKA 99505-5800

27 September 2006

Captain John L. Calcagni III
Chief, Military Justice
HQs, Combined/Joint Task force (CJTF)-76
Bagram Airfield, Afghanistan
APO AE 09354

Dear Captain Calcagni:

Enclosed are documents responsive to your 23 September 2006 request; MAJ Collins coordinated with me, and instructed me to send documents and certification to you. There are two attached certifications, one from the G1 as custodian who found the records, but the second is the attestation of the author of the documents. There is no standard certification language for the G1. If you need a different certification, let me know. Both individuals work full-time on Fort Richardson. Per Mr. (formerly Captain) Jones, the documents are not the entire record of what happened; he indicated that the individual was re-hired by the Youth Corps director at the time after review of the case. I cannot locate any records indicating any military investigation or adverse action transpired as a result of this correspondence. The State Equal Employment Manager was unable to locate any EEO or EO records in current files, or the archives.

There may be other records relevant to your request in the State of Alaska records system. Further inquiry may be made of Mr. Jones. He may be reached at: TJones@ngchak.org. His telephone numbers are: Commercial (907)384-6017, home is (907)694-5860. His mailing address is: Mr. Timothy Jones, Director, Alaska Military Youth Academy, P.O. Box 5727, Fort Richardson, AK 99505. Records requests may be directly made to: Mr. John Cramer, Administrative Service Director, Department of Military and Veterans Affairs, P.O. Box 5800, Fort Richardson, AK 99505-0800. His voice phone is (907)428-6881 commercial, and his fax is (907) 428-6027. His e-mail is john_cramer@ak-prepared.com.

Sincerely,

Susan Bailar
Lieutenant Colonel, Alaska Air National Guard
Staff Judge Advocate (Joint)

Enclosures

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Notice of Government's |
| | ) | To Admit Evidence |
| GAMBLE, Fredrick M. | ) | Pursuant to M.R.E. 413 |
| MAJ, U.S. Army | ) | |
| Headquarters and Headquarters | ) | |
| Company | ) | |
| Combined/Joint Task Force (CJTF)-76 | ) | |
| Bagram Airfield, Afghanistan | ) | |
| APO AE 09354 | ) | 14 November 2006 |

COMES NOW THE UNITED STATES, by and through counsel, and hereby notifies the Defense that it seeks to introduce evidence at trial pursuant to M.R.E. 413. Specifically, the Government seeks to introduce the following prior offenses of sexual assault by the accused:

1. Between on or about 1 January 1994 and on or about 13 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, approached then Airman First Class (A1C) Jenina C. Stewart, and without her authority or consent, hugged her and grabbed, rubbed, and squeezed A1C Stewart's buttocks.

2. Between on or about 1 January 1994 and on or about 31 March 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, approached Ms. Jean L. Marcey, grabbed her by the hand, and without her authority or consent, lead her into a classroom, pushed her against a wall and stood directly in front of her. Moments later, the accused followed Ms. Marcey into a female bathroom and without her authority or consent, pushed Ms. Marcey against the wall and attempted to kiss her.

3. On or about 26 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, walking up behind then Specialist (SPC) Kim Bacon, grabbed her right hand, and placed it onto his groin, whereby SPC Bacon was able to feel the accused's erection.

FOR THE UNITED STATES THIS 14th day of November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, via electronic mail, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

3

UNITED STATES )
)
v. )                                    Government
)                                    Witness List
GAMBLE, Fredrick M. )
MAJ, U.S. Army )
Headquarters )
National Command Element )
Kandahar Airfield, Afghanistan )
APO AE 09354 _____

14 November 2006

     The Government notifies the Defense Counsel, the Court, and the Court Reporter of the following witnesses that the Government intends to call during all phases of trial in the above captioned court-martial:

1. CSM Robert Averett, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9612;

2. 1SG Ronald Braun, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9432;

3. SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

4. SPC Joyce Dean, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

5. SPC Lydia Edwards, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9364;

6. MSG Pamela Harrington, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1238/9356;

7. SPC Tonya James, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1726;

8. SGT Keith Steven, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

9. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1021;

10. SPC Sheena Lindsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9425;

11. MAJ William Luce, Task Force Grisley, Bagram Airfield, Afghanistan AOP AE 09354, 841-7906

12. SPC Karla Moses, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

13. SGT Robin Munnlyn, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1421;

13. MAJ Kelly Nichols, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9152 (cell), 841-1417 (office);

15. LTC David Osborn, Multi-National Brigade, Kandahar Airfield, Afghanistan, APO AE 09354, 841-7906

16. MAJ Chad Parker, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9419;

17. SSG Robert Parrish, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080/9183;

18. SFC John Ramsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9183;

19. 1LT Randall Russell, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1058 (cell), 841-9363 (office);

20. SPC Angela Selden, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9370 (cell), 841-1360 (office);

21. LTC Michael Thompson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9616;

22. SSG Jaqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9413; and

23. MAJ Frank Veith, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9344.

FOR THE UNITED STATES THIS 14th day of November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief of Military Justice

2

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above on the CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Trial Counsel

3



**DEPARTMENTS OF THE ARMY AND THE AIR FORCE**
HEADQUARTERS, ALASKA NATIONAL GUARD
OFFICE OF THE STAFF JUDGE ADVOCATE
P.O. BOX 5800, CAMP DENALI
FORT RICHARDSON, ALASKA 99505-5800

27 September 2006

Captain John L. Calcagni III
Chief, Military Justice
HQs, Combined/Joint Task force (CJTF)-76
Bagram Airfield, Afghanistan
APO AE 09354

Dear Captain Calcagni:

Enclosed are documents responsive to your 23 September 2006 request; MAJ Collins coordinated with me, and instructed me to send documents and certification to you. There are two attached certifications, one from the G1 as custodian who found the records, but the second is the attestation of the author of the documents. There is no standard certification language for the G1. If you need a different certification, let me know. Both individuals work full-time on Fort Richardson. Per Mr. (formerly Captain) Jones, the documents are not the entire record of what happened; he indicated that the individual was re-hired by the Youth Corps director at the time after review of the case. I cannot locate any records indicating any military investigation or adverse action transpired as a result of this correspondence. The State Equal Employment Manager was unable to locate any EEO or EO records in current files, or the archives.

There may be other records relevant to your request in the State of Alaska records system. Further inquiry may be made of Mr. Jones. He may be reached at: TJones@ngchak.org. His telephone numbers are: Commercial (907)384-6017, home is (907)694-5860. His mailing address is: Mr. Timothy Jones, Director, Alaska Military Youth Academy, P.O. Box 5727, Fort Richardson, AK 99505. Records requests may be directly made to: Mr. John Cramer, Administrative Service Director, Department of Military and Veterans Affairs, P.O. Box 5800, Fort Richardson, AK 99505-0800. His voice phone is (907)428-6881 commercial, and his fax is (907) 428-6027. His e-mail is john_cramer@ak-prepared.com.

Sincerely,

Susan Bailar
Lieutenant Colonel, Alaska Air National Guard
Staff Judge Advocate (Joint)

Enclosures

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Notice of Government's |
| | ) | To Admit Evidence |
| GAMBLE, Fredrick M. | ) | Pursuant to M.R.E. 413 |
| MAJ, U.S. Army | ) | |
| Headquarters and Headquarters | ) | |
| Company | ) | |
| Combined/Joint Task Force (CJTF)-76 | ) | |
| Bagram Airfield, Afghanistan | ) | |
| APO AE 09354 | ) | 14 November 2006 |

COMES NOW THE UNITED STATES, by and through counsel, and hereby notifies the Defense that it seeks to introduce evidence at trial pursuant to M.R.E. 413. Specifically, the Government seeks to introduce the following prior offenses of sexual assault by the accused:

1. Between on or about 1 January 1994 and on or about 13 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, approached then Airman First Class (A1C) Jenina C. Stewart, and without her authority or consent, hugged her and grabbed, rubbed, and squeezed A1C Stewart's buttocks.

2. Between on or about 1 January 1994 and on or about 31 March 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, approached Ms. Jean L. Marcey, grabbed her by the hand, and without her authority or consent, lead her into a classroom, pushed her against a wall and stood directly in front of her. Moments later, the accused followed Ms. Marcey into a female bathroom and without her authority or consent, pushed Ms. Marcey against the wall and attempted to kiss her.

3. On or about 26 April 1994, the accused, then First Lieutenant (1LT) Fredrick M. Gamble, walking up behind then Specialist (SPC) Kim Bacon, grabbed her right hand, and placed it onto his groin, whereby SPC Bacon was able to feel the accused's erection.

FOR THE UNITED STATES THIS 14th day of November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, via electronic mail, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief, Military Justice

3

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Government |
| | ) | Witness List |
| GAMBLE, Fredrick M. | ) | |
| MAJ, U.S. Army | ) | |
| Headquarters | ) | |
| National Command Element | ) | |
| Kandahar Airfield, Afghanistan | ) | |
| APO AE 09354 | | 14 November 2006 |

The Government notifies the Defense Counsel, the Court, and the Court Reporter of the following witnesses that the Government intends to call during all phases of trial in the above captioned court-martial:

1. CSM Robert Averett, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9612;

2. 1SG Ronald Braun, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9432;

3. SEC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

4. SPC Joyce Dean, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1138;

5. SPC Lydia Edwards, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9364;

6. MSG Pamela Harrington, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1238/9356;

7. SPC Tonya James, National Support Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1726;

8. SGT Keith Steven, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-2080;

9. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-1021;

10. SPC Sheena Lindsey, National Command Element, Kandahar Airfield, Afghanistan APO AE 09354, 841-9425;

11. MAJ William Luce, Task Force Grisley, Bagram Airfield, Afghanistan AOP AE 09354, 841-7906

12. SPC Karla Moses, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-2080;

13. SGT Robin Munnlyn, National Support Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-1421;

13. MAJ Kelly Nichols, National Support Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9152 (cell), 841-1417 (office);

15. LTC David Osborn, Multi-National Brigade, Kandahar Airfield, Afghanistan, APO
AE 09354, 841-7906

16. MAJ Chad Parker, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9419;

17. SSG Robert Parrish, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-2080/9183;

18. SFC John Ramsey, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9183;

19. 1LT Randall Russell, National Support Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-1058 (cell), 841-9363 (office);

20. SPC Angela Selden, National Support Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9370 (cell), 841-1360 (office);

21. LTC Michael Thompson, National Command Element, Kandahar Airfield,
Afghanistan APO AE 09354, 841-9616;

22. SSG Jaqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9413; and

23. MAJ Frank Veith, National Command Element, Kandahar Airfield, Afghanistan
APO AE 09354, 841-9344.

FOR THE UNITED STATES THIS 14th day of November 2006.


//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Chief of Military Justice

## CERTIFICATION

I certify that I served or caused to be served a true copy of the above on the CPT Mark A. Kerr, Military Defense Counsel, and Mr. David F. Brash, Civilian Defense Counsel, on 14 November 2006.

//Original Signed//
JOHN L. CALCAGNI III
CPT, JA
Trial Counsel

Attachment 8

# SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is ODCSOPS

| PRIVACY ACT STATEMENT | |
|---|---|
| AUTHORITY: | Title 10 USC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 *(SSN)*. |
| PRINCIPAL PURPOSE: | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION Building 600, Fort Richardson, Alaska | 2. DATE *(YYYYMMDD)* | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| 5. LAST NAME, FIRST NAME, MIDDLE NAME Saxby, Rachel Phoebe | 6. SSN 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 | | 7. GRADE/STATUS MAJ USAR |

8. ORGANIZATION OR ADDRESS
Medical Retention Processing Unit, US Army Garrison, Fort Richardson, Alaska

9.
I, Rachel Phoebe Saxby _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

I recently heard some allegations of possible sexually misconduct by MAJ Fred Gamble toward some female Soldiers in Afghanistan. The news hit me on a very personal level and I felt compelled to make a statement. I am ashamed of myself for not trying to speak to Fred as a peer in the past and not trying to correct his behavior.

MAJ Gamble worked for my husband from around July 2004 until just prior to his recent deployment. My impression of MAJ Gamble was that he was reasonably intelligent, a good operations officer and very immature. I thought that his potential was often overshadowed by his bragging about his self worth and badmouthing other officers in the Alaska National Guard. Most of my exposure to MAJ Gamble came from the times I stopped in to see my husband at his office. It seemed to be a regular occurrence for Fred to walk up to me and put his arm on my shoulder and make inappropriate comments. Sometime the comments were about how important he was to the organization or how he and I were better than everyone else because we were both Dimond High School Graduates. Many times the comments were sexual in nature, comments like: "hey, why don't you come with me, you don't need him (referring to my husband), once you have had black you will never go back" or a "hard man is good to find." I cannot recall a lot of specific information as it didn't seem important at the time. I thought that he was doing this to get a reaction from Dave and just laughed it off.

When I heard about the recent events it changed my perspective. I remembered being shocked a couple years ago when I found out that MAJ Gamble was married. I don't socialize with guard-members on a regular basis so I don't know who is married or single; but, I thought for sure that Fred was single because he went to social functions without his wife and danced with anyone he could get out on the dance floor. Most of the girls were young I assumed that they were enlisted Soldiers. For some reason I never made the connection between MAJ Gamble's comments toward me and the fact that he may have been doing the same thing to unwitting enlisted Soldiers. I couple of weeks ago I asked one of my Soldiers who worked with MAJ Gamble if he had ever came on to her. She was nervous and said "yes, that is just him, he comes on to everyone."

I encourage anyone addressing this case not to take these allegations lightly. All Soldiers deserve the right to serve in the Army to the best of their ability. Sexual harassment affects morale and discipline of the entire unit, while demoralizing the victim. Soldiers should not have to operate with this type of distraction especially in a combat zone.

———————————— END OF STATEMENT ————————————

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | PAGE 1 OF ___ PAGES |
|---|---|---|

*ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT _____ TAKEN AT _____ DATED _____*

*THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.*

**DA FORM 2823, DEC 1998**    DA FORM 2823, JUL 72, IS OBSOLETE    USAPA V1.00

STATEMENT OF _____ TAKEN AT _____ DATED _____

9.  STATEMENT  *(Continued)*

NOT

USED

**AFFIDAVIT**

I, _Rachel Phoebe Saxby_____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE _1__. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
*(Signature of Person Making Statement)*

WITNESSES:

MARK VAUGHN
Deputy to the Garrison Commander
Fort Richardson
ORGANIZATION OR ADDRESS

RWAC
Richard A. Watson
Garrison Command Sergeant Major
Fort Richardson  USAG-AK
ORGANIZATION OR ADDRESS

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 21ST day of SEPTEMBER, 2007 at _____

_____
*(Signature of Person Administering Oath)*

_____
*(Typed Name of Person Administering Oath)*

_____
*(Authority To Administer Oaths)*

INITIALS OF PERSON MAKING STATEMENT

| | | |
|---|---|---|
| PAGE | 2  OF  2 | PAGES |

PAGE 3, DA FORM 2823, DEC 1998

USAPA V1.00

# SWORN STATEMENT
For use of this form, see AR 190-45; the proponent agency is PMG.

## PRIVACY ACT STATEMENT

| AUTHORITY: | Title 10 LSC Section 301; Title 5 USC Section 2951; E.O. 9397 dated November 22, 1943 (SSN) . |
|---|---|
| PRINCIPAL PURPOSE: | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| ROUTINE USES: | Your social security number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| DISCLOSURE: | Disclosure of your social security number is voluntary. |

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| Fort Richardson, Alaska | 2006/09/21 | 1320 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| BLAYLOCK, DEBRA J. | 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 | O5/LTC/AGR AKARNG |

8. ORGANIZATION OR ADDRESS

HQ, 207th Regional Training Institute, Fort Richardson, Alaska 99505

9.

I, Debra J. Blaylock _____, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

1. I have known Major Fred Gamble for nearly 10 years. When I first met him (to the best of my knowledge), he was the Commander for the Headquarters Company, 207th Infantry Group and I was the S1 Officer for the Headquarters, 207th Infantry Group. I remember him as being very friendly, and outgoing. I considered him a friend and a colleague. I was a Captain and I'm pretty sure he was too. Fred's good humor was always infectious and I don't ever recall him being disgruntled. Even when we first met, Fred acted and talked to me like we had been friends for a long time.

2. One of Fred's standard comments during the past years has been, " I don't feel the love" whenever someone said something to Fred that could be considered negative. I interpreted this comment to mean that he didn't like what someone just said to him. Gradually, over the years, Fred's comments to me started to change. Sometime during the period after he moved to Juneau, I can recall him making comments that I considered to have sexual overtones. I don't remember specific comments but I took the meaning as an offer/request from him to engage in sexual activities with him. At first, when he started these comments, I didn't take them seriously and said nothing to him but laughed and thought he was just joking around. I related his actions/wording more along the line of his "not feeling the love" mannerism. We were both Majors by then. Fred was never disrespectful in his tone and manner, but his intent was clear to me and that was he wanted to engage in some type of sexual activity.

3. At some point, I did come to realize that Major Gamble was not merely joking around because he continued to make sexually related comments to me in private. I finally told him (on a day that I do not recall) to cut it out and to stop making the remarks. He didn't. Fred became an annoying pest. I did consider reporting him but by that time, I outranked him and thought no one would take me seriously or would think that I was trying to get Fred in trouble in order for my husband to have less competition for promotion control grades. I've heard from others that Major Gamble was doing the same thing to them. I don't know why he wasn't reported before. I imagine it has to do with the fact that most people consider him a friend, didn't really take him seriously because of his joking manner and therefore didn't want him to get in trouble.

4. During the past year since my husband deployed to Iraq and up until his own mobilization in April 2006, Major Gamble's advances towards me grew more insistent and bold. He started coming in to my office here in the armory and made his offers of sexual activity. My standard answer was either to tell him to go away or tell him I was going to inform my husband. He continued to make his offer each time he stopped by my office.

5. He never went beyond the offering and he never threatened me in any way. I was relatively confident that Major Gamble would not harm or force himself on me or anyone else.

6. End of Statement

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT DB | PAGE 1 OF 3 DB PAGES |
|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE BE INDICATED.

| DA FORM 2823, DEC 1998 | DA FORM 2823, JUL 72, IS OBSOLETE | APD PE v1.01 |
|---|---|---|

USE THIS PAGE IF NEED    IF THIS PAGE IS NOT NEEDED, PLEASE PROCEED    FINAL PAGE OF THIS FORM.

STATEMENT OF  BLAYLOCK, DEBRA J.            TAKEN AT  Ft Richardson Alaska    DATED  2006/09/21

STATEMENT  *(Continued)*



INITIALS OF PERSON MAKING STATEMENT         DB

PAGE *1* OF *3* PAGES

STATEMENT OF  BLAYLOCK, DEBRA J.                 TAKEN AT  Ft Richardson, AK       DATED 2006/09/21

9.  STATEMENT    *(Continued)*

NOT USED

**AFFIDAVIT**

I, Debra J. Blaylock _____ , HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1, AND ENDS ON PAGE  1 . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_____
*(Signature of Person Making Statement)*

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 21st day of September 2006

_____

_____

at THIRD JUDICIAL DISTRICT, ALASKA

_____
*(Signature of Person Administering Oath)*

ORGANIZATION OR ADDRESS

ANTONIO SUAREZ
*(Typed Name of Person Administering Oath)*

_____

_____

NOTARY PUBLIC, ALASKA
*(Authority To Administer Oaths)*

ORGANIZATION OR ADDRESS

INITIALS OF PERSON MAKING STATEMENT

|  | PAGE | 1 | OF | 3 | PAGES |

PAGE 3, DA FORM 2823, DEC 1998                                        APD PE v1.01

*Attachment 12*



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, COMBINED/JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-SJA-MJ                                                     15 OCT 2006

MEMORANDUM FOR Lieutenant Colonel Charlynn V. Saguid, 219th Area Support Group, Task Force Tiger, Combined/Joint Task Force (CJTF)-76, Bagram Airfield, Afghanistan, APO AE 09354

SUBJECT: Defense Request for Assistance in Securing Information

The Government responds to the Defense request for assistance in securing information, dated 12 October 2006, as follows:

1. A complete copy of the EO complaint made by SPC Lydia B. Edwards, dated 30 July 0606, which is in possession of the Government, was provided to the Defense on 16 October 2006.

2. A complete copy of the sworn statements by SPC Angela J. Selden, dated 12 July 2006, and 3 August 2006, which are in possession of the Government, were provided to the Defense on 16 October 2006.

3. To date, the Government is unaware of additional EO complaints made against MAJ Fredrick M. Gamble by any of the accusers in this case, to include SPC Diana Chester, SPC Joyce P. Dean, SPC Karla Moses, SGT Robin S. Munnlyn, MAJ Kelly A. Nichols, SPC Angela J. Selden, and SPC Sheena Lindsay.

4. To date, the Government is unaware of any IG complaints made against MAJ Fredrick M. Gamble by any of the accusers in this case, to include SPC Diana Chester, SPC Joyce P. Dean, SPC Lydia B. Edwards, SPC Karla Moses, SGT Robin S. Munnlyn, MAJ Kelly A. Nichols, SPC Angela J. Selden, and SPC Sheena Lindsay.

5. To date, the Government is unaware of any written direction, guidance or policy regarding barracks visitation in effect for the time period of 17 April 2006 to 20 July 2006.

6. A complete copy of the sworn statement by CW2 Linda L. Oliver, dated 5 August 2006, which is in possession of the Government, was provided to the Defense on 16 October 2006.

7. A complete copy of the sworn statement made by SPC Lydia B. Edwards, dated 2 August 2006, which is in possession of the Government, was provided to the Defense on 16 October 2006.

**Attachment Q**

CJTF-76-SJA-MJ
SUBJECT: Defense Request for Assistance in Securing Information

8. The thumb drives seized during the AR 15-6 investigation into allegations of misconduct against MAJ. Fredrick M. Gamble are in possession of the Government and available for inspection by the Defense at the Kandahar Legal Office, Building 245, Kandahar Airfield, Afghanistan, APO AE 09355. POC for coordinating inspection of this evidence is MAJ Daniel Collins, Command Judge Advocate, U.S. National Command Element.

9. SPC Lydia B. Edwards was promoted to the rank of Specialist (E4) on 24 September 2006.

JOHN L. CALCAGNI III
CPT, JA
Chief of Military Justice

DISTRUBUTION:
CPT Mark A. Kerr (1)
Mr. David Brash, Civilian Counsel (1)

Attachment 19



**DEPARTMENT OF DEFENSE**
HEADQUARTERS, 219TH AREA SUPPORT GROUP
COMBINED/JOINT TASK FORCE (CJTF)-76
BAGRAM AIRFIELD, AFGHANISTAN
APO AE 09354

REPLY TO
ATTENTION OF:

CJTF-76-BASEOPS-DCO                                    7 September 2006

MEMORANDUM FOR Major Frederick M. Gamble, Headquarters and Headquarters Company, Combined/Joint Task Force (CJTF)-76, Bagram Airfield, Afghanistan APO AE 09354

SUBJECT: Article 32b Investigation

1. On 20 September 2006 at 0930 hours at Kandahar Airfield, Afghanistan (Building TBD), I will conduct an investigation pursuant to Article 32b, UCMJ, to investigate the facts and circumstances concerning the charges preferred against you on 19 August 2006. The charges allege that you committed the offenses of failure to obey a lawful order or regulation, cruelty and maltreatment, conduct unbecoming an officer and a gentleman, adultery, indecent assault, and fraternization.

2. You have the right to be present during the entire investigation. Additionally, you have the right to be represented at all times during this investigation by a legally qualified counsel. Such counsel may be a civilian lawyer of your own choice, provided at no expense to the United States; a qualified military lawyer of your selection, if reasonably available; or a qualified military counsel detailed by the Trial Defense Service. There is no cost to you for military counsel. You also have the right to waive representation by counsel. Submit your decision to me by 11 September 2006.

3. The names of witnesses known to me, who will be asked to testify at the hearing are as follows:

   a. CSM Robert Averett, National Command Element, Kandahar Airfield, Afghanistan;

   b. MAJ Robert Barr, National Command Element, Kandahar Airfield, Afghanistan;

   c. 1SG Ronald Braun, National Command Element, Kandahar Airfield, Afghanistan;

   d. SFC Sherry Butters, National Support Element, Kandahar Airfield, Afghanistan;

   e. SPC Joyce Dean, National Support Element, Kandahar Airfield, Afghanistan;

   f. PFC Lydia Edwards, National Command Element, Kandahar Airfield, Afghanistan

CJTF-76-BASEOPS-DCO
SUBJECT: Article 32b Investigation

g. SPC Diana Chester, National Command Element, Kandahar Airfield, Afghanistan;

h. MSG Pamela Harrington, National Support Element, Kandahar Airfield, Afghanistan;

i. SPC Tonya James, National Support Element, Kandahar Airfield, Afghanistan;

j. SGT Keith Steven, National Command Element, Kandahar Airfield, Afghanistan;

k. MAJ Charles Knowles, National Command Element, Kandahar Airfield, Afghanistan;

l. MAJ Richard Koch, National Command Element, Kandahar Airfield, Afghanistan;

m. SPC Sheena Lindsey, National Command Element, Kandahar Airfield, Afghanistan;

n. MAJ William Luce, MNB;

o. PFC Karla Moses, National Command Element, Kandahar Airfield, Afghanistan;

p. SGT Robin Munnlyn, National Support Element, Kandahar Airfield, Afghanistan;

q. MAJ Kelly Nichols, National Support Element, Kandahar Airfield, Afghanistan;

r. CW2 Linda Oliver, National Support Element, Kandahar Airfield, Afghanistan;

s. LTC David Osborn, MNB, 841-7906

t. MAJ Chad Parker, National Command Element, Kandahar Airfield, Afghanistan;

u. SSG Robert Parrish, National Command Element, Kandahar Airfield, Afghanistan;

v. MAJ Katrina Pillow, National Support Element, Kandahar Airfield, Afghanistan;

w. SGT Peggy Prado, National Support Element, Kandahar Airfield, Afghanistan;

x. SFC John Ramsey, National Command Element, Kandahar Airfield, Afghanistan;

y. CPT Elecon Reformado, National Command Element, Kandahar Airfield, Afghanistan;

z. MAJ Jeffrey Roach, National Command Element, Kandahar Airfield, Afghanistan;

aa. 1LT Randall Russell, National Support Element, Kandahar Airfield, Afghanistan;

bb. SPC Angela Selden, National Support Element, Kandahar Airfield, Afghanistan;

cc. SGT Lisa Thompson, National Support Element, Kandahar Airfield, Afghanistan;

CJTF-76-BASEOPS-DCO
SUBJECT: Article 32b Investigation

    dd. LTC Michael Thompson, National Command Element, Kandahar Airfield, Afghanistan;

    ee. SPC Matoyia Tolliver, National Support Element, Kandahar Airfield, Afghanistan;

    ff. SSG Jaqueline Tyson, National Command Element, Kandahar Airfield, Afghanistan;

    gg. MAJ Frank Veith, National Command Element, Kandahar Airfield, Afghanistan;

4. I will also consider and examine the documents attached and forwarded with the Charges and Specifications.

5. As investigating officer, I will try to arrange for the appearance of any witness that you want to testify at the hearing. Please submit the names, telephone numbers, and addresses of such witnesses to me no later than 11 September 2006. If, at a later time, you identify additional witnesses you wish for me to examine, inform me of their names, telephone numbers, and addresses.

6. The uniform for this hearing is ACU's.

7. You may reach me through the Office of the Staff Judge Advocate, Combined/Joint Task Force (CJTF)-76, ATTN: CPT Calcagni at 318-231-3007.

CHARLYNN V. SAGUID
LTC, SC
Investigating Officer

# Privacy Act Statement

Pursuant to 10 U.S.C. 3013 and Army Regulation 15-6, we request this information. This information will be used to evaluate the facts and circumstances currently under investigation. Your response is not mandatory. However, your failure to respond will require that we evaluate this matter without the benefit of your input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files.

# Affidavit

I, _Michael Thompson_ have read or have had read to me this Privacy Act Statement. I fully understand the contents of the entire statement.

_____
(Signature of Person Making Statement)

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _6_ day of _Aug_ , 200_6_ at _____
_Kandahar Airfield, Afghanistan_

_____
(Signature of Person Administering Oath)

_Gary W. Thomas_
(Type name of Person Administering Oath)

_KAF BASEOPS Cdr / IO_
(Authority to Administer Oath)

Attachment 15

# Privacy Act Statement

Pursuant to 10 U.S.C. 3013 and Army Regulation 15-6, we request this information. This information will be used to evaluate the facts and circumstances currently under investigation. Your response is not mandatory. However, your failure to respond will require that we evaluate this matter without the benefit of your input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files.

# Affidavit

I, _FRANK L. VEITH JR_ have read or have had read to me this Privacy Act Statement. I fully understand the contents of the entire statement.

_____
(Signature of Person Making Statement)

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _4_ day of _Aug_ , 20_06_ at _Kandahar Airfield, Afghanistan_ .

_____
(Signature of Person Administering Oath)

_Gary W. Thomas_
(Type name of Person Administering Oath)

_USF BASTI/S Cdr/IO_
(Authority to Administer Oath)

# Privacy Act Statement

Pursuant to 10 U.S.C. 3013 and Army Regulation 15-6, we request this information. This information will be used to evaluate the facts and circumstances currently under investigation. Your response is not mandatory. However, your failure to respond will require that we evaluate this matter without the benefit of your input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files.

# Affidavit

I, _Robert C. Barr_ have read or have had read to me this Privacy Act Statement. I fully understand the contents of the entire statement.

_____
(Signature of Person Making Statement)

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _4_ day of _Aug_, 200_6_ at _Kandahar Airfield, Afghanistan_

_____
(Signature of Person Administering Oath)

_Gary W. Thomas_
(Type name of Person Administering Oath)

_KAF BASEOPS Cdr / IO_
(Authority to Administer Oath)

*Attachment 17*

# Privacy Act Statement

Pursuant to 10 U.S.C. 3013 and Army Regulation 15-6, we request this information. This information will be used to evaluate the facts and circumstances currently under investigation. Your response is not mandatory. However, your failure to respond will require that we evaluate this matter without the benefit of your input. This information will be used in determining the appropriateness of any action, including adverse administrative action. Department of Defense employees, acting within their official capacity, who have a need to know this information, will have access to this information. This information may be used as the basis for adverse personnel action, and documents reflecting this information and such action may be filed in your official personnel files.

# Affidavit

I, William J. Luce Jr, have read or have had read to me this Privacy Act Statement. I fully understand the contents of the entire statement.

_____
(Signature of Person Making Statement)

Subscribed and sworn to before me, a person authorized by law to administer oaths, this 6 day of ___, 2006 at
Kandahar Airfield, Afghanistan

_____
(Signature of Person Administering Oath)

Gary W. Thomas
(Type name of Person Administering Oath)

KAF BASEOPS Cdr /IO
(Authority to Administer Oath)